No. 21-2017 (L)

**In the
United States Court of Appeals
for the Fourth Circuit**

**MARYLAND SHALL ISSUE, *et al.*,**
Plaintiffs-Appellants

v.

**LAWRENCE HOGAN, *et al.*,**
Defendants-Appellees

On Appeal from the United States District Court
for the District of Maryland
No. 1:16-cv-03311-ELH (Hon. Ellen L. Hollander)

**JOINT APPENDIX VOLUME II**
**JA0480-JA0933**

Cary J. Hansel, III
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd.
Ste. C #1015
Baltimore, MD 21234
Phone: 301-873-3671
m.pennak@me.com

Counsel for Appellants

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
Connor M. Blair
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Counsel for Appellant Atlantic Guns, Inc.

# JOINT APPENDIX TABLE OF CONTENTS

| District Court Docket No.: | Description | Joint Appendix Page: |
|---|---|---|
| **VOLUME I: JOINT APPENDIX** | | |
| | U.S. District Court District of Maryland (Baltimore) Civil Docket for Case #: 1:16-cv-03311-ELH | JA0001 |
| 14 | Amended Complaint | JA0020 |
| 34 | Memorandum and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Amended Complaint | JA0043 |
| 54 | Order Granting Plaintiff's Motion to Compel/Local Rule 104.7 and 104.8 | JA0073 |
| 125 | Defendants' Motion for Summary Judgment | JA0075 |
| 125-2 | Exhibit 2: Md. Code Ann., Pub. Safety § 5-117.1 | JA0077 |
| 125-3 | Exhibit 3: Testimony of Daniel W. Webster in Support of H.B. 294 | JA0083 |
| 125-4 | Exhibit 4: U.S. General Accounting Office, Firearms Purchased from Federal Firearm Licensees Using Bogus Identification, GAO–01–427 (2001) | JA0089 |
| 125-5 | Exhibit 5: Testimony of James W. Johnson (Mar. 1, 2013) | JA0112 |
| 125-6 | Exhibit 6: Testimony of Anthony W. Batts (Feb. 6, 2013) | JA0118 |
| 125-7 | Exhibit 7: Declaration of Captain Andy Johnson | JA0121 |
| 125-8 | Exhibit 8: Code of Maryland Regulations (COMAR) 29.03.01.26—.41 | JA0225 |
| 125-9 | Exhibit 9: Declaration of First Sergeant Donald Pickle | JA0234 |
| 125-10 | Exhibit 10: Declaration of Captain Andrew Rossignol | JA0238 |
| 125-11 | Exhibit 11: Declaration of Daniel W. Webster, ScD | JA0251 |
| 125-12 | Exhibit 12: Second Supplemental Declaration of Daniel W. Webster, ScD | JA0412 |
| **VOLUME II: JOINT APPENDIX** | | |
| 125-13 | Exhibit 13: Declaration of Captain James Russell | JA0480 |
| 125-14 | Exhibit 14: Declaration of James W. Johnson | JA0488 |
| 125-15 | Exhibit 15: Excerpts of deposition transcript of Gary Kleck | JA0495 |
| 125-16 | Exhibit 16: Declaration of Mary Scanlan | JA0498 |
| 133 | Motion to Strike Opinions of Defendants' Experts James Johnson, James Russell, and Daniel Webster | JA0501 |
| 133-2 | Exhibit 1: Deposition of James Johnson | JA0516 |
| 133-3 | Exhibit 2: Deposition of James P. Russell, Jr. | JA0535 |
| 133-4 | Exhibit 3: Deposition of Daniel Webster, Ph.D. | JA0542 |
| 133-5 | Exhibit 4: Supplemental Declaration of Gary Kleck | JA0555 |
| 135 | Plaintiffs' Cross-Motion for Summary Judgment | JA0590 |
| 135-2 | Exhibit 1: Declaration of Stephen Schneider (redacted) | JA0592 |

i

| 135-3 | Exhibit 2: Declaration of Mark W. Pennak, President, Maryland Shall Issue, Inc. | JA0595 |
|---|---|---|
| | Exhibit A: October 2013 Comments of MSI and of its Directors and Officers on Proposed Weapons Regulations | JA0608 |
| | Exhibit B: Maryland State Police Advisory regarding Alternative Ammunition for HQL Live Fire Training Component dated November 17, 2017 | JA0631 |
| | Exhibit C: Montgomery County, Maryland Department of Police Weapons Law Summary | JA0632 |
| 135-4 | Exhibit 3: Excerpts of the Deposition of Susan Brancato Vizas | JA0634 |
| 135-5 | Exhibit 4: Excerpts of the Deposition of Deborah Kay Miller | JA0644 |
| 135-6 | Exhibit 5: Excerpts of the Deposition of Daniel Webster, Ph.D. | JA0661 |
| 135-7 | Exhibit 6: Excerpts of the Deposition of Andy R. Johnson | JA0700 |
| 135-8 | Exhibit 7: Excerpts of the Deposition of James Johnson | JA0735 |
| 135-9 | Exhibit 8: Excerpts of the Deposition of James P. Russell, Jr. | JA0748 |
| 135-11 | Exhibit 10: Md. Code Ann., Pub. Safety § 5-118(b)(3)(x) (2003) | JA0772 |
| 135-12 | Exhibit 11: Excerpts of the Deposition of Diane S. Armstrong | JA0775 |
| 135-13 | Exhibit 12: J. Joseph Curran, *A Farewell to Arms: The Solution to Gun Violence in America* (October 20, 1999) | JA0800 |
| 135-14 | Exhibit 13: Senate Bill 281 – Enrolled Firearm Safety Act of 2013 | JA0863 |
| 135-15 | Exhibit 14: Defendant William M. Pallozzi's Third Supplemental Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories | JA0925 |
| VOLUME III: JOINT APPENDIX | | |
| 135-16 | Exhibit 15: Licensing Division Weekly Report 1/1/2018-1/4/2018, Licensing Division Weekly Report 12/28/2014-12/31/2014 & Licensing Division Weekly Report 12/23/2016-12/31/2016, respectively. | JA0934 |
| 135-17 | Exhibit 16: Excerpts of the Deposition of Dana J. Hoffman | JA0947 |
| 135-18 | Exhibit 17: Excerpts of the Deposition of Mark W. Pennak | JA0959 |
| 135-19 | Exhibit 18: LiveScan HQL Fingerprinting Costs as of 12/2/2017 | JA0967 |
| 135-20 | Exhibit 19: Excerpts of the Deposition of Stephen Schneider, Corporate Designee | JA0971 |
| 135-21 | Exhibit 20: Defendant William Pallozzi's Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories | JA0974 |
| 135-22 | Exhibit 21: Administrative Log | JA0996 |
| 135-23 | Exhibit 22: Maryland Crime Statistical Data | JA1195 |
| 135-24 | Exhibit 23: Declaration of Carlisle Moody | JA1250 |
| | Attachment A: Excerpt of Expert Report of Carlisle Mood.  Data runs omitted. | JA1259 |
| 135-25 | Exhibit 24: Declaration of Gary Kleck | JA1286 |
| | Exhibit A: Expert Report of Gary Kleck | JA1295 |
| | Exhibit B: The Myth of Big-Time Gun Trafficking and the Overinterpretation of Gun Tracing Data | JA1367 |

| | VOLUME IV: JOINT APPENDIX | |
|---|---|---|
| 135-26 | Exhibit 25: Deposition of Scott Thomas Miller | JA1429 |
| 135-27 | Exhibit 26: Deposition of John Matthew Clark | JA1433 |
| 135-28 | Exhibit 27: Declaration of Connor M. Blair | JA1441 |
| 135-29 | Exhibit 28: Supplemental Declaration of Gary Kleck | JA1444 |
| 140-1 | Exhibit 17: Excerpts of deposition transcript of Daniel Webster | JA1479 |
| 140-2 | Exhibit 18: Supplemental Declaration of Daniel Webster | JA1485 |
| 140-3 | Exhibit 19: Third Supplemental Declaration of Daniel Webster | JA1494 |
| 140-4 | Exhibit 20: Excerpts of deposition transcript of Andy Johnson | JA1530 |
| 140-5 | Exhibit 21: Excerpts of deposition transcript of James Johnson | JA1551 |
| 140-6 | Exhibit 22: Excerpts of deposition transcript of Diane Armstrong | JA1560 |
| 140-7 | Exhibit 23: Excerpts of deposition transcript of Scott Miller | JA1568 |
| 140-8 | Exhibit 24: Excerpts of deposition transcript of John Clark | JA1582 |
| 140-9 | Exhibit 25: Excerpt of deposition transcript of Stephen Schneider, designee of Atlantic Guns | JA1595 |
| 140-10 | Placeholder for Exhibit 26 Filed Under Seal | JA1607 |
| 140-11 | Exhibit 27: Declaration of Lieutenant Padraic Lacy | JA1608 |
| 140-12 | Exhibit 28: Yearly Count of Firearm Transfer by Gun Type | JA1612 |
| 140-13 | Exhibit 29: Excerpts of deposition transcript of Captain James Russell | JA1614 |
| 140-14 | Exhibit 30: Excerpts of deposition transcript of Carlisle Moody | JA1618 |
| 140-15 | Exhibit 31: Supplemental Declaration of Mary Scanlan | JA1635 |
| 142-1 | Exhibit 1: Excerpts of deposition transcript of Daniel Webster | JA1637 |
| 145 | Defendants' Motion to Strike Opinions of Plaintiffs' Lay Witness Mark Pennak and Experts Gary Kleck and Carlisle Moody | JA1645 |
| 145-2 | Exhibit 1: Plaintiff Atlantic Guns, Inc.'s Rule 26(A)(2) Disclosures | JA1647 |
| 145-3 | Exhibit 2: Excerpts of deposition transcript of Carlisle Moody | JA1650 |
| 145-4 | Exhibit 3: Excerpts of deposition transcript of Gary Kleck | JA1667 |
| 150-1 | Exhibit 1: Email from Robert Scott to John Parker Sweeney and Ryan Dietrich re: Licensing Division FRS/HQL statistical data 2018-present | JA1684 |
| 150-2 | Exhibit 2: Letter from Dan Friedman, Counsel to the General Assembly, to Senator Brian Frosh re: Senate Bill 281, The "Firearm Safety Act of 2013" | JA1697 |
| 150-3 | Exhibit 3: Plaintiff Maryland Shall Issue's Answer to Defendant Lawrence Hogan's Interrogatories | JA1708 |
| 150-4 | Exhibit 4: Deposition of James Johnson | JA1716 |
| 151-1 | Exhibit 1: Plaintiff Maryland Shall Issue's Answer to Defendant Lawrence Hogan's Interrogatories | JA1720 |
| 151-2 | Exhibit 2: Prepared Testimony of Mark W. Pennak | JA1728 |
| 151-3 | Exhibit 3: Deposition of Carlisle Eaton Moody, Jr. | JA1740 |
| 151-4 | Exhibit 4: Richard Rosenfeld, *Documenting and Explaining the 2015 Homicide Rise: Research Directions* (June 2016) | JA1753 |
| 155-1 | Exhibit 4: Plaintiffs' Amended Rule 26(a)(1)(A) Disclosures | JA1760 |

iii

| | | |
|---|---|---|
| 156 | Memorandum Opinion (Motion to Strike) | JA1783 |
| 157 | Order (Motion to Strike) | JA1809 |
| 159 | Order (Cross-Motions for Summary Judgment) | JA1810 |
| 163 | Notice of Appeal | JA1811 |
| 171 | Redacted and Revised Memorandum Opinion (Cross-Motions for Summary Judgment) | JA1814 |
| VOLUME V: SEALED APPENDIX | | |
| 84 | Declaration of Stephen Schneider (Filed Under Seal) | JA1872 |
| 140-10 | Exhibit 26: Confidential Stipulation (Filed Under Seal) | JA1876 |
| 158 | Sealed Memorandum Opinion (Cross-Motions for Summary Judgment) | JA1879 |

# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,   *

    *Plaintiffs,*   *

    v.   *    Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN   *

    *Defendant.*   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DECLARATION OF JAMES P. RUSSELL, JR.

I, Capt. James P. Russell, Jr., under penalty of perjury, declare and state:

1.    I am a captain in the Maryland State Police. I am more than 18 years of age and am competent to testify, upon personal knowledge, to the matters stated below.

2.    I have been employed as a sworn officer by the Maryland State Police since 1997. During those 21 years, I served in a variety of state police units, including routine patrol, criminal investigations, domestic violence, firearms training, recruiting and field operations.

3.    In 2006, I successfully completed a two-week, 80-hour firearms instructor course and obtained my certification as a firearms instructor from the Maryland Police Training Commission.

4.    In 2006, I was assigned to the Maryland State Police Academy, where I was responsible for teaching criminal law and providing firearms training to incoming

1

trooper candidates. While at the academy, I provided firearms training to more than 300 trooper candidates.

5. In 2009, I was transferred to the licensing division of the Maryland State Police, where I assumed duties associated with licenses issued to private detectives, security guards and other special police. After that, I received further promotions and served in several other roles with the Maryland State Police until 2016, when I was appointed to my current position of commander of the Automotive Safety Enforcement Division.

6. Since I left the academy in 2009, I have continued to perform firearms training for hundreds of Maryland State Police sworn officers. These semi-annual, eight-hour training sessions are designed to ensure that the officers meet Maryland Police Training Commission standards for firearm safety.

7. During this training, officers fire at least 50 rounds of ammunition at various distances under my supervision. I conduct approximately 50 of these training sessions each year, qualifying approximately 150 officers per year.

8. In addition to my firearms training with sworn officers, I also provide firearms training to approximately 100 to 125 retired officers each year.

9. I also provide firearms training to citizens who are seeking a Maryland permit to wear and carry a handgun.

10. I have spent thousands of hours over the last 13 years teaching firearms safety training to hundreds of police candidates, sworn officers, retired officers and others.

2

11.     As part of this training, I have personally supervised these students fire thousands of live rounds of ammunition, and have explained and demonstrated to the students the safe way to load, unload, assemble, disassemble, clean, fire, transport and store handguns.

12.     In 2013, I became certified to teach the four-hour firearms safety training required under Maryland law to obtain a Handgun Qualification License ("HQL").  Since that time, I have provided the HQL training to Maryland citizens seeking to obtain an HQL and am familiar with the subject areas and topics covered by the HQL training.

13.     Based on my 21 years of law enforcement experience, and over 13 years of experience as a Maryland certified firearms instructor, it is my opinion that requiring HQL applicants to take the firearms safety training contemplated by § 5-117.1 of the Public Safety Article of the Maryland Code encourages responsible gun ownership and has numerous public benefits, including the prevention of accidental discharges of handguns.

14.     In my experience, prior to taking a training course, the vast majority of firearms safety students lack a sufficient working knowledge of a handgun to handle and operate it safely.

15.     I have personally witnessed firearms safety students engage in dangerous conduct on the firing range, including pointing loaded handguns in the direction of others, placing their fingers on the trigger of a loaded handgun at inappropriate times and failing to recognize that a round of ammunition can remain in the gun's firing chamber even after the magazine is removed.

3

16.     The four-hour firearm safety training that is required to obtain an HQL covers critical components of firearm safety, including State firearm law, home firearm safety, proper storage of handguns, and handgun mechanisms and operation.   It also requires that trainees demonstrate the safe operation and handling of a handgun.

17.     I believe that the HQL training's overview of State firearms law – including how to properly purchase or transfer a handgun, where a person is allowed to carry or transport a handgun, that a person may not store or leave a loaded firearm in a location where the person knew or should have known that an unsupervised child would gain access to the firearm, and that a person may not engage in a straw purchase of a regulated firearm – enhances knowledge of and compliance with State laws designed to promote public safety and reduce access of firearms to children and persons who are prohibited by law from possessing firearms.

18.     In addition, it is my opinion that the HQL training's instruction on handgun and firearm safety in the home – including discussion of access to minors, locking and storing of firearms, and use of safety devices such as secure lock boxes – reduces the risk that a minor or prohibited adult will gain access to firearms.  I believe that the risk of injury or death by gunshot is mitigated if gun owners are trained on the proper use and storage of firearms.

19.     It is also my opinion that the HQL training's required instruction on handgun mechanisms and operation – including cleaning and maintenance, proper loading and unloading of ammunition, and the differences between revolvers and semi-

4

automatic handguns – promotes safe handling and operation of firearms, which reduces the risk of accidental discharges and, thus, the risk of potentially fatal accidents.

20.     I also believe that the HQL training's requirement that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, promotes public safety.  In my experience, the proper use of a handgun is an acquired skill, and requiring that applicants demonstrate the hands-on safe operation and handling of a firearm helps reduce accidental discharges.

21.     Based on my training and experience, it is my opinion that the HQL training's  instruction on the proper handling and storage of firearms teaches responsible gun ownership, which reduces access of firearms to children in the home, and also reduces the likelihood of theft, thus, reducing access of firearms to criminals.  Many children who have brought firearms to school and other public spaces gained access to those firearms in the home.  It is my opinion that effective law enforcement is enhanced by reducing access of firearms to prohibited persons.

22.     The firearm safety training that previously was required under § 5-118 of the Public Safety Article of the Maryland Code, prior to the implementation of the Firearm Safety Act in October 2013, was completed by viewing a 45-minute video.  I have personally seen that video, and I am familiar with its contents.  The video training did not require applicants to demonstrate the safe operation and handling of a handgun.

5

23.    In contrast, the four-hour HQL training now mandated by Maryland law provides more thorough instruction on State firearms law, handgun and firearm safety in the home, and handgun mechanisms and operation, and has a verification component such that an instructor verifies that an applicant participated in the training.

24.    It is my opinion that the addition of the requirement that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, improves the effectiveness of the training by ensuring that applicants have handled a handgun and have demonstrated an ability to safely fire and clear the weapon.

25.    I believe that this is a significant step toward ensuring responsible and safe gun ownership.   In my opinion, merely watching a video describing how to fire a handgun is not sufficient training on the safe handling and operation of a handgun.

26.    I believe that the HQL's live, in-person classroom training is more effective than the former training given by video because it provides the students an opportunity to ask questions and receive feedback from the instructor.   In my experience, students tend to be more attentive in a classroom setting than they are watching a video.   A further benefit of the in-person training is that the instructor must verify that the student was present for and completed the course, whereas students watching a video may leave the room while the video is playing.

I declare and affirm under penalty of perjury that the foregoing is true and correct.

Date: _Aug 8, 2018_                    _____

                                       Capt. James P. Russell, Jr.,
                                       Maryland State Police

7

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,   *

     *Plaintiffs*,   *

     v.   *     Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN   *

     *Defendant*.   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>DECLARATION OF JAMES W. JOHNSON</u>

I, James W. Johnson, under penalty of perjury, declare and state:

1.    I am the former Chief of the Baltimore County Police Department. I am more than 18 years of age and am competent to testify to the matters stated below.

2.    I joined the Baltimore County Police Department as a cadet at the age of 20 in January 1979, and have held every sworn rank in the Department, including police officer, corporal, sergeant, lieutenant, captain, major, and colonel. I was Chief of the Police Department from May 31, 2007 until my retirement in January 2017. During my tenure as chief, the Baltimore County Police Department was the 20th largest police department in the United States.

3.    During the past 20 years, I have conducted hundreds of presentations on firearm safety, including trainings on the safe handling, cleaning, unlocking, securing, transporting, storing, and firing of firearms. Most recently, I provided in-service training on how to reduce accidental discharges and how to properly safeguard a service weapon.

1

Filed: 08/03/2022   Pg: 15 of 460

Doc: 25-2

USCA4 Appeal: 21-2017

4.    During my 39-year career in law enforcement, I have spent hundreds of hours handling various types of handguns.  Also, during my time as Chief and as a Chairman of the National Law Enforcement Partnership to Prevent Gun Violence, I have spent hundreds of hours studying firearms issues related to public safety.  Based on my experience and common sense, I have concluded that proper training in the storage, handling, and operation of firearms and the State's firearms laws is critical to public safety and reducing the negative effects of gun violence.  My expertise in these issues arises from my experience with the Baltimore County Police Department, hundreds of hours of research into issues related to gun violence, attendance at law enforcement meetings and conferences, and hundreds of conversations with other law enforcement officers regarding their experience.

5.    I understand that the plaintiffs in this lawsuit are challenging the HQL provision of the Firearm Safety Act, which requires that most Marylanders seeking to purchase, rent, or receive a handgun must first obtain an HQL.  I understand that in order to obtain an HQL most people must submit their fingerprints for a robust background check and receive four hours of firearm safety training, which includes demonstrating the safe operation of a handgun by safely firing one round of ammunition.

6.    I testified in front of the General Assembly in support of the HQL provision in the Firearm Safety Act.  My testimony centered on the critical importance of adopting a fingerprint requirement for the background investigation in order to obtain an HQL and the deterrent effect that the training requirement would have on straw purchases.

2

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 16 of 460

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 17 of 460

7.    For the reasons given in my testimony before the General Assembly and discussed below, it is my opinion that Maryland's HQL law will make Maryland safer by reducing access of handguns to criminals, minor children, and other persons not eligible to possess firearms; and reducing accidental discharges of handguns by ensuring that handgun owners have been properly trained on the safe handling and operation of a firearm.

8.    Requiring the submission of fingerprints allows for a more robust background investigation because it enables the Maryland State Police to positively identify an applicant for an HQL.  Based on my law enforcement experience and conversations with other law enforcement personnel, it is my opinion that an individual who has to render a set of fingerprints to obtain an HQL will be deterred from falsely identifying him or herself during the application process.  In contrast, a background investigation based solely on photographic identification can be defeated with false identification.

9.    As I testified in front of the General Assembly, obtaining a set of fingerprints is not an inconvenience for law-abiding Marylanders.  Based on my experience, however, it is my opinion that an individual who knows they have to render a set of fingerprints to obtain an HQL is less likely to engage in a straw purchase on behalf of a disqualified individual.  In my experience, individuals who have criminal intent are more concerned than law-abiding individuals about presenting their fingerprints to a law enforcement agency.

3

10.    I am aware that the four-hour firearm safety training that is required to obtain an HQL covers critical components of firearm safety, including State firearm law, home firearm safety, proper storage of handguns, and handgun mechanisms and operation.  It also requires that trainees demonstrate the safe operation and handling of a handgun.  This training encourages responsible gun ownership and has many public safety benefits.

11.    Based on my 39 years of law enforcement experience, it is my opinion that instructing individuals on State firearms laws concerning straw purchases will deter straw purchases in Maryland.  I am aware of cases in Baltimore County involving straw purchases of handguns for prohibited persons prior to the HQL law going into effect. Based on my law enforcement experience, it is my opinion that these straw purchasers would have been deterred if they had been required to comply with the HQL requirements of submitting their fingerprints and taking a four-hour firearms safety training that included an overview of State firearms law.

12.    Deterring straw purchases promotes public safety generally and also aids law enforcement because it reduces access of handguns to criminals, who in my experience are more likely to commit crimes of violence than individuals who are not disqualified from possessing a handgun.  Armed criminals pose significant risks of injury and death to law enforcement officers, who are charged with confronting and disarming armed criminals.

13.    During my 39 years of experience in law enforcement, I received and conducted numerous trainings on firearm safety and worked closely with firearms safety

4

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 19 of 460

trainers. Based on this experience, it is my opinion that certified firearm safety trainers will responsibly verify that HQL applicants who have attended firearm safety training have complied with all of the training requirements, including a demonstration of the safe operation and handling of a firearm.

14.     During my career in law enforcement, I was aware of numerous incidents of accidental discharges of handguns in Maryland, some of which were fatal, and responded to many such incidents involving police officers and private citizens. Many accidental discharges resulted from the individual pulling the trigger of a semiautomatic firearm without having realized that there was a round chambered in the weapon after the ejection of the magazine. It is my opinion that the HQL training requirement that a person demonstrate the safe firing of one round of live ammunition can prevent such accidental discharges because it teaches the operation of the weapon including how to clear the weapon after firing.

15.     In my experience as a law enforcement officer, training handgun owners on the proper storage of their handguns furthers public safety. I am aware of at least two instances in which minors accessed improperly-stored firearms within the home, brought the weapons to school, and discharged them at school. Proper storage also reduces the likelihood of theft, which reduces the diversion of guns to criminals and can deter gun violence.

16.     Proper training on the lawful transport of firearms also furthers public safety because it reduces the likelihood that individuals will improperly transport

5

firearms in their vehicles, for example transporting a loaded weapon in a glove box, which can lead to confrontations with law enforcement.

17.    I am aware that prior to the enactment of the HQL requirement, purchasers of handguns were required to view a video that, in my opinion, did not amount to training on the safe operation and handling of a firearm.  Based on my 39-year career in law enforcement, I do not consider merely watching a video to be training.  Proper training is done in a classroom setting with an instructor that involves hands-on experience and allows for dialogue between the instructor and the student, such that students can ask questions.  A further advantage of classroom training is that an instructor can verify that an individual attended the training, as opposed to watching a video, which cannot be verified.

18.    The addition of the training requirement that applicants demonstrate the safe firing of one round of ammunition also promotes public safety by ensuring that applicants have handled a handgun and demonstrated an ability to safety fire and clear the weapon.


I declare and affirm under penalty of perjury that the foregoing is true and correct.

Date: _Aug. 14.18_                    _James W Johnson_
                                      James W. Johnson

# EXHIBIT 15

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3

4      ------------------------------x

5      MARYLAND SHALL ISSUE, INC.,

6      et al.,

7                          Plaintiffs,

8       v.                              Civil Case No.

9      LAWRENCE HOGAN, et al.,          16-cv-3311-MJG

10                       Defendants.

       ------------------------------x

11

12

13                 Deposition of GARY KLECK

14                  Baltimore, Maryland

15                    May 18, 2018

16                    10:02 a.m.

17

18

19

20     Job No.:  190812

21     Pages:  1 - 52

22     Transcribed by:  Bobbi J. Fisher, RPR

Transcript of Gary Kleck
Conducted on May 18, 2018                        49

```
 1        A.    Yes.

 2        Q.    Do you have a carry permit?

 3        A.    No.

 4        Q.    All right.  Why don't we take a short

 5   break.

 6              (A brief recess was taken.)

 7   BY MR. SCOTT:

 8        Q.    Are you aware of whether the

 9   fingerprinting required by Maryland's HQL law --

10   the fingerprinting of applicants for an HQL enables

11   law enforcement to become aware when an HQL permit

12   holder becomes ineligible to possess a handgun?

13        A.    No.

14        Q.    Would you agree that the ability to

15   identify an HQL permit holder became disqualified

16   from possessing a handgun subsequent to receiving a

17   permit has potential public safety benefits?

18        A.    Yes.

19              MR. SCOTT:  I don't have any other

20   questions.

21              MR. SWEENEY:  All right.  We'll read and

22   sign.
```

# EXHIBIT 16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,    *

    *Plaintiffs,*    *

    v.    *    Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.,*    *

    *Defendants.*    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### DECLARATION OF MARY SCANLAN

I, Mary Scanlan, under penalty of perjury, declare and state:

1.    I am an executive associate in the Office of the Attorney General of Maryland.  I am over the age of 18 and am competent to testify, upon personal knowledge, to the matters stated below.

2.    Attached as Exhibit 3 to Defendants' Memorandum in Support of Motion for Summary Judgment is a true and correct copy of Testimony of Daniel W. Webster in Support of H.B. 294.

3.    Attached as Exhibit 4 to Defendants' Memorandum in Support of Motion for Summary Judgment is a true and correct copy of U.S. General Accounting Office, Firearms Purchased from Federal Firearm Licensees Using Bogus Identification, GAO-01-427 (2001).

4.    Attached as Exhibit 5 to Defendants' Memorandum in Support of Motion for Summary Judgment is a true and correct copy of Testimony of James W. Johnson (Mar. 1, 2013).

5.      Attached as Exhibit 6 to Defendants' Memorandum in Support of Motion for

Summary Judgment is a true and correct copy of Testimony of Anthony W. Batts (Feb. 6,

2013).

I declare and affirm under penalty of perjury that the foregoing is true and correct to the
best of my knowledge, information, and belief.


Date: _11/23/2020_____          *Mary Scanlan*
                                      _____
                                      Mary Scanlan

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 16-cv-3311-ELH** |
| ) | |
| **LAWRENCE HOGAN, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### Plaintiffs' Motion to Strike Opinions of Defendants' Experts
### James Johnson, James Russell, and Daniel Webster

Defendants rely upon the declarations of their proffered expert witnesses former Chief of the Baltimore County Police Department James Johnson (ECF 125-14), Maryland State Police Captain James Russell (ECF 125-13), and the declaration and second supplemental declaration of Bloomberg Professor Daniel Webster of the Bloomberg School of Public Health (ECF 125-11 & ECF 125-12, respectively) in support of their Motion for Summary Judgment. Chief Johnson's and Capt. Russell's opinions are not based upon sufficient facts or data. Professor Webster's opinions do not fit the facts of this case and are unreliable. Because Defendants may only rely upon admissible evidence in support of their motion for summary judgment, Defendants may not rely upon these inadmissible opinions. *E.g.*, *Mitchell v. Data General Corp*., 12 F.3d 1310, 1315–16 (4th Cir.1993) ("The summary judgment inquiry thus scrutinizes the [party's] case to determine whether the [party] has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof in his claim at trial."). Defendants' reliance on each of these opinions under Federal Rule of Civil Procedure 56 is improper. *See id*. Under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 56, Plaintiffs respectfully request that the Court strike from the record and preclude Defendants from relying upon the opinions in paragraphs 7–15, 17–18 of Chief Johnson's declaration ("Chief Johnson Decl."), paragraphs 13, 17–25 in Capt. Russell's

declaration ("Capt. Russell Decl."), paragraphs 8–20 in Professor Webster's declaration ("Webster Decl."), and paragraphs 5–8 in Professor Webster's second supplemental declaration ("Webster Supp. Decl.").

### A. James Johnson and James Russell

Under Federal Rule of Evidence 702(b), expert witness testimony is admissible only if "the testimony is based on sufficient facts or data." Under this Rule, "the trial judge is assigned the task of 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Zellers v. NexTech Northeast, LLC*, 533 F. App'x 192, 196 (4th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)). "[W]hen the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994); *see also, e.g.*, *Blake v. Bell's Trucking, Inc.*, 168 F. Supp. 2d 529, 533 (D. Md. 2001) ("A district court has a responsibility to ensure than an expert's opinion has an adequate basis in fact."); *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 470 & n.11 (D. Md. 2000) ("Speculation, guesswork and conjecture are not acceptable substitutes for facts and data.").

While trained experts commonly extrapolate from existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157–58 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). When determining whether to admit testimony, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. For example, the United States District Court for the Northern District of Texas excluded expert testimony when the expert witness conducted no survey, study, or analysis but instead "base[d] his opinion on

personal experience and attempt[ed] to use that personal experience to extrapolate [his conclusion]." *De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd*, No. 3:12-CV-01462, 2015 WL 12698060, at *2 (N.D. Tex. Jan. 21, 2015).

In the District of Maryland, "sufficient facts or data" requires that the expert witness possess comprehensive knowledge in his field of study and a complete understanding of the case itself. *See Elat v. Ngoubene*, 993 F. Supp. 2d 497, 510–11 (D. Md. 2014). In *Elat*, the plaintiff retained an expert witness to opine that she was the victim of human trafficking. *Id*. While preparing for her testimony, the expert witness interviewed the plaintiff and reviewed multiple pleadings, depositions, "more than 200 pages of documents produced in discovery," and "publications about human trafficking." *Id*. at 511. The expert witness's preparation was so comprehensive, the Court noted that there were few, if any, available documents that she failed to consider. *Id*. Thus, her opinions were "based on sufficient facts or data," and the Court refused to exclude her testimony. *Id*.

In *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911 (4th Cir. 2004), by contrast, the Fourth Circuit affirmed exclusion of expert testimony regarding the design of a product because the proposed expert had no training in the design of the product or familiarity with the product itself. *Id*. at 917. Because of his lack of experience, "his opinion [was] invalid" and properly excluded. *Id*. And, because the testimony was properly excluded, the proffering party was unable to prove its case, and "summary judgment on all claims was clearly proper." *Id*. at 918; *see also Stolting v. Jolly Roger Amusement Park, Inc.*, 37 F. App'x 80, 83 (4th Cir. 2002) (affirming the exclusion of expert testimony that was based on nothing more than "bare conclusions without reliable support").

The assertions in paragraphs 7–15 and 17–18 of Chief Johnson's declaration and paragraphs 13 and 17–25 of Capt. Russell's declaration are not based on sufficient data and are therefore inadmissible under Federal Rule of Evidence 702(b).

### 1. Chief James Johnson

Chief Johnson opines that proper firearm training—which he also opines the HQL requirements provide—is necessary to promote public safety in Maryland. *See* Chief Johnson Decl., ECF 125-14, at ¶¶ 14–18. Chief Johnson claims that the HQL requirement, including the fingerprint requirement and the four-hour firearm safety training, will reduce the access of handguns to ineligible people, the incidents of accidental discharge, and straw purchases. *Id.* ¶¶ 7–12. Chief Johnson believes that firearm safety instructors will verify that all applicants have complied with the HQL safety course requirements and are well-versed on firearm safety. *Id.* ¶ 13.

These opinions are mere beliefs that are not based on sufficient facts or data. As *ipse dixit*, they should be excluded. *E.g.*, *Kumho Tire*, 526 U.S. at 157–58. Although Chief Johnson claims to possess "an extensive amount of knowledge of local and national gun law," Johnson Dep., Ex. 1, at 14:7–18, his deposition testimony revealed numerous gaps in relevant knowledge and a dearth of statistical or empirical evidence in support of his positions. When asked whether he has facts or data to support his positions, Chief Johnson repeatedly answered, "no," "I do not know," or some variation thereof. For example:

- "I do not know" whether the Maryland State Police has issued guidelines, standards, or expectations to HQL safety instructors. Deposition of Chief Johnson ("Johnson Dep."), Ex. 1, at 33:22–35:3;

- "No, I do not" have "any facts or data that indicate on how many occasions [prohibited individuals] purchased handguns in Maryland prior to the Handgun Qualification License being initiated." *Id*. at 35:4–12;

- "No, I do not" have "data or information about incidents in which [prohibited] individuals have or have not been able to obtain handguns after the Handgun Qualification License." *Id*. at 35:14–18;

- "No" studies to support his opinion that firearm training deters straw purchasing. *Id*. at 41:4–7;

- "I do not possess" material indicating the number of accidental shootings in Maryland or nationwide and have not researched this topic. *Id*. at 51:17–52:8;

- "I have no data" on "how often firearms [or handguns specifically] are used defensively in Baltimore County." *Id*. at 85:4–86:6;

- "No" data on "how often homeowners have had to use handguns to protect themselves in their homes." *Id*. at 88:1–4;

- "No" data on "how often or what percentage of crime guns are handguns in Baltimore County" or "the percentage of handguns that are crime guns that are not illegally owned or possessed at the time they are used in crime" in Baltimore or Maryland. *Id*. at 90:6–20;

- "I have no information" on "whether or not handgun crimes in Baltimore County have decreased since the Handgun Qualification License went into effect." *Id*. at 91:9–13;

- "No" the Law Enforcement Partnership, the organization Chief Johnson chairs, has not recommended a permit-to-purchase scheme, a fingerprint requirement, or a training requirement. *Id*. at 16:15–18:17.

Chief Johnson anticipates that HQL trainers will effectively "weed out" those unqualified to obtain an HQL, though he "do[es] not know" whether the Maryland State Police has issued any written or oral guidance on the subject. *Id*. at 33:22–34:10. Nor does he have facts or data relevant to handgun ownership by impaired individuals prior to the initiation of the HQL requirement. *Id*. at 35:4–12.

Chief Johnson also lacks knowledge of crime causation and prevention. With respect to straw purchases, Chief Johnson "do[es] not possess statistics on the prevalence of false identification," *id*. at 23:6–14, and has no information on "whether or not the fingerprinting requirement has caught anyone who was a straw purchaser," *id*. at 25:10–16. Nor is he familiar with any studies illuminating the behavior of straw purchasers. *Id*. at 41:4–7. Despite strong opinions on the subject, Chief Johnson has no information on the prevalence of accidental gun injury and death in Maryland prior to the initiation of the HQL requirement. *Id*. at 50:9–13; 51:17–52:8. He has no data to demonstrate how often firearms are used defensively by citizens in Baltimore County. *Id*. at 85:18–86:6. Chief Johnson has no data with respect to the percentage of handguns that are illegally owned or possessed at the time they are used in criminal activity in Maryland. *Id*. at 90:8–20.

Chief Johnson offers a series of unsupported opinions devoid of statistical or empirical support. Despite the list of credentials stemming from his law enforcement background, Chief Johnson's opinions are nothing more than *ipse dixit* masquerading as "sufficient facts or data." Like the expert in *De Boulle*, Chief Johnson has conducted no empirical research but attempts to

use his professional resume to breach the gaps in knowledge and logic that were exposed during his deposition testimony. Unlike the expert witness in *Elat*, Chief Johnson has failed to demonstrate a comprehensive knowledge of the facts underlying this case or in his field of study relevant to the HQL requirement. His opinion testimony should be excluded because it is nothing more than his *ipse dixit*.

### 2. Captain James Russell

Capt. Russell opines that the HQL requirement encourages responsible gun ownership and public safety in Maryland. Capt. Russell Decl., ECF 125-13, at ¶¶ 13, 17. He believes that the HQL training requirement, by encouraging safe storage practices, reduces the risk that minors or prohibited adults will gain access to firearms or that eligible adults will accidentally discharge a firearm. *Id*. ¶¶ 18–21. Capt. Russell also opines that the HQL requirement's live-fire component improves the effectiveness of the training by requiring applicants to prove their ability to safely fire and clear a firearm. *Id*. ¶ 24.

Like Chief Johnson, Capt. Russell's opinions are not based on sufficient facts or data but are *ipse dixit* and should be excluded. Aside from his "13 years of being on a live firing range," Russell Dep., Ex. 2, at 11:8–14, Capt. Russell possesses little empirical knowledge to support his opinions on training civilians. He has never conducted research relevant to firearm use and its relationship to public safety. *Id*. at 20:19–22. Nor is he familiar with empirical research on whether the HQL training requirement actually reduces the occurrence of accidental firearms discharge. *See id*. at 93:7–18. Capt. Russell has no knowledge of whether the HQL training requirement has reduced the number of straw purchases in Maryland or the number of felons or disqualified people in possession of firearms. *Id*. at 136:5–17. And he has no data on whether the HQL training requirement has affected compliance with Maryland firearms storage law. *Id*. at 136:18–137:11.

Furthermore, Capt. Russell has no idea "how many accidental discharges occur[red] in Maryland either before or after the HQL requirement," and he has no idea how such a statistic may be obtained. *Id*. at 166:10–15. Despite his Maryland State Police work experience, Capt. Russell has little knowledge of whether the HQL training requirement serves its intended purpose. His opinions are nothing more than *ipse dixit* and should be excluded.

The opinions in paragraphs 7–15, 17–18 of Chief Johnson's declaration and paragraphs 13, 17–25 of Capt. Russell's declaration are not based on sufficient facts or data and thus are inadmissible. Capt. Russell's opinions are unsupported say-so and should be stricken.

## B. Daniel Webster

### 1. Professor Webster's opinions in paragraphs 8–20 of his declaration and paragraphs 5-8 of his second supplemental declaration do not fit the facts of this case.

Under *Daubert*, an expert's testimony must "fit" the facts of the case. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id*. (quotation omitted). Therefore, an expert's opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Relying on *Daubert*, the District of Maryland has held that an expert's opinion does not fit the facts of the case where his testimony is based upon circumstances outside the scope of the case itself. *See Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 502 (D. Md. 2000) (excluding an expert's testing on rollover propensity in large vehicles because his methods bore no relation to "real-world" circumstances and so "d[id] not measure what was at issue in the case").

Like in *Samuel*, Professor Webster's opinions do not fit the facts of this case. Professor Webster opines that the HQL requirement is an effective way to prevent: (1) straw purchases, or the diversion of guns for criminal purposes; (2) homicides; (3) suicides; and (4) serious injuries

-8-

and deaths to police officers. Webster Decl., ECF 125-11, at ¶¶ 8–20. Professor Webster claims that the fingerprinting and safety-training requirements will reduce the likelihood of false identifications at the point of purchase and the opportunity for would-be offenders to access loaded firearms. *Id*. ¶¶ 8–9 & 18–20. Professor Webster proffers research conducted in other states on the effect of so-called permit-to-purchase (or "PTP") laws. *See id*. ¶¶ 14–16. Specifically, Professor Webster relies heavily on Missouri's PTP law, which was repealed on August 28, 2007, and Connecticut's PTP law, which became effective October 1, 2015. *Id.* ¶¶ 15–16. Professor Webster's research allegedly revealed an upward trend in crime to correlate with the repeal of Missouri's PTP law and a significant reduction in Connecticut's firearm homicide rate over the first ten years its PTP law was in effect. *Id*. ¶¶ 14–16. Professor Webster relies on these studies to opine that PTP laws (like Maryland's HQL requirement) have a statistically significant effect on reducing gun violence. *Id*. ¶¶ 14–20.

But Professor Webster admits that the Missouri and Connecticut PTP laws have little in common with Maryland's HQL requirement. Professor Webster agrees that the PTP laws in Missouri, Connecticut, and Maryland are related only nominally in that all three require a permit to purchase a firearm. Deposition of Daniel Webster ("Webster Dep."), Ex. 3, at 189:9–13. The permit requirements in each state differ in critical ways. For example:

- ***Missouri (formerly Mo. Rev. Stat. § 571.090):*** According to Professor Webster, "there's only one common denominator between the Missouri PTP law and the HQL, and that's the requirement of a permit in order to purchase." Webster Dep., Ex. 3, at 179:18–180:1. Unlike Maryland, neither fingerprinting nor safety training was required prior to the issuance of a PTP in Missouri. *Id*. at 55:14–19. On this point, Professor Webster's research revealed no "special value to fingerprinting as opposed to the other elements of a PTP law in effect in [other] jurisdiction[s]." *Id.* at 184:16–188:9. And "Missouri required in-person appearance at a law enforcement agency, which Maryland does not." *Id*. at 56:6–9.

- ***Connecticut (Conn. Gen. Stat. Ann. §§ 29-28(b), 29-29):*** Connecticut, like Maryland, requires parties seeking a PTP to provide fingerprints and undergo a background check prior to issuance. But, unlike Maryland, "the fingerprinting requirement in Connecticut has

-9-

to be obtained through a law enforcement agency." Webster Dep., Ex. 3, at 45:6–13. Connecticut also requires a training course for PTP applicants, but Connecticut's required training is "an eight-hour course as opposed to a four-hour course." *See id*. at 44:15–20. And Connecticut requires photo identification on its permits to purchase, while Maryland does not. *Id*. at 56:16–18.

By analyzing these states' laws, and not Maryland's, Professor Webster relies upon data that does not fit the facts of this case. Because these studies relied upon by Professor Webster are so factually distinguishable, they tell us nothing about the potential effects of the HQL requirement. Professor Webster's opinions in his declaration do not fit the facts of this case and should be excluded.

Professor Webster's second supplemental declaration, and the opinions it advances, only exacerbate the divide between Professor Webster's opinions and the facts of this case. In apparent recognition of the flaws in his prior studies and testimony in this case, Professor Webster has "completed additional research studies" touching upon his prior testimony. ECF 125-12, at ¶ 4.

The first, according to Professor Webster, is an update of his own prior, fatally-flawed analysis of Missouri's repeal of its permit-to-purchase law. *See* Hasegawa RB, Webster DW, Small DS. *Bracketing the Comparative Interrupted Time-Series Design to Address Concerns about History Interacting with Group: Evaluating Missouri's Handgun Purchaser Law. Epidemiology* 2019 May; 30(3): 371-379 (the "Second Missouri Study"). ECF 125-12, at ¶ 5. The second, Daniel W. Webster, *et al.*, *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Criminology & Public Policy 171-212 (2020) (the "Fatal Mass Shooting Study"), purports to find that permit-to-purchase laws that require "either in person application with law enforcement *or* fingerprinting" (emphasis added) resulted in a 56% lower chance of fatal mass shootings. ECF 125-12, at ¶ 6. The third, Alexander D. McCourt, et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in Four States, 1985-2017*, 110 Am. J. of Public Health 10, 1546 (October

2020) (the "PTP study"), claims that permit-to-purchase laws in four states resulted in a dramatic decrease in firearm homicide and firearm suicide rates.[1] ECF 125-12, at ¶ 7.

Each of these studies, in addition to being flawed in their own individual way, cannot be relied upon because they are the product of manifest "data dredging," where a researcher identifies some non-causal associations (such as, for example, a coincidental uptick in firearm homicide rates the year after the repeal of a particular gun control law), and then continuously refines his research approach in an attempt to support a hypothesis that there is a causal relationship, usually by cherry-picking laws, or locations, or date ranges, to the exclusion of the larger body of available data. *See* Kleck Supp. Decl., Ex. 4, at ¶¶ 2–23. This approach is of no value to either a court or a legislative body, because it does not accurately analyze whether any particular gun control law is likely to have a salutary effect on violence in that jurisdiction. *Id.* It also fails to match the facts of this case, because its biased selection of data to utilize makes it inapplicable to the HQL requirement and its actual effects here.

Professor Webster's Second Missouri Study cherry-picks the state of Missouri, artificially restricts the date range analyzed, and makes no effort to explain why all the alleged increase in firearm crime happened *in one year* and then reverted to its pre-repeal rate. *Id.* at ¶¶ 20–36. In the Fatal Mass Shooting Study, Professor Webster cherry-picks which variables to control for (while ignoring nearly all actual confounding variables), cherry-picks what kind of mass shootings to include (and how to define them in terms of numbers of fatalities), cherry-picks which states to include in the study, and obscures whether fingerprinting *or* personally appearing at a law

---

[1] Professor Webster estimates that the repeal of Missouri's handgun purchaser licensing law was "associated" with a 47.3% increase in firearm homicide rates in this study. ECF 125-12, at ¶ 7. However, in the Hasegawa study, Webster and his colleagues estimated that the same repeal was "associated" with a 27% increase in firearm homicide rates. *Id.* at ¶ 5. No explanation is given for the enormous difference in the results of the two studies.

-11-

enforcement agency *or* perhaps both has the allegedly beneficial effect on fatal mass shootings. *Id*. at ¶¶ 12–23, 37–38. Finally, the PTP Study cherry-picks the date range it analyzes, the states it reviewed, and the factors and variables it would include in its so-called "synthetic control" methodology. *Id*. at ¶¶ 12–23, 55–56.

Even worse, in the PTP Study, Professor Webster could have compared the *actual* effect of the HQL requirement from 2013 to 2017 (data he had and that was within the date range of the rest of the study) to the effect of the Maryland 77R comprehensive background check in place from 1996, but he chose not to do so, instead comparing the 77R to Connecticut's purchasing license. *Id*. By ignoring Maryland-specific data during the 2013-2017 date range, Professor Webster avoided reporting that the firearm homicide rate surged in Maryland following implementation of the HQL requirement in 2013. *Id.* This problem is hinted at, but not addressed or resolved, in Defendants' MSJ. *See* ECF 125, at 22–23, n. 9 (claiming that "dramatic civil unrest prompted by actions taken by police are often followed by sharp increases in violent crime….") (citing Webster Decl., at 16). Not only does this study not fit the facts of this case, it actively and intentionally ignores the facts of this case to reach its forced conclusions.

Because these studies relied upon by Professor Webster are factually distinguishable, clearly the result of data dredging, and all ignore the actual effect of the HQL requirement during the relevant time period in Maryland, they tell us nothing about the potential effects of the HQL requirement. Professor Webster's opinions in his second supplemental declaration do not fit the facts of this case and should be excluded. *See, e.g*., *Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 98 (1st Cir. 2020) ("[T]he reliability bar cannot be met by an expert's self-serving assertion that his conclusions were derived by the scientific method; rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require

some objective, independent validation of the expert's methodology.") (citation and quotations omitted); *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 1007 (4th Cir. 2020) (Agee, J., concurring in part and dissenting in part) ("In fulfilling its gatekeeping function, a district court must conduct a preliminary assessment to determine whether the methodology underlying the expert witness' testimony is valid.") (quotation omitted).

### 2. Professor's Webster's opinions in paragraph 17 of his declaration are unreliable and fail to show a causal link between the HQL requirement and perceived public safety effects.

Professor Webster relies upon revised data in his declaration to support his opinion that the HQL requirement is "associated" with a "48 percent reduction in firearm homicide rates in [Maryland's] large urban counties." Webster Decl., ECF 125-11, at ¶ 17. Professor Webster bases this conclusion upon his own study, which had to be revised by an erratum because of incorrect data.[2] The revised data cannot provide a basis for a reliable causation opinion. As Professor Webster notes, the revised data purportedly shows an "association" between the HQL requirement and a 48% *decrease* in firearm homicide rates in Maryland's large urban counties, while simultaneously showing an "association" between the HQL requirement and a 28% *increase* in firearm homicide rates in Baltimore. Webster Decl., ECF 125-11, at ¶ 17. This formulation, *i.e.* relying on "associational" language, instead of the more precise "causal" or "effective" language, makes it obvious that Professor Webster is identifying no causal link between the HQL requirement and firearm homicide rates in Maryland. Rather, the HQL requirement was – coincidentally – in effect during a time period in which the Baltimore firearm homicide rate rose while the state-wide firearm homicide rate fell. *See, e.g., In re Lipitor (Atorvastatin Calcium)*

---

[2] Cassandra K. Crifasi, et al., *Association between firearm laws and homicide in large, urban U.S. counties, 95(3) Journal of Urban Health* 383–90 (2018).

-13-

*Marketing, Sales Practices and Products Liability Litigation*, 227 F. Supp. 3d 452, 482–83 (D.S.C. 2017) (association is not equivalent to causation, and does not create a genuine issue of material fact as to causation). Professor Webster fails to demonstrate (or even explicitly state) that the HQL requirement *caused* either of these effects. Furthermore, these two results that allegedly are "associated" with the HQL statute are contradictory: the *same* statute is associated with *both* an *increase* in homicides and a *decrease* of homicides *at the same time*. Professor Webster never explains the contradiction, simply claiming that the aftermath of the post-Freddie Gray riots in Baltimore caused the homicide rate there to increase dramatically, while failing to adduce any evidence that supports that claim. Because Professor Webster only identifies, at best, a correlative – and not causative – relationship between the HQL requirement and firearm homicide rates in Maryland, the Court should strike this opinion and preclude Defendants from relying upon it.

### Conclusion

For the foregoing reasons, this Court should strike from the record and preclude Defendants from relying upon the opinions contained in paragraphs 7–15 and 17–18 of Chief Johnson's declaration (ECF 125-14), paragraphs 13 and 17–25 in Capt. Russell's declaration (ECF 125-13), paragraphs 8–20 in Professor Webster's declaration (ECF 125-11), and paragraphs 5-8 in Professor Webster's second supplemental declaration (ECF 125-12).

Dated: January 27, 2021

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
T. Sky Woodward
James W. Porter, III
Marc A. Nardone
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, DC 20036
P: 202-719-8316
jsweeney@bradley.com

Cary Johnson Hansel, III
Hansel Law, P.C.
2514 North Charles Street
Baltimore, MD 21218
P: 301-461-1040
cary@hansellaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2021, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system, which will provide service to all counsel of record, who are registered CM/ECF users.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Counsel for Plaintiffs*

JA0515

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,     :

et al.,                         :

                                :   Case No:

          Plaintiffs            :   16-cv-3311-MJG

                                :

              -vs-              :   Pages 1 - 109

                                :

LAWRENCE HOGAN, in his          :

capacity of Governor of         :

Maryland, et al.,               :

                                :

          Defendants            :

------------------------------X


Deposition of James Johnson

Baltimore, Maryland

Tuesday, March 13, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  390081


MAGNA LEGAL SERVICES

(866) 624-6221

EXHIBIT
1



Page 14

1    that?

2         A.   I did not prepare the document.  However,

3    I was involved in dialogue with Ms. Katz on one or

4    more occasions over the last several months that I

5    believe was used to help identify the areas that I

6    could address.

7         Q.   All right.  This says you were a hybrid

8    fact and expert witness.  Can you tell me what that

9    means to you?

10        A.   I cannot help out with hybrid fact.  I do

11   believe, though, that I possess an extensive amount

12   of knowledge of local and national gun law, efforts

13   to address current state and federal laws that

14   regulate purchasing, possessing guns.

15             I have testified extensively on the gun

16   issue in Maryland's legislature.  I have written on

17   the topic for the past seven years and read

18   significant material related to the gun issue.

19        Q.   Do you have a list of your published

20   articles on the area of gun policy?

21        A.   No.

22        Q.   Do you have them with you in the box?



Page 16

1           We've addressed gun violence restraining

2    orders recently and provided detail of what, as an

3    organization, we felt was necessary.  Keep in mind

4    that organization, the gun partnership, represents

5    the nine leading and largest law enforcement

6    management organizations nationwide, so we speak on

7    behalf of those organizations.

8        Q.   All right.  And in terms of the training

9    that the Law Enforcement Partnership recommends for

10   would-be gun owners, you said there's no specific

11   hours that you recommend; is that correct?

12       A.   No, I don't recall actually placing a

13   number of hours.  It's more the skills, and it's up

14   to each state to decide what's reasonable.

15       Q.   And does the Law Enforcement Partnership

16   recommend a live fire component of such training?

17       A.   We have not addressed a live component

18   exercise.

19       Q.   Now, has the Law Enforcement Partnership

20   recommended fingerprinting prior to the purchase of

21   handguns?

22       A.   We have not addressed fingerprinting, but



Page 17

1    I would add that I strongly believe, as chairman of

2    the organization, both measures are reasonable

3    before one is issued, you know, license to purchase

4    a weapon.

5         Q.   By both measures are you saying

6    fingerprinting and training?

7         A.   I do believe that they are reasonable,

8    yes.

9         Q.   But there is no publication by the Law

10   Enforcement Partnership recommending fingerprinting?

11        A.   No.

12        Q.   And there's no publication by the Law

13   Enforcement Partnership recommending a permit to

14   purchase scheme; correct?

15             MS. KATZ:  Objection.

16             THE WITNESS:  I do believe you're going to

17   find documents in the file that indicate states that

18   have licensing training do show a decrease in gun

19   violence.  We have used Dan Webster's material

20   extensively to develop our position, his research.

21   BY MR. SWEENEY:

22        Q.   Well, what I'm asking, is there any



Page 18

1    publication by the Law Enforcement Partnership that

2    recommends a permit to purchase scheme prior to

3    handgun ownership?

4             MS. KATZ:  Objection as to form.

5             THE WITNESS:  Answer the question?

6             MS. KATZ:  Oh, sure.  Yes.  Sorry.

7             THE WITNESS:  I'm going to say no without

8    sitting down and going through each and every

9    document again.

10   BY MR. SWEENEY:

11        Q.   All right.  We'll give you an opportunity

12   to break to refresh your recollection by going

13   through your documents to see if you can find any

14   publication by the partnership that recommends a

15   permit to purchase, but as you sit here right now,

16   you can't think of anyone; correct?

17        A.   No.  No, sir.

18        Q.   Thank you.  So the subject matter that has

19   been set forth in Exhibit 36 for your testimony

20   starts with the requirements of the Handgun

21   Qualification License.  Are there any requirements

22   other than the training and fingerprinting that we



Page 23

 1    Maryland?

 2        A.    I can't recall seeing a report of an

 3    individual who used false identification to buy a

 4    weapon.  I have seen several reports of individuals

 5    who bought weapons under a straw purchasing scheme.

 6        Q.    We'll get to that in a moment, but let's

 7    focus now on false identification.  Other than these

 8    conversations you've had with gun squads, you have

 9    no information at all about false identification

10    purchase of handguns in Maryland; correct?

11            MS. KATZ:  Objection as to form.  You can

12    answer, if you can.

13            THE WITNESS:  I do not possess statistics

14    on the prevalence of false identification used.

15    BY MR. SWEENEY:

16        Q.    So you're not in a position to say that

17    the initiation of the HQL application fingerprinting

18    process in 2013 has made any difference on the

19    extent to which individuals are able to purchase

20    handguns with false identification in Maryland?

21            MS. KATZ:  Objection to the form.  You can

22    answer.



Page 25

1   adult life that individuals are very concerned about

2   the government possessing their fingerprints for

3   various reasons that they'll have to explain.

4       Q.   And that's true for all Maryland citizens;

5   correct?

6           MS. KATZ:  Objection as to form.  You can

7   answer, if you can.

8           THE WITNESS:  I can't answer that.

9   BY MR. SWEENEY:

10      Q.   Now, do we have any information as to

11  whether or not the fingerprinting requirement has

12  caught anyone who was a straw purchaser?

13          MS. KATZ:  Objection to form.  You can

14  answer.

15          THE WITNESS:  I don't possess that

16  information.

17  BY MR. SWEENEY:

18      Q.   All right.  Do you have any data on the

19  extent to which straw purchases of handgun occurred

20  in Maryland prior to the Handgun Qualification

21  License requirement being initiated?

22      A.   Yes.



Page 33

1    can answer, if you know.

2           THE WITNESS:  I don't know if they are

3    trained to.  I would hope, I would think that most

4    responsible gun owners that take the initiative to

5    be a trainer have pride in their work, and they

6    don't want to see someone that shouldn't have a

7    weapon obtain one.

8    BY MR. SWEENEY:

9        Q.   So, if an individual passes a NICS check,

10   passes the additional Maryland State Police

11   background check, including any incidence of

12   commitment to a mental institution or adjudication

13   of mental defectiveness, the Handgun Qualification

14   License you expect will weed out more individuals

15   based on mental incompetence because the instructors

16   in the training program will weed them out; is that

17   what you're saying?

18           MS. KATZ:  Objection.

19           THE WITNESS:  I do believe that's the

20   case, yes.

21   BY MR. SWEENEY:

22       Q.   And do you know if the Maryland State



Page 34

1    Police has issued any guidelines or standards for

2    the instructors to use in that regard?

3         A.   I do not know.

4         Q.   Do you know if there are any written

5    instructions that the instructors are expected to do

6    that with the individuals who they train?

7         A.   I do not know.

8         Q.   So do you have anything other than a hope

9    that this would occur to support your opinion that

10   the training will weed out such individuals?

11        A.   I've been around gun, guns, trainers,

12   educational range process for over 40 years, and

13   it's been my experience that individuals that take

14   the time and effort and the initiative to become

15   knowledgeable about weapons and go so far as to take

16   the additional step to become a trainer, which is

17   quite advanced, I would have confidence that that

18   individual would call someone out that obviously

19   suffered from an impairment or a condition that

20   alarmed them.  I do not think they would pass that

21   individual on.

22             I feel strongly about that.  I think they



Page 35

1    would.  I base that on my nearly 40 years of

2    experience dealing with weapons, firearms, ranges,

3    gun shops, gun shop owners.

4        Q.   Do you have any facts or data that

5    indicate on how many occasions such individual with

6    impairments or other conditions that make them

7    unsuitable to be a gun owner purchased handguns in

8    Maryland prior to the Handgun Qualification License

9    being initiated?

10            MS. KATZ:  Objection as to form, but you

11   can answer, if you know.

12            THE WITNESS:  No, I do not.

13   BY MR. SWEENEY:

14       Q.   And I take it you also don't have any such

15   data or information about incidents in which such

16   individuals have or have not been able to obtain

17   handguns after the Handgun Qualification License?

18       A.   No, I do not.

19       Q.   What do you understand the Handgun

20   Qualification License training program consists of

21   precisely?

22       A.   An overview of Maryland law regarding when



USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022      Pg: 52 of 460

Page 41

1   more significant in its scope and certainly

2   information when you're taught that by another

3   individual.

4       Q.   Do you have any studies of the behavior of

5   straw purchasers that would support your opinion in

6   this regard?

7       A.   No.

8       Q.   The second topic of testimony is

9   investigate the origins of firearms used in crime in

10  Baltimore County.  What information do you have

11  about the origins of firearms used in crime in

12  Baltimore County?

13      A.   We would track the use of firearms on a

14  regular, you know, yearly basis.  We determined

15  individual crimes, what type of weapon was used.  We

16  worked closely with ATF in tracing systems.  I was

17  instrumental in developing a gun squad in the

18  Baltimore County Police Department that tracked the

19  use of weapons and crimes of violence, illegal

20  purchasing of weapon, illegal purchases of

21  ammunition, and then actually targeting known

22  prohibited individuals that were believed to be or



Page 50

1    with the training that's offered under the Handgun

2    Qualification License?

3         A.    No.  In my notes I'm sure it details the

4    elements of the training.

5         Q.    All right.  Now, item 6 mentions training

6    on safe handgun use and storage practices can

7    prevent accidental gun injury and death; correct?

8         A.    Mm-hmm.

9         Q.    Do you have any information, any data on

10   the prevalence of accidental gun injury and death

11   prior to the initiation of the Handgun Qualification

12   License in Maryland?

13        A.    My data would be national.  Again, this is

14   an area that I could likely answer by taking

15   extensive time and conducting research into Maryland

16   specifically.  Across the nation today, it is

17   accepted that over 100,000 individuals are injured

18   either accidentally or in crimes of violence, 12,000

19   individuals killed by homicide.

20             The cost of firearms violence in America

21   today, there's a Police Executive Research Forum

22   Study that indicates in six cities alone in a



Page 51

1    one-month period of time the cost is $38 million as

2    a result of gun violence and accidental or suicide

3    by use of guns.  I believe this training could help

4    address one or more of those areas.

5         Q.   Can we try to pull apart your

6    understanding of the prevalence of accidental gun

7    injury and death as opposed to the other categories

8    of intentional criminal acts and suicide?

9         A.   I can tell you, as a police officer, I've

10   handled a number of accidental discharges involving

11   children and/or adults.  I'll bring your attention,

12   just last within the last 24 hours in Harford County

13   an individual cleaning his gun shot and killed

14   himself.  It's quite common.  It's quite frequent to

15   have accidental gun discharges.  Again, even amongst

16   police officers, it's not an infrequent event.

17        Q.   Can you point to any data that quantifies

18   quite common and quite frequent?  How many

19   accidental shootings are occurring each day, each

20   year in this country?

21        A.   I believe that material is available.  I

22   do not possess it.  Again, it would require



Page 52

1    research, time, and resources.

2        Q.    Which you have not done in advance of your

3    opinion in this case?

4        A.    No, sir.

5        Q.    All right.  And you also don't have any

6    such information specifically about Maryland;

7    correct?

8        A.    That's correct.

9        Q.    Item 7 of your testimony talks about the

10   live fire requirement.  We already discussed that.

11   Is there anything else about your opinion with

12   respect to the live fire requirement that you'd like

13   to address?

14       A.    Well, personally, I think just firing one

15   round is not adequate, but I do not think the

16   requirement to show proficiency in discharging a

17   round is unreasonable.  Again, I would draw your

18   attention to the process of actually chambering a

19   round, which is an exercise in and of itself.  And,

20   you know, the average individual that's new to guns,

21   I think, would struggle working that mechanism of

22   the weapon, and I'm sure that's a necessary



Page 85

1    30 seconds I could have prevented.  I just don't

2    know.

3    BY MR. SWEENEY:

4        Q.   All right.  Is it the case that Baltimore

5    County police cannot always respond and do not

6    always respond to reports of home invasions in

7    Baltimore County in time to prevent any harm

8    occurring to the homeowners and other lawful

9    occupants?

10           MS. KATZ:  Objection as to form, but you

11   can answer, if you know.

12           THE WITNESS:  I'm comfortable in stating

13   that there may be one or more cases where a

14   homeowner or individual was harmed because the

15   officer got there 5.20 seconds instead of three

16   minutes.  I suppose you could find a case like that.

17   BY MR. SWEENEY:

18       Q.   Do you have any data one way or the other

19   on that?

20       A.   No.  No.

21       Q.   Do you know how often firearms are used

22   defensively by citizens in Baltimore County?



Page 86

 1      A.   I have no data.

 2      Q.   All right.  And do you have any

 3  information on the extent to which handguns are used

 4  in self-defense in Baltimore County?

 5      A.   I have no data, but I'm aware of specific

 6  circumstances.

 7      Q.   Okay.  In your experience, are handguns

 8  used in self-defense more frequently than long guns

 9  in Baltimore County?

10      A.   Yes.

11      Q.   Can you estimate the percentage?

12      A.   I'd say probably 70 percent of the cases

13  handguns are used.

14      Q.   All right.  Is there any difference in the

15  Baltimore County's average response time for a home

16  invasion, a burglary, or a domestic violence event?

17          MS. KATZ:  Objection as to form, but you

18  can answer, if you know.

19          THE WITNESS:  Ask the question again.

20  BY MR. SWEENEY:

21      Q.   Sure.  We talked about you thought it was

22  about a four-minute average response time for a



Page 88

1        Q.    Do you have any data on how often

2    homeowners have had to use handguns to protect

3    themselves in their homes?

4        A.    No.

5        Q.    Do you believe the constitution protects

6    the right of law abiding citizens to engage in armed

7    self-defense in the home?

8              MS. KATZ:   Objection as to form.   You can

9    answer.

10             THE WITNESS:   I believe state law allows

11   one to protect themselves in their home, yes.

12   BY MR. SWEENEY:

13       Q.    All right.   And you don't have an opinion

14   one way or the other what the constitution provides?

15             MS. KATZ:   Objection.

16             THE WITNESS:   No.

17   BY MR. SWEENEY:

18       Q.    All right.   Do you ever swear an oath to

19   uphold the constitution?

20       A.    I have.

21       Q.    All right.   And do you have any

22   understanding what the Second Amendment comprises?



Page 90

1    any greater need to defend themselves with handguns

2    in the home than law abiding citizens?

3        A.   No.

4            MS. KATZ:  Objection as to form.

5    BY MR. SWEENEY:

6        Q.   I think we talked generally about the

7    frequency that handguns are used in crime in

8    Baltimore County.  Do you have any data with respect

9    to how often or what percentage of crime guns are

10   handguns in Baltimore County?

11       A.   No.

12       Q.   And do you have any data on the percentage

13   of handguns that are crime guns that are not

14   illegally owned or possessed at the time they are

15   used in crime?

16       A.   In Baltimore County?

17       Q.   Yes.

18       A.   No.

19       Q.   How many in Maryland generally?

20       A.   Not in Maryland, no.

21       Q.   Do you have any information about how many

22   Baltimore County officers were shot by legally



Page 91

1    purchased handguns?

2         A.    Yes.  It's not in the file, but those are

3    records that are retrievable.

4         Q.    All right.  As you sit here today, do you

5    have any recollection of how often Baltimore County

6    police officers have been shot by legally purchased

7    handguns?

8         A.    I'm aware of four incidents.

9         Q.    Do you have any information as to whether

10   or not handgun crimes in Baltimore County have

11   decreased since the Handgun Qualification License

12   went into effect?

13        A.    I have no information.

14        Q.    Or for Maryland statewide do you know

15   whether or not handgun crimes have decreased since

16   the HQL went into effect?

17        A.    No.

18             MR. SWEENEY:  Why don't we take another

19   break.

20             MS. KATZ:  Okay.

21             (Whereupon, a lunch recess was taken from

22   12:12 to 12:57 p.m.)



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

-------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :   Case No:

          Plaintiffs             :   16-cv-3311-MJG

                                 :

          -vs-                   :   Pages 1 - 205

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

          Defendants             :

-------------------------------X


Deposition of James P. Russell, Jr.

Baltimore, Maryland

Monday, June 11, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409351


MAGNA LEGAL SERVICES

(866) 624-6221



JA0535

Page 11

1    among whom?

2        A.   Maryland State Police.  Sworn personnel

3    within the Maryland State Police.  Sorry about that.

4        Q.   That's okay.  Just trying to clarify for

5    the record.  Now, were you asked to provide any

6    written report?

7        A.   Yes, sir.

8        Q.   All right.  And in addition to being a

9    firearms instructor and a law enforcement officer,

10   do you have any other areas of expertise that are,

11   pertain to the opinions you're going to give in this

12   case?

13       A.   To just do my 13 years of being on a live

14   firing range, as well as -- when you say my other

15   instructor certifications, dealing with anything

16   outside the realm of firearms?

17       Q.   Yes.

18       A.   I can start listing those off as well, and

19   I provided those, I believe, to AG Katz in regard to

20   my certifications as a Maryland State Police

21   defensive tactics instructor.

22       Q.   Okay.



Page 20

1    that support your written report which we've marked

2    as Exhibit 126?

3            MR. SCOTT:  Objection to form.  You can

4    answer.

5            THE WITNESS:  In regards to authorities?

6    BY MR. SWEENEY:

7       Q.   Yes.

8       A.   And public safety laws?

9       Q.   Maryland law.  Any authority you're

10   relying on other than what we've already marked and

11   talked about this morning.

12           MR. SCOTT:  Objection.  You can answer,

13   unless I tell you not to.  Go ahead and answer.

14           THE WITNESS:  Yes, sir.  Just due to my

15   prior training and experience in regards to Maryland

16   law and Maryland statute in regard, as well as

17   public safety.

18   BY MR. SWEENEY:

19      Q.   All right.  Have you, yourself, conducted

20   any kind of study regarding firearm use and its

21   relationship to public safety?

22      A.   I've never conducted any studies, no, sir.



Page 93

1    another set of eyes and ears.

2         Q.   And do you have any information on how

3    many individuals qualified for the training required

4    by the 77R by taking an NRA pistol course or similar

5    course as opposed to the online video?

6         A.   No, sir, I'm not.

7         Q.   Do you know if anybody has done any study

8    about whether or not any individuals who took only

9    the online video as opposed to having taken one of

10   the other courses of instruction like the NRA pistol

11   course have any different outcome in terms of

12   accidental discharge or safe use of firearms?

13        A.   I'm not familiar with any studies, but I

14   can just tell you through my time on the range and

15   watching the live fire and also the portions that we

16   talk about for the firearm safety is that there's a

17   lot of issues that get uncovered at that range when

18   they started dealing with the weapon.

19        Q.   Now, the vast majority of your experience

20   as a firearms instructor is with law enforcement

21   officers, primarily Maryland State Police and also

22   retired law enforcement officers; correct?



Page 136

1   have accidental shootings; correct?  We talked about

2   that?

3       A.   Yes, there's been accidental shootings

4   among the sworn personnel and LEOSA.

5       Q.   And do you have any information or data

6   that the HQL training has reduced the number of

7   straw purchases in Maryland?

8       A.   No, sir, I do not have any information.

9       Q.   Do you have any information about whether

10  the HQL training has reduced the number of convicted

11  felons in possession of handguns in Maryland?

12      A.   No, sir, I don't have that information.

13      Q.   Do you have any information about whether

14  the HQL training has reduced the number of

15  disqualified persons in possession of handguns in

16  Maryland?

17      A.   No, sir.

18      Q.   Do you have any information on whether the

19  training has had any effect on compliance with

20  Maryland firearms storage law?

21      A.   No, sir, I don't have any data, but I can

22  go back, once again, and talk about the experiences



Page 137

1    that I've had on the range and in the classroom

2    setting in regards to the questions that are being

3    presented that fulfills that portion of it, the

4    safety portion of it, that they wouldn't have

5    received in a video and follow-up questions.

6            Like I said, I'll use the example of

7    helping obtain a safe, you know.  I'll lead them to

8    Cabela's, the safes that I think are most

9    appropriate for the amount of weapons that they are

10   using and stuff like that.  That wouldn't be, you

11   know, they don't have that information on the video.

12       Q.   And that's based solely on the feedback

13   you get from questioning by your students in your

14   HQL classes?

15       A.   Just as a result of, correct, it would be

16   in there in person.

17       Q.   And do you provide quizzes to your

18   students in your classes on the HQL?

19       A.   Quizzes, no, sir.

20       Q.   Any other test of their learning in the

21   classroom?

22       A.   Just like I said, sender/receiver



JA0540

Page 166

1    of a big pick-up truck.  We were working on the

2    vehicles, and I was standing outside of it when it

3    went off, outside the vehicle when it went off.  So

4    that's one I did observe.  My ears are still

5    ringing.

6         Q.   I understand.  Have you or any member of

7    your family ever been personally affected by gun

8    violence or the victim of any type of gun crime?

9         A.   No, sir.

10        Q.   You don't have any idea how many

11   accidental discharges occur in Maryland either

12   before or after the HQL requirement, do you?

13        A.   No, sir, I do not.  I don't know how you'd

14   track that.  Good question.  How many happened at a

15   range?

16        Q.   I have no idea.  I got your two-page

17   summary that said you were telling me there was a

18   reduction.  I don't know how you track it.  You

19   agree with me that pretty much would be impossible

20   to track, don't you?

21             MR. SCOTT:  Objection.

22             THE WITNESS:  I wouldn't say it's



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

-------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :   Case No:

        Plaintiffs               :   16-cv-3311-MJG

                                 :

            -vs-                  :   Pages 1 - 337

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

        Defendants               :

-------------------------------X




        Deposition of Daniel Webster, Ph.D.

              Washington, D.C.

          Wednesday, June 13, 2018




Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409352


        MAGNA LEGAL SERVICES

          (866) 624-6221

EXHIBIT
3

Daniel Webster

Page 44

1      A.    No, they are not the same.  So no, none of

2   those states are exactly like Maryland.  So one

3   similarity between Connecticut and Maryland is that

4   they both require, they both require safety training

5   before you can get it.  They both require

6   fingerprinting.  They both require, in addition to

7   having a valid permit or license, that at a point of

8   sale there is still an initial background check

9   done.

10         Those are the things that I can recall

11   right now that are similar between Connecticut

12   and -- the issuance is different in that Connecticut

13   you go directly to the law enforcement agency as

14   opposed to Maryland.

15      Q.   All right.  And do you know what the

16   requirements for the training in Connecticut are

17   compared to Maryland?

18      A.   They are longer I know.  I know the course

19   requirement is, like, an eight-hour course as

20   opposed to a four-hour course.

21      Q.   They require the basic NRA pistol course

22   or equivalent; correct?

Daniel Webster

Page 45

```
1        A.   I think that's right, yes.

2        Q.   Do you know the difference between the NRA

3   basic pistol course and the Maryland training

4   requirements?

5        A.   I don't.

6        Q.   And the fingerprinting requirement in

7   Connecticut has to be obtained through a law

8   enforcement agency; correct?  You actually have to

9   go to --

10       A.   Yes.

11       Q.   -- a law enforcement agency to give your

12  fingerprints unlike Maryland; correct?

13       A.   Yes, mm-hmm.

14       Q.   And Connecticut requires a photo for its

15  permit; correct?

16       A.   Yes.

17       Q.   Now, you didn't mention that as a

18  requirement of Maryland.  Do you know whether or not

19  Maryland requires a photo on its Handgun

20  Qualification License?

21       A.   Well, I don't think they require a photo

22  that's done, you know, when you're applying.  No, I
```

Daniel Webster

Page 55

1    requirement include Connecticut, Hawaii, Iowa,

2    Massachusetts, Michigan, again, with the caveat that

3    I already mentioned, New Jersey, New York, and

4    District of Columbia.

5         Q.   And you've done some study on the PTP law

6    in Missouri; correct?

7         A.   Yes.

8         Q.   And that was repealed some years ago; am I

9    correct?

10        A.   Yes.  Effective August 28, 2007.

11        Q.   And that's never been reinstated in

12   Missouri?

13        A.   That's correct.

14        Q.   And what did it require in terms of the

15   elements of training?  Was training required in

16   Missouri under the old PTP law there?

17        A.   I don't believe it was.

18        Q.   And was fingerprinting required?

19        A.   No.

20        Q.   But they -- the individuals obtaining

21   their PTP in Missouri under the old law did have to

22   appear at a law enforcement agency; correct?

Daniel Webster

Page 56

1      A.   Yes, they did.  Yes.

2      Q.   And so a critical difference between

3  Maryland and Missouri is that Maryland requires

4  training and fingerprinting, which Missouri did not?

5      A.   Yes.

6      Q.   But Missouri required in-person appearance

7  at a law enforcement agency, which Maryland does

8  not; is that correct?

9      A.   That's correct.

10      Q.   And Connecticut requires training like

11  Maryland, but much more training; correct?

12      A.   Well, in terms of hours, double the hours,

13  yeah.

14      Q.   And maybe not any live fire at all?

15      A.   Yeah, I don't remember for Connecticut.

16      Q.   And Connecticut requires a photo ID, but

17  Maryland doesn't; correct?

18      A.   Correct.

19      Q.   And Connecticut requires that the permit

20  application be submitted in person at a law

21  enforcement agency, and Maryland does not; correct?

22      A.   Correct.

Daniel Webster

Page 179

1    going to purchase a handgun, you needed to get a

2    permit.  And that was always step one.  I think

3    that's the most important.

4         Q.   And that was a permit that you had to

5    apply directly to a law enforcement agency in

6    Missouri to get; correct?

7         A.   Yes.

8         Q.   Unlike Maryland?

9              MR. SCOTT:  Objection.

10             THE WITNESS:  Correct.

11   BY MR. SWEENEY:

12        Q.   And Missouri didn't require fingerprinting

13   like Maryland requires fingerprinting, did it?

14        A.   That's right.

15        Q.   And it didn't require training either;

16   correct?

17        A.   That's correct.

18        Q.   So, if we're looking for a common

19   denominator, there's only one common denominator

20   between the Missouri PTP law and the HQL, and that's

21   the requirement of a permit in order to purchase; am

22   I correct?

Daniel Webster

Page 180

1       A.   Yes.

2       Q.   Do any of the components of the Firearms

3   Safety Act, other than the HQL, not have any effect

4   on firearms violence?

5       A.   I have to go through all of these

6   provisions.

7       Q.   Just the ones you talked about.  Would

8   they not have any effect at all or do you think

9   they'd have some effect on preventing firearms?

10      A.   I think some effects.  Some of them would

11  be more gradual than others.  So, for example, like

12  an enhanced regulatory capacity for State Police

13  with respect to licensed gun dealers, it may be that

14  is a more gradual effect as compliance increases and

15  the degree to which the State Police demonstrate

16  that there are consequences to not following the

17  laws.

18           So that is sort of a question mark of how

19  quickly that might impact laws.  The data we have

20  about licensing suggests that, when you have a new

21  law, there's generally some impact that grows a

22  little bit over time, but that's my own opinion is

Daniel Webster

Page 184

1   by Collins and colleagues this year they found

2   that -- and I can pull it up probably quickly here

3   or it's actually in my report.  Anyway, they made

4   distinctions between fingerprinting, discretionary

5   permitting, so there's only three states that allow

6   some discretion meaning, even if you don't meet a

7   disqualifier, if something is, there's a red flag,

8   so to speak, in someone's record, they can use

9   discretion to deny.  That's the most restrictive

10  form of licensing with fingerprinting and then all

11  other licensing.

12          And, basically, there was a dose response

13  kind of effect that the strongest effects were for

14  those that allow discretion.  Second strongest was

15  those that required fingerprinting.

16      Q.   So in your own studies of Missouri and

17  Connecticut and Maryland under PTP laws, have you

18  been able to identify any, a special value to

19  fingerprinting as opposed to the other elements of

20  the PTP law in effect in a particular jurisdiction?

21      A.   Not with those three separate studies I

22  can't say that we have.  Basically, what we've done,

Daniel Webster

Page 185

1    this is what we did in each case is -- well, I'll

2    take it one by one.  So Missouri we were interested

3    in understanding what happens when you take a law

4    away that other research suggests might be important

5    for preventing diversion of guns for criminal use.

6         Connecticut we are looking at the impact

7    of that particular policy and its effect.  One

8    reason we chose those two policy change times is

9    that, until the Firearms Safety Act of 2013 in

10   Maryland, those were the two most recent changes

11   that were, could be studied.

12        So now we're, with the Maryland law we're

13   been able to first look at indicators of diversions

14   from crime gun trace data.  We've been able to look

15   at survey data from people involved in underground

16   gun market, and now we've had some early data on

17   homicides from an extended analysis of a paper that

18   we published recently in the Journal of Urban Health

19   looking at the effects of state firearm policies on

20   homicide rates in large urban counties.

21        So what the published study found was an

22   average, aggregated average across all of the

Daniel Webster

Page 186

1    policies 14 percent reduction in firearm homicide

2    rates in that study that covered data from 1981

3    through 2015.  As I presented in the report, my

4    report, we were interested to understand what was

5    going on in Maryland and also understanding probably

6    at least a third of my time is focused on

7    understanding what's going on in Baltimore and its

8    gun violence program and different strategies to

9    address it.  I've been mostly studying local

10   policing and community prevention programs.

11           But through my studies and another study

12   published by Steven Morgan at Johns Hopkins it was a

13   very well-known phenomenon that occurred in

14   Baltimore following the death of Freddie Gray, the

15   in-custody death of Freddie Gray that led to broad

16   civil unrest and riots, documented change in

17   policing practices, sort of an underpolicing, a step

18   back by the police department.

19           So, depending on the statistical model of

20   sort of what was the impact of that civil unrest in

21   the Freddie Gray case, anywhere from 50 percent to

22   100 percent increase in shootings and homicides

Daniel Webster

Page 187

1    associated with that change.  So we knew that that

2    was a huge historical confounder that, when you're

3    trying to tease apart the effect of the law overall

4    in Maryland, you had to understand what was going on

5    in Baltimore.

6              So we stratified our estimate of the

7    effect of this law on gun homicides in the major

8    urban counties other than Baltimore.  That includes

9    Baltimore County, Anne Arundel County, Montgomery

10   County, Prince George's County, and we found a large

11   and statistical significant decrease in gun homicide

12   rates in those counties while a 25 percent increase

13   in Baltimore, again, Baltimore influenced by the

14   post-Freddie Gray riot data.

15             So to me the available data that we have

16   right now suggests that the law is working as

17   intended.  It's preventing the diversions of guns

18   for criminal misuse, and it's leading to fewer

19   homicides with guns.

20             MR. SWEENEY:  Could you reread my

21   question, Kathleen, if you can find it?

22             (The reporter read back as requested.)

Daniel Webster

Page 188

1    BY MR. SWEENEY:

2        Q.   And your answer to my question is no, you

3    have not; correct?

4        A.   The answer to your question was we studied

5    each of these laws separately and reported what we

6    found.  And as we discussed, there are differences

7    in these laws, one of which is the fingerprint

8    requirement with respect to difference between

9    Missouri and Maryland.

10       Q.   And the only thing that Missouri,

11   Maryland, and D.C. have in common, and Connecticut

12   have in common is that they all require a permit to

13   purchase?

14       A.   No.  There are other things that Maryland

15   shares with, certainly with Connecticut.

16       Q.   With respect to the requirements of their

17   permit-to-purchase law, the elements differ in each

18   of those three states, so the only common

19   denominator for the three states is that they all

20   require a permit to purchase?

21            MR. SCOTT:  Objection.

22            THE WITNESS:  Maryland and Connecticut

Daniel Webster

Page 189

1   both require safety training, and they both require

2   fingerprints.  So those two things, and they also

3   require a point of sale background check

4   requirement.  So they are similar in those three

5   respects.

6   BY MR. SWEENEY:

7        Q.   And Missouri doesn't require those?

8        A.   That's correct.

9        Q.   So the three only have in common that the

10  permit to purchase is required; correct?

11            MR. SCOTT:  Objection.

12            THE WITNESS:  Among all three, I will

13  agree that what you said is factually correct.

14  BY MR. SWEENEY:

15       Q.   And that Maryland differs from Missouri

16  and Connecticut in that regard because, unlike

17  Missouri and Connecticut, it does not require a

18  direct application to law enforcement in order to

19  obtain that permit; correct?

20            MR. SCOTT:  Objection.

21            THE WITNESS:  I'm not sure what to do.

22            MR. SCOTT:  I'm objecting to the question.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.*, et al.*,

     *Plaintiffs,*

v.                                                    Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.,*

     *Defendants.*

---

## SUPPLEMENTAL DECLARATION OF GARY KLECK

I, Gary Kleck, under penalty of perjury, declare and state:

1.     This supplemental declaration is a response to Daniel W. Webster's Second Supplemental Declaration, in which he cites three additional studies that purportedly buttress his opinion supporting Maryland's Handgun Qualification License ("HQL") law. In Part 1 I explain fundamental problems afflicting Webster's evaluation of background check laws, addressing problems characterizing all of his studies on this topic. Then, in Parts 2-4 I separately examine each of the three studies he newly cites in the Second Supplemental Declaration.

**Part 1 - Problems with the Webster Research Program as a Whole**

2.     Each of the individual studies on which Webster relies in his Second Supplement is fatally flawed in itself, but the entire series of studies on background check laws co-authored by Webster is misguided and misleading as a whole, showing all the earmarks of data-dredging to obtain chance findings and present them as if they were tests of a single *a priori* hypothesis formulated before looking at the data.

EXHIBIT
4

3.      "Data dredging" is a misuse of data analysis in which the analyst examines a large, complex body of data (such as the set of all the rates of firearm violence in all states over the past 80 years), identifies some chance (non-causal) associations, formulates a hypothesis after this peek at the data, conducts an analysis rediscovering these associations, then reports the results of the analysis as if it provides a test of a single *a priori* hypothesis, i.e. one formulated before examining the data.  The strategy is disreputable partly because it employs tests of significance that rely on the assumption that the analyst was only testing a single hypothesis (such as "firearm purchasing licensing laws that require the applicant to personally appear before law enforcement authorities reduce firearms homicide") when the analyst had actually tested dozens or hundreds of variants of the hypothesis (e.g., "some kind of gun control law (unspecified) reduces some kind of crime or violence").  Tests of statistical significance are supposed to assess the probability that a statistical result could be entirely the result of chance factors (rather than the product of actual causation), but the significance levels yielded when the analyst indulges in data dredging are grossly inaccurate, because the probability of a purely chance finding is far greater when the analyst performs dozens or hundreds of tests rather than the single test assumed by conventional significance computations (for a classic discussion of data dredging, see Selvin and Stuart 1966).

4.      The tactic is notably unreliable because it lends itself to cherry-picking unrepresentative subsets of the available data and reporting misleading results that confirm the researcher's expectations, and not reporting results contrary to those expectations.

5.      There have been thousands of changes in gun control law in the 50 states and the District of Columbia (DC) in past decades.  Further, over the past 80 years or so, homicide and suicide rates have increased about half the time and decreased about half the time (U.S. Federal Bureau of Investigation 2017; Kleck 1997, pp. 262-263, 289-290).  Thus, at any one time that a

new gun control law is passed or an old one is repealed there is roughly a 50% chance that enactment of the law will *coincide* with a reduction in the homicide or suicide rate – even if the policy has no actual effects. An unscrupulous analyst could dredge through decades of violence statistics, examine data for each of the 50 states and D.C., identify the many time points when firearms violence decreased in this or that state, and then selectively look for the states and years when the decreases coincidentally happened to be preceded by a change in gun law. Even if gun law changes had no actual causal effects on violence rates, there would be hundreds or thousands of such coincidences simply because there were so many changes in gun laws and so many years in which violence decreased. Under a no-effect assumption, it would be a reasonable expectation that roughly half of enactments of new gun laws would be followed by increases in firearm violence and half by decreases.

6.      If one were sufficiently selective, one would also be able to identify some very specific subtypes of gun laws for which violence decreases were *more* common in the post-law period than violence increases, just as other subtypes were more often followed by *increases* than decreases. The unethical analyst might be tempted to publish results pertaining to the former type of gun law, while ignoring the latter.

7.      Webster and his colleagues do not assert that firearm background check laws in general reduce firearms violence. Quite the contrary, they have explicitly rejected this position (McCourt, Crifasi, Stuart, Vernick, Kagawa, Wintemute, and Webster 2020, pp. 1546-1547). Rather, Webster has claimed that only very specific subtypes of background check laws, incorporating very specific elements, have this beneficial effect, though over time he has changed which elements he thinks are responsible for gun violence reductions.

8.      Webster has offered multiple speculations about which background check subtypes are consequential, and has changed over time which ones he has stressed as beneficial.  Thus, he cannot assert that, at the very start of his research on this topic, around 2013, he was going to test for the gun violence-reducing effects of one specific type of background check laws, such as those requiring fingerprinting.  Rather, he effectively revised his implied hypothesis as he and his colleagues examined more subsets of the available data, testing multiple specific versions of the general hypothesis that some kind of background check on firearms purchasers reduces gun violence.  There is nothing wrong with scholars changing their views about what an evolving body of evidence shows; indeed, flexibility is generally a scholarly virtue.  What is not desirable is: (1) selectively presenting only some research findings regarding a wide variety of hypotheses and not others; and (2) reporting erroneous significance tests as if the researcher had tested only a single version of his hypothesis.

9.      Webster's earliest empirical work in this area assessed the effect of repealing Missouri's permit-to-purchase ("PTP") law (which he now relabels a "purchaser licensing law") on firearms violence, finding that the repeal was followed by increases in firearms homicides (Webster, Crifasi, and Vernick 2014).  Since the repeal did not eliminate background checks on people trying to get guns from licensed dealers, he had to offer some kind of rationale for why Missouri's repeal of its PTP law would increase firearms violence.  The repealed law had to have some additional provisions that reduced gun violence when it was still in effect.  At that time (2014) Webster seemed to most strongly emphasize the fact that background checks were required for private transfers as well as dealer transfers, stressing that the repeal "eliminated mandatory background checks for handguns sold by unlicensed sellers" (p. 294; stressed again on p. 298).

10.      Recent research on states with universal background checks, however, indicates that it is highly unlikely that this element of Missouri law had any measurable pre-repeal effect on gun violence or criminal acquisition of guns, since few private sellers obey this legal requirement, and virtually none of the few prospective private transferees who do submit to background checks are denied.  Data from Colorado, Oregon, and California indicate that only about 1/10[th] of 1% of private transfers of guns in those states were both: (1) subjected to the legally required background check; and (2) resulted in a denial of the transfer (Kleck 2020).  In this light, it is implausible that eliminating this feature of Missouri gun law could have had any measurable effect on rates of firearms violence.  Indeed, Webster's own recent research concludes that universal background checks - which he has relabeled "comprehensive background checks" ("CBC") - do not reduce firearms violence (McCourt et al. 2020).

11.      Webster also stressed that applicants for PTP permits in Missouri had to appear in person at some law enforcement agency to apply, asserting (though not documenting) that "most states with PTP handgun licensing require applicants to apply for the license directly at a law enforcement agency" (Webster, Crifasi, and Vernick 2014, p. 294).  He speculated that this might deter some criminal applicants who would have passed the checks (those who would not have passed the checks are irrelevant to this claim since they would have been denied anyway).

12.      By 2018 Webster and his colleagues (Crifasi et al. 2018) had obtained findings of *higher* firearms homicide rates in places with CBC laws, suggesting that violence-reducing effects of background check laws, including Missouri's pre-repeal law, were *not* due to background checks  covering private (nondealer) transfers.  Webster then argued that CBCs alone do not reduce firearms homicides, but that other elements of the permitting process do.  He and his colleagues then speculated that these crucial elements were either: (1) the longer times that permit laws often

allow for authorities to conduct the background check (p. 387); or (2) the requirement for a personal appearance of the applicant at a law enforcement agency.

13.     By 2020, however, Webster had become more ambivalent about the value of the personal appearance requirement for reducing gun violence. The background check laws that he and his colleagues claimed reduce firearms violence were those that required *either*: (1) an in-person application; *or* (2) fingerprinting (Webster, McCourt, Crifasi, Booty, and Stuart 2020, p. 187). In other places in that article, he alludes only to fingerprinting (p. 171). Strictly speaking, by this point Webster was unwilling to unambiguously commit himself to the value of personal appearance of applicants, effectively hedging his bets by claiming it *might* reduce gun violence, or it might not, and that it may instead be fingerprinting requirements that account for the purported benefits of permit laws.

14.     Webster has never offered a credible explanation of why fingerprinting would strengthen the ability of background check laws to block criminals and other high-risk persons from getting guns. A fingerprinting requirement does not increase the comprehensiveness of criminal background databases' coverage, nor does it widen the scope of persons who fall into a disqualified category. Rather, the standard rationale for requiring applicants to be fingerprinted is simply to ensure that applicants really are who they claim to be, and minimize the use of fake documents to claim the identity of a person qualified to receive a gun. Whether a fingerprinting requirement has a measurable effect on gun acquisition by disqualified persons is, then, a function of how often such persons use false ID to impersonate a qualified person.

15.     This tactic, however, appears to be extremely unusual. According to a 2016 national survey of 24,848 prison inmates, most criminals who possessed a gun during the offense for which they were incarcerated did not get the gun from a licensed source of the type required to

perform a background check, and among those who use such sources, most used their own name. Only about 1.3% of gun-armed criminals got their gun from a retail source and used a false name (Alper and Glaze 2019, p. 8). A fingerprinting requirement therefore seems to be a solution to an extremely rare problem, and therefore unlikely to produce the enormous effects on firearms homicides claimed by Webster.

16.    In his most recent article on background check laws, Webster no longer stresses the personal appearance requirement at all - or even mentions it. In that article's conclusions, he and his co-authors primarily emphasize the purported benefits of authorities being allowed more time to conduct background checks (McCourt et al. 2020, p. 1550), though they also make a single brief allusion to "mandated fingerprinting" at the beginning of the article (p. 1546). Having dropped the stress on either universal background checks or personal appearance requirements (and possibly fingerprinting), he seems to now stress the waiting period element of the permitting process. The problem with this emphasis is that virtually all technically sound research indicates that waiting period laws have no measureable effect on homicide rates (Loftin and McDowall 1983; Kleck and Patterson 1993; Ludwig and Cook 2000; Lott and Whitley 2001; Makarios and Pratt 2012; Kleck, Kovandzic, and Bellows 2016). The authors cite a *single* study to support the contrary position (Luca, Malhotra, and Poliquin 2017), which supposedly showed that "longer waiting periods between applying to purchase firearms and receiving the firearms are associated with lower rates of firearm homicides and suicides," but even this study's strongest findings did not find an association between waiting periods and either total homicide or total suicide that was significant at the conventional 5% level (Kleck 2017, pp. 8-9).

17.    Thus, Webster did not have, back in 2013, a single specific *a priori* hypothesis about a specific kind of background check law that he believed reduced gun violence. Rather,

over the years he tested for effects of many different variants of such laws, repeatedly changing which elements of those different laws were claimed to be responsible for supposed effects. He was testing multiple hypotheses, not just one. And the results of these multiple hypothesis test do not consistently support any one specific hypothesis about the benefits of permit laws.

18.    They certainly do not consistently support *Maryland's* HQL law. Maryland requires fingerprinting of handgun applicants, yet the results of Webster's research do not consistently support the effect of fingerprinting of permit applicants. His most recent research concludes that the law in Connecticut, which requires fingerprinting, reduces gun violence, but that Maryland's law, which also requires fingerprinting, does not reduce gun violence (McCourt et al. 2020, pp. 1548-1549).

19.    Nor are his results consistent regarding the view that allowing more time for background checks reduces gun violence. Maryland allows 30 days for the check to be completed, but Webster and his colleagues concluded that its law had no effect on firearms homicide, while concluding that Missouri's repealed permit law, which involved no wait at all, *did* reduce gun homicide (McCourt et al. 2020, pp. 1548-1549).

**Cherry-picking States to Study**

20.    At least 11 states plus DC have laws requiring a permit to purchase firearms (CT, HA, IA, MD, MI, NE, NJ, NC) or a license to own or purchase them (IL, MA, NY) (Giffords Law Center to Prevent Gun Violence 2021)(collectively referred to as "Purchaser Licensing" or "PL" laws). Why, then, did Webster study just four of these 12 jurisdictions? And if only four, why CT, MD, MO, PA in particular? These questions are crucial because if researchers decide to study just a few instances of a policy that has been implemented in many jurisdictions, there is a risk that researchers will cherry-pick one or two unrepresentative examples that appear to support a

preferred finding, even if analysis of all instances would have indicated that the average effect of the policy was zero.

21.    The danger can be illustrated by a simple example. Suppose gun control policy X had no effect whatsoever on homicide rates, but a hypothetical researcher wanted to create the false impression that X was effective. This is easy to do with any policy that has been implemented in numerous states. In the long run, over the past 80 years or so, homicide rates have increased about half the time and decreased about half the time (U.S. Federal Bureau of Investigation 2017). Thus, at any one time that a new state gun control law is passed, there is roughly a 50% chance that its introduction will be followed by a reduction in the homicide rate, even if the law has no effect on violence. All the researcher would need to do to create the false impression that some kind of gun control law was effective in reducing homicide would be to dredge through data on homicide rates in the 50 states and DC, looking for declines in state firearms homicide rates occurring in any of the 80-some years for which state homicide statistics are available, and to then search for instances of new gun laws that happened to have been introduced just before the homicide declines began. Each of the 4,000-plus state-years (51 x 80 = 4,080) would represent a potential opportunity to observe a homicide decline that began just after a new gun law was enacted, and roughly half of these state-years would be cases in which the homicide rate was lower than it had been the year before. Consequently, there would be hundreds of instances where introduction of a new gun law was coincidentally followed by a drop in the firearms homicide rate. The researcher could simply pick a few of them that happened to coincide with an especially strong drop in the firearm homicide rate to analyze and publish the results for these few nonrandomly selected states, as if they were the specific states that the researcher wanted to study all along.

22.    Studying just a small minority of a larger number of implementations of a given type of policy is prone to yielding misleading results for the foregoing reasons, and consequently is not accepted as a method by knowledgeable researchers.  The more accepted procedure is to study *all* implementations of a given type of gun law, estimating the average treatment effect of the full set, in either a cross-sectional analysis of states, counties, or cities (e.g. Kleck and Patterson 1993; Kleck, Kovandzic, and Bellows 2016) or a panel design in which all state-years are coded as to which ones had a given type of law in operation (e.g. Lott and Whitley 2001; Marvell and Moody 1995).  Either way, no one could claim that researchers using these methods had cherry-picked an unrepresentative subset of the instances of a given type of law being implemented.

23.    It is unhelpful to phrase research results in associational language, saying that changes in handgun purchasing licensing laws were "associated with" changes in firearms homicide or suicide.  This could charitably be interpreted as a sign of scientific caution, the authors refraining from making unwarranted claims about cause-and-effect.  Less charitably, it serves to obscure the actual meaning the authors were clearly trying to convey – that changes in gun law *caused* changes in firearms violence.  Webster and his colleagues conveyed their actual intended meaning in their abstract (and other places) when they admitted that they were trying to estimate "the *effects* of these laws on homicide and suicide rates" (p. 1546, emphasis added).  The word "effects" plainly denotes causal effects. But, policy cannot be based on merely coincidental statistical *associations* between violence rates and changes in law. Accordingly, for purposes of this supplemental report, I treat the authors' conclusions as if they pertained to the purported causal effects of changes in gun laws.

**Part 2 - Critique of the Hasegawa et al. (2019) Study**

24.     In his Second Supplement, Webster does not explain how the Hasegawa study adds anything to our understanding of the impact of Missouri's repeal of its PTP law or in what specific ways it improves on his original Missouri study (Webster et al. 2014).  It fails to address the most glaring problems with that prior study.

25.     Hasegawa et al. appeared to believe that a serious problem with the original 2014 research was that it did not address "concerns about history interacting with group" (p. 371).  As applied to this study, "history interacting with group" refers to the possibility that unmeasured confounding variables had different effects on firearms homicide rates in Missouri in the post-repeal period than in other states that did not change their purchase permit laws.  It is crucial to stress what "interacting" means in this context.  A confounder (or an historical event) "interacting with group" means that the confounding factor has different effects in one group (e.g., Missouri) than in another (e.g. a bordering control state such as Iowa).  It does not mean the level of the variable changed over time more in one group than another.  Rather, it means that the *degree of effect* differs across groups, e.g. the amount of change in firearms homicide caused by a one unit change in the confounder (or the historical event) differs between the groups.

26.     This is not a problem that afflicted Webster's 2004 study, and thus the solution is irrelevant to any of the actual problems with the earlier study (summarized in Kleck 2017).  The most important problem with that study was uncontrolled confounders – variables beside the PTP repeal that affected firearms homicide rates, that were not controlled by Webster, and that changed over time more in Missouri than in control states.  The problem was not "history interacting with group," but rather simple omitted variables bias.  These "omitted variables" were uncontrolled variables that might well exert the same magnitude of effect, unit-for-unit, in both Missouri and

control states (and thus did *not* "interact with group"), both before and after the repeal, but simply changed more in Missouri than in the control states. This is not the problem addressed in the Hasegawa et al. study, and the procedures they employ do not solve it. The only way to solve it would be to measure and explicitly control for the omitted confounding variables, and this was not done in either the original Webster et al. (2014) study or in the Hasegawa et al. (2019) study.

27.    Suppose, for example, that a spate of street gang violence occurred in Missouri for reasons completely unrelated to the PTP repeal, and resulted in more firearms homicides in Missouri in 2008, just after the repeal. The unit-for-unit impact on the firearms homicide rate of a given number of gang combats might be identical in both Missouri and in other states, and identical in both the pre-repeal and post-repeal period, so their effect does not interact with either group or period. Nevertheless, if the level of gang violence increased in Missouri more than in the control states, it would cause a larger increase in firearms homicide in Missouri than in other states. Since Webster did not control for the level of gang violence (or any other known confounders), he had no basis for attributing post-repeal homicide increases in Missouri to the PTP repeal (Kleck 2017).

28.    In that earlier study, Webster did at least acknowledge in principle the need to control for confounders, and facially appeared to do that. A confounder in that study would be a variable that both affects the rate of firearms homicide and is correlated with the existence of a PTP law. The variables actually controlled by Webster, however, were not confounders, either because they showed no significant association with firearms homicide rates, or had no known association with the existence of a PTP law. For example, while Webster and his colleagues claimed to control for at least eight variables or sets of variables, results buried in their Supplemental Tables show that five of these showed no significant association with firearms

homicide rates (and thus could not be confounders), while two others showed nonsensical associations (they implied that more poverty *reduces* homicide, and that bans on Saturday Night Special handguns *increase* homicide) (Kleck 2017).

29.    The Hasegawa study likewise did nothing to correct any other serious defects of the 2014 study.  One fundamental problem was simply the decision to assess the impact of just one state's change in PTP law, rather than studying the average impact of all state PTP laws.  Focusing on a single state lends itself to cherry-picking an unrepresentative state, and ignoring the more typical effects in other states, or the average effect across all states with a PTP law.  At the time this study was done there were at least nine states with PTP laws, raising the question: "Why study just Missouri?" (Kleck 2017).  The Hasegawa study is also confined to just Missouri, so it simply repeats this problem.

30.    Another problem in the 2014 study left unsolved by the Hasegawa study was the extremely short pre-repeal time series, 1998-2007.  Webster et al. had limited the pre-repeal period to just nine years, even though there were data for many times that many years.  This decision to needlessly restrict the pre-intervention sample guaranteed more unstable results, particularly regarding how much post-repeal Missouri firearms homicide rates changed compared to the rates prevailing prior to the repeal.  Hasegawa's analysis used exactly the same needlessly truncated pre-repeal time period (p. 375).

31.    Yet another problem with the 2014 study of Missouri was that Webster and his colleagues could not explain why repeal of the PTP law appeared to have all of its "effect" in a single year.  All of the post-2007 increase in the firearms homicide rate in Missouri occurred from 2007 to 2008.  Thereafter, there was no further increase during the period studied by Webster et al.  The Missouri firearm homicide rates jumped from 4.6 per 100,000 in 2007 to 6.2 in 2008, but

by 2011 had returned to its pre-repeal 2005 rate of 5.2. (Kleck 2017).  If eliminating the PTP elements of background checks had actually caused a gun homicide increase, the effects should have persisted as long as those elements continued to be absent, i.e. right up through the end of the study period.  They did not.  Why would a persisting set of conditions for buying a gun have effects lasting only a year?

32.    More likely causes of this very short-lived jump in Missouri gun homicide would be short-lived developments in Missouri, such as a brief spate of inter-gang violence in which killings by one gang triggered retaliatory killings by another.  A similar development might be a brief elevation of homicide linked with conflicts over drug dealing.  Since nearly all homicides linked with street gang conflict or drug dealing are committed with firearms (U.S. FBI 2007, Expanded Homicide Data Table 10), one would expect the impact to be largely limited to the rate of firearms homicide.  This is precisely the pattern observed in Missouri, but one that Webster et al. touted as evidence that the increase was due to the PTP repeal.

33.    Nothing in either the original 2014 study or in the 2019 Hasegawa study even establishes that more Missouri criminals purchased guns after the 2007 repeal, which is clearly the reason why Webster et al. thought that eliminating the PTP law would cause increased gun homicide (2014, p. 294).  They claimed to have had measures of what they vaguely described as "illegal diversion" of guns to criminals (p. 299), a term they never defined, and asserted that this increased after the PTP law was repealed.  Their indicator of "illegal diversion" was the share of guns recovered by police that: (1) had been first sold at retail a relatively short time before recovery; and (2) came from a state outside of Missouri.  Neither is a valid indicator of gun trafficking or of criminals' gun acquisition (Kleck and Wang 2009).

34.     The repeal of the PTP law only changed one mechanism for acquiring guns - purchase.  Webster later concluded that extending background checks to cover private transfers does not affect gun homicide (McCourt et al. 2020), so repealing this element of Missouri's PTP law should not have affected criminal gun acquisition via purchases from private transfers.  Thus, he must believe criminal purchases of guns from dealers must have increased.  Since Missouri continued to have federally mandated background checks on purchases from gun dealers, one would expect that Webster might have checked whether an increased share of these checks in Missouri resulted in denials due to criminal records.  He did not - or at least did not report the results of such an inquiry.  Hasegawa et al. contribute nothing on this score – they provide no basis for believing that criminal purchases of guns increased after Missouri repealed its PTP law.

35.     The Hasegawa study repeats the critical error pervading all of the studies Webster has advanced addressing the purported impact of gun control laws.  He reports analyses confined to *firearms* violence.  Nothing in either Missouri study even addresses whether Missouri's PTP law saved lives while it was in effect, i.e. reduced the total number of homicides.  There is no public safety benefit in merely inducing criminals to murder people with different weapons, if there is no decrease in the total number murdered.  Webster, in both the 2014 study and in his 2019 study with Hasegawa, simply ignores this problem.  Consequently, nothing in either study – even if taken at face value – actually supports the view that PTP laws save any lives.

36.     In sum, Webster's new reliance on the Hasegawa study does not strengthen his opinion that PTP laws in general or the Maryland HQL provisions in particular reduce firearms violence.

16

**Part 3 - Critique of the Webster et al. (2020) Study**

37.    Webster, McCourt, Crifasi, Booty, and Stuart (2020) concluded, based on a panel study of annual state-level data, that the incidence of mass shooting incidents and the total number of fatalities linked with such incidents are reduced by purchaser licensing laws that require applicants to personally appear at a public safety agency or that require them to be fingerprinted, as well as bans on large-capacity magazines (LCM). The conclusion regarding purchaser licensing is not supported by any technically sound methods, and is highly sensitive to exactly how a mass shooting is defined.

38.    Webster cites this study to support the claim that "handgun purchaser licensing laws requiring either in-person application with law enforcement or fingerprinting (of applicants) were associated with incidents of fatal mass shootings 56 percent lower than that of other states" (Webster Second Supplement, p. 3). Webster in this Supplement, and in the cited article, used associational language, but in the Abstract of that article advanced the meaning that he and his colleagues actually intended to convey: causation. They asserted that their findings indicate that "laws requiring firearms purchasers to be licensed through a background check supported by fingerprints and laws banning LCMs [large-capacity magazines] are the most *effective* gun policies for reducing fatal mass shootings" (Webster et al. 2020, p. 171, emphasis added).

**The Failure to Control Confounding Variables Means the Results Cannot Be Used to Support any Causal Effects of Purchaser Licensing Laws**

39.    Accurately inferring causation in this case would have required the authors to control for as many confounding variables as possible. In this context, confounding variables would be other factors besides the two supposedly effective gun laws (PL laws and LCM bans)

that had both of two properties: (1) they affected the frequency or seriousness of mass shootings; and (2) they were correlated with the presence of absence of those two gun laws.

40.    As far as can be determined from the authors' published findings, they did not actually control for *any* confounding variables, which are the only kind of controls that help establish causal effects of one's focal variables.

41.    In the analysis reported in their Table 3, only two control variables (i.e. variables other than the two gun control laws) were even significantly related to incidence of fatal mass shootings, neither of which is known to be correlated with the presence/absence of purchaser permit laws or LCM bans.  In the Table 3 analysis pertaining to number of victim deaths, *none* of the control variables were related to the outcome variable, and thus none could be regarded as confounders.  In their Table 4 analyses limited to "domestic-linked" mass shootings, not a single control variable was significantly related to either outcome variable, and thus none could be regarded as confounders.  Finally, in their Table 5 analyses, pertaining to mass shootings not linked to domestic violence, just *one* of the control variables was significantly related to either outcome variable, and the authors did not show this control variable to be correlated with their two preferred gun control laws.  Thus, the authors did not control for a single known confounder in this analysis either.  In particular, although they controlled for a few gun control laws unlikely to affect mass shootings, they did not even control for the one that would seem to be most likely to affect killings by mentally ill killers – bans on gun purchases by mentally ill persons.  In sum, the authors simply did not control for variables that were actually confounders.  The controls that they did introduce could not help isolate the effect of purchaser licensing laws because the variables they did control were not confounding variables, but rather were either irrelevant variables (i.e. variables that do

not affect the outcome variable) or variables that were relevant but uncorrelated with gun laws and consequently could not bias estimates of gun law effects.

**The Misleading Effects of an Ambiguous Definition of the Gun Law Variable**

42. If one ignores the authors' failure to control for confounders, and takes at face value their estimates of the effect of firearm Purchaser License ("PL") laws, what do their findings mean? The key to understanding these findings lies in the curiously ambiguous way they defined PL laws, as "handgun purchaser licensing laws that require *either* in-person application *or* fingerprinting" (p. 174, emphasis added). Any sensible analyst would obviously want to know which of these elements of PL laws reduce violence – it might be only the fingerprinting requirement, it might be only the personal appearance requirement, or it might be both. The ambiguous way that Webster and his colleagues chose to define their PL variable makes it impossible to establish which element has violence-reducing effects. Given that Maryland's PL law requires fingerprinting, but not a personal appearance, it would be especially important in the current case to know which element improves the law's potential for reducing violence.

43. The authors could easily have created two separate variables, one of which measured whether a state had a PL law requiring fingerprinting (without regard to whether it also required a personal appearance), and another that measured whether a state had a PL law requiring a personal appearance (without regard to whether it also required fingerprinting). This approach could have revealed which one worked. From the standpoint of which approach gives better guidance as to policy makers in crafting better public policy, the separate variables approach is obviously superior, but the authors did not utilize this strategy.

44. Since the authors do not report any results of analyses using the superior strategy, it cannot be known for certain what those results would have been. Nevertheless some relevant

statistical insights can be confidently stated.  First, whether the PL/mass shooting association is statistically significant is a function of the standard error of the coefficient measuring this association.  The standard error is a measure of the instability of estimates of the coefficient.  The bigger the standard error, the less likely it is that a given estimate of the PL/mass shooting association is statistically significant.

45.    Second, the size of a standard error is a function of, among other things, the variation in the variables involved in the association – in this case, PL laws and mass shootings. The more variation, the smaller the standard error.  Variation in a binary variable that merely measures the presence or absence of a PL law, as with any other binary variables, is a function of how common the thing being measured is.  If only two or three states have a specific kind of PL law, there is little variation, since nearly all states are the same, i.e. nearly all do *not* have the law. Conversely, if nearly all states had that type of PL law, there would also be little variation since nearly all states would be the same in that they *did* have the law.  The greatest amount of variation, as with any binary variable, would be if half the states had the law and half did not.

46.    Consequently, the standard error of the coefficient for a specific PL law would be larger if few states had that law, smaller if the share was closer to half.  The rarer the specific type of PL law being tested, the bigger its coefficient's standard error would be, other things being equal, and the less likely the coefficient would be significant.  By definition, the number of states with a type of PL law that required fingerprinting would have to be smaller than the number of states that had *either* a fingerprinting requirement *or* a personal appearance requirement, unless all states with the former requirement also had the latter – something we know is not true.  Thus, there is less variation in a variable that specifically measures the presence of a PL law with a fingerprinting requirement, or a variable that specifically measures the presence of a PL law with

a personal appearance requirement, than there is in a variable that ambiguously measures whether a state has *either* provision. Consequently, the standard error will be smaller, other things being equal, using the ambiguous formulation used by the authors.

47.    This means that by choosing to use the more ambiguous way of defining their PL variable, the authors artificially increased their chances of getting a significant association between the PL variable and the incidence or seriousness of mass shootings.  Webster of all people should have been especially desirous of establishing which specific elements of a background check law reduce violence, since his own research indicates that some variants appear to be effective, while others do not.

48.    Webster's ambiguity about which elements of PL laws help reduce violence is especially problematic in connection with Maryland's HQL law.  It requires fingerprinting of applicants but does not require in-person application at a law enforcement agency.  Therefore it is critical to know which of these two provisions reduce violence.  If it is fingerprinting that matters, then Webster's results may support Maryland's HQL law as he claims.  If only the personal appearance requirement matters, his results do not support Maryland's HQL law.  As things stand, given the inherent ambiguity of Webster's definition of his PL law variable, it is impossible to tell whether the results of the Webster et al. (2020) study provide any support for Maryland's PL law.

**The Results of this Study Are Inconsistent and Dependent on Arbitrary Decisions as to How a Mass Shooting is Defined**

49.    Tables A14 and A15 of the appendix include findings based on analyses using different cut-offs for the minimum number of victims that must be killed in an incident for it to be defined as a mass shooting.  In the analysis reported in the main body of the article, there was a significant association between PL laws and the incidence of mass shootings, interpreted by the authors to means that PL laws "were associated with incidents of fatal mass shootings 56% lower

than that of other states" (p. 181). This was based on a definition of mass shooting as an incident with more than three victims killed. Since the exact numerical cut-off used is necessarily somewhat arbitrary, it is important to test whether the results are consistent if different cut-offs are used.

50.     When the authors changed their cut-off by just one, to "more than four victims," there was no longer any significant association between PL laws and mass shootings (Table A14). When the cut-off was changed to "more than five victims," the association was not only insignificant; it almost completely disappeared (Table A15). The authors gloss over this glaring inconsistency by claiming that the magnitude of the association did not change much when the cut-off was changed (p. 187), but this is inaccurate. The estimated association changed from one implying 56% fewer mass shootings in states with PL laws when the cut-off was more than three (Table 3) to a nonsignificant *13%* lower when the cut-off was more than five (Table A15). Describing these results as "similar," as the authors did (p. 187) is misleading.

**The Authors Analyzed a Biased Sample of Mass Shootings that Artificially Inflated Support for an Impact of Purchaser Licensing Laws**

51.     Background check laws of all types are most likely to affect gun acquisition by persons willing to submit to checks when trying to get a gun, i.e. the law-abiding. Conversely, the people least likely to get guns from a source that would require them to submit to a background check would be hard-core criminals. Surveys of prison inmates confirm that few serious criminals get guns from sources that require a background check, such as licensed gun dealers (Alper and Glaze 2019, p. 7). Thus, PL laws are least likely to influence the kinds of repeat offenders who deal drugs or belong to gangs, and when addressing mass shootings, one would expect that PL laws would be least likely to affect mass shooters who commit massacres connected to gangs or drug dealing.

52.     This means that one could bias results in favor of the view that PL laws reduce mass shootings by simply not counting the kinds of massacres least likely to be affected.  This is precisely what the authors did.  They frankly admitted that "we excluded any case that was coded as having a connection to gang or narcotic activity" (p. 174).  They did not acknowledge the biasing effects of this exclusion.  Their justification for introducing this sample bias was that other researchers had altered their samples in the same way (p. 174).

53.     They further biased their sample by non-randomly excluding five states from their analyses (p. 174).  Their justification for these exclusions was that there were "Uniform Crime Reports (UCR)-SHR [Supplementary Homicide Reports] reporting issues over multiple years" (p. 374).  A justification based on problems with UCR/SHR data is particularly implausible given that the authors did not need to use these sources for counting up either the number of mass shootings in a given state or the number of deaths linked with these incidents (or for any other purpose).  They could rely on either the "Stanford Mass Shootings in America" dataset or the data in the Gun Violence Archive for producing these counts, and indeed they did use these very sources to "remedy" the deficiencies in UCR/SHR data (p. 374).  Significantly, their "sensitivity analyses" (pp. 183-187) did not include any checks to see if their estimates of gun law effects were distorted by excluding these particular five states.

54.     In sum, the Webster et al. (2020) study does not provide a scientifically credible basis for estimating the effect of handgun purchaser license laws on mass shootings, and does not strengthen Daniel Webster's support for Maryland's Handgun Qualifying License law.

23

**Part 4 - Critique of the McCourt et al. (2020) Study**

**The Results Pertaining to Maryland**

55.     Before addressing why the McCourt et al. study cited by Webster is not credible, it is first important to note what its results bearing on Maryland, if taken at face value, imply for this case.  Webster claimed that the McCourt study showed "that State handgun purchaser licensing laws such as the Maryland law at issue in this case—which require a prospective buyer to apply for a license or permit from state or local law enforcement—are highly effective at reducing firearm homicide and suicide rates." (Webster Second Supplement, pp. 3-4).

56.     Webster uses the key phrase "laws *such as* the Maryland law," as opposed to simply "the Maryland law."  Webster stresses the McCourt et al. study's findings regarding Connecticut and Pennsylvania, but is silent on what that study found specifically regarding the purchaser licensing law of Maryland - the only state whose law is at issue in this case.  McCourt et al. only studied Maryland's "implementation of a CBC [comprehensive background check] law (1996-2013) (p. 1548). That is, they studied Maryland's pre-exiting and continuing background check law, and NOT the HQL that was adopted in 2013. And despite the fact they studied through the period of 2017, they failed to report what happened to the firearms homicide in Maryland after it implemented the HQL in 2013.  Instead they compare Maryland's pre-existing CBC with Connecticut's PL and failed to report the effects if any of Maryland's comparable law, the HQL. In sum, Webster's own most recent study does not support a claim that Maryland's gun law reduced firearms homicide.

**The Essential Analysis the Authors Failed to Do**

57.     There is no public health benefit in reducing the number of firearms homicides (or firearms suicides) if the number of *non-firearms* homicides (or *non-firearms* suicides) increases

by an equal or larger amount, so that the total number of people who are murdered or commit suicide is unchanged.  If such an outcome did result from a change in gun law, however, it would be impossible to detect if analysts never analyzed the impact of the change on the *total* (firearms and non-firearms homicides combined) homicide rate or the *total* suicide rate (firearms and non-firearms suicides combined).  For reasons the authors never explain, they never analyzed either total homicide rates or total suicide rates – or at least did not report the results of such an analysis.

58.    It is possible the authors fell prey to a fallacy widespread among scholars who publish in public health journals.  They accept, consciously or unconsciously, the following fallacious logic:  If X is: (1) significantly associated with the rate of *firearms* homicide (or suicide); and (2) X has *no* significant association with the rate of *non-firearms* homicide (or suicide); then (3) X must have a significant association with the *total* homicide (or suicide) rate.  In that case, the reasoning goes, it is unnecessary to actually show that X has a significant association with the total homicide/suicide rate.

59.    We can be certain this logic is fallacious because numerous empirical studies have obtained results directly contradicting the logic.  For example, many studies obtain findings of: (1) a significant positive association of gun ownership rates with *firearm* suicide rates; and (2) no significant association of gun ownership rates with *non-firearm* suicide rates, yet also find *no* significant association of gun ownership rates with *total* suicide rates.  For a sample of examples displaying this pattern, see Smith and Stevens (2003, p. 37), Miller et al. (2002, p. 32), Markush and Bartolucci (1984, p. 126), Lester (1987, p. 288), and Killias (1993, p. 294).

60.    Thus, if this is the logic the authors were relying on to believe that it was unnecessary to analyze total homicide or suicide rates, they were wrong.  Based on the findings the authors did report, even if one took these dubious findings at face value, *there was no*

25

*foundation in this study for believing that the changes in the four gun laws studied had any effect at all on either the total number of homicides or the total number of suicides.* All of their results are completely consistent with the interpretation that these changes, if they had any actual impact at all, merely induced some people to change the weapons they used to kill others, or the methods they used to kill themselves, without any effect on the total number who died.

61.    This issue is critical to understanding the extremely misleading summary of previous studies the authors provide on p. 1547. In study after cited study, the authors report that previous research found that purchaser licensing laws were significantly associated with rates of *firearm* homicide or *firearm* suicide (see their cited studies 11, 12, 14, and 15). The crucial information the authors omitted, however, was that none of these four studies showed any impact of such laws on either *total* homicide or *total* suicide. Three of the studies did not even address this crucial issue (or at least did not report the relevant findings), and the one that did (study 12, p. 48) found *no* significant association of the gun law with total suicide – a finding McCourt et al. did not feel obliged to share with readers. In sum, as far as the authors knew, all four of these studies supported the view that these laws were useless for reducing either total homicides or total suicides.

**The Authors' Arbitrary Truncation of the Time Period Studied**

62.    The results of any statistical analysis can always be manipulated simply by arbitrarily picking unrepresentative subsets of the available data – in this case, unrepresentative sets of years – to analyze. The authors cannot justify their truncation of their study period by claiming the necessary data were not available. Official statistics on firearm and non-firearm homicides, and firearm and non-firearm suicides, have been available for every state and every year since at least as far back as 1933, in a volume titled Vital Statistics of the United States (year).

For example, the easily available online version of the 1933 data (and corresponding data for later years) may be found at https://www.cdc.gov/nchs/data/vsushistorical/mortstatsh_1933.pdf. By arbitrarily starting their study period at 1985, leaving out 1933-1984 (52 years), the authors were omitting over 61% of the available data (1933-2017 – 85 years).

63.     This is especially harmful to their efforts to identify states that could effectively serve as components of the synthetic control because the efforts then rely on a needlessly reduced number of data points, which increases the probability that any correlation of pre-intervention trends found between the prospective control state and the target state is the mere result of a short-term coincidence prevailing only in the very brief 10-year pre-intervention period they chose to study. More generally, using smaller samples leads to less stable statistical results, regardless of the topic studied or the statistical techniques employed.

64.     The authors themselves admit that their estimates of effects of the Connecticut law were smaller when they changed the end point of their study period from 2017 to 2012. Deleting just five years from their time series reduced the estimated effect of the law on firearm homicide by 40% (compare their Table 2 with Table I in Appendix A). In short, the results are extremely sensitive to exactly which set of years were analyzed.

65.     The data for some of the predictor variables the authors incorporated in their synthetic controls (listed on p. 1547) would not be available for some earlier years, but this is irrelevant to whether it was legitimate to exclude the earlier years. The authors do not provide any evidence, in either their main article or the online supplement Appendix A, that these variables are essential or even helpful in predicting trends in homicide or suicide rates. Therefore, there is no reason to believe that the absence of such data in earlier years would justify excluding most of the years for which data on homicide and suicide were available.

66.     The end points for some of the authors' study periods are also arbitrary.  The end point for their Maryland analysis is 2013 even though the authors had data for years at least up through 2017.  Having fewer post-intervention years makes their results more unstable and subject to chance findings, so one should have a very strong justification for this truncation, something the authors lack.  They say they truncated their study periods because another change in gun law occurred after their end-point year (2013 for the Maryland analysis, 2017 for Missouri).  If enactment of new laws really did mean that an analyst could not use years after such laws had been implemented, it would mean one could not use data for *any* year.  *Every* state legislature makes multiple changes in the criminal law that could affect violence rates in *every* year.  For example, over the period 1973 to 1992, the Florida legislature passed an average of 381 general bills (this total excludes resolutions), including 2.45 gun control bills, *per year* (Etten, 2002).  A cursory glance at the Session Laws of other states, including MO, MD, PA, and CT, supports the same general point - almost every enactment of a change in gun law is preceded or followed by numerous other changes in criminal law, many also intended to reduce crime.  If the occurrence of such changes were accepted as a legitimate reason for truncating a time series, every researcher would be entitled to trim their time series down to whatever subset of history generated results supporting a favored hypothesis.

67.     Here the reason given for cutting off the study at 2013 in Maryland was enactment of a criminal law, but they do not reveal that the law was the HQL, similar to Connecticut's. Nor do they reveal that the homicide rates in Maryland increased during their study period – including 2017 – after that law's enactment.  *See* Everytown for Gun Safety, Gun Violence in Maryland, at

p. 1[1]; Daniel W. Webster, *et al*., Reducing Violence and Building Trust, at p. 12[2]; Violent Crime & Property Crime Statewide Totals: 1975 to Present.[3]

**The Synthetic Control Method is Unlikely to be Useful for Assessing Policy Impact**

68.    The authors tested the impact of changes in purchaser license laws on firearm homicide and firearm suicide rates using the "synthetic control" (SC) methodology.  This method itself theoretically might be useful for evaluating the impact of a policy, but only in extraordinarily rare circumstances.

69.    The basic logic of the design is that the researcher looks for areas (besides the target area that implemented the policy being evaluated) that had similar trends in the outcome variable (the firearms homicide or suicide rate in this case) as well as correlates of the outcome variable prior to the implementation of the new policy.  These areas are then combined into a single "synthetic control" unit whose trends in the outcome variable are used to simulate how that outcome variable would have trended in the intervention area during the post-intervention period, had that policy not been implemented.  The areas that more closely mirror the pre-treatment trends of the outcome variable are assigned greater weight in the computation of the synthetic control (SC).  If post-intervention trends in the outcome variable are more favorable (more of a decrease or less of an increase in violence) in the area with the new policy than in the synthetic control, the analyst tentatively concludes that the intervention was effective.

---

[1] https://maps.everytownresearch.org/wp-content/uploads/2020/04/Every-State-Fact-Sheet-2.0-042720-Maryland.pdf

[2] https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_docs/reducing-violence-and-building-trust-gun-center-report-june-4-2020.pdf

[3] https://opendata.maryland.gov/Public-Safety/Violent-Crime-Property-Crime-Statewide-Totals-1975/hyg2-hy98

70.    The utility of the SC method, then, relies entirely on the coincidence of there being other areas whose trends in the outcome variable closely mirror those prevailing in the area in which the policy was implemented.  In the present case, if there are no states whose trends in firearms homicide or suicide rates in the years prior to changes in purchaser licensing law happened to closely parallel those trends in the states experiencing such changes, the SC method cannot predict post-intervention trends and thus cannot generate an accurate estimate of the impact of the gun law change.  This is true regardless of what weights are attached to each state – if none of the states are much good for predicting trends in firearms homicide or suicide rates, the differing weights can only reflect the fact that some states are even worse than others.

71.    As it happens, there were no states whose trends in firearms homicide or firearms suicide closely matched those prevailing in the pre-intervention periods in the four states evaluated by the authors.

**The Authors' Synthetic Controls Were Not Effective in Tracking Gun Violence Trends**

72.    The authors' conclusion that the changes in gun laws caused changes in firearms homicide or suicide rates was entirely dependent on a single assumption: that their synthetic controls could accurately predict how these rates would have trended in the target states, had those states not changed their gun laws.  The empirical support for this assumption in turn consists entirely of the temporal correspondence of pre-intervention trends in the synthetic control and those trends in the target state.

73.    The authors' own results, however, uniformly indicate that their synthetic controls had a very poor pre-intervention correspondence with actual trends in rates of firearms violence.  Consider, for example, Figure 1 (p. 1550), focusing on pre-intervention trends in the firearm homicide rate (to the left of the dashed vertical line).  In the figure pertaining to the Missouri

analysis (Figure 1b), the synthetic Missouri increases from 1997 to 1998, in effect predicting that Missouri's gun homicide rate would increase as well.  In reality, the actual rate (solid line) *decreased*.  Not only did the authors' synthetic Missouri fail to predict the magnitude of the actual change in firearm homicide, it did not even get the *direction* of change correct – something one could guess correctly 50% of the time by flipping a coin.  One might think this was just an isolated failure, but the next year's change (1998-1999) indicates the same thing – the SC predicted a decline in firearms homicide, but Missouri actually experienced another increase.  Then the SC predicted a reversal of trend from increases to decreases between 1999 and 2000, but actual gun homicides did precisely the opposite of what the SC predicted.  Indeed, in *every single year from 1997 to 2002,* actual changes in firearms homicide rates were exactly the opposite of what the authors' SC predicted.  In the last year before Missouri changed its law, from 2006 to 2007, the SC again failed to predict the direction of the change in firearms homicide.  The same unsupportive patterns can be found in the figure pertaining to Connecticut (Figure 1a) – the direction of change predicted by the Connecticut synthetic control was wrong for 1986-1987, 1987-1988, 1989-1990, and 1991-1992.  Even when the synthetic control got the direction of change correct, the magnitude of change was often wrong.  For example, the SC predicted a sharp decline from 1993 to 1994, but Connecticut actually experienced only a mild decline.

74.    Results in the online supplement Appendix A[4] regarding Maryland (see their figures A and B) and Pennsylvania (see their figures J, K, and L) likewise indicate that the authors' synthetic controls for those two states do a poor job of tracking pre-intervention trends in firearm and non-firearm homicides and suicides, and thus provide no sound basis for forecasting post-intervention trends, or judging the impact of the changes in gun laws.  In sum, the authors did not

---

[4] https://ajph.aphapublications.org/doi/suppl/10.2105/AJPH.2020.305822

have effective synthetic controls for any of the four states they studied, and thus no scientifically

valid basis for judging the effects of changes in purchasing licensing laws.  The statistical method

the authors contend to be "rigorous" (p. 1551) is anything but.

**The Authors' Interpretation of their Findings is Unwarranted**

75.    The authors claimed that, because post-intervention trends in homicide or suicide

rates deviated from what their synthetic controls predicted, the change in gun laws that they

happened to be studying caused the deviation.  This interpretation is unwarranted for two reasons.

First, even if the authors' synthetic controls were effective in predicting post-intervention trends

(something we know is not true), their interpretation of the results would still be unwarranted.  At

best, the SC method can only establish that *something* happened around the time of the intervention

to change firearms homicide or suicide rates.  It cannot establish what specific factor (or, more

likely, facto*rs*) changed at that time to produce the change.  The authors' opinion that it was

changes in firearms purchaser license laws that caused the change is little more than speculation

based on the temporal coincidence of the law change and the shift in gun violence trends.

However, as previously noted, virtually every drop in violence will *coincide* with some change in

law simply because of the frequency of law making and the frequency of violence declines, so this

coincidence is essentially meaningless.

76.    Second, there is an obvious alternative explanation for the deviation of (a) post-

intervention trends in homicide or suicide in the target state from (b) post-intervention trends in

the synthetic control.  Trends in the synthetic control's homicide or suicide are used as predictions

of future trends in homicide or suicide in the treated state, had no gun law changed.  Predictions

of future trends, however, tend to get less and less accurate the further into the future they are

projected.  For example, the weatherman can predict fairly well what the daily high temperature

will be tomorrow, and his predictions for a few days after that may be moderately accurate, but his predictions for two or three weeks into the future are usually much less accurate. Correspondingly, predictions of homicide or suicide for future years get worse and worse the more one tries to make predictions for times many years into the future. Thus, even if the purchaser licensing laws had no effect at all on homicide or suicides, one would still expect target states' trends in homicide or suicide to deviate more and more from what the synthetic control predicted the homicide or suicide would be, simply because the synthetic control's ability to predict future levels of violent crime degrades the further into the future the one goes.

77.     To summarize, the McCourt et al. study does not provide any credible evidence on the effects of background check laws. None of the three Webster-coauthored studies increases the scientific strength of Webster's support for Maryland's Handgun Qualifying License.

### References

Alper, Mariel, and Lauren Glaze. 2019. Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016. Special Report. Bureau of Justice Statistics. Available online at https://www.bjs.gov/content/pub/pdf/suficspi16.pdf.

Etten, Tamryn. 2002. Gun Control in Florida. Unpublished paper, School of Criminal Justice, Rutgers University.

Giffords Law Center to Prevent Gun Violence. 2021. The Case for Firearm Licensing. Available online at file:///C:/Users/Gary/Downloads/Giffords-Law-Center.The-Case-for-Firearm-Licensing%20(1).pdf.

Hasegawa, Raiden B., Daniel W. Webster, and Dylan S. Small. 2019. "Evaluating Missouri's handgun purchaser law." Epidemiology 30:371-379.

Killias, Martin. 1993. "Gun ownership, suicide, and homicide: an international perspective."

Pp. 289–303 in Anna del Frate, Uglijesa Zvekic, and Jan J. M. van Dijk, eds.,

Understanding Crime: Experiences of Crime and Crime Control. Rome: UNICRI.

Kleck, Gary. 1997.  Targeting Guns: Firearms and their Control. NY: Aldine de Gruyter.

Kleck, Gary. 2017.  "The Impact of the Repeal of Missouri's Handgun Permit Law on

Homicide: Comment on Webster et al. (2014)."  Paper available at the Social Science

Research Network, at https://www.ssrn.com/en/.

Kleck, Gary, Tomislav Kovandzic, and Jon Bellows. 2016.  "Does gun control reduce violent

crime?"  Criminal Justice Review 41:488-513.

Kleck, Gary, and E. Britt Patterson. 1993.  "The impact of gun control and gun ownership levels

on violence rates."  Journal of Quantitative Criminology 9(3):249-287.

Kleck, Gary, and Shun-yung Wang. 2009. "The myth of big-time gun trafficking." UCLA Law

Review 56(5):1233-1294.

Lester, David. 1987. "Availability of guns and the likelihood of suicide." Sociology and Social

Research 71:287-288.

Lott, John R., and John E. Whitley. 2001.  "Safe-storage gun laws: accidental deaths, suicides,

and crime." The Journal of Law and Economics 44:659-689.

Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2017.  "Handgun waiting periods

reduce gun deaths."  Proceedings of the National Academy of Sciences of the United

States of America (PNAS).

Ludwig, Jens, and Philip J. Cook. 2000.  "Homicide and suicide rates associated with

implementation of the Brady handgun violence prevention act." JAMA 284:585-591.

Makarios, Matthew D., and Travis C. Pratt.  2012.  "The effectiveness of policies and programs

that attempt to reduce firearm violence: a meta-analysis."  Crime & Delinquency

58(2):222-244.

Markush, Robert E., and Alfred A. Bartolucci. 1984. "Firearms and suicide in the United States."
American Journal of Public Health 74:123-127.

Marvell, Thomas B,, and Carlisle E. Moody. 1995. "The impact of enhanced prison terms for
felonies committed with guns." Criminology 33:247-281.

McCourt, Alexander D., Cassandra K. Crifasi, Elizabeth A. Stuart, Jon S. Vernick, Rose M. C.
Kagawa, Garen J. Wintemute, and Daniel W. Webster. 2020. "Purchaser licensing, point-
of-sale background check laws, and firearm homicide and suicide in 4 US states, 1985-
2017." American Journal of Public Health 110:1546-1552.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2002. "Firearm availability and suicide,
homicide, and unintentional firearm deaths among women." Journal of Urban Health 79:26-
38.

Smith, Tony, and Bradley R. Stevens. 2003. "A cross-national investigation of firearm
availability and lethal violence." European Journal of Psychiatry 17:34–37.

Selvin, Hanan C., and Alan Stuart. 1966. "Data-dredging procedures in survey analysis." The
American Statistician 20:20-23.

U.S. Federal Bureau of Investigation. 2007. Uniform Crime Reports, 2007. Available online at
https://www2.fbi.gov/ucr/cius2007/offenses/expanded_information/data/shrtable_10.html

Webster, Daniel W., C. K. Crifasi, and J. S. Vernick. 2014. "Effects of the repeal of Missouri's
handgun purchaser licensing law on homicides." Journal of Urban Health 91:293-302.

Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marissa D. Booty, Elizabeth
A. Stuart. 2020. "Evidence concerning the regulation of firearms design, sale, and

carrying on fatal mass shootings in the United States." Criminology & Public Policy
19:171-212.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 1-26-21

Gary Kleck

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No. 16-cv-3311-ELH** |
| | ) |
| **LAWRENCE HOGAN, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### Plaintiffs' Cross-Motion for Summary Judgment

Plaintiffs Maryland Shall Issue, Inc., Deborah Kay Miller, Susan Brancato Vizas, and Atlantic Guns, Inc. (collectively, "Plaintiffs"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, move for summary judgment on all counts of Plaintiffs' Amended Complaint and oppose Defendants' Motion for Summary Judgment for the reasons stated in their accompanying Memorandum and request a hearing on their Cross-motion.

Respectfully submitted,

Cary J. Hansel (Bar No. 14722)  
2514 N. Charles Street  
Baltimore, MD 21218  
Phone: 301-461-1040  
Facsimile: 443-451-8606  
cary@hansellaw.com  

Counsel for Plaintiffs

John Parker Sweeney (Bar No. 08761)  
James W. Porter, III (Bar No. 19416)  
Marc A. Nardone (Bar No. 18811)  
Bradley Arant Boult Cummings LLP  
1615 L Street N.W., Suite 1350  
Washington, D.C. 20036  
Phone: 202-393-7150  
Facsimile: 202-347-1684  
jsweeney@bradley.com  

Counsel for Plaintiff Atlantic Guns, Inc.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 27th day of January, 2021, the foregoing was served, via electronic delivery to Defendants' counsel via CM/ECF system which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
John Parker Sweeney (Bar No. 08761)

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 118 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/28/21   Page 1 of 3
Case 1:16-cv-03311-ELH   Document 86   Filed 10/25/18   Page 1 of 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.;** | ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Case No.: 16-cv-3311-ELH** |
| **v.** | ) ) | |
| **LAWRENCE HOGAN, et al.;** | ) ) ) | |
| **Defendants.** | ) ) | |

### <u>DECLARATION OF STEPHEN SCHNEIDER</u>

I, Stephen Schneider, under penalty of perjury, declare and state as follows:

1.      I am more than 18 years of age and am competent to testify, upon personal knowledge, to the matters stated below.

2.      I am the owner and president of Atlantic Guns, Inc. ("Atlantic Guns"). Atlantic Guns is a family-owned firearms retailer founded in 1950 by my father.

3.      Atlantic Guns is a licensed Maryland regulated firearms dealer, and it buys, sells, receives, and transfers firearms including handguns within and without Maryland.

4.      Atlantic Guns has two locations. One in Rockville, Maryland, and one in Silver Spring, Maryland.

5.      Atlantic Guns' customers and prospective customers are law-abiding, responsible Maryland citizens who wish to possess handguns for self-defense in their homes but are deterred from doing so by Maryland's Handgun License requirement.

**EXHIBIT
1**

6.    Handguns are the most popular choice of Atlantic Guns' customers for self-defense in the home.

7.    Atlantic Guns' business has been severely impacted by the passage of Maryland's Handgun License requirement because it is barred by law from providing handguns to customers who do not have a Handgun License.

8.    Atlantic Guns turns away would be customers every week for this reason, totaling at least in the hundreds over the five years since the Handgun License requirement took effect. Sometimes prospective customer place a deposit on a handgun, which we then hold pending their obtaining a Handgun License. Some of these customers later request refunds and the sale is not consummated.

9.    Since the Handgun License took effect in Maryland, Atlantic Guns has sold significantly fewer handguns per year. According to the Maryland State Police records, comparing the four years prior to the Handgun License enactment in 2013 (2009–2012) to the four years following (2014–2017), Atlantic Guns lost approximately ▮▮▮▮▮ of its prior handgun sales after the Handgun License requirement was imposed. Exhibit A. Atlantic Guns' gross revenues from handgun sales have also decreased by ▮▮▮▮▮ since the Handgun License requirement took effect. Exhibit B.

10.    Additionally, the average cost of a new handgun in Maryland is between approximately $500 and $600.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

_Stephen Schneider_
Stephen Schneider

10/3/18
Date

-2-

REDACTED

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2018, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the District of Maryland by using the CM/ECF system, which will provide service to all counsel of record, who are registered CM/ECF users.

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Counsel for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.;** | ) | |
| | ) | |
| | ) | **Case No.: 16-cv-3311-ELH** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWRENCE HOGAN, et al.;** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### DECLARATION OF MARK W. PENNAK,
### PRESIDENT, MARYLAND SHALL ISSUE, INC.

COMES NOW the declarant, Mark W. Pennak, and hereby solemnly swears under the penalties of perjury and upon personal knowledge that the contents of the following declaration are true:

1. My name is Mark W. Pennak and I am over eighteen (18) years of age, and competent to testify. I am the President of plaintiff Maryland Shall Issue ("MSI"), which provides representation in this suit on behalf of itself and its members. I became President of MSI in 2016 and prior to that time I was Vice-Chairman of the Board, a Board member and a member of MSI. I have been an attorney since 1975, and I have been active member of the Bar of the District of Columbia since 1976, and an active member of the Maryland Bar since May of 2019. For more than 33 years, I practiced law as an attorney at the Appellate Staff of the Civil Division of the United States Department of Justice until I retired from the federal government on October 31, 2016. I remain an active member of the D.C. Bar and the Maryland Bar. As President of MSI, I

**EXHIBIT 2**

JA0595

have testified repeatedly, both orally and in written testimony, before Committees of the Maryland General Assembly as a legal expert in federal and state firearms law and the law of self-defense.

2. MSI is a non-profit membership organization incorporated under the laws of Maryland with its principal place of business in Annapolis, Maryland, with approximately 1900 members, statewide. By an overwhelming margin, MSI members are residents of Maryland. "MSI is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public." https://www.marylandshallissue.org/jmain/index.php. These purposes of MSI include promoting and defending the exercise of the right to keep and bear arms. MSI thus endorses, promotes and encourages law-abiding adults, who are otherwise legally qualified to own and possess firearms, to acquire and to become proficient in the use of handguns for lawful self-defense purposes. This purpose encompasses defending the Constitutional right of law-abiding persons to lawfully purchase, own, possess and carry firearms and firearms accessories. Pursuant to that objective, MSI brought this suit as lead plaintiff.

3. The membership of MSI includes each of the named individual plaintiffs in this suit as well as numerous other individuals who do not possess a Handgun Qualification License and who are faced with the obstacles created by MD Code, Public Safety, § 5-117, and the implementing regulations of the Maryland State Police, concerning their constitutional right to purchase a handgun in Maryland. MSI brings this suit on its own behalf as an organization and on behalf of each of its many members who do not have an HQL, its many members who object to the HQL requirements, and its many members who have been deterred from exercising their Second Amendment right to acquire a handgun because of the HQL requirements. MSI has many members

2

who are National Rifle Association ("NRA") instructors as well as "qualified handgun instructors" within the meaning of Section 5-117.1, including the undersigned and most of the officers and Board members of MSI.

4. I am a Maryland State Police certified "qualified handgun instructor" within the meaning of MD Code, Public Safety, § 5-117.1(d)(3)(i), for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and have been since 2013. I am also a National Rifle Association ("NRA") certified instructor in Rifle, Pistol, Personal Protection in the Home, Personal Protection Outside the Home and Muzzleloading. I am a NRA certified Range Safety Officer. As a Maryland State Police certified "qualified handgun instructor," I have, on numerous occasions, given instruction and training to students seeking the Handgun Qualification License under Section 5-117.1 and Maryland State Police regulations, as well as providing instruction to persons seeking to obtain the Maryland Wear and Carry Permit under MD Code, Public Safety, § 5-306. I have also given instruction to persons seeking NRA certificates in the "Basic Pistol," "Personal Protection In the Home" and "Personal Protection Outside the Home" courses. I have been long-standing merit badge counselor for the Boy Scouts of America and have given rifle and pistol firearms instruction to Scouts in that capacity. I am a member of the Frederick County Chapter of the Izaak Walton League of America, as well as a member of two other private firing ranges in Frederick County, MD. I also give informal handgun instruction to individuals outside of these formal courses. While the regulations adopted by the Maryland State Police set forth general contents of the HQL course, the State Police have never monitored or supervised the actual instruction accorded in my HQL training courses.

5. As a member of MSI, I participated in presenting expert panel testimony to the Maryland General Assembly in opposition to the enactment of the Firearms Safety Act of 2013 in the

JA0597

Maryland General Assembly. See http://mgahouse.maryland.gov/mga/play/8697a09e-c001-4bb4-a558-f365e3c5422b/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c. MSI actively and strongly opposed enactment of that legislation at the time. That opposition included opposing the proposed handgun qualification license provisions that became law and are codified as MD Code, Public Safety, § 5-117.1. I am the drafter of and a signatory to the MSI Comments On Proposed Weapons Regulations, Maryland Register for Regulations .01-.58 under COMAR 29.03.01 Regulated Firearms, as published in Maryland Register Volume 40, Issue 19, Friday, September 20, 2013 40 MD REG 1568 et seq. (Sept. 20, 2013). Those comments were submitted to the Maryland State Police on behalf of MSI and each of its Board members and Officers in October of 2013 in opposition to the regulations adopted by the Maryland State Police under Section 5-117.1 and which are at issue in this case. A true and correct copy of those comments submitted to the Maryland State Police is attached as Exhibit A.

6. The objectives and purposes of MSI include promoting the constitutional right of lawful armed self-defense and the lawful armed defense of family and loved ones. As part of its mission, MSI actively encourages all law-abiding adult citizens of this State to acquire handguns for lawful self-defense in and outside the home. MSI defends the constitutional rights of law-abiding citizens to purchase handguns, in court, before the Maryland General Assembly and in other public and private forums. The HQL requirements, MD Code, Public Safety, § 5-117.1, and the implementing Maryland State Police regulations, burden and obstruct the exercise of the right of law-abiding residents of Maryland, including MSI members, to acquire handguns for lawful self-defense in and outside the home and thus frustrates the mission of MSI.

7. As a Maryland State Police certified "qualified handgun instructor" for the HQL class, I have had numerous occasions to give instruction in "a firearms orientation component that

demonstrates the person's safe operation and handling of a firearm," required by MD Code, Public Safety, § 5-117.1(d)(3)(iii). I have charged $100, plus expenses, for the HQL training course. I am aware that other instructors charge at or in excess of $100. For instance, Guntry in Owings Mills charges $175.00 (including fingerprints), the Frederick Chapter of the Izaak Walton League of America charges $150.00 (without fingerprinting), Gilbert Indoor Range in Rockville offers the course for "free" with the purchase of an annual membership that costs $175.00, and The Machinegun Nest in Frederick charges $100 per person.

8. The firearms instruction I offer includes the hands-on use by students of actual handguns of various types, including single and double action revolvers and semi-automatic handguns of different makes, models and calibers. This classroom orientation instruction has never required or involved the use of live ammunition. In the classroom, a student achieves a full orientation concerning the functionality and the safe operation and handling of all these types of handguns without live ammunition. As a basic safety measure, live ammunition is never permitted anywhere in the classroom at any time in any class that I have taught. This ban on ammunition in the classroom is also a hard and fast rule in all NRA courses I have ever taught or participated in as a student. Such bans on live ammunition in the classroom is a matter of basic safety and are standard operating procedures in firearms instruction.

9. In the HQL and the NRA classes that I have taught, the orientation component of firearms instruction that demonstrates safe operation and handling of a handgun includes the use of dummy rounds, sometimes referred to as "snap caps." A dummy round or "snap cap" is typically made of metal and plastic and is the same size and shape of an actual round of live ammunition but contains no actual primer, bullet or powder. Such dummy rounds or snap caps allow the student to practice loading an actual handgun using the dummy rounds, pulling the trigger and otherwise

5

operating the handgun thus "loaded" with dummy ammunition. A "snap cap" has a part that functions as a center fire impact "primer," which is usually connected to a spring inside the body of the snap cap that allows the firing pin or hammer of the handgun to impact the "primer" without damaging the firearm. A dummy round or snap cap thus protects the firearm from damage that can result in some types of handguns from "dry firing" on an empty chamber. The use of such dummy rounds also the student to mimic the operation of live ammunition by allowing the slide of a semi-automatic handgun to chamber a round in the same way as it would with a live round of ammunition.

10. But for the Maryland State Police requirement, imposed by COMAR 29.03.01.29 C 4, that a student "fires at least one round of live ammunition," I would never have any occasion or reason to include "live fire" in providing HQL instruction on any of the elements of instruction required by Section 5-117.1. Omitting live fire instruction would permit me to offer full HQL instruction at any suitable location, such as the student's home. I have never found it necessary for a student to fire a round of live ammunition in order for the student to "demonstrate safe operating and handling of a firearm." I routinely teach the safe operation and handling of a handgun, using real firearms, without the student engaging in live fire. Firing one live round accomplishes no training objective at all.

11. As a certified NRA instructor, I have also taught the NRA Basic Pistol course, as well as more advanced courses, such as Personal Protection in the Home and Personal Protection Outside the Home. The Basic Pistol course is a minimum of 8 hours of instruction and the more advanced "Personal Protection" classes are a minimum of 16 hours of instruction. All such courses include very extensive live fire as well as extensive instruction on the safe use, handling and operation of handguns. The eight hour Basic Pistol class typically involves approximately 200

6

rounds of live fire of pistols. The 16 hour "Personal Protection" courses typically involve approximately 300 rounds of live fire of pistols. The "Personal Protection" courses also require extensive legal instruction. This legal instruction must be given by either a law enforcement officer or an attorney and includes the same basic areas of legal instruction mandated by the HQL statute. These courses, including the Basic Pistol course, are widely accepted as sufficient proof of live fire training by States, such as Florida and Virginia, which require live fire training for the issuance of a concealed carry permit for carrying a handgun in public. The HQL statute, Section 5-117.1(d)(3), allows the Maryland State Police to approve "a firearms safety training course." Yet, the Maryland State Police do not recognize any of these NRA courses as sufficient training for purposes of the HQL, even though the HQL regulates only the acquisition of handguns and cannot be used to legally carry a handgun in public.

12. Section 5-101(q)(3) of the Maryland Code of Public Safety specifically defines "Qualified handgun instructor" to include an instructor who "has a certification issued by a nationally recognized firearms organization," such as the NRA. Yet, notwithstanding Section 5-101(q)(3), NRA certified instructors are not recognized as instructors by the Maryland State Police. Accordingly, any HQL course taught by such NRA instructors are not considered valid by the State Police **unless** the NRA instructor **also** possesses a Qualified Handgun Instructor license **issued by the State Police**. The State Police have thus effectively done away with Section 5-101(q)(3) instructors and NRA training as a separate category of "qualified handgun instructors." In order to provide HQL instruction, the NRA instructor must apply to the State Police for a "Qualified Handgun Instructor Certificate." That certificate, once issued, contains the instructor's State Police identification number. Only if the course is taught by a Maryland State Police certified "qualified handgun instructor" will the instruction be recognized by the Maryland State Police for

JA0601

purposes of issuing the Handgun Qualification License. The on-line application process used by the State Police requires each applicant to identify the applicant's instructor by reference to the State Police issued instructor number. Only State Police licensed instructors appear on the State Police website of approved instructors. In addition, all HQL instructors must establish their own on-line accounts with the State Police. Such instructors must use that on-line account to verify the training received by a student after the student submits an application for the HQL. Such instructor on-line verification is required before any HQL is issued by the State Police. None of these instructor requirements and verification procedural steps is set forth in State Police regulations. Yet, all of these requirements are mandatory, as enforced by the State Police.

13. The Maryland State Police regulations, COMAR 29.03.01.29 C (4), require the student to "safely fire[]" a live round. The Maryland State Police requirement of "live fire" in the HQL course requires the use of a firing range, as firing even one live round of ammunition can only be done "safely" on a properly constructed range. In Comments submitted to the Maryland State Police by MSI during its rulemaking process, MSI strongly objected to the live fire requirement, noting this need for a range and that most firing ranges "are relatively few in number in Maryland and mostly privately owned." *See* MSI Comments at 9. While the State Police accepted other comments made by MSI, the comments on the live fire requirement were ignored by the Maryland State Police in issuing the regulations at issue here. *See* 2013 MD REG TEXT 338193 (NS) (Dec. 23, 2013). As further detailed below, the discharge of ammunition is generally banned in the more populated areas of Maryland, except at established firing ranges. State law bars counties and municipalities from prohibiting the discharge of firearms at established ranges. MD Code, Criminal Law, § 4-209(d)(2). The City of Baltimore has no private or publicly available firing range. As a result of the Maryland State Police requirement of "live fire," the absence of a range

JA0602

in Baltimore means that it is legally impossible for me as an instructor to complete the HQL training of a student in the City of Baltimore. The population of the City of Baltimore is over 600,000 people.

14. A similar problem exists in Baltimore County. Section 17-2-101(a) of the Baltimore County ordinances provides that, with listed exceptions, "a person may not fire or discharge a crossbow, pistol, air pistol, gas-propelled pistol, rifle, air rifle, gas-propelled rifle, or shotgun within: (1) The limits of the metropolitan district of the county; (2) A nondistrict enclave within the metropolitan district; or (3) An appendage attached to the metropolitan district." The "metropolitan district" of Baltimore County is "the geographic boundary within which a property may be eligible to receive public water and sewer service." https://bit.ly/3sHPqjJ. That area is quite large, encompassing almost the entirely of the heavily populated areas of the County all around Baltimore City. *See* maps set forth at https://www.baltimorecountymd.gov/Agencies/publicworks/basicservices.html. Like the other counties, there is an exception for discharges "[o]n a permanently located, properly posted, and bona fide target range, the location of which has been filed with the Police Department." Section 17-2-101(c)(2)(i). However, like other counties, there are relatively few public ranges in Baltimore County available for HQL pistol instruction. The population of Baltimore County is over 800,000 people.

15. On November 17, 2017 (after this suit was filed and after the State's Motion To Dismiss was denied on September 6, 2017), the Maryland State Police announced in Advisory LD-HQL-17-004 (Exh. B), that it had determined that "the use of non-lethal marking projectiles would meet the HQL 'live fire' training requirement." That Advisory also states that such marking ammunition, often also called "simunition" rounds, is acceptable if it meets the Maryland statutory

definition of ammunition set forth in MD Code, Public Safety, §5-133.1(a), in that it is "a cartridge, shell, or any other device containing explosive or incendiary material designed and intended for use in a firearm." I have personally used such simunition rounds at the Drug Enforcement Administration Academy of the Department of Justice located at Quantico, Virginia. Simunition rounds are not the same as "paint ball" rounds, as paint ball rounds typically use compressed air or CO2 as a propellant, and thus do not qualify as live ammunition under MD Code, Public Safety, §5-133.1(a). Accordingly, paint ball rounds may not be used to satisfy the State Police requirement of live fire.

16. Simunition rounds use a projectile (usually plastic) that impacts the target with enough force to cause a deep, painful bruise and could cause serious injury to an unprotected face, eyes, throat or other sensitive tissues of the body. Such ammunition is typically used in realistic "force-on-force" combat training exercises in which special protective equipment is mandatory. Because this simunition ammunition uses an explosive charge, firing such ammunition can be quite loud. For example, firing a 9mm simunition round results in an explosive noise of approximately 139 decibels (weapon dependent), a level widely recognized as sufficient to cause ear injury. https://www.cdc.gov/nceh/hearing_loss/what_noises_cause_hearing_loss.html. Without such special protective equipment, the "safe" way to fire a simunition round is at a suitable range with ear and eye protection. As a "qualified handgun instructor" and a certified NRA instructor, I would not give instruction involving the firing of any live round of ammunition, including simunition rounds, in any other way.

17. Simunition firearms require not only special ammunition but also special physical modifications to existing handguns in order for them to fire such simunition rounds. *See, e.g.*, https://simunition.com/en/. To my knowledge, very few HQL instructors, including myself, own

10

JA0604

or have ready access to such conversion equipment necessary to modify existing handguns to fire simunition rounds. Acquiring such equipment typically requires not only instructor credentials, but also contracts to purchase the training systems provided by the manufacturer, special insurance, attendance at a certification course, and other requirements. *See*, *e.g.*, https://simunition.com/en/range_program.

18. The Maryland State Police Advisory LD-HQL-17-004 correctly recognizes that simunition rounds are legally considered to be live ammunition. Ex. B. Accordingly, the actual firing of such simunition rounds is regulated by counties and municipalities in Maryland the same way that the firing of other types of live ammunition is regulated. While preempting most local laws concerning firearms, State law expressly permits such local regulation of firearm discharges. *See* MD Code, Criminal Law, § 4-209(d). In Montgomery County, Maryland, where I live, the County broadly bans, with limited exceptions, the discharge of live ammunition anywhere in the Montgomery County "urban area." *See* Montgomery County Ordinances Ch.57, Section 57-4. The "urban area" of Montgomery County is most of Montgomery County, including all areas south, southeast of Black Hill Regional Park in north-central Montgomery County, south and east of Seneca Creek State Park in western Montgomery County and all areas south and west of designated areas right on the border of Montgomery County in the eastern portion of the County. *See* Ex. C. In so far as relevant to HQL instruction, the sole exception to this general ban is a "shooting range that the Firearms Safety Committee has inspected and approved in writing." Section 57-4(b)(1).

19. To my knowledge, there is only one such authorized shooting range open to the public in the Montgomery County "urban area"—the privately owned Gilbert Indoor Range located at 14690 Rothgeb Drive, Rockville, Maryland. My understanding is that while Gilbert's provides HQL classes, it does not permit other instructors to use its range for that purpose. While there are

private ranges operated by chapters of The Izaak Walton League of America in Montgomery County, access to these ranges is restricted to members and their guests only. To my knowledge, there are no other established ranges anywhere else in Montgomery County. The population of Montgomery County is over 1 million people.

20. When I give HQL and other firearms instruction, I generally do so in Frederick County which has more ranges and has no such extensive or county-wide bans on discharges of firearms. In Frederick County, I have thus been able to give live fire instruction on private land other than at an established range. Frederick County is, however, highly inconvenient to persons living in lower Montgomery County. Potential students of mine who have contacted me for HQL training have declined to take the training when I informed them that they would have to travel to Frederick County to receive the live fire training required by the Maryland State Police.

21. Prince Georges County effectively bans the discharge of a firearm anywhere in Prince Georges County. *See* County Code Section 14-142(a) ("No person shall practice shooting at any mark, board, sign, tree, bank, or other object with any gun, rifle, cannon, mortar, pistol, or other firearm within the limits of this County . . . ."). Such a discharge is allowed only with the written consent of "all owners, tenants, or occupants of real estate residing within the carrying capacity of such firearms." The exception for established firing ranges (Section 14-142(c)(3)) does not enable me provide HQL instruction in Prince Georges County, as it appears that there are only two such public ranges anywhere in or near Prince Georges County (the Maryland Small Arms Range and Fred's Outdoors). Maryland Small Arms Range is located at 9801 Fallard Court, Meadows, Maryland, near Joint Base Andrews, which is far from my home. Fred's Outdoors is located at 2895 Crain Hwy., Waldorf, Maryland, in or immediately adjacent to Charles County, which is even farther from my home. The population of Prince George's County is over 900,000 people.

12

JA0606

22. Baltimore City bans the "discharge" of "any gun, pistol or firearm" in the City of Baltimore, with the only exception being that such discharge of firearms is allowed "on permanently located, properly posted and bona fide target ranges, the location of which has been fled (sic) with the Police Department of Baltimore City." Section 59-2 of Article 19 of Baltimore Ordinances. To my knowledge, there are no such ranges anywhere in the City of Baltimore, other than the police range, access to which is limited to law enforcement officers. The lack of a firing range effectively means that the Maryland State Police mandated live fire training for the HQL class cannot be legally completed within the City of Baltimore.

23. But for the Maryland State Police "live fire" requirement, I could and would conduct and complete HQL instruction in any otherwise suitable location, including in Baltimore City, Montgomery County and Prince Georges County, as state law expressly bars any county or municipality from prohibiting firearms safety training. MD Code, Criminal Law, § 4-209(b)(2) ("A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety . . . ."). Specifically, without the "live fire" requirement, I could and would increase HQL training to students as it could be completed in student homes or other meeting locations that are convenient to students and instructors alike.

Signed: _____    Dated: Jan 23, 2021

Mark W. Pennak
President, Maryland Shall Issue, Inc.

13

JA0607

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 134 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 14 of 39
Case 1:16-cv-03311-ELH   Document 75-2   Filed 10/05/18   Page 14 of 39



**MARYLAND SHALL ISSUE®**
SELF DEFENSE IS A CIVIL RIGHT

**President**
Patrick Shomo

**Vice President**
Dan Blasberg

**Secretary**
Brian Simmons

**Treasurer**
David Michailof

**Board of Directors**
Peter Bagnell
George Durst
Mark Pennak
Rob Bowman
Greg Primrose
Teddy Schatz
Frank Zastawnik

**Membership Comittee**
Peter Bagnell
Jef Fernley
David Michailof

**Events Committee Chair**
Glen LaAsmar

October 2013

VIA USPS and EMAIL to
Thomas.Vondersmith@maryland.gov

Thomas L. Vondersmith, Jr.
Administrator
Department of State Police
1201 Reistertown Road
Pikesville, MD 21208

Re:     Comments On Proposed Weapons Regulations, Maryland Register for Regulations .01-.58 under COMAR 29.03.01 Regulated Firearms, as published in Maryland Register Volume 40, Issue 19, Friday, September 20, 2013 40 MD REG 1568 et seq. (Sept. 20, 2013)

### COMMENTS OF *MARYLAND SHALL ISSUE* AND OF ITS DIRECTORS AND OFFICERS, INDIVIDUALLY AND ON BEHALF OF *MARYLAND SHALL ISSUE*

These comments are submitted in response to the Proposed Weapons Regulations published by the Maryland State Police in the Maryland Register for Regulations .01-.58 under COMAR 29.03.01 Regulated Firearms, published in Maryland Register Volume 40, Issue 19, Friday, September 20, 2013 40 MD REG 1568 et seq. (Sept. 20, 2013). The comments set forth below on behalf of Maryland Shall Issue,(MSI), a duly incorporated Section 501(c)(4) educational organization and on behalf of each of the Directors and Officers of MSI in their individual and official capacities, including President - Patrick Shomo, Vice President - Dan Blasburg, Treasurer - Dave Michailof, Secretary - Brian Simmons and the following members of the MSI Board of Directors : Peter Bagnell, George Durst, Mark Pennak, Rob Bowman, Greg Primrose, Frank Zastawnik, and Teddy Schatz. For the reasons set forth below, the regulations are seriously flawed and cannot be implemented as currently written. Nothing in these comments should be construed as a waiver or acceptance by MSI, or by its officers and directors, of the underlying legality or constitutionality of any provision of SB 281. Rather, these comments are limited to addressing some of the major flaws and

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

1

EXHIBIT A

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022      Pg: 135 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 15 of 39
Case 1:16-cv-03311-ELH   Document 135-3   Filed 10/05/20   Page 15 of 39

shortcomings in the implementation of SB 281 by the State Police in the proposed regulations.

## I.   THE REGULATIONS VIOLATE SECTION 7 OF THE PRIVACY ACT, 5 U.S.C. 552A NOTE IN REQUIRING SOCIAL SECURITY NUMBERS.

The regulations repeatedly require an applicant for various permits and licenses to submit his federal Social Security Number (SSN).  This submission is mandatory and any failure to include appears to be subject to punishment or denial of the application on that basis alone.  These requirements to submit a Social Security number are flatly in violation of Section 7(a) and Section 7(b) the Privacy Act, 5 U.S.C. 552 Note, Public Law 93-579 (1974), and must be eliminated.

Specifically, Section 7(a)(1) of the Privacy Act makes it unlawful for "[a]ny Federal, State or local government agency" to "deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."  Section 7(b) of the Privacy Act provides that an agency that any agency that "requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it."  Section 7(a) and Section 7(b) create individually enforceable rights that supersede and preempt any provision of state law in conflict with these requirements.  See, e.g., *Schwier v. Cox*, 340 F. 3d 1284, 1288 (11th Cir. 2003) (holding that Section 7 of the Privacy Act "clearly confers a legal right on individuals: the right to refuse to disclose his or her [social security number] without suffering the loss 'of any right, benefit, or privilege provided by law.'"); *Ingerman v. Del. River Port Auth.*, 630 F.Supp.2d 426, 437–38 (D.N.J. 2009) (same).  These provisions may be enforced as federal rights under 42 U.S.C. 1983, and attorneys' fees and costs may be awarded against the state and state officers in any such suit under 42 U.S.C. 1988.  (Id.).

Numerous sections of the proposed regulations violate Section 7 of the Privacy Act.  Specifically, the following subsections in the proposed regulations demand the applicant's Social Security Number (references are to COMAR 29.01.01.xx, as proposed):

1. A new resident of MD must register his regulated firearms and provide his SSN (Section .05);

2. The purchaser of a regulated firearm must include the applicant's SSN (Section .16);

3. A multiple purchase applicant must include the SSN (Section .24);

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
2

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 136 of 460

Case 1:16-cv-03311-ELH    Document 135-2    Filed 01/29/21    Page 16 of 39
Case 1:16-cv-03311-ELH    Document 135-2    Filed 10/05/23    Page 16 of 39

4. A designated collector applicant must provide his SSN (Section .25);

5. The applicant for a Handgun Qualification License must include the SSN, both initially and upon renewal (Sections .28 and .34);

6. The SSN must be provided by applicants for instructor designation and renewals of the designation (Sections .38 and .39);

7. An applicant for a dealer's license must include his SSN (Section .45 );

8. A dealer must provide the transferee's SSN in complying with his duties to provide shell casings (Section .58).

This demand for the social security number also appears in the proposed regulations for the hand gun carry permit, COMAR 29.03.02 et seq. Handgun Permit Unit.  Specifically, an applicant for a carry permit must provide his SSN both in the initial application (Section .04) and upon any application for a renewal (Section .12).

All these provisions are in violation of federal law.  Specifically, these provisions violate Section 7(b) of the Privacy Act in that none of these sections "inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it."

The new proposed regulations also violate Section 7(a) of the Privacy Act in that the regulations expressly state that the State Police will deny the application or license if the SSN is omitted.  Indeed, the proposed regulations even threaten criminal prosecution for any such omission, stating:

.06 False or Omitted Information.

A. An applicant shall not provide false information on an application for a permit, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

B. Any knowing material omission or false statement may be considered grounds for denial of a permit or for criminal prosecution.

.17 Regulated Firearm Application—False or Omitted Information.

A. Any false information supplied or statement made in the application is a crime which may be punished by imprisonment for a period of not more than 3 years, or a fine of not more than $5,000, or both.

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
3

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 137 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 10/05/18   Page 17 of 39
Case 1:16-cv-03311-ELH   Document 125-3   Filed 01/29/21   Page 17 of 39

B. An applicant shall not provide false information on a regulated firearm application, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

C. Any knowing material omission or false statement may be considered grounds for disapproval of an application or for criminal prosecution.

.46 Dealer's License—False or Omitted Information.

A. An applicant may not provide false information on an application for a dealer's license, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

B. Any knowing material omission or false statement may be considered grounds for denial of a license or for criminal prosecution.

.30 Handgun Qualification License—False or Omitted Information.

A. An applicant shall not provide false information on the application for Handgun Qualification License, or omit significant information on the application, or cause false information to be given in connection with the verification investigation.

B. Any knowing material omission or false statement may be considered grounds for denial of a license or for criminal prosecution.

Plainly, the regulations threaten to do precisely what Section 7(a) bans, viz., "deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."  Indeed, the threat of criminal prosecution for any such omission is particularly egregious.  These provisions are flatly illegal.

## II.    THE REGULATIONS UNLAWFULLY BAN AMMUNITION "SOLELY DESIGNED FOR A REGULATED FIREARM"

Section .03 of the new regulations purports to ban the possession of ammunition by persons under the age of 21 if the ammunition is "solely designed for a regulated firearm."  Specifically, Section .03(B) states:

B. A person under the age of 21 years may not possess a regulated firearm **or ammunition solely designed for a regulated firearm,** unless the person is not otherwise prohibited from possessing a regulated firearm and is:

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 138 of 460

Case 1:16-cv-08811-ELH   Document 135-2   Filed 10/03/18   Page 18 of 39
Case 1:16-cv-08811-ELH   Document 135-2   Filed 01/29/21   Page 18 of 39

(1) A member of the armed forces of the United States or the National Guard and is performing official duties;

(2) Required to possess a regulated firearm for employment purposes and holds a valid permit under Public Safety Article, Title 5, Subtitle 3, Annotated Code of Maryland;

(3) Temporarily transferring or possessing a regulated firearm or ammunition and is:

(a) Under the supervision of another who is at least 21 years old and who is not prohibited by federal or State law from possessing a firearm; and

(b) Acting with the permission of the parent or legal guardian of the person;

(4) Temporarily transferring or possessing a regulated firearm or ammunition and is:

(a) Participating in marksmanship training of a recognized organization; and

(b) Under the supervision of a qualified instructor; or

(5) Possessing the firearm for self-defense or the defense of others against a trespasser into the person's residence or a residence in which the person is an invited guest.

This provision, to the extent it addresses "ammunition solely designed for a regulated firearm," is contrary to law and beyond the authority of the Maryland State Police.

The ammunition ban is simply not authorized, either by Senate Bill 281 or by any other provision of state law. SB 281 amends Section 5-133.1 of the Public Safety Article to state:

(B) A Person May Not Possess Ammunition If the Person Is Prohibited from Possessing a Regulated Firearm under § 5–133 (B) or (C) of this Subtitle

These provisions of Section 5-133.1 as enacted by SB 281 are now reflected in the proposed regulations in new section.06 Ammunition.  That section states:

A. A person may not possess ammunition if the person is prohibited from possessing a regulated firearm under Regulation .03A of this chapter or Public Safety Article, §5-133(b)-(c), Annotated Code of Maryland.

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
5

JA0612

However, Section 5-333(b) and (c), as amended, do not purport to ban, or even address, possession of a regulated firearm by a person on account of their being under the age of 21. Section 5-133(d) does purport to ban possession of regulated firearms by persons under the age of 21, but, as re-enacted by SB 281, nothing in Section 5-133(d) purports to address possession of ammunition, must less ammunition possession by persons under the age of 21, much less ammunition "solely designed for a regulated firearm." In short, nothing in any current Maryland statute purports to address, much less ban, possession of ammunition "solely designed for a regulated firearm" as Section .03 does.

The language in the proposed regulations banning possession of ammunition by persons under the age of 21 appears to have been taken from an earlier version of Section 5-133(d), which did specifically contain the language set forth in the proposed regulations. However, that language was repealed in legislation enacted by the General Assembly in 2011. Specifically, Acts 2011, c. 343, § 1, in subsecs. (d)(1), (d)(2)(i), and (d)(2)(iv), deleted "or ammunition solely designed for a regulated firearm" after "regulated firearm"; and in subsec. (d)(2)(vi), deleted "or ammunition" after "possession of a firearm." A copy of that legislation is attached and is incorporated into these comments by reference.

The State Police lack the discretion to re-impose a ban on "ammunition solely designed for a regulated firearm" where precisely that ban was repealed by the General Assembly in 2011. The law of Maryland clearly establishes that "[a]n agency's authority extends only as far as the General Assembly prescribes." *Thanner Enterprises, LLC v. Baltimore County.* 414 Md. 265, 995 A.2d 257 (2010). See also *Board of Liquor License Commissioners v. Hollywood Productions, Inc.*, 344 Md. 2, 10, 684 A.2d 837, 841 (1996) ("[R]egardless of any rule making authority that the Liquor Board may enjoy, it may not impose a sanction that exceeds the confines of its expressly or impliedly delegated powers."). Nothing in SB 281 authorizes the State Police to impose new restrictions not otherwise imposed by statute. The ban imposed by Section .03 cannot be justified as an interpretative matter, as there is no phrase or term that could possibly support this ban. The legislative intent was expressed in 2011 with the repeal of the very language that Section .03 re-imposes. The ban is lawless and thus must stricken.

The language "solely designed for regulated firearms" is objectionable for the additional reason that it is hopelessly vague and undefined, thus raising fundamental Due Process Clause concerns. See, e.g., *FCC v. Fox Television Stations, Inc.* 132 S.Ct. 2307, 2317 (2012) ("the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). These

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
6

JA0613

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022    Pg: 140 of 460

Case 1:16-cv-08811-ELH   Document 125-2   Filed 01/29/21   Page 20 of 39
Case 1:16-cv-08811-ELH   Document 135-3   Filed 10/03/18   Page 20 of 39

concerns are at a zenith when a vague statute purports to regulate the exercise of fundamental constitutional rights. (Id.) ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."). Nowhere in these draft regulations is there any definition for what constitutes ammunition "designed solely" for regulated firearms. For example, if the language "solely designed" is meant to mean solely "used" in handguns, then the language is nonsensical. In fact, many, if not most, so-called handgun calibers are used in non-regulated long guns. For example, the Henry Big Boy lever action rifle is chambered in .44 Magnum, .45 Colt & .357 Magnum, which are all considered to be handgun cartridges, but which are also perfectly well suited to use in non-regulated long guns. See http://henryrepeating.com/rifle-big-boy.cfm. Similarly, the Rossi Model M92 lever action rifle is chambered in the .38 Special, .357 Mag., .44 Mag., .45 Colt and .44-40 Win., cartridges that are also used in handguns. See http://www.rossiusa.com/product-details.cfm?id=150. These rifles are available in the United States and Maryland.

If the phrase "designed solely" is intended to refer to the original intent of the designer when the cartridge was created, then there is simply no way someone could possibly be on notice that a particular round of ammunition is banned. Many types of ammunition used in handguns have been in the marketplace for decades and there is no generally accepted or common understanding what the original design intent was at the time the cartridge was produced. Such uncertainty and lack of notice creates massive problems under the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution. See *Fox Television*, 132 S.Ct. at 2317 ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'") quoting *United States v. Williams*, 553 U.S. 285, 304 (2008). See also *Conley v. United States*, --- A.3d ----, 2013 WL 5355730 (D.C., September 26, 2013) (holding that a DC statute violated the Due Process Clause by criminalizing behavior that the average citizen would not know to be wrongful). In sum, given these issues, there is no reason for the State Police to re-impose the ban on ammunition that the General Assembly wisely repealed in 2011.

## III.    THE REGULATIONS IMPROPERLY IMPOSE A "ONE ROUND" REQUIREMENT FOR THE HANDGUN QUALIFICATION LICENSE

As enacted, SB 281, in that part now codified in Section 5-117.1 of the Public Safety Article imposed a ban on the purchase, rental or receipt of any handgun unless that person possessed a State issued Handgun Qualification License. To acquire that

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
7

JA0614

HQL, the person, with specified exceptions, must take a training course, which is defined to be:

> (i) a minimum of 4 hours of instruction by a qualified handgun instructor;
>
> (ii) classroom instruction on:
>
> 1. State firearm law;
>
> 2. home firearm safety; and
>
> 3. handgun mechanisms and operation; and
>
> (iii) a firearms orientation component that demonstrates the person's safe operation and handling of a firearm;

Public Safety Article §5-117.1(d)(3). Nothing in this language mentions "proficiency" or "live ammunition" or even purports to require any "practice."

Notwithstanding the lack of authorization, the proposed regulations concerning the Handgun Qualification License (HQL) adds an additional requirement of firing "one round of live ammunition" and a "practice component," providing:

> 4) Operation and Handling Demonstration. Orientation that demonstrates the applicant's safe operation and handling of a firearm, **including a practice component in which the applicant safely fires at least one round of live ammunition**

The bolded language is new and is not in SB 281, as enacted. As set forth below, this requirement to file "at least one round of live ammunition" as part of a "practice component" is both unauthorized by SB-281 and is unconstitutional under the Second Amendment to the Constitution.

First, the "live fire" requirement and the imposition of a "practice component" are not authorized by statute. The initial version of SB-281 submitted by the Governor in the Senate contained a requirement that the HQL training would contain "A FIREARMS QUALIFICATION COMPONENT THAT DEMONSTRATES THE PERSON'S PROFICIENCY AND USE OF A FIREARM." That language was understood by all to encompass a "live fire" component, as proficiency can only be demonstrated through live fire. SB 281, for example, imposed such a proficiency requirement for carry permits as part of the 16 hours of training that is now required for such permits under Section 5-306 of the Public Safety Article.

The Governor's proposal to require proficiency drew heavy opposition and was changed by an amendment proposed by Del. McDermott and adopted on April 2, 2013.

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

8

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022   Pg: 142 of 460

Case 1:16-cv-08811-ELH   Document 135-2   Filed 10/29/21   Page 22 of 39
Case 1:16-cv-08811-ELH   Document 135-2   Filed 10/05/18   Page 22 of 39

See http://mgaleg.maryland.gov/2013RS/am...1_48392701.pdf That amendment was discussed on the floor. See http://mgaleg.maryland.gov/webmga/frmAudioVideo.aspx?ys=2013RS&clip=HSE_04 022013_2.mp4

This amendment was adopted because the live fire requirement necessary to demonstrate "proficiency" for the simple purchase of a handgun would require access to a firing range, which are relatively few in number in Maryland and mostly privately owned. During the hearings on the Governor's proposal requiring "proficiency" for the HQL, it was repeatedly pointed out in both the House and the Senate hearings that any live fire requirement would effectively act on a *de facto* ban on the purchase of handguns because of the lack of publicly available gun ranges in Maryland. See, e.g., testimony beginning at 1:16 extending through 2:01. http://mgahouse.maryland.gov/House/Play/1b31254187ae46e8bd799eae2685029c1d?c atalog=03e481c7-8a42-4438-a7da-93ff74bdaa4c. The amendment by Del. McDermott was understood to remedy this problem by eliminating any live fire requirement. The enacted language also does not contain any requirement for any "practice component," as the proposed regulations seek to impose. A "practice component" is necessary to show proficiency, it is not necessary to "demonstrate operation and handling of a firearm." The statutory language requires that the trainee "demonstrate" safe handling; it does not require that the trainee "practice" safe handling, much less "practice" with an actual handgun, much less "practice" actually firing such a handgun. The regulations' imposition of the live fire requirement and a practice component thus contravene the legislative language and intent of the SB 281. These requirements are therefore invalid.

Second, a live fire requirement is unconstitutional. The imposition of a live fire requirement creates an enormous obstacle to the purchase of a handgun, as it requires access to a firing range which are generally privately owned in Maryland and not available to non-members. The live fire requirement thus acts as a burdensome prior restriction on a law-abiding citizen's now recognized, constitutional right to keep and bear arms under the Second Amendment, as construed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). This right is so fundamental that it has been incorporated into the Due Process Clause of the 14th Amendment and thus made applicable to the States. See *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010)("citizens must be permitted to use handguns for the core lawful purpose of self defense").

The burden is on the State to justify any burden on this core constitutional right. While the question has not yet been definitively settled by the Supreme Court as to

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
9

JA0616

whether the Second Amendment "core right" of self defense extends outside the home, there is no dispute among the federal courts of appeals that, at a minimum, the core right extends to the right to purchase and possess a handgun for self defense in the home by law-abiding citizens. Because these licensing requirements are a pre-condition to the purchase of any handgun, they indisputably burden the right of citizens to be armed with a handgun in the home. Indeed, the D.C. Circuit has so held with respect to the licensing provisions of D.C. law. *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011) (*Heller II*). As *Heller II* ruled, these licensing provisions thus burden "the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis omitted). The State would be required to show both a "compelling" state interest and that the measure was "narrowly tailored" to that interest, *viz.*, was the least restrictive measure that addressed the compelling interest. See, e.g., *Abrams v. Johnson*, 521 U.S. 74, 91 (1997); *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 683 F.3d 539, 558 (4th Cir. 2012). Strict scrutiny almost always results in invalidation of a regulatory provision. See Laurence H. Tribe, *American Constitutional Law* § 16–30, at 1089 (1st ed.1978) (noting strict scrutiny is a "virtual death-blow"). Here, the licensing provisions would not survive strict scrutiny. .

In any event, even under the more relaxed standard of intermediate scrutiny, "the government bears the burden of demonstrating (1) that it has an important governmental 'end' or 'interest' and (2) that the end or interest is 'substantially served by enforcement of the regulation.'" *United States v. Carter*, 669 F.2d 411, 417 (4th Cir. 2012) (citations omitted). "Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester*, 628 F.3d at 682. Any such showing will require real evidence, not mere conjecture or supposition. See *Carter*, 669 F.3d at 418 (noting that the State may not "'rely upon mere 'anecdote and supposition'" in attempting to meet its burden), quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000); *Chester*, 628 F.3d at 682 (requiring a "strong showing"). Indeed, this need for real evidence has been repeatedly stressed in the Second Amendment case law. See *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) (vacating a district court decision sustaining the D.C. requirements and remanding for a factual determination on whether the District's attempts at "licensing the owner of the firearm" were supported by actual evidence under intermediate scrutiny); *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (holding that Illinois ban on public possession of handguns outside the home was not supported by sufficient legislative facts); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), *cert. denied* 131 S.Ct. 1674 (2011) (requiring a "form of strong showing" — a/k/a "intermediate scrutiny"—in a Second Amendment challenge to a prosecution under 18 U.S.C. §

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
10

JA0617

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 144 of 460

Case 1:16-cv-03311-ELH   Document 125-2   Filed 01/29/21   Page 24 of 39
Case 1:16-cv-03311-ELH   Document 135-2   Filed 10/05/18   Page 24 of 39

922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor); *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (striking down City of Chicago ban on gun ranges and holding that "'logic and data' must demonstrate "a substantial relation between [the regulation] and [an important governmental] objective.") (quoting *Skoien*, 614 F.3d. at 642); *Chester*, 628 F.3d at 682 (remanding because the government "has not attempted to offer sufficient evidence to establish a substantial relationship between § 922(g)(9) and an important governmental goal.").

Here, the only conceivable legitimate state interest served by the training requirement is safety.  Yet, there is no evidence that safety is substantially furthered by a live fire requirement.  Nationwide, very few states impose any licensing requirement on the purchase of a handgun. None, to our knowledge, impose any requirement of live fire for the simple purchase of a handgun for self-defense in the home.  For example, the District of Columbia has the strictest gun control laws in the country and D.C. formerly required a training class of four hours, but provided that class for free.  D.C. Code §§ 7-2502.03(a)(13).  D.C. did not require live fire training.  More recently, D.C. has repealed the provision requiring first time registrants to take a 4-hour firearm training course.  Instead, D.C. Police are now offering an online Firearms Safety Training Course.  There is no cost for taking this course and it takes approximately 30 minutes to complete.  See http://mpdc.dc.gov/node/177912.  If D.C. does not require live fire with its extremely strict rules, what possible justification does Maryland State Police have for such imposition of live fire?  We know of none.

Thus, with the promulgation of these regulations, Maryland would become the *only* state in the United States that not only imposes a licensing requirement, but also imposes  a state-wide "live fire" requirement as an additional requirement for purchase of a handgun for self-defense in the home (as opposed to outside-the-home carry).  This requirement for a simple purchase for home defense is utterly unnecessary to implement Section 5-117.1.  Section 5-117.1 requires only "firearms orientation component that demonstrates the person's safe operation and handling of a firearm."  Safe operation and handling of a handgun can easily be "demonstrated" by the actual handling of the firearm and the use of "snap caps" or dummy rounds that would allow the individual trainee to experience pulling the trigger without live ammunition.  We are informed that the State Police have not conducted any studies or possess any evidence that would suggest that live fire is necessary to demonstrate safe handling.  As explained above, real evidence is a constitutional requirement and the burden is on the State to submit that evidence.  In essence, the regulations create a substantial constitutional issue concerning the necessity for live fire when the regulations could have much more easily construed the training requirements of Section 117.1 to avoid such constitutional issues.  The State

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 145 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 25 of 39
Case 1:16-cv-03311-ELH   Document 135-2   Filed 10/05/18   Page 25 of 39

Police's approach thus directly contravenes the usual rule that "a construction of a provision which casts doubt on its constitutionality should be avoided." *Washington Suburban Sanitary Com'n v. Phillips*, 413 Md. 606, 620, 994 A.2d 411, 420 (2010). A live fire requirement will not survive challenge.

## IV.    THE PROPOSED REGULATIONS IMPROPERLY PURPORT TO BAN POSSESSION OF A REGULATED FIREARM BY PERSONS WHOSE DISQUALIFYING CONVICTION HAS BEEN EXPUNGED

Section .03, COMAR 29.03.01.03, sets forth what purports to be a list of persons who may not possess any firearm whatsoever. Most of these provisions largely copy the underlying statute and are not objectionable. For example, subparts (5) and (6) of Section .03 provide that persons prohibited from possession include a person who has been convicted of a "disqualifying crime," including a person who:

(5) Has received probation before judgment for a crime of violence, except for assault in the second degree;

(6) Has received probation before judgment for a domestically related crime, as defined in Criminal Procedure Article, §6-233, Annotated Code of Maryland;

This ban corresponds to the language set for in SB 281 in amendments to Section 5-101 of the Public Safety Article.

However, SB 281 amends Section 5-101 to include a further qualification of the term 'disqualifying crime" to exclude any crime "THAT WAS EXPUNGED UNDER TITLE 10, SUBTITLE 1 OF 26 THE CRIMINAL PROCEDURE ARTICLE." See SB 281, amending Section 5-101(b)(2). Nowhere in the proposed regulations is this provision reflected. Nowhere in the proposed regulations are persons advised that such expungement relieves the person of the firearms disability. Since the regulations purport to be comprehensive, the regulations should be amended to add this additional qualification.

## V.    THE REGULATIONS FAIL TO ADDRESS THE USE OF "RECEIVE" OR "RECEIPT" AS USED IN THE REGULATIONS AND SB 281.

The regulations, as proposed fail to define the use of receive or receipt as used in various places throughout SB 281. This failure may well lead to arbitrary enforcement and prosecution and should be clarified by the regulations. We therefore respectfully request that the regulations be revised and amended to define "receive" and "receipt" in such a way as to make clear that these terms apply only to the permanent transfer of ownership of article in question. The regulations should also make clear that the

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
12

JA0619

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022    Pg: 146 of 460

Case 1:16-cv-08331-ELH   Document 135-2   Filed 10/05/18   Page 26 of 39
Case 1:16-cv-08331-ELH   Document 135-2   Filed 10/29/21   Page 26 of 39

temporary "receipt" of these articles is not prohibited as between law-abiding persons
who are otherwise qualified to possess these items under other provisions of state and
federal law.

**Assault Weapons and Magazines**

SB-281 amends various sections of the Criminal Article to regulate receive or
receipt of the newly defined provisions concerning "assault weapons," providing:

4–303.

(a) Except as provided in subsection (b) of this section, a person may not:

(1) transport an assault weapon into the State; or

(2) possess, sell, offer to sell, transfer, purchase, or **receive** an assault weapon.

Similarly, SB-281 amends Section 4-304 and Section 4-305 to provide:

4–304

A law enforcement unit may seize as contraband and dispose of according to
regulation an assault weapon transported, sold, transferred, purchased, **received**,
or possessed in violation of this subtitle.

4-305

(b) A person may not manufacture, sell, offer for sale, purchase, **receive**, or
transfer a detachable magazine that has a capacity of more than 10 rounds of
ammunition for a firearm.

Violations of these provisions would arguably subject the violator to the risk of a
conviction under Section 4-306 of a misdemeanor and thus become "subject to
imprisonment not exceeding 3 years or a fine not exceeding $5,000."

**Handguns**

In addition SB-281 creates a whole new set of provisions regulating the "receipt" of
handguns in particular.  Section 5-501 of the Public Safety Article has added a new
provision for the newly created "Handgun Qualification License."

(O) "Handgun Qualification License" means a license issued by the Secretary
that authorizes a person to purchase, rent, or **receive** a handgun.

SB-281 then relies on this definition of the "Handgun Qualification License" in creating
Section 117.1 to the Public Safety Article.  Subsections (b) and (c) of newly enacted

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

13

Section 117.1 broadly mandate that a person have such a "Handgun Qualification License" as a condition to acquiring such a handgun, providing:

> (B) a dealer or any other person may not sell, rent, or transfer a regulated firearm handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person a valid regulated firearm handgun qualification license issued to the purchaser, lessee, or transferee by the Secretary under this section.

> (c) a person may purchase, rent, or **receive** a handgun only if the person:

> (1) (i) possesses a valid handgun qualification license issued to the person by the Secretary in accordance with this section; * * * *

Section 5-143 of the Public Safety Article (which was recodified without change by SB-281 to become Section 5-144), can be read to apply to transactions governed by new Section 5-117.1 so as to impose severe criminal penalties.  Section 5-144 provides:

> (a) Except as otherwise provided in this subtitle, a dealer or other person may not:

> (1) knowingly participate in the illegal sale, rental, transfer, purchase, possession, or **receipt** of a regulated firearm in violation of this subtitle;

> * * * *

> Penalty

> (b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

The regulations do not purport or define "receive" or "receipt" in these provisions.

**Interpretation Issues Associated with SB 281's Regulation of "Receipt" or "Receive":**

The terms "receipt" or "receive" in these provisions of SB-281 are not defined, either in the existing code or in SB-281 and there is, of course, no Maryland case law on these newly enacted provisions.  Regulation of the "receipt" of firearms is addressed under federal law, 18 U.S.C. 922(h), which provides:

> (h) It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment--

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
14

JA0621

(1) to **receive**, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce;

or

(2) to **receive** any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

However, there are significant differences between "receive" as used in SB-281 and "received" as used in federal law. Subsection (g), referenced in Section 922(h), refers to persons who are disqualified from possessing any firearms because of prior criminal convictions or other disqualification. In this context, the term "receive" as used in subsection (h) "means to take possession of or to knowingly accept the same." See, e.g., *United States v. Turnmire*, 574 F.2d 1156, 1157 (4th Cir. 1978). Other federal courts of appeals are in accord. (Id). *Turnmire* explains that, under federal law, "'receipt' may be inferred by mere possession, on the assumption that one cannot possess without having had first "received." See *Turnmire*, 574 F.2d at 1157 (approving the instruction that "since one cannot possess something without having received it, (then) receipt of a firearm may be shown circumstantially by proving possession.").

Stated simply and as detailed more specifically below, if this federal interpretation of "receive" under Section 922(h) were to be used under SB-281, it would shut down instructional shooting, family shooting activities, youth shooting and the mere temporary transfer of firearms at the range to friends and other persons who wish to learn about shooting activities or try out a particular handgun or assault weapon. Assault weapons, magazines and handguns may also be the lawful property of sanctioned competitive teams or incorporated shooting clubs. These organizations may temporarily loan these items to team or club members for use at the range. A literal reading of "receive" or "receipt" would ban such loans and thus effectively impair the legitimate functioning of such organizations. A literal definition of "receive" or "receipt" also could be applied to bar a gunsmith from taking temporary possession of an assault weapon, a magazine or handgun for purposes of repair. A gunsmith presumably would be able to take temporary possession of a handgun if he or she had a Handgun Qualification License, but the ban on "receipt" with respect to assault weapons and magazines do not contain any such exception for the temporary "receipt" of an assault weapon by a gunsmith for purposes of repair. Given these potential issues and the inherent uncertainties associated with the terms "receive" and "receipt," it is incumbent on the State Police to define these terms.

As is apparent, a literal definition of "receive" or "receipt" under SB-281 would be little short of absurd. Few persons will temporarily loan an assault weapon, a

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
15

JA0622

magazine or handgun for temporary use at the range under these provisions. Otherwise innocent, law-abiding persons could risk arrest, criminal prosecution and imprisonment by participating in such temporary "receipts" of these items. SB 281 would become a legal trap for the unwary. That result cannot be tolerated. With the enactment of SB 281, the General Assembly did not intend to create a whole new class of criminals arising from the temporary loan of these regulated articles as between otherwise law-abiding citizens.

Such a strict construction of "receive" for purposes of the above provisions in State law, as amended by SB-281, would also expose innocent, law-abiding persons to the loss of all their firearms for life. Under federal law, 18 U.S.C. 921(a)(20) and 18 U.S.C. 922(g), a person convicted of a state misdemeanor, which is "punishable" by a sentence of greater than two years in prison, becomes a disqualified "felon in possession" and loses the right to possess any modern firearms for the rest of his or her life. Any possession of such firearms after such a conviction for such state misdemeanor may also result in federal imprisonment of up to 10 years under 18 U.S.C. 924(a)(2). Violations of any of the SB-281 provisions noted above or a conviction under former Section 5-143 (now Section 5-144) easily satisfies these conditions for a permanent federal firearms possession disability.

There are other reasons that the federal definition of "receive" for purposes of 18 U.S.C. 922(h) should not be applied or extended to the terms "receive" or "receipt" as used in SB-281 or for prosecution under Section 5-144. Unlike the disqualified persons addressed in 18 U.S.C. 922(h), these persons affected by SB-281 are not already criminals or otherwise disqualified from owning or possessing firearms. For example, unlike Section 922(h), which bans "receive, possess, or transport" by prohibited persons, nothing in SB-281 purports to ban the mere possession of a handgun by a person without a handgun license; it focuses on the transaction or the transfer of the handgun. Under SB-281, a person who lawfully owns and possesses an "assault weapon" prior to October 1, 2013, may continue to own, possess, transport and lawfully use that weapon. Similarly, the ban on sales and transfers and on the receipt of magazines with a capacity of greater than 10 rounds does not ban the continued possession or use of such magazines or even the receipt of such magazines in transactions taking place out-of-state. Persons who already own handguns are not required to obtain a Handgun Qualification License to keep and lawfully use his or her already-owned handguns.

Yet, if the existing lawful owner of such an assault weapon, or magazine or handgun were temporarily to loan his assault weapon, magazine or handgun to another law-abiding person, such as a spouse, other family members, a friend or even a student at a sanctioned training course, then the recipient of that assault weapon, magazine or

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
16

JA0623

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022    Pg: 150 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 30 of 39
Case 1:16-cv-03311-ELH   Document 135-3   Filed 10/05/18   Page 30 of 39

handgun could be seen as "taking possession" and thus "receiving" these articles simply by that fact alone. That result does not obtain under Section 922(h), which bars receipt only by a person who is already banned from possessing firearms. Section 922(h) states that a prohibited person may not "receive, possess, or transport" a firearm in order to keep guns out of the hands of criminals and the definition of "receipt" in Section 922(h) should be read in light of that purpose. No such legitimate purpose is served by applying that definition to the temporary "receipt," as used in SB-281 and Section 5-144, to otherwise law-abiding citizens. In short, the provisions of SB-281 and Section 5-144 contemplate an ownership transaction in which there is a permanent transfer or receipt of ownership, not a mere temporary receipt of a regulated firearm or magazine on a shooting outing.

Incorporating the strict interpretation of "receipt" or "receive" applicable to Section 922(h) to the use of those terms in SB 281 would also make it needlessly difficult, if not impossible, to provide and receive the training now required by SB-281 for the Handgun Qualification License. Specifically, SB-281 enacts Section 5-117.1 of the Public Safety Article, which imposes a training requirement for the Handgun Qualification License and the State Police now propose live fire, as discussed above. Satisfying these requirements necessitates that the trainee to take temporary possession (and hence "receipt") of various types of handguns in order to be properly and fully instructed on "Handgun mechanisms and operation" and to satisfy the "orientation component" for the "safe operation and handling" of that firearm. Indeed, the proposed regulations now require handling of a firearm and the actual firing of "one round of live ammunition" before a HQL may be issued. Such receipt and possession is also mandatory in the eight-hour NRA Basic Pistol course taught to new shooters, as well as in other, more advanced NRA courses.

Nothing in SB-281 expressly exempts training from the separate requirement that person must possess a HQL prior to the receipt of a handgun. Thus, if "receipt" requires a HQL and "receipt" means mere possession, then the statute would effectively impose a "Catch 22" and an unconstitutional ban on the purchase of handgun. As *Jackson v. United States*, --- A.3d ----, 2013 WL 5458946 (D.C. 2013), recently explained, "we have concluded that *Heller* means it would be 'impermissible under the Second Amendment to convict a defendant for possessing an unregistered handgun in the home when the District's unconstitutional ban made registration of a handgun impossible, unless the defendant was disqualified from registering the handgun for constitutionally permissible reasons.'" quoting *Magnus v. United States*, 11 A.3d 237, 242–43 (D.C.2011) (citing *Plummer v. United States*, 983 A.2d 323 (D.C.2009); see also *Herrington v. United States*, 6 A.3d 1237 (D.C.2010) (extending this holding to a conviction for unlawful possession of handgun ammunition). This principle means that the State may not,

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
17

JA0624

under *Heller*, require training as a condition to the purchase of a handgun and then make that training legally or practically impossible to obtain. See *Ezell*, 651 F.3d at 698 (sustaining the argument that Chicago's "range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city."). Moreover, the State has no legitimate interest in banning the receipt of handguns in NRA courses which are otherwise completely lawful and which train students in the safe handling and storage of firearms.

Such practical absurdities are also present for persons under the age of 21, who are expressly permitted to take temporary possession of a regulated handgun under Section 5-133(d) of the Public Safety Article if they are being supervised by a person over 21 or if that person under 21 is "1. participating in marksmanship training of a recognized organization; and 2. under the supervision of a qualified instructor." SB-281 re-enacted these provisions without change. Persons under the age of 21 are barred from obtaining a HQL by Section 5-117(d)(1). Yet, obviously, a person under 21 must also "receive" the regulated firearm in order to perform the shooting permitted by Section 5-133(d) and the supervising person over 21 or the instructor must "participate" in such receipt (within the arguable meaning of Section 5-144) if such shooting is to take place. SB-281 re-enacted these provisions of Section 5-133(d); it did not intend to implicitly repeal these provisions by banning the "receipt" of regulated firearms used for these legitimate purposes. See *State v. Johnson*, 415 Md. 413, 422, 2 A.3d 368, 373 (2010) (noting that the courts must give the statute "a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense."). Construing "receipt" to mean "possession" would render the shooting permitted by Section 5-133(d) legally impossible, thereby rendering that provision a dead letter. By any measure, that result is "incompatible with common sense." (Id.).

In enacting SB-281, the General Assembly did not enact a "Catch 22" law by mandating training that could not be reasonably accomplished without violating other provisions in the same statute, or by allowing shooting by persons under 21, but then making it impossible to "receive" the very guns necessary for such shooting activity. Cf *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, --- F.3d ----, 2013 WL 1092793 (9th Cir. 2013) (refusing to construe a statute to create a Catch 22 situation). The General Assembly did not intend any construction of SB 281 that would lead to absurd results, such as banning all NRA training unless each participant possessed a HQL. See, e.g., *Blue v. Prince George's County*, --- A.3d ----, 2013 WL 5382188 (Md.,2013) ("An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality."), quoting *Town of Oxford v. Koste*,

Case 1:16-cv-03311-ELH   Document 135-2   Filed 10/05/18   Page 32 of 39

204 Md.App. 578, 585–86, 42 A.3d 637 (2012), aff'd, 431 Md. 14, 63 A.3d 582 (2013) (citations omitted). This is particularly so as these provisions of SB-281 regulate the exercise of the fundamental Second Amendment constitutional rights to own and possess a handgun for self-defense in the home and thus should be strictly and narrowly construed to minimize constitutional issues. See, e.g., *VNA Hospice of Maryland v. Department of Health and Mental Hygiene*, 406 Md. 584, 961 A.2d 557, 569 (2008) ("we have 'consistently adhered to the principle that "an interpretation which raises doubts as to a legislative enactment's constitutionality should be avoided if the language of the act permits."'") (citations omitted). As explained above, the State cannot, consistent with *Heller*, mandate training for the purchase of a handgun and then make that training impossible.

Accordingly, the regulations should define the terms "receipt" or "receive" in the above provisions of law to limit the terms "receipt" and "receive" to a permanent ownership context and to exclude the temporary receipt of a regulated firearm or magazine for otherwise legal purposes, such as the temporary receipt of a regulated firearm or magazine. Such a gloss was applied to the temporary "transfer" of a regulated firearm in *Chow v. State,* 393 Md. 431, 903 A.2d 388 (2006). The Court in *Chow* interpreted former section 442(d)(1), which is currently codified (without substantial change) as § 5–124 of the Public Safety Article. Section 442(d)(1) provided (and Section 5-124 currently provides) that "'[a] person who is not a regulated firearms dealer may not sell, rent, transfer, or purchase any regulated firearm.'" (903 A.2d at 390-91) (quoting Section 442(d)). The Court held that "the plain language and legislative history of the 'Regulated Firearms' subheading indicates that the word 'transfer,' as used in § 442(d), is used **in an ownership context** and does not apply to the situation extant in the case sub judice — that of a gratuitous temporary exchange or loan between two adults who are otherwise permitted to own and obtain regulated firearms." (Id. at 391) (emphasis added). The *Chow* Court's interpretation of "transfer" in former Section 442(d)(1) should also be applied to the terms "receive" and "receipt" as used in SB-281 and for prosecutions under Section 5-144, as amended, so to limit the terms "receipt" and "receive" to an "ownership context."

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org

## CONCLUSION

For all the foregoing reasons, the regulations must be revised and amended in the manner set forth above.   Nothing in these comments should be construed as a waiver or acceptance by MSI or its officers and directors, concerning the underlying legality or constitutionality of any provision of SB 281.  Rather, these comments are limited to addressing some of the major flaws and shortcomings in the implementation of SB 281 by the State Police in the proposed regulations.

Respectfully submitted:

Mark W. Pennak, Member, MSI Board of Directors,

on behalf of MSI, its Officers and Directors

President - Patrick Shomo,

Vice President - Dan Blasberg,

Treasurer - Dave Michailof,

Secretary - Brian Simmons

MSI Board of Directors :

Peter Bagnell,

Rob Bowman,

George Durst,

Mark Pennak,

Greg Primrose,

Teddy Schatz

Frank Zastawnik,

Maryland Shall Issue, Inc.
1332 Cape St. Claire Road #342
Annapolis, MD 21409
(410) 849-9197
www.MarylandShallIssue.org
20

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 154 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 34 of 39
Case 1:16-cv-03311-ELH   Document 73-2   Filed 10/05/18   Page 34 of 39

MARYLAND 2011 SESSION LAWS
REGULAR SESSION

Additions are indicated by **Text**; deletions by
~~Text~~.
Vetoes are indicated by ~~Text~~ ;
stricken material by **~~Text~~** .

Chapter 343
H.B. No. 519
FIREARMS--VIOLATION OF SPECIFIED PROHIBITIONS--AMMUNITION AND PENALTY

AN ACT concerning

**Firearms--Violation of Specified Prohibitions--Ammunition and Penalty**

FOR the purpose of repealing a certain prohibition against the possession of ammunition solely designed for a regulated firearm by a person who is under a certain age; applying a certain penalty to the knowing violation of a certain prohibition against obliterating, removing, changing, or altering the manufacturer's identification mark or number on a firearm; and generally relating to firearms violations.

BY repealing and reenacting, without amendments,
Article--Public Safety
Section 5–142
Annotated Code of Maryland
(2003 Volume and 2010 Supplement)

BY repealing and reenacting, with amendments,
Article--Public Safety
Section 5–133(d) and 5–143
Annotated Code of Maryland
(2003 Volume and 2010 Supplement)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article--Public Safety**

<< MD PUBLIC SAFETY § 5–133 >>

**5–133.**

(d)(1) Except as provided in paragraph (2) of this subsection, a person who is under the age of 21 years may not possess a regulated firearm ~~or ammunition solely designed for a regulated firearm~~.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 155 of 460

2011 Monthly... Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 35 of 39 Page 2
Case 1:16-cv-03311-ELH   Document 73-2   Filed 10/03/13   Page 35 of 39

(2) Unless a person is otherwise prohibited from possessing a regulated firearm, this subsection does not apply to:

(i) the temporary transfer or possession of a regulated firearm ~~or ammunition solely designed for a regulated firearm~~ if the person is:

1. under the supervision of another who is at least 21 years old and who is not prohibited by State or federal law from possessing a firearm; and

2. acting with the permission of the parent or legal guardian of the transferee or person in possession;

(ii) the transfer by inheritance of title, and not of possession, of a regulated firearm;

(iii) a member of the armed forces of the United States or the National Guard while performing official duties;

(iv) the temporary transfer or possession of a regulated firearm ~~or ammunition solely designed for a regulated firearm~~ if the person is:

1. participating in marksmanship training of a recognized organization; and

2. under the supervision of a qualified instructor;

(v) a person who is required to possess a regulated firearm for employment and who holds a permit under Subtitle 3 of this title; or

(vi) the possession of a firearm ~~or ammunition~~ for self-defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest.

<< MD PUBLIC SAFETY § 5–142 >>

**5–142.**

(a) A person may not obliterate, remove, change, or alter the manufacturer's identification mark or number on a firearm.

(b) If on trial for a violation of this section possession of the firearm by the defendant is established, the defendant is presumed to have obliterated, removed, changed, or altered the manufacturer's identification mark or number on the firearm.

<< MD PUBLIC SAFETY § 5–143 >>

**5–143.**

(a) Except as otherwise provided in this subtitle, a dealer or other person may not :

(1) knowingly participate in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

firearm in violation of this subtitle **; or**

> **(2) knowingly violate § 5–142 of this subtitle**.

(b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

(c) Each violation of this section is a separate crime.

SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2011.

Approved May 10, 2011.

Effective date: October 1, 2011.

MD LEGIS 343 (2011)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 157 of 460

Case 1:16-cv-03311-ELH   Document 135-2   Filed 01/29/21   Page 37 of 39
Case 1:16-cv-03311-ELH   Document 75-2   Filed 10/05/18   Page 37 of 39

*UNCLASSIFIED//FOR OFFICIAL USE ONLY*



# MARYLAND STATE POLICE

**Maryland Department of State Police / Licensing Division**
**1111 Reisterstown Road**
**Pikesville, Maryland**
**Office: (410) 653.4500 / Fax: (410) 653.4036**

# ADVISORY

## LD-HQL-17-004

## NOVEMBER 17, 2017

## ALTERNATIVE AMMUNITION FOR HANDGUN QUALIFICATION LICENSE (HQL) LIVE FIRE TRAINING COMPONENT

PUBLIC SAFETY §5-117.1(c)(3)(iii) requires a firearms orientation component that demonstrates the person's safe operation and handling of a firearm, which includes, as required by COMAR 29.03.01.29.C(4), a practice component in which the applicant safely fires at least one round of live ammunition.

The Maryland State Police (MSP) has received several requests to review alternative non-lethal, marking projectiles to satisfy the "live fire" component of the HQL training requirement. The MSP has determined that the use of non-lethal marking projectiles would meet the HQL "live fire" training requirement provided that the non-lethal marking projectile meets the following requirements:

1) meets the definition of "ammunition" as defined in Public Safety §5-133.1(a): "a cartridge, shell, or any other device containing explosive or incendiary material designed and intended for use in a firearm;" and
2) can be fired from a firearm as defined in Public Safety §5-101(h)(1)(i): "a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive."

If you have any questions regarding this matter, please contact the Handgun Qualification License Unit, by email, at msp.hql@maryland.gov, or call the Licensing Division at 410-653-4500. Thank you for your attention to this matter.

Alert Advisories are a service of the Maryland Department of State Police. The content of this document is for OFFICIAL USE ONLY. Any request for disclosure of this document or the information contained herein, should be referred to either the originator of the Advisory, or the Maryland Department of State Police, Licensing Division, 410.653.4500.

*UNCLASSIFIED//FOR OFFICIAL USE ONLY*

**EXHIBIT B**

HQL_0003600

with the person's mental disorder; (4) is an alcoholic, the person is not disabled by such illness in a manner which should prevent his possessing a rifle or shotgun; (5) has been confined to any hospital or institution for treatment of alcoholism unless a licensed physician has by affidavit stated that he is familiar with the person's history of alcoholism and that in his opinion, the person is no longer suffering from a disability in such manner which should prevent his possessing a rifle or shotgun.

**Keeping Guns on Persons or in Vehicles**

It is unlawful for any person to have either concealed or exposed, or to have in a motor vehicle where it can be readily used, any gun which uses explosive ammunition unless a person is engaged in a lawful mission where it is necessary to use a gun; or is employed as a special guard, special police officer, or special detective and has been deputized by the sheriff, or has been appointed a constable, or has been licensed by the laws of the state to carry a gun and is in the immediate vicinity of the premises of any employer whose occupation requires someone to carry a gun.

A person is allowed to carry a gun if he is a member of the military service or authorized as a peace officer; or is engaged in lawful hunting, drill training, or target practice, or is on property which the person owns or leases with prior permission of the owner or lessee; or is going to or from lawful hunting, drill training, or target practice, or is engaged in any lawful transfer of possession such as carrying a gun from a gunsmith or repairman, provided that the gun is not loaded and the person is traveling on a public highway, or on property which he owns or leases, or on property with prior permission from the owner or lessee.

**Penalty for Violation of Weapons Law**

The residents of Montgomery County, by and through their government, fully expect that any and all persons who engage in hunting or other activities associated with the discharge of firearms and/or bows and arrows, do so in a safe and responsible manner, without placing anyone at risk of harm. We, therefore, seek your voluntary compliance with all provisions of this law as well as other existing state and federal statutes governing hunting and the discharge of weapons. Voluntary compliance with the law will serve to protect the safety and well being of all.

The Montgomery County Department of Police remains committed to public education and to the strict enforcement of these laws. Any person convicted of any of the provisions of this chapter may be fined up to $1,000 or confined in the Montgomery County Detention Center for a period not to exceed six months, or both fine and confinement.

**MONTGOMERY COUNTY WEAPONS LAW**

The ownership, possession, and use of weapons within Montgomery County, Maryland, is limited by the County weapons law. This pamphlet is a summary of the major provisions of the law and is provided for information only. Copies of the actual ordinance, Chapter 57, titled "Weapons", of the Montgomery County Code, can be obtained from the Office of the County Attorney, 101 Monroe Street, Rockville, Maryland 20850, or at regional libraries.

The County is divided, for the purpose of the law, into two areas which have different restraints on weapons and their usage. The discharge of guns is totally prohibited within the urban area as shown on the map on the reverse side of this pamphlet, with some specific exceptions as noted below. The law also places some limits on the discharge of guns outside the urban area. In addition, the law includes limitations on the discharge of bows that apply both inside and outside the urban area.

In view of the continued growth and development which takes place in the County it is necessary, for the protection and welfare of our residents and communities, to review the urban area boundary on a regular basis. The urban area boundary can be changed through the normal legislative process. The current boundary has been in place since May 15, 1997.

**DISCHARGE OF GUNS**

**Inside the Urban Area**

Other than under the exceptions noted in this summary, a person must not discharge a gun within the urban area (see map inside this brochure), whether the gun is loaded with blank or live cartridges or projectiles of any kind.

**Outside the Urban Area**

Outside the urban area, a person must not discharge fixed ammunition from a rifle or pistol of any caliber higher than a .25 caliber, or discharge a full metal jacketed bullet of any caliber from any gun. Fixed ammunition is defined as any ammunition composed of a projectile or projectiles, a casing, an explosive charge, and a primer, all of which shall be contained as one unit. Hunters are advised that breech loading rifles may not be used to hunt deer in Montgomery County pursuant to Maryland hunting regulations. For more information on the proper weapons and seasons for hunting consult the Maryland Guide to Hunting and Trapping published annually by the Maryland Department of Natural Resources and available on-line at www.dnr.state.md.us/huntersguide/deerregs.asp.

---

The newly revised urban area (again, that portion of the County where the discharge of firearms is generally prohibited) is defined as "that part of the County within the following boundaries: Beginning at a point where the Maryland/District of Columbia boundary line in the County intersects with the Maryland/Virginia boundary line on the southwest side of the Potomac River; running then northwest along the Maryland/ Virginia boundary line to the emptying of Watts Branch into the Potomac River; then northwest along the northeast side of the Potomac River to the emptying of Seneca Creek into the Potomac River; then north along Seneca Creek to Route 112 (Seneca Road); then east along Route 112 to Route 28 (Darnestown Road); then northwest along Route 28 to Route 118 (Dawestown-Germantown Road); then north along Route 118 to Route 117 (Clopper Road); then northwest along Route 117 to Little Seneca Creek; then northeast along Little Seneca Creek to Black Hill Regional Park; then along the eastern boundary of Black Hill Regional Park to the Park's southernmost intersection with 1-270; then northwest along I270 to Little Seneca Creek; then north along Little Seneca Creek to West Old Baltimore Road: then east along West Old Baltimore Road to Route 355 (Frederick Road); then south along Route 355 to Brink Road; then southeast on Brink Road to the Town of Laytonsville; then along the northern boundary of the Town of Laytonsville to Route 420 (Sundown Road); then east along Route 420 to Route 650 (Damascus Road); then southeast along Route 650 to Route 97 (Georgia Avenue); then south along Route 97 to Brighton Dam Road; then northeast along Brighton Dam Road to Route 650 (New Hampshire Avenue); then south along Route 650 to Route 108 (Ashton Road); then east along Route 108 to the Potomac Electric Power Company transmission line property; then southeast along the east side of the Potomac Electric Power Company right-of-way to Route 198 (Sandy Spring Road); then east along Route 198 to the Prince George's County/Montgomery County boundary line; then southwest along the Montgomery County/Prince George's County boundary line to the Montgomery County/District of Columbia boundary line; then along the Montgomery County/District of Columbia boundary line to the place of beginning."



Department of Police
Firearm Safety Committee
2350 Research Boulevard • Rockville, Maryland 20850
240-773-5030

11/08         #7970

---

A person must not discharge fixed ammunition from any rifle or pistol except at legal game or varmints on the ground or at a safe target which is on or near the ground and will not deflect a bullet.

A person must not discharge a gun onto, across, or within 50 yards of a public road. A person, other than the owner or occupant, must not discharge a gun within 150 yards of a building or camp designed for human occupancy without the owner or occupant's written consent, or shoot, from onto, or across public or private land without the owner or occupant's written consent.

**Exceptions**

The prohibitions on discharge of guns *inside and outside the urban area* are not applicable to the discharge of a gun: (1) on any target, trap, skeet, or shooting range that has been inspected and approved in writing by the Firearm Safety Committee; (2) in a private basement or cellar target range; (3) when necessary to protect life or property or to kill a dangerous animal; (4) to any duly authorized peace officer acting in the proper performance of his official duties; (5) to the discharge of blank cartridges in musical and theatrical performances, parades, or sporting events; (6) to the firing of salutes by firing squads at military funerals; or (7) under a deer damage control permit issued by the Maryland Department of Natural Resources. (Note: A person may not discharge a gun *inside the urban area* even after obtaining a deer damage control permit unless the person also obtains approval from the Chief of Police).

A person may also discharge a gun *inside the urban area* for the purpose of hunting deer on private property that is at least 50 acres in size under the following conditions: (1) the person discharges the gun from an elevated position; (2) the person does not load the gun until the person is in the elevated position; (3) the person unloads the gun before descending from the elevated position; (4) the projectile has a downward trajectory; (5) the property owner complies with any public notice requirements in applicable regulations; and (6) the property owner has given the Chief of Police written notice at least 15 days before any gun is discharged on the property that lists the day(s) hunting will occur and the time hunting will begin and end each day, lists the name of each hunter, and includes a copy of the record plat or tax assessment record for the property. Up to five owners of contiguous parcels may aggregate their property to meet the 50 acre threshold.

A shooting range approval certificate is valid for three years and is issued by the Firearm Safety Committee after a finding that the discharge of guns on the range will not jeopardize life or property. The certificate may specify types of guns and ammunition that may be used on the range. Certificates will only be issued on written request by the person lawfully in possession of the land on which the range is located.

---



Montgomery County, Maryland
Department of Police

# Weapons Law Summary

Montgomery County Maryland

---

Requests should be sent to:

FIREARM SAFETY COMMITTEE
c/o Montgomery County Department of Police
2350 Research Boulevard
Rockville, Maryland 20850

**DISCHARGE OF BOWS**

A person must not discharge a bow in the County: (1) from, onto, or across a public road; (2) into or within 150 yards of a building or camp designed for human occupancy without the owner or occupant's written consent; or (3) on, from, onto, or across public or private land without the owner or occupant's written consent.

The restrictions in the previous paragraph do not apply to target archery practiced under the following safety guidelines established by Executive Regulation: (1) target archery may be practiced on public property in the County in any area designated for target archery; and (2) target archery may be practiced on private property in the County with the owner or occupant's written consent as long as: (a) an arrow does not travel across or hit on a public road or strike any person, animal, or vehicle on a public road; and (b) an arrow does not travel across or land on property owned or occupied by a person who has not given written consent for the target archery, or hit any person, animal, building, or vehicle.

**Transfer of Rifles or Shotguns to Minors**

It is unlawful to give, sell, rent, lend, or otherwise transfer any rifle or shotgun to a person under the age of 18 years unless the relationship which exists is that of parent and child, guardian and ward, or adult instructor and pupil, or unless the transfer is in connection with a regularly conducted program of marksmanship training.

**Unlawful Ownership or Possession of Firearms**

A person must not possess, exercise control over, use, carry, transport, or keep a rifle, shotgun, or pistol, if the person: (1) is an unlawful user of or addicted to marijuana or any depressant or stimulant drug or narcotic drug (as defined in Section S-101 of the Criminal Law Article of the Annotated Code of Maryland), or is under treatment for such addiction; (2) has been convicted in any court of a crime of violence, or of trafficking in narcotics or of a criminal violation of any of the provisions of Section 5-602 to 5-609 and Sections 5-612 to 5-614 of the Criminal Law Article of the Annotated Code of Maryland, or any federal firearms control law; (3) is a fugitive from justice; (4) has been confined to any hospital or institution for treatment of a mental disorder, or for mental illness unless a licensed physician has by affidavit stated that he is familiar

EXHIBIT C

# WEAPONS LAW LIMITS



WEST OLD BALTIMORE RD.
LITTLE SENECA CREEK
I-270
BLACK HILL REGIONAL PARK
LITTLE SENECA CREEK
ROUTE 117
ROUTE 118
ROUTE 28
ROUTE 112
WATTS BRANCH
SENECA CREEK

ROUTE 355
BRINK ROAD
ROUTE 420
ROUTE 97
DAMASCUS ROAD
ROUTE 650
BRIGHTON DAM ROAD
ROUTE 650
ROUTE 108
ROUTE 198
PEPCO LINE

The **urban area** (again, that portion of the County where the discharge of firearms is generally prohibited) is defined as "that part of the County within the following boundaries: Beginning at a point where the Maryland/District of Columbia boundary line in the County intersects with the Maryland/Virginia boundary line on the southwest side of the Potomac River; running then northwest along the Maryland/Virginia boundary line to the emptying of Watts Branch into the Potomac River; then northwest along the north boundary of Seneca Creek to Route 112 (Seneca Road); then northwest along Route 28 to Route 118 (Germantown Road); then north along Route 118 to Route 117 (Clopper Road); then northwest along the north boundary of Black Hill Regional Park to the park's southernmost intersection with I-270; then northwest along I-270 to Little Seneca Creek; then north along Little Seneca Creek to West Old Baltimore Road; then east along West Old Baltimore Road to Route 355 (Frederick Road); then south along Route 355 to Brink Road to Route 97 (Georgia Avenue); then south along Route 97 to Brighton Dam Road; then east along Route 650 (New Hampshire Avenue); then south along Route 650 to Route 108 (Ashton Road); then east along Route 108 to the Potomac Electric Power Company transmission line property; then southeast along the Montgomery County/Prince George's County boundary line; then southwest along the Montgomery County/District of Columbia boundary line to the place of beginning.

SCALE IN MILES
0   1   2   3

NORTH

URBAN AREA

DISTRICT LINE
PRINCE GEORGES COUNTY LINE
PEPCO LINE

LAYTONSVILLE

SENECA CREEK STATE PARK

BLACK HILL REGIONAL PARK

JA0633



**Planet Depos**
*We Make It Happen™*

---

## CONFIDENTIAL INFORMATION REDACTED

# Transcript of Susan Brancato Vizas

**Date:** February 27, 2018
**Case:** Maryland Shall Issue, Inc., et al. -v- Hogan, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT
3

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MARYLAND

 3    - - - - - - - - - - - - x

 4   MARYLAND SHALL ISSUE,    :

 5   INC., et al.,            :

 6            Plaintiffs,     :    Civil Action No.

 7      v.                    :    16-cv-3311-MJG

 8   LAWRENCE HOGAN, et       :

 9   al.,                     :

10            Defendants.     :

11    - - - - - - - - - - - - x

12

13         CONFIDENTIAL INFORMATION REDACTED

14         Deposition of SUSAN BRANCATO VIZAS

15              Baltimore, Maryland

16           Tuesday, February 27, 2018

17                  9:33 a.m.

18

19

20   Job No.:  178304

21   Pages:  1 - 60

22   Reported By:  Sandra A. Slater, RPR, CSR
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 162 of 460

Case 1:16-cv-03311-ELH   Document 135-4   Filed 01/28/21   Page 3 of 10
Case 1:16-cv-03311-ELH   Document 77-3   Filed 10/05/18   Page 3 of 10

CONFIDENTIAL INFORMATION REDACTED
Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                          9

```
 1       Q  You need to give a verbal response to my

 2   questions, yes, no or some other statement.

 3   Shaking your head or nodding your head or unh-unh

 4   or uh-huh are not sufficient.  Okay?

 5       A  Yes.

 6       Q  If you need to take a break at any time,

 7   just let us know and we will arrange to do that.

 8       Are you on any medications or are you suffering

 9   from any medical conditions that would prevent you

10   from testifying truthfully today?

11       A  No.

12       Q  Have you ever been a party to a lawsuit

13   before this?

14       A  No.  Oh, when I was a teenager there was

15   an issue with canceling an appointment for my

16   wisdom teeth removal but that was --

17       Q  Other than that, you've never been a party

18   to a lawsuit?

19       A  Nope.

20       Q  What is your current address?

21       A  8002 Bull Rush Court, Frederick, Maryland

22   21701.
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 163 of 460

Case 1:16-cv-03311-ELH   Document 135-4   Filed 01/28/21   Page 4 of 10
Case 1:16-cv-03311-ELH   Document 77-3   Filed 10/05/18   Page 4 of 10

CONFIDENTIAL INFORMATION REDACTED
Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                                    10

```
1        Q   And how long have you resided there?

2        A   18 years.

3        Q   And is that --

4        A   18 years in September.  Sorry.

5        Q   Is that a single family home?

6        A   A townhome.

7        Q   A townhome?  And you own that?

8        A   Us and the bank.

9        Q   And who else lives there with you?

10       A   My husband and three children.  Assorted

11   pets.

12       Q   How old are your children?

13       A   16, 14 and 10.

14       Q   Other than your attorneys have you talked

15   to anybody about this lawsuit?

16       A   No.

17       Q   What's your current employment?

18       A   I work part-time from my home for Harmony

19   Hills.

20       Q   I'm sorry, I missed that.

21       A   That's okay.  Harmony Hills, LLC.

22       Q   And what does that company do?
```

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022    Pg: 164 of 460

Case 1:16-cv-03311-ELH   Document 135-4   Filed 01/28/21   Page 5 of 10
Case 1:16-cv-03311-ELH   Document 77-3   Filed 10/05/18   Page 5 of 10

CONFIDENTIAL INFORMATION REDACTED
Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                                    18

```
 1        A   Oh, I apologize, yes.

 2        Q   You have seen this before?

 3        A   I have seen this before.

 4        Q   This is a copy of the First Amended

 5   Complaint --

 6        A   Right.

 7        Q   -- that's been filed in the lawsuit on

 8   your behalf.  And in Paragraph 17 it alleges that

 9   you would like to purchase a handgun for self

10   defense, target practice and other lawful

11   purposes.  Do you see that?

12        A   I do.

13        Q   All right.  When did you decide that you

14   wanted to purchase a handgun?

15        A   When my daughter expressed an interest in

16   shooting.

17        Q   And when was that?

18        A   2015.

19        Q   And how old is your daughter?

20        A   14.

21        Q   So in 2015 she would have been 11; is that

22   right?  Yes?
```

CONFIDENTIAL INFORMATION REDACTED

Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                    24

```
1        A   I don't understand the question.

2        Q   What year, was it more than 10 years ago?

3        A   Yes.  Well, probably in the last 10 years

4    I've probably been once with him.

5        Q   So when you fired the handgun when you

6    said your property you were referring to property

7    in South Carolina, not in Maryland?

8        A   That is correct.

9        Q   And what year was it, if you can recall,

10   when was the last time you fired a handgun?

11       A   I can't recall.

12       Q   Was it more than five years ago?

13       A   Yes.

14       Q   The Complaint alleges that you would like

15   to purchase a handgun for self defense, target

16   practice and quote, other lawful purposes.  What

17   other purposes do you intend to use the handgun

18   for?

19       A   As it is now, the law is when my father

20   passed away I couldn't have one of his guns

21   because I don't have the HTO; is that correct?

22       Q   Unfortunately, I'm not the person being
```

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022     Pg: 166 of 460

CONFIDENTIAL INFORMATION REDACTED

Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                              25

```
 1   deposed here today, so I'm not going to be
 2   answering any questions --
 3       A   Okay.
 4       Q   -- unless it's to clarify something that I
 5   asked you.  So your father had a gun, a handgun
 6   that he -- that you wanted to take ownership of;
 7   is that correct?
 8       A   That would be correct.
 9       Q   That's after he died or?
10       A   Yes.
11       Q   What kind of a gun was it?
12       A   A Colt 45.
13       Q   And what year did he die?
14       A   2012.
15       Q   And so what did you intend to do with the
16   Colt 45 other than just have it?
17       A   There you go.
18       Q   Nothing?
19       A   Correct.
20       Q   All right.  But you now want to purchase a
21   handgun for self defense and target practice; is
22   that correct?
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 167 of 460

Case 1:16-cv-03311-ELH   Document 135-4   Filed 01/28/21   Page 8 of 10
Case 1:16-cv-03311-ELH   Document 77-3   Filed 10/05/18   Page 8 of 10
CONFIDENTIAL INFORMATION REDACTED

Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                                    36

```
 1   application for HQL?

 2       A   No.

 3           MR. HANSEL:  I've got a minor emergency in

 4   my office.  Do you mind if we go off for just five

 5   minutes?

 6           MR. SCOTT:  Sure, fine.

 7           (A recess was taken.)

 8   BY MR. SCOTT:

 9       Q   Ms. Vizas, I just want to go back and

10   follow-up a little bit on the Colt 45 that you

11   were going to inherit from your father.  You said

12   that it was in 2013 when you would have taken

13   ownership of that gun.  Do you recall what month

14   that would have happened in?

15       A   I do not recall the month.

16       Q   All right.  You mentioned the background

17   check that you underwent to be a volunteer at the

18   school.  Did that include fingerprinting?

19       A   No.

20       Q   In the Complaint, which is Exhibit 2, in

21   Paragraph 16, it's alleged that you have taken and

22   passed hunter safety training.  Do you see that?
```

USCA4 Appeal: 21-2017    Doc: 25-2         Filed: 08/03/2022    Pg: 168 of 460

Case 1:16-cv-03311-ELH   Document 135-4   Filed 01/28/21   Page 9 of 10
Case 1:16-cv-03311-ELH   Document 77-3   Filed 10/05/18   Page 9 of 10
CONFIDENTIAL INFORMATION REDACTED
Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                    37

```
1        A  I do see that.

2        Q  Is that correct?

3        A  That is correct.

4        Q  All right.  When did you do that?

5        A  I think it was 2016.  I'd have to go back

6    and look.

7        Q  It was in Maryland?

8        A  Correct.  The only reason I took it was

9    because I had to take my children to take it.

10       Q  Your children wanted to take the same

11   class?

12       A  Yes.

13       Q  And did they do that?

14       A  They did.

15       Q  And what's your understanding of whether

16   or not that hunter safety training would qualify

17   as training in order to obtain an HQL?

18       A  I guess my understanding is not quite

19   clear.

20       Q  Have you done any investigation into that

21   question?

22       A  I have not.
```

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022        Pg: 169 of 460

CONFIDENTIAL INFORMATION REDACTED
Transcript of Susan Brancato Vizas
Conducted on February 27, 2018                           43

```
1    specific individual who wishes to purchase a

2    handgun but is unable to complete the HQL

3    requirements because they lack a Maryland driver's

4    license or other Maryland State identification?

5         A  No.

6         Q  Can you please describe for me the

7    inconvenience that has deterred you from obtaining

8    an HQL?

9         A  It's the expense end of the class.

10        Q  The expense of the class?

11        A  The class is an issue.

12        Q  Anything else?

13        A  No, not really.  The time, though, is

14   another issue.

15        Q  The time to what?

16        A  The time to take the class, to get

17   fingerprints, to wait for a background check.

18        Q  Well, what's your understanding of how

19   long it would take to complete the course?

20        A  When you can fit it into your schedule.

21   The course is I think it's a few days but then

22   time on the range.  I don't know how long that
```



## CONFIDENTIAL INFORMATION REDACTED

# Transcript of Deborah Kay Miller

**Date:** February 27, 2018
**Case:** Maryland Shall Issue, Inc., et al. -v- Hogan, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT
4

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3    - - - - - - - - - - - x

4    MARYLAND SHALL ISSUE,   :

5    INC., et al.,           :

6            Plaintiffs,   :   Civil Action No.

7      v.                   :   16-cv-3311-MJG

8    LAWRENCE HOGAN, et      :

9    al.,                    :

10           Defendants.   :

11   - - - - - - - - - - - x

12

13           CONFIDENTIAL INFORMATION REDACTED

14         Deposition of DEBORAH KAY MILLER

15                Baltimore, Maryland

16            Tuesday, February 27, 2018

17                    1:27 p.m.

18

19

20   Job No.:  178304

21   Pages:  1 - 47

22   Reported By:  Sandra A. Slater, RPR, CSR
```

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller

Conducted on February 27, 2018                    8

```
 1    understand or that is unclear to you, please ask
 2    me to rephrase it and I will do that.  Okay?
 3         A   Okay.
 4         Q   If you need to take a break at any time,
 5    just let me know and we will arrange to do that.
 6    All right?
 7         A   Okay.
 8         Q   What is your current address?
 9         A   297 Aston Forest Lane in Crownsville,
10    Maryland 21032.
11         Q   And how long have you lived there?
12         A   Since 2001.
13         Q   Is that a single family home?
14         A   Yes.
15         Q   And do you own it?
16         A   Yes.
17         Q   And who lives there with you?
18         A   My husband.
19         Q   Anybody else?
20         A   No.
21         Q   How long have you lived in Maryland?
22         A   I've lived in Maryland almost my whole
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 173 of 460

Case 1:16-cv-03311-ELH   Document 135-5   Filed 01/28/21   Page 4 of 17
Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 4 of 17

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                              9

```
1    life except for the first three months.
2         Q   Are you taking any medications that would
3    affect your ability to testify truthfully or
4    remember events?
5         A   No.
6         Q   Are you suffering from any medical
7    conditions that affect your memory or would impair
8    your ability to testify truthfully today?
9         A   No.
10        Q   Have you ever been a party to a lawsuit
11   before?
12        A   No.
13        Q   Have you ever been convicted of a crime?
14        A   No.
15        Q   Other than your attorneys have you talked
16   to anybody about this lawsuit?
17        A   No.
18        Q   What is your current employment situation?
19        A   I work for the Department of Defense.
20        Q   And what is your job there?
21        A   Currently, I'm an office manager.
22        Q   And what are your job duties?
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 174 of 460

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                          10

```
 1        A   Answering the phone, reserving conference

 2   rooms, things like that.

 3        Q   And how long have you been in this

 4   position?

 5        A   So I started December 26th so it's new.

 6        Q   December 26th of 2017?

 7        A   Correct.

 8        Q   And where did you work before that?

 9        A   The same place, Department of Defense.

10        Q   Different position?

11        A   Yes, different position.

12        Q   What was your position before you became

13   office manager?

14        A   Customer service representative.

15        Q   And what were your duties in that

16   position?

17        A   I processed requests for travel

18   authorizations and authorized the flights.

19        Q   And how long were you in that position?

20        A   Since 2012.

21        Q   So 2012 to December 26th, 2017?

22        A   Yes.
```

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller
Conducted on February 27, 2018                        13

```
1        Q   So it's just you and your husband at the
2    house; is that correct?
3        A   Correct.
4        Q   And do you have a computer in the house?
5        A   Yes.
6        Q   Do you have internet access?
7        A   Yes.
8        Q   Do you have a credit or debit card?
9        A   Yes.
10       Q   Do you have a Maryland driver's license or
11   Maryland State ID?
12       A   Yes.
13       Q   Do you have access to a scanner?
14       A   Yes.
15       Q   Do you own any firearms?
16       A   No, I do not.
17       Q   Have you ever owned any firearms?
18       A   No.
19       Q   Have you ever rented any firearms?
20       A   No.
21       Q   Have you ever fired a handgun?
22       A   Yes.
```

JA0649

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller

Conducted on February 27, 2018                          16

```
1        Q   When you've been to the shooting range

2    have you fired handguns or long guns or both?

3        A   Handguns.

4        Q   Have you ever fired a handgun outside of a

5    shooting range?

6        A   No.

7        Q   Have you ever taken any firearm safety

8    training?

9        A   No, I have not.

10       Q   Does your husband own any firearms?

11       A   Yes.

12       Q   How many?

13       A   I don't know the exact number.

14       Q   More than five?

15       A   I don't know.

16       Q   More than 10?

17           MR. HANSEL:  Don't guess, just if you

18   know.

19       A   I don't know.

20       Q   Does he own handguns, long guns or both?

21       A   Both.

22       Q   Do you know if he has a Maryland Handgun
```

Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 8 of 17
CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    18

```
 1    questions about some of the allegations in here.

 2    Have you seen this before, Exhibit 14?  Excuse me,

 3    Exhibit 2?

 4        A  Yes.

 5        Q  On page 3, paragraph 12, there's an

 6    allegation that says that you would like to

 7    purchase a handgun for self defense, target

 8    practice and other lawful purposes.  Do you see

 9    that?

10        A  Yes.

11        Q  Is that true?

12        A  That is true.

13        Q  When did you decide that you wanted to

14    purchase a handgun?

15        A  It was last year.

16        Q  2017?

17        A  Um-hum.

18        Q  Is that yes?

19        A  Yes.

20        Q  And what prompted that decision, if

21    anything?

22        A  Because I wanted to be able to defend
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 178 of 460

Case 1:16-cv-03311-ELH   Document 135-5   Filed 01/28/21   Page 9 of 17
Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 9 of 17

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                    19

```
1    myself in my home.
2        Q   All right.  Your husband already has guns
3    in the house, correct?
4        A   Yes.
5        Q   Why did you feel you needed to have one
6    for yourself?
7        A   Because of the new law, I was concerned
8    that if I used his gun it would be considered
9    receiving the handgun and that I could be
10   prosecuted.
11       Q   And how did you find out about that part
12   of the law?
13           MR. HANSEL:  Objection.  Give me a second
14   to think about that.  Go ahead.  I stated an
15   objection but you can answer.
16       A   Oh.  I read the law.
17       Q   Did you talk to anybody about the law?
18       A   No, I read it for myself.
19       Q   And you became concerned that the law
20   would not permit you to take possession of a
21   handgun that belonged to your husband?
22       A   Yes, it was unclear.
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 179 of 460

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller

Conducted on February 27, 2018                              21

```
1        Q   Have you ever shopped for handguns?

2        A   I've looked at them, but that's about it.

3        Q   Have you looked at them at a gun store or

4    on the internet?

5        A   At a gun store.

6        Q   Which gun store?

7        A   I don't remember the name of it.

8        Q   When did you visit the gun store to look

9    at the handguns?

10       A   It was about a year ago.

11       Q   And how much were you planning to spend on

12   this handgun?

13       A   I don't know.  I hadn't thought about the

14   price.

15       Q   You have the financial wherewithal to

16   purchase a handgun?

17       A   Yes.

18       Q   Have you thought about a price range that

19   you're willing to spend?

20       A   No, I have not.

21       Q   Have you done any research to determine

22   what type of handgun would best suit your needs?
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 180 of 460

Case 1:16-cv-03311-ELH   Document 135-5   Filed 01/28/21   Page 11 of 17
Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 11 of 17

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                    29

```
1         A  No, I have not.

2         Q  Are you a member of any gun rights

3    organizations?

4              MR. HANSEL:  Objection.  Go ahead.

5              THE WITNESS:  Go ahead?

6              MR. HANSEL:  Yep.  I'll be real clear when

7    you're not supposed to answer.  I'm pretty good at

8    making myself known, so you'll be all right until

9    I let you know.  Thank you.

10        A  I am currently a member of Maryland Shall

11   Issue, MSI.

12        Q  Any others?

13        A  No.

14        Q  How long have you been a member of MSI?

15        A  Last year.

16        Q  2017?

17        A  Yes.

18        Q  Do you participate in any activities in

19   connection with your membership at MSI?

20             MR. HANSEL:  Objection.  Go ahead.  Go

21   ahead.

22        A  Oh.  I attend some of the meetings.
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 181 of 460

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                   33

```
 1        Q   Can you describe for me the inconvenience
 2   that has deterred you from obtaining an HQL?
 3        A   The training, the time for the training.
 4   I have back issues so sitting still for four hours
 5   would be a burden on me.
 6        Q   Anything else?
 7        A   Taking the time off work.
 8        Q   Anything else?
 9        A   No.
10        Q   So it's not the cost?
11        A   The cost is a burden but the important
12   thing is my back issues for the training.
13        Q   So you have the financial wherewithal to
14   pay the fees that are required to get an HQL if
15   you want to, correct?
16            MR. HANSEL:  Objection.  Asked and
17   answered.  Irrelevant.  Go ahead.  You can answer.
18        A   It is a burden but it is -- I can do it.
19        Q   And you said your understanding was that
20   the training would take approximately four hours,
21   correct?
22        A   Yes.
```

JA0655

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 182 of 460

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                                34

```
 1        Q  All right.  Do you know whether that would

 2   need to be during the day or during the week or

 3   whether you could do it on a Saturday or in the

 4   evening?

 5        A  No, I don't.

 6        Q  So you don't know whether you would need

 7   to take off time from work to complete the

 8   training or not, correct?

 9        A  Correct.

10        Q  And you said you have back issues.  When

11   did those start?

12        A  It started in around 2001.

13        Q  And is it ongoing, you suffer from it

14   today?

15        A  Yes.

16        Q  And what specifically is the problem?

17        A  I have the disc in my back.

18        Q  What do you do at work, you have to sit at

19   a desk?

20        A  Yes.

21        Q  All day?

22        A  I have to get up.  When my back gets
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 183 of 460

Case 1:16-cv-03311-ELH   Document 135-5   Filed 01/28/21   Page 14 of 17
Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 14 of 17

CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                    35

1    uncomfortable, I get up.
2        Q  But most of the time when you're at work
3    you are seated at a desk; is that correct?
4        A  Yes.
5        Q  Have you done any research to determine
6    whether during the training that's required to
7    obtain a HQL you would have the opportunity to get
8    up and move around?
9        A  No, I haven't.
10       Q  Have you made any inquiries of any
11   Maryland State Police approved firearm safety
12   trainers or instructors as to whether or not you
13   could get an accommodation for your back problems
14   if you took the training?
15       A  No, I have not.
16       Q  Did you have to submit to a background
17   check when you got your current job?
18       A  Yes.
19       Q  Do you need a handgun for your work?
20       A  No.
21       Q  Do you have any other physical
22   disabilities other than your back that affect your

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 184 of 460

Case 1:16-cv-03311-ELH   Document 135-5   Filed 01/28/21   Page 15 of 17
Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 15 of 17

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller

Conducted on February 27, 2018                        38

```
 1      Q  You said you were confused by the receive

 2   and receipt portion of the HQL law?

 3         MR. HANSEL:  Objection.  She didn't say

 4   that.  She said it was ambiguous.

 5      Q  Did it confuse you?

 6      A  I felt it was vague.

 7      Q  What about it did you find to be vague?

 8      A  It just -- it didn't define what it meant

 9   to receive.

10      Q  And did you do any research into that

11   issue?

12      A  No, I just read the law.

13      Q  Are you aware of any Maryland State Police

14   guidance on that question?

15      A  No.

16         (D. Miller Deposition Exhibit 15 was

17   marked for identification and retained by

18   counsel.)

19      Q  Ms. Miller, let me ask you to look at

20   what's been marked as Exhibit 15.  This is an

21   advisory from the Maryland State Police concerning

22   the interpretation of "received" in the HQL law.
```

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 185 of 460

CONFIDENTIAL INFORMATION REDACTED

Transcript of Deborah Kay Miller

Conducted on February 27, 2018                                    39

```
1    Have you seen this before?

2         A   No, I haven't seen this.

3            MR. HANSEL:   They issue a lot of

4    advisories.  Just for the record, this is

5    LD-HQL-17-003 dated November 17th, 2017.  I just

6    put it on the record because there's the issue of

7    a lot of advisories.

8         Q   At the bottom you'll see where it says

9    therefore, an individual not otherwise prohibited

10   from owning or possessing regulated firearms is

11   not required to possess an active HQL in order to

12   borrow a regulated firearm from another individual

13   on a temporary basis.  Do you see that?

14        A   Yes.

15        Q   In light of that do you still believe that

16   you have a need to purchase a handgun?

17        A   Yes.

18        Q   Why?

19        A   After reading the law, I felt I could be

20   prosecuted.

21        Q   All right.  So even under this

22   interpretation, you feel you could still be
```

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 186 of 460

Case 1:16-cv-03311-ELH   Document 135-5   Filed 01/28/21   Page 17 of 17
Case 1:16-cv-03311-ELH   Document 77-4   Filed 10/05/18   Page 17 of 17
CONFIDENTIAL INFORMATION REDACTED
Transcript of Deborah Kay Miller
Conducted on February 27, 2018                               40

```
1    prosecuted?
2          MR. HANSEL:  Would you like to stipulate
3    that no one can be prosecuted?
4          MR. SCOTT:  I'm not going to stipulate to
5    anything, Counsel, and the question remains
6    pending.
7          MR. HANSEL:  I'll happily stipulate, if
8    you would like, and then that would solve the
9    issue.
10          MR. SCOTT:  Can you read back the last
11    question, please?
12          (Pending question read.)
13       A  Yes.
14       Q  Have you had any surgery for your back?
15       A  Yes.
16       Q  How many times?
17       A  Twice.
18          (D. Miller Deposition Exhibit 16 was
19    marked for identification and retained by
20    counsel.)
21       Q  I've had marked as Exhibit 16 the Answers
22    to Interrogatories that we received from your
```

Daniel Webster

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :   Case No:

        Plaintiffs               :   16-cv-3311-MJG

                                 :

          -vs-                   :   Pages 1 - 337

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

        Defendants               :

------------------------------X

Deposition of Daniel Webster, Ph.D.

Washington, D.C.

Wednesday, June 13, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409352

MAGNA LEGAL SERVICES

(866) 624-6221

EXHIBIT
5

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 2 of 39
Daniel Webster

Page 19

1    understanding about what the Maryland State Police

2    were able to do by way of identifying individuals

3    who owned handguns who were subsequently convicted

4    of a disqualifying offense?

5        A.    Could you just restate the question again

6    to some extent?

7        Q.    Sure.  Prior to the HQLs fingerprinting

8    requirement, was the Maryland State Police able to

9    identify handgun owners upon their conviction of a

10   disqualifying offense?

11       A.    They would -- they could determine whether

12   a gun that they possessed had been registered, had

13   been through their system.

14       Q.    I'm asking a slightly different question.

15   I'm, obviously, putting it ineloquently, so let me

16   try it again.  When I purchase a handgun in

17   Maryland, it's registered with the Maryland State

18   Police; am I correct?

19       A.    That's correct.

20       Q.    And the Maryland State Police has a

21   registry of handgun ownership such that, if I were

22   to be convicted of a disqualifying offense, they

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 189 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 3 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 3 of 39
Daniel Webster

Page 20

1    could readily look me up, determine if I owned a

2    handgun, and dispossess me of that handgun; correct?

3         A.   That's correct.

4         Q.   And they've always been able to do that,

5    and the fingerprinting requirement of the HQL did

6    not add anything to that capability; am I correct?

7              MR. SCOTT:  Objection.  Go ahead.

8              THE WITNESS:  I think what it does, it's a

9    more clear-cut way to confirm identity.  So, if

10   someone took my wallet, used my ID to purchase a gun

11   that I didn't actually buy, you know, there's a

12   question, I guess, of, you know, who possessed that

13   gun, who purchased that gun.  When you have

14   fingerprint verification, there's no question.

15   BY MR. SWEENEY:

16        Q.   There's nothing about the HQL that

17   requires verification of fingerprints at the point

18   of purchase of a handgun, is there?

19        A.   Verifies identity at that particular

20   point?

21        Q.   Fingerprints.

22        A.   Well, they can check them against other

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 190 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 4 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 4 of 39
Daniel Webster

Page 21

1    information.

2         Q.    Let me understand.  When I go to purchase

3    a handgun in Maryland today and I fill out my 77R

4    application, do I give my fingerprints at the point

5    of purchase in order for my fingerprints to be

6    verified at that time?

7         A.    Not at that time.  You're supposed to do

8    that beforehand.

9         Q.    Okay.  And beforehand in connection with

10   acquiring my HQL?

11        A.    Sorry.  Say that again.

12        Q.    Sure.  When you say beforehand, that I

13   provided my fingerprints beforehand, I provided them

14   in connection with applying for my HQL originally;

15   correct?

16        A.    That's correct, yes.

17        Q.    All right.  But that has nothing to do

18   with the ability of the Maryland State Police, if

19   I'm convicted of a disqualifying offense, to

20   identify that I am an owner of a handgun and

21   dispossess me of the handgun.  They had that ability

22   long before the fingerprinting requirement of the

Daniel Webster

Page 22

1    HQL; correct?

2         MR. SCOTT:  Objection.  Go ahead.

3         THE WITNESS:  Well, again, I'll just

4    restate what I said before, which is, if everything

5    was done above board with proper identification,

6    they could be able to do that, but if someone used a

7    fake ID, I don't think they would be able to do

8    that.

9    BY MR. SWEENEY:

10        Q.   How many firearms have been purchased in

11   Maryland with fake IDs?

12        A.   I don't know.

13        Q.   Has there ever been a study done on that?

14        A.   On Maryland specifically, no.  There was a

15   study probably about 20 years ago by the General

16   Accounting Office for U.S. Congress where they went

17   into gun shops in, I believe, about five or six

18   states and attempted to purchase firearms with fake

19   IDs, and what they found in those cases -- I don't

20   remember exactly the number of tries they did, but

21   there wasn't a single case in which they were, their

22   IDs were questioned or their applications did not --

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022    Pg: 192 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 6 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 6 of 39

Daniel Webster

Page 23

1   in each case they were able to walk away with

2   firearms.

3        Q.   And none of those dealers were licensed

4   firearms dealers in the state of Maryland; is that

5   correct?

6        A.   That's correct.

7        Q.   And none of those states studied by the

8   GAO had a waiting period like the seven-day waiting

9   period that's long been in effect in Maryland;

10  correct?

11       A.   Again, I don't remember each of the

12  states.  I'm not going to confirm or deny that.  I'm

13  not sure.

14       Q.   All right.  How much time have you spent

15  preparing for this case so far.

16       A.   It's, my last calculation, I think it's

17  about 54 hours, something like that.

18       Q.   And can you tell me what you have spent

19  those 54 hours doing?

20       A.   Sure.  Reviewing relevant documents,

21  relevant studies, looking at ATF data that they put

22  on their website for gun traces, crime gun traces,

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022     Pg: 193 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 7 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 7 of 39
Daniel Webster

Page 30

1      Q.    What do you mean by apply directly to law

2    enforcement?  What does that mean?

3      A.    What that means -- and, again, it varies

4    from state to state.  Sometimes that means a

5    face-to-face application at a local or state law

6    enforcement or public safety agency.  Sometimes that

7    means applying not face to face, but through mail or

8    there may be one case that allows an online process.

9      Q.    And what is the importance of the element

10   of applying directly to law enforcement?

11     A.    Right.  So, in my opinion, I think the

12   relevance is that it is a more meaningful, I guess,

13   application, perhaps, frankly, intimidating of sort

14   of underscoring what's at stake here.  The important

15   thing is the overall context of firearm

16   marketplaces, and we know from research that there

17   are a relatively small percentage of licensed gun

18   dealers who through a variety of kinds of evidence

19   suggest that they are not particularly rigorous in

20   vetting and sort of making sure that sales

21   applications are done in an accurate and lawful

22   manner.

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022      Pg: 194 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 8 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 8 of 39
Daniel Webster

Page 31

1              And in the context of straw purchase where

2     someone, usually, not always, but usually a

3     prohibited individual is asking someone, in essence,

4     to stick their neck out to purchase a gun for them,

5     that going into a less than reputable gun shop or

6     alternatively going to different private sales

7     venues, might be gun shows or other similar kind of

8     situations through online, that that appears to be

9     and probably, frankly, is a relatively risk-free

10    thing to do.

11             And I think that going directly to law

12    enforcement when a prohibited person is asking

13    someone to buy a gun for them, it likely causes

14    hesitancy to do so.

15        Q.   All right.  So I get the intimidating

16    factor being face to face with a law enforcement

17    officer at police headquarters, but what is the

18    intimidating effect of applying through the mail, as

19    you said, some of these PTPs allow?

20        A.   Yeah.  Honestly, I don't know.  I haven't

21    studied that.

22        Q.   And you also said that there's online

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022      Pg: 195 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 9 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 9 of 39
Daniel Webster

Page 32

1    applications for some of these, at least one of

2    these PTPs.  What's the intimidating effect to

3    applying to a law enforcement agency online?

4        A.   Yeah, again, I don't know.  I haven't

5    studied that specifically.

6        Q.   So in Maryland, for instance, is that the

7    example you were thinking that you can apply online

8    for your PTP?

9        A.   In Maryland you have to go to a certified

10   vendor, you know, that processes fingerprinting,

11   does the fingerprinting, so it's not -- you can't be

12   fingerprinted online.

13       Q.   But you apply online?

14       A.   Yeah.

15       Q.   But you apply directly to the Maryland

16   State Police online?

17       A.   Yes.

18       Q.   That would qualify under your definition

19   of applying directly to a law enforcement agency for

20   the permit; correct?

21       A.   Yes, but, again, I think it's distinct

22   from other states that allow that without a

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022     Pg: 196 of 460

Daniel Webster

                                                    Page 33

1    fingerprinting process.

2         Q.   All right.  We'll get to that.  Now, are

3    the firearms marketplaces more important than

4    polling places in America?

5         A.   I'm not sure I understand the question.

6    Important in what way?

7         Q.   Well, you said that firearms markets are

8    important and, therefore, people should be

9    intimidated to make sure they are aware of the

10   seriousness of going into the firearms market.

11        MR. SCOTT:  Objection.

12   BY MR. SWEENEY:

13        Q.   So I'm asking you if they are more

14   important than polling places in that regard.

15        MR. SCOTT:  Objection.

16        THE WITNESS:  I don't know.

17   BY MR. SWEENEY:

18        Q.   Should we intimidate people before they go

19   into polling places to exercise their right to vote

20   in order to impress upon them the seriousness of

21   what they are about to do?

22        MR. SCOTT:  Objection.

Daniel Webster

Page 38

1    fee for the HQL needs to be paid before you get your

2    training or only after you've obtained your

3    training?

4         A.    I don't recall.

5         Q.    Is there anything else that's required in

6    order to get an HQL?

7         A.    Well, most importantly, of course, that

8    you don't have any disqualifying conditions.

9         Q.    So could we call that a background check?

10        A.    Yes.

11        Q.    And is there any difference between the

12   background check that's done for the HQL and the

13   background check that was previously done for the

14   purchase of a handgun in Maryland?

15        A.    Not in a sense of the same agency doing

16   the background check, again, looking for the same

17   disqualifying conditions.

18        Q.    And after one obtains an HQL in Maryland

19   today and goes to purchase a handgun, is there any

20   subsequent background check done at that time?

21        A.    Yes.

22        Q.    And how does that background check differ

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 198 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 12 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 12 of 39
Daniel Webster

Page 39

1    from the background check done to obtain your HQL?

2         A.   Again, I don't think they are materially

3    different.

4         Q.   Do you know how long it takes from start

5    to finish to get your HQL?

6         A.   Start to finish?  So, well, there's always

7    a waiting period.  So with respect to, like, a

8    backlog of how long it takes them to process it?

9    I'm not sure what you mean.

10        Q.   Well, if you were -- have you applied for

11   an HQL?

12        A.   I have not.

13        Q.   Okay.  So, if I were to apply for an HQL,

14   which I have done, how long does it take me?  How

15   many days from the time I start the process of

16   obtaining an HQL until I receive my HQL?  Do you

17   have any idea how long that is?

18        A.   I don't.  It would depend upon how quickly

19   you got your safety training requirements and

20   whether there -- sometimes there might be delays

21   with background checks.

22        Q.   So it might take several days for me to

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 199 of 460

Case 1:16-cv-03311-ELH    Document 135-6    Filed 01/28/21    Page 13 of 39
Case 1:16-cv-03311-ELH    Document 77-5    Filed 10/05/18    Page 13 of 39
Daniel Webster

Page 70

1    probation in Baltimore City.

2         Q.    If my handgun is stolen because some

3    criminal can't get it in a straw purchase now and

4    decides he wants to take my handgun, do I have any

5    obligations under law with respect to that stolen

6    handgun?

7         A.    You do.

8         Q.    What are they?

9         A.    You're required -- again, this was part of

10    the Firearms Safety Act of 2013.  You're required to

11    report that theft to law enforcement within 72 hours

12    of learning that your gun has been stolen.

13         Q.    If I no longer have the handgun that I own

14    in my possession, the only way I could have

15    dispossessed myself of it is to have transferred it,

16    lost it, or lost it to theft; correct?

17         A.    Pretty much, yeah.

18         Q.    And if I transfer it in Maryland, I have

19    to register that, and I have to do a 77R, even if

20    it's a private transfer; correct?

21         A.    That's correct.

22         Q.    And that's long been the law; correct?

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 200 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 14 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 14 of 39
Daniel Webster

Page 73

1        Q.    "Straw purchasers simply have to go into a

2    gun shop, present a government issued ID, complete a

3    form that the gun owner or employee transmits to the

4    FBI and/or state law enforcement agency to complete

5    the transaction."

6              In Maryland it's always been the

7    requirement that the Maryland State Police do a

8    background check, which is over and above the F.B.I.

9    NICS check, and includes more checking on more

10   things than the F.B.I. NICS check includes; correct?

11       A.    I don't know if it's always been the case,

12   but it's been the case for a long time, yes.

13       Q.    Long before the HQL came into effect;

14   correct?

15       A.    Yes.

16       Q.    And when you say in the next sentence most

17   states do not require background checks or record

18   keeping for firearm transfers between non-licensed

19   sellers and purchasers, that's not the case in

20   Maryland; right?  We already talked about that?

21       A.    Correct.

22       Q.    So that factor doesn't apply here?

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 15 of 39
Daniel Webster

Page 165

1    constitution, in fact, does confer on Americans the

2    individual right to own guns?

3             MR. SCOTT:  Objection.

4             THE WITNESS:  Yes.  Okay.

5    BY MR. SWEENEY:

6        Q.  Did Joseph Curran serve as attorney

7    general under Governor O'Malley?

8        A.  I don't really remember whether they

9    intersected or not.

10       Q.  And did Martin O'Malley attend your

11   summit?

12       A.  He did.

13       Q.  And did he support the Firearm Safety Act

14   of 2013?

15       A.  Yes.  He signed it.

16       Q.  In fact, he was one of the foremost

17   proponents of it; am I correct?

18       A.  Yes.

19       Q.  Who was the primary author of what became

20   the Firearm Safety Act of 2013?

21       A.  I, honestly, don't know.

22       Q.  Did Brian Frosh, the attorney general of

JA0675

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 16 of 39
Daniel Webster

Page 166

1  Maryland, have any role in the time he was in the

2  Senate?

3       A.   I suspect he had an important role given

4  his role in the Senate of chairing the Judicial

5  Proceedings Committee and being someone who has had

6  firearm policy as a particular area of his interest.

7       Q.   And have you met Mr. Frosh?

8       A.   Oh, yes.

9       Q.   And you've had conversations with him?

10      A.   Sure.

11      Q.   And you've had conversations with him

12  about firearms law and policy?

13      A.   Yes.

14      Q.   Did you have conversations with him about

15  the proposed Firearm Safety Act of 2013?

16      A.   I mostly talked to him about handgun

17  purchaser licensing.  I think I may have also talked

18  to him -- actually, there were three components, the

19  purchaser licensing, the granting the State Police

20  greater authority to take action against gun dealers

21  who are violating state firearm law, and the

22  requirement for mandatory reporting of theft.

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 203 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 17 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 17 of 39
Daniel Webster

Page 167

1       Q.   All right.  Did you testify on the bill

2   that became the Firearm Safety Act of 2013?

3       A.   I did.

4       Q.   How did that come about?  Who invited you?

5       A.   I believe Senator Frosh.

6       Q.   And do you remember what he asked you to

7   do?

8       A.   He asked me if I would come and testify in

9   support of the law.

10      Q.   And you were happy to do that?

11      A.   I was willing to do that, yes.

12      Q.   He didn't subpoena you to do that and

13  compel you to be there to testify, did he?

14      A.   No.

15           MR. SWEENEY:  Let's mark this as 146.

16           (Exhibit No. 146, Pages out of Bill File

17  for SB281, was marked for identification and

18  retained by Mr. Scott.)

19  BY MR. SWEENEY:

20      Q.   And I've marked 156 pages 105 to 110 out

21  of the bill file on SB281, which appears to be

22  written testimony in support of SB281 by you; am I

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 204 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 18 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 18 of 39
Daniel Webster

```
                                                      Page 168
 1   correct?

 2              MR. SCOTT:  I think it's 146, Counsel.

 3              THE WITNESS:  It's 146.

 4              MR. SWEENEY:  I'm sorry.

 5              MR. SCOTT:  You said 156.

 6              MR. SWEENEY:  Oh, I did.  It is 146.

 7   That's correct.  I'm sorry.

 8              THE WITNESS:  Yes.

 9   BY MR. SWEENEY:

10      Q.   If I was good with numbers, I could have

11   been an epidemiologist.  Is this a statement that

12   you, yourself, prepared and submitted to the

13   Maryland Senate Judicial Proceedings Committee?

14      A.   Yes.

15      Q.   And that was chaired by Brian Frosh at the

16   time?

17      A.   Yes.

18      Q.   In paragraph two you identify three

19   different aspects of the proposed Firearms Safety

20   Act of 2013, a licensing system for purchasers of

21   regulated firearms, a provision to reduce ammunition

22   capacity limits, and the reporting of events which
```

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 205 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 19 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 19 of 39
Daniel Webster

Page 169

1    triggered disqualification; am I correct?

2         A.   Yes.

3         Q.   And the first one relates to the HQL

4    requirement; correct?

5         A.   Yes.

6         Q.   And the other two are different

7    requirements that would have been a part of the

8    Firearms Safety Act of 2013; correct?

9         A.   Yes.

10        Q.   In total there were a couple of dozen of

11   those requirements; correct?

12        A.   I don't remember the exact number of

13   requirements.

14        Q.   We'll get to that.  You say in the next

15   paragraph, "Arguably, the most important objective

16   of the state's gun laws is to prevent dangerous

17   individuals from possessing firearms."  Do you see

18   that?

19        A.   Yes.

20        Q.   By dangerous individuals are you referring

21   only to individuals who are disqualified by reason

22   of mental illness or defect or have been convicted

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 20 of 39
Daniel Webster

Page 170

1   of a disqualifying criminal offense?

2        A.   Yes, and, of course, that extends to

3   individuals under certain domestic violence

4   restraining orders as well.

5        Q.   I accept that.  But no other individuals;

6   am I correct?

7        A.   Right.

8        Q.   Now, you say here that the system, the

9   Maryland system is especially vulnerable to illegal

10  straw purchases and individuals using false

11  identification in their applications to purchase

12  regulated firearms; am I correct?

13       A.   Mm-hmm.  Yes.

14       Q.   And you have no data on the special

15  vulnerability of Maryland to illegal straw

16  purchasers or the use of false identification by

17  individuals purchasing firearms; correct?

18       A.   No.

19       Q.   And here's that General Accounting Office

20  study that you referred to in which they went and

21  used false identification at gun stores in Virginia,

22  West Virginia, Montana, New Mexico, and Arizona;

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022     Pg: 207 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 21 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 21 of 39
Daniel Webster

Page 171

1    correct?  We talked about that a little earlier.

2          A.    Yes.

3          Q.    Now, down in the next line it says, "All

4    five states conform to minimum requirements of the

5    Brady Act relying on instant background checks, but

6    do not require fingerprinting or waiting periods for

7    firearm purchases."  Did I read that correctly?

8          A.    Mm-hmm.  Yes.

9          Q.    Does that refresh your recollection that

10   the GAO study you relied on involved states that did

11   not have waiting periods for firearms purchases like

12   Maryland does?

13         A.    Yes.

14         Q.    The GAO did not make any study and, to

15   your knowledge, there is no study of the degree of

16   scrutiny, casual or otherwise, that Maryland

17   firearms dealers like my client give to firearms

18   purchasers; correct?

19         A.    Correct.

20         Q.    That same paragraph three sentences down

21   it says, "Systems requiring firearm purchase

22   applications be processed directly by law

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 208 of 460

Case 1:16-cv-03311-ELH    Document 135-6    Filed 01/28/21    Page 22 of 39
Case 1:16-cv-03311-ELH    Document 77-5    Filed 10/05/18    Page 22 of 39
Daniel Webster

Page 172

1    enforcement agencies," skipping, "would result in

2    fewer false applications for firearm purchases being

3    processed and fewer guns in the wrong hands."  Did I

4    read that correctly?

5         A.    Mm-hmm.  Yes.

6         Q.    All right.  And the HQL is an example of

7    something which is processed directly by law

8    enforcement agencies in your statement here?

9         A.    Well, it's processed now through the

10   certified, the fingerprint component is processed by

11   the certified vendors to do that.

12        Q.    And you said here you assumed, however,

13   that the HQL would be implemented by direct

14   application to law enforcement agencies; correct?

15        A.    Yes.

16        Q.    And that didn't happen; right?

17        A.    That's correct.

18        Q.    The next paragraph you say,

19   "Permit-to-Purchase licensing and registration

20   firearms laws could mitigate the potential negative

21   consequences of negligent sales practices by gun

22   dealers."  Do you see that?

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 23 of 39
Daniel Webster

Page 173

1      A.    Yes, at the bottom of page one there.

2      Q.    And you don't have any data on negligent

3   sales practices by Maryland gun dealers or my client

4   in particular, Atlantic Guns; correct?

5      A.    Correct.

6      Q.    The next paragraph carries over onto page

7   two, and down below it talks about federal firearms

8   sales laws have several weaknesses, and it cites

9   Braga and Gaglardi.  Is that the Braga study that we

10  talked about earlier today?

11     A.    No.  Actually, this references a chapter

12  in the book Reducing Gun Violence in America that we

13  just discussed that came out in 2013.

14     Q.    All right.  And the point made here is

15  that there is no specific statute making straw

16  purchases illegal under federal law; correct?

17     A.    Correct.

18     Q.    And that's not the case in Maryland where

19  we have a law that makes straw purchases illegal;

20  correct?

21     A.    That's correct.

22     Q.    And the next paragraph you point out that

USCA4 Appeal: 21-2017   Doc: 25-2        Filed: 08/03/2022      Pg: 210 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 24 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 24 of 39
Daniel Webster

Page 174

1    Connecticut, Iowa, Massachusetts, New Jersey, New

2    York, and the District of Columbia all require

3    persons wishing to purchase handguns apply directly

4    with a law enforcement agency and be photographed

5    and fingerprinted; correct?

6        A.   Yes.

7        Q.   And that's what you were assuming the

8    Maryland Handgun Qualification License would

9    require; correct?

10       A.   Correct.

11       Q.   But it did not; correct?

12       A.   Correct.

13       Q.   Now, you went on on page four and page

14   five to focus on the policies involving reporting of

15   the mentally ill and banning assault weapons and

16   large capacity ammunition feeding devices as

17   provisions in the proposed Firearm Safety Act that

18   you believed would help prevent gun violence;

19   correct?

20       A.   Yes.

21       Q.   And there are a number of other provisions

22   in SB281 that also would prevent gun violence;

Daniel Webster

Page 175

1    correct?

2        A.   Yes, in my opinion.

3        Q.   All right.  And let's mark as Exhibit 147

4    a copy of SB281.

5             (Exhibit No. 147, SB281 File, was marked

6    for identification and retained by Mr. Scott.)

7    BY MR. SWEENEY:

8        Q.   I'm not going to apologize for how it

9    looks.  I have no Maryland legislative process, but

10   I will ask you have you seen previously the document

11   that we've marked as 147, which is a markup of

12   Senate Bill 281, which is the Firearms Safety Act of

13   2013 as passed.

14       A.   Yes.

15       Q.   And do you recognize this as the actual

16   content of that law?

17       A.   Appears to be.

18       Q.   And it was codified in different

19   provisions of the Maryland code, but this is the

20   only really back-to-back iteration of what was

21   contained in that act; correct?

22             MR. SCOTT:  Objection.

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022    Pg: 212 of 460

Daniel Webster

Page 178

1    we had, the states with permit-to-purchase licensing

2    had proportionally fewer of their guns used in

3    crime, actually came from guns that they sold and

4    were regulated under state law.  They had fewer

5    number of guns that made their way very quickly from

6    a retail sale to criminal involvement.

7         They generally had lower levels of firearm

8    mortality and a growing body of evidence in what we

9    had begun of our first iteration of the effect of

10   Missouri's repeal of a handgun purchaser licensing

11   system.  At that time, again, the evidence was

12   indicating that the purchaser licensing was

13   protective both against diversions of guns from

14   criminal use and against homicide rights, preventive

15   against homicide.

16        We now have additional research that makes

17   me feel even stronger that this is a type of policy

18   that is among our most effective at curtailing gun

19   violence.

20        Q.   So what did Missouri's permit-to-purchase

21   plan have in common with Maryland's HQL requirement?

22        A.   Well, first and foremost, if you were

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 213 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 27 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 27 of 39
Daniel Webster

Page 179

1    going to purchase a handgun, you needed to get a

2    permit.  And that was always step one.  I think

3    that's the most important.

4        Q.   And that was a permit that you had to

5    apply directly to a law enforcement agency in

6    Missouri to get; correct?

7        A.   Yes.

8        Q.   Unlike Maryland?

9             MR. SCOTT:  Objection.

10            THE WITNESS:  Correct.

11   BY MR. SWEENEY:

12       Q.   And Missouri didn't require fingerprinting

13   like Maryland requires fingerprinting, did it?

14       A.   That's right.

15       Q.   And it didn't require training either;

16   correct?

17       A.   That's correct.

18       Q.   So, if we're looking for a common

19   denominator, there's only one common denominator

20   between the Missouri PTP law and the HQL, and that's

21   the requirement of a permit in order to purchase; am

22   I correct?

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022    Pg: 214 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 28 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 28 of 39
Daniel Webster

Page 180

1        A.    Yes.

2        Q.    Do any of the components of the Firearms

3    Safety Act, other than the HQL, not have any effect

4    on firearms violence?

5        A.    I have to go through all of these

6    provisions.

7        Q.    Just the ones you talked about.  Would

8    they not have any effect at all or do you think

9    they'd have some effect on preventing firearms?

10       A.    I think some effects.  Some of them would

11   be more gradual than others.  So, for example, like

12   an enhanced regulatory capacity for State Police

13   with respect to licensed gun dealers, it may be that

14   is a more gradual effect as compliance increases and

15   the degree to which the State Police demonstrate

16   that there are consequences to not following the

17   laws.

18           So that is sort of a question mark of how

19   quickly that might impact laws.  The data we have

20   about licensing suggests that, when you have a new

21   law, there's generally some impact that grows a

22   little bit over time, but that's my own opinion is

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022   Pg: 215 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 29 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 29 of 39
Daniel Webster

Page 184

1    by Collins and colleagues this year they found

2    that -- and I can pull it up probably quickly here

3    or it's actually in my report.  Anyway, they made

4    distinctions between fingerprinting, discretionary

5    permitting, so there's only three states that allow

6    some discretion meaning, even if you don't meet a

7    disqualifier, if something is, there's a red flag,

8    so to speak, in someone's record, they can use

9    discretion to deny.  That's the most restrictive

10   form of licensing with fingerprinting and then all

11   other licensing.

12          And, basically, there was a dose response

13   kind of effect that the strongest effects were for

14   those that allow discretion.  Second strongest was

15   those that required fingerprinting.

16   Q.   So in your own studies of Missouri and

17   Connecticut and Maryland under PTP laws, have you

18   been able to identify any, a special value to

19   fingerprinting as opposed to the other elements of

20   the PTP law in effect in a particular jurisdiction?

21   A.   Not with those three separate studies I

22   can't say that we have.  Basically, what we've done,

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022     Pg: 216 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 30 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 30 of 39
Daniel Webster

Page 185

1    this is what we did in each case is -- well, I'll

2    take it one by one.  So Missouri we were interested

3    in understanding what happens when you take a law

4    away that other research suggests might be important

5    for preventing diversion of guns for criminal use.

6            Connecticut we are looking at the impact

7    of that particular policy and its effect.  One

8    reason we chose those two policy change times is

9    that, until the Firearms Safety Act of 2013 in

10   Maryland, those were the two most recent changes

11   that were, could be studied.

12           So now we're, with the Maryland law we're

13   been able to first look at indicators of diversions

14   from crime gun trace data.  We've been able to look

15   at survey data from people involved in underground

16   gun market, and now we've had some early data on

17   homicides from an extended analysis of a paper that

18   we published recently in the Journal of Urban Health

19   looking at the effects of state firearm policies on

20   homicide rates in large urban counties.

21           So what the published study found was an

22   average, aggregated average across all of the

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 217 of 460

Daniel Webster

Page 186

```
 1   policies 14 percent reduction in firearm homicide

 2   rates in that study that covered data from 1981

 3   through 2015.  As I presented in the report, my

 4   report, we were interested to understand what was

 5   going on in Maryland and also understanding probably

 6   at least a third of my time is focused on

 7   understanding what's going on in Baltimore and its

 8   gun violence program and different strategies to

 9   address it.  I've been mostly studying local

10   policing and community prevention programs.

11          But through my studies and another study

12   published by Steven Morgan at Johns Hopkins it was a

13   very well-known phenomenon that occurred in

14   Baltimore following the death of Freddie Gray, the

15   in-custody death of Freddie Gray that led to broad

16   civil unrest and riots, documented change in

17   policing practices, sort of an underpolicing, a step

18   back by the police department.

19          So, depending on the statistical model of

20   sort of what was the impact of that civil unrest in

21   the Freddie Gray case, anywhere from 50 percent to

22   100 percent increase in shootings and homicides
```

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 32 of 39
Daniel Webster

Page 187

1    associated with that change.  So we knew that that

2    was a huge historical confounder that, when you're

3    trying to tease apart the effect of the law overall

4    in Maryland, you had to understand what was going on

5    in Baltimore.

6              So we stratified our estimate of the

7    effect of this law on gun homicides in the major

8    urban counties other than Baltimore.  That includes

9    Baltimore County, Anne Arundel County, Montgomery

10   County, Prince George's County, and we found a large

11   and statistical significant decrease in gun homicide

12   rates in those counties while a 25 percent increase

13   in Baltimore, again, Baltimore influenced by the

14   post-Freddie Gray riot data.

15             So to me the available data that we have

16   right now suggests that the law is working as

17   intended.  It's preventing the diversions of guns

18   for criminal misuse, and it's leading to fewer

19   homicides with guns.

20             MR. SWEENEY:  Could you reread my

21   question, Kathleen, if you can find it?

22             (The reporter read back as requested.)

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022     Pg: 219 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 33 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 33 of 39

Daniel Webster

Page 188

1    BY MR. SWEENEY:

2        Q.    And your answer to my question is no, you

3    have not; correct?

4        A.    The answer to your question was we studied

5    each of these laws separately and reported what we

6    found.  And as we discussed, there are differences

7    in these laws, one of which is the fingerprint

8    requirement with respect to difference between

9    Missouri and Maryland.

10       Q.    And the only thing that Missouri,

11   Maryland, and D.C. have in common, and Connecticut

12   have in common is that they all require a permit to

13   purchase?

14       A.    No.  There are other things that Maryland

15   shares with, certainly with Connecticut.

16       Q.    With respect to the requirements of their

17   permit-to-purchase law, the elements differ in each

18   of those three states, so the only common

19   denominator for the three states is that they all

20   require a permit to purchase?

21           MR. SCOTT:  Objection.

22           THE WITNESS:  Maryland and Connecticut

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 220 of 460

Daniel Webster

Page 189

1   both require safety training, and they both require

2   fingerprints.  So those two things, and they also

3   require a point of sale background check

4   requirement.  So they are similar in those three

5   respects.

6   BY MR. SWEENEY:

7        Q.   And Missouri doesn't require those?

8        A.   That's correct.

9        Q.   So the three only have in common that the

10  permit to purchase is required; correct?

11            MR. SCOTT:  Objection.

12            THE WITNESS:  Among all three, I will

13  agree that what you said is factually correct.

14  BY MR. SWEENEY:

15       Q.   And that Maryland differs from Missouri

16  and Connecticut in that regard because, unlike

17  Missouri and Connecticut, it does not require a

18  direct application to law enforcement in order to

19  obtain that permit; correct?

20            MR. SCOTT:  Objection.

21            THE WITNESS:  I'm not sure what to do.

22            MR. SCOTT:  I'm objecting to the question.

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 221 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 35 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 35 of 39
Daniel Webster

Page 190

1    You can answer.

2              THE WITNESS:  Okay.  So your statement was

3    that Maryland differs from those other two with

4    respect to the other two have direct, in-person

5    application.  Maryland does not.  That is true.

6              MR. SWEENEY:  Let's take a break.

7              (Whereupon, a short recess was taken from

8    3:43 to 3:51 p.m.)

9    BY MR. SWEENEY:

10       Q.   Doctor, in your expert report on page two

11   you assert that the Center For Gun Policy and

12   Research that you direct was established to look

13   objectively at all available data; correct?

14       A.   Yes.

15       Q.   And when you review the research on the

16   effect of gun controls on violence that you do, do

17   you always follow that principle?

18       A.   Yes.

19       Q.   And when you draw a conclusion about the

20   impact of permit-to-purchase laws on homicide rates,

21   do you objectively review all the relevant scholarly

22   research?

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 222 of 460

Daniel Webster

Page 248

1    say the firearms selected do not constitute a random

2    sample and should not be considered representative

3    of the larger universe of all firearms used by

4    criminals or any subset of that universe; is that

5    correct?

6        A.   That's what it states.

7        Q.   Do you have any information that the ATF

8    is saying that?

9        A.   Well, I think they are correct in the

10   first part in that, in essence, there's no way for

11   us to know whether they represent an accurate sample

12   or not, but I think the statement dismisses the

13   validity and importance of those data more so than I

14   feel is the case, and I think many experts would

15   agree.

16       Q.   Your report on the HQL in Baltimore

17   includes data from a survey conducted of criminals

18   in Baltimore; correct?

19       A.   Very specifically we conducted a survey of

20   individuals on parole and probation, and these were

21   anonymous surveys, and we recruited outside of

22   offices where parolees, people on probation report

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 223 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 37 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 37 of 39
Daniel Webster

Page 249

1   to their POs.

2        Q.   So how did you determine that they

3   qualified for that narrow definition of criminal

4   that you were using?

5        A.   We asked them.  We asked them whether they

6   were on parole or probation.

7        Q.   And how did you identify these criminals

8   to ask them that question?

9        A.   I just said that.  We recruited

10  individuals as they were exiting the buildings in

11  which the Maryland Department of Public Safety and

12  Correctional Services has places for people to

13  report who are on parole and probation.

14       Q.   Did you do anything to verify whether or

15  not these individuals, in fact, were criminals, in

16  fact, were on probation?

17       A.   No.  This was an anonymous survey.  We

18  wanted, we thought the best way to get honest,

19  accurate data is to not ask for identifiers that we

20  would verify.

21       Q.   Did you ask these men if they actually

22  tried to get a gun before the HQL went into effect?

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022    Pg: 224 of 460

Case 1:16-cv-03311-ELH   Document 135-6   Filed 01/28/21   Page 38 of 39
Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 38 of 39
Daniel Webster

Page 250

1        A.    We asked them their experience in

2    acquiring firearms in the underground market.  I

3    don't have the very specific survey items in front

4    of me, but we asked them questions that were, like,

5    ever?  Have you ever done this?  And then we asked

6    about the last 12 months, and then we had a set of

7    questions that asked them to, in their own, for

8    their own impressions or perceptions whether they

9    observed, perceived changes in the ability to get

10   guns or get individuals to buy guns for them

11   following the October 2013 gun laws.

12        Q.    How many of the men you surveyed admitted

13   to getting a gun after the Firearms Safety Act was

14   in effect?

15        A.    I'd have to go back and look at our data.

16   I don't remember offhand.  We didn't ask the

17   question exactly in the way that you just phrased

18   it.  We asked, as I mentioned before, we asked about

19   whether they acquired a gun within the past

20   12 months.  So, based on when we were collecting the

21   data, anybody said yes to that question would, in

22   essence, would have been acquiring a gun post

Case 1:16-cv-03311-ELH   Document 77-5   Filed 10/05/18   Page 39 of 39
Daniel Webster

Page 251

1    Firearms Safety Act.

2         Q.   And you didn't ask any of them if they had

3    ever acquired a gun prior to the Firearms Safety Act

4    going into effect?

5         A.   We, again, asked whether they ever had and

6    then the experience within 12 months, so sometimes

7    some said yes to the first question of ever, and

8    more said no to the more frequent, more recent time

9    period than ever.

10        Q.   Did you do anything to parse that ever

11   period in a pre-FSA and a post-FSA section?

12        A.   No.

13        Q.   It's possible that none of the men you

14   interviewed actually acquired a firearm prior to the

15   FSA taking effect?

16        A.   Is it possible?  Let me -- is it possible?

17   Yeah, it's possible.  I think it's incredibly highly

18   improbable, again, based upon the differences in

19   response of ever acquired and acquired within the

20   past year.

21             MR. SWEENEY:  Let's take a quick break.

22             (Whereupon, a short recess was taken from

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,       :

et al.,                           :

                                  :   Case No:

          Plaintiffs              :   16-cv-3311-MJG

                                  :

          -vs-                    :   Pages 1 - 169

                                  :

LAWRENCE HOGAN, in his            :

capacity of Governor of           :

Maryland, et al.,                 :

                                  :

          Defendants              :

------------------------------X


Deposition of Andy R. Johnson

Baltimore, Maryland

Wednesday, April 11, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  393199


MAGNA LEGAL SERVICES

(866) 624-6221



EXHIBIT
6

JA0700

Page 40

1        Q.    Does the Licensing Division handle the

2   revocation of HQLs?

3        A.    Yes, sir.

4        Q.    And who in the personnel of the HQL unit

5   would handle the revocation of HQLs?

6        A.    That would be up to Sergeant Burns.

7        Q.    But it would be Sergeant Burns or someone

8   under him in the HQL unit that would handle the

9   processing of revocation of HQLs; correct?

10       A.    Yes, sir.

11       Q.    Does the HQL unit handle any inquiries

12  from other units or other sections such as from the

13  handgun permit section?

14       A.    Any inquiries?

15       Q.    Inquiries.

16       A.    Could you be more specific?

17       Q.    Sure.  Let me give you a hypothetical

18  because I don't have actual facts here.

19  Hypothetically, if an individual applied for a

20  handgun permit and the handgun permit section was

21  processing that application and a question arose

22  about the HQL information that had been presented by



Page 52

1    Scott.)

2              MR. SWEENEY:  And this is 88.

3              (Exhibit No. 88, Copy of Letter to Mr.

4    Deanovich, was marked for identification and

5    retained by Mr. Scott.)

6    BY MR. SWEENEY:

7         Q.   I have had marked as 87 a copy of the

8    Bulletin LD HQL 17004 and as Exhibit 88 a copy of

9    your letter to Mr. Deanovich.  Can you tell me how

10   it is that you came about to send this letter to

11   Mr. Deanovich?

12        A.   A request was made to the Licensing

13   Division to determine whether or not the type of

14   round that Mr. Deanovich is using would fall under

15   the qualification for ammunition used for the live

16   fire component.

17        Q.   All right.  If I had a firearm that was

18   loaded only with the simunition that's approved in

19   Bulletin LD HQL 17004, would I be permitted to

20   discharge that firearm with that simunition inside

21   of Baltimore City limits?

22        A.   I don't know that.



Page 53

```
 1        Q.   Did you make any inquiry about where in

 2   the state of Maryland that simunition would be

 3   allowed to be used?

 4        A.   I did not.

 5        Q.   Do you know of anyone who offers live fire

 6   training for the HQL inside of Baltimore City

 7   limits?

 8        A.   Live fire component?

 9        Q.   Mm-hmm.

10        A.   I do not.

11        Q.   Do you know if the live fire component

12   training is available in each of Maryland's

13   counties?

14        A.   I do not.

15        Q.   Why do you understand the Maryland State

16   Police allowed the use of simunition in addition to,

17   I'll just call it ordinary ammunition for purposes

18   of this question to satisfy the live fire component?

19        A.   I'm sorry.  Why did we allow it?

20        Q.   Yes.

21        A.   Because we felt that it fell into the

22   description required in the law and that it was good
```



Page 65

```
 1        A.    It currently is kept indefinitely as well.

 2        Q.    Do you know if that goes back to 2013?

 3        A.    I'd have to review the copies of the log.

 4        Q.    Are there other ledgers maintained by the

 5   HQL unit of a similar nature?

 6        A.    Not to my knowledge.

 7        Q.    Are revocations maintained -- do you keep

 8   track of revocations in the disapproval ledger?  Or

 9   is there a separate ledger that reflects

10   revocations?

11        A.    I believe there may be a separate ledger.

12   Again, I'd have to review that paperwork, but I

13   believe it is separate.

14        Q.    All right.  Have you had a chance to

15   review the records retention schedule that's in your

16   notebook here?

17        A.    Briefly.

18        Q.    All right.  Is it your understanding that

19   the practices of the Licensing Division at this time

20   are consistent with the requirements of the records

21   retention and disposal schedule?

22        A.    Those are the attempts to be made, yes,
```



JA0704

Page 66

1    sir, to make it in compliance with the retention

2    schedule.

3        Q.   What do you mean attempts?

4        A.   I'm sure there are times when they are not

5    100 percent followed.

6        Q.   And what specific instances do you recall

7    in which in relationship with the HQL it was your

8    understanding that they were not in compliance with

9    the record retention and disposal schedule?

10       A.   Could you repeat that?

11       Q.   What specific instances do you recall in

12   which the HQL unit was not in compliance with the

13   records retention and disposal schedule?

14       A.   None.

15       Q.   To the extent you recall any such

16   incidents within your division, it's not within the

17   HQL unit?

18       A.   Only specifically for a change of a

19   supervisor.  There may be a lapse in time before

20   that process is caught up to the retention schedule.

21       Q.   Then you have what appears to be a sample

22   firearm safety lesson plan, which is Bates numbers



Page 67

1    286 to 313, and can you tell me what that document

2    is?

3        A.   Yes, sir.  It's a sample lesson plan for

4    firearm safety.

5        Q.   And do you know who prepared that sample

6    plan?

7        A.   Listed on the document it says it's

8    prepared by Sergeant Laura Beck.

9        Q.   And who is that?

10       A.   Excuse me.  At the time that this was

11   prepared, I believe she was at our Education and

12   Training Division.  She's now First Sergeant Laura

13   Beck.

14       Q.   And is that a document that's available on

15   the Maryland State Police website?

16       A.   Yes, sir.

17       Q.   Is that a document Maryland State Police

18   puts on its website for the purpose of making it

19   available for firearms safety training for the HQL

20   application?

21       A.   That's my understanding, yes, sir.

22       Q.   Are you, personally, familiar with the



Page 68

1    requirements of that sample lesson plan?

2         A.    As documented in this lesson plan?

3         Q.    Yes.

4         A.    No, sir.

5         Q.    And have you made any inquiries about the

6    extent to which the certified instructors in

7    Maryland are following that sample lesson plan for

8    the HQL training that they provide?

9         A.    I'm sorry.  I'd like to have you rephrase

10   that or ask it again, please.

11        Q.    Do it all over again.  Do you have any

12   information about the extent to which the

13   instructors who are certified by the Maryland State

14   Police to provide the safety training for the HQL

15   process are following the sample lesson plan?

16        A.    I do not.

17        Q.    All right.  Do you have any means by

18   comparing the sample lesson plan to what's required

19   in the hunter safety training course that Maryland

20   provides?

21        A.    No, sir.

22        Q.    We marked as Exhibit 85 a copy from your



Page 75

1            MR. SCOTT:  Objection.  Asked and

2       answered.

3            THE WITNESS:  I stand by my original

4       answer.

5  BY MR. SWEENEY:

6       Q.   I would, too, after I was couched by my

7  counsel in that way.

8            MR. SWEENEY:  I don't need speaking

9  objections, Mr. Scott, nor does the witness.  Just

10  object.  That's all you need to do.

11            MR. SCOTT:  I'm entitled to state my

12  basis.

13            MR. SWEENEY:  No, you're not.

14            MR. SCOTT:  Disagree.

15            MR. SWEENEY:  We will.

16  BY MR. SWEENEY:

17       Q.   May I direct your attention to item 19,

18  unintentional accidental shootings in Maryland.  You

19  have a notation there, "We do not track."  So what

20  information do you have about the incidents of

21  unintentional accidental shootings in Maryland?

22       A.   We don't track that information, sir.



Page 76

```
 1        Q.    So you don't have any information or

 2    access to any information about how many

 3    unintentional accidental shootings occur in Maryland

 4    each year?

 5        A.    No, sir.

 6        Q.    Do you know anybody who does in the

 7    Maryland state government?

 8        A.    I do not.

 9        Q.    To your knowledge, does Maryland State

10    Police ever have that information available to it?

11        A.    Not to my knowledge.

12        Q.    All right.  Item 20, the public safety

13    benefits of HQL, what is your notation there?

14        A.    Just that we've provided an interrogatory

15    response for that.

16        Q.    All right.  Item 21, arrests and

17    prosecutions for illegal straw purchasers, you say,

18    "MSP doesn't track.  Request has been made to

19    DPSCS."  Have you gotten any information from DPSCS?

20        A.    I don't recall if that came in this

21    morning or not.  We have made the request to DPSCS.

22    We are awaiting a response from them.
```



Page 78

1    information provided was all the information that

2    was pulled from Maryland Judiciary Case Search.

3         Q.   Item 22, the number of handguns used in

4    crime recovered in Maryland each year from 2008 to

5    2017.  You have a note, "MSP doesn't track."  Can

6    you explain that?

7         A.   That's correct.  We don't track that

8    information.

9         Q.   Maryland State Police has no information

10   about the number of handguns used in crime recovered

11   in Maryland each year?

12        A.   Not to my knowledge.

13        Q.   And what effort did you make to determine

14   that Maryland State Police does not have that

15   information?

16        A.   I'm sorry.  Could you repeat the question,

17   sir?

18        Q.   Sure.  What efforts did you make to

19   determine that Maryland State Police does not have

20   the information on number of handguns used in crime

21   recovered in Maryland?

22        A.   Both from personal knowledge and



Page 79

1    conversations with Detective Sergeant Lopez.

2        Q.   To your knowledge, has Maryland State

3    Police ever had access to that information?

4        A.   That I don't know.

5        Q.   Item 23, the HQL's effect on handgun sales

6    in Maryland from 2013 through 2017.  You have a

7    note, "No response on effect."  What does that mean?

8        A.   It just means that I can't, I don't feel

9    that I can testify on the effect on the sales in

10   Maryland.

11       Q.   Do you have any information on the effect

12   of handgun sales in Maryland from the HQL?

13       A.   Only that today we're back to near record

14   numbers.

15       Q.   What's the basis of that statement?

16       A.   Just the information I reviewed here

17   today.

18       Q.   Show me exactly what you're pointing to.

19   Is that the -- well, just show me what you're

20   referring to.

21       A.   Sure.  So I have information on the MAFSS

22   yearly count of firearm transfer by gun type.



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 238 of 460

Page 88

1    that.

2         Q.   All right.  Does Maryland State Police

3    track the number of firearms it recovers from

4    prohibited persons each year?

5         A.   Yes.

6         Q.   Who has that information?

7         A.   That would be the Firearms Enforcement

8    Unit.  I shouldn't say yes.  I should say we did.  I

9    don't know if they still do.  I assume they do,

10   but --

11        Q.   And does Maryland State Police track the

12   arrests for purchasing illegal firearms that it does

13   undercover?

14        A.   I don't know if they are separated by

15   arrests specifically for undercover purchases or

16   not.

17        Q.   Do you know whether or not the HQL has any

18   effect on the number of firearms recovered from

19   prohibited persons?

20        A.   I'm sorry.  Can you ask that again?

21        Q.   Sure.  Do you know if the HQL has had any

22   effect on the number of firearms recovered from



Page 89

1    prohibited persons?

2         A.    I do not.

3         Q.    Who would have that information?

4         A.    As an effect, I don't know who would have

5    the information other than somebody who's maybe done

6    a study on the effect of.

7         Q.    Well, who -- you said the Firearms

8    Enforcement Unit maintains the data, assuming they

9    still maintain it?

10        A.    Yes.

11        Q.    All right.  Wouldn't they be able to tell

12   whether or not there has been an increase, decrease,

13   or the number of firearms recovered from prohibited

14   persons has stayed the same since the HQL was in

15   effect?

16        A.    I misunderstood the question.  Can you

17   repeat the last question?

18        Q.    Sure.  Let me kind of start all over.  Do

19   you know whether or not the number of firearms

20   recovered from prohibited persons in Maryland has

21   increased, decreased, or stayed the same since 2013?

22        A.    I left there in January of 2016, so I



Case 1:16-cv-03311-ELH   Document 77-6   Filed 10/05/18   Page 15 of 35

Page 98

1    preparation of those documents?

2        A.   Yes, sir.

3        Q.   All right.  What was your role in the

4    preparation of these depositions?

5        A.    Meeting with counsel, determining what

6    information needed to be compiled to answer the

7    interrogatories.

8        Q.    Let me direct your attention to what we've

9    marked as Exhibit 94, the Supplemental Answers.  And

10   directing your attention to page two and three, the

11   Interrogatory Number 5 asks to identify the number

12   of HQL applications not completed each year from

13   2013 to 2017.  The answer stated that MSP does not

14   have this information within its possession.

15            The supplemental answer, I won't read it

16   all into the record, but if you feel you need to

17   read it all, that's fine.  I want to focus on

18   paragraph, page three, top of the page where it

19   says, "This information is not currently tracked by

20   MSP.  It would be possible for the Licensing

21   Division's Information Technology personnel to

22   capture the raw number of applications that have



Page 99

1   been initiated through MSP's website and the raw

2   number of applications that have been submitted as

3   final."  Did I read that correctly?

4       A.   I believe I was reading ahead of you, but

5   yes.

6       Q.   Take your time to read the whole thing so

7   you have it all in mind.  I don't want to take it

8   out of context, but I just want to focus on that

9   statement.

10      A.   Okay.

11      Q.   To your knowledge, that's a correct

12  statement?

13      A.   We are on page three, the part that you

14  read, if I'm correct, is from it would be possible

15  for Licensing Division?

16      Q.   Correct.

17      A.   Okay.  Yes, sir.

18      Q.   All right.  Thank you.  Going back to

19  number 93, the interrogatories.  94 is the

20  supplement.  Going back to 93, when we were looking

21  at the designated topics for testimony, specifically

22  item 20, the public safety benefits of HQL, your



Page 109

1        A.    Based on my law enforcement career, yes,

2    sir.

3        Q.    All right.  And do you know whether those

4    same storage requirements were part of the training

5    required for 77R prior to the HQL?

6        A.    I do not.

7        Q.    So you can't state whether or not there

8    are more or less training on the issue of storage of

9    firearms in the HQL training program than was

10   provided for the 77R previously; correct?

11       A.    I cannot.

12       Q.    Do you have any information on the extent

13   to which fewer individuals have obtained access to

14   handguns who were prohibited from possessing any

15   firearm since 2013 in Maryland?

16       A.    Can you repeat that?  I'm sorry.

17       Q.    Sure.  Do you have any information that

18   fewer individuals prohibited from possessing a

19   firearm have had access to handguns in Maryland

20   since 2013?

21       A.    I do not.

22       Q.    Do you have any information on whether or



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 243 of 460

Page 110

1    not handguns are stored in compliance with Maryland

2    law more since 2013 than before?

3        A.   I do not.

4        Q.   Does anybody at Maryland State Police or

5    any other agency that you know track that

6    information?

7        A.   Not that I'm aware of.  I don't know that,

8    I don't know -- the first question I don't know that

9    you would, I don't know the way to track that

10   information short of going out and asking every

11   person who's purchasing.

12       Q.   Well, we do ask every person who's

13   purchasing in the state of Maryland on the 77R form

14   whether or not they are qualified to be in

15   possession?

16       A.   Yes, sir.

17       Q.   So we have answers to that information?

18       A.   I'd have to rehear the question.  More

19   specifically talking about the first question, it

20   was -- I don't think it was specific to the 77R

21   question or the question that's on the 77R.

22       Q.   All right.  My question was do we have



Page 111

1    any, do you have any information on whether fewer

2    individuals are prohibited, that are prohibited from

3    possessing a firearm have gained access to handguns

4    in Maryland since 2013?  That was my question.

5         A.   That fewer --

6         Q.   Fewer.

7         A.   -- persons --

8         Q.   Have attained access?

9         A.   -- have attained access?  No.

10        Q.   Do you know of a single instance in which

11   a person did not complete the training and complete

12   their HQL because they were deterred from doing so

13   by the training requirement?

14        A.   I do not.

15        Q.   As far as you know, the training

16   requirement does not deter any individuals from

17   completing the HQL?

18        A.   None that I'm aware of.

19        Q.   All right.  Focusing on the next paragraph

20   on page 13 that talks about fingerprints, how is it

21   that the HQL's fingerprint requirement makes it more

22   difficult for a prohibited person to obtain access



Page 112

1    to a firearm?

2        A.    First through positive identification of

3    the person, preventing someone from having a false

4    ID, fake ID to make a purchase, as well as

5    potentially preventing a straw purchase from someone

6    who is deterred by the fact that they are having to

7    have their fingerprints taken.

8        Q.    All right.  The 77R required positive

9    identification of an applicant to purchase a

10   handgun; correct?

11       A.    Yes, sir.

12       Q.    And that positive identification consisted

13   of requiring a Maryland state driver's license or

14   similar quality identification; correct?

15       A.    Yes, sir.

16       Q.    And the firearms, is it the registration

17   section, the firearms registration section of the

18   process is the 77Rs?

19       A.    Yes.

20       Q.    And that unit confirms in each case before

21   not disapproving the purchase of a handgun that the

22   person who presented that ID is who he or she says



Page 113

1    they are?

2         A.    To the best of our ability, yes, sir.

3         Q.    And how many times prior to 2013 do you

4    know individuals somehow beat that positive

5    identification system under the 77R?

6         A.    I do not know.

7         Q.    Does anybody at Maryland State Police have

8    that information?

9         A.    Not that I'm aware of.

10         Q.    And you were involved in the firearms

11    enforcement section beginning in 2013; am I correct?

12         A.    Yes, sir.

13         Q.    And at that time, were you aware of any

14    instances while you were in that unit in which

15    individuals had gotten away with purchasing a

16    handgun with false identification under 77R?

17         A.    I'm trying to remember there was one

18    specific case.  I don't remember the particulars of

19    the case.  I know it revolved around the

20    identification of the person, but I can't say that

21    it was for a false ID.

22         Q.    And over what period of time do you recall



Page 114

1    that one case being the only one that comes to mind?

2    How long were you with that unit?  Three years?

3         A.   Yes, sir.

4         Q.   When the fingerprints given for the HQL

5    application are processed, what database are they

6    compared against?

7         A.   They are sent from DPSCS.  I don't know

8    who compares the prints.

9         Q.   Okay.  And are they run against some

10   database of criminals that are in the criminal

11   justice system?

12        A.   Yes, sir.

13        Q.   All right.  If the individual who's

14   applying for an HQL doesn't have a criminal record,

15   their fingerprints will probably come back

16   unmatched; correct?

17        A.   If they do not have a criminal record,

18   yes, sir, unless they were fingerprinted for

19   employment purposes or some other reason.

20        Q.   Do you know whether or not the Department

21   of Public Service matches HQL applicant fingerprints

22   against other licensing databases of fingerprints or



Page 115

1    just the criminal records?

2         A.   I believe it's run through CJIS.  I don't

3    know what other records they check when they compare

4    the fingerprints.

5         Q.   All right.  An individual who was not

6    disqualified from purchasing a handgun by reason of

7    prior criminal record would probably come back clean

8    from a fingerprint check under the HQL application

9    process; correct?

10        A.   Someone who is not disqualified?  Under

11   the fingerprint --

12        Q.   Not disqualified to purchase a handgun or

13   to obtain an HQL would probably come back clean

14   after giving their fingerprints; correct?

15        A.   Yes, sir.

16        Q.   So the fingerprinting requirement is not

17   catching any persons not qualified to obtain a

18   handgun in Maryland in the HQL process, is it?

19             MR. SCOTT:  Objection to the form.

20             THE WITNESS:  I wouldn't say that, but I'd

21   have to have you repeat the question.

22   BY MR. SWEENEY:



Page 116

1       Q.   Sure.  Let me try it a different way.

2   Under the 77R process then and now individual

3   purchasers of handguns are checked to see whether or

4   not they are legally able to possess a handgun;

5   correct?

6       A.   Yes.

7       Q.   And if they are legally able to possess a

8   handgun under the 77R process, presumably they would

9   also pass the HQL application process and obtain an

10  HQL; correct?

11      A.   Yes.

12      Q.   What is it about the fingerprinting

13  requirement that is allowing the HQL process to

14  catch any disqualified persons who are trying to

15  obtain a handgun in Maryland?

16      A.   Specifically to the proper identification

17  of that person.  When that fingerprint is submitted,

18  if it's run through the system, we have, we receive

19  a code back.  That code is matched to the applicant,

20  as well as the applicant's name and date of birth

21  and the date that they were fingerprinted,

22  therefore, assuring us that the person that's



Page 117

1    actually making the purchase is, in fact, who they

2    say they are.

3         Q.   And you have no information; correct,

4    about the extent to which false identifications have

5    been used to purchase handguns in Maryland prior to

6    the HQL?

7         A.   Correct.

8              MR. SWEENEY:  All right.  Let's take a

9    break for lunch.

10             (Whereupon, a lunch recess was taken from

11   1:00 to 2:09 p.m.)

12   BY MR. SWEENEY:

13        Q.   Captain Johnson, do you have any

14   information on how many crimes were committed each

15   year with illegally purchased handguns in Maryland

16   prior to the HQL?

17        A.   I'm missing some of the information.  I'm

18   sorry.

19             MR. SCOTT:  Oh, it's --

20             THE WITNESS:  Yeah, that's what I'm

21   looking for.

22             MR. SWEENEY:  That I need a copy of.



USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022    Pg: 251 of 460

Page 119

1    law enforcement officers are shot by handguns each

2    year in Maryland?

3         A.   I don't have that information readily

4    available.

5         Q.   Do you have any information about whether

6    or not the number of law enforcement officers shot

7    by handguns in Maryland has decreased since the HQL

8    went into effect in 2013?

9         A.   No, sir.

10        Q.   Has the homicide rate increased in

11   Maryland since the HQL went into effect?

12        A.   I don't have those statistics.

13        Q.   Does anybody in Maryland State Police

14   track that information?

15        A.   Not that I'm aware of.

16        Q.   Do you have any information about how many

17   handguns are lost or stolen in Maryland every year?

18        A.   I do not.

19        Q.   Do you have any information about how many

20   handguns used in crime in Maryland were purchased

21   outside of Maryland?

22        A.   I do not.



Page 123

1          MR. SWEENEY:  Let's mark this as

2    Exhibit 97.

3          (Exhibit No. 97, Bates Numbers 1193 to

4    1217, was marked for identification and retained by

5    Mr. Scott.)

6    BY MR. SWEENEY:

7     Q.   Captain Johnson, while we were off the

8    record, I marked as Exhibit 97 a document which is

9    Bates numbers 1193 through 1217, and this is a copy

10   which is 11-and-a-half by 17 inch blowup, makes it a

11   little bit easier for all of us to read.  And can

12   you identify that document for us?

13    A.   It is from the HQL section.  I'm just

14   trying to determine if it's the disapproval ledger.

15   Does not have dates, so I'm just trying to -- it

16   appears it's the HQL's administrative denial log.

17    Q.   And can you tell us what this is used for?

18   Is this -- first of all, strike that question.  You

19   mentioned before, we were talking about an

20   administrative ledger.  Is this the administrative

21   ledger you were referring to?

22    A.   So the administrative ledger is different



Page 124

1    than the administrative denial log.

2        Q.   And what does the administrative ledger

3    track?

4        A.   The administrative denial log is the log

5    of those items, those persons who were disapproved

6    administratively.  The disapproval ledger are the

7    folks that have been, had full denials.

8        Q.   A number of these entries under final

9    action indicate overturned.  What does that mean?

10        A.   It means that whatever the reason for the

11    initial disapproval has been corrected and,

12    therefore, the initial denial has been overturned.

13        Q.   So we can conclude that this is the

14    administrative ledger that tracks the initial

15    denials, but not final disapprovals and that we are

16    not looking at the disapproval log?

17        A.   Could you repeat that one more time?

18            (The reporter read back as requested.)

19            THE WITNESS:  Correct.

20    BY MR. SWEENEY:

21        Q.   The first date that I see entered on this

22    log is for August 28, 2015.  Do you know if there is



Page 127

1    the code?  You have this list of codes on 96.  What

2    code is used for an administrative disapproval of an

3    HQL?

4            MR. SCOTT:  Objection to form.

5            THE WITNESS:  If you look at those codes

6    in 2014, there's a drop-down menu for administrative

7    HQL, and that was separated from an administrative

8    denial for FRS.  So, if it was on that ledger at

9    that time and it was an administrative disapproval,

10   it was listed as administrative HQL.  That was the

11   code that was used.

12   BY MR. SWEENEY:

13       Q.   Okay.  And I see that you have two

14   separate disapproval codes, one for, that's headed

15   administrative FRU and one that's headed

16   administrative HQL that began in 2017 as you just

17   described; correct?

18       A.   Yes, sir.

19       Q.   What are the reasons which would result in

20   the HQL unit administratively disapproving an HQL

21   application?

22       A.   An incomplete application.



Page 128

1     Q.   Now, an application has to have certain

2   requisite elements before it can even be submitted

3   to the HQL unit by the applicant; correct?

4     A.   It can be submitted.  I don't know if all

5   of the information has to be submitted prior to the

6   submission to the HQL section.

7     Q.   Okay.  So what are the things that are

8   incomplete in an HQL application that do result in

9   administrative disapproval?

10     A.   Live Scan, training, proof of residency,

11   military DD214.  Looks like a large percentage are

12   Live Scan and training issues.  Some proof of

13   residency issues, underage.  It appears that most of

14   them are Live Scan and training.

15     Q.   Why is underage an administrative

16   disapproval as opposed to a permanent disapproval?

17     A.   Because if someone, if we contact the

18   person, we allow them to keep the application in

19   until they turn 21.

20     Q.   Are there any other of the grounds for

21   permanent disapproval that you allow an applicant to

22   keep an HQL application alive while they try to



Page 133

1    report, the person is put on this log or ledger as a

2    person who's come back on that report.  That's what

3    I recognize this to be.

4         Q.   We had been calling this the revocation

5    log.

6         A.   Correct.

7         Q.   Does that make -- is that what you would

8    call it?

9         A.   Yes, sir.

10        Q.   And it is a different spreadsheet and

11   stream of data than the administrative log that we

12   marked as Exhibit 97; correct?

13        A.   Yes, sir.

14        Q.   And let me understand what's a Rap Back?

15        A.   I believe it's a record of arrest and

16   prosecution, if I'm not mistaken, or processing.

17   I'm sorry.  Not prosecution.

18        Q.   What does that mean?

19        A.   That's a term that they use when they are

20   getting this -- it's called an ADR report, Arrest

21   Disposition Report, sent back to the unit based on

22   someone's fingerprints who has now been charged with



Page 134

1    a crime or arrested.

2         Q.   And what does the HQL unit do with that

3    information?  In other words, an HQL holder has been

4    fingerprinted in connection with an arrest.  That

5    information comes to the HQL unit.  It's reflected

6    in this log.  What then happens?

7         A.   If -- you can see there are some here that

8    have been revoked, so if the charge is prohibitor,

9    they would follow the disposition of the case; and

10   once the case had a disposition, if it is, in fact,

11   a disqualifier, they would then revoke the person's

12   HQL.  Those are highlighted in the blue on the color

13   copy we have here.

14        Q.   Do you know what the significance, if any,

15   of the yellow highlighting is?

16        A.   I believe those are cases that may still

17   be under disposition.  Actually, I don't know.  I

18   believe they were still -- they have not yet

19   received disposition, I believe.  That's my

20   understanding of what they are.

21             So, if you look at the majority of the

22   charges in white, they are either for the most part



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 258 of 460

Page 136

1  has a handgun permit, the code for the fingerprints

2  is related to handgun permit.  They would be

3  notified.  They would then notify HQL.

4       Q.   All right.  So, before the HQL

5  fingerprinting requirement, if the owner of a

6  registered firearm in Maryland was arrested for a

7  potentially disqualifying crime, was there any

8  report of that arrest that went to anyone at

9  Maryland State Police?

10       A.   Not that I recall.

11       Q.   And other than reports that are triggered

12  by fingerprint matches, would the HQL fingerprint

13  data that's kept on file, there's no reporting to

14  Maryland State Police of the arrest of any HQL

15  holder now; correct?

16       A.   That is my understanding, yes, sir.

17       Q.   Going back to Exhibit 97, if you would for

18  a moment, and let's just look at the first item and

19  see -- it's on Bates stamp page 1214 and see if we

20  can understand it.

21            There appears to be a column that's been

22  redacted in black on the far left of the page.  Are



JA0732

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022      Pg: 259 of 460

Page 139

1    the administrative log when the application in

2    question was submitted?

3        A.   I don't believe so.

4        Q.   Are the dates in which an application that

5    has been administratively disapproved is overturned

6    all occurring within 30 days of the submission of

7    that application to MSP?

8        A.   I'm going to have to have you repeat that.

9    I'm sorry.

10           MR. SWEENEY:  Please read that back,

11    Kathy.

12           (The reporter read back as requested.)

13           THE WITNESS:  Once the, the reason for

14    administrative denial has been corrected, it then

15    becomes a properly completed application.  Within

16    30 days of that happening, they are being

17    overturned, yes, sir.

18    BY MR. SWEENEY:

19        Q.   And I'm trying to find out what the time

20    period is between the submission of the application

21    and the overturning of the administrative

22    disapproval.  Is that within 30 days?



Page 140

1          A.    The time that it's denied and the

2     administrative approval?  In most cases it would be.

3     However, if it's not a properly completed

4     application, we can only make a decision on it once

5     we have a properly completed application.

6          Q.    What I'm trying to find out is how long

7     does that take?

8          A.    It varies.

9          Q.    And does it sometimes involve more than

10    30 days from the submission of the application?

11         A.    From the submission of a not properly

12    completed application to the time of overturn for a

13    denial, yes.

14         Q.    All right.  More than 30 days?

15         A.    Yes, sir.

16         Q.    And that's happened more than once;

17    correct?

18         A.    I would assume so.

19         Q.    All right.  And do you know how often it's

20    happened?

21         A.    I'm just told that it's, most of those

22    cases are still generally, once we have the reason



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

-------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :  Case No:

          Plaintiffs             :  16-cv-3311-MJG

                                 :

             -vs-                :  Pages 1 - 109

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

          Defendants             :

-------------------------------X


Deposition of James Johnson

Baltimore, Maryland

Tuesday, March 13, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  390081


MAGNA LEGAL SERVICES

(866) 624-6221



EXHIBIT
7

Page 19

1    just mentioned that you are prepared to address with

2    respect to the specific requirements of the Handgun

3    Qualification License in Maryland?

4        A.    Could you ask me the question again?

5        Q.    Sure.  Of course.  The first area of

6    testimony for, set forth for you are the

7    requirements of the Handgun Qualification License in

8    Maryland, and we talked a little bit about

9    fingerprinting, a little bit about training just

10   now.  Are there any other requirements other than

11   the training and the fingerprinting requirements of

12   the Handgun Qualification License that you are

13   prepared to address?

14       A.    I think I would address today the

15   background work that's done as well.  I think the

16   opposing side believes that the current NICS system

17   check is sufficient, and I would argue that

18   Maryland's system is more comprehensive.

19       Q.    All right.  Now, when you talk about

20   Maryland's system is more comprehensive, are you

21   referring to the 77R background check?

22       A.    I believe that the fingerprint itself is a



Page 20

1    more robust element that determines one's true

2    identity.  The NICS check obviously can be defeated

3    with false identification, and I believe that's a

4    significant measure to reduce false ID, and I would

5    also state at this time that the training class

6    itself I strongly believe will reduce straw

7    purchasing, which is very significant.

8        Q.   Is there anything about the background

9    check associated with the HQL application processing

10   other than fingerprinting that's different from the

11   background check on a 77R application?

12       A.   Ask the question again, please.

13       Q.   Sure.  Is there anything different other

14   than the fingerprint about the background check on

15   an HQL application that's different from the

16   background check on a 77R application in Maryland?

17       A.   If I understand it correctly, Maryland

18   prohibits now an individual who voluntarily

19   committed themselves for more than 30 days or an

20   individual who was involuntarily committed.  I

21   believe the state of Maryland or the state is in a

22   better position to research and verify those



Page 21

1    circumstances to begin with.

2            I've had an opportunity to actually travel

3    to the state and location that administers these

4    NICS checks and sat at the console of an operator.

5    These NICS checks are done in two, two-and-a-half

6    minutes.  Understanding Maryland's process, I

7    believe it to be a much more exhaustive, thorough

8    process, and I do believe it's reasonable.

9        Q.   So isn't it true that the Maryland process

10   that you're referring to, in addition to the NICS

11   process, takes place in connection with the 77R

12   application, as well as with the HQL application?

13       A.   I don't know if it actually involves the

14   77 or not.  I don't know.

15       Q.   So you don't know what process is done to

16   do a background check on a 77R application by

17   Maryland State Police compared to whatever process

18   they do to do a background check on the HQL

19   application; is that what you're saying?

20       A.   I don't know.

21       Q.   Okay.  Now, what is it about

22   fingerprinting that makes a difference in a



Page 24

1            THE WITNESS:  I'm not in a position to

2     answer the question.

3     BY MR. SWEENEY:

4        Q.   Now, fingerprinting is not, per se, going

5     to deter a straw purchaser; correct?  Because by

6     definition a straw purchaser is an individual who

7     can be positively identified and is qualified to

8     purchase a handgun; correct?

9            MS. KATZ:  Objection to form.  You can

10    answer.

11           THE WITNESS:  I believe that's an accurate

12    statement.

13    BY MR. SWEENEY:

14       Q.   All right.  So what is it about the

15    fingerprinting process that in any way discourages

16    straw purchases?

17       A.   I believe that an individual that knows

18    that they have to render fingerprints is less likely

19    to carry out the scheme.  I believe that most

20    individuals have a great concern or a concern about

21    rendering their fingerprints.

22           It's been my experience throughout my



Page 25

1    adult life that individuals are very concerned about

2    the government possessing their fingerprints for

3    various reasons that they'll have to explain.

4         Q.   And that's true for all Maryland citizens;

5    correct?

6              MS. KATZ:  Objection as to form.  You can

7    answer, if you can.

8              THE WITNESS:  I can't answer that.

9    BY MR. SWEENEY:

10        Q.   Now, do we have any information as to

11   whether or not the fingerprinting requirement has

12   caught anyone who was a straw purchaser?

13             MS. KATZ:  Objection to form.  You can

14   answer.

15             THE WITNESS:  I don't possess that

16   information.

17   BY MR. SWEENEY:

18        Q.   All right.  Do you have any data on the

19   extent to which straw purchases of handgun occurred

20   in Maryland prior to the Handgun Qualification

21   License requirement being initiated?

22        A.   Yes.



Page 26

1      Q.    What information do you have?

2      A.    I think the case that I put forward is a

3   Palasinski case where an individual bought for who

4   she knew was a convicted felon that was prohibited.

5   Those guns were subsequently used in multiple

6   homicides.

7           I also bring to your attention the death

8   of a Baltimore County police tactical officer who

9   was killed with a gun purchased at a Bass Pro

10  Outlet, I believe, in South Carolina by a couple who

11  later traded that gun for drugs, and that gun was

12  then subsequently used to kill a police officer.

13          There's a case in New York where a gun was

14  purchased for an individual who killed two firemen,

15  for example, a 2015 case I believe it is or '14

16  case.

17     Q.    Are those all the examples?

18     A.    Those are the ones that come to mind.  I'd

19  have to do research.  I'm sure there are a

20  significant number of cases like that nationwide.

21     Q.    Now, the first one, can you spell the name

22  of the individual?



Page 27

```
 1          A.   Palasinski?

 2          Q.   Yes.

 3          A.   No.

 4          Q.   And that occurred in Maryland?

 5          A.   Yes, sir.

 6          Q.   All right.  And the second one, the police

 7     officer was shot in Maryland, but the gun was not

 8     purchased in Maryland; correct?

 9          A.   That's correct.

10          Q.   And there is nothing about the Handgun

11     Qualification License that could have prevented that

12     from occurring; am I correct?

13          A.   The individual that used that gun on the

14     officer was prohibited.  He went outside the state

15     to acquire that weapon, so Maryland's HQL would not

16     have affected that case.

17          Q.   All right.  And the New York incident you

18     indicated had nothing to do with Maryland; correct?

19          A.   No.  It's just an example of another straw

20     purchase that's, you know, very obvious.

21          Q.   So, the Palasinski case is the only

22     example that comes to mind in which you're aware of
```



Case 1:16-cv-03311-ELH   Document 77-7   Filed 10/05/18   Page 9 of 13

Page 28

1    a straw purchase in Maryland; correct?

2         A.    That is the case that I'm quite aware of.

3    However, I'm very comfortable in saying that with

4    research and resources additional cases could be

5    found.

6         Q.    All right.  As you sit here today, are you

7    aware of any research and any resources that have

8    been done that tell us anything about the prevalence

9    of straw purchasing of handguns in Maryland before

10   or after the Handgun Qualification License was

11   initiated?

12             MS. KATZ:  Objection as to form.  You can

13   answer.

14             THE WITNESS:  No.

15   BY MR. SWEENEY:

16        Q.    You also mentioned that you thought the

17   training requirement of the Handgun Qualification

18   License could deter a straw purchaser.  Did I

19   understand that correctly?

20        A.    Yes.

21        Q.    And could you elaborate on that opinion

22   for me, please?



Page 52

1   research, time, and resources.

2        Q.    Which you have not done in advance of your

3   opinion in this case?

4        A.    No, sir.

5        Q.    All right.  And you also don't have any

6   such information specifically about Maryland;

7   correct?

8        A.    That's correct.

9        Q.    Item 7 of your testimony talks about the

10  live fire requirement.  We already discussed that.

11  Is there anything else about your opinion with

12  respect to the live fire requirement that you'd like

13  to address?

14       A.    Well, personally, I think just firing one

15  round is not adequate, but I do not think the

16  requirement to show proficiency in discharging a

17  round is unreasonable.  Again, I would draw your

18  attention to the process of actually chambering a

19  round, which is an exercise in and of itself.  And,

20  you know, the average individual that's new to guns,

21  I think, would struggle working that mechanism of

22  the weapon, and I'm sure that's a necessary



Page 53

1    component or process in actually discharging a

2    round.

3        Q.   Now, can this live fire training take

4    place anywhere or do you have to have it at a

5    special location?

6        A.   I believe that with the change in allowing

7    a marker-type round that can be conducted virtually

8    anywhere.  I do not believe that is discharging a

9    weapon in a metropolitan district, for example, so I

10   believe it could be done anywhere.  We use

11   simunition weapons in classrooms, at the academy.

12   We use simunition weapons in various locations.

13       Q.   So it's your opinion then that a

14   simunition live fire training can take place within

15   the city limits of Baltimore City?

16       A.   I do not think it's discharging a weapon

17   in a metropolitan district.

18       Q.   And so that could take place anywhere?  It

19   could take place, say, in a backyard or a home in

20   Baltimore City?

21       A.   When I think about this issue, I'm

22   thinking about a projectile that simply delivers a



Page 54

1    paint ball-type mark on an object.  I understand

2    there's certain restrictions of the shell casing

3    itself, but without research I do not think that

4    it's discharging a weapon in a metropolitan

5    district.

6        Q.   So that's your opinion as you sit here

7    today, but you haven't researched it specifically?

8        A.   No, sir.

9        Q.   Okay.  So do you know, for instance, if

10   The Cop Shop in Baltimore City is offering Handgun

11   Qualification License training including live fire

12   now?

13       A.   I do not know about that location.

14       Q.   Do you know of any location in Baltimore

15   City that offers Handgun Qualification License

16   training?

17       A.   Not in Baltimore City.

18       Q.   What's the closest training location

19   outside of Baltimore City that you can think of?

20       A.   Off Route 43 in the Essex community, which

21   is approximately 17 minutes north of the Baltimore

22   City line, you've got a location, Continental Arms,



Page 76

1        Q.    Was there any issue with your county of

2    residence?

3        A.    I own property in Harford County,

4    Maryland, and I own property in Baltimore County,

5    Maryland.

6        Q.    And the Fallston address you gave me this

7    morning is in Harford County?

8        A.    That's correct.

9        Q.    And how long has that been your residence?

10       A.    For the past year I've used that address,

11   but I still own the one in Baltimore County as well.

12       Q.    All right.  Of the firearms that you

13   mentioned you owned, do you keep any of them for

14   self-defense purposes?

15       A.    I do.

16       Q.    And which of the firearms do you use for,

17   do you keep for self-defense purposes?

18       A.    The semiautomatic handgun.

19       Q.    Do you keep it loaded and accessible for

20   self-defense purposes?

21       A.    I do.

22       Q.    Do any other members of your family



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :   Case No:

            Plaintiffs           :   16-cv-3311-MJG

                                 :

            -vs-                  :   Pages 1 - 205

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

            Defendants           :

------------------------------X

Deposition of James P. Russell, Jr.

Baltimore, Maryland

Monday, June 11, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409351

MAGNA LEGAL SERVICES

(866) 624-6221



EXHIBIT
8

JA0748

Page 67

1        A.    No, sir.

2        Q.    Now, what did you do to become qualified

3    as an HQL instructor?

4        A.    Basically, they were able to take my

5    Maryland Police Training Commission where I went

6    through two weeks of training, since I'm exempt due

7    to the fact that, as a sworn law enforcement officer

8    that attended Maryland Police Training Commission,

9    and then also currently as a certified firearms

10   instructor exempt, and that's how I was able to get

11   my QHIC.

12       Q.    So you didn't have any special training or

13   instruction over and above what you had already had

14   as an instructor of law enforcement officers in

15   order to be qualified as an HQL instructor; correct?

16       A.    Just the rules and laws pertaining to the

17   HQL.

18       Q.    All right.  And what did you learn about

19   rules and laws pertaining to the HQL for purposes of

20   the HQL instruction?

21       A.    Maryland law, public safety law, COMAR

22   that's related to those, that's what I was basically



Page 68

1    learning.  It's included in our sample lesson plan

2    that's distributed to all the QHIC instructors.

3         Q.   Before you were qualified or in order to

4    be qualified as an HQL instructor, did you have to

5    pass any test or otherwise show your proficiency in

6    understanding those rules and laws?

7         A.   Yes.  We had to, through the Maryland

8    Police Training Commission, we had to do

9    qualification courses and shoot at least a

10   90 percent, which would have been a 225 out of 250

11   on the qualification course.  We have to have that

12   in order to get the QHIC.

13        Q.   But not to get your HQL.  I'm trying to

14   find out what in addition you had to do in order to

15   get your HQL qualification.

16        A.   Nothing else.

17        Q.   Anything?

18        A.   Just through the training that I had

19   already received.

20        Q.   So you didn't have to have any special

21   training or show any special understanding of the

22   HQL rules and laws in order to be qualified as an



Page 69

1    HQL instructor?

2        A.   Yes.  We did because we still had to go

3    back and do what, our sample lesson plans.  We had

4    to draw it out.  Do PowerPoints and things like that

5    of how we were going to be teaching the course to

6    the personnel that will be attending the four-hour

7    block of instruction.

8        Q.   Let me try to understand that a little bit

9    more.  Before you were certified as an HQL

10   instructor, what did you have to show other than you

11   had previously been certified by the Maryland Police

12   Training Commission?

13       A.   All I had to do was provide that

14   documentation showing that I was already a

15   full-fledged member or instructor.

16       Q.   Sorry.

17       A.   That's okay.

18       Q.   Once you were certified as an HQL

19   instructor, then did you prepare your lesson plans

20   and the like?

21       A.   Fair, yes, sir.

22       Q.   Okay.  Now, we marked previously as 123 --



Page 70

```
 1        A.    124.

 2        Q.    -- for the sample lesson plan.

 3        A.    Yes.

 4        Q.    And can I ask you when you first obtained

 5    this?

 6        A.    Probably shortly after going, obtaining my

 7    QHIC.  I got a copy of it.  So 2013 time frame,

 8    somewhere around that time.  2013, 2014.

 9        Q.    This document has a date of September 10,

10    2013, on it.  Does that sound about right to you?

11    Sometime after then?

12        A.    Yes, sir, because this is posted on our

13    www.mdsp.org and all instructors have access to this

14    information.

15        Q.    All right.  Now, did you have any lesson

16    plan prior to obtaining a copy of what we've marked

17    as Exhibit 124?

18        A.    No, sir.

19        Q.    Have you any other written lesson plans

20    other than what we've marked as Exhibit 124?

21        A.    This is what I use for my training.

22        Q.    I thought I heard something about
```



Page 71

1    PowerPoints.  Do you have any PowerPoints that

2    you've prepared in connection with your HQL

3    instruction?

4         A.   We have PowerPoints that are utilized.  I

5    don't have any with me today, but the PowerPoint

6    follows this sample lesson plan basically verbatim

7    so that you're not handing out all kinds of sheets

8    of paper.

9              MR. SCOTT:  Counsel, we do have the

10   certificate that the witness testified about, if you

11   want us to get a copy.

12             MR. SWEENEY:  We can add it at the break.

13             MR. SCOTT:  That's fine.

14             MR. SWEENEY:  I have no reason to doubt

15   his recollection.  I just want to verify it for the

16   record.

17   BY MR. SWEENEY:

18        Q.   What is your understanding of handgun

19   safety training for non-law enforcement officers in

20   Maryland prior to the Handgun Qualification License

21   training requirements?

22        A.   Prior to going through and developing the



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 280 of 460

Case 1:16-cv-03311-ELH   Document 135-9   Filed 01/28/21   Page 7 of 24
Case 1:16-cv-03311-ELH   Document 77-8   Filed 10/05/18   Page 7 of 24

Page 80

1    not an issue, but those things come up as well that

2    are not, they are discussed in the video, but once,

3    again, you can't have follow-up questions that are

4    asked in the video where follow-up questions can be

5    asked in the classroom setting.

6         Q.   So let me understand.  There's no

7    difference in the subject matter, but the difference

8    in the format, the live classroom setting allows for

9    questions and answers, which is not part of the

10   video process?

11            MR. SCOTT:  Objection.  Go ahead.

12            THE WITNESS:  Can you ask that one more

13   time?  I'm sorry.  I apologize.

14   BY MR. SWEENEY:

15        Q.   Sure.  Can you just repeat my question,

16   please?

17            (The reporter read back as requested.)

18            MR. SCOTT:  Objection.

19            THE WITNESS:  Allows for questions and

20   answers and also, like I said, to elaborate it also

21   allows for use of the weapon on the range.  You get

22   to handle the weapon.  You get to feel it.  You get



Page 81

 1    to see it.  You get to touch it, and I go back to my

 2    experience as an instructor and as my experience as

 3    a adjunct instructor at Cecil College working with

 4    personnel is that people learn by seeing, touching,

 5    and feeling.  They don't -- a lot of times they are

 6    not learning sitting at that video or sitting behind

 7    the computer.

 8            I've had situations also I need to tell

 9    you about.  I've had personnel tell me that you are

10    able to, watching that video, they were able to get

11    up, go get some chocolate milk, get on their phone,

12    answer e-mails.  That video is still playing

13    continuously, and then you at the end are saying,

14    yeah, I watched it all, and I've had situations I

15    can tell you I know they haven't.  I've been told

16    about that as well.

17            And now, when you're in the classroom

18    setting, as an instructor, I'm watching.  You

19    understand we have a receiver and we have a sender.

20    Okay?  We communicate, and I can watch you do it as

21    well.

22            So that basically covers all the facets



**MAGNA** ▶
LEGAL SERVICES

Page 82

1    that I know, hey, this is person is safe with those

2    weapons and knows what they are doing with it.

3        Q.   Now, when you have a video that's online,

4    a user can go back to it repeatedly and refer to it

5    and do it over and over again, and you can't do that

6    in a classroom setting; correct?

7        A.   I don't know if you can go back and watch

8    that video.  The one that I'm referring to the one

9    I'm most familiar with it, it was online and, like I

10   said, I don't know if anybody is familiar with it.

11   It has a web ID issued at the end.  You had a sheet

12   of paper, and it was a web ID number.  That web ID

13   would then go on the 77R.  I don't know if, after

14   you watched it, if you could go back and view it

15   again.  I'm not too sure.  I can't answer that

16   question because -- are you familiar with that one

17   where it issues the web ID number and then that goes

18   on the 77R?  That's the one I'm referring to, and

19   that's the latest one.

20       Q.   I, actually, did that process at one

21   point.

22       A.   So I can't answer the question if you



Page 83

1    could go back after you watched it one time and do

2    it again because I used to -- I would help family

3    members get on there and actually view that and get

4    the web ID number for the transfer, the rental, or

5    the sale of a weapon, so, but I don't know if you

6    can go back and watch it.

7        Q.   The video did cover the primary subject

8    matters of state firearm law, home firearm safety,

9    proper storage of handguns, and handgun mechanism

10   and operation; correct?

11       A.   Yes, sir, it did, sir.

12       Q.   Now, could I just review for a moment your

13   understanding about the Maryland Police Training

14   Commission's role in preparing that video?  What's

15   your understanding in that regard?

16       A.   I'm not too sure because, like I said, it

17   had Mr. Shipley, who was the Maryland State Police

18   public information officer, in the old video that I

19   watched so I don't know who -- I guess Maryland

20   Police Training Commission prepared both those

21   videos, but I'm not too sure.

22       Q.   All right.  Now, since becoming certified



Page 106

1      Q.   And that's what you use to track the live

2   fire performance of each of your HQL students?

3      A.   Yes, sir.

4      Q.   All right.  Are there any other materials

5   that are provided for Handgun Qualification License

6   operation and handling demonstration of a handgun?

7      A.   No, sir.

8      Q.   All right.  How many rounds do you require

9   your students to shoot during your class?

10      A.   You have to at least fire one.  All the

11   students that I've talked about and previously the

12   25 to 30 that I've done I make them shoot at least

13   two courses of fire, and there's never been any

14   issues.  I whole-heartedly believe that the training

15   that we're doing now is so much better than the

16   videos, and I just think additional rounds of fire

17   gets the applicant or the person more proficient,

18   more comfortable in the use of handling the weapon.

19          I'm not saying there's anything wrong with

20   one.  That's absolutely fine, but I encourage my

21   students that I'm working with to fire more than one

22   round of fire, and I've never had anyone say



Page 107

1    anything differently that they don't want to fire

2    any more courses of fire.  In fact, when we're done,

3    they thank me.  They say I feel so much comfortable

4    with the nomenclature, how to make it safe, and we

5    talk about shooting stances, shooting procedures and

6    things like that, and they are a lot more

7    comfortable when they leave.

8             And they are, like, hey, can we call you

9    six months or eight months from now and do another

10   course of fire just so we don't lose what we've

11   already learned?  But to answer your question, one

12   round.

13        Q.   Well, your students fire more than one

14   round?

15        A.   Yes, sir.

16        Q.   How many more?  You say two courses of

17   fire at least.  How many rounds is that altogether?

18        A.   60 total rounds.  Two 30-round courses,

19   sir.

20        Q.   So you typically have your students fire

21   as many as 60 rounds during their HQL instruction?

22        A.   Yes, sir.



JA0759

Page 108

1        Q.    Do you have anybody who has shot less than

2    those 60 rounds?

3        A.    No, sir.

4        Q.    All right.  You would agree with me that

5    the proper use of the handgun is an acquired skill?

6        A.    Acquired skill, yes, sir, I would.  The

7    more you handle it the better you are.

8        Q.    And it is a skill that you, as a firearm

9    instructor, encourage all of your students to

10   practice on a regular basis?

11       A.    Yes, sir.

12       Q.    Is the ownership of a handgun an acquired

13   skill?

14             MR. SCOTT:  Objection.

15             THE WITNESS:  I'm not able to answer that,

16   sir.

17   BY MR. SWEENEY:

18       Q.    All right.  Is the storage of a handgun an

19   acquired skill?

20       A.    I think you need to know the laws

21   regarding the storage of the weapon, and then you

22   need to practice it.  You need to continue



USCA4 Appeal: 21-2017　Doc: 25-2　Filed: 08/03/2022　Pg: 287 of 460

```
                                              Page  114

 1   the HQL, either the statute or the regulation?

 2        A.   In regards to the purchase, transfer,

 3   selling?

 4        Q.   The training requirement for the 77R prior

 5   to the HQL training requirement.

 6        A.   Prior to all this and the video, no, sir.

 7        Q.   So you've never reviewed the regulation or

 8   the statute that was the basis for the video and

 9   what was required to be in it?

10        A.   No.  No.

11        Q.   All right.  Now, the sample lesson plan

12   that we marked as Exhibit 124, is it?

13        A.   Yes, sir, 124.

14        Q.   Previously there's no requirement that

15   that be used by any particular HQL instructor, is

16   there?

17        A.   No.  It's just a sample to use off of --

18   that's what they recommend that you use, something

19   along those lines to cover each of the components.

20        Q.   But as long as the instructor covers the

21   items that are in the handgun instructor advisory of

22   2013 that we reviewed, the curriculum requirements,
```



Page 124

1      Q.    All right.  Is there any other right, any

2   other constitutionally guaranteed right that would

3   require individuals to demonstrate proficiency

4   before we allow them to exercise that right like,

5   for instance, voting?

6           MR. SCOTT:  Objection.

7           THE WITNESS:  I'm not familiar.

8   BY MR. SWEENEY:

9      Q.    When we talk about the HQL training

10  requirements, does it in any way deter individuals

11  from making straw purchases of handguns?

12     A.    Once again, through my experience and

13  knowledge of doing this, yes, it answers the

14  questions in regards to this and talks about

15  different laws and rulings that we're dealing with.

16  So, in my opinion, yes, it does.

17     Q.    The 77R form itself that is used to

18  purchase a handgun has always or at least forever

19  that I can think of warned people against making a

20  straw purchase; correct?  And declared that it was

21  illegal for them to do so; correct?

22     A.    It's in one of the questions, yes, sir, on



Page 125

1    the 77R.

2         Q.   And the prior training, the training prior

3    to the HQL also made it clear that straw purchases

4    were illegal in Maryland; correct?

5         A.   The training videos do have that in there,

6    yes.

7         Q.   All right.  Do you have any data on the

8    number of straw purchasers in Maryland, say,

9    annually?

10        A.   No, sir, I do not.

11        Q.   Do you know anybody who does?

12        A.    It might be a Captain Johnson question

13   with Licensing Division, but I'm not sure.

14        Q.   And do you have any data on children

15   having unsupervised access to firearms in Maryland?

16        A.   Data?  Yes, I have some.  I mean, facts is

17   what I can tell you that I have facts just through,

18   like I said, I go back to my ALICE and ALERT

19   certification training as an active shooter

20   instructor, and we open up with most of our videos,

21   majority of our videos and most of our training and

22   school shootings, there's a lot of examples of where



Page 128

1    a Handgun Qualification License, how many days?

2         A.    In regards to the transfer?  Seven days.

3         Q.    Seven-day transfer, but if you don't have

4    a Handgun Qualification License, how long does it

5    take you to get your Handgun Qualification License?

6         A.    If you call me, we can get it done in a

7    day.

8         Q.    Okay.  So I can go and get the training

9    from you in a day, but I also have to get

10   fingerprinted someplace.  Where would I get

11   fingerprinted?

12        A.    That's part of the training.  When we do

13   live training and we're in the training portion of

14   it, I provide them a list of agencies, as well as a

15   list of services, whether it be Cecil County,

16   Harford County, Eastern Shore that provides

17   fingerprint services to the applicant.

18        Q.    So all I have to do is go out to Cecil

19   County and get it done in a day?

20        A.    Or Eastern Shore.  If you want to do it

21   with me.

22        Q.    Do you know if that, if the training, sir,



USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 291 of 460

Page 129

1     is available in Baltimore City?

2          A.   I'm not too sure if it's available.  I'm

3     not too sure about Baltimore City.

4          Q.   So residents of Baltimore City, because

5     there is no range and there is no ability to

6     discharge a firearm inside the city limits, would

7     have to go outside the city limits of Baltimore to

8     obtain their HQL training; correct?

9          A.   No range?  Then they would have to go

10    outside the city, yes, sir.

11         Q.   All right.  You're not aware, one way or

12    another, whether there's a range?  I don't want to

13    put words in your mouth.  I thought you knew that.

14         A.   No, I'm not aware if there's a range in

15    Baltimore City.  Where does the Baltimore City

16    Police Department qualify?

17         Q.   Well, they have a range.

18         A.   I qualify a lot of the retirees as well.

19         Q.   Once I get my training from you and

20    fingerprinting, how long does it take the Maryland

21    State Police to process my application?

22              MR. SCOTT:  Objection.



Page 134

1    and put away the devices and everything else and

2    concentrate on what they are doing, I think it's

3    self-explanatory and they can work through it.

4    BY MR. SWEENEY:

5        Q.   Would it surprise you that there may be as

6    many as 30,000 people that have started, but haven't

7    finished their HQL applications online?

8             MR. SCOTT:  Objection.

9             THE WITNESS:  Would it surprise me?  No,

10   it wouldn't surprise me because someone may be,

11   learn they are prohibited or something else that may

12   affect that.

13   BY MR. SWEENEY:

14       Q.   You think there are 30,000 prohibited

15   individuals who are applying for HQLs?

16             MR. SCOTT:  Objection.

17             THE WITNESS:  I'm not too sure.

18   BY MR. SWEENEY:

19       Q.   All right.  All right.  Do you have any

20   information about whether or not the HQL training

21   that's been provided now by you and others for over,

22   I guess, five years has reduced the number of



Page 135

1   accidental shootings in Maryland?

2        A.   I don't have any numbers, but I can surely

3   tell you from being on the range and through, like I

4   said, 14 years of being on the range with not only

5   sworn, but now civilian and over the last five years

6   of doing HQL, I can sit here and tell you that a lot

7   of flaws, faults have been discovered on the range

8   and that the video would not have uncovered just

9   because they are on the range firing that live round

10  or, like I said, I do 30-round courses of fire, two

11  of them, and we uncover a lot of different things

12  that would not be uncovered with a video.

13           I get a lot of questions asked in the

14  classroom setting that are not covered in the video

15  when the hands go up, and it seems to lead into

16  another question, and just a lot of good questions

17  are being asked that the video did not answer.

18       Q.   And that's with respect to the students

19  that you've taught, the 25 or 30 students?

20       A.   Yes, sir.

21       Q.   Okay.  And you mentioned the officers on

22  the range.  Despite all their training, they still



Page 176

1    suggestions and stuff like that.  If they pass the

2    requirements needed by law, then I'll pass them.  If

3    somebody come in, say, and said I only brought one

4    round because that's what I read on the website and

5    that's what's needed by law, then we do one round.

6         Q.   Have you ever done just one round with

7    somebody?

8         A.   Never have done one round.  In fact, I've

9    done the courses of fire.  When I'm done, they want

10   to fire more courses of fire because they've learned

11   so much.  A county executive in Cecil County, as a

12   matter of fact, never handled a weapon before came

13   in and has come back numerous times now to fire

14   additional courses of fire because they are learning

15   so much.

16        Q.   And a course of fire, and I know ammo

17   varies by caliber, manufacturer, material, but a

18   course of fire along the lines of what you're

19   talking about, these three courses of fire that you

20   do in your training would probably be anywhere from,

21   what, 30 to $50 in ammo; is that right?

22             MR. SCOTT:  Objection.



Page 177

1            THE WITNESS:  Well, boxes of ammo, all

2      depends what kind you purchase.  If we're dealing

3      with 22, 380s, you know, sim rounds, so as far as

4      asking for a price, I mean, a hot box of federal

5      ammo, I can tell you this.  You can ask some of the

6      people I've qualified.  I've been known to give them

7      boxes of ammo because I have extra 'cause I'm, for

8      the allowance of the State Police that they provide

9      us.

10            And/or at the indoor range that we qualify

11     at Chad's house he hs extra ammo that we provide to

12     the applicants as well.  So a box, I don't know.  It

13     all depends, like you said, the type of ammo that

14     you're shooting.

15        Q.  And you don't have any idea of the prices

16     of ammo?

17        A.  I have an idea, yes, sir.  Local Walmart,

18     but --

19        Q.  What would the three courses cost, say,

20     using a .9 millimeter?

21            MR. SCOTT:  Objection.

22            THE WITNESS:  Buying bulk?



JA0769

Page 182

1    you keep about the HQL training that you do?

2        A.   All of mine are kept in e-mail because I

3    scan and e-mail everything to the Licensing Division

4    when they need documentation of everything and hand

5    deliver anything that needs to go there or have the

6    applicant mail it to Licensing Division.

7        Q.   Do you believe yours go through faster

8    than anybody else's?

9        A.   No, sir.  I wish they did.  They ask me if

10   I can, and Licensing Division has a record of

11   everything that comes in, and they have to go in

12   order.

13       Q.   Do you have a contact at the Licensing

14   Division?

15       A.   Well, just for each section that's being

16   utilized, yes.  If it's handgun permit, Sergeant

17   Durkee.  If it's HQL, it's Corporal Askins.

18       Q.   Is everyone in your HQL class, are they

19   required to have their own firearm?  Sometimes you

20   give them ammo.  Do you also loan guns out

21   sometimes?

22       A.   Normally, they have, they will have their



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 297 of 460

Case 1:16-cv-03311-ELH   Document 135-9   Filed 01/28/21   Page 24 of 24
Case 1:16-cv-03311-ELH   Document 77-8   Filed 10/05/18   Page 24 of 24

Page 183

1    own weapon.  If they don't, Chad Johnston does the

2    training at his house, and he has the ammo at his

3    residence at the indoor range that's secured there.

4         Q.    So you've participated in training where

5    Mr. Johnston has loaned a gun to somebody for use?

6         A.    Yes, sir.

7         Q.    And you've already sounds like more often

8    than not participated in training where the person

9    has shown up to get an HQL, and they already have a

10   handgun they are going to use for the training; is

11   that right?

12        A.    That's happened previously.

13        Q.    Has it ever struck you as odd that the

14   person is showing up to get training to buy a gun,

15   and they already have a handgun?

16        A.    No, it's never, no.

17        Q.    Have you ever asked any of them or

18   followed up on how or why they obtained a handgun?

19        A.    How or why?

20        Q.    Yes, sir.  In other words, these folks are

21   coming to you to get a Handgun Qualification License

22   to buy a gun; right?



> West's Annotated Code of Maryland
>     Public Safety (Refs & Annos)
>         Title 5. Firearms
>             Subtitle 1. Regulated Firearms (Refs & Annos)

This section has been updated. Click here for the updated version.

MD Code, Public Safety, § 5-118

Formerly cited as MD CODE Art. 27, § 442

§ 5-118. Firearm application

Effective: [See Text Amendments] to September 30, 2013

**In general**

(a) A firearm applicant shall:

(1) submit to a licensee or designated law enforcement agency a firearm application on the form that the Secretary provides; and

(2) pay to the licensee or designated law enforcement agency an application fee of $10.

**Required information**

(b) A firearm application shall contain:

(1) the firearm applicant's name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver's or photographic identification soundex number, occupation, and regulated firearm information for each regulated firearm to be purchased, rented, or transferred;

(2) the date and time that the firearm applicant delivered the completed firearm application to the prospective seller or transferor; and

(3) a statement by the firearm applicant under the penalty of perjury that the firearm applicant:

(i) is at least 21 years old;

(ii) has never been convicted of a disqualifying crime;

(iii) has never been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

EXHIBIT
10

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 299 of 460

Case 1:16-cv-03311-ELH   Document 135-11   Filed 01/28/21   Page 2 of 3
§ 5-118. Firearm application, MD PUBLIC SAFETY § 5-118
Case 1:16-cv-03311-ELH   Document 77-10   Filed 10/05/18   Page 2 of 3

(iv) is not a fugitive from justice;

(v) is not a habitual drunkard;

(vi) is not addicted to a controlled dangerous substance or is not a habitual user;

(vii) has never spent more than 30 consecutive days in a medical institution for treatment of a mental disorder, unless a physician's certificate issued within 30 days before the date of application is attached to the application, certifying that the firearm applicant is capable of possessing a regulated firearm without undue danger to the firearm applicant or to another;

(viii) is not a respondent against whom a current non ex parte civil protective order has been entered under § 4-506 of the Family Law Article;

(ix) if under the age of 30 years at the time of application, has not been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult; and

(x) subject to § 5-119 of this subtitle, has completed a certified firearms safety training course that the Police Training Commission conducts without charge or that meets the standards that the Police Training Commission establishes under § 3-207 of this article.

### Required warning

(c) Each firearm application shall contain the following statement: "Any false information supplied or statement made in this application is a crime which may be punished by imprisonment for a period of not more than 3 years, or a fine of not more than $5,000, or both.".

### Firearm application of corporation

(d) If the firearm applicant is a corporation, a corporate officer who is a resident of the State shall complete and execute the firearm application.

**Credits**
Added by Acts 2003, c. 5, § 2, eff. Oct. 1, 2003.

**Editors' Notes**

### LEGISLATIVE NOTES

Revisor's Note (Acts 2003, c. 5):

JA0773

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 300 of 460

Case 1:16-cv-03311-ELH   Document 135-11   Filed 01/28/21   Page 3 of 3
§ 5-118. Firearm application, MD PUBLIC SAFETY § 5-118
Case 1:16-cv-03311-ELH   Document 77-10   Filed 10/05/18   Page 3 of 3

Subsection (a)(1) of this section is standard language added to state expressly that which only was implied in the former law, i.e., applications may be made only on the form that the Secretary provides.

Subsections (a)(2) through (d) of this section are new language derived without substantive change from former Art. 27, § 442(g), (h), and (f)(1).

In subsection (a)(2) of this section, the former reference that a firearm applicant pay a fee of $10 "with the application" is deleted in light of the reference to an "application fee".

In subsection (b)(3)(vii) of this section, the former reference to mental "disorders" is deleted as included in the reference to a "mental disorder". *See* Art. 1, § 8 which provides that the singular always includes the plural unless the construction would be unreasonable.

In subsection (b)(3)(ix) of this section, the reference to an adjudication for an "act" that would be a disqualifying crime "if committed by an adult" is added for consistency with § 5-306 of this title.

Also in subsection (b)(3)(ix) of this section, the reference to "if" under the age of 30 years is substituted for the former apparently erroneous reference to "is" [under the age of] 30 years to avoid the mistaken interpretation requiring an applicant to be under the age of 30 years to be eligible to purchase a regulated firearm.

In subsection (b)(3)(x) of this section, the former reference to "an application made on or after January 1, 2002" is deleted as obsolete.

Defined terms: "Designated law enforcement agency" § 5-101

"Disqualifying crime" § 5-101

"Firearm" § 5-101

"Firearm applicant" § 5-101

"Firearm application" § 5-101

"Fugitive from justice" § 5-101

"Habitual drunkard" § 5-101

"Habitual user" § 5-101

"Licensee" § 5-101

"Regulated firearm" § 5-101

"Secretary" § 5-101

MD Code, Public Safety, § 5-118, MD PUBLIC SAFETY § 5-118
Current through all legislation from the 2018 Regular Session of the General Assembly

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,        :

et al.,                            :

                                   :   Case No:

         Plaintiffs                :   16-cv-3311-MJG

                                   :

           -vs-                    :   Pages 1 - 229

                                   :

LAWRENCE HOGAN, in his             :

capacity of Governor of            :

Maryland, et al.,                  :

                                   :

         Defendants                :

------------------------------X


Deposition of Diane S. Armstrong

Baltimore, Maryland

Friday, March 23, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  391104


MAGNA LEGAL SERVICES

(866) 624-6221



EXHIBIT
11

Page 18

1    And who on your staff did you talk to?

2        A.   Do you want all their names?  'Cause I

3    have five people on my staff.

4        Q.   Yes.  So I will need those names.

5        A.   Mona Smith.

6        Q.   And what is her title?

7        A.   All of the individuals are office service

8    clerks.

9        Q.   Got it.  All right.  So the other four

10   names?

11       A.   Tienda Greene.

12       Q.   Could you spell the first name?

13       A.   T-I-E-N-D-A, G-R-E-E-N-E; Diane Duckett,

14   D-U-C-K-E-T-T.  I'm trying to go in the line.  Sam

15   Michaelson.

16       Q.   All right.

17       A.   And Dellene, D-E-L-L-E-N-E, Lizama,

18   L-I-Z-A-M-A.

19       Q.   Can you estimate how many hours you spent

20   preparing for the deposition today?

21       A.   Three or four.  I did not keep track.

22       Q.   And can you summarize the subject matters



Page 47

1        Q.   Can you elaborate on how it is that the

2   information that the trainer enters on the trainer's

3   screen gets to a screen that your unit sees in the

4   initial processing of a standard HQL application?

5        A.   I don't know the details on the workings

6   of the computer, but I know that, when a student

7   enters in an instructor's ID number, it is then

8   supposed to transmit over to the instructor's

9   account for them to sign off on it.  They do not get

10  any notification that a student has submitted their

11  application.

12       Q.   Does it happen every, on some occasion

13  that in reviewing a standard HQL application there

14  is no entry under training?

15       A.   Can you --

16       Q.   It was a terrible question.  Let me try it

17  again.  So, when your unit reviews the standard HQL

18  applications, are there times when there is no entry

19  under training?

20       A.   Yes.

21       Q.   All right.  And what do you do then?

22       A.   We reach out to the applicant and advise



Page 48

1    them that the instructor at that time had not signed

2    off on the training and for them to reach out to the

3    instructor or, if they have a certificate from the

4    class, to -- they e-mail that to us, and we can use

5    that.

6        Q.   Okay.  Just to be clear, your unit does

7    not reach out to the trainer and ask the trainer to

8    complete that.  You reach out to the applicant and

9    ask the applicant to have the trainer complete it;

10   am I correct?

11       A.   Correct, because we don't know who they've

12   used as an instructor.  That does not come over.

13       Q.   All right.  Are there times when they put

14   in the trainer's identification on their

15   application, but there's no indication that the

16   training is complete?

17       A.   Can you reword that?

18       Q.   Sure.  I understood that your unit will

19   receive an identification of the trainer from the

20   applicant in the standard HQL application, and it's

21   based on that identification that you know which

22   trainer they went to?



USCA4 Appeal: 21-2017   Doc: 25-2    Filed: 08/03/2022    Pg: 305 of 460

Case 1:16-cv-03311-ELH   Document 135-12   Filed 01/28/21   Page 5 of 25
Case 1:16-cv-03311-ELH   Document 77-11   Filed 10/05/18   Page 5 of 25

Page 59

    1        A.    Can you repeat that?  I'm sorry.

    2        Q.    Sure.  So you're processing an

    3   application.  You come up against a 30-day deadline.

    4        A.    Mm-hmm.

    5        Q.    You recognize it's 30 days, but you don't

    6   have all the information to approve it at that

    7   point.  Do you disapprove it on the 30-day deadline?

    8             MR. SCOTT:  Objection.  It's beyond the

    9   scope of her designation.  You can answer, if you

   10   know.

   11             THE WITNESS:  I don't know.  I would just

   12   say that it would depend on what we need to approve

   13   or disapprove it.

   14   BY MR. SWEENEY:

   15        Q.    Okay.  Well, let's say if you still need a

   16   training verification and you're on day 30, what

   17   happens to that application?  Is it disapproved or

   18   is it simply held?

   19        A.    Well, we have to deny it until we get the

   20   training confirmed.

   21        Q.    Now, if an application is denied and then

   22   the training is confirmed, how is that treated?



Page 60

 1   What happens then?

 2        A.   Then we overturn the denial and approve

 3   the application.

 4        Q.   And does that sometimes happen after the

 5   30-day deadline?

 6        A.   Yes.

 7        Q.   And that's happened more than once after

 8   the 30-day deadline?

 9        A.   Are we talking just about the instructors

10   or in general for the administrative log?

11        Q.   I'm just focusing on that portion of the

12   administrative log dealing with training, training

13   verification.

14        A.   From the instructor?

15        Q.   Right.

16        A.   To the best of my knowledge, there is no

17   one that has gone over 30 days for the training.

18        Q.   Okay.

19        A.   That have been denied.

20        Q.   I didn't understand your response.  Could

21   you elaborate?

22        A.   There is no one on the administrative log



Page 61

1    that is beyond 30 days that has been denied for the

2    training.  All of the training has been cleared from

3    contacting the applicants.

4         Q.   And what are the other reasons why an

5    application gets on the administrative log other

6    than lack of training verification?

7              MR. SCOTT:  Objection.  Beyond the scope

8    of her designation.  You can answer.

9              THE WITNESS:  Okay.  Live Scan, proof of

10   residency, if they have an out-of-state driver's

11   license, and training documentation other than the

12   instructor 'cause there's a difference between the

13   training documentation and the instructor.

14   BY MR. SWEENEY:

15        Q.   Explain to me the difference.

16        A.   The training documentation would be either

17   a DD 214 or the DNR Hunter Safety Card.

18        Q.   And those would be exemptions from

19   training; correct?

20        A.   Correct.

21        Q.   What happens if someone starts and submits

22   a standard application and they don't have training



USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 308 of 460

Page 62

1    verification, but they seek an exemption from

2    training?  How is that application handled?

3         A.   I don't understand the question.

4         Q.   Sure.  An individual submits a standard

5    application.

6         A.   Mm-hmm.

7         Q.   But it does not have training

8    verification.  And then the initial -- does the

9    initial processing unit inquire of them about their

10   training verification?  And suppose they learn that

11   they are exempt from training, and then they get a

12   verification, the DD form or the DNR.  What happens

13   then to the processing of that standard application?

14        A.   Then we internally switch -- we ask the

15   applicant to e-mail or fax over their documents, and

16   if it's acceptable, then we -- excuse me -- then we

17   switch internally the application from the incorrect

18   application to the correct application.

19        Q.   The first application has a unique

20   identifier number in your system; is that correct?

21   The standard application that was first submitted in

22   that instance we're talking about.



USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 309 of 460

Case 1:16-cv-03311-ELH   Document 135-12   Filed 01/28/21   Page 9 of 25
Case 1:16-cv-03311-ELH   Document 77-11   Filed 10/05/18   Page 9 of 25

Page 63

1            MR. SCOTT:  Objection.

2            THE WITNESS:  I don't know.

3    BY MR. SWEENEY:

4       Q.   Oh, you don't know whether or not each

5    application has a unique identifier in your system?

6       A.   I don't know what you mean by unique

7    identifier.

8       Q.   Oh, sure.  How do you tell the

9    applications apart from your system?

10      A.   It comes by the type that the applicant

11   submits.

12      Q.   Okay.  I'm sorry.  I didn't mean to cut

13   you off.

14      A.   If the applicant commits a standard, it

15   comes through showing HQL standard.

16      Q.   And let's say this is an applicant by a

17   particular individual John Smith.  Does that have a

18   particular identifying number?

19           MR. SCOTT:  Objection.

20   BY MR. SWEENEY:

21      Q.   For that individual application?

22      A.   I don't know.



Page 64

1        Q.   All right.  And when you, in the

2    processing unit, switch that initial standard

3    application to a training exempt application after

4    obtaining verification that the individual is

5    exempt, is that the same application that was

6    initially submitted or is that a new application

7    that has begun that is a training exempt

8    application?

9        A.   It would be the same application.

10       Q.   In addition to training verification, what

11   are the other deficiencies that would put an

12   application on the administrative log?  I'm trying

13   to understand.  You mentioned instructor, and how is

14   that different from training?

15       A.   Well, the instructor is when they have to

16   take the four-hour training class.

17       Q.   So that's for the standard applicant?

18       A.   Correct.

19       Q.   And then the training criteria otherwise

20   would be for the exempt applicant?

21       A.   Correct.

22       Q.   What are the issues about Live Scan that



Page 65

1    would cause an application to be placed on the

2    administrative log?

3            MR. SCOTT:  Objection.  Beyond the scope.

4    You can answer, if you can.

5            THE WITNESS:  Just the inability to verify

6    that they obtained the Live Scan or that it was

7    coded to the wrong authorization number.

8    BY MR. SWEENEY:

9        Q.   And what is a, what is the authorization

10   number that a Live Scan fingerprint is coded to?

11           MR. SCOTT:  Objection.  You can answer.

12           THE WITNESS:  When you go to get your

13   fingerprints done, my understanding is that you have

14   to tell them the reason that you're there to get

15   printed.  Each reason has an authorization number

16   that gets coded to that department.

17   BY MR. SWEENEY:

18       Q.   Does your initial HQL processing unit

19   verify that the Live Scan information is complete

20   and accurate?

21           MR. SCOTT:  Objection.  You can answer all

22   of his questions after I object, unless I tell you



Page 66

1    not to.

2              THE WITNESS:  Okay.  Yes.

3    BY MR. SWEENEY:

4         Q.   And if the Live Scan information is not

5    complete or to your review accurate, what do you

6    then do with that application?

7              MR. SCOTT:  Objection.

8              THE WITNESS:  They reach out to the

9    applicant.

10   BY MR. SWEENEY:

11        Q.   And in the case of it being, the

12   fingerprints being coded to the wrong authorization

13   number, what is the applicant asked to do about

14   that?

15        A.   Contact the vendor who took the

16   fingerprints and have them resubmit the prints with

17   the correct authorization code.

18        Q.   And to your knowledge, has that occurred

19   more than once?

20        A.   Yes.

21        Q.   And can you estimate how many times that's

22   occurred?



Page 77

1    your unit currently that you supervise?

2         A.   Five.

3         Q.   Those five, and those are the individuals

4    we talked about earlier.  You gave me their names;

5    correct?

6         A.   Correct.

7         Q.   All right.  So there are six of you all

8    together that compose the personnel of the HQL

9    initial processing staff; correct?

10        A.   Let me just recount.  Correct.

11        Q.   Are the three troopers and the one

12   civilian assistant who do the secondary processing

13   officed near your group?

14        A.   Yes.

15        Q.   And in addition to the six that are in

16   your group and the four of them, are there any other

17   personnel that are assigned to the processing of HQL

18   applications?

19        A.   No.

20        Q.   Where are the personnel who process the

21   77R applications physically located in relationship

22   to you and your group?



Page 91

1    and training exempt HQL applications?

2              MR. SCOTT:  Objection.

3              THE WITNESS:  Yes.

4    BY MR. SWEENEY:

5        Q.    Does the Maryland State Police offer Live

6    Scan fingerprinting to the public?

7        A.    No.

8        Q.    How does an HQL standard or training

9    exempt applicant obtain Live Scan fingerprinting?

10             MR. SCOTT:  Objection.

11             THE WITNESS:  They have to contact a

12   vendor.

13   BY MR. SWEENEY:

14       Q.    And are the vendors who provide Live Scan

15   fingerprinting satisfactory to the Maryland State

16   Police certified as such by the Maryland State

17   Police?

18             MR. SCOTT:  Objection.

19             THE WITNESS:  No, they are not regulated

20   by the State Police.

21   BY MR. SWEENEY:

22       Q.    All right.  How would an applicant know



Page 92

  1   where to go to get Live Scan fingerprinting?

  2            MR. SCOTT:  Objection.

  3            THE WITNESS:  They would check the, I

  4   guess we have a list on our website or they can

  5   search their browser for fingerprint vendors.

  6   BY MR. SWEENEY:

  7       Q.   What is your understanding of where the

  8   list on the Maryland State Police website of

  9   fingerprinting vendors comes from?

 10            MR. SCOTT:  Objection.

 11            THE WITNESS:  The Department of Public

 12   Safety.

 13   BY MR. SWEENEY:

 14       Q.   Do you know if Live Scan fingerprinting

 15   satisfactory to the Maryland State Police is offered

 16   in every Maryland county and in the city of

 17   Baltimore?

 18            MR. SCOTT:  Objection.

 19            THE WITNESS:  No, I do not know.

 20   BY MR. SWEENEY:

 21       Q.   Does Maryland State Police set any

 22   specific fee or range of fees for private



Page 101

1       Q.   And can you indicate where in the document

2    a change is made without telling me the substance of

3    the change?

4           MR. SCOTT:  Objection.

5           MR. SWEENEY:  Are you instructing her not

6    to answer?

7           MR. SCOTT:  You can answer yes or no.

8    BY MR. SWEENEY:

9       Q.   Can you indicate in the document where you

10   made that change without telling me what the nature

11   of the change was?

12      A.   Yes.

13      Q.   And where on the document did you make

14   that change?

15          MR. SCOTT:  Objection.  I'm going to

16   instruct her not to answer that.

17          MR. SWEENEY:  All right.

18   BY MR. SWEENEY:

19      Q.   And are you going to follow your counsel's

20   instruction?

21      A.   Yes.

22      Q.   All right.  In paragraph three you state



Page 102

1    that you received numerous phone calls daily from

2    citizens related to the HQL application process.  Do

3    you see that?

4         A.   Yes.

5         Q.   Approximately how many phone calls a day

6    on average do you receive from citizens related to

7    the HQL application process?

8         A.   Me, personally?

9         Q.   Yes.

10        A.   More than 20.

11        Q.   And can you estimate how many calls are

12   received by the individuals that you supervise on

13   average on a daily basis from citizens related to

14   the HQL application process?

15        A.   More than 20.

16        Q.   So the total would be more than 40

17   received by your unit each day on average from

18   citizens related to the HQL application process;

19   correct?

20        A.   Correct.

21        Q.   Do you maintain any log of those telephone

22   calls?



Page 103

```
 1        A.   No.

 2        Q.   Do you take any notes of those calls?

 3        A.   No.

 4        Q.   Do you ever confirm or follow up those

 5   calls with e-mails or letters to the individual

 6   callers?

 7        A.   No.

 8        Q.   And are the individuals who you supervise

 9   follow the same pattern of not maintaining logs or

10   notes or following up with e-mails or letters to the

11   individuals they speak to with respect to the HQL

12   process?

13        A.   Yes.

14        Q.   Paragraph four of Exhibit Number 47 says,

15   "Currently, MSP does not track the number of HQ

16   applications on the MSP server that have been

17   initiated through the MSP website."

18             Did MSP ever track the number of HQL

19   applications on the MSP server that had been

20   initiated through the MSP website?

21             MR. SCOTT:  Objection to form.

22             THE WITNESS:  No.
```



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 319 of 460

Case 1:16-cv-03311-ELH   Document 135-12   Filed 01/28/21   Page 19 of 25
Case 1:16-cv-03311-ELH   Document 77-11   Filed 10/05/18   Page 19 of 25

Page 139

1    e-mails stay on there, that they do not, even if we

2    delete them, they do not delete.  They may delete

3    from us, but they stay on the server.

4         Q.   When you say you were told by your

5    section --

6         A.   We were told by our information system

7    technology section that the e-mails stay on there.

8         Q.   And in connection with the collection of

9    e-mails that were provided to us in discovery, were

10   you making that inquiry or is this general knowledge

11   you have?

12        A.   That's general knowledge that I have.

13        Q.   And do you have any information about who

14   was involved in collecting the e-mails regarding

15   citizen reports of difficulties with the HQL that

16   were provided to us?

17        A.   No.

18        Q.   We talked before about your estimate of

19   the number of calls that you and your people

20   received daily with respect to questions about the

21   HQL.  Can you estimate the number of e-mail

22   inquiries that you receive daily, you or your people



Page 140

1    receive daily with respect to the HQL?

2         A.    Me, personally, I do over 30 e-mails a

3    day, and I do not know the number of e-mails handled

4    by everyone in my section, no.

5         Q.    Can you make an estimate, as you did with

6    the phone calls, that it's probably at least as many

7    as you receive?

8         A.    Combined?

9         Q.    Yes.

10        A.    Combined it's probably -- it could be 20

11   or more, but it's not going to be as many as mine

12   because I have the department e-mails.

13        Q.    When you receive an e-mail from a citizen

14   making an inquiry about the HQL, do you e-mail them

15   or call them in response?

16        A.    Usually e-mail them.

17        Q.    All right.  And is there an e-mail address

18   that you use to respond?

19        A.    Yes.

20        Q.    And what address is this?

21        A.    The msp.hql@maryland.gov.

22        Q.    And do you always sign your e-mails as



USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 321 of 460

Case 1:16-cv-03311-ELH   Document 135-12   Filed 01/28/21   Page 21 of 25
Case 1:16-cv-03311-ELH   Document 77-11   Filed 10/05/18   Page 21 of 25

Page 187

1              THE WITNESS:  No.

2    BY MR. HANSEL:

3        Q.   The training information is received,

4    obviously, from a third party; right, from the

5    trainer?

6        A.   The class, yes, that is received by a

7    third party.

8        Q.   Okay.  And, likewise, the Live Scan

9    information as it comes to you is received from a

10   third-party vendor; is that correct?

11       A.   Correct.

12       Q.   Okay.  All right.  So, other than going to

13   those third parties, the trainer for the class and

14   the Live Scan folks, that is not something that an

15   individual has immediate personal control over.

16   They have to rely on those third parties to submit

17   the information; is that right?

18              MR. SCOTT:  Objection.

19              THE WITNESS:  Correct.

20   BY MR. HANSEL:

21       Q.   Okay.  And not only do they have to rely

22   on the third parties to submit the information, but



Case 1:16-cv-03311-ELH   Document 77-11   Filed 10/05/18   Page 22 of 25

Page 188

1    in the proper form with the proper codes; is that

2    right?

3              MR. SCOTT:  Objection.

4              THE WITNESS:  Correct.

5    BY MR. HANSEL:

6       Q.   Okay.  All right.  And applications, you

7    agree with me certainly, and I think we've seen some

8    examples -- we can dig them back up, if you want,

9    but you agree with me certainly that applications

10   can take longer than 30 days to be approved for

11   reasons that are unrelated to the individuals that

12   are not the fault of the applicant?  Let's put it

13   that way.

14             MR. SCOTT:  Objection.

15   BY MR. HANSEL:

16      Q.   Examples being problems with Live Scan,

17   miscoding by the sheriff's department, issues with

18   their trainer not getting the data in.

19      A.   Then, yes.

20      Q.   Okay.  All right.  And just to be clear,

21   because we muddied the question significantly, you

22   agree with me that applications can take longer, for



Page 189

1    an HQL can take longer than 30 days to process for

2    reasons that are beyond the control of the

3    applicant; correct?

4            MR. SCOTT:  Objection.

5            THE WITNESS:  And also beyond the control

6    of the State Police.

7    BY MR. HANSEL:

8        Q.   And the applicant?

9            MR. SCOTT:  Objection.

10           THE WITNESS:  The applicant and the State

11   Police, yes.

12   BY MR. HANSEL:

13       Q.   Okay.  All right.  In cases where the

14   incomplete nature of the application is not the

15   fault of the applicant, is the HQL, nevertheless,

16   denied?

17           MR. SCOTT:  Objection.

18           THE WITNESS:  What do you mean by

19   "nevertheless, denied"?

20   BY MR. HANSEL:

21       Q.   Is it not approved.

22       A.   It is not approved until we get the



USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 324 of 460

Page 190

1    documentation that is required by law.

2        Q.    And for -- and that is the, at the 30-day

3    mark, the application then is placed on this

4    administrative log; is that correct?

5        A.    Correct.

6        Q.    Okay.  And then it's removed from the

7    administrative log and dealt with appropriately, but

8    in the appropriate case approved when the problem

9    with Live Scan or the problem with training is

10   corrected; is that right?

11           MR. SCOTT:  Objection.

12           THE WITNESS:  Correct.

13   BY MR. HANSEL:

14       Q.    Okay.  So the overall time period in those

15   circumstances from the person hitting the submit

16   button and paying the fee to actually having

17   approval of their HQL is in those circumstances

18   longer than 30 days?

19           MR. SCOTT:  Objection.

20           THE WITNESS:  Correct.

21   BY MR. HANSEL:

22       Q.    Okay.  Now, the administrative log, I



JA0798

Page 220

1    but I'm asking you was the Internet Explorer problem

2    fixed before or after 2017, if you know?

3              MR. SCOTT:  Objection.

4    BY MR. HANSEL:

5         Q.   And remember, we looked at an e-mail from

6    December 28 of 2016 when it still existed.

7         A.   And that is why I said I do not know the

8    date.  I'm not going to tell you a date that I don't

9    know.

10        Q.   I'm not asking the date.

11        A.   I don't even want to guess at a date that

12   I don't know.

13        Q.   So you don't even know the year, other

14   than what the e-mails show?

15        A.   Correct.

16        Q.   Okay.  All right.  Is there any path for

17   someone without a fixed address to obtain an HQL in

18   Maryland?

19             MR. SCOTT:  Objection.

20             THE WITNESS:  They need, what we require

21   in the HQL is an address on the application for us

22   to mail them the card.  That's what we require.





# A FAREWELL TO ARMS

The Solution to Gun Violence in America

**Maryland Attorney General's Special Report**

**J. Joseph Curran, Jr., Attorney General**

**October 20, 1999**

EXHIBIT
12

HQL_0000611

# EXECUTIVE SUMMARY

A three-year old in Baltimore City kills himself with the handgun he finds under a mattress. A mother of two is shot in Prince George's County hanging curtains in her window. A Park Heights pastor is gunned down in a botched robbery outside his home. A stray bullet from a drug dispute fells a thirteen-year old girl outside her Carrollton Ridge rowhouse, making her the fifth to die in the neighborhood in four months.

How violent must it get before we demand an end? How many more anguished parents must bury their children before we deal with gun violence head on, instead of taking the small, timid measures which have constituted "gun control" for the past quarter century? How many tragedies of premature death and disabling injury must we endure before we realize we need to think about gun violence in a different way?



Gun violence is not just about law enforcement. Children dying in a school cafeteria, an elderly man taking his own life with a handgun, an eight-year old shooting his sister - in these tragedies we must begin to recognize the multi-dimensional. Gun violence is about law enforcement, but it is also a crisis of public health and consumer protection. We have thus far attempted only to fix the law enforcement piece, *e.g.* prohibiting convicted felons from owning guns, doing background checks on some gun buyers. Yet because our problem is more complex, this one-dimensional approach dooms us to failure. Until we recognize this truth, we will not be able to fashion the solutions that will finally end our nightmare.

We are overrun with guns. Despite waiting periods, one-gun-a-month laws, and other faltering attempts to stem the flow, we are hemorrhaging guns into our streets, schools and homes. In a country of about 270 million people, there are over 200 million guns - 65-70 million of which are handguns - and these numbers are climbing. Forty-four million Americans - or 25% of all adults and 38% of American households - possess at least one gun.

Yet despite the ever-increasing number of guns in circulation, the number of Americans choosing to own a firearm is declining. *Fewer and fewer of us own more and more guns.* Only 16% of Americans own a handgun; five out of six of us do not.

Thus, there are two critical questions we must ask ourselves. First, what do we pay to indulge the minority among us who accumulate firearms? In other words, what is the cost of gun

☛ *Gun violence is about law enforcement, but it is also a crisis of public health and consumer protection.*

☛ *In Maryland, more people die from firearms than motor vehicle accidents - well over 700 a year.*

HQL_0000612

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 328 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 3 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 3 of 63

ownership in America? The answer lies in our daily headlines, in the quiet mourning for lives lost, and in the economic toll of these recurring tragedies. The costs are at once incalculable and astronomical.

First and foremost, we pay in deaths. Over 35,000 Americans die from firearms every year - about 100 deaths a day. Firearm injuries have doubled since 1962 and are now the eighth leading cause of death. In Maryland, more people die from firearms than motor vehicle accidents - well over 700 a year. Handguns are responsible for the vast majority of these fatalities.

The U.S. gun homicide rate for children under 15 years old is *sixteen* times higher than in 25 other industrialized countries combined. In 1996, 104 Maryland children under age 19 died from firearm homicide or suicide. In addition, for every firearm death in Maryland and nationwide, nearly three people suffer non-fatal firearm injuries.

Contrary to popular perception, most gun death in America is not crime-related. Suicides, which have doubled over the past few decades because of greater access to firearms, represent 54% of all firearm deaths. Unintentional shootings constitute 3-4%. Homicides represent 41%, and most of these deaths occur among family members or acquaintances.

This breakdown underscores the multi-faceted nature of gun violence. Law enforcement measures can address only the relatively small percentage of deaths represented by homicides outside the context of family violence. If we were also to institute public health and consumer protection measures, we could begin to prevent both the 58% of deaths represented by suicides and unintentional shootings, and the substantial percentage of homicides occurring among family and friends.

In addition to death and injury, we also pay in economic terms. The price of gun ownership is not measured only by the human costs of cutting short a child's life or consigning a teenager forever to a hospital bed. Firearm death and injury impose economic burdens, *i.e.*, the costs of medical care, lost productivity and quality of life, police and emergency services, and criminal justice resources. Medical care alone costs between $2.3 and $4 billion annually, of which at least 67% is borne by the public through elevated insurance premiums and higher taxes. Estimates of additional direct and indirect costs range from $20 to $112 billion annually. Based on conservative estimates, Marylanders pay more than $90 million a year in lifetime medical costs alone for firearm injury and deaths.



**Parents End Hunt for Killer of Son**

■ **Crime:** Marine was shot in August at a bus stop. His father went back to the spot every week, armed with a sketch of the gunman. Now a gang member

Those are the facts. A declining minority of Americans own an ever-increasing number of guns. Yet all pay the consequences, as we watch children

☛ *Based on conservative estimates, Marylanders pay more than $90 million a year in lifetime medical costs alone for firearm injury and deaths.*

3

HQL_0000613

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 329 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 4 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 4 of 63

die in our streets and we shoulder the increasing costs of that carnage.

As this tragedy has unfolded, how has the gun industry responded? It has refused to make guns safer. It has failed to market and distribute its products in a way calculated to keep guns out of the hands of children and criminals. It has reacted to a saturated market by creating new products with greater killing power and by attempting to expand its market to women and children.

Unlike many consumer products, guns can last for decades. With fewer Americans wanting to own a gun, the industry has contrived reasons to buy new guns. Instead of using the need for innovation to produce safer guns, it has opted to develop guns with increased lethality. As one scholar writes, "Lethality is the nicotine of the gun industry." The industry has created the desire to buy "better" guns by putting on the market assault-style weapons and firearms with greater ammunition capacity, higher firepower, or increased concealability. If having the capacity to kill one person is good, being able to kill 30 people without reloading is even better. The industry has also marketed its innovative new products aggressively to expand its market, targeting women and children.

The freedom the gun industry enjoys to pursue these strategies has no parallel. Unlike virtually every other consumer product, from refrigerators to toothpaste, guns are exempted from the jurisdiction of the Consumer Product Safety Commission. Instead, the federal government's power over firearms and ammunition is limited essentially to issuing licenses and collecting taxes.

We would not tolerate for a moment a situation in which there were no safety regulation of automobiles. We take for granted the wisdom of the regulation that makes power lawnmowers safer. No one regrets the lives saved every year since safety standards made butane cigarette lighters child-resistant. Yet guns, an inherently dangerous product, are free from health and safety regulation.

Increasing the killing power of firearms has been the gun industry's reaction to declining gun ownership and bloodletting across America. What, then, should be our response? When a man killed 16 children and a teacher with four handguns at Dunblane Primary School in Scotland in 1997, Britain banned all handguns. When a man gunned down 35 people with a variety of assault weapons in Australia in 1996, that country banned all automatic and semi-automatic weapons and pump-action shotguns.

> ☞ *Unlike virtually every other consumer product, from refrigerators to toothpaste, guns are exempted from the jurisdiction of the Consumer Product Safety Commission.*



**Survival 101: 'Get Down'**

*Parents Teach Children to Take Cover When Bullets Fly at East Capitol Dwellings.*

4

HQL_0000614



Now it is our turn. Two teens massacre 12 children and a teacher at Columbine High School in Colorado. A disgruntled day trader in Atlanta goes on a shooting spree leaving nine people dead and 13 wounded. A man guns down 8 teens and adults celebrating a religious holiday in the sanctuary of a church; even our institutions of faith are no longer inviolate. So should we wrangle for months over whether background checks at gun shows make sense? Should we fight in Congress and state legislatures for a few more of the modest proposals that mean gun control in this country and then declare victory? How long do we wait for a genuine solution? Until 25 children are killed on a playground? Or maybe 35? Or 100?

No. The time is now. We must get serious - no more band-aids, no more excuses. The moral fiber of our society will be measured by our response. The problem is not just guns in the wrong hands or a failure to enforce laws already on the books. Yes, we should use all the tools at our disposal to prevent crime. Yet this is about more than crime. It is a public health crisis - an epidemic of violent yet preventable death. Modest measures that keep guns away from criminals, together with all the punishment a civilized society can impose, will never stop all the dying.

Getting serious means posing the second critical question: Are the terrible costs that flow from handgun violence worth the benefits? In other words, is the price we pay for indulging the minority who own handguns really worth it? This cost-benefit analysis leads to one answer only - no. The costs overwhelm the benefits.

The common justification for widespread civilian gun ownership is two-fold: the hunting and shooting sports, and self-defense. Neither provides justification for the millions of handguns circulating in our neighborhoods. Hunters and sports shooters do not generally use handguns, and the notion that we are safer with guns in our homes to defend ourselves is false. Study after study shows that guns are rarely used successfully in self-defense, and the chance of a family member dying from a firearm-related injury is far greater in homes with guns.

For me, therefore, the answer is easy. I have added up the costs, and they outweigh the benefits. As a grandfather, I am ready to say enough children have died. In short, I believe that we should no longer allow unrestricted handgun ownership. More effective laws and vigilant enforcement can reduce criminal firearm injury. Increased safety and child-proofing features on handguns can prevent unintentional shootings. Personalized guns can prevent teen suicides and injury from stolen guns. Yet even all these measures would still leave untouched thousands of preventable handgun injuries and deaths every year. We would still be left mourning the multitude of deaths and disabling injury which result from the adult suicide attempts and domestic assaults

☛ *Is the price we pay for indulging the minority who own handguns really worth it?*

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 331 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 6 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 6 of 63

which occur in homes across America every day.

Thus, our public policy goal should be to restrict the sale and possession of all handguns to those who can demonstrate a legitimate law enforcement purpose or can guarantee that the use of such guns will be limited to participation in a regulated sporting activity. Handgun ownership that advances reasonable law enforcement purposes must be permitted. Individuals with a professional need to have a licensed gun - law enforcement officers, gun collectors, some business owners and certain other professional groups - will continue to keep handguns on business premises or for use on the job. The rest of us, however, must give them up. The cost has simply become too great.

We must begin to work toward this goal immediately. We must institute a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership. This plan must reflect the several dimensions of gun violence, so that it begins to reduce specific categories of firearm deaths and injuries. Thus, I recommend the following three-step plan to make Maryland the first state in the country to close the door on the widespread handgun ownership that has contributed to so much preventable tragedy and suffering.

## Consumer Protection Measures:

We should seek to reduce child-inflicted firearm injury and other unintentional shootings, teen suicides, and criminal assaults with stolen guns by holding the gun industry to the same health and safety standards imposed on every other consumer product in the American marketplace. Several technologies now exist which, if the gun industry were compelled to develop them, would prevent many of these handgun injuries and deaths.

We should pursue three separate means of requiring the gun industry to adhere to safety standards. Congress should give the Consumer Product Safety Commission jurisdiction over guns. We should impose our own safety standards on all guns sold in Maryland. We should also enable the tort system to restore

☞ *We must institute a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership.*



6

HQL_0000616

balance in the marketplace between the industry and the consumer by reinstating strict liability for firearm injury, thereby allowing lawsuits seeking to hold the gun industry accountable in Maryland.

**1. Federal Firearms Safety Regulation:**

At the federal level, I call upon Congress to create a meaningful federal health and safety regulatory authority over the gun industry. The federal government must finally insist on the same level of responsibility from the gun industry as it does from the manufacturers of toys. We must end the absurd paradox that there are no federal safety standards for one of the most inherently dangerous products in the American marketplace.

**2. State Firearms Safety Regulation:**

In Maryland, we must pursue the same strategy. We can accomplish this through either direct legislation or regulation. We should support and work to ensure the success of Governor Glendening's legislative initiative to require handguns sold in Maryland to be "personalized," or capable of being fired only by authorized users. This legislation would prevent unintentional injuries, teen suicides, and assaults with stolen guns.

Alternatively, we can impose personalized gun technology and other safety features on guns sold in Maryland through regulation. We are unique in the country in having a Handgun Roster Board charged with approving all handguns to be sold in Maryland. The Board should promulgate common sense regulations setting safety standards which all handguns sold in



**Gun in boy's killing was stolen, police say**

Owner says it was missing 3 months

A priority trace placed on the weapon by the Bureau of Alcohol, Tobacco and Firearms earlier this

the State must meet. This would allow Marylanders the benefit of all current and emerging technologies which can make guns safer. If this fails, I intend to investigate the possibility of promulgating such regulations under the Consumer Protection Act.

While state regulation should go forward, I also recommend that local governments explore similar measures to regulate the safety of guns in their jurisdictions. Prince George's and Montgomery counties have already taken significant steps toward limiting minors' access to firearms. While state law preempts some local firearms regulation, there is room for local initiative, particularly with respect to minors' access to guns.

We must also ensure that Marylanders do not suffer from any unfair or deceptive firearms marketing practices. I intend to investigate the extent to which the gun industry may be marketing handguns to Maryland children or making misleading claims about the utility of handgun ownership for self-defense.

**3. Use of Tort System to Promote Firearm Safety Measures:**

Holding the companies who design and manufacture guns accountable for preventable gun injury and death will also induce the industry to make guns safer. We should no longer tolerate the

☞ *We must end the absurd paradox that there are no federal safety standards for one of the most inherently dangerous products in the American marketplace.*

☞ *We must heap appropriate scorn on the industry's "we don't pull the trigger" excuse, as it continues to inject increasingly lethal guns into the marketplace.*

☞ *We should impose at least the same requirements on people wishing to own and operate firearms as we do on those wishing to own and operate motor vehicles.*

industry's "not my problem" defense to the carnage its products wreak. We must heap appropriate scorn on the industry's "we don't pull the trigger" excuse, as it continues to inject increasingly lethal guns into the marketplace, to distribute more guns than law-abiding citizens could ever need, and to refuse to take meaningful steps to make guns safer or to keep them out of the wrong hands.

The tort system provides us with time-tested, traditional tools which encourage industries to make products safer by allowing the imposition of liability for product injury. Specifically, the common law doctrine of strict liability shifts the costs of product injury from victims to those who make and distribute the product, thus providing them the incentive to make the product safer. Courts generally impose this liability when a manufacturer's product or activity is inherently dangerous, the risk of injury outweighs its utility, and a safer design is feasible.

Under current Maryland law, we cannot use this common law doctrine; a compromise in 1987 over the Hand-gun Roster Board eliminated this means to hold the gun industry accountable. At the time, it seemed a good compromise. Technology has

**Party Shooting Kills Teen-Ager And Hurts One**

**ENOUGH!**

**Flood of Officers Hits D.C. Streets To Stop Violence**

evolved since then, however, and both individuals and governments around the country are seeking to induce the industry to adhere to safety standards and use safer technologies through civil lawsuits. I believe, therefore, that this balance created by the tort system between the gun industry and the consumer should be restored in Maryland. We certainly do not want our State to become a safe haven for guns the industry would not dare market elsewhere. Thus, I will request the General Assembly to reinstate strict liability for firearm injury.

## Law Enforcement Measures:

We should also take several steps to assist law enforcement efforts to reduce criminal, non-domestic homicides and firearm injury.

### 1. Firearm Fingerprint Licensing and Training:

We should impose at least the same requirements on people wishing to own and operate firearms as we do on those wishing to own and operate motor vehicles. Even more to the point, we already require anyone wishing to carry a concealed firearm for protection to obtain a permit. The requirements for this permit are considerably

8

more stringent than those necessary to pass a background check when buying a gun. In addition to never having been convicted of a felony, a person must be found, on the basis of an investigation, not to have exhibited a "propensity for violence or instability which may reasonably render his possession of a handgun a danger to himself or other law-abiding persons." The applicant must also provide fingerprint identification and satisfactory evidence of being qualified and trained in the use of handguns.

There is no reason why the same should not be required of people wishing to own handguns. Is it no less important for a person with a handgun under his mattress not to have a "propensity for violence" than it is for a person carrying the gun to work? Why should we allow people to own handguns without knowing how to operate them safely when we do not allow the same for people driving cars? We should end this nonsensical paradox and require anyone buying a gun to obtain a fingerprint license.

**2. Lawbreakers Cannot Own Handguns:**

We should also take the common sense step of preventing anyone who breaks the law from owning a handgun. Currently, only convicted felons, spouse and child abusers, those adjudicated mentally ill, and those convicted of misdemeanors carrying penalties of more than two years of incarceration are precluded from owning firearms in Maryland. This bar should be extended to anyone, including juveniles, who is convicted of *any* misdemeanor. Recent studies show that any prior misdemeanor convictions increase by sevenfold the chances of future criminal activity, including firearms-related offenses and violent crime. We would eliminate a significant amount of criminal firearm use if guns were taken from the hands of anyone who breaks the law.

**3. Increase Law Enforcement Tools for Targeting Illegal Sales and Possession of Handguns:**

Finally, the General Assembly should provide assistance to law enforcement efforts to reduce illegal sales and possession of handguns by enacting two changes in the firearms laws.

First, illegal possession, sale, or transfer of a firearm should be a felony, not a misdemeanor. Although the misdemeanor charge carries the potential for incarceration, neither offenders nor the criminal justice system treat the offense as seriously as they would if it were a felony. We send the wrong message in charging a person who sells

☞ *Illegal possession, sale, or transfer of a firearm should be a felony, not a misdemeanor.*



**Atlanta teen fatally shot by girl, 12**

ammunition to a minor or engages in interstate firearms trafficking with nothing more than a misdemeanor.

Second, law enforcement officers investigating the illegal sale of regulated firearms should be permitted to use body wires. This would enhance substantially the ability to identify and prosecute straw purchasers and gun traffickers.

## Public Health Measures:

These consumer protection and law enforcement initiatives will make significant strides toward reducing certain categories of preventable firearm injury and death. Yet thousands will still die. None of these measures will stop the multitudes of adults and senior citizens who take their lives in moments of anguish, or the thousands of family members or friends who kill or maim loved ones in moments of rage. To stop this horrific but preventable violence, we must turn the whole ship around. We must stop the unrestricted, widespread public availability and private ownership of handguns.



### 1. Change Our Culture of Guns:

In the short run, we must change our gun culture. People must come to realize that we endanger our lives and those of our children by owning and

> ☞ *People must come to realize that we endanger our lives and those of our children by owning and carrying handguns, and by tolerating it in our neighbors.*

carrying handguns, and by tolerating it in our neighbors. There is no reason why, in going to a movie theater or grocery store, we should worry that someone's gun might discharge accidentally and kill our child. As attitudes have slowly but surely undergone radical transformation regarding such critical public health issues as smoking and using seatbelts, bicycle helmets, and child car restraints, so too must owning and carrying handguns come to be seen as dangerous and aberrant behavior. We must change people's minds about how far they are willing to endanger themselves in tolerating the choice of others to carry a gun.

Thus, I call upon everyone - private employers, government agencies, schools, physicians, and especially parents - to help. First, to put teeth into this initiative, I ask the General Assembly to take the lead and make guns in public accommodations illegal. It is one thing to continue to tolerate people choosing to endanger themselves and their loved ones by keeping a gun at home. We should no longer, however, allow them to force others to endanger themselves by going to a movie theater or baseball game where guns are permitted. In addition, private employers outside the context of public accommodations

HQL_0000620

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 336 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 11 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 11 of 63

should prohibit guns on their premises, with prominent signs to remind the public that guns must be left at the door.



Second, we must all help escalate the conversation about the dangers of gun ownership. Physicians should counsel patients, and teachers should talk to students about the perils of gun ownership. Schools should ask students and families to sign gun-free pledges. We should create gun-free zones, like drug-free zones, around school premises.

Most critically, parents must be involved. They must talk with their children about the dangers of guns and gun ownership. They must also talk to the parents of their children's friends. How many times might your child have visited a friend whose parents have a loaded gun hidden in a closet? We must begin setting limits for ourselves and those who live around us.

**2. Restrictive Handgun Licensing:**

In the long run, we must go the last mile. These limits must be reflected in the laws by which we govern ourselves. The law must embody the public policy goal of ridding our homes and communities of handguns through restrictive handgun licensing. Handgun ownership which advances reasonable law enforcement purposes can and must continue, but the costs of allowing the rest of us to own handguns are too great.  We should endure those costs no longer.

The result will be well worth it. Imagine an inner city where mothers no longer keep children from playing outside for fear of drive-by shootings. Imagine a suburban high school cafeteria where the worst teenage disagreements lead only to fistfights, never to shoot outs. Imagine a major metropolitan newspaper that would never again blare the headline, "Three Year-Old Boy Shoots Self With Gun Found In Parent's Bedroom." Imagine a hospital emergency room where beleaguered doctors desperately trying to save a child bleeding to death of a gunshot wound would be a thing of the past.

That is the result I want for Maryland and for America.

J. Joseph Curran, Jr.
*Attorney General of Maryland*
October 20, 1999

☛ *The law must embody the public policy goal of ridding our homes and communities of handguns through restrictive handgun licensing.*

11

HQL_0000621

Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 12 of 63

# I. The Proliferation Of Guns And Gun Lethality In America

A common misconception holds that our culture of gun ownership dates back to the early days of the Republic, with the bulk of our citizenry owning firearms as our founding fathers drafted the Second Amendment. On the contrary, gun ownership in the eighteenth and early nineteenth centuries was far from widespread; guns at that time were still individually crafted, very expensive, and difficult to repair, so ownership was restricted largely to prosperous landowners. Prior to 1850, less than 10% of the populace owned firearms, and public sentiment was indifferent to personal gun ownership.

☞ *One in four Americans owns a gun.*

Only with industrialization in the 1840's, when guns began to be mass produced, did ownership become commonplace. Our "gun culture" grew, therefore, with the growth of the gun industry, and it was not until after the Civil War that the notion of a right to own guns became part of the American psyche. Since those post-war years, the gun industry has carefully and successfully cultivated this uniquely American notion of personal gun ownership, and the result has been a flourishing gun culture.[1]

## A. Gun Ownership

Nowhere in the developed world does a greater percentage of the citizenry own at least one firearm. Great Britain has banned handguns altogether and Australia has banned all automatic and semi-automatic weapons, as well pump-action shotguns. Similarly, Japan and most European countries strictly control gun ownership.[2] By contrast, 38% of American households and 25% of all adults own at least one gun. About 23% of households and 16% of adults own at least one handgun.[3] In gun-owning households, the average number of guns is 4.1.[4] In a country of 270 million people, there are more than 200 million guns in circulation.

---

[1]    *See* MICHAEL A. BELLESILES, *The Origins of Gun Culture in the United States, 1760-1865* at 18-20, 38, and *Introduction to Part One* at 4,5, of GUNS IN AMERICA (Jan E. Dizard, Robert M. Muth and Stephen P. Andrews, eds., 1999).

[2]    TOM DIAZ, MAKING A KILLING: THE BUSINESS OF GUNS IN AMERICA at 8 (1999).

[3]    TOM W. SMITH, NATIONAL OPINION RESEARCH CENTER, 1998 NATIONAL GUN POLICY SURVEY: RESEARCH FINDINGS, at 10-12, Tables 6-8 (University of Chicago, May, 1999).

[4]    *See* PHILIP J. COOK ET AL., *Regulating Gun Markets*, 86 J. CRIM. L. 59, 81 (1995).

HQL_0000622

USCA4 Appeal: 21-2017     Doc: 25-2        Filed: 08/03/2022      Pg: 338 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 13 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 13 of 63

## 1. Who Owns Guns?

Members of virtually every demographic group own guns.  Gun ownership is most prevalent among men living in rural areas, where the hunting and gun culture has its deepest roots.  Men are far more likely to own guns than women, and married couples are more likely to own guns than single people.  Gun ownership generally increases with income but bears little relation to educational levels or the presence of children in a home.[5]

Gun possession among juveniles is increasing; 14% of teens report carrying a gun regularly, with the number closer to 22% in the inner city.  These numbers skyrocket to a stunning 88% among convicted juvenile offenders.[6]  In 1996, one in 17 high school senior boys reported carrying a gun to school in the previous 4 weeks, and almost 13% of middle and high school students report knowing a student who brought a gun to school.[7]

Other studies of students in high risk neighborhoods show even more disturbing trends.  A Los Angeles survey revealed that 10% of the youth had owned or possessed a gun at some point, and 30% had a close friend who owned a gun.[8]  Skyrocketing increases in juvenile weapons violations also demonstrate the increase in youth gun possession.  Between 1970 and 1992, annual juvenile weapons violations rose 291%.[9]  Juvenile homicide more than doubled between 1987 and 1994, and virtually the entire increase in homicide offending was firearm-related, *i.e.*, juvenile firearm homicide increased 200%, while homicide offenses involving other weapon types increased only 10%.[10]  Between 80-90% of all juvenile homicides involve a handgun.[11]

The Gun Control Act of 1968 made it illegal to sell or transfer a firearm to a minor.[12]  Yet gun possession rates among teens make clear that a determined youth can usually obtain a gun.  Of those youth reporting gun ownership in a Los Angeles survey of youth in an at-risk neighborhood, 70% had obtained the gun from a friend.  25% of all youth knew where to get a gun in their neighborhood, and 7% reported they could acquire one in less than an hour.[13]  Far too many youth can

☛ *More teens own guns than ever before, including 88% of all juvenile offenders.*

☛ *The presence of children in a home bears almost no correlation to whether a gun is kept in the household.*

---

[5]     Tom W. Smith, *supra,* note 3.

[6]     Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, Promising Strategies to Reduce Gun Violence at 4 (February 1999).

[7]     *Id.* at 6.

[8]     Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, Report to Congress on Juvenile Violence Research at 11 (July 1999).

[9]     James T. Dixon, *On Lemon Squeezers and Locking Devices: Consumer Product Safety and Firearms, A Modest Proposal,* 47 Case Western Law Review 979, 990 (1997).

[10]     Office of Juvenile Justice and Delinquency Prevention, U.S. Dept. of Justice, OJJDP Research: Making a Difference for Juveniles at 14 (August 1999).

[11]     OJJDP, Report to Congress on Juvenile Violence Research, *supra,* note 8 at 11.

[12]     Pub. L. No. 90-354, 8 Stat. 162 (1968) (codified at 18 U.S.C. Section 922(b)(1) (1994)).

[13]     OJJDP, Report to Congress on Juvenile Violence Research, *supra,* note 8.

13

HQL_0000623

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 339 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 14 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 14 of 63

acquire a gun without even stepping outside their homes.  During a Senate hearing exploring the problem of children and weapons, the Executive Director of the National School Safety Center stated that "the primary source of all weapons [is] the student's residence."[14]

## 2. Habits of Gun Ownership

Almost half of all handgun owners report obtaining their handguns from unregulated sources, *e.g.*, gun shows, private sales, gifts.[15]  This means that these purchases are subject to no federal controls whatsoever.  A private gun owner can choose to sell his gun to a minor, an alcoholic, a drug addict, or a convicted felon.

Study after study also reveals that, having bought their guns, most gun owners fail to exercise standard gun safety precautions.  First, they carry them frequently, usually loaded.  Among residents of households with handguns, 23% report carrying the gun away from home within the last year.  22% of the carriers do so almost daily, 11% several times a week, and 17% several times or once a month.  Half of those who carry guns away from home keep their guns loaded while out of the home.[16]

Second, many gun owners ignore standard guidelines for storing a gun.  Over one-third of gun owners keep their guns loaded all or some of the time while at home, and 53% keep them unlocked.  Handgun owners are twice as likely to keep their guns loaded.[17]  One recent study showed that 14% of gun owners living with children kept a gun both loaded and unlocked.[18]  Another revealed that 61% of gun-owning parents keep at least one gun unlocked.[19]

## 3. Breadth of Gun Ownership

### a. How Many Guns Do We Own?

No one knows exactly how many guns are currently in our communities, but estimates range from 200 to 250 million, with an influx of new guns into the market of about 5 million annually.[20]  Between 65 to 70 million are handguns.  Most of the

> ☞ *One-half of handgun owners buy their guns from unregulated sellers, 53% keep them unlocked at home, and one-third keep them loaded.*

> ☞ *In a country of 270 million people, there are well over 200 million guns.*

---

[14]    *Children Carrying Weapons: Why the Recent Increase: Hearing on the Possession of Weapons Among Children and the Presence of These Weapons in our Schools Before the Senate Committee on the Judiciary,* 102nd Congress, 2d Sess. (1992).

[15]    Tom W. Smith, *supra,* note 3 at 11.

[16]    Douglas S. Weil and David Hemenway, *Loaded Guns in the Home: Analysis of a National Random Survey of Gun Owners* at 226-227, in Guns in America, *supra,* note 1.

[17]    *Id.*

[18]    *See* Hemingway, *et al., Firearm Training and Storage,* 273 JAMA 46, 47 (1995).

[19]    *See* Yvonne D. Senturia *et al., Gun Storage Patterns in U.S. Homes with Children,* 150 Archives Pediatrics & Adolescent Medicine 265, 265 (1996).

HQL_0000624

growth in ownership has occurred within the last 25 years; a national firearms ownership survey estimates that 80% of all guns in private hands in 1994 had been acquired within the previous twenty years.  Approximately 38,000 gun sales, of which 18,000 are handguns, occur every day in this country.[21]  The Bureau of Alcohol, Tobacco and Firearms ("ATF") estimates that 7.5 million new and used firearms are sold at retail outlets every year.[22]

### b. Who Makes Them?

There are about 1,200 firearm manufacturers in the United States.  The domestic firearms market is a mix of old-line, established manufacturers and new, smaller outfits that have sprung up largely in response to the ban on the import of the cheap handguns known as Saturday night specials.[23]  While many of the most dangerous and misused guns come from the small, often short-lived companies, a few giants of the industry produce the vast majority of domestic firearms.

More to the point, while these old, established companies attempt to paint themselves as "responsible" manufacturers, set apart from the "Ring of Fire" California-based manufacturers of Saturday night specials, the handguns produced by the so-called "responsible" companies are nonetheless among the most commonly used in crime.  Despite the growth of more cheaply-made handguns over the last 15 years, firearms manufactured by Smith & Wesson, Sturm, Ruger & Co., Inc., Colt's Mfg. Co., Inc., and Beretta USA Corp. have also made the list of the top ten crime guns traced by the ATF over the last decade.[24]

An increasing percentage of the guns sold today also come from foreign companies which, as one industry analyst puts it, want their share of the world's "last great [gun] market."[25] America is a net importer of guns.  Between 1973 and 1994, for example, the average annual firearms export rate was 8% of domestic production. During roughly the same period, over 20 million guns were imported for the U.S. civilian market.  Most foreign companies exporting firearms to this country sell far fewer guns in their own markets.  For example, in 1993 only 1.2% of Japan's gun production stayed in Japan, which has stringent gun control, while about 80% of its firearms exports came into the United States.[26]  There are almost 800 federally

☛ *Handguns have accounted almost completely for the sharp increase in the number of guns over the last quarter century; there are 65-70 million handguns currently in circulation.*

☛ *A few large manufacturers supply most of the guns sold in this country, but an increasing percentage of the guns flowing into the American marketplace come from foreign companies that take advantage of the huge U.S. demand.*

---

[20]    See, e.g., BELLESILES, supra, note 1 at 17; ADAM WALINSKY, The Crisis of Public Order at 299 in GUNS IN AMERICA, supra, note 1.

[21]    OJJDP, PROMISING STRATEGIES TO REDUCE GUN VIOLENCE, supra, note 6 at 4.

[22]    JAMES T. DIXON, supra, note 9 at 984 (citations omitted).

[23]    Many domestic manufacturers have become domestic subsidiaries of foreign companies in recent years, at least in part because such acquisitions have enabled foreign manufacturers to evade the more stringent requirements imposed on gun imports.  DIAZ, supra, note 2 at 5.

[24]    Id. at 23-30.

[25]    Id. at 69-70 (citation omitted).

[26]    Id. at 31.

15

USCA4 Appeal: 21-2017    Doc: 25-2         Filed: 08/03/2022      Pg: 341 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 16 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 16 of 63

licensed gun importers, which bring in both new and military surplus firearms. For example, one company specialized until recently in importing Chinese military assault weapons.[27]

### c. What Kinds of Guns Do We Own: The Shift from Long Guns to Handguns

The types of guns sold in the United States has also changed significantly since World War II. Before the second world war, the gun industry produced primarily a stable line of utilitarian long guns for hunters and sports shooters. The sharp growth in the industry in the last half century has occurred in the production of powerful handguns and assault rifles - guns designed for military or criminal use rather than hunting.[28]

In the 1960s, rifles and shotguns used mostly for sport constituted 80% of the 80 million guns in circulation, with only 12% of adults owning a handgun. By 1976, the number of handgun owners had increased to 21%, and at least half of the new guns coming on the market ever since have been handguns.[29] With respect to imports alone, the percentage represented by handguns increased from 24% to 62% between 1978 and 1994.[30] Thus, since the 1960's, the percentage of all guns in circulation represented by handguns has risen from 20% to roughly 35%. The market has changed fundamentally from guns designed for killing animals to guns designed to kill people more and more efficiently.

### 4. Gun Ownership in Decline

Despite our widespread gun ownership and steadily increasing supply of handguns, the percentage of Americans who own guns is declining. In the early 1970s, 50% of adults lived in households with guns, and this number has fallen below 40% today. The percentage of adults personally owning a gun has decreased from 29% in 1980 to 25% in 1998.[31]

This decline, however, is occurring in long gun ownership. Handgun ownership continues to rise. Between 1973 and 1998, long gun household ownership fell from 42% to 32%, while handgun household ownership rose from 20% to 23%.[32]

## B. The Gun Industry: Unfettered Freedom from Regulation

In the emotional debate about gun ownership in America, with rhetoric from all sides about personal freedom, the founding fathers, and the epidemic of violence, we often lose sight of the pedestrian fact that the gun industry is an extremely

*☞ Fewer and fewer Americans own more and more guns.*

*☞ The market for firearms has changed from guns designed to kill animals to guns designed to kill people.*

---

[27]    *Id.* at 39-40.
[28]    *Id.* at 83.
[29]    Walinsky, *supra*, note 20.
[30]    Diaz, *supra*, note 2 at 30.
[31]    Tom W. Smith, *supra*, note 3 at 12.
[32]    *Id.*

16

profitable business. It also enjoys a unique privilege as the only unregulated industry in corporate America.

## 1. The Business of Guns

The business of making, importing and selling guns is a booming, multi-billion dollar industry. While the companies make it difficult to get a detailed picture of their activities, estimates put the economic impact of gun and ammunition sales at about $9 billion annually. Total sales, including accessories and gun-related services, is estimated at between $20 to $25 billion.[33] One estimate puts hunting expenditures alone, by 17 million enthusiasts, at $10 billion.[34] The Sporting Arms and Ammunition Manufacturers Institute, Inc., a gun industry trade group, claims that the hunting and shooting sports market generates about $18 billion each year. Yet these estimates are difficult to verify; one scholar has observed that "the firearms industry is a business so secret that it makes the tobacco industry look like a model of transparency."[35]

☞ *Gun and ammunition sales generate about $9 billion annually.*

## 2. Where Is the Watchdog?

### a. Federal Restraints on the Manufacture, Distribution, and Possession of Firearms

If the way in which the gun industry operates remains a mystery, it should be no surprise that it does so largely as it pleases. The ATF ostensibly regulates the industry, but its function is limited primarily to issuing pro forma licenses and collecting excise taxes. Thus, domestic firearms manufacturers, importers, and retail dealers must obtain federal firearms licenses. Purchasers of new handguns at federally-licensed dealers are also subject to background checks. What this means in practice, however, is that in America, almost anyone can sell a gun and almost anyone can buy a gun.[36]

☞ *In America, almost anyone can sell a gun and, more significantly, almost anyone can buy a gun.*

#### i. Interstate Licensing Requirements

To become a federally-licensed, interstate trafficking gun dealer, one need simply be over 21, have a place of business which conforms to local zoning laws, a clean criminal record, no history of willfully violating any firearms laws, and a few hundred dollars to pay the application fee for the federal license.[37] If one cannot meet these minimal requirements, one can simply forego the license and sell guns privately, at gun shows or out of one's home.

---

[33]    DIAZ, *supra*, note 2 at 7.
[34]    *See* ALAN FARNHAM, *A Bang That's Worth Ten Billion Bucks*, FORTUNE AT 80 (Mar. 9, 1992).
[35]    DIAZ, *supra*, note 2 at 5.
[36]    *Id.* at 50-58.
[37]    THE GUN CONTROL ACT OF 1968, 18 U.S.C. CHAPTER 44, §923.

17

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 343 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 18 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 18 of 63

Until 1993, there were about 250,000 federally-licensed dealers in this country. Only 20,000 had actual stores, and half of those were pawn brokers. Since the passage of the Brady bill, the 1994 crime bill and other administrative reforms, the number has dropped to between 90,000 and 100,000. This decrease has been attributed to the new requirements that licensed dealers specify an actual place of business on the license application, and notify local law enforcement authorities of their license.[38]

Once licensed, the dealer must keep a record of all gun sales. Yet stringent restrictions instituted by the Firearm Owner's Protection Act in 1986, which rolled back many regulatory controls of the Gun Control Act of 1968, preclude the ATF from keeping any national database of gun ownership, and strictly limit on-site inspections to ensure dealer compliance.[39]

### ii. Restrictions on Buyers

To buy a gun from a federally-licensed dealer, one must be of sound mind and not be a convicted felon or a spouse or child abuser. If these are problems, however, there are no federal restrictions on buying a gun privately from any unlicensed seller willing to make the sale. A buyer without a license also may not purchase a handgun across state lines.[40]

### iii. Unregulated Sales and Sources

Thus, even the restrictions placed on "regulated" sales by licensed dealers are lax and poorly enforced. Moreover, at least 40% of all gun transfers occur outside this minimal regulatory framework. While federal law precludes interstate sales among unlicensed, private citizens, it imposes no restrictions on transfers between residents of the same state.[41] In gun shows held every weekend across the country, private citizens exchange guns with no obligation to perform background checks or record the transfer. Estimates of the number of gun shows held annually range from 2,000 to 5,000.[42] In addition, conservative estimates put the number of stolen firearms each year at about 500,000.[43]

☛ At least 40% of all gun transfers occur outside the minimal federal regulations governing licensed firearms dealers.

☛ Conservative estimates put the number of stolen firearms each year at about 500,000.

---

[38]    DIAZ, *supra*, note 2 at 42.

[39]    VIOLENCE POLICY CENTER, *Gun Shows in America: Tupperware Parties for Criminals, Executive Summary* at 1 (July 1996). For example, the ATF had an extremely difficult time tracing the guns used in the Columbine High shootings because of the limitations placed on the agency by Congress. *See* WALL STREET JOURNAL, *Weapons Search: The ATF's Tracers Follow Tortuous Path of the Littleton Guns* (April 30, 1999).

[40]    DIAZ , *supra*, note 2 at 37.

[41]    The exception to this otherwise blanket freedom are the various restrictions placed on the sale of a few specific classes of firearms, *e.g.*, machine guns and semi-automatic assault weapons. *Id.* at 37.

[42]    *Id.* at 47. Maryland is one of the few exceptions; firearm sales at gun shows are subject to background checks. *See* discussion at Section I(B)(2)(b), *infra*.

[43]    COOK, ET AL., *supra*, note 4, at 81-82.

18

HQL_0000628

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022      Pg: 344 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 19 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 19 of 63

Thus, the federal regulations governing gun manufacturing, buying and selling are minimal.[44]  As author Tom Diaz puts it, "the nature and quality of the firearm, the ethics of the dealer, and the good sense or even sobriety of the buyer are effectively irrelevant to the exchange of money for guns in most states."[45]  Any other restrictions are left to the individual states.

### b. State Laws and Regulations

State laws governing the legal transfer of firearms vary widely, from virtually no restrictions on licensing, sale or possession in some states, like Arizona, to some limited licensing and purchasing requirements in others, including Maryland.  Even states with their own restrictions, however, suffer from failing to define what constitutes being a dealer and thus needing a license, and limiting the types of guns subject to regulation.[46]

Among the states, Maryland is one of the more progressive.  First, Maryland requires dealers to obtain a state license, although the requirements are very similar to those at the federal level.[47]  The State also limits gun purchases to one a month per buyer; prohibits "straw purchases," where someone buys a gun for someone else; and requires a background check and 7-day waiting period on all gun transfers, including secondary sales.  It is also illegal to sell a gun to a person under 21, and minors cannot possess guns without parental consent and supervision.  The State also strictly regulates the sale of assault pistols, machine guns, and magazines with more than twenty rounds of ammunition.[48]

In addition, Maryland is unique in the country in having a Handgun Roster Board.  Created in 1988, the Board determines which handguns may be sold in Maryland.  The nine-member board, made up of law enforcement, gun control, NRA, gun industry, and citizen representatives, is charged with compiling a handgun roster of permitted handguns, and only handguns on the roster can be sold in the State.  The Board must use nine criteria in determining which handguns are permitted, *i.e.*, concealability, ballistic accuracy, weight, quality of materials, quality of manufacture, reliability as to safety, caliber, detectability by standard security

☞ *"The nature and quality of the firearm, the ethics of the dealer, and the good sense or even sobriety of the buyer are effectively irrelevant to the exchange of money for guns in most states."*

---

[44]   Some argue that, on the contrary, there are more than 20,000 gun laws, and our whole problem with gun violence is that we do not enforce them adequately.  What they fail to mention is that the vast majority of these "gun laws" have nothing to do with the manufacturing, sale or possession of guns, but deal instead with collateral issues like regulating where gun stores are located, whether firearms may be discharged within city limits, etc.  *Id.* at 5.

[45]   *Id.* at 36.

[46]   *Id.* at 38.

[47]   To obtain a state license, one must have a place of business, submit a photograph, fingerprints, be at least 21, a citizen and of sound mind, have a clean criminal record, and not be an addict or habitual user of any controlled substances.  Md. Ann. Code, Art. 27, §443 (1996 Repl.).

[48]   Md. Ann. Code, Art. 27, §§372, 378-9, 441,441A, 442, 442A,445 *et.seq.* (1996 Repl.).

19

HQL_0000629

☞ *The gun industry has unfettered freedom to design, manufacture and promote its lethal products with virtually complete disregard for consumer health and safety. It answers to no one.*

equipment, and utility for legitimate sporting, self-protection, or law enforcement activities. The Board can place handguns on the roster on its own initiative, or citizens can petition for placement, and decisions can be appealed under the Maryland Administrative Procedure Act.[49]

The intent of the Handgun Roster Board law was to ban the type of handguns colloquially known as "Saturday Night Specials." These handguns, predominantly made by so-called "Ring of Fire" small gun manufacturers, are particularly attractive to criminals. They are low-cost, light weight, easily concealed, poorly made, have short barrels, and are inaccurate and unreliable. The Board has specifically disapproved 29 handguns out of the more than 2,000 available. An additional 82 handguns which have been manufactured since 1984 are not on the approved list, and thus, although not expressly disapproved, may not be sold in Maryland.[50]

Maryland has augmented to a limited extent, therefore, the barebones federal regulation of the sale and possession of firearms. Like the federal government and almost every other state, however, Maryland has failed to take serious steps to regulate firearms from a public health or consumer product safety perspective.

### 3. The Gun Industry's Exemption from Consumer Product Safety Commission Jurisdiction

None of the skeletal federal regulations and few state regulations contain the minimal health and safety standards applied to most other consumer products in the American marketplace. A comparison of guns and cars is striking.

Automobiles, like guns, are a widely-used and potentially injurious product. As a result, we require universal registration for ownership and licensing for operation. A person who wants to operate an automobile must pass a test showing he or she knows how to drive and has a basic understanding of standard safety laws and practices. By contrast, there is no requirement that a person who wishes to own and use guns know anything about how to operate, store, or clean them safely. A 21-year-old can carry a newly-purchased semi-automatic pistol out of a gun show without ever having laid eyes on one. Similarly, we require automobile manufacturers to incorporate a plethora of safety features into their automobile designs, and their cars must pass a myriad of tests designed to maximize health and safety. By contrast, the law is silent on safety features required of gun manufacturers or importers.

Aside from the ATF's limited regulatory authority, no federal agency has any authority over health and safety firearms issues, or weighs the relative costs and benefits of any firearms product. Notwithstanding firearms' undisputed reign as one of the most "inherently dangerous products" ever made, no federal agency has a thing to say, for example, about how guns are designed. Nor does anyone monitor

☞ *If you want to own and drive a car in America, you must register your vehicle and obtain a license demonstrating basic driving skills. If you want to own and operate a gun in America, you need only go to a gun show and buy one, without ever having touched one in your life.*

---

[49]    Md. Ann. Code, Art. 27, §§36I-36J (1988).

[50]    MARYLAND STATE POLICE HANDGUN ROSTER BOARD LIST (September 19, 1994).

HQL_0000630

the quality of the materials used or whether any safety features should be required in a firearm's design and manufacture. Perhaps most paradoxically, no federal governmental authority assesses whether the dangers of certain firearm designs outweigh their utility.[51]

The legislation creating the Consumer Product Safety Commission ("CPSC"), which sets minimum health and safety standards for virtually every other product available to the American consumer, expressly exempted the gun industry from its jurisdiction through an amendment offered by a National Rifle Association board member.[52] Since then, the NRA and the gun industry have vehemently fought all efforts to repeal this nonsensical exemption. Thus, subject to limited potential tort liability, the gun industry continues to operate without restriction, free to design, manufacture, distribute and promote its products without regard for consumer health or safety. If a particular new gun design makes accidental discharge more likely, it matters not. If a new feature on a gun design serves no purpose other than enabling the user to shoot three times as many victims without reloading, who cares? The industry answers to no one.

### 4. The Saturated Market and the Need for Innovation

Despite its $9 billion in annual sales and added billions from ancillary services, the gun industry has faced a recurring, serious problem. Unlike most consumer products, guns do not wear out. While few of us own our grandparents' phonograph or 1950 Oldsmobile, guns can be and are passed down from generation to generation. With minimum care of a gun, there is no utilitarian reason to buy a new one. As Sen. Patrick Moynihan once put it, "the life of a handgun seems to be measured in decades, generations, and even centuries."[53] One analyst notes that the usable life of a firearm is best measured by the number of rounds it is able to fire, which can be as many as 10,000.[54]

This durability, combined with a declining interest among young people in the hunting and shooting sports, has created a saturated gun market.[55] As one industry magazine summed it up, "more and more guns [are] being purchased by fewer and fewer consumers."[56] Thus, in order to survive, the gun industry has been forced to *create* reasons for people to buy new guns by developing different products. Again, as an industry magazine advises, "convincing people they need more guns is the job of innovation."[57]

> ☞ *Guns do not wear out. "The life of a handgun seems to be measured in decades, generations, and even centuries."*

---

[51]   DIAZ, *supra*, note 2 at 11-14, 193-4.

[52]   *See* DIXON, *supra*, note 9 at 1003; *see also* DIAZ, *supra*, note 2 at 13.

[53]   139 CONG. REC. S16,931 (daily ed. Nov. 3, 1993).

[54]   GEORGE D. NEWTON, JR. & FRANKLIN E. ZIMRING, *Firearms and Violence in American Life*, 3,5(1970).

[55]   DIAZ, *supra*, note 2 at 91-93.

[56]   *Id.* at 93, *citing, Doing Business in the Golden Age of Consumers,* SHOOTING INDUSTRY at 29 (February 1997).

[57]   *Id., citing, The Industry White Papers: Expert Intelligence on the State of the Industry; the Future of the Gun Industry,* 38 SHOOTING INDUSTRY, No. 7 at 40 (July 1993).

21

HQL_0000631

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 347 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 22 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 22 of 63

## C.  The Implications of Regulatory Freedom and a Saturated Market

The gun industry is certainly not the only business ever to confront the problems of saturated markets and the need for innovation to spur further sales.  What is unique about the firearms industry, however, is that its innovation has not been constrained or shaped in any way by health and safety regulation.  Thus, the industry's drive to survive in a saturated market, combined with the lack of regulatory oversight, has produced disastrous results.

*☞ The gun industry has systematically made its products more and more lethal, promoting them as more effective and more efficient.  New firearms are more likely to kill instead of simply injure, and are able to kill more people at one time.*

### 1. Increased Lethality

The gun industry could have reacted to market saturation by developing safer guns.  It could have responded, for example, by designing a variety of safety features to make an unintentional discharge less likely, to make guns child-proof, or to make guns less concealable for use in criminal activity.

Yet the industry chose to do the opposite.  It began instead to manufacture guns with greater killing power.  It made guns more and more lethal, *e.g.*, military style assault rifles, higher caliber pistols.  It made guns capable of holding more rounds of ammunition, increased the power of the rounds, and made guns smaller and more easily concealable.[58]

For example, beginning in the late 1970's, gun manufacturers began promoting pistols over the previously-favored revolvers by developing new pistols in higher calibers which combined double-action operation with high capacity magazines.  The pistols carried many more rounds than revolvers, and could be fired faster and reloaded more quickly.  By 1987, pistol production had surpassed revolver production.  A Justice Department study comparing the magazine capacity of handguns acquired before and after 1993 found a 25% increase in average magazine capacity between pre-1993 and 1994 handguns, with 38% of the latter having a capacity of ten or more rounds.[59]

The lack of federal regulation over the industry has made this lethal innovation possible.  No one has required gun industry executives to consider increasing gun safety instead of killing power.  Thus, the exponential growth in the gun market reflects a shift in focus from guns designed to kill animals to guns designed to kill people.   The gun industry has relied on, in the words of an NRA executive, the "Rambo factor," with the emphasis in shooting activities moving to "large caliber arms that can be fired rapidly. . . the key words in arms and ammunition advertising are not skill, accuracy or marksmanship. . . [but] 'power,' 'speed' and 'firepower.'"[60]

---

[58]    *Id.* at 93-101.
[59]    *Id.* at 99-101.
[60]    *Id.* at 83, *citing*, International Association of Fish and Wildlife Agencies, *Proceedings of the First National Shooting Range Symposium* at 89 (1990).

22

HQL_0000632

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 348 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 23 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 23 of 63

The new focus on killing power has rendered guns more effective tools of crime. For example, the industry's development of new, high-capacity, double-action 9mm pistols has exacerbated both the level and destructiveness of gun violence. High-capacity magazines make possible the "spray and pray" shooting technique, so more victims are shot more times. Fewer victims survive gunshot wounds, and the damage and cost of treatment for those who do is far greater. From 1985 to 1992, for example, the domestic manufacture of 9mm pistols increased 92%, while hand-gun deaths correspondingly increased 48%.[61]

## 2. Aggressive Marketing and Targeting New Markets

The gun industry could have responded to a saturated market by decreasing supply. It might have diversified, branching out into less lethal forms of recreation. Industry executives could have recognized that in a country of 270 million people and 200 million guns, we have enough. They chose another route and, as the manufacturers of an unregulated consumer product, they were free to do so. They began marketing their new, more lethal products very aggressively. They blatantly targeted the most promising new markets - women and children.

### a. Aggressive Marketing

The industry has used the gun press, the entertainment media, and industry trade, lobbying, and "gun rights" organizations to promote its products. These three institutions have worked together to stoke the fires of the American gun culture, where a firearm is an icon, embodying manliness, individual liberty, self-reliance, and the right to exact personal justice.[62]

The gun press is not only a cheerleader for the industry, but is also intricately involved in its strategy and planning. No firearm is unworthy of praise. Much of the rhapsody by the press emphasizes the "Rambo" factor, focusing on how much damage new firearms can effect. This boosterism, which is thinly-disguised adver-tising, helps generate interest in the steady stream of increasingly deadly products coming on the market.[63]

One recent example is the campaign in the gun press to convince citizens they need to arm themselves for the Y2K problems which might befall us in the new millennium. The February, 1999 issue of *Guns and Ammo* exhorts, for instance, "There's Still Time! ARM YOURSELF for the Y2K Disaster!"[64] The August, 1999 issue of the *American Guardian* features the article "Y2 Care About Y2K," in which

☛ *In its drive to expand, the gun industry has aggressively targeted young people, using the schools, cartoon characters, video games and other advertising techniques in a "wrestling match for the hearts and minds of our children."*

☛ *One recent example of the gun industry's aggressive marketing is the campaign to convince citizens they need to arm themselves for Y2K.*

---

[61]     *Id.* at 102-105. Police officials in Baltimore City corroborate that the 9mm pistol has become the crime weapon of choice. Of the 2,814 guns confiscated in Baltimore City in 1998, 21.1% were 9mm pistols. Baltimore City Police Department, *Caliber Handgun Submissions By Frequency, 1998.*

[62]     Diaz, *supra*, note 2 at 50-68.

[63]     *Id.* at 51-60.

[64]     Robert Hausman, *There's Still Time! ARM YOURSELF for the Y2K Disaster!* Guns and Ammo at 30 (February 1999).

23

HQL_0000633

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022        Pg: 349 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 24 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 24 of 63

readers are told to "add to their [firearm] capabilities," and to "stock enough ammunition to last for a few weeks of severe social unrest."[65]  The September, 1999 issue of *Handguns* advises, "If there is a Y2K problem, you'll need . . . a gun," and it cautions against trading ammunition for food, because "if you have the ammunition, you can get the food."[66]

The entertainment media also glorifies gun violence.  The "shootout" is a centerpiece of many films, television shows and video games.  Popular movie stars are shown using guns to solve conflict successfully.  Entertainment even promotes specific types of firearms; Dirty Harry's use of the .44 Magnum boosted its popularity enormously.[67]  As the industry magazine *Guns and Ammo* put it, "T.V. and motion picture guns create powerful, unforgettable images that have had a measurable impact on the shooting world."[68]

Finally, the gun industry trade and advocacy organizations promote the gun culture and industry products through financial support, political lobbying, grass roots organizing and other methods.  While the National Rifle Association ("NRA") is the largest and most well-known of these organizations, there are many others which also contribute to the extremely powerful voice gun advocates enjoy at all levels of government.

### b. Targeting New Markets

Notwithstanding its exponential growth over the last century, gun ownership remains concentrated among white males.  A key to the industry's future viability, therefore, is to continue its strength in this group while expanding to others.

The industry has focused on women, both as a market unto themselves and as a vehicle to reach children.  Growing up with a gun in the home is a strong predictor of whether a child will choose to own a gun as an adult.[69]  As the National Shooting Sports Foundation ("NSSF") has reported, "bringing women and youngsters to the shooting sports is the goal of fully half of [its new programs.]"[70]  The industry has

☞ *The industry has introduced new guns designed expressly to appeal to women, and has marketed them by playing upon women's fear for their personal safety, particularly the fear of rape.*

---

[65]    James Cord, *Y2 Care About Y2K*, American Guardian at 44 (August 1999).

[66]    Walt Rauch, *Smith & Wesson's Model 10 Revolver: A Good Choice as a Y2K Handgun*, Handguns at 55 (September 1999).

[67]    Diaz, *supra*, note 2 at 60-64.

[68]    *Id.* at 60, *citing, Guns of T.V. and Movies: Behind the Scenes*, Guns & Ammo at 42-43  (December 1985).

[69]    Philip J. Cook and Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use* at 31 (Police Foundation 1996).

[70]    Diaz, *supra*, note 2 at 184, *citing, NSSF Board Approves New Programs: New Focus on Women &*

HQL_0000634

introduced new guns designed expressly to appeal to women, and has marketed them by playing upon women's fear for their personal safety, particularly the fear of rape.[71]

In its attempt to corral children into its fold, the industry has also targeted the youth market directly. Examples of this strategy abound. At the NRA's 1996 annual meeting, then-President Marion Hammer introduced her 10-year old grandson, stating, "I know that when the NRA reaches out and takes the hand of a child, we are touching America's future."[72] Ms. Hammond then outlined the NRA's agenda to "invest" in America's youth in an "old-fashioned wrestling match for the hearts and minds of our children."[73]

Since then the NRA has dedicated $100 million towards this "investment," and has used a variety of strategies in this orchestrated attempt to reach out to America's youth. For example, it has employed popular idols, like Tom Selleck and former Seattle Seahawks wide receiver and Congressman Steve Largent, in advertisements. In a full-page ad appearing in the March 8, 1999 cover of *Time Magazine*, Tom Selleck advises "Shooting teaches young people good things. . . So whether it's an afternoon throwing clay birds or getting up at dawn in turkey season or just cleaning grandpa's side-by-side, you can't lose." At the bottom of the page, a young boy is pictured holding a shooting clay next to his father, who is holding a shotgun, with the question, "Did You Know . . . The NRA's youth hunting, safety and training programs reach more than a million young people each year."[74]

The May, 1997 issue of the NRA's *American Guardian* magazine touts a similar alliance between gun manufacturer Browning and rock singer Ted Nugent. Browning's president explained, "We hope our affiliation with Ted will be a catalyst for our promotion of the hunting and shooting lifestyle to a younger audience. . . " The NRA youth magazine *InSights* routinely carries ads for firearms, including the Harrington & Richardson 929 Sidekick revolver and the Savage Arms "Predator" combination rifle/shotgun.[75]

☛ *"I know that when the NRA reaches out and takes the hand of a child, we are touching America's future."*

---

[71]  The effectiveness of this strategy is born out in advertisements aimed at industry members of products designed to appeal to women, which, rather than focusing on women's safety, boast instead of the prospect that the products will "doubl[e] our business." *Id.* at 185. A recent study by the Violence Policy Center underscores, however, that this effort to induce women to buy guns by playing upon their fear of stranger assault is dangerously misguided. Contrary to this myth, most fatal assaults by men against women are the result of domestic violence, and most involve a handgun. More than 12 times as many women were murdered by a man they knew than were killed by male strangers. VIOLENCE POLICY CENTER, *When Men Murder Women: An Analysis of 1996 Homicide Data* (September 1998).

[72]  VIOLENCE POLICY CENTER, *Start 'Em Young: Recruitment of Kids to the Gun Culture. Section One: 'An Old Fashion Wrestling Match for the Hearts and Minds of Our Children,'* at 1 (1999).

[73]  *Id.*

[74]  *Id.* at 2.

[75]  *Id.* at 2.

25

HQL_0000635

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022      Pg: 351 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 26 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 26 of 63

The NRA has also used a cartoon character, Eddie Eagle, to put a friendly face on guns for kids in the name of "gun safety." Rather than discouraging guns in the home or focusing on the inherent danger of firearms, especially when adults store them unlocked, this program places the onus of gun ownership safety and responsibility directly on children. An entire product line, from bibs to backpacks and plush toys, features the Eddie Eagle mascot. Firearms manufacturers contribute thousands of dollars to fund the Eddie Eagle program through the NRA Foundation, for as one NRA Foundation official explained, "The industry is an indirect beneficiary of this program."[76]

The industry has developed smaller firearms designed specifically for children, and it has expressly marketed the aesthetics of guns to appeal to teenagers. For example, in describing a particularly menacing-looking assault weapon, the AP9, a *Guns & Ammo* review raved, " . . . it is one mean-looking dude, considered cool and Ramboish by the teenage crowd; to a man, they love the AP9 at first sight. Stuffed to the brim with Nyclad hollow points, the pistol is about as wicked a piece as you can keep by your pillow, . . . Take a look at one. And let your teen-age son tag along. Ask him what *he* thinks." (Emphasis in original).[77] The industry has also purchased inserts in scouting magazines to reach five to eight million young people as "potential customers;" it has urged shooting ranges to develop "education and training" programs for children and to offer discounts to adults who bring children in; and it has developed CD-ROM hunting and other gun-oriented games.[78]

Finally, the industry has used both elementary and middle schools to introduce children to firearms through NSSF educational materials focusing on hunting and "wildlife management." Outlining this last strategy in the 1993 issue of the NSSF's publication *SHOT Business*, an industry columnist urged,

> "Use the schools . . . they can be a huge asset. Schools collect . . . a large number of minds and bodies that are important to your future well-being. How else would you get these potential customers and future leaders together, to receive your message about guns and hunting, without the help of the schools . . . Schools are an opportunity. Grasp it."[79]

☞ *The industry has developed smaller firearms designed specifically for children, and it has expressly marketed the aesthetics of guns to appeal to teenagers.*

---

[76]   VIOLENCE POLICY CENTER, *Joe Camel With Feathers: How the NRA with Gun and Tobacco Industry Dollars Uses it Eddie Eagle Program to Market Guns to Kids*, at 1-2 (1999).
[77]   DIAZ, *supra*, note 2 at 129 (citations omitted).
         *Youngsters*, NSSF REPORTS (January/February 1992).
[78]   *Id.* at 186-189.
[79]   *Id.* at 188, *citing*, GRITS GRESHAM, *Community Relations: The Schoolchildren of Today Are the Leaders of Tomorrow*," *SHOT BUSINESS* at 9 (September/October 1993).

26

HQL_0000636

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 352 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 27 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 27 of 63

## D. The Industry Shirks Responsibility

The gun industry has responded to its shrinking market base by using innovation to increase lethality, by aggressively marketing that increased lethality, and by reaching out to women and children as potential expanded markets.  Yet even as it expends resources to create the markets for increasing numbers of increasingly lethal firearms, it denies any responsibility for the havoc in our streets, and it refuses to take any steps which might begin to stem the flow of blood.

One journalist, who traced the path of a gun used in a murder, concluded that a "none-of-my-business attitude permeates the firearms distribution chain from production to final sale, allowing gun makers and gun marketers to promote the killing power of their weapons while disavowing any responsibility for their use in crime."[80]  A prominent industry executive corroborated this finding when he was asked about the industry's responsibility for gun violence and he responded simply "It's not my fault.  It really isn't."[81]

One dodge the industry executives employ is to claim that the market is demanding the increasingly lethal firearms they produce.  Yet the industry's own exhortations about the need for innovation to increase demand belie this excuse.  Others attempt to claim that only a few irresponsible companies are creating the problem.  Yet the presence of old-line company handguns among the top ten crime guns belies these evasions of responsibility.

Other common dodges are to fall back on the Second Amendment or to blame the victims.  As the chief executive of Ruger explained, "People do their own thing. . . in this country, you have the constitutional right to make a gun and to buy a gun . . . that's not debatable."[82]  In responding to inquiries about unintentional child shootings, the chief executive of Smith & Wesson responded, "The problem is not the guns . . . These people that they call children, in my mind, are little criminals and ought to be held accountable."[83]

In short, the industry fails to acknowledge even a shared responsibility for the high cost of gun violence in America, and it refuses to give any ground in efforts to curb the violence.  It stands firm against the very efforts it claims are the only ones that work, *i.e.,* "keeping the guns out of the wrong hands."  If the industry were

☞ *If the gun industry were willing to help keep guns out of the wrong hands, why does it oppose background checks at gun shows?*

☞ *The gun industry refuses to acknowledge even the smallest bit of responsibility for the carnage its products wreak.  It refuses to acquiesce to the smallest steps to begin to curb the violence.*

---

[80]    *Id.* at 194, *citing* ERIK LARSON, *The Story of a Gun; Cobray M-11/9,* 271 THE ATLANTIC 1, 48 (January, 1993).
[81]    *Id., citing,* William Ruger, Sr.
[82]    *Id.* at 196.
[83]    *Id.* at 197 (citations omitted).

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 353 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 28 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 28 of 63

willing to help with even this one aspect of gun tragedy, why would it oppose background checks at gun shows?  While insisting that our daily tragedies would disappear if we would simply keep guns out of the hands of criminals, the industry sits on its own hands, making no effort to limit the distribution of its products to those very criminals.

## II. Costs Of The Carnage

☞ *There is a disconnect between actual gun ownership in America and our tolerance of gun ownership.*

Notwithstanding the fact that the industry has had to work hard to nurture our gun culture, to maintain viable levels of interest in personal gun ownership, and to increase its market base, many people do believe vehemently that we have a right to own guns.  Only 25% of us actually do own guns, with only 16% owning handguns, and the vast majority of Americans believe there should be stricter gun control laws. For example, 85% of Americans endorse the mandatory registration of handguns and five-day waiting periods before purchase.  Almost 80% favor requiring background checks in private sales, and 75% agree that government should do everything possible to keep guns from criminals, even if such measures make it harder for law-abiding citizens to obtain guns.  70% believe that all handgun owners should be licensed and trained in the use of their weapons.[84]

Yet the fact remains that while we want these and other stronger restrictions on gun ownership, most of us stop short of acknowledging that we would prefer a blanket prohibition on personal gun ownership.  Only 39% would support restricting the possession of handguns to "the police and other authorized persons," and only 16% want a "total ban on handguns."[85]

Thus, there is a disconnect between *actual* gun ownership in America and our *tolerance* of gun ownership.  Although a far greater percentage of us own guns than do the citizens of any other developed country, gun owners are still a minority in the United States. Yet most of us, despite choosing not to own a gun ourselves, are willing to tolerate gun ownership by others.  We acquiesce to the minority's insistence that our Constitution creates an inalienable right to own guns and that preserving that inalienable right is important to our culture and way of life.

This indulgence of the minority leads inexorably to the first critical question: what does it cost us?  What do we pay for continuing to tolerate personal gun ownership?  In what ways do we all suffer from its impact on our culture and way of life?

---

[84]    Tom Smith, *supra*, note 3 at 2-4.
[85]    *Id.* at 4.

HQL_0000638

## A.  Human Costs - Who Dies and How Do they Die?

An analysis of who dies and how they die from gun violence makes clear the nature of the problem.  The epidemic of gun violence in this country is not just a law enforcement issue.  It is also about public health and consumer product safety.  As long as we continue to view the challenge of gun violence through a single lense, real solutions will elude us.  Until we recognize all three aspects of how guns injure and destroy, they will continue tearing mercilessly at the fabric of American life.

### 1. Numbers of Deaths

Between 35,000 and 40,000 people have died from gun injury every year in America over the past decade.  More than 30,000 have died each year since 1972, and over one million total have died since 1965.[86]  More than 100 die every day, making firearms the 8th leading cause of death in the United States.[87]  It is the 2nd leading cause of injury death, surpassed only by motor vehicle fatalities.  In 1996, firearm deaths actually exceeded those from motor vehicles in six states, including Maryland, and the Centers for Disease Control and Prevention estimates that by the year 2001, firearms will surpass motor vehicles as the leading cause of product-related death nationwide.[88]

In Maryland, firearm death has surpassed motor vehicle accident death since 1991.  In 1996, firearm deaths numbered over 16 per 100,000 people, for a total of 764, giving Maryland the 14th highest rate in the country.[89]  Since 1987, the handgun death rate has risen 73%.[90]

### 2.  Demographics of Gun Fatalities

#### a. National Statistics

Males are more than six times more likely to die from firearms than females in all age groups, but male teens and young adults suffer most disproportionately.  The 1996 firearms death rate among male teens ages 15-19 was 36.3 per 100,000, nearly three times higher than the overall firearms death rate of 12.9 per 100,000.  This group constitutes 3.4% of the population and yet accounted for almost 13% of

☛ *Gun violence in America is not just about crime; it is a multi-faceted crisis of law enforcement, public health, and consumer product safety.*

☛ Over 35,000 people die each year from firearm injury, or more than 100 every day.

☛ In recent years in Maryland, more people have died from guns than from motor vehicle accidents.

---

[86]   VIOLENCE POLICY CENTER, *Who Dies?  A Look At Firearms Death and Injury in America, Appendix One: Number and Rates of Firearm Mortality-United States,1965-1996* (1999) (citations omitted).

[87]   OJJDP, PROMISING STRATEGIES TO REDUCE GUN VIOLENCE, *supra*, note 6 at 3.

[88]   CENTERS FOR DISEASE CONTROL/NATIONAL CENTER FOR HEALTH STATISTICS, *Fatal Firearm Injuries in the United States 1962-1994* (1997).

[89]   VIOLENCE POLICY CENTER, *Who Dies?, supra*, note 86 at *Firearm Deaths by State, 1996*.

[90]   Maryland Department of Health & Mental Hygiene, *Firearm-Related Mortality in Maryland, 1976-1996, Report of the Maryland Firearm-Related Injury Surveillance System* at 2, Table 11 (June 1997).

29

HQL_0000639

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 355 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 30 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 30 of 63

firearms deaths.[91]  This disproportionate impact is even greater for African-American males.  Firearm death is *the* leading cause of death among African-American males ages 15-24, and the second leading cause of death in the 5-14 age group.[92]

These alarming rates correspond to surveys regarding male teen access and use of firearms.  In 1997, nearly one in 10 male high school students reported carrying a gun in the previous 30 days.[93]  In the same year, 18, 19, and 20 year-olds ranked first, second, and third in the number of gun homicides committed.  Of all gun homicides where the offender was identified, 24% were committed by 18-20 year-olds.[94]

Children are also disproportionately victimized by gun violence.  In 1996, 4,643 children and teenagers were killed by firearms in the United States, or an average of 12 every day.  Between 1993 and 1995, firearm injury was the 2nd leading cause of death for children aged 10-14, and the risk of dying from gun injury for teens aged 15-19 more than doubled between 1985 and 1994.[95]  The firearm homicide rate for the 15-24 year-old age group increased 158% during roughly the same decade.  In sum, a teenager today is more likely to die of a gunshot wound than from all "natural" causes of death combined.[96]

### b. Maryland Deaths

Maryland gun deaths rose to a peak of 797 in 1993, and have declined since then, to a total of 764 in 1996, the latest available figures.  Of the 714 deaths representing homicides and suicides in 1996, the vast majority of victims, or 87%, were male.  Of these, 53% were African-American males.[97]

The age group hardest hit by homicide or suicide gun death in Maryland is 15 to 24 years old; 224 young people died in 1996.  In the same year, 104 children under age 19 died from homicide or suicide gun injury, or 15% of all firearm-related deaths.[98]  Between 1992 and 1997, 3,641 Marylanders died of gunshot wounds.[99]

☛ *An American teenager today is more likely to die of a gunshot wound than from all "natural" causes of death combined.*

☛ *Gun injury is the leading cause of death among African-American males ages 15-24.*

☛ *Every day in America, an average of 12 children die from guns.*

☛ *In 1996, 53% of all homicide and suicide gun deaths in Maryland were African-American males.*

---

[91]  VIOLENCE POLICY CENTER, *Who Dies?, supra,* note 86 at *Males and Firearms Violence* at 1.
[92]  *Id.*
[93]  *Id. See also,* CENTERS FOR DISEASE CONTROL, *Youth Risk Behavior Surveillance - United Sates, 1997,* 47 MORBIDITY AND MORTALITY WEEKLY REPORT SS-3 (August 14, 1998).
[94]  DEPARTMENT OF THE TREASURY AND DEPARTMENT OF JUSTICE, *Gun Crime in the Age Group 18-20* at 2 (June 1999).
[95]  THE HELP NETWORK, *Firearm Injury and Fatality Among Children and Adolescents* at 1 (January 1999) (citations omitted).
[96]  OJJDP, *Promising Strategies to Reduce Gun Violence, supra,* note 6 at 3.
[97]  JOHNS HOPKINS GUN POLICY CENTER, *Firearm Deaths in Maryland, Summary Tables* (July 13, 1999).
[98]  *Id.*
[99]  MARYLAND OFFICE OF THE CHIEF MEDICAL EXAMINER, *Annual Report* at 15 (1997).

30

### 3. Epidemic of Gun Violence

Thus, we find ourselves in the midst of an epidemic. Compare the polio epidemic in the 1950's. In 1952, 3,145 people of all ages died from polio. In 1993, 39,595 people died from gun violence, of which 5,751 were children.[100] Between 1988 and 1991, the 144,237 people who died from firearm injury exceeded the number of men who died in battle during the entirety of the Vietnam War.

Moreover, we are first among industrialized nations in the severity of this epidemic. The rate of death from firearms in the United States is eight times higher than in its economic counterparts around the world.[101] In 1996, handguns were used to murder 30 people in Great Britain, 106 in Canada, and 15 in Japan. By contrast, a mind-boggling 9,390 were used in the homicide deaths of Americans.[102]

These huge gaps yawn even wider when comparing firearm deaths in children. The firearm homicide rate for children age 15 and under is 16 times higher in America than in 25 other industrialized countries *combined.* In the 15-24 year-old age group, the U.S. firearm homicide rate is 5 times higher than in Canada and 30 times higher than in Japan.[103] A stunning 9 out of 10 murders of children worldwide occur in the United States.[104]

### 4. How Firearm Deaths Occur

#### a. National Experience

The way in which the 34,000 plus Americans die each year from firearm injury underscores the multi-faceted nature of the problem. Contrary to popular perception, most gun death in this country is not crime-related. Firearm homicides certainly constitute a sizable percentage of the deaths, but they are outnumbered by suicides, and a substantial percentage result from unintentional injury. Even among firearm homicide victims, most die not at the hands of unknown criminals, but rather from someone they know.[105]

The law enforcement model for examining gun violence addresses homicide. Yet only by treating gun violence also as a public health issue can we address the

☞ *More children died of firearm injury in 1996 than died in the entire polio epidemic of the 1950's.*

☞ *9 out of 10 murders of children worldwide occur in the United States.*

☞ *15% of all homicide and suicide gun deaths in 1996 were children under age 19.*

☞ *Most gun deaths are not crime-related; the majority of firearm deaths are suicides.*

---

[100]    GEORGES C. BENJAMIN, M.D., SECRETARY, MARYLAND DEPARTMENT OF HEALTH & MENTAL HYGIENE, *Violence as a Public Health Issue,* presented June 10, 1999, *citing,* MMWR, Vol 46, No. RR-14.

[101]    THE HELP NETWORK, *U.S. Firearm Homicide and Suicide Facts* (1999), *citing* KELLERMAN AND WAECKERLE, *Preventing Firearm Injuries,* 32 ANNUAL EMERGENCY MEDICINE 77, 79 (July 1998).

[102]    JOIN TOGETHER ONLINE, *How Communities Can Take Action to Prevent Gun Violence* at 1 (Summer 1999) (citations omitted).

[103]    OJJDP, *Promising Strategies to Reduce Gun Violence, supra,* note 6 at 3.

[104]    GEORGES C. BENJAMIN, *supra,* note 100, *citing* UNICEF data reported in the *Chicago Tribune,* 9/23/93.

[105]    VIOLENCE POLICY CENTER, *Who Dies?, supra,* note 86, at *Introduction* at 1, *citing* Federal Bureau of Investigation *Uniform Crime Reports.*

31

suicide component of gun death, and only by treating guns as consumer products which must be regulated like all others can we reduce unintentional firearm injury.

### i. Suicides

First, of the 34,040 firearm deaths in 1996, the majority, or 54%, were suicides.[106] Firearms are used in the majority of all suicides, and the alarming increase in suicides in recent years is attributed to increased access to firearms.[107] For example, between 1952 and 1992, the incidence of suicide among adolescents and young adults nearly tripled, and the rate more than doubled in the 10-14 age group between 1980 and 1995.[108] In 1996, there were 1,308 gun suicides among young people 10-19 years old, or more than 3 every day.[109]

☞ *More than three American children and teens commit suicide every day.*

The rate of suicide by firearm among the elderly is also rising, with 103,503 Americans over age 65 taking their own life between 1979 and 1996. In 1996, almost 4,000 suicides occurred among men over 65. This represented 21% of all suicides, while that age group represents only 5% of the total population.

### ii. Homicides

Second, firearm death from homicide exacts the terrible toll that is so familiar from the nightly news and daily headlines. Roughly 41% of all firearm deaths are from homicide, and nearly 70% of homicides are committed with a firearm. Of these firearm homicides, the vast majority are committed with a handgun. In 1997, for example, 86% of all firearms homicides in which the type of gun was known were committed with handguns.[110]

☞ *Nearly 70% of all homicides are committed with a gun, and the vast majority of all firearm homicides are committed with a handgun.*

One disturbing trend is the increasing number of homicides committed by juveniles, and the increasing number of juvenile homicides committed with a firearm. Rates of adolescent arrest for murder by firearm increased 79% through

---

[106]    Of the remainder, 41% were homicides, 3% were unintentional, and 2% were undetermined deaths. OJJDP, *Promising Strategies to Reduce Gun Violence, supra*, note 6 at 3. This breakdown differs somewhat among children and teenagers, with 61% homicides, 28% suicides, and 8% unintentional shootings. THE HELP NETWORK, *Firearm Injury and Fatality Among Children and Adolescents, supra*, note 95, at 1.

[107]    JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Fact Sheet on Gun Injury and Policy* at 1 (November 1998).

[108]    THE HELP NETWORK, *U.S. Firearm Homicide and Suicide Facts, supra*, note 101 at 1 (citations omitted); VIOLENCE POLICY CENTER, *Who Dies?, supra*, note 86, at *Males and Firearms Violence* at 1.

[109]    JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Fact Sheet on Gun Injury and Policy, supra*, note 107 at 2.

[110]    *Id.* at 1.

[111]    DIXON, *supra*, note 9 at 990.

32

the 1980's.[111]  Between 1988 and 1993, the juvenile homicide arrest rate more than doubled.[112]  The homicide arrest rate has dropped since then, but the juvenile violent crime arrest rate is still nearly 50% higher today than ten years ago.  Most significantly, nearly all the growth in the juvenile violent crime rate has been hand-gun-related.[113]

### iii.  Unintentional Shooting Deaths

Finally, unintentional gunshot deaths account for about 3% of overall fatalities, and 8% of child firearm death.  From 1987 to 1996, nearly 2,200 American children under age 14 died from unintentional shootings, with 138 dying in 1996 alone.  The rate of unintentional firearms death is highest among males age 15-19.  For all children under 15, the death rate is nine times higher than in 15 other industrialized countries combined.[114]

### b. Maryland Experience

Because of the high homicide rate in Maryland, the ratio of homicides to suicides differs from national figures.  Of the 764 firearm deaths in 1996, homicides accounted for 58% and suicides accounted for 35%, with about 2% unintentional and 5% undetermined.[115]

Of the homicides, 76% were African-American males, 11% were white males, and 13% were female.  The highest rates of homicide gun death were in the 20-24 year-old age group, followed by age 15-19.  Ninety-one children under age 19 were murdered by firearm.  Of all the homicides in which the type of gun was known, a telling 91% were handguns.

Of the suicides, 72% were white males, 15% were African-American males, and 12% were female.  The highest rates of suicide gun death were among senior citizens, with the 75 to 84 age group leading, followed by 65-74.  Twelve teens killed themselves by firearm.[116]

Thus, firearms violence is not simply an issue of crime.  Crime-related firearm injury is the most highly visible and notorious aspect of gun violence, but it is only one piece of the tragedy.

☛ *The rate at which American children die from unintentional shootings is nine times higher than in other industrialized countries.*

☛ *91 Maryland children were murdered by firearm in 1996.*

☛ *62 Maryland senior citizens took their own lives by firearm in the same year.*

---

[112]  OJJDP, OJJDP Research: Making a Difference for Juveniles, *supra*, note 10 at 14.

[113]  *Id.* at 14-15.

[114]  Johns Hopkins Center for Gun Policy and Research, *Fact Sheet on Gun Injury and Policy, supra*, note 107 at *Unintentional Firearm Deaths* at 1.

[115]  Johns Hopkins Center for Gun Policy and Research, *Firearm Deaths in Maryland, Summary Tables, supra*, note 97.

[116]  *Id.*

33

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022      Pg: 359 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 34 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 34 of 63

### 5. Nonfatal Firearm Injury

In addition to the epidemic of firearm death, nearly three times as many Americans suffer nonfatal firearm injuries every year.  In 1995, 35,957 people died from gunshot wounds, while an additional 41,362 were hospitalized with firearm injuries and another 42,656 were treated in hospital emergency rooms.[117]  For every unintentional shooting death, more than 16 people suffer nonfatal unintentional shooting injuries, and for every gun homicide, four people survive a firearm assault.  By contrast, about 85% of firearm suicide attempts result in death.[118]

With estimates of nonfatal gun injury at about three times the number of gun deaths, the 764 Maryland gun deaths in 1996 indicate that over 2,000 Marylanders suffer nonfatal firearms injuries each year.

## B.  Economic Costs - Who Pays For What?

The emotional and psychological toll on all those who suffer injury themselves or must endure the injury or death of a loved one from firearms is incalculable.  These human costs alone give rise to the question of how much more suffering we will tolerate to protect the "right" to own guns.  Yet these intangible costs are only the beginning.  The economic costs, which touch virtually all of us, have become astronomical.

### 1. National Estimates

Estimates as to exactly how large an economic burden flows from firearm injury vary, but even those in the conservative range are startling.  The estimated average cost of medical care for a fatal gunshot wound is about $14,000.[119]  The average estimated total cost, including medical care, police services and lost productivity, is $938,500.[120]

Nonfatal firearm injuries are far more costly in medical terms than gunshot fatalities.  The most severe nonfatal injuries, such as traumatic brain or spinal cord injury, can require lifetime care and rehabilitative services totaling more than $1 million per survivor.  Putting the most severe injuries aside, the estimated average cost per firearm injury survivor is between $36,000 and $38,000.[121]

☛ An estimated 100,000 people are treated for nonfatal gunshot wounds every year.

☛ The average total lifetime cost of medical care for a fatal gunshot injury is $14,000; the average estimated total cost, including police and emergency services and lost productivity, is $938,500.

---

[117]    THE HELP NETWORK, *Costs of Firearm Injuries* at 1 (February 1999).

[118]    THE HELP NETWORK, *U.S. Firearm Homicide and Suicide Facts* at 1 (February 1999).

[119]    The most recent study of the medical costs of gunshot injury estimates that the total cost of a fatal gunshot wound in Maryland is $13,191 in 1994 dollars.  *See*, PHILIP J. COOK, ET AL., *The Medical Costs of Gunshot Injuries in the United States*, JAMA Vol. 282, No. 5 at 447 (August 4, 1999).  Other studies estimate the cost to be $14,000 nationwide.  *See, e.g.*, THE HELP NETWORK, *Cost of Firearm Injuries* at 1 (February 1999) (citations omitted).

[120]    THE HELP NETWORK, *Cost of Firearm Injuries, supra*, note 119.

[121]    *Id.  See also*, COOK ET AL., *supra*, note 119.

34

HQL_0000644

The estimated annual cost of total health care expenditures ranges from $2.3 to $4 billion.[122]  Estimates of annual overall costs, which include loss of productivity and quality of life, range from $20 billion to $126 billion.[123]  Whatever the actual figure, most of these costs are passed on to private insurers and taxpayers.  The most recent study estimates that taxpayer-funded government programs pay 49% of the total medical costs for gunshot injuries, and private insurance pays 18%.  In addition, while victims pay 19%, many are unable actually to make payment, and these costs then pass through to other health care consumers.[124]  Thus, while far too many of us are affected directly by the intangible costs of firearm injury, either as a victim, relative, friend or employer of a victim, nearly all of us shoulder the burden of these huge economic costs in the form of higher insurance premiums and higher taxes.

## 2. Costs to Marylanders

The best estimates for the total medical costs of gunshot injury in Maryland come from the recent study published in the *Journal of the American Medical Association* which analyzed Maryland and two other states as the basis for its conclusions.  The Maryland data from this study, however, covers only firearm injuries in which the victims were hospitalized.  Thus, these estimates do not include injuries in which the victim was treated in the emergency room only or did not seek medical treatment.  The data also excludes the cost of the emergency transport and medical examiner's services incurred when gunshot victims died at the scene of the incident.

The medical costs alone of 1994 Maryland gun fatalities in which the victim was hospitalized totaled over $2.6 million.  200 hospitalized victims died of gunshot wounds, at an average cost per death of $13, 191.[125]  Applying a separate study's $938,500 estimate of the total direct cost of every firearm fatality, which factors in police and emergency services and lost productivity, the total cost of Maryland hospitalized gun fatalities in 1994 was almost $200 million.[126]

☛ *The estimated annual cost of all gun-related health care is between $2.3 and $4 billion, the majority of which we all finance in the form of higher insurance premiums and higher taxes.*

☛ *The total cost of Maryland hospitalized gun fatalities in 1994 was almost $200 million.*

---

[122]     *Id.  See also,* JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Fact Sheet on Gun Injury and Policy, supra,* note 107, *citing* WENDY MAX AND DOROTHY P. RICE, *Shooting in the Dark: Estimating the Cost of Firearm Injuries,* 12 HEALTH AFFAIRS 171 (1993).

[123]     For the lower estimate, *see* note 122, *supra.*  The higher figure comes from a 1997 study estimating that each firearm fatality costs $2.8 million, including both direct costs, *e.g.,* medical care, mental health care, emergency transport, police services, and insurance administration costs, as well as indirect costs, *e.g.,* lost productivity, pain and suffering, and diminished quality of life.  The study also estimated nonfatal injuries at $249,000 for every hospitalized victim, and $73,000 for every victim treated in an emergency room and released.  All annual costs totaled $126 billion.  TED R. MILLER AND MARK A. COHEN, *Costs of Gunshot and Cut/Stab Wounds in the United States, With Some Canadian Comparisons,* 29 Accid. Anal. & Prev. 329 (1997).

[124]     COOK, ET AL., *supra,* note 119 at 451-453; *see also* MARY J. VASSER, *ET AL., Hospitalizations for Firearm-Related Injuries,* 275 JAMA 1734 (1996).

[125]     COOK, ET AL., *supra,* note 119 at 450.

[126]     THE HELP NETWORK, *Cost of Firearm Injuries, supra,* note 119 at 1.

35

HQL_0000645

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022        Pg: 361 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 36 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 36 of 63

☛ *Why is no cost-benefit analysis conducted when gun industry executives decide a new firearm should have twice the magazine capacity?*

Nonfatal, hospitalized gun injuries imposed even greater direct medical costs. In 1994, 2,394 people were hospitalized and survived firearm injury, with an average lifetime medical cost per injury of $36,685. The total lifetime medical cost of all 1994 nonfatal hospitalized gun injuries was $87.5 million. This figure does not include police and emergency services, or lost productivity. Marylanders underwrote at least 67% of these dollars through higher insurance premiums and higher taxes.[127]

In sum, analysis of the costs of gun violence in this country reveals two important truths. First, both the economic costs associated with medical and emergency services, loss of productivity and quality of life, and the intangible costs of death and maiming injury are enormous. We pay dearly for our "right to bear arms." Second, the nature of firearms injury and death make clear that we have on our hands a crisis of three dimensions - law enforcement, public health, and consumer product safety. Only in recognizing this will we succeed in fashioning real and lasting solutions.

## III.  Cost/Benefit Analysis:  Debunking Gun Industry Myths

☛ *With suicide rates among our youth doubling and tripling because of increased access to firearms, why does the "right" to have a gun in a home where a depressed teenager can take his own life on a whim go unchallenged?*

In the face of such costs, we must ask a second critical question:  "Is it worth it?" Amid the clamor about the Second Amendment, our hunting and shooting heritage, and the need for self-defense, the fundamental question of whether the benefits of personal gun ownership are worth the carnage in our homes, schools and streets is lost.

Yet this question must be answered . We demand that it be answered with every other consumer product in the American marketplace. The Consumer Product Safety Commission, the Food and Drug Administration and other federal regulatory agencies make judgments about whether the risks of a particular product, or a new feature on a particular product, are worth the projected benefits. Why is no cost-benefit analysis conducted when gun industry executives decide a new firearm should have twice the magazine capacity? With 86% of all firearm homicides committed with a handgun, why do we not stack up the benefits of handgun ownership against this sobering reality? With suicide rates among our youth doubling and tripling because of increased access to firearms, why does the right to have a gun in a home where a depressed teenager can take his own life on a whim continue to go unchallenged?

So let us do that analysis. Let us look at the "right" to own handguns and the purported benefits of personal gun ownership so that we may begin to make rational judgments about what we should continue to tolerate. With the terrible risks and costs of handgun violence borne by all Americans, we must look at the real

---

[127]        Cook, et al., *supra,* note 119 at 452.

36

Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 37 of 63

benefits which flow from the "right" to own guns and determine whether any circumstances still exist in which the benefits outweigh the costs.

Gun proponents advance two arguments as to why this cost-benefit analysis is either futile or unnecessary. First, the argument goes, it matters not whether the benefits of personal gun ownership outweigh the costs because the Constitution has recognized an inalienable, individual right to such ownership. Second, we need not figure out how valuable the "benefits" of gun ownership are because the costs would be eliminated if we could just keep guns out of the hands of criminals. Both arguments are spurious.

## A. The Myth of the Second Amendment

First, no rational discussion about how we might limit personal gun ownership is possible as long as the Second Amendment continues to be used as a weapon in a battle for which it was never designed. A notion has evolved over the years, in conjunction with the growth of our "gun culture," that the Constitution confers on all Americans the inalienable, individual "right" to own guns. The NRA has even tried to assert that this right extends to the personal ownership of machine guns and military-style assault weapons. If this were true, then a cost-benefit analysis of personal gun ownership would be academic; no matter how high the costs or how many people were dying in the streets, we would have no recourse short of amending the Constitution.

This notion of an individual constitutional right to own firearms is a myth. The Supreme Court and all lower federal courts have *unanimously* held, since the first decision in 1886, that the Second Amendment is about the *states'* right to maintain a militia, and has nothing whatever to do with an individual's right to bear arms outside the context of a state militia.

The profound and widespread misunderstanding of this so-called "constitutional right" must be dispelled so that rational discourse can take its place. For years, the NRA has loudly and consistently distorted public understanding of the Second Amendment, with so much success that most Americans believe erroneously that it does indeed confer on individuals the right to own a gun.[128] Far fewer of us, however, believe that the Constitution *should* confer such a right or that any such right stands in the way of gun control laws, and it is important to the national debate that we dispel the myth that it does.[129] In the words of former U.S. Supreme Court Chief Justice Warren Burger, the NRA has perpetrated a "fraud on the American public."[130]

> ☛ *In distorting the meaning of the Second Amendment to argue that it confers on individuals the right to own guns, the NRA has, in the words of former Chief Justice Warren Burger, perpetrated a "fraud on the American public."*

---

[128]    CENTER TO PREVENT HANDGUN VIOLENCE LEGAL ACTION PROJECT, *The Second Amendment: Myth and Meaning; see also,* TOM W. SMITH, *supra,* note 3 at 8.

[129]    TOM W. SMITH, *supra,* note 3 at 8.

[130]    CENTER TO PREVENT HANDGUN VIOLENCE LEGAL ACTION PROJECT, *supra,* note 128, *citing Interview with Chief Justice Warren Burger,* MACNEIL/LEHRER NEWSHOUR, WNET, New York, New York (December 16, 1991).

First, gun control opponents would have us believe that the Second Amendment states simply that the "right of the people to keep and bear Arms shall not be infringed." This language is repeated over and over, and indeed graces the national headquarters of the NRA.

The full text of the Second Amendment, however, reads as follows: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Both Supreme Court interpretation and historical records of the constitutional ratification debates make clear that this amendment was added only to ensure that the federal government could not pass laws restricting the right of the states to maintain a militia. State militias in those days were military forces comprised of ordinary citizens serving as part-time soldiers with their own private arms. The "Anti-Federalists" among the Constitutional framers feared the federal standing army, believed the state militias would serve as an important counterpoint to that army, and thus wanted to ensure the federal government could never require the states to disarm their militias.[131]

☞ *"It is appalling how distorted . . . and unknown to the public is the judicial consensus on the Second Amendment."*

No federal court has *ever* held that the Second Amendment is anything but a guarantee *to the states* that they are free to maintain a militia and to allow their citizens to be armed in connection with the maintenance of that militia. No court has ever held that it confers on the individual *anything*, let alone a right to own guns, except in connection with participation in a state militia. Indeed, courts have dismissed outright cases brought by individuals under the Second Amendment, holding that only the states have standing to sue because only the states have any rights to assert under the Amendment.[132] The Second Amendment also does not apply to state laws.[133]

As one scholar has put it, "It is appalling how distorted . . . and unknown to the public is the judicial consensus on the Second Amendment."[134] Examples of this judicial consensus and clarity on the Second Amendment's meaning abound. In 1939, for example, the Supreme Court upheld a law prohibiting the shipment of

---

[131]    *See, generally,* CENTER TO PREVENT HANDGUN VIOLENCE LEGAL ACTION PROJECT, *supra,* note 128; VIOLENCE POLICY CENTER, *The Second Amendment: No Right to Keep and Bear Arms* (1998).

[132]    *See, e.g.,* Hickman v. Block, 81 F.3rd 98 (9th Cir.), ("Because the Second Amendment guarantees the right of the states to maintain armed militia, the states alone stand in the position to show legal injury when this right is infringed.") *cert. denied,* 519 U.S. 912 (1996).

[133]    79 Opinions of the Attorney General ___ (1994) [Opinion No. 94-012 (February 25, 1994)].

[134]    *Guns and the Judiciary: Interview with Dennis Henigan,* www.handguncontrol. org/legalaction/ C2/c2henigan.htm.

38

USCA4 Appeal: 21-2017     Doc: 25-2          Filed: 08/03/2022        Pg: 364 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 39 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 39 of 63

sawed-off shotguns in interstate commerce because the law had no "reasonable relationship to the preservation or efficiency of a well-regulated militia." It held that the Second Amendment "must be interpreted and applied" only in the context of safeguarding the states' rights with respect to their militias.[135]  More recently, in upholding a restriction in the Gun Control Act of 1968 prohibiting felons from owning firearms, the Supreme Court applied only a rational basis instead of a strict scrutiny standard, reasoning that the "legislative restrictions on the use of firearms do not trench upon any constitutionally protected liberties."[136]

The lower federal appellate courts have not deviated from the interpretation of the Supreme Court.  In 1976, for example, the Sixth Circuit Court of Appeals dismissed the defendant's multiple arguments that federal law prohibiting his possession of an unregistered machine gun violated his Second Amendment rights, stating that the arguments were "based on the erroneous supposition that the Second Amendment is concerned with the rights of individuals rather than those of the states."[137]  Similarly, the Seventh Circuit upheld both a 1981 ban on the possession and sale of handguns in a suburb of Chicago because "possession of handguns by individuals is not part of the right to keep and bear arms," and an ordinance freezing the number of handguns in Chicago because the law did "not impinge upon the exercise of a fundamental personal right."[138]

In sum, since the Supreme Court's decision in *Miller,* federal appellate courts have addressed the meaning of the Second Amendment in over thirty cases, and in *every* case, they have rejected any suggestion that it guarantees an individual the right to be armed except in connection with the states' right to maintain a citizens' militia.  The courts also have never struck down any gun control law on Second Amendment grounds.

Thus, in assessing our tolerance of private gun ownership, and whether the benefits outweigh the costs, we must shed the unfounded premise that the Constitution demands it.  The Second Amendment's use as a political weapon bears no relationship to its meaning.  In a rational debate over whether we should continue to permit personal gun ownership, we must consider all purported benefits, but we cannot continue to allow gun proponents to cloak their advocacy in the Constitution.

☞ *The Second Amendment's use as a political weapon bears no relationship to its meaning.*

---

[135]     United States v. Miller, 307 U.S. 174, 178 (1939).
[136]     Lewis v. United States, 445 U.S. 55, 64, n. 8 (1980).
[137]     United States v. Warin, 530 F.2d 103, 108 (6th Cir.), *cert. denied,* 96 S.Ct. 3168 (1976).
[138]     Quilici v. Village of Morton Grove, 695 F.2d 261, 271 (7th Cir. 1982); Byrne v. City of Chicago, 727 F.2d 633, 636 (7th Cir. 1984).

HQL_0000649

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022      Pg: 365 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 40 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 40 of 63

## B. The Illusory Promise of "Keeping Guns Out of the Wrong Hands"

Even though the Second Amendment does not confer a right to individual gun ownership, gun proponents argue that we could eliminate its terrible costs if we would just enforce the laws already on the books to keep guns out of the hands of criminals.

This argument fails for two reasons. First, with over 200 million guns in circulation in a country of 270 million people, it is totally unrealistic to hope that even the most beefed-up criminal justice system could ever accomplish this task. Second, even if this illusion could ever be made a reality, it would only solve part of the problem. The suicides, unintentional shooting deaths, and homicides committed among family members in the heat of conflict would continue unabated.

### 1. Enforcement of Current Firearms Laws Will Not Keep Guns Out of the Hands of Criminals

There are roughly 20,000 federal, state, and local laws currently on the books governing firearms. Gun advocates use this figure to insist that gun violence is simply a problem of poor police work and prosecution. How many times have we heard the exhortation, "If we just enforced the laws we already have . . ."

The problem with this theory is that the vast majority of these laws have nothing to do with the sale or possession of firearms. Rather, they regulate peripheral issues like zoning laws mandating where gun stores and shooting ranges may be located, how firearms may be transported, or where they can be discharged.[139] For example, as the recent debates in Congress have demonstrated, notwithstanding the alarming access to and use of firearms by children, we do not even have consistent laws on how old one must be to use, possess, or buy a gun. Thus, our gun laws, even if vigorously enforced, are not sufficient to enable law enforcement to keep guns away from criminals.

Second, the gun industry and many gun proponents themselves thwart vigorous enforcement of the laws and regulations we do have. For example, it is illegal to sell a gun to a convicted felon. The only way to enforce this law is through background checks. Yet the gun lobby cries foul at the notion that background checks be required at gun shows, where thousands of firearms change hands every year. Similarly, the Firearm Owner's Protection Act of 1996 has erected many obstacles to the ATF's ability to enforce laws governing licensed federal firearms dealers. For example, it precludes the agency from keeping any national database on gun sales and restricts ATF inspection of dealers. In the recent Columbine tragedy, the ATF's ability to trace the guns used in the massacre depended largely upon luck and old

☞ *With over 200 million guns in circulation, not even the most beefed-up criminal justice system could ever round up all the illegal ones.*

☞ *In the recent Columbine tragedy, the ATF's ability to trace the guns used in the massacre depended largely upon luck and old fashioned police leg work, for it had no record or ability to keep a record of the sale of the guns to the teenagers.*

---

[139]    Diaz, *supra*, note 2 at 36.

USCA4 Appeal: 21-2017     Doc: 25-2        Filed: 08/03/2022      Pg: 366 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 41 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 41 of 63

fashioned police leg work, for it had no record or ability to keep a record of the sale of the guns to the teenagers.[140]  Thus, the gun lobby not only fails to cooperate in the effort to "keep guns away from criminals," but also resists efforts to make enforcement more effective.

Thus, a gun policy premised on the notion that we need only enforce the laws "already on the books" is doomed to failure.  This is not to say that we should ever relax our efforts to pursue gun-toting criminals with every tool in our arsenal.  We should also attempt, where appropriate and possible, to augment police and prosecution resources.  Yet the fact remains that our current laws are inadequate, and even the most vigorous enforcement efforts will not keep guns away from those who should not have them.

## 2. Keeping Guns Away From Criminals Would Not Solve the Problem

Finally, even if we arrested, prosecuted and incarcerated every person illegally possessing a gun beginning tomorrow, we would only solve a relatively small part of the tragedy of gun violence.  Crime is only its most visible and notorious component.  We would still suffer the senseless tragedy of children accidentally shooting themselves.  We would still shake our heads, 18,000 times a year, over the story of an unhappy teen or lonely retiree putting a gun to his head in a moment of anguish.  We would not even prevent the majority of homicides.  Most homicides are committed by family members or friends in *legal* possession of a gun who become, as we all do at one time or another, very angry.  Instead of storming out of the house, they reach for their perfectly legal gun.

Thus, we cannot escape the imperative that we examine how the benefits of gun ownership stack up against the costs by retreating either to the Second Amendment or to the untenable theory that keeping guns out of the wrong hands will do the trick.

## C.  The Benefits of Personal Gun Ownership

So what are the benefits and how do they stack up?  Aside perhaps from collecting guns as museum relics, the two justifications for gun ownership most commonly advanced are the recreational enjoyment of hunting and sport shooting and the need to defend ourselves.  While both have surface appeal, and the shooting sports justify long gun ownership, neither can stand up under analysis as a rationale for personal handgun ownership.

☞ *Even if we incarcerated every criminal with a gun tomorrow, we would have done nothing to stop the thousands of suicides, unintentional shooting deaths, and family-related homicides.*

---

[140]     DAVID B. OTTAWAY, *With Often Arcane Tools, U.S. Agency Traces Littleton Guns*, WASHINGTON POST, at A06 (April 30, 1999).

41

HQL_0000651

## 1. Our Hunting and Shooting Heritage

The gun industry's promotional materials are filled with bucolic images of fathers passing on to sons the joys of the shooting sports. In fact, the industry is working hard to regenerate interest in hunting and sport shooting. As fewer and fewer Americans live the rural life conducive to hunting, interest in the sports and long gun ownership is declining.

Yet despite declining interest, these sports are extremely important to some Americans, and there is little reason to focus on them in our efforts to find solutions to gun violence. The guns used in the shooting sports are not, for the most part, the guns causing the death and injury in our homes and communities. Long guns are the instruments of hunters and sports shooters, while the vast majority of firearm injury occurs from handguns. For example, of all the firearm homicides in 1996 in which the type of gun was known, 86% involved handguns. Thus, eliminating the shooting sports would not solve very much of our problem.

On the other hand, we are deceived if we continue to allow gun enthusiasts to use recreational shooting sports as justification for handgun ownership. They are two very separate issues which gun advocates attempt disingenuously to tie together to drum up support. There is no reason why the most dedicated, enthusiastic hunter, mindful of preserving what he perceives to be our national heritage, need ever own a handgun. Conversely, there is no reason why any restrictions on handgun ownership need ever impede the hunter's enjoyment of his sport.

☞ *Long guns are the instruments of the shooting sports, while handguns cause 86% of all firearm injury.*

## 2. The Myth of Self-Defense

Finally, gun advocates wrap their message of the glories of gun ownership in a package of fear. They prey upon people's worries about their personal safety and that of their families. They talk of the armed burglar and the rapist. Gun industry advertisements paint pictures of a family saved from the would-be murderer by the valiant father brandishing his 9 mm pistol.[141] Implicit and explicit in all of this hype is the notion that those of us with guns are safer. With a gun, we can protect ourselves against the crime and violence in our communities. Without a gun, we stand naked against the intruder and will die at his hands.

The problem is that the propaganda is false. People are persuaded to buy handguns for self-protection under false pretenses. Most people who own guns for self-protection have handguns. Yet while thousands of Americans harbor handguns in their homes believing it increases their safety, the truth is just the opposite.

---

[141]    Diaz, *supra*, note 2 at 155-60, *citing* Erik Eckholm, *The Riots Bring a Rush to Arm and New Debate*, N.Y. Times, May 17, 1992 at 18 (discussion of how industry advertisements played upon fears for personal safety after the 1992 Los Angeles riots).

[142]    Johns Hopkins Center for Gun Policy and Research, *Guns in the Home* at 1 (November 1998) (citations omitted).

42

HQL_0000652

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 368 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 43 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 43 of 63

First, guns in the home are rarely used for protection.[142] For every time a citizen used a firearm in 1996 in a justifiable homicide, 160 lives were ended through criminal homicide, suicide, or unintentional shootings.[143] The U.S. Bureau of Justice Statistics estimates that there are on average 108,000 defensive uses of guns each year, compared to about 1.3 million crimes committed with guns.[144] Another recent study concluded that a gun was used for protection in fewer than 2% of all cases of home invasion.[145]

Second, the dangers of keeping a gun in the home far outweigh its speculative benefits. The homicide of a family member is almost 3 times more likely to occur in homes with guns than in those without guns. The risk of a family member committing suicide is five times higher in homes with guns, with this risk elevated still further in homes with adolescents and young adults. A gun in the home also increases the chances that domestic violence incidents will end in death. Domestic assaults with firearms are 12 times more likely to be fatal than non-firearm-related assaults.[146] Finally, a gun in the home creates the risk of unintentional shooting that

☛ *A gun is used for protection in fewer than 2% of all cases of home invasion.*

☛ *In homes with guns, the homicide of a family member is three times more likely and a suicide five times more likely than in homes without guns.*

---

[143]   VIOLENCE POLICY CENTER, *Who Dies?, supra,* note 86 at *Introduction* at 1.

[144]   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Guns in the Home, supra,* note 142 at 1.

[145]   *See* KELLERMAN *ET AL., Weapon Involvement in Home Invasion Crimes,* 273 JAMA 1759, 1761 (1995). In one study, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,* JOURNAL OF CRIMINAL LAW AND CRIMINOLOGY, Vol. 86, No. 1, pp. 150-187 (1995), authors Gary Kleck and Marc Gertz claim that a survey of households reveals that 2.5 million Americans use a gun defensively against criminal attackers each year. Subsequent studies, however, have shown this figure to be wildly over-estimated. For example, when broken down into number of defensive gun uses in which the attackers were supposedly wounded or killed, that number was close to the total number of people killed or treated for gunshot wounds in a single year. Yet we know that most firearm death and injury each year results from suicides, criminal homicides, and unintentional shootings. The far better estimate is 108,000 defensive gun uses each year, a figure derived from the National Crime Victimization Survey conducted by the Census Bureau for the U.S. Department of Justice. In this survey, the question about defensive gun uses is limited to those actually reporting a crime victimization in which there was direct contact with the perpetrator. *See, e.g.,* DAVID HEMENWAY, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates,* THE JOURNAL OF CRIMINAL LAW AND CRIMINOLOGY, Vol. 87, No. 4, pp. 1430-1445 (1997); COOK, *ET AL., The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?,* JOURNAL OF POLICY ANALYSIS AND MANAGEMENT, Vol. 16, No. 3, 463-469 (1997).

[146]   JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Guns In The Home, supra,* note 142, *citing* KELLERMAN, *ET AL., Gun Ownership as a Risk Factor for Homicide in the Home,* NEW ENGLAND JOURNAL OF MEDICINE, 329:1084-1091 (1993) and KELLERMAN, *ET AL., Suicide in the Home in Relation to Gun Ownership,* NEW ENGLAND JOURNAL OF MEDICINE, 327:467-472 (1992). A recent study also shows that women are far more likely to be killed by a spouse or partner in the home than they are in an assault by a stranger. VIOLENCE POLICY CENTER, *When Men Kill Women: An Analysis of Homicide Data, supra,* note 71.

43

HQL_0000653

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 369 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 44 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 44 of 63

would otherwise not exist at all.[147]  Thus, the risks of having a gun in the home for protection outweigh the speculative benefits, and gun advocates' advertisements to the contrary are misleading at best.

In sum, neither preservation of shooting as recreation nor the need for self-defense can fairly be advanced as a benefit of handgun ownership to be weighed against its grim toll on American life.

## D. Precedent of Other Industrialized Nations

Lest we believe that we have no guidance in our attempt to determine whether the benefits of handgun ownership justify its costs, we need only look to our company in the industrialized world.  Without comparing the experience of other countries, it is possible to become desensitized to our levels of violence.  It becomes possible to accept it unquestioningly as inevitable - a fact of life at the end of the 20th century.  We have, indeed, become at some level inured to it.  Yet looking outside our borders jerks us back to the realization that it need not be so.  Most other industrialized nations have eschewed whatever benefits might flow from widespread handgun ownership in favor of strict gun control, and they have far lower firearm injury rates to show for it.

☛ *In 1996, more than twice as many people were murdered by handgun in Maryland than in Canada, Germany, Great Britain, Japan, Australia, and New Zealand combined.*

---

147    Gun proponents often cite one highly-publicized study which claims that so-called "right-to-carry" ("RTC") laws have been responsible for substantial decreases in violent crime.  *See*, JOHN R. LOTT AND DAVID B. MUSTARD, *Crime, Deterrence, and Right-to-carry Concealed Handguns*, JOURNAL OF LEGAL STUDIES, XXVI(1):1-68 (1997).  Many states have recently enacted such laws, which enable people to obtain permits to carry concealed weapons more easily.  Several independent analyses have demonstrated the conclusions of Lott's study to be without merit.  Researchers at the Johns Hopkins Center for Gun Policy and Research, as well as scholars at Carnegie Mellon University and Georgetown University have all, independently, dismissed the validity of Lott's claims for a variety of reasons, including flawed statistical models and analyses, and failure to control for variables such as poverty and crime cycles.  *See*, WEBSTER, *ET AL.*, *Flawed Gun Policy Research Could Endanger Public Safety*, AMERICAN JOURNAL OF PUBLIC HEALTH, 87:918-921 (!997); J. LUDWIG, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence From State Panel Data*, INTERNATIONAL REVIEW OF LAW AND ECONOMICS, 18:239-254 (1998); DANIEL W. WEBSTER, *The Claims That Right-to-Carry Laws Reduce Violent Crime are Unsubstantiated*, JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH (1997).  For example, these subsequent studies conclude that after controlling for changes in poverty and crime cycles, RTC laws have no significant effect on states' murder rates.  Similarly, Lott and Mustard tout Florida as a prime example of RTC laws' deterrent effect on rape and homicide.  They fail to acknowledge, however, that violent crime rates *rose* initially after the RTC law went into effect.  Only after the state passed stringent laws requiring mandatory background checks and waiting periods did violent crime rates begin to decline.  In any event, Florida nonetheless has had the highest per capita violent crime rate in the country since 1987, the year in which the RTC law went into effect.  *See also*, CENTER TO PREVENT HANDGUN VIOLENCE, *Carrying Concealed Weapons* (1999).  Thus, Lott's study fails to establish that RTC laws reduce violent crime, and fails to undercut the myriad statistical analyses showing that guns in the home increase the likelihood that someone in the home will be killed or injured with that gun.

44

HQL_0000654

USCA4 Appeal: 21-2017    Doc: 25-2        Filed: 08/03/2022      Pg: 370 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 45 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 45 of 63

For example, in 1996, handguns murdered 2 people in New Zealand, 13 in Australia, 15 in Japan, 30 in Great Britain, 106 in Canada, and 213 in Germany, for a total of 379. By tragic contrast, 9,390 people were murdered by handgun in the United States.[148] More than twice as many people were murdered in Maryland alone than in all 6 countries combined.

Similarly, in one year firearms killed no children in Japan, 19 in Great Britain, 57 in Germany, 109 in France, and 153 in Canada, for a total of 338. Again, by tragic contrast, 5,285 children were killed in America.[149] In 1996, 91 children were killed in Maryland.

That more children are killed in Maryland every year than in Japan, Great Britain, and Germany combined speaks volumes about our priorities.

# IV.   A Solution:  Attacking Gun Violence As Problem Of Law Enforcement, Public Health, And Consumer Product Safety

To what conclusion does this cost-benefit analysis lead us? For me, on a personal level, the answer is very easy. I am ready to say that we have suffered long enough. As a grandfather, I am ready to say too many children have died. I have added up the costs, and they so outweigh the benefits as to smother them. In short, I count myself among those who believe that we should no longer allow unrestricted handgun ownership. Our public policy goal must be to rid our communities of handguns.

Only through restrictive handgun licensing, which would allow possession of guns to advance reasonable law enforcement purposes only, will we ever reduce all types of gun death and injury. More effective guns sales and distribution laws, and vigorous enforcement of those laws, can reduce intentional criminal firearm injury. Encouraging gun manufacturers to equip guns with safety and child-proofing features will help prevent unintentional shootings. Personalized guns can prevent teen suicides and injury from stolen guns. Yet not even all of these measures together would address all preventable gun violence and death. We would still be left with the adult suicides and the domestic assaults which take thousands of lives every year.

*☛  In 1996, a total of 338 children were killed by handgun in Japan, Great Britain, Canada, Germany and France.  5,285 children were killed by handguns in America.*

*☛  Our public policy goal must be to rid our communities of handguns.*

---

[148]    Center to Prevent Handgun Violence, *Flyer, citing* U.S. Department of Justice statistics.
[149]    *Id.*

45

HQL_0000655

☛ *We must undertake a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership.*

Thus, we must cease to allow the widespread, unrestricted ownership of handguns. The owner of a grocery store should still be able to obtain a license to protect his business premises. The sports shooter who enjoys competitive shooting must still be permitted sharpen his skills with a gun left at the shooting range. The police officer must still carry a gun on the job. But no one should be able to reach for a gun hidden under a pillow to shoot a loved one in a moment of anger, or to turn it on himself in a moment of anguish. We should no longer tolerate living in communities awash with handguns.

We must begin to work immediately toward this goal. We must undertake a plan that will move us to the point where people are ready to accept the end to unrestricted private handgun ownership. This plan must constitute a comprehensive strategy which reflects the nature of gun violence as a multi-faceted problem of law enforcement, public health and consumer product safety. We must pursue specific initiatives designed to reduce every possible category of preventable firearm death and injury. And we must act now. Too many people are dying to wait for the next study, the next election, or the next Littleton massacre.

Thus, I recommend the following three-step plan to make Maryland the first state in the country to close the door on widespread handgun ownership:

☛ **To decrease preventable teen suicides, unintentional shootings, and injury from stolen firearms, we should regulate firearms as a consumer product, at the federal, state and local levels, to require safety and child-proofing features and to promote the development of personalized guns. We should also provide gun manufacturers the incentive to institute these safety measures by allowing the use of strict liability in the courts.**

## A.  Regulating Firearms As a Consumer Product

☛ *We should immediately demand that guns become subject to the same rigorous regulatory oversight as are automobiles, lawnmowers, stepladders, aspirin bottles, child car seats . . . the list is endless.*

It defies all logic, fairness, and intelligent analysis that we do not regulate guns under the health and safety standards we apply to every other product available to American consumers. We should immediately demand, at the federal, state, and local levels, that guns become subject to the same rigorous regulatory oversight as are automobiles, lawnmowers, stepladders, aspirin bottles, child car seats . . . the list is endless. The health and safety of the consumer should assume the same importance in the realm of firearms as it does in all other spheres of American product manufacturing.

46

HQL_0000656

## 1. Federal Health and Safety Regulatory Authority Over the Gun Industry

First, Congress should finally do what it should have done thirty years ago when it created the Consumer Product Safety Commission and end the gun industry's unique and paradoxical exemption from that agency's jurisdiction. Congress should turn over responsibility for gun health and safety regulation to the agency that oversees virtually every other consumer product, most of which pose far less inherent danger to the American consumer than the firearm.

The CPSC was created in 1972 in response to a general recognition that too many people were being killed or injured from certain consumer products, and continued piecemeal regulation of these products would be ineffective.[150]  The CPSC, as well as other federal agencies like the Federal Drug Administration and the National Traffic Safety Administration, all work to protect us from unreasonable risk of injury or death from consumer products. The CPSC alone has jurisdiction over more than 15,000 products, including ironically, pellet and air guns. It has the power to set mandatory safety standards, monitor industry compliance with them, issue recalls of defective products, and disseminate safety information to the public. It also maintains the National Electronic Injury Surveillance System to collect data on product-related injuries and to do follow-up studies. This system allows the CPSC to identify specific product hazards, quantify injuries, and respond appropriately. Finally, it can ban products it determines to be unreasonably hazardous.

The cigarette lighter provides a germane example of how the CPSC functions. Beginning in 1985, a nurse petitioned the Commission requesting that disposable butane lighters be made child-resistant. The Commission knew at that time that 140 children, most of whom were under age 5, were dying each year from fires started by playing with the lighters. Thus, in response to the petition, the Commission conducted field studies regarding which lighters were causing the injuries and in what manner, the child-resistance of existing lighters, and relevant product information to determine baseline acceptability standards. Thereafter, pursuant to its research and after posting advance notice of proposed rule-making, it published a proposed safety standard, which was enacted in 1993.[151]

Firearms stand virtually alone in their exemption from basic health and safety regulation. Why should an assault rifle avoid the scrutiny to which a coffeemaker is subject? Congress should finally undo the harm of thirty years ago when an NRA board member in Congress offered the amendment insulating the firearms industry

☛ *Why should an assault rifle avoid the scrutiny to which a coffeemaker is subject?*

---

150    For general discussion about the powers of the Consumer Product Safety Commission, *see* DIXON, *supra*, note 9 at 1000-1004; *see also* DIAZ, *supra*, note 2 at 201-206.

151    *See* DIXON, *supra*, note 9 at 1002-03.

47

HQL_0000657

from health and safety regulation.  It should give the CPSC jurisdiction over fire-arms, or accord similar powers to the ATF.

Were the CPSC or another federal agency given such regulatory authority, it could make substantial improvements in both the safety of firearms themselves and the relatively freewheeling way in which they are distributed.  It could, for example, divide firearms into categories based upon the level of risk they present to public safety, and then place different controls on manufacture, distribution, and use in each category.  Assault weapons would thus be subject to different regulatory restrictions than long guns.  It could also set safety standards regarding, for example, the likelihood of accidental discharge and child accessibility, monitor compliance with the standards, and recall defective models.

*☞ Were Congress to right the mistake of thirty years ago, and put firearms under CPSC jurisdiction, the federal government could assume the same responsibility over assault weapons and machine guns as it does over pacifiers.*

In short, were Congress to right the mistake of thirty years ago, the federal government could assume the same responsibility over assault weapons and machine guns as it does over pacifiers.  It could perform the same analysis of the risks and benefits and enact appropriate controls on the vast array of firearms available to American consumers as it does routinely with the thousands of other, mostly far more pedestrian, products available in this country.  It should be allowed to assume that long overdue responsibility.

## 2.  State Health and Safety Regulation

Although federal regulation is necessary and can be most effective in some areas, there is plenty of room for the states to step in where the federal government falls short.  Some states have enacted limited laws governing the sale, use and possession of firearms, but most states have yet to venture into regulating firearms as a product under state consumer protection or firearm control laws.  The states should remedy this omission.

### a. Massachusetts' Consumer Protection Firearms Regulations

In the sole example of state health and safety regulation of firearms, former Massachusetts Attorney General Scott Harshbarger did promulgate consumer protection regulations of firearms before he left office in 1998, and the Supreme Judicial Court of Massachusetts recently upheld the validity of those regulations.[152]  The regulations define as deceptive or unfair, under the state Consumer Protection Act, the transfer of certain types of handguns to consumers.  They essentially prohibit the commercial sale or transfer of handguns failing to satisfy prescribed safety and performance standards.  These standards prohibit guns made without tamper-resistant serial numbers, some kind of locking mechanism and child-proofing devices, as well as guns made of certain inferior materials with a barrel shorter than three inches.  They also prohibit guns prone to repeated firing based on a single pull of the trigger, prone to explosion during firing with standard

---

[152]     American Shooting Sports Council, Inc. v. Attorney General, 429 Mass. 871, 711 N.E. 2d 899 (1999).

ammunition, or prone to accidental discharge. Finally, any gun sold without a "personalization" device, which allows the gun to be fired only by an authorized user, must be accompanied by stringent warnings.[153]

In sum, the Massachusetts regulations are common sense health and safety restrictions on an inherently dangerous product. The federal government ought to make such basic regulations national in scope, but absent such sensible federal initiative, the states should set the example.

### b. Recommendation for Maryland

In pursuing this goal in Maryland, we should enact legislation imposing health and safety requirements on handguns sold in the State. Alternatively, we can promulgate regulations toward the same end.

#### i. Model Legislation

Governor Glendening has recently created a *Task Force on Child-Proof Guns* charged with "draft[ing] legislation to implement measures that prevent the unintentional and criminal misuse of handguns by children and other unauthorized users."[154] I applaud and fully support the Governor's recognition that the time is ripe for such a requirement, and Marylanders deserve the protections it would offer.

"Personalized" or "smart" guns would permit a gun to be fired only by an authorized user. Some rudimentary ways of accomplishing this have existed for a long time, and more sophisticated, high-tech methods are being developed. For example, a safety lock currently on the market requires knowledge of the combination lock for firing. Another device involves putting a magnet in the gun which must be aligned with a magnet on a ring worn by the user.[155]

A number of newer technologies, however, could be placed in the original design of the gun, thereby not requiring action by the consumer to "personalize" the gun. For example, one device would read the user's fingerprint, another would use a "touch memory sensor" to read a serial number or other identifying number on a ring worn by the user, and still others would use radio frequency identification or remote control codes.[156]

These safety features would eliminate much of the gun death that plagues us. Quite simply, without restrictions on unintended, unauthorized use of firearms, they are unsafe. As one scholar has said, "Child-play becomes injury and death. Adolescent immaturity, frustration, and dysfunction become arrest, assault, suicide, and homicide. A firearm bought for protection or sport becomes a valued instrument for the commission of crime."[157]

> ☞ *I applaud and fully support the Governor's recognition that the time is ripe for requiring all guns sold in Maryland to be "personalized," or able to be fired only by an authorized user.*

> ☞ *Without restrictions on unintended, unauthorized use of firearms, "child-play becomes injury and death. Adolescent immaturity, frustration, and dysfunction become arrest, assault, suicide, and homicide."*

---

[153]    940 Code Mass. Regs. §§16.00 *et seq.* (1997).

[154]    Governor's Executive Order 01.01.1999.18.

[155]    JOHNS HOPKINS CENTER FOR GUN POLICY AND RESEARCH, *Personalized Guns: Reducing Gun Deaths Through Design Changes* at 7 (May 1998).

[156]    *Id.* at 8-10.

[157]    DIXON, *supra*, note 9 at 1005.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 375 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 50 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 50 of 63

In sum, while personalization technology would not rid us of all gun injury and death, it would reduce dramatically teen suicides, unintentional shooting injuries and deaths, and criminal shootings with stolen guns. While suicides by gun owners and criminal acts by those in legal possession of guns would continue, the reduction in these other areas would be significant.

First, the elimination of teen suicides by firearm would save three lives every day nationwide, and an average of 10 lives a year in Maryland. With the turbulence characteristic of adolescence, at least one-third of all teens have thoughts of suicide. With a firearm accessible, these thoughts can be given effect. Studies show a strong correlation, for example, between adolescent suicide risk and a gun in the home.[158] That teen suicides doubled between 1970 and 1990 is also attributed to increased access to firearms. The actual number of suicide *attempts* did not go up significantly, but more attempts were successful because of firearm use. When a firearm is the chosen method for a suicide attempt, there is an 85-90% chance the attempt will end in death.[159]

Second, the prevention of unintentional shootings would eliminate between 1,200 to 2,000 deaths every year nationwide. In Maryland, at least 12 people died from unintentional shootings (with 38 more undetermined deaths) in 1996 alone, and many more were non-fatally injured. About 40% of all gunshot wounds suffered by children are unintentional.[160]

Finally, the homicides and non-fatal shootings from stolen guns represent a substantial portion of criminal gun death. National Crime Victimization Survey and FBI data show that about 500,000 guns, primarily handguns, are stolen every year. Other surveys show that thefts are a significant source of guns used in crime; one-third of the guns used by armed felons are stolen.[161] Preventing the use of guns by unauthorized users would effectively stem this flow of illegal gun use. Thus, of the 445 homicides in Maryland in 1996, personalized gun technology might have prevented the 148 which likely were committed with stolen guns.

In short, personalized gun technology would significantly reduce gun injury and death in Maryland. It would require patience, for older, unsafe guns would continue in circulation for years. Yet gradually, with all new guns personalized, the circulation of unsafe guns would diminish. While our own children or even grandchildren would perhaps not see the full benefit, we would ensure that our grandchildren's children would not die because a curious child picked up a gun or a despondent teen indulged a passing, fatal fantasy.

☞ *The elimination of teen suicides by firearm would save three lives every day nationwide, and an average of 10 lives a year in Maryland.*

☞ *The prevention of unintentional shootings would eliminate between 1,200 to 2,000 deaths every year nationwide.*

☞ *Thefts are a significant source of guns used in crime; one-third of the guns used by armed felons are stolen.*

---

[158]    Johns Hopkins Center for Gun Policy and Research, *Personalized Guns: Reducing Gun Deaths Through Design Changes*, *supra*, note 155 at 3-4.

[159]    Dixon, *supra*, note 9 at 991 (citations omitted).

[160]    Johns Hopkins Center for Gun Policy and Research, *Personalized Guns: Reducing Gun Deaths Through Design Changes*, *supra*, note 155 at 4-5 and *Firearms Deaths in Maryland: Summary Tables*," *supra*, note 97, Table I.

[161]    *Id.* at 5.

50

HQL_0000660

I appeal to the General Assembly, therefore, to show the courage and leadership needed to put Maryland in the forefront of this opportunity to protect our future generations. It should enact legislation immediately which sets forth a requirement, to be phased in over the next few years, for all handguns sold in Maryland to be personalized, or able to be fired by authorized users only.

### ii. Health and Safety Regulation

In holding handguns to the same health and safety standards applied to other consumer products, we can also take advantage of our unique status as the only state with a Handgun Roster Board. With its mandate and expertise, the Board is in an optimal position to take important steps toward promoting the protection of children and others. It should use its authority to promulgate regulations with a view toward requiring child-proofing devices, personalized gun technology, and other safety features on guns sold in Maryland.

The Handgun Roster Board's current mandate, as explained above, is to review handguns to determine whether they are "useful for legitimate sporting, self-protection, or law enforcement purposes," and approve or disapprove them for sale in Maryland.[162] It must consider each handgun in light of nine specific criteria, *i.e.*, concealability, ballistic accuracy, weight, quality of materials and manufacture, *reliability as to safety,* caliber, detectability by standard security equipment, and utility for legitimate sporting, self-protection, or law enforcement activities.[163] Under its current authority, therefore, the Board can consider any consumer product safety issue, including whether a gun has a child-proofing device, in deciding whether the gun is useful for sporting, self-protection or law enforcement purposes.

Under this authority, the Board should promulgate regulations setting forth the health and safety standards it will apply to all guns to be approved for sale in Maryland. These regulations should work towards implementing Governor Glendening's proposal to require "personalized" or "smart" guns in Maryland, as well as the standards set forth in the Massachusetts regulations.

Under such regulations, the Board would be able to hold the firearms industry to the health and safety standards we apply to every other consumer product sold in Maryland. The Board could also modify the regulations as necessary to respond to emerging technologies. As public outcry, as well as litigation, finally propel the gun industry to use its formidable powers of innovation to develop new safety devices to protect the innocent from gun violence, the Handgun Roster Board should ensure, to the extent possible, that Marylanders receive the full benefit of those innovations.

☛ *Personalized guns would ensure that our grandchildren's children would not die because a curious child picked up a gun or a despondent teen indulged a passing, fatal fantasy.*

☛ *As public outcry, as well as litigation, finally propel the gun industry to use its formidable powers of innovation to develop new safety devices to protect the innocent from gun violence, the Handgun Roster Board should ensure that Marylanders receive the full benefit of those innovations.*

---

[162]    Md. Ann. Code Art. 27, §3J(b)(1)(1988).
[163]    Md. Ann. Code Art. 27, §§3I-J (1988).

51

HQL_0000661

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 377 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 52 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 52 of 63

If the Handgun Roster Board does not exercise its authority to afford Marylanders the protection from dangerous handguns they deserve, I intend to investigate the possibility of promulgating health and safety firearm regulations under the Consumer Protection Act. As outlined below, I will also examine the extent to which the industry uses deceptive advertising to market its products as an additional potential avenue for consumer firearms regulation.

### iii. Unfair or Deceptive Advertising

In addition to imposing safety regulations on the design of handguns to be sold in Maryland, we should begin looking at the way guns are promoted in the State. Most important, it is illegal to sell guns to a minor, and any firearms advertisements targeting children should be banned. In addition, claims that gun ownership increases the safety of household members are highly suspect. Thus, I intend to begin an investigation of firearms promotion and advertisement in Maryland, and to take whatever steps may be appropriate to ensure that the gun industry does not unfairly target our children or subject anyone to misleading or deceptive information about its products.

☞ *Any firearms advertisements targeting children should be banned.*

### iv. Local Health and Safety Regulations

While federal consumer safety regulation will potentially be more effective than state regulation, and state regulation more effective than local, the old adage that "something is better than nothing" is certainly germane here. Should the State fail to protect children from the unintentional gunshot wound or premature death, then localities should step in. Montgomery and Prince George's counties, commendably, have already enacted ordinances requiring the sale of any handgun to be accompanied by the sale of a trigger lock.[164] Other counties should follow suit, and they may be able to go even farther in protecting their residents from harm.

State law generally preempts local regulation of firearms and ammunition, but there are several exceptions. Most important, counties and municipalities may regulate the sale and possession of firearms as they relate to minors and law enforcement personnel.[165] In an Opinion of the Attorney General, we concluded that this exception gives localities the power to require guns to be kept inaccessible to minors, or to mandate the sale of trigger locks to accompany all handgun transfers.[166] Thus, localities may be able to enact their own requirements for the sale of personalized gun technology and the use of such technology by law enforcement.

---

[164]   *See, e.g.,* Montgomery County Code §57-5A(a)-(c).
[165]   Md. Code Ann., Art. 27, §36H *et seq.*
[166]   *See* 76 Op. Att'y Gen. 240 (1991); 82 Op. Att'y Gen. ___ (1997)[Opinion No. 97-04 (February 13, 1997)].

HQL_0000662

USCA4 Appeal: 21-2017     Doc: 25-2          Filed: 08/03/2022      Pg: 378 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 53 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 53 of 63

## B.  Holding the Gun Industry Accountable

We cannot and should not, however, rely solely on legislative and regulatory reform to stem the flow of gun violence in our communities.  In the end, we must persuade the gun industry itself to join the effort to increase the safety of its products.  Yet the gun industry has an incredibly powerful lobby and huge financial backing.  Past experience teaches that the gun industry vigorously resists all reforms, with huge sums of money and lobbying prowess.  We are unlikely to get true cooperation or willingness to work toward real solutions until the industry has financial reasons to come to the table.

### 1. Restoring the Legal Balance Between Individuals and Gun Manufacturers

In short, the gun industry will only begin to make significant changes in the way it manufactures and distributes its products when it begins to feel the pinch in its pocketbook.  With its decision to respond to market saturation by increasing firearm lethality, with its refusal to develop safety mechanisms or do anything to help "keep guns out of hands of criminals," including closing gaping loopholes in private gun sales, the gun industry should be subject to the same accountability as other American product manufacturers.

In short, we must restore the legal balance between individuals and the gun industry to allow consumers to hold the industry accountable through the courts.  We have a time-honored tradition in this country of recognizing that some things can be fixed more effectively through the tort system, rather than through government intervention.  Allowing consumers to sue manufacturers of products which cause harm, and to hold them strictly liable for injuries under certain circumstances, has helped to maintain a necessary but delicate balance in the marketplace between the individual and powerful corporate manufacturers.

We lack this critical balance in Maryland.  The Maryland consumer cannot sue gun manufacturers in Maryland courts under the doctrine of strict liability.  This has profound implications for our State.  As lawsuits against the gun industry spring up all over the country, we are in danger of becoming a safe haven for surplus or unsafe guns - a dumping ground for an industry under siege.

### 2. Reinstating Strict Liability

Thus, we must reinstate strict liability as a theory under which Marylanders can seek to recover damages from the gun manufacturers.  We must make it clear that for those who continue irresponsibly to flood our State with unsafe guns, for those who persist in putting an abnormally dangerous product into the Maryland marketplace, there will be a cause of action under which they can be held accountable in Maryland courts.

☛ *We must persuade the gun industry itself to join the effort to increase the safety of its products.*

☛ *As lawsuits against the gun industry spring up all over the country, we are in danger of becoming a safe haven for surplus or unsafe guns - a dumping ground for an industry under siege.*

☛ *We must restore the legal balance between individuals and the gun industry to allow consumers to hold the industry accountable through the courts.*

53

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 379 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 54 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 54 of 63

In 1985, in a groundbreaking case *Kelley v. R.G. Industries*,[167] the Court of Appeals of Maryland held that strict liability could be imposed on the manufacturers of Saturday Night Specials. While declining to apply previously-recognized principles of strict liability to handguns in general, it decided to expand common law strict liability doctrine to conform with public policy on handgun use established by the General Assembly and to hold Saturday Night Special manufacturers liable. Specifically, finding that Saturday Night Specials are too inaccurate, unreliable, and poorly made for any legitimate uses, but rather are valued only for criminal activity, manufacturers and marketers of the guns could be held strictly liable for gunshot injuries flowing from their criminal misuse. The Court noted that the gun manufacturers and dealers knew or should have known they were making and selling a product "principally to be used in criminal activity."[168]

The promise this decision may have held for bringing the gun industry into court never unfolded, since the General Assembly later eliminated all strict liability for damages flowing from firearms.[169] While this legislative compromise seemed right at the time, firearms technology and the dynamics of gun violence have changed. In reversing the trend the *Kelley* decision may have launched, we eliminated the Maryland consumer's ability to use what is widely-recognized as one of the best means of injury prevention - holding manufacturers of inherently and unreasonably dangerous products strictly liable for harms caused by their products.[170]

The purpose of strict liability is to ensure that the costs of injuries resulting from unreasonably dangerous or defective products be placed on the manufacturer rather than on victims.[171] Without strict liability, the costs of accidents and injury fall on the victim, and thus the injurer does not factor such costs into his decision-making about his product, and has no incentive to minimize the risk of accident and injury. Strict liability shifts the costs to the party both better able to bear them and in a better position to eliminate them.[172] Thus, strict liability discourages parties from manufacturing and distributing dangerous products, or encourages them to develop alternative designs and distribution which are safer.[173]

> ☞ *Strict liability shifts the costs to the party both better able to bear them and in a better position to eliminate them.*

---

[167]  304 Md. 124, 497 A.2d 1143 (1985).

[168]  *Id.* at 155.

[169]  Md. Ann. Code Art. 27, §36H-5(h)(1), which states, "A person or entity may not be held strictly liable for damages of any kind resulting from injuries to another person sustained as a result of the criminal use of any firearm by a third person, unless the person or entity conspired with the third person to commit, or willfully aided, abetted, or caused the commission of the criminal act in which the firearm was used."

[170]  *See* Mark D. Polston and Douglas S. Weil, *Unsafe By Design: Using Tort Actions to Reduce Firearm-related Injuries*, 8 Stanford Law and Policy Review 13 (Winter, 1997).

[171]  Greenman v. Yuba Power Prod. Inc., 59 Cal. 2d 57, 63, 377 P.2d 897, 901 (1962).

[172]  *See* Andrew O. Smith, *The Manufacture and Distribution of Handguns As An Abnormally Dangerous Activity*, 54 University of Chicago Law Review 369, 371 (1987).

[173]  *See* W. Prosser, J. Wade & V. Schwartz, *Cases and Materials on Torts*, 74-65 (7th ed. 1982).

HQL_0000664

Courts hold parties strictly liable under two general theories, *i.e.,* the abnormally dangerous activity doctrine, and the abnormally dangerous product doctrine.[174]  Under the first theory, a party may be strictly liable if engaged in an ultrahazardous activity, the danger of which cannot be eliminated even with the exercise of reasonable care, and the risks of which outweigh the utility to the community.[175]

Under the second doctrine, the manufacturer or marketer of an unreasonably dangerous product may be strictly liable if the court finds the product to be manufactured, designed, or marketed defectively.[176]  In assessing the alleged defect, courts determine either whether the product conforms to consumer expectations, whether the risks of the product outweigh its benefits, or whether an alternative, safer product design would have been feasible.[177]  Finally, some courts are beginning to recognize what scholars have called "generic liability" or "product category liability," in which strict liability is imposed upon manufacturers and marketers of products that are unreasonably dangerous despite the best possible design, construction, and warnings.[178]

In Maryland, individuals are now precluded from seeking recovery for handgun injury and death under any and all of these principles of strict liability.  Marylanders are missing the opportunity others are now grasping to force the firearms industry finally to act responsibly.  Handgun manufacturers and distributors "inject into the stream of commerce products intended to facilitate the infliction of grave personal injury."[179] The State of Maryland, its taxpayers and consumers of health insurance have incurred substantial financial harm from the costs resulting from these products, and many individuals have suffered untold misery and economic burden from the harm inflicted by firearms.  Moreover, these harms will become more severe as lawsuits and regulations in other states begin to outlaw the sale of unsafe guns which remain perfectly legal in Maryland.  Maryland will become a handgun mecca.

☞ *The State of Maryland, its taxpayers and consumers of health insurance have incurred substantial financial harm from the costs resulting from these products, and many individuals have suffered untold misery and economic burden from the harm inflicted by firearms.*

---

[174]   RESTATEMENT (SECOND) OF TORTS, §402A.

[175]   *Id.* at §§519-520.

[176]   2 L. FRUMER & M. FRIEDMAN, *Products Liability*, §16A(4)(f)(i).

[177]   *See* Phipps v. General Motors Corp., 278 Md. 337, 363 (1976); Kelley v. R.G. Industries, 304 Md. at 136-138; Barker v. Lull Engineering Co., Inc., 20 Cal.3d 413, 143, 573 P.2d 443 (1978).

[178]   *See* CARL T. BOGUS, *The Third Revolution in Products Liability*, 72 CHICAGO KENT LAW REVIEW 3 (1996).

[179]   ANDREW O. SMITH, *supra*, note 171 at 369.

USCA4 Appeal: 21-2017     Doc: 25-2          Filed: 08/03/2022     Pg: 381 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 56 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 56 of 63

☞ *We must reinstate strict liability, so Maryland consumers can use what is widely-recognized as one of the best means of injury prevention - holding manufacturers of inherently and unreasonably dangerous products strictly liable for harms caused by their products.*

In short, to protect our future and ensure Maryland does not become a safe haven for unsafe guns, we should make it clear that the gun industry shall also answer in our State for the harms it has caused.  We should reinstate strict liability by statute, so that Marylanders have the means to force the industry to come to terms with the unreasonably dangerous nature of the products it pushes on American men, women, and children.  Marylanders should be permitted to persuade the courts that any gun without a child-proof design or personalization technology is unreasonably dangerous, for a child's misuse of a gun or a criminal's use of a stolen gun are certainly foreseeable;[180] the gun industry has marketed guns without adequate safety warnings and safeguards against distribution to criminals;[181] the manufacture and distribution of handguns is an abnormally dangerous activity in which the harm it causes outweighs its benefits;[182] or handguns are abnormally dangerous products regardless of their manufacture or design because they have created a public health crisis of epidemic proportions.[183]

Thus, we should repeal the statute barring the imposition of strict liability for firearm injury and enact a strict liability law ensuring Marylanders the right to hold the gun industry accountable.  Why should we put our State at any greater risk by allowing it to become a mecca for unsafe guns?  Why should we be deprived of the opportunity, which is finally opening up at the end of this violent century, to make the gun industry answer for its share of the terrible cost of gun violence and to mend its ways?  We should not pass up this opportunity to make Maryland a safer place for our children and grandchildren.

---

[180]   *See* POLSTON AND WEIL, *supra*, note 169.

[181]   DANIEL C. POPE,  *Maryland Holds Manufacturer of 'Saturday Night Specials' Strictly Liable For Injuries Suffered By Innocent Victims of Criminal Handgun Violence,* XX Suffolk University Law Review 1147, 1156 (1986) (and citations therein).

[182]   *See* ANDREW O. SMITH, *supra*, note 171.

[183]   *See* CARL T. BOGUS, *supra*, note 177.

56

HQL_0000666

☛ To reduce intentional criminal shootings, we should take the following law enforcement measures.  First, we should require all gun owners to be trained in the proper use, storage and cleaning of guns, and to obtain a fingerprint license before they take a firearm home.  We should also preclude all lawbreakers from owning a gun - not only convicted felons, but also those convicted of a misdemeanor.  Finally, we should assist law enforcement efforts by making the illegal sale and possession of firearms a felony and by allowing investigators to wear body wires when targeting illegal firearm sales.

## A. Firearm Fingerprint Licensing and Training

We should end the paradox that Americans must pass a driver's test and obtain a license to operate a car, but can own and fire a handgun with no training or experience.  We do require anyone wishing to *carry* a concealed firearm for protection to obtain a permit.  The requirements for this permit are considerably more stringent than those necessary to pass a background check when buying a gun.  In addition to never having been convicted of a felony, a person must be found, on the basis of an investigation, not to have exhibited a "propensity for violence or instability which may reasonably render his possession of a handgun a danger to himself or other law-abiding persons."[184]  The applicant must also provide fingerprint identification and satisfactory evidence of being qualified and trained in the use of handguns.[185]

There is no reason why the same should not be required of people wishing to own handguns.  Is it any less important for a person with a handgun under his mattress not to have a "propensity for violence" than it is for a person carrying the gun to work?  Why should we allow people to own handguns without knowing how to operate them safely when we do not allow the same for people driving cars?  To put it in the starkest terms, why do we allow anyone with any inclination toward violence to have a handgun?  How many people must die before we acknowledge that this makes no sense?

In addition to preventing individuals with a known propensity for violence from owning handguns, fingerprint licensing will make it harder for the link between a gun and the person using it to be broken.  This will aid law enforcement in its efforts to trace guns used in crime, and it will serve as both an impediment and a deterrence to straw purchases and other illegal firearms sales.

> ☛ *We should end the paradox that Americans must pass a driver's test and obtain a license to operate a car, but can own and fire a handgun with no training or experience.*

> ☛ *No person should be allowed to own a handgun without demonstrating, on the basis of an investigation, that he has no "propensity for violence" or mental instability.*

---

[184] Md. Code Ann., Art. 27, §36E(5)(1996 Repl.).
[185] *Id.*

HQL_0000667

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 383 of 460

Case 1:16-cv-03311-ELH   Document 135-13   Filed 01/28/21   Page 58 of 63
Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 58 of 63

A study conducted recently by the Center to Prevent Handgun Violence supports the efficacy of fingerprint licensing.[186]  The study compared the use of firearms in crime and suicide in Maryland and New Jersey, two states with similar demographics.  Both states' populations have similar age distribution and educational levels, percentages of people living below the poverty line, and percentages living in urban and rural settings.  The states also have similar firearms laws, with the exception that New Jersey has required firearm purchasers to obtain a license since the 1960's.

The study, which compared firearms-related crime and suicide rates between 1970 and 1994, showed that New Jersey's violent crime, murder, and suicide rates are all significantly lower than those in Maryland.  The mean percent of Maryland's homicide rates are 38% higher, aggravated assault rates 53% higher, and suicide rates 69% higher than those in New Jersey.[187]

Thus, we should require anyone buying a gun to obtain a fingerprint license.  The requirements should be similar to those now imposed on gun owners seeking a permit to carry their guns, *i.e.,* the prospective gun owner should be required to submit fingerprints, to demonstrate evidence of being qualified in the operation of handguns, and to be found, on the basis of an investigation, not to have a propensity for violence.

## B.  Lawbreakers Should Not Own Handguns: Instituting Any Misdemeanor Conviction as a Bar to Gun Ownership

☞ *No one who breaks the law, juvenile or adult, should be allowed to own a handgun.*

We should also take the common sense step of preventing anyone who breaks the law from owning a handgun.  Currently, only convicted felons, spouse and child abusers, those convicted of misdemeanors carrying penalties of more than two years of incarceration, and those adjudicated mentally ill are precluded from owning firearms in Maryland.  These laws reflect the policy that certain gun violence can be prevented by barring persons believed to be at high risk of future criminal activity from owning firearms.  Indeed, background checks of prospective gun buyers identify about 70,000 prohibited persons every year, most of whom have been convicted of felonies.

This law leaves the misimpression that only law-abiding citizens own and purchase handguns.  On the contrary, thousands of people with a history, sometimes substantial, of criminal activity buy handguns legally every year.  Misdemeanor convictions carrying a penalty of less than two years incarceration are no obstacle to the legal purchase of firearms in Maryland, regardless of the number or types of misdemeanors on a person's record.

---

[186]    CENTER TO PREVENT HANDGUN VIOLENCE, *The Effectiveness of Firearms Licensing* (July 1996).
[187]    *Id.*

HQL_0000668

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 384 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 59 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 59 of 63

Both longstanding research and recent scholarship demonstrate that this policy is misguided. Experts established long ago that people with a history of even a single prior arrest are, as a group, significantly more likely to engage in future criminal activity than are those with no criminal history.[188] A recent study published in the *Journal of the American Medical Association* concluded specifically that handgun purchasers with prior misdemeanor convictions are at substantially increased risk of future criminal activity, including violent and firearms-related crimes.[189]

The study examined the criminal records of almost 6,000 handgun purchasers over 15 years, both before and after the firearms purchase. It found that handgun purchasers with at least one prior misdemeanor conviction were more than 7 times as likely as those with no prior criminal record to be charged after the handgun purchase with a new offense, including nonviolent firearm offenses, violent offenses, and Violent Crime Index offenses. Those with more than one prior conviction for a violent misdemeanor offense were more than 10 times as likely to be charged with new criminal activity, and 15 times as likely to be charged with murder, rape, robbery, or aggravated assault. Even those with only *one* misdemeanor conviction for a nonviolent offense were nearly 5 times as likely to be charged with new offenses involving firearms or violence.[190]

Thus, I recommend that Maryland take the lead in correcting this error and establish the simple policy that no one who breaks the law can own a handgun. This automatic bar should also include juvenile offenders. The evidence makes clear that allowing persons with any criminal history to own a handgun increases the chances that some legally purchased guns will be used in future gun violence. Moreover, a recent national survey indicates that 95% of Americans, including 91% of gun owners, support prohibiting the purchase of firearms by persons with misdemeanor convictions.[191] We should save lives and prevent many future violent crimes by instituting a misdemeanor conviction of any kind as a bar to the purchase of a handgun in Maryland.

> ☞ *Handgun purchasers with prior misdemeanor convictions are more than seven times more likely to commit a new offense as those with no prior criminal record.*

---

[188]  This increased likelihood of future criminality also characterizes juveniles with arrest records. For example, one study showed that 94% of boys incarcerated in juvenile institutions were arrested as adults, with 82% for a major felony and 65% for a violent crime. Another survey found that 36% of juveniles with only one arrest were arrested again by age 25, 62% with 2-4 juvenile arrests had another by age 25, and 78% with 5 or more juvenile arrests were rearrested as adults. *See,* OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION, U.S. DEPARTMENT OF JUSTICE, *Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders* at 114-115 (1995) (citations omitted).

[189]  CAREN J. WINTEMUTE, *ET AL., Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns,* JAMA Vol. 280, No. 24 (December 23/30, 1998).

[190]  *Id.*

[191]  S. P. TERET, D. W. WEBSTER, AND J.S. VERNICK, ET AL., *Support For New Policies to Regulate Firearms: Results of Two National Surveys,* 339 NEW ENGLAND JOURNAL OF MEDICINE 813-818 (1998).

HQL_0000669

## C. Increase Law Enforcement Tools for Targeting Illegal Sales and Possession of Handguns

Finally, the General Assembly should provide assistance to law enforcement efforts to reduce illegal sales and possession of handguns by enacting two changes in the firearms laws. First, under current law, illegal possession or sales of firearms are misdemeanors.[192] Although violations of Art. 27, §445, which set forth the restrictions on the sale, transfer and possession of firearms, carry the potential for incarceration, these crimes should be felonies. The characterization of these offenses as misdemeanors sends the wrong message. It conveys both to potential offenders and to members of the criminal justice system responsible for prosecuting and sentencing offenders that the crimes are not that serious. It falls critically short of communicating what should be the opposite message, *i.e.*, that illegal firearm sales and possession contribute to an epidemic of violence we will no longer tolerate, and they will be treated as the profound threat that we recognize them to be.

For example, Art. 27, §445(c) prohibits the sale of ammunition to a minor. Should not this crime, which could lead to the kind of tragedy suffered at Columbine High School in Colorado, be a felony? Should a person who "transports firearms into this State for the purpose of illegal sale or trafficking" be charged with a mere misdemeanor?[193] In addition to the message we want to send offenders, there is a practical, law enforcement-related reason these crimes should be felonies. If a Maryland firearm trafficker leaves the State, the FBI cannot assist Maryland law enforcement in tracking down the fugitive because he is only charged with a misdemeanor. Thus, violations of Art. 27, §445 should be felonies.

Second, law enforcement officers investigating the illegal sale of regulated firearms should be permitted to use body wires. Under the law prohibiting straw purchases, the details of a transaction are critical to whether it constitutes an illegal sale.[194] It is often extremely difficult to reconstruct these details to prosecute the crime without proof of what actually happened. We should enhance law enforcement's ability to identify and prosecute straw purchasers and gun traffickers by allowing them to tape the illegal transactions.

☞ *The illegal sale or possession of firearms should be a felony, not a misdemeanor.*

---

[192]    Md. Ann. Code, Art. 27, §§445-449 (1996 Repl.).
[193]    Md. Ann. Code, Art. 27, *supra*, note 191, §449(d).
[194]    Md. Ann. Code, Art. 27, §441 (1996 Repl.).

60

HQL_0000670

Case 1:16-cv-03311-ELH   Document 77-12   Filed 10/05/18   Page 61 of 63

Crime gun tracing statistics from Baltimore City underscore the importance of cracking down on illegal trafficking and straw purchases.  The *ATF Crime Gun Trace Analysis Report* shows that 57% of crime guns in Maryland originate within the State.  Eleven percent come from border states, with 32% from the 47 other states.  A large percentage of these guns are purchased legally and turn up in a crime within three years.  Thus, the report demonstrates that a significant amount of illegal gun trafficking and straw purchases are taking place in Maryland.[195]  According law enforcement a more effective means of identifying illegal gun purchases is of critical importance.

☛ **To reduce the remainder of firearm death and injury, i.e., adult suicides and assaults between family and acquaintances, we must, in the short term, change our gun culture so that gun ownership is no longer viewed as positive, mainstream behavior.  In the long term, we will not eliminate all types of handgun death and injury until, through restrictive handgun licensing, we ensure that most people no longer have guns.**

# A. Changing the Gun Culture

Government regulation can address many of the causes of gun injury and death, but as in most things, it cannot be the full answer.  To reduce the categories of injury not reachable by government intervention or the tort system, we must, in the short term, change our culture - the culture in which the majority who do not own guns accept without question the risk of being surrounded by people who do.  We must change the fact that we do not typically even think about the dangers we all face every day - the risk of taking our children shopping at a mall and having someone's firearm accidentally discharge; the risk of going to work and having a fellow employee's momentary rage turn lethal; the risk of a neighbor's child finding his parent's loaded, unlocked gun and unintentionally killing a daughter; the risk of a criminal stealing a neighbor's gun to hold us up at gunpoint.  We must change this culture of passive acceptance to one in which people view gun ownership as dangerous and aberrant and behave accordingly.  Gun ownership must go the way of smoking, which was once accepted universally and is now recognized as a harmful activity that cannot be inflicted on other unconsenting individuals.

☛ *57% of crime guns in Maryland originate within the State.*

☛ *Gun ownership must go the way of smoking, which was once accepted universally and is now recognized as a harmful activity that cannot be inflicted on other unconsenting individuals.*

---

[195]     The Baltimore County Police Department's *Third Grade Gun Safety Program* and its high school counterpart, *Violence in America*, teach children, with age-appropriate curricula, about the dangers of guns, how to handle various situations which might involve guns, the nature of gun violence in America, and how to respond to and avoid violence.

61

HQL_0000671

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 387 of 460

Case 1:16-cv-03311-ELH    Document 135-13    Filed 01/28/21    Page 62 of 63
Case 1:16-cv-03311-ELH    Document 77-12    Filed 10/05/18    Page 62 of 63

*☞ We must engage everyone - schools, employers, physicians, government, and especially parents - to begin the task of informing and convincing people of the truth about guns and gun ownership.*

This kind of sea change in public attitudes and behavior requires mounting a vigorous public information campaign. This campaign must confront not only decades of misinformation and misunderstanding, but also the gun industry's and the NRA's well-financed propaganda.

Daunting though it seems, it can be done. Our attitudes toward smoking have changed radically over the past few years. A generation ago almost no one wore seatbelts despite their availability, and now their widespread use saves thousands of lives each year. Bicycle helmets and child car restraints are still other examples of public information campaigns changing public attitudes and behavior.

Thus, I recommend that we must engage everyone - schools, employers, physicians, government, and especially parents - to begin the task of informing and convincing people of the truth about guns and gun ownership. First, to put teeth in this initiative, I call upon the General Assembly to take the lead and make guns in public accommodations illegal. We do not allow smokers to harm others in public places by indulging their smoking habit. Likewise, we should no longer allow anyone, with the exception of licensed law enforcement officers, to endanger the lives of others by carrying a gun into a place of public accommodation. It is one thing to continue to tolerate people choosing to endanger themselves and their loved ones by harboring a handgun in their bedroom. It is quite another to ask people to endanger their own children by taking them to a movie theater where people are permitted to carry handguns.

In addition, private employers outside of the context of public accommodations should follow the State's lead in making workplaces "gun-free." Prominent signs should remind everyone entering that guns must be left behind.

Second, we all must help escalate the conversation about the dangers of guns. Physicians, especially pediatricians, should talk to patients about the dangers of firearms. Law enforcement officers should take advantage of their status as role models in the classroom and teach children about how to protect themselves from gun violence. For example, the Baltimore County Police have instituted gun violence prevention programs in area elementary, middle and high schools.[196]

Schools should also make such discussions part of their curriculum. They should ask parents to sign gun-free pledges, which would assure other parents that their children will not be endangered by guns in the homes of their children's friends. They should consider following the example of some schools around the country which have already asked students to sign gun-free pledges. Finally, as we have with drug-free zones, we should create gun-free zones around school premises.

---

[196]    The Baltimore County Police Department's *Third Grade Gun Safety Program* and its high school counterpart, *Violence in America*, teach children, with age-appropriate curricula, about the dangers of guns, how to handle various situations that might involve guns, the nature of gun violence in America, and how to respond to and avoid violence.

HQL_0000672

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 388 of 460

Case 1:16-cv-03311-ELH     Document 135-13     Filed 01/28/21     Page 63 of 63
Case 1:16-cv-03311-ELH     Document 77-12     Filed 10/05/18     Page 63 of 63

As always, parents have a special role. Without the commitment and involvement of parents, genuine change in attitude and behavior is beyond reach. Parents must talk to their kids, question their kids, and listen to their kids about guns. They must explain the propaganda, the dangers, the temptations. They must talk to the parents of their children's friends about their attitudes and habits regarding gun ownership. Finally, they must become models for their children.

Thus, I call upon educators, doctors, business owners, private and public employers, and especially parents to join in an effort to change our gun culture into one in which everyone regards guns as the destructive instruments of injury and death we know them to be, and to see gun ownership as dangerous, unacceptable behavior.

## B. Restrictive Handgun Licensing: Homes and Neighborhoods Free of Guns

The course I have outlined will take us a long way toward a safer, saner Maryland. I pledge to do everything possible to move these initiatives forward. Yet the sad truth is that even at the end of that road, we will not be where we should be, or where we can be. We are capable of more - an even better Maryland and a better country. To get there, we must overcome the reluctance within ourselves and in others to confront candidly why we own handguns at all, and to come to terms with the inexorable conclusion that gun ownership is not worth its costs.

Our goal, then, must be to eliminate widespread handgun ownership through restrictive handgun licensing. This will preserve the benefits of handgun use while finally ridding our communities of its terrible cost. Law enforcement personnel must have handguns for use on the job. Business owners may need a licensed gun on the premises under certain circumstances. Sports shooters will still practice their sport. Where guns are needed to advance reasonable law enforcement purposes or to participate in a regulated sporting activity, they will be licensed for use in that manner. People will no longer, however, own guns without demonstrating a compelling law enforcement or recreational reason to do so.

The presence of handguns in homes across America endangers everyone. We do not need them, and the misguided desire people feel to own handguns for self-defense would be greatly diminished if they did not feel threatened by widespread handgun ownership. We certainly do not need handguns badly enough to continue numbly to accept the pain and anguish they inflict. Handguns exact too high a price. We should pay it no longer.

☛ *Without the commitment and involvement of parents, genuine change in attitude and behavior is beyond reach.*

☛ *Handguns exact too high a price. We should pay it no longer.*

63

HQL_0000673

# SENATE BILL 281

E4 (3lr0154)

### *ENROLLED BILL*

*— Judicial Proceedings / Judiciary and Health and Government Operations —*

Introduced by **The President (By Request – Administration)** and Senators **Benson, Conway, Currie, Ferguson, Forehand, Frosh, Kelley, King, Madaleno, Manno, Montgomery, Peters, Pinsky, Ramirez, Raskin, Robey, Rosapepe, Young,** ~~and Zirkin~~ **Zirkin,** ~~and Jones–Rodwell~~ **Jones–Rodwell, and McFadden**

Read and Examined by Proofreaders:

_____
Proofreader.

_____
Proofreader.

Sealed with the Great Seal and presented to the Governor, for his approval this

_____ day of _____ at _____ o'clock, _____M.

_____
President.

CHAPTER _____

| | |
|---|---|
| 1 | AN ACT concerning |
| 2 | **Firearm Safety Act of 2013** |

3  FOR the purpose of *establishing a certain exception to the prohibition against carrying*
4    *a deadly weapon on public school property; making it a misdemeanor to possess*
5    *or use certain firearm ammunition during and in relation to the commission of a*
6    *certain crime of violence;* altering the authorization for a person to wear, carry,
7    or transport a handgun to be within certain limitations; designating certain
8    firearms as assault weapons; prohibiting, with certain exceptions, a person from
9    transporting an assault weapon into the State or possessing, selling, offering to
10   sell, transferring, purchasing, or receiving an assault weapon; ~~authorizing~~
11   ~~certain licensed firearms dealers to continue to possess, sell, offer for sale, or~~

EXPLANATION: **CAPITALS INDICATE MATTER ADDED TO EXISTING LAW.**
  [Brackets] indicate matter deleted from existing law.
  Underlining indicates amendments to bill.
  ~~Strike out~~ indicates matter stricken from the bill by amendment or deleted from the law by
    amendment.
  *Italics indicate opposite chamber / conference committee amendments.*





JA0863

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 390 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 2 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 2 of 62

2                                    SENATE BILL 281

1    transfer assault long guns or copycat weapons providing that certain
2    prohibitions relating to certain assault weapons and detachable magazines do
3    not apply to certain persons under certain circumstances; authorizing a person
4    to transport certain assault weapons under certain circumstances; authorizing
5    certain persons to continue to possess assault long guns or copycat weapons
6    under certain circumstances; providing that certain registration requirements
7    for certain assault weapons do not apply under certain circumstances; altering
8    the maximum capacity of rounds of ammunition allowable to be manufactured,
9    sold, offered for sale, purchased, received, or transferred for a firearm, with
10   certain exceptions; making it a misdemeanor to use an assault long gun or a
11   copycat weapon or a magazine that exceeds a certain maximum capacity of
12   rounds of ammunition in the commission of a felony or a crime of violence;
13   requiring a certain hearing officer, after making a certain determination, to
14   order certain individuals to surrender or consign firearms in the individual's
15   possession under certain circumstances; prohibiting an individual, while
16   hunting for any wild bird or mammal, from shooting or discharging a firearm
17   within a certain distance of a public or nonpublic school during certain times;
18   repealing certain duties of the Police Training Commission relating to a certain
19   firearms safety training course; requiring the Secretary of State Police to
20   disapprove an application for a State–regulated firearms dealer's license if the
21   Secretary determines that the applicant intends a certain person to participate
22   or hold a certain interest in the management or operation of the business for
23   which the license is sought; requiring that requiring the Secretary to include
24   certain information in a certain notice if a State–regulated firearms dealer's
25   license application is denied; authorizing the Secretary to suspend a dealer's
26   license if the licensee is not in compliance with certain record keeping and
27   reporting requirements; authorizing the Secretary to lift a certain license
28   suspension under certain circumstances; prohibiting a certain person from
29   selling, purchasing, renting, transferring, or receiving a certain regulated
30   firearm unless the person presents or possesses a certain handgun qualification
31   license issued by the Secretary of State Police or certain credentials or
32   identification; providing for exceptions to the requirement to present
33   and possess a certain handgun qualification license under certain
34   circumstances; establishing certain requirements and procedures for the
35   issuance and renewal of a certain handgun qualification license; authorizing the
36   Secretary to revoke a certain handgun qualification license under certain
37   circumstances; requiring a certain person to return a certain handgun
38   qualification license under certain circumstances; establishing certain
39   requirements and procedures for the issuance of a replacement handgun
40   qualification license under certain circumstances; requiring certain fees;
41   requiring a certain licensee or designated law enforcement agency to transfer a
42   certain firearm application to the Secretary in an electronic format; authorizing
43   a certain hearing for a certain aggrieved person under certain circumstances;
44   altering the information required in a certain statement for a certain firearm
45   application; altering the circumstances under which a person is prohibited from
46   possessing a certain regulated firearm; making it a misdemeanor for a certain
47   person to possess certain ammunition if the person is prohibited from

SENATE BILL 281

3

possessing a certain firearm under certain circumstances; establishing certain
penalties; requiring certain persons to provide certain data about a certain
person to a certain federal index in a certain manner under certain
circumstances; authorizing a certain person who is subject to certain
prohibitions from possessing certain firearms to apply for certain relief from
certain prohibitions under certain circumstances; establishing the procedures
and requirements for a person who is subject to certain prohibitions on the
possession of certain firearms to apply for certain relief for certain prohibitions;
~~requiring certain persons to enter into a certain memorandum of understanding~~
*authorizing the Secretary of Health and Mental Hygiene to adopt certain
regulations; providing that certain individuals may not be held criminally or
civilly liable for certain actions*; requiring a person who moves into the State for
the purpose of establishing residency to register certain firearms within a
certain time period with the Secretary in a certain manner; requiring that a
licensed dealer keep records of all receipts, sales, and other dispositions of
firearms affected in connection with the licensed dealer's business; requiring the
Secretary to adopt certain regulations specifying certain information; requiring
that the records that licensed dealers maintain include certain information;
specifying certain record keeping requirements to be met when a firearms
business is discontinued; requiring that a licensee respond in a certain way
after receipt of a request from the Secretary for certain information; authorizing
the Secretary to implement a system by which a certain person may request
certain information; requiring the Secretary to inspect the inventory and
records of a licensed dealer under certain circumstances; authorizing the
Secretary to conduct a certain inspection during a certain time; *requiring
certain persons who sell or transfer regulated firearms to notify certain
purchasers or recipients at the time of purchase or transfer that the purchaser or
recipient is required to report a lost or stolen regulated firearm to a certain law
enforcement agency; requiring the owner of a regulated firearm to report the loss
or theft of the regulated firearm to a certain law enforcement agency within a
certain period of time after the owner discovers the loss or theft; requiring a law
enforcement agency on receipt of a report of a lost or stolen regulated firearm to
enter certain information into a certain database;* providing that certain
information is not open to public inspection; prohibiting a certain person from
possessing a rifle or shotgun under certain circumstances; repealing a provision
of law that prohibits a certain person from possessing a rifle or shotgun unless
the person possesses a certain physician's certificate; requiring a certain
applicant for a certain firearm permit to complete a certain firearm training
course under certain circumstances; exempting a certain applicant for a permit
from a certain training requirement under certain circumstances; authorizing
the Secretary to issue a certain handgun qualification license without an
additional application or fee under certain circumstances; *prohibiting public
inspection of the records of certain regulated firearm dealers, owners, or permit
holders; authorizing the individual named in the record and the individual's
attorney to view certain records; providing that this Act does not prohibit the
Department of Public Safety and Correctional Services and the Department of
State Police from accessing certain records in the performance of official duties;*

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022     Pg: 392 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 4 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 4 of 62

4                              SENATE BILL 281

1    defining certain terms; *requiring the Department of State Police to make certain*
2    *investigations and to report its findings to the Governor and the General*
3    *Assembly on or before a certain date; providing for the termination of certain*
4    *provisions of this Act;* and generally relating to firearms.

5    *BY adding to*
6         *Article – Criminal Law*
7         *Section 4–110*
8         *Annotated Code of Maryland*
9         *(2012 Replacement Volume and 2012 Supplement)*

10   BY repealing and reenacting, with amendments,
11        Article – Criminal Law
12        Section *4–102,* 4–203(b), and 4–301 through 4–306 to be under the amended
13             subtitle "Subtitle 3. Assault Weapons and Detachable Magazines"
14        Annotated Code of Maryland
15        (2012 Replacement Volume and 2012 Supplement)

16   BY adding to
17        Article – Health – General
18        Section 10–632(g)
19        Annotated Code of Maryland
20        (2009 Replacement Volume and 2012 Supplement)

21   BY repealing and reenacting, with amendments,
22        Article – Natural Resources
23        Section 10–410(g)
24        Annotated Code of Maryland
25        (2012 Replacement Volume)

26   BY repealing and reenacting, with amendments,
27        Article – Public Safety
28        Section *3–208,* 5–101, 5–110(a) *and (b),* 5–114(a), 5–115, 5–118(b)(2) and (3),
29             5–120, 5–133, 5–143, 5–205, 5–206, 5–301, and 5–306
30        Annotated Code of Maryland
31        (2011 Replacement Volume and 2012 Supplement)

32   BY adding to
33        Article – Public Safety
34        Section 5–117.1, 5–118(b)(4), 5–133.1, 5–133.2, 5–133.3, ~~and 5–143~~ 5–143, and
35             5–145, *and 5–146*
36        Annotated Code of Maryland
37        (2011 Replacement Volume and 2012 Supplement)

38   BY repealing
39        Article – Public Safety
40        Section 5–119

JA0866

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 393 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 5 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 5 of 62

SENATE BILL 281                                    5

1    Annotated Code of Maryland
2    (2011 Replacement Volume and 2012 Supplement)

3    *BY repealing and reenacting, without amendments,*
4    *Article – State Government*
5    *Section 10–616(a)*
6    *Annotated Code of Maryland*
7    *(2009 Replacement Volume and 2012 Supplement)*

8    *BY adding to*
9    *Article – State Government*
10   *Section 10–616(v)*
11   *Annotated Code of Maryland*
12   *(2009 Replacement Volume and 2012 Supplement)*

13   SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF
14   MARYLAND, That the Laws of Maryland read as follows:

15                    **Article – Criminal Law**

16   *4–102.*

17        *(a)    This section does not apply to:*

18             *(1)    a law enforcement officer in the regular course of the officer's duty;*

19             *(2)    AN OFF–DUTY LAW ENFORCEMENT OFFICER WHO IS A PARENT,*
20   *GUARDIAN, OR VISITOR OF A STUDENT ATTENDING A SCHOOL LOCATED ON THE*
21   *PUBLIC SCHOOL PROPERTY, PROVIDED THAT:*

22                  *(I)    THE OFFICER IS DISPLAYING THE OFFICER'S BADGE OR*
23   *CREDENTIAL; AND*

24                  *(II)    THE WEAPON CARRIED OR POSSESSED BY THE OFFICER*
25   *IS CONCEALED;*

26             *[(2)] (3)    a person hired by a county board of education specifically for*
27   *the purpose of guarding public school property;*

28             *[(3)] (4)    a person engaged in organized shooting activity for*
29   *educational purposes; or*

30             *[(4)] (5)    a person who, with a written invitation from the school*
31   *principal, displays or engages in a historical demonstration using a weapon or a*
32   *replica of a weapon for educational purposes.*

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 394 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 6 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 6 of 62

6                                SENATE BILL 281

1        (b)    *A person may not carry or possess a firearm, knife, or deadly weapon of*
2   *any kind on public school property.*

3        (c)    (1)    *Except as provided in paragraph (2) of this subsection, a person*
4   *who violates this section is guilty of a misdemeanor and on conviction is subject to*
5   *imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.*

6                (2)    *A person who is convicted of carrying or possessing a handgun in*
7   *violation of this section shall be sentenced under Subtitle 2 of this title.*

8   *4–110.*

9        (A)    IN THIS SECTION, "RESTRICTED FIREARM AMMUNITION" MEANS A
10   CARTRIDGE, A SHELL, OR ANY OTHER DEVICE THAT:

11                (1)    CONTAINS EXPLOSIVE OR INCENDIARY MATERIAL DESIGNED
12   AND INTENDED FOR USE IN A FIREARM; AND

13                (2)    HAS A CORE CONSTRUCTED, EXCLUDING TRACES OF OTHER
14   SUBSTANCES, ENTIRELY FROM ONE OR A COMBINATION OF:

15                        (I)    TUNGSTEN ALLOYS;

16                        (II)    STEEL;

17                        (III)    IRON;

18                        (IV)    BRASS;

19                        (V)    BERYLLIUM COPPER;

20                        (VI)    DEPLETED URANIUM; OR

21                        (VII)   AN EQUIVALENT MATERIAL OF SIMILAR DENSITY OR
22   HARDNESS.

23        (B)    A PERSON MAY NOT, DURING AND IN RELATION TO THE COMMISSION
24   OF A CRIME OF VIOLENCE AS DEFINED IN § 14–101 OF THIS ARTICLE, POSSESS
25   OR USE RESTRICTED FIREARM AMMUNITION.

26        (C)    A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A
27   MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT
28   EXCEEDING 5 YEARS OR A FINE NOT EXCEEDING $5,000 OR BOTH.

29   4–203.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 395 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 7 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 7 of 62

SENATE BILL 281                                7

(b)    This section does not prohibit:

(1)    the wearing, carrying, or transporting of a handgun by a person who [is on active assignment engaged in law enforcement,] is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

(i)    a law enforcement official of the United States, the State, or a county or city of the State;

(ii)    a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;

(iii)    a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

(iv)    a correctional officer or warden of a correctional facility in the State;

(v)    a sheriff or full–time assistant or deputy sheriff of the State; or

(vi)    a temporary or part–time sheriff's deputy;

(2)    the wearing, carrying, or transporting of a handgun, **IN COMPLIANCE WITH ANY LIMITATIONS IMPOSED UNDER § 5–307 OF THE PUBLIC SAFETY ARTICLE,** by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

(3)    the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(4)    the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources–sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 396 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 8 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 8 of 62

8                                    SENATE BILL 281

1          (5)    the moving by a bona fide gun collector of part or all of the
2    collector's gun collection from place to place for public or private exhibition if each
3    handgun is unloaded and carried in an enclosed case or an enclosed holster;

4          (6)    the wearing, carrying, or transporting of a handgun by a person on
5    real estate that the person owns or leases or where the person resides or within the
6    confines of a business establishment that the person owns or leases;

7          (7)    the wearing, carrying, or transporting of a handgun by a
8    supervisory employee:

9                 (i)    in the course of employment;

10                (ii)    within the confines of the business establishment in which
11   the supervisory employee is employed; and

12                (iii)    when so authorized by the owner or manager of the business
13   establishment;

14         (8)    the carrying or transporting of a signal pistol or other visual
15   distress signal approved by the United States Coast Guard in a vessel on the
16   waterways of the State or, if the signal pistol or other visual distress signal is
17   unloaded and carried in an enclosed case, in a vehicle; or

18         (9)    the wearing, carrying, or transporting of a handgun by a person
19   who is carrying a court order requiring the surrender of the handgun, if:

20                (i)    the handgun is unloaded;

21                (ii)    the person has notified the law enforcement unit, barracks,
22   or station that the handgun is being transported in accordance with the court order;
23   and

24                (iii)    the person transports the handgun directly to the law
25   enforcement unit, barracks, or station.

26         Subtitle 3.  Assault [Pistols] WEAPONS and Detachable Magazines.

27   4–301.

28   (A)    IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS
29   INDICATED.

30   (B)    "ASSAULT LONG GUN" MEANS ANY ASSAULT WEAPON LISTED
31   UNDER § 5–101(R)(2) OF THE PUBLIC SAFETY ARTICLE.

SENATE BILL 281                9

1       (C)    [In this subtitle, "assault] **"ASSAULT** pistol" means any of the following
2    firearms [or a copy regardless of the producer or manufacturer]:

3              (1)    AA Arms AP–9 semiautomatic pistol;

4              (2)    Bushmaster semiautomatic pistol;

5              (3)    Claridge HI–TEC semiautomatic pistol;

6              (4)    D Max Industries semiautomatic pistol;

7              (5)    Encom MK–IV, MP–9, or MP–45 semiautomatic pistol;

8              (6)    Heckler and Koch semiautomatic SP–89 pistol;

9              (7)    Holmes MP–83 semiautomatic pistol;

10             (8)    Ingram MAC 10/11 semiautomatic pistol and variations including
11   the Partisan Avenger and the SWD Cobray;

12             (9)    Intratec TEC–9/DC–9 semiautomatic pistol in any centerfire
13   variation;

14             (10)   P.A.W.S. type semiautomatic pistol;

15             (11)   Skorpion semiautomatic pistol;

16             (12)   Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);

17             (13)   UZI semiautomatic pistol;

18             (14)   Weaver Arms semiautomatic Nighthawk pistol; or

19             (15)   Wilkinson semiautomatic "Linda" pistol.

20     **(D)**    **"ASSAULT WEAPON" MEANS:**

21             **(1)**    **AN ASSAULT LONG GUN;**

22             **(2)**    **AN ASSAULT PISTOL; OR**

23             **(3)**    **A COPYCAT WEAPON.**

24     **(E)**    **(1)**    **"COPYCAT WEAPON" MEANS:**

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 398 of 460

10                          SENATE BILL 281

1              (I)    A SEMIAUTOMATIC CENTERFIRE RIFLE THAT CAN
2    ACCEPT A DETACHABLE MAGAZINE AND HAS ANY TWO OF THE FOLLOWING:

3                    1.    A PISTOL GRIP THAT PROTRUDES
4    CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON;

5                    2.    A THUMBHOLE STOCK;

6                    3.    A FOLDING OR TELESCOPING STOCK;

7                    4. 3. 2. A GRENADE LAUNCHER OR FLARE LAUNCHER;
8    OR

9                    5. 4. 3. A FLASH SUPPRESSOR; OR

10                   6. 5.    A FORWARD PISTOL GRIP;

11              (II)    A SEMIAUTOMATIC CENTERFIRE RIFLE THAT HAS A
12   FIXED MAGAZINE WITH THE CAPACITY TO ACCEPT MORE THAN 10 ROUNDS;

13              (III)    A SEMIAUTOMATIC CENTERFIRE RIFLE THAT HAS AN
14   OVERALL LENGTH OF LESS THAN 30 29 INCHES;

15              (IV)    A SEMIAUTOMATIC PISTOL THAT CAN ACCEPT A
16   DETACHABLE MAGAZINE AND HAS ANY TWO OF THE FOLLOWING:

17                   1.    A THREADED BARREL, CAPABLE OF ACCEPTING A
18   FLASH SUPPRESSOR, FORWARD HANDGRIP, OR SILENCER;

19                   2.    A SECOND HANDGRIP;

20                   3.    A SHROUD THAT IS ATTACHED TO OR THAT
21   PARTIALLY OR COMPLETELY ENCIRCLES THE BARREL, EXCEPT FOR A SLIDE
22   THAT ENCLOSES THE BARREL, AND THAT ALLOWS THE BEARER TO FIRE THE
23   WEAPON WITHOUT BURNING THE BEARER'S HAND; OR

24                   4.    THE CAPACITY TO ACCEPT A DETACHABLE
25   MAGAZINE OUTSIDE THE PISTOL GRIP;

26              (V) (IV)    A SEMIAUTOMATIC PISTOL WITH A FIXED
27   MAGAZINE THAT CAN ACCEPT MORE THAN 10 ROUNDS;

28              (VI) (V)    A SEMIAUTOMATIC SHOTGUN THAT HAS:

SENATE BILL 281         11

1          ~~1.~~     A FOLDING ~~OR TELESCOPING~~ STOCK; ~~AND~~

2          ~~2.~~    ~~A PISTOL GRIP THAT PROTRUDES~~
3 ~~CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON, THUMBHOLE STOCK,~~
4 ~~OR VERTICAL HANDGRIP; OR~~

5          ~~(VII)~~ *(VI)*    A SHOTGUN WITH A REVOLVING CYLINDER.

6          (2)    "COPYCAT WEAPON" DOES NOT INCLUDE AN ASSAULT LONG
7 GUN OR AN ASSAULT PISTOL.

8       (F)   "DETACHABLE MAGAZINE" MEANS AN AMMUNITION FEEDING
9 DEVICE THAT CAN BE REMOVED READILY FROM A FIREARM WITHOUT
10 REQUIRING DISASSEMBLY OF THE FIREARM ACTION OR WITHOUT THE USE OF A
11 TOOL, INCLUDING A BULLET OR CARTRIDGE.

12       (G)   "FLASH SUPPRESSOR" MEANS A DEVICE THAT FUNCTIONS, OR IS
13 INTENDED TO FUNCTION, TO PERCEPTIBLY REDUCE OR REDIRECT MUZZLE
14 FLASH FROM THE SHOOTER'S FIELD OF VISION.

15       ~~(H)~~ ~~"FORWARD PISTOL GRIP" MEANS A GRIP THAT ALLOWS FOR A~~
16 ~~PISTOL-STYLE GRASP FORWARD OF THE TRIGGER.~~

17       ~~(I)~~ *(H)*    "LICENSED FIREARMS DEALER" MEANS A PERSON WHO
18 HOLDS A DEALER'S LICENSE UNDER TITLE 5, SUBTITLE 1 OF THE PUBLIC
19 SAFETY ARTICLE.

20       ~~(J)~~ ~~"PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE~~
21 ~~ACTION OF THE WEAPON" MEANS A GRIP THAT ALLOWS FOR A PISTOL-STYLE~~
22 ~~GRASP IN WHICH THE WEB OF THE TRIGGER HAND BETWEEN THE THUMB AND~~
23 ~~INDEX FINGER CAN BE PLACED BELOW THE TOP OF THE EXPOSED PORTION OF~~
24 ~~THE TRIGGER WHILE FIRING.~~

25       ~~(K)~~ ~~"THUMBHOLE STOCK" MEANS A STOCK WITH A HOLE THAT ALLOWS~~
26 ~~THE THUMB OF THE TRIGGER HAND TO PENETRATE INTO OR THROUGH THE~~
27 ~~STOCK WHILE FIRING.~~

28    4–302.

29       This subtitle does not apply to:

30          (1)    if acting within the scope of official business, personnel of the
31 United States government or a unit of that government, members of the armed forces
32 of the United States or of the National Guard, *MEMBERS OF THE MARYLAND*

12                                    SENATE BILL 281

1    ~~DEFENSE FORCE,~~ or law enforcement personnel of the State or a local unit in the
2    State, OR A RAILROAD POLICE OFFICER AUTHORIZED UNDER TITLE 3 OF THE
3    PUBLIC SAFETY ARTICLE OR 49 U.S.C. § 28101;

4            (2)      a firearm modified to render it permanently inoperative;

5            (3)      POSSESSION, *IMPORTATION,* MANUFACTURE, RECEIPT FOR
6    MANUFACTURE, SHIPMENT FOR MANUFACTURE, *STORAGE,* purchases, sales, and
7    transport to or by a licensed firearms dealer or manufacturer who is:

8                (i)      providing or servicing an assault [pistol] WEAPON or
9    detachable magazine for a law enforcement unit or for personnel exempted under item
10   (1) of this section; ~~or~~

11               (ii)      acting to sell or transfer an assault [pistol] WEAPON or
12   detachable magazine to a licensed firearm dealer in another state *OR TO AN*
13   *INDIVIDUAL PURCHASER IN ANOTHER STATE THROUGH A LICENSED FIREARMS*
14   *DEALER*; OR

15               (III)     ACTING TO RETURN TO A CUSTOMER IN ANOTHER STATE
16   AN ASSAULT WEAPON TRANSFERRED TO THE LICENSED FIREARMS DEALER OR
17   MANUFACTURER UNDER THE TERMS OF A WARRANTY OR FOR REPAIR;

18           (4)      organizations that are required or authorized by federal law
19   governing their specific business or activity to maintain assault [pistols] WEAPONS
20   and applicable ammunition and detachable magazines;

21           (5)      the receipt of an assault [pistol] WEAPON or detachable magazine
22   by inheritance*, AND POSSESSION OF THE INHERITED ASSAULT WEAPON OR*
23   *DETACHABLE MAGAZINE,* if the decedent lawfully possessed the assault [pistol]
24   WEAPON *OR DETACHABLE MAGAZINE AND THE PERSON INHERITING THE*
25   *ASSAULT   WEAPON   OR   DETACHABLE   MAGAZINE   IS   NOT   OTHERWISE*
26   *DISQUALIFIED FROM POSSESSING A REGULATED FIREARM;* ~~or~~

27           (6)      the receipt of an assault [pistol] WEAPON or detachable magazine
28   by a personal representative of an estate for purposes of exercising the powers and
29   duties of a personal representative of an estate; OR

30           (7)      POSSESSION BY A PERSON WHO IS RETIRED IN GOOD
31   STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE STATE
32   OR A LOCAL UNIT IN THE STATE AND IS NOT OTHERWISE PROHIBITED FROM
33   RECEIVING AN ASSAULT WEAPON OR DETACHABLE MAGAZINE IF:

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 401 of 460

SENATE BILL 281                                    13

1    (I)    THE ASSAULT WEAPON OR DETACHABLE MAGAZINE IS
2  SOLD OR TRANSFERRED TO THE PERSON BY THE LAW ENFORCEMENT AGENCY
3  ON RETIREMENT; OR

4    (II)    THE ASSAULT WEAPON OR DETACHABLE MAGAZINE WAS
5  PURCHASED OR OBTAINED BY THE PERSON FOR OFFICIAL USE WITH THE LAW
6  ENFORCEMENT AGENCY BEFORE RETIREMENT; OR

7    (8)    POSSESSION OR TRANSPORT BY AN EMPLOYEE OF AN
8  ARMORED CAR COMPANY IF THE INDIVIDUAL IS ACTING WITHIN THE SCOPE OF
9  EMPLOYMENT AND HAS A PERMIT ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE
10 PUBLIC SAFETY ARTICLE; OR

11   (9)    POSSESSION, RECEIPT, AND TESTING BY, OR SHIPPING TO OR
12 FROM:

13   (I)    AN ISO 17025 ACCREDITED, NATIONAL INSTITUTE OF
14 JUSTICE–APPROVED BALLISTICS TESTING LABORATORY; OR

15   (II)    A FACILITY OR ENTITY THAT MANUFACTURES OR
16 PROVIDES RESEARCH AND DEVELOPMENT TESTING, ANALYSIS, OR
17 ENGINEERING FOR PERSONAL PROTECTIVE EQUIPMENT OR VEHICLE
18 PROTECTION SYSTEMS.

19  4–303.

20   (a)    Except as provided in subsection (b) of this section, a person may not:

21   (1)    transport an assault [pistol] WEAPON into the State; or

22   (2)    possess, sell, offer to sell, transfer, purchase, or receive an assault
23 [pistol] WEAPON.

24   (b)   (1)    A person who lawfully possessed an assault pistol before June 1,
25 1994, and who registered the assault pistol with the Secretary of State Police before
26 August 1, 1994, may:

27   [(1)]   (I)    continue to possess AND TRANSPORT the assault pistol; or

28   [(2)]   (II)    while carrying a court order requiring the surrender of the
29 assault pistol, transport the assault pistol directly to the law enforcement unit,
30 barracks, or station if the person has notified the law enforcement unit, barracks, or
31 station that the person is transporting the assault pistol in accordance with a court
32 order and the assault pistol is unloaded.

14                                    SENATE BILL 281

1        (2)   *A LICENSED FIREARMS DEALER MAY CONTINUE TO POSSESS,*
2    *SELL, OFFER FOR SALE, OR TRANSFER AN ASSAULT LONG GUN OR A COPYCAT*
3    *WEAPON THAT THE LICENSED FIREARMS DEALER LAWFULLY POSSESSED ON OR*
4    *BEFORE OCTOBER 1, 2013.*

5        ~~(3)   A LICENSED FIREARMS DEALER MAY CONTINUE TO POSSESS,~~
6    ~~SELL, OFFER FOR SALE, OR TRANSFER AN ASSAULT LONG GUN OR A COPYCAT~~
7    ~~WEAPON THAT THE LICENSED FIREARMS DEALER LAWFULLY POSSESSED ON OR~~
8    ~~BEFORE OCTOBER 1, 2013.~~

9        ~~(3)~~   (I)   A PERSON WHO LAWFULLY POSSESSED ~~OR PLACED A~~
10   ~~VERIFIABLE PURCHASE ORDER FOR,~~ HAS A PURCHASE ORDER FOR, OR
11   *COMPLETED AN APPLICATION TO PURCHASE* AN ASSAULT LONG GUN OR A
12   COPYCAT WEAPON BEFORE OCTOBER 1, 2013, ~~AND WHO REGISTERS THE~~
13   ~~ASSAULT LONG GUN OR COPYCAT WEAPON WITH THE SECRETARY OF STATE~~
14   ~~POLICE BEFORE NOVEMBER 1, 2013~~ JANUARY 1, 2014, MAY:

15       (I)   ~~1.~~ (I)   ~~CONTINUE TO~~ POSSESS AND TRANSPORT THE
16   ASSAULT LONG GUN OR COPYCAT WEAPON; OR

17       (II)   ~~2.~~ (II)   WHILE CARRYING A COURT ORDER REQUIRING
18   THE SURRENDER OF THE ASSAULT LONG GUN OR COPYCAT WEAPON,
19   TRANSPORT THE ASSAULT LONG GUN OR COPYCAT WEAPON DIRECTLY TO THE
20   LAW ENFORCEMENT UNIT, BARRACKS, OR STATION IF THE PERSON HAS
21   NOTIFIED THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION THAT THE
22   PERSON IS TRANSPORTING THE ASSAULT LONG GUN OR COPYCAT WEAPON IN
23   ACCORDANCE WITH A COURT ORDER AND THE ASSAULT LONG GUN OR COPYCAT
24   WEAPON IS UNLOADED.

25       ~~(II)   A PERSON WHO PURCHASED AN ASSAULT LONG GUN~~
26   ~~BEFORE OCTOBER 1, 2013, AND REGISTERED THE ASSAULT LONG GUN WITH~~
27   ~~THE SECRETARY OF STATE POLICE IS NOT REQUIRED TO REREGISTER THE~~
28   ~~ASSAULT LONG GUN UNDER THIS SUBSECTION.~~

29       ~~(3)   (I)   SUBJECT TO PARAGRAPH (4) OF THIS SUBSECTION, A~~
30   ~~PERSON WHO LAWFULLY POSSESSED AN ASSAULT LONG GUN OR A COPYCAT~~
31   ~~WEAPON BEFORE OCTOBER 1, 2013, AND WHO VOLUNTARILY REGISTERS THE~~
32   ~~ASSAULT LONG GUN OR COPYCAT WEAPON ON OR AFTER NOVEMBER 1, 2013~~
33   ~~JANUARY 1, 2014, IS NOT SUBJECT TO THE PENALTIES IN § 4–306 OF THIS~~
34   ~~SUBTITLE.~~

35       ~~(II)   A PERSON WHO VOLUNTARILY REGISTERS AN ASSAULT~~
36   ~~LONG GUN OR A COPYCAT WEAPON AS DESCRIBED IN SUBPARAGRAPH (I) OF~~
37   ~~THIS PARAGRAPH IS SUBJECT TO A CIVIL PENALTY NOT EXCEEDING $1,000;~~

SENATE BILL 281                                    15

1      1. ~~BEFORE MAY 1, 2014, A CIVIL PENALTY NOT~~
2  ~~EXCEEDING $290 PER REGISTERED FIREARM;~~

3      2. ~~ON OR AFTER MAY 1, 2014 AND BEFORE~~
4  ~~NOVEMBER 1, 2015, A CIVIL PENALTY NOT EXCEEDING $580 PER REGISTERED~~
5  ~~FIREARM; AND~~

6      3. ~~ON OR AFTER NOVEMBER 1, 2015 AND BEFORE~~
7  ~~MAY 1, 2016, A CIVIL PENALTY NOT EXCEEDING $1,000 PER REGISTERED~~
8  ~~FIREARM.~~

9      ~~(4)~~ ~~(I)~~ ~~A PERSON WHO LAWFULLY POSSESSED AN ASSAULT~~
10  ~~LONG GUN OR A COPYCAT WEAPON BEFORE OCTOBER 1, 2013, AND WHO~~
11  ~~REGISTERS THE ASSAULT LONG GUN OR COPYCAT WEAPON ON OR AFTER~~
12  ~~NOVEMBER 1, 2013 JANUARY 1, 2014, ONLY AFTER BEING DISCOVERED IN~~
13  ~~POSSESSION OF THE ASSAULT LONG GUN OR COPYCAT WEAPON BY A LAW~~
14  ~~ENFORCEMENT OFFICER IS NOT SUBJECT TO THE PENALTIES IN § 4–306 OF THIS~~
15  ~~SUBTITLE.~~

16      ~~(II)~~ ~~A PERSON DESCRIBED IN SUBPARAGRAPH (I) OF THIS~~
17  ~~PARAGRAPH IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO~~
18  ~~IMPRISONMENT NOT EXCEEDING 18 MONTHS 1 YEAR FOR EACH INCIDENT IN~~
19  ~~WHICH THE PERSON IS DISCOVERED WITH UNREGISTERED FIREARMS.~~

20      *(4)* *A PERSON MAY TRANSPORT AN ASSAULT WEAPON TO OR*
21  *FROM:*

22      *(I)* *AN ISO 17025 ACCREDITED, NATIONAL INSTITUTE OF*
23  *JUSTICE–APPROVED BALLISTICS TESTING LABORATORY; OR*

24      *(II)* *A FACILITY OR ENTITY THAT MANUFACTURES OR*
25  *PROVIDES RESEARCH AND DEVELOPMENT TESTING, ANALYSIS, OR*
26  *ENGINEERING FOR PERSONAL PROTECTIVE EQUIPMENT OR VEHICLE*
27  *PROTECTION SYSTEMS.*

28  4–304.

29      A law enforcement unit may seize as contraband and dispose of according to
30  regulation an assault [pistol] WEAPON transported, sold, transferred, purchased,
31  received, or possessed in violation of this subtitle.

32  4–305.

JA0877

16                               SENATE BILL 281

1       (a)     This section does not apply to:

2              *(1)*     a .22 caliber rifle with a tubular magazine*; OR*

3              *(2)     A LAW ENFORCEMENT OFFICER OR A PERSON WHO RETIRED IN
4      GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE
5      UNITED STATES, THE STATE, OR ANY LAW ENFORCEMENT AGENCY IN THE
6      STATE.*

7       (b)     A person may not manufacture, sell, offer for sale, purchase, receive, or
8      transfer a detachable magazine that has a capacity of more than [20] **10** rounds of
9      ammunition for a firearm.

10     4–306.

11      (a)     ~~A~~ **EXCEPT AS OTHERWISE PROVIDED IN THIS SUBTITLE, A** person
12     who violates this subtitle is guilty of a misdemeanor and on conviction is subject to
13     imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

14      (b)     (1)     A person who uses an assault [pistol] **WEAPON**, or a magazine that
15     has a capacity of more than [20] **10** rounds of ammunition, in the commission of a
16     felony or a crime of violence as defined in § 5–101 of the Public Safety Article is guilty
17     of a misdemeanor and on conviction, in addition to any other sentence imposed for the
18     felony or crime of violence, shall be sentenced under this subsection.

19              (2)     (i)     For a first violation, the person shall be sentenced to
20     imprisonment for not less than 5 years and not exceeding 20 years.

21                      (ii)     The court may not impose less than the minimum sentence
22     of 5 years.

23                      (iii)    The mandatory minimum sentence of 5 years may not be
24     suspended.

25                      (iv)    Except as otherwise provided in § 4–305 of the Correctional
26     Services Article, the person is not eligible for parole in less than 5 years.

27              (3)     (i)     For each subsequent violation, the person shall be sentenced
28     to imprisonment for not less than 10 years and not exceeding 20 years.

29                      (ii)     The court may not impose less than the minimum sentence
30     of 10 years.

31                      (iii)    A sentence imposed under this paragraph shall be
32     consecutive to and not concurrent with any other sentence imposed for the felony or
33     crime of violence.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 405 of 460

SENATE BILL 281                                    17

1              Article – Health – General

2     10–632.

3         (G)   IF A HEARING OFFICER ENTERS AN ORDER FOR INVOLUNTARY
4     ~~ADMISSION~~ *COMMITMENT* UNDER PART III OF THIS SUBTITLE AND THE
5     HEARING OFFICER DETERMINES THAT THE INDIVIDUAL CANNOT SAFELY
6     POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO
7     OTHERS, THE HEARING OFFICER SHALL ORDER THE INDIVIDUAL WHO IS
8     SUBJECT TO THE INVOLUNTARY ~~ADMISSION~~ *COMMITMENT* TO:

9              (1)   ~~(I)~~   SURRENDER TO LAW ENFORCEMENT AUTHORITIES ANY
10    FIREARMS IN THE INDIVIDUAL'S POSSESSION~~; OR~~

11             ~~(II)   TEMPORARILY CONSIGN ANY FIREARMS IN THE~~
12    ~~INDIVIDUAL'S POSSESSION TO A LICENSED DEALER FOR STORAGE OR~~
13    ~~CONSIGNMENT~~; AND

14             (2)   REFRAIN FROM POSSESSING A FIREARM UNLESS THE
15    INDIVIDUAL IS GRANTED RELIEF FROM FIREARMS DISQUALIFICATION IN
16    ACCORDANCE WITH § 5–133.3 OF THE PUBLIC SAFETY ARTICLE.

17             Article – Natural Resources

18    10–410.

19        (g)   (1)   Except as provided in [paragraph (2)] PARAGRAPHS (2) AND (3)
20    of this subsection, a person, other than the owner or occupant, while hunting for any
21    wild bird or mammal may not shoot or discharge any firearm or other deadly weapon
22    within 150 yards, known as the "safety zone," of a dwelling house, residence, church,
23    or other building or camp occupied by human beings, or shoot at any wild bird or
24    mammal while it is within this area, without the specific advance permission of the
25    owner or occupant.

26             (2)   A PERSON, WHILE HUNTING FOR ANY WILD BIRD OR MAMMAL,
27    MAY NOT SHOOT OR DISCHARGE ANY FIREARM WITHIN 300 YARDS OF A PUBLIC
28    OR NONPUBLIC SCHOOL DURING SCHOOL HOURS OR AT A TIME WHEN A
29    SCHOOL–APPROVED ACTIVITY IS TAKING PLACE.

30             [(2)] (3)   For archery hunters in Carroll County or Frederick County,
31    the safety zone described in paragraph (1) of this subsection extends for 50 yards from
32    a dwelling house, residence, church, or any other building or camp occupied by human
33    beings.

18                          SENATE BILL 281

1          [(3)] (4)    During any open hunting season, a person, other than the
2    owner or occupant, may not hunt or chase willfully any wild bird or mammal within
3    the safety zone without the specific advance permission of the owner or occupant.

4                          Article – Public Safety

5    3–208.

6          [(a)]  Subject to the authority of the Secretary, the Commission has the following
7    powers and duties:

8                (1)    to adopt regulations necessary or appropriate to carry out this
9    subtitle; and

10               (2)    to adopt regulations that establish and enforce standards for prior
11   substance abuse by individuals applying for certification as a police officer.

12         [(b)    Subject to subsections (c) and (d) of this section, the Commission shall
13   adopt regulations on or before January 1, 2001, for a certified firearms safety training
14   course required for an applicant for a regulated firearms purchase, rental, or transfer
15   made on or after January 1, 2002.

16         (c)    The certified firearms safety training course required under subsection (b)
17   of this section shall:

18               (1)    be offered by the Commission; or

19               (2)    contain a handgun safety component and be conducted by an
20   individual or organization certified by:

21                     (i)     the Commission;

22                     (ii)    the Department of Natural Resources;

23                     (iii)   the Department of State Police; or

24                     (iv)    any reputable organization:

25                            1.    that has as one of its objectives the promotion of
26   competency and safety in handling handguns; and

27                            2.    whose course has been determined by the Commission
28   to meet the regulations adopted by the Commission.

29         (d)    Any course offered by the Commission under subsection (c) of this section:

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 407 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 19 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 19 of 62

SENATE BILL 281                    19

1        *(1)*    *shall be offered free of charge or fee;*

2        *(2)*    *may not be more than 2 hours in duration;*

3        *(3)*    *shall be conducted or offered at least once each week in all*
4    *geographic areas of the State;*

5        *(4)*    *shall be available after regular business hours;*

6        *(5)*    *shall be open to each individual required by law to complete the*
7    *firearms safety training course, within 2 weeks after request of the individual;*

8        *(6)*    *shall only require attendance throughout the duration of the course*
9    *in order to complete the course successfully; and*

10        *(7)*    *may not require any skills or knowledge testing in the use of a*
11    *regulated firearm in order to complete the course successfully.]*

12    5–101.

13        (a)    In this subtitle the following words have the meanings indicated.

14        (b)    "Antique firearm" has the meaning stated in § 4–201 of the Criminal Law
15    Article.

16        *(B–1) (1)    "CONVICTED OF A DISQUALIFYING CRIME" INCLUDES:*

17        *(I)    A CASE IN WHICH A PERSON RECEIVED PROBATION*
18    *BEFORE JUDGMENT FOR A CRIME OF VIOLENCE; AND*

19        *(II)    A CASE IN WHICH A PERSON RECEIVED PROBATION*
20    *BEFORE JUDGMENT IN A DOMESTICALLY RELATED CRIME AS DEFINED IN § 6–233*
21    *OF THE CRIMINAL PROCEDURE ARTICLE.*

22        *(2)    "CONVICTED OF A DISQUALIFYING CRIME" DOES NOT*
23    *INCLUDE A CASE IN WHICH A PERSON RECEIVED A PROBATION BEFORE*
24    *JUDGMENT:*

25        *(I)    FOR ASSAULT IN THE SECOND DEGREE; OR*

26        *(II)    THAT WAS EXPUNGED UNDER TITLE 10, SUBTITLE 1 OF*
27    *THE CRIMINAL PROCEDURE ARTICLE.*

28        (c)    "Crime of violence" means:

20                                  SENATE BILL 281

1          (1)    abduction;

2          (2)    arson in the first degree;

3          (3)    assault in the first or second degree;

4          (4)    burglary in the first, second, or third degree;

5          (5)    carjacking and armed carjacking;

6          (6)    escape in the first degree;

7          (7)    kidnapping;

8          (8)    voluntary manslaughter;

9          (9)    maiming as previously proscribed under former Article 27, § 386 of
10   the Code;

11         (10)   mayhem as previously proscribed under former Article 27, § 384 of
12   the Code;

13         (11)   murder in the first or second degree;

14         (12)   rape in the first or second degree;

15         (13)   robbery;

16         (14)   robbery with a dangerous weapon;

17         (15)   sexual offense in the first, second, or third degree;

18         (16)   an attempt to commit any of the crimes listed in items (1) through
19   (15) of this subsection; or

20         (17)   assault with intent to commit any of the crimes listed in items (1)
21   through (15) of this subsection or a crime punishable by imprisonment for more than 1
22   year.

23     (d)    "Dealer" means a person who is engaged in the business of:

24         (1)    selling, renting, or transferring firearms at wholesale or retail; or

25         (2)    repairing firearms.

26     (e)    "Dealer's license" means a State regulated firearms dealer's license.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 409 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 21 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 21 of 62

SENATE BILL 281                                     21

1         (f)    "Designated law enforcement agency" means a law enforcement agency
2    that the Secretary designates to process applications to purchase regulated firearms
3    for secondary sales.

4         (g)    "Disqualifying crime" means:

5            (1)    a crime of violence;

6            (2)    a violation classified as a felony in the State; or

7            (3)    a violation classified as a misdemeanor in the State that carries a
8    statutory penalty of more than 2 years.

9         (h)    (1)    "Firearm" means:

10              (i)    a weapon that expels, is designed to expel, or may readily be
11   converted to expel a projectile by the action of an explosive; or

12              (ii)    the frame or receiver of such a weapon.

13           (2)    "Firearm" includes a starter gun.

14        (i)    "Firearm applicant" means a person who makes a firearm application.

15        (j)    "Firearm application" means an application to purchase, rent, or transfer
16   a regulated firearm.

17        (k)    "Fugitive from justice" means a person who has fled to avoid prosecution
18   or giving testimony in a criminal proceeding.

19        (l)    "Habitual drunkard" means a person who has been found guilty of any
20   three crimes under § 21–902(a), (b), or (c) of the Transportation Article, one of which
21   occurred in the past year.

22        (m)    "Habitual user" means a person who has been found guilty of two
23   controlled dangerous substance crimes, one of which occurred in the past 5 years.

24        (n)    (1)    "Handgun" means a firearm with a barrel less than 16 inches in
25   length.

26           (2)    "Handgun" includes signal, starter, and blank pistols.

27        **(O)    "HANDGUN QUALIFICATION LICENSE" MEANS A LICENSE ISSUED BY**
28   **THE SECRETARY THAT AUTHORIZES A PERSON TO PURCHASE, RENT, OR**
29   **RECEIVE A HANDGUN.**

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 410 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 22 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 22 of 62

22                                    SENATE BILL 281

1        [(o)] **(P)**    "Licensee" means a person who holds a dealer's license.

2        **(Q)**   "Q~~UALIFIED HANDGUN INSTRUCTOR~~" MEANS A ~~PERSON CERTIFIED~~
3  ~~BY THE SECRETARY WHO MEETS THE REQUIREMENTS ESTABLISHED BY THE~~
4  ~~SECRETARY TO PROVIDE TRAINING IN THE CARE, SAFETY, AND USE OF~~
5  ~~HANDGUNS~~ *CERTIFIED FIREARMS INSTRUCTOR WHO:*

6                  *(1)    IS   RECOGNIZED   BY   THE   MARYLAND   POLICE   AND*
7  *CORRECTIONAL TRAINING COMMISSIONS;*

8                  *(2)    HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY*
9  *THE SECRETARY; OR*

10                 *(3)    HAS  A  CERTIFICATION  ISSUED* ~~AND  RECOGNIZED  BY  A~~
11 ~~NATIONAL   ORGANIZATION~~   *BY  A  NATIONALLY  RECOGNIZED  FIREARMS*
12 *ORGANIZATION.*

13       [(p)] **(R)**    "Regulated firearm" means:

14                 (1)    a handgun; or

15                 (2)    a firearm that is any of the following specific assault weapons or
16 their copies, regardless of which company produced and manufactured that assault
17 weapon:

18                        (i)      American Arms Spectre da Semiautomatic carbine;

19                        (ii)     AK–47 in all forms;

20                        (iii)    Algimec AGM–1 type semi–auto;

21                        (iv)     AR 100 type semi–auto;

22                        (v)      AR 180 type semi–auto;

23                        (vi)     Argentine L.S.R. semi–auto;

24                        (vii)    Australian Automatic Arms SAR type semi–auto;

25                        (viii)   Auto–Ordnance Thompson M1 and 1927 semi–automatics;

26                        (ix)     Barrett light .50 cal. semi–auto;

27                        (x)      Beretta AR70 type semi–auto;

28                        (xi)     Bushmaster semi–auto rifle;

SENATE BILL 281                    23

1                    (xii)   Calico models M–100 and M–900;

2                    (xiii)  CIS SR 88 type semi–auto;

3                    (xiv)   Claridge HI TEC C–9 carbines;

4                    (xv)    Colt AR–15, CAR–15, and all imitations except Colt AR–15
5    Sporter H–BAR rifle;

6                    (xvi)   Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K–1, and
7    K–2;

8                    (xvii)  Dragunov Chinese made semi–auto;

9                    (xviii) Famas semi–auto (.223 caliber);

10                   (xix)   Feather AT–9 semi–auto;

11                   (xx)    FN LAR and FN FAL assault rifle;

12                   (xxi)   FNC semi–auto type carbine;

13                   (xxii)  F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

14                   (xxiii) Steyr–AUG–SA semi–auto;

15                   (xxiv)  Galil models AR and ARM semi–auto;

16                   (xxv)   Heckler and Koch HK–91 A3, HK–93 A2, HK–94 A2 and A3;

17                   (xxvi)    Holmes model 88 shotgun;

18                   (xxvii)   Avtomat Kalashnikov semiautomatic rifle in any format;

19                   (xxviii)  Manchester Arms "Commando" MK–45, MK–9;

20                   (xxix)  Mandell TAC–1 semi–auto carbine;

21                   (xxx)   Mossberg model 500 Bullpup assault shotgun;

22                   (xxxi)  Sterling Mark 6;

23                   (xxxii)   P.A.W.S. carbine;

24                   (xxxiii)  Ruger mini–14 folding stock model (.223 caliber);

USCA4 Appeal: 21-2017   Doc: 25-2      Filed: 08/03/2022    Pg: 412 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 24 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 24 of 62

24                           SENATE BILL 281

1                    (xxxiv)   SIG 550/551 assault rifle (.223 caliber);

2                    (xxxv)   SKS with detachable magazine;

3                    (xxxvi)   AP–74 Commando type semi–auto;

4                    (xxxvii) Springfield   Armory   BM–59,   SAR–48,   G3,   SAR–3,
5    M–21 sniper rifle, M1A, excluding the M1 Garand;

6                    (xxxviii)  Street sweeper assault type shotgun;

7                    (xxxix)  Striker 12 assault shotgun in all formats;

8                    (xl)    Unique F11 semi–auto type;

9                    (xli)    Daewoo USAS 12 semi–auto shotgun;

10                   (xlii)   UZI 9mm carbine or rifle;

11                   (xliii)  Valmet M–76 and M–78 semi–auto;

12                   (xliv)   Weaver Arms "Nighthawk" semi–auto carbine; or

13                   (xlv)    Wilkinson Arms 9mm semi–auto "Terry".

14         [(q)] (S)     "Rent" means the temporary transfer for consideration of a
15    regulated firearm that is taken from the property of the owner of the regulated
16    firearm.

17         [(r)] (T)     "Secondary sale" means a sale of a regulated firearm in which
18    neither party to the sale:

19                   (1)     is a licensee;

20                   (2)     is licensed by the federal government as a firearms dealer;

21                   (3)     devotes time, attention, and labor to dealing in firearms as a
22    regular course of trade or business with the principal objective of earning a profit
23    through the repeated purchase and resale of firearms; or

24                   (4)     repairs firearms as a regular course of trade or business.

25         [(s)] (U)     "Secretary" means the Secretary of State Police or the Secretary's
26    designee.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 413 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 25 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 25 of 62

SENATE BILL 281                              25

1    [(t)] (V)    "Straw purchase" means a sale of a regulated firearm in which a
2    person uses another, known as the straw purchaser, to:

3              (1)    complete the application to purchase a regulated firearm;

4              (2)    take initial possession of the regulated firearm; and

5              (3)    subsequently transfer the regulated firearm to the person.

6    5–110.

7        (a)    The Secretary shall disapprove an application for a dealer's license if:

8              (1)    the Secretary determines that the applicant supplied false
9    information or made a false statement;

10             (2)    the Secretary determines that the application is not properly
11   completed; [or]

12             (3)    the Secretary receives a written notification from the applicant's
13   licensed attending physician that the applicant suffers from a mental disorder and is a
14   danger to the applicant or to another; OR

15             (4)    THE SECRETARY DETERMINES THAT THE APPLICANT INTENDS
16   THAT A PERSON WHO IS NOT ELIGIBLE TO BE ISSUED A DEALER'S LICENSE OR
17   WHOSE DEALER'S LICENSE HAS BEEN REVOKED OR SUSPENDED:

18                    (I)    WILL    PARTICIPATE    IN    THE    MANAGEMENT    OR
19   OPERATION OF THE BUSINESS FOR WHICH THE LICENSE IS SOUGHT; OR

20                    (II)    HOLDS A LEGAL OR EQUITABLE INTEREST IN THE
21   BUSINESS FOR WHICH THE LICENSE IS SOUGHT.

22        (b)    If the Secretary disapproves an application for a dealer's license, the
23   Secretary shall notify the applicant in writing of:

24             (1)    the disapproval OF THE APPLICATION; AND

25             (2)    THE REASON THE APPLICATION WAS DENIED.

26   5–114.

27        (a)    (1)    The Secretary shall suspend a dealer's license if the licensee:

28             (1)    (I)    is under indictment for a crime of violence; [or]

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 414 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 26 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 26 of 62

26                              SENATE BILL 281

1         (2)    *(II)*   is arrested for a violation of this subtitle that prohibits the
2    purchase or possession of a regulated firearm; OR .

3         (3) *(2)*       *(I)*    *THE SECRETARY MAY SUSPEND A DEALER'S*
4    *LICENSE IF THE LICENSEE* IS NOT IN COMPLIANCE WITH THE RECORD KEEPING
5    AND REPORTING REQUIREMENTS OF § 5–145 OF THIS SUBTITLE.

6                    *(II)*    *THE SECRETARY MAY LIFT A SUSPENSION UNDER THIS*
7    *PARAGRAPH AFTER THE LICENSEE PROVIDES EVIDENCE THAT THE RECORD*
8    *KEEPING VIOLATION HAS BEEN CORRECTED.*

9    5–115.

10        (a)    (1)    A person whose dealer's license is suspended or revoked OR WHO
11   IS FINED FOR A VIOLATION OF THIS SUBTITLE and who is aggrieved by the action
12   of the Secretary may request a hearing by writing to the Secretary within 30 days
13   after the Secretary forwards notice to the applicant under § 5–114(c) of this subtitle.

14               (2)    The Secretary shall grant the hearing within 15 days after
15   receiving the request.

16        (b)    The hearing shall be held in accordance with Title 10, Subtitle 2 of the
17   State Government Article.

18   5–117.1.

19        (A)    THIS SECTION DOES NOT APPLY TO:

20               (1)    A LICENSED FIREARMS MANUFACTURER;

21               (2)    A LAW ENFORCEMENT OFFICER OR PERSON WHO IS RETIRED
22   IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE
23   UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE
24   STATE; OR

25               (3)    A MEMBER OR RETIRED MEMBER OF THE ARMED FORCES OF
26   THE UNITED STATES OR, *OR* THE NATIONAL GUARD, *OR THE MARYLAND*
27   *DEFENSE FORCE; OR*

28               *(4)*    *A PERSON PURCHASING, RENTING, OR RECEIVING AN*
29   *ANTIQUE, CURIO, OR RELIC FIREARM, AS DEFINED IN FEDERAL LAW OR IN*
30   *DETERMINATIONS PUBLISHED BY THE BUREAU OF ALCOHOL, TOBACCO,*
31   *FIREARMS AND EXPLOSIVES.*

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 415 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 27 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 27 of 62

SENATE BILL 281                                27

1       (A) (B)    A DEALER OR ANY OTHER PERSON MAY NOT SELL, RENT, OR
2  TRANSFER A ~~REGULATED FIREARM~~ *HANDGUN* TO A PURCHASER, LESSEE, OR
3  TRANSFEREE UNLESS THE PURCHASER, LESSEE, OR TRANSFEREE PRESENTS TO
4  THE DEALER OR OTHER PERSON A VALID ~~REGULATED FIREARM~~ HANDGUN
5  QUALIFICATION LICENSE ISSUED TO THE PURCHASER, LESSEE, OR TRANSFEREE
6  BY THE SECRETARY UNDER THIS SECTION.

7       (B) (C)    A PERSON MAY PURCHASE, RENT, OR RECEIVE A HANDGUN
8  ONLY IF THE PERSON:

9           (1) (I)    POSSESSES A VALID HANDGUN QUALIFICATION LICENSE
10  ISSUED TO THE PERSON BY THE SECRETARY IN ACCORDANCE WITH THIS
11  SECTION; ~~AND~~

12           *(II)*   *POSSESSES VALID CREDENTIALS FROM A LAW*
13  *ENFORCEMENT AGENCY OR RETIREMENT CREDENTIALS FROM A LAW*
14  *ENFORCEMENT AGENCY;* ~~OR~~

15           *(III)*  *IS AN ACTIVE OR RETIRED MEMBER OF THE ARMED*
16  FORCES OF THE UNITED STATES ~~OR~~, *OR* THE NATIONAL GUARD, ~~*OR THE*~~
17  ~~*MARYLAND DEFENSE FORCE*~~ *AND POSSESSES A VALID MILITARY*
18  *IDENTIFICATION CARD;* ~~AND~~ *OR*

19           *(IV)*  *IS PURCHASING, RENTING, OR RECEIVING AN ANTIQUE,*
20  *CURIO, OR RELIC FIREARM, AS DEFINED IN FEDERAL LAW OR IN*
21  *DETERMINATIONS PUBLISHED BY THE BUREAU OF ALCOHOL, TOBACCO,*
22  *FIREARMS AND EXPLOSIVES; AND*

23           (2)    IS NOT OTHERWISE PROHIBITED FROM PURCHASING OR
24  POSSESSING A HANDGUN UNDER STATE OR FEDERAL LAW.

25       (C) (D)    SUBJECT TO SUBSECTIONS ~~(E) AND (F)~~ (F) AND (G) OF THIS
26  SECTION, THE SECRETARY SHALL ISSUE A HANDGUN QUALIFICATION LICENSE
27  TO A PERSON WHO THE SECRETARY FINDS:

28           (1)   *(I)*   IS AT LEAST 21 YEARS OLD; ~~*OR*~~

29           ~~*(II)*~~  ~~*IS AT LEAST 18 YEARS OLD IF THE PERSON IS A MEMBER*~~
30  ~~*OF THE UNITED STATES ARMED FORCES, THE NATIONAL GUARD, OR THE*~~
31  ~~*MARYLAND DEFENSE FORCE;*~~

32           (2)    IS A RESIDENT OF THE STATE;

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 416 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 28 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 28 of 62

28                        SENATE BILL 281

1        (3)    EXCEPT AS PROVIDED IN SUBSECTION (D) (E) OF THIS
2   SECTION, HAS DEMONSTRATED SATISFACTORY COMPLETION, :

3            (I), WITHIN 1 YEAR 3 YEARS PRIOR TO THE SUBMISSION OF
4   THE APPLICATION, OF A FIREARMS SAFETY TRAINING COURSE APPROVED BY
5   THE SECRETARY THAT INCLUDES:

6            (I)    1. (I)   A MINIMUM OF 8 4 HOURS OF INSTRUCTION BY A
7   QUALIFIED HANDGUN INSTRUCTOR;

8            (II)   2. (II)   CLASSROOM INSTRUCTION ON:

9                 1. A. 1.   STATE FIREARM LAW;

10                 2. B. 2.   HOME FIREARM SAFETY; AND

11                 3. C. 3.   HANDGUN MECHANISMS AND OPERATION; AND

12            (III) (II) (III)   WITHIN 10 YEARS PRIOR TO THE
13   SUBMISSION OF THE APPLICATION, OF A FIREARMS SAFETY TRAINING COURSE
14   APPROVED BY THE SECRETARY THAT INCLUDES A FIREARMS QUALIFICATION
15   COMPONENT THAT DEMONSTRATES THE PERSON'S PROFICIENCY AND USE OF
16   THE ORIENTATION COMPONENT THAT DEMONSTRATES THE PERSON'S SAFE
17   OPERATION AND HANDLING OF A FIREARM; AND

18        (4)    BASED ON AN INVESTIGATION, IS NOT PROHIBITED BY
19   FEDERAL OR STATE LAW FROM PURCHASING OR POSSESSING A HANDGUN.

20   (D) (E)   AN APPLICANT FOR A HANDGUN QUALIFICATION LICENSE IS
21   NOT REQUIRED TO COMPLETE A FIREARMS SAFETY TRAINING COURSE UNDER
22   SUBSECTION (C) (D) OF THIS SECTION IF THE APPLICANT:

23        (1)    IS A LAW ENFORCEMENT OFFICER OF THE UNITED STATES,
24   THE STATE, OR ANY LOCAL LAW ENFORCEMENT AGENCY IN THE STATE;

25        (2)    IS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES
26   OR THE NATIONAL GUARD; OR

27        (3)    HAS COMPLETED A CERTIFIED FIREARMS TRAINING COURSE
28   APPROVED BY THE SECRETARY; OR

29        (2)    HAS COMPLETED A COURSE OF INSTRUCTION IN COMPETENCY
30   AND SAFETY IN THE HANDLING OF FIREARMS PRESCRIBED BY THE DEPARTMENT

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 417 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 29 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 29 of 62

SENATE BILL 281                              29

1   OF NATURAL RESOURCES UNDER § 10–301.1 OF THE NATURAL RESOURCES
2   ARTICLE;

3              (2) (3)        IS CURRENTLY A CERTIFIED FIREARMS INSTRUCTOR
4   WHO:

5                   (I)    IS RECOGNIZED BY THE MARYLAND POLICE AND
6   CORRECTIONAL TRAINING COMMISSIONS;

7                   (II)   HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE
8   ISSUED BY THE SECRETARY; OR

9                   (III)  HAS A CERTIFICATION ISSUED AND RECOGNIZED BY A
10  NATIONAL ORGANIZATION A QUALIFIED HANDGUN INSTRUCTOR; OR

11             (3) (4)        IS AN HONORABLY DISCHARGED MEMBER OF THE
12  ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; OR

13             (4) (5)        IS AN EMPLOYEE OF AN ARMORED CAR COMPANY AND
14  HAS A PERMIT ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY
15  ARTICLE ; OR

16             (6)    LAWFULLY OWNS A REGULATED FIREARM.

17       (E) (F)    (1)    IN THIS SUBSECTION, "CENTRAL REPOSITORY" MEANS
18  THE CRIMINAL JUSTICE INFORMATION SYSTEM CENTRAL REPOSITORY OF THE
19  DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES.

20             (2)    IN ORDER TO OBTAIN A HANDGUN QUALIFICATION LICENSE,
21  AN APPLICANT SHALL APPLY TO THE CENTRAL REPOSITORY FOR A NATIONAL
22  AND STATE CRIMINAL HISTORY RECORDS CHECK THE SECRETARY SHALL
23  APPLY TO THE CENTRAL REPOSITORY FOR A STATE AND NATIONAL CRIMINAL
24  HISTORY RECORDS CHECK FOR EACH APPLICANT FOR A HANDGUN
25  QUALIFICATION LICENSE.

26             (3)    AS PART OF THE APPLICATION FOR A CRIMINAL HISTORY
27  RECORDS CHECK, THE APPLICANT SECRETARY SHALL SUBMIT TO THE
28  CENTRAL REPOSITORY:

29                   (I)    TWO COMPLETE SETS A COMPLETE SET OF THE
30  APPLICANT'S LEGIBLE FINGERPRINTS TAKEN IN A FORMAT APPROVED BY THE
31  DIRECTOR OF THE CENTRAL REPOSITORY AND THE DIRECTOR OF THE
32  FEDERAL BUREAU OF INVESTIGATION;

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 418 of 460

30 SENATE BILL 281

1     (II) THE FEE AUTHORIZED UNDER § 10–221(B)(7) OF THE
2 CRIMINAL PROCEDURE ARTICLE FOR ACCESS TO MARYLAND CRIMINAL
3 HISTORY RECORDS; AND

4     (III) THE MANDATORY PROCESSING FEE REQUIRED BY THE
5 FEDERAL BUREAU OF INVESTIGATION FOR A NATIONAL CRIMINAL HISTORY
6 RECORDS CHECK.

7    (4) THE CENTRAL REPOSITORY SHALL PROVIDE A RECEIPT TO
8 THE APPLICANT FOR THE FEES PAID IN ACCORDANCE WITH PARAGRAPH (3)(II)
9 AND (III) OF THIS SUBSECTION.

10    (5) IN ACCORDANCE WITH §§ 10–201 THROUGH 10–234 OF THE
11 CRIMINAL PROCEDURE ARTICLE, THE CENTRAL REPOSITORY SHALL FORWARD
12 TO THE APPLICANT AND THE SECRETARY A PRINTED STATEMENT OF THE
13 APPLICANT'S CRIMINAL HISTORY INFORMATION.

14    (6) INFORMATION OBTAINED FROM THE CENTRAL REPOSITORY
15 UNDER THIS SECTION:

16     (I) IS CONFIDENTIAL AND MAY NOT BE DISSEMINATED; AND

17     (II) SHALL BE USED ONLY FOR THE LICENSING PURPOSE
18 AUTHORIZED BY THIS SECTION.

19    (7) IF CRIMINAL HISTORY RECORD INFORMATION IS REPORTED
20 TO THE CENTRAL REPOSITORY AFTER THE DATE OF THE INITIAL CRIMINAL
21 HISTORY RECORDS CHECK, THE CENTRAL REPOSITORY SHALL PROVIDE TO THE
22 DEPARTMENT OF STATE POLICE LICENSING DIVISION A REVISED PRINTED
23 STATEMENT OF THE APPLICANT'S OR LICENSEE'S STATE CRIMINAL HISTORY
24 RECORD.

25   (F) (G) AN APPLICANT FOR A HANDGUN QUALIFICATION LICENSE
26 SHALL SUBMIT TO THE SECRETARY:

27    (1) AN APPLICATION IN THE MANNER AND FORMAT DESIGNATED
28 BY THE SECRETARY;

29    (2) A NONREFUNDABLE APPLICATION FEE OF $100 TO COVER
30 THE COSTS TO ADMINISTER THE PROGRAM OF UP TO $50 $25 $50;

31    (3) (I) PROOF OF SATISFACTORY COMPLETION OF:

SENATE BILL 281                                    31

1          *1.* A FIREARMS SAFETY TRAINING COURSE
2    APPROVED BY THE SECRETARY*; OR*

3                    *2.    A COURSE OF INSTRUCTION IN COMPETENCY AND*
4    *SAFETY IN THE HANDLING OF FIREARMS PRESCRIBED BY THE DEPARTMENT OF*
5    *NATURAL RESOURCES UNDER § 10–301.1 OF THE NATURAL RESOURCES*
6    *ARTICLE;* OR

7                    *(II)    A VALID FIREARMS INSTRUCTOR CERTIFICATION;*

8            (4)    ANY OTHER IDENTIFYING INFORMATION OR DOCUMENTATION
9    REQUIRED BY THE SECRETARY; AND

10           (5)    A STATEMENT MADE BY THE APPLICANT UNDER THE PENALTY
11   OF PERJURY THAT THE APPLICANT IS NOT PROHIBITED UNDER FEDERAL OR
12   STATE LAW FROM POSSESSING A HANDGUN.

13   ~~(G)~~ *(H)    (1)* WITHIN 30 DAYS AFTER RECEIVING A PROPERLY
14   COMPLETED APPLICATION, THE SECRETARY SHALL ISSUE TO THE APPLICANT:

15                ~~(1)~~ *(I)* A HANDGUN QUALIFICATION LICENSE IF THE
16   APPLICANT IS APPROVED; OR

17                ~~(2)~~ *(II)* A WRITTEN DENIAL OF THE APPLICATION THAT
18   CONTAINS*:*

19                        ~~(I)~~ *1.    THE REASON THE APPLICATION WAS DENIED; AND*

20                        ~~(II)~~ *2.* A STATEMENT OF THE APPLICANT'S APPEAL
21   RIGHTS UNDER SUBSECTION ~~(J)~~ *(L)* OF THIS SECTION.

22           *(2)    (I)    AN INDIVIDUAL WHOSE FINGERPRINTS HAVE BEEN*
23   *SUBMITTED TO THE CENTRAL REPOSITORY, AND WHOSE APPLICATION HAS*
24   *BEEN DENIED, MAY REQUEST THAT THE RECORD OF THE FINGERPRINTS BE*
25   *EXPUNGED BY OBLITERATION.*

26                    *(II)    PROCEEDINGS TO EXPUNGE A RECORD UNDER THIS*
27   *PARAGRAPH SHALL BE CONDUCTED IN ACCORDANCE WITH § 10–105 OF THE*
28   *CRIMINAL PROCEDURE ARTICLE.*

29                    *(III)    ON RECEIPT OF AN ORDER TO EXPUNGE A FINGERPRINT*
30   *RECORD, THE CENTRAL REPOSITORY SHALL EXPUNGE BY OBLITERATION THE*
31   *FINGERPRINTS SUBMITTED AS PART OF THE APPLICATION PROCESS.*

32                                    SENATE BILL 281

1            *(IV)* *AN INDIVIDUAL MAY NOT BE CHARGED A FEE FOR THE*
2    *EXPUNGEMENT OF A FINGERPRINT RECORD IN ACCORDANCE WITH THIS*
3    *PARAGRAPH.*

4            ~~(II)~~ (I)    ~~(1)~~    A HANDGUN QUALIFICATION LICENSE ISSUED UNDER
5    THIS SECTION EXPIRES ~~5~~ 10 YEARS FROM THE DATE OF ISSUANCE.

6            ~~(2)~~ (J)    (1)    THE HANDGUN QUALIFICATION LICENSE MAY BE
7    RENEWED FOR SUCCESSIVE PERIODS OF ~~5~~ 10 YEARS EACH IF, AT THE TIME OF
8    AN APPLICATION FOR RENEWAL, THE APPLICANT ~~POSSESSES THE~~
9    ~~QUALIFICATIONS FOR THE ISSUANCE OF THE HANDGUN QUALIFICATION~~
10   ~~LICENSE AND PAYS THE FEES REQUIRED IN SUBSECTIONS (E)(3) AND (F)(2) OF~~
11   ~~THIS SECTION:~~

12           (I)    POSSESSES THE QUALIFICATIONS FOR THE ISSUANCE
13   OF THE HANDGUN QUALIFICATION LICENSE; AND

14           (II)    SUBMITS A NONREFUNDABLE APPLICATION FEE TO
15   COVER THE COSTS TO ADMINISTER THE PROGRAM UP TO $20.

16           (2)    AN APPLICANT RENEWING A HANDGUN QUALIFICATION
17   LICENSE UNDER THIS SUBSECTION IS NOT REQUIRED TO:

18           (I)    COMPLETE THE FIREARMS SAFETY TRAINING COURSE
19   REQUIRED IN SUBSECTION (D)(3) OF THIS SECTION; OR

20           (II)    SUBMIT TO A STATE AND NATIONAL CRIMINAL HISTORY
21   RECORDS CHECK AS REQUIRED IN SUBSECTION (F) OF THIS SECTION.

22           ~~(I)~~ (K)    (1)    THE SECRETARY MAY REVOKE A HANDGUN
23   QUALIFICATION LICENSE ISSUED OR RENEWED UNDER THIS SECTION ON A
24   FINDING THAT THE LICENSEE NO LONGER SATISFIES THE QUALIFICATIONS SET
25   FORTH IN SUBSECTION ~~(C)~~ (D) OF THIS SECTION.

26           (2)    A PERSON HOLDING A HANDGUN QUALIFICATION LICENSE
27   THAT HAS BEEN REVOKED BY THE SECRETARY SHALL RETURN THE LICENSE TO
28   THE SECRETARY WITHIN 5 DAYS AFTER RECEIPT OF THE NOTICE OF
29   REVOCATION.

30           ~~(J)~~ (L)    (1)    A PERSON WHOSE ORIGINAL OR RENEWAL APPLICATION
31   FOR A HANDGUN QUALIFICATION LICENSE IS DENIED OR WHOSE HANDGUN
32   QUALIFICATION LICENSE IS REVOKED, MAY SUBMIT A WRITTEN REQUEST TO
33   THE SECRETARY FOR A HEARING WITHIN 30 DAYS AFTER THE DATE THE

SENATE BILL 281                                    33

1   WRITTEN NOTICE OF THE DENIAL OR REVOCATION WAS SENT TO THE
2   AGGRIEVED PERSON.

3               (2)   A HEARING UNDER THIS SECTION SHALL BE GRANTED BY THE
4   SECRETARY WITHIN 15 DAYS AFTER THE REQUEST.

5               (3)   A HEARING AND ANY SUBSEQUENT PROCEEDINGS OF
6   JUDICIAL REVIEW UNDER THIS SECTION SHALL BE CONDUCTED IN
7   ACCORDANCE WITH TITLE 10, SUBTITLE 2 OF THE STATE GOVERNMENT
8   ARTICLE.

9               (4)   A HEARING UNDER THIS SECTION SHALL BE HELD IN THE
10  COUNTY OF THE LEGAL RESIDENCE OF THE AGGRIEVED PERSON.

11      (M)   (1)   IF AN ORIGINAL OR RENEWAL HANDGUN QUALIFICATION
12  LICENSE IS LOST OR STOLEN, A PERSON MAY SUBMIT A WRITTEN REQUEST TO
13  THE SECRETARY FOR A REPLACEMENT LICENSE.

14              (2)   UNLESS THE APPLICANT IS OTHERWISE DISQUALIFIED, THE
15  SECRETARY SHALL ISSUE A REPLACEMENT HANDGUN QUALIFICATION LICENSE
16  ON RECEIPT OF A WRITTEN REQUEST AND A NONREFUNDABLE FEE TO COVER
17  THE COST OF REPLACEMENT UP TO $20.

18      (N)   THE SECRETARY MAY ADOPT REGULATIONS TO CARRY OUT THE
19  PROVISIONS OF THIS SECTION.

20  5–118.

21      (b)   A firearm application shall contain:

22              (2)   the date and time that the firearm applicant delivered the
23  completed firearm application to the prospective seller or transferor; [and]

24              (3)   a statement by the firearm applicant under the penalty of perjury
25  that the firearm applicant:

26              (i)   1.   is at least 21 years old; OR

27                       2.   IS AT LEAST 18 YEARS OLD IF THE FIREARM
28  APPLICANT IS A MEMBER OF THE UNITED STATES ARMED FORCES, THE
29  NATIONAL GUARD, OR THE MARYLAND DEFENSE FORCE;

30              (ii)   has never been convicted of a disqualifying crime;

JA0895

34                          SENATE BILL 281

1          (iii)   has never been convicted of a violation classified as a
2  common law crime and received a term of imprisonment of more than 2 years;

3                    (iv)   is not a fugitive from justice;

4                    (v)   is not a habitual drunkard;

5                    (vi)   is not addicted to a controlled dangerous substance or is not
6  a habitual user;

7          **(VII)  DOES NOT SUFFER FROM A MENTAL DISORDER AS**
8  **DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAVE A**
9  **HISTORY OF VIOLENT BEHAVIOR AGAINST** ~~THEMSELVES~~ *THE FIREARM*
10 *APPLICANT* **OR ANOTHER,** ~~UNLESS THE PERSON HAS A PHYSICIAN'S~~
11 ~~CERTIFICATE THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED~~
12 ~~FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER;~~

13          ~~(vii)~~ **(VIII)**  has never ~~spent more than 30 consecutive days in a~~
14 ~~medical institution for treatment of a mental disorder, unless a physician's certificate~~
15 ~~issued within 30 days before the date of application is attached to the application,~~
16 ~~certifying that the firearm applicant is capable of possessing a regulated firearm~~
17 ~~without undue danger to the firearm applicant or to another;~~

18          ~~(viii)~~  ~~is not a respondent against whom a current non–ex parte~~
19 ~~civil protective order has been entered under § 4–506 of the Family Law Article~~ **BEEN**
20 **FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL**
21 **PROCEDURE ARTICLE;**

22          **(IX)   HAS NEVER BEEN FOUND NOT CRIMINALLY**
23 **RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;**

24          **(X)** ~~HAS NEVER BEEN BEFORE OCTOBER 1, 2013, WAS~~ *HAS*
25 **NEVER** *BEEN* **VOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS**
26 **TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;**

27          **(XI)   HAS NEVER BEEN INVOLUNTARILY COMMITTED TO A**
28 **FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;**

29          ~~(XII)   HAS NEVER BEEN ADMITTED TO A FACILITY AS DEFINED~~
30 ~~IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN~~
31 ~~EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL~~
32 ~~ARTICLE OR, IF THE PERSON HAS BEEN ADMITTED TO A FACILITY, POSSESSES A~~
33 ~~CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF~~
34 ~~POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON~~
35 ~~OR TO ANOTHER;~~

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 423 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 35 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 35 of 62

SENATE BILL 281                                    35

1      (XIII) *(XII)* IS NOT UNDER THE PROTECTION OF A GUARDIAN
2   APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND
3   TRUSTS ARTICLE , *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A*
4   *GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY;*

5      (XIII) (XIV) *(XIII)* IS NOT A RESPONDENT AGAINST WHOM:

6         1.    A CURRENT NON EX PARTE CIVIL PROTECTIVE
7   ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

8         2.    AN ORDER FOR PROTECTION, AS DEFINED IN §
9   4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF
10   ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; AND

11      (ix) (XIV) (XV) *(XIV)*    if under the age of 30 years at the time of
12   application, has not been adjudicated delinquent by a juvenile court for an act that
13   would be a disqualifying crime if committed by an adult[; and

14      (x)    subject to § 5–119 of this subtitle, has completed a certified
15   firearms safety training course that the Police Training Commission conducts without
16   charge or that meets the standards that the Police Training Commission establishes
17   under § 3–207 of this article]; AND

18      (4)    A COPY OF THE APPLICANT'S HANDGUN QUALIFICATION
19   LICENSE.

20   [5–119.

21      A firearm applicant is not required to complete a certified firearms training
22   course required under §§ 5–118 and 5–134 of this subtitle if the firearm applicant:

23      (1)    has already completed a certified firearms training course required
24   under §§ 5–118 and 5–134 of this subtitle;

25      (2)    is a law enforcement officer of the State or any local law
26   enforcement agency in the State;

27      (3)    is a member, retired member, or honorably discharged member of
28   the armed forces of the United States or the National Guard;

29      (4)    is a member of an organization that is required by federal law
30   governing its specific business or activity to maintain handguns and applicable
31   ammunition; or

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 424 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 36 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 36 of 62

36                          SENATE BILL 281

1              (5)   holds a permit to carry a handgun under Subtitle 3 of this title.]

2    5–120.

3        (a)   (1)   On receipt of a firearm application, a licensee or designated law
4    enforcement agency shall promptly forward one copy of it to the Secretary by[:

5                    (i)   certified mail;

6                    (ii)   facsimile machine; or

7                    (iii)]   electronic means approved by the Secretary.

8              (2)   The copy of the firearm application forwarded to the Secretary
9    shall contain the name, address, and signature of the prospective seller, lessor, or
10   transferor.

11       (b)   (1)   The prospective seller, lessor, or transferor shall keep one copy of
12   the firearm application for not less than 3 years.

13             (2)   The firearm applicant is entitled to [the remaining] A copy of the
14   firearm application.

15       (c)   [(1)   Except as provided in paragraph (2) of this subsection, the] THE
16   licensee or designated law enforcement agency shall forward the $10 application fee
17   with the firearm application to the Secretary.

18             [(2)   A licensee or designated law enforcement agency that uses a
19   facsimile machine to forward the firearm application to the Secretary shall:

20                    (i)   be billed $10 for each firearm application forwarded to the
21   Secretary during the month; and

22                    (ii)   pay the total application fee by the fifteenth day of the
23   following month.]

24   5–133.

25       (a)   This section supersedes any restriction that a local jurisdiction in the
26   State imposes on the possession by a private party of a regulated firearm, and the
27   State preempts the right of any local jurisdiction to regulate the possession of a
28   regulated firearm.

29       (b)   [A] SUBJECT TO § 5–133.3 OF THIS SUBTITLE, A person may not
30   possess a regulated firearm if the person:

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 425 of 460

SENATE BILL 281                37

1        (1)     has been convicted of a disqualifying crime;

2        (2)     has been convicted of a violation classified as a common law crime
3   and received a term of imprisonment of more than 2 years;

4        (3)     is a fugitive from justice;

5        (4)     is a habitual drunkard;

6        (5)     is addicted to a controlled dangerous substance or is a habitual
7   user;

8        ~~(6)     [suffers from a mental disorder as defined in § 10–101(f)(2) of the~~
9   ~~Health – General Article and has a history of violent behavior against the person or~~
10  ~~another, unless the person has a physician's certificate that the person is capable of~~
11  ~~possessing a regulated firearm without undue danger to the person or to another,~~
12  ~~unless the person has a physician's certificate that the person is capable of possessing~~
13  ~~a regulated firearm without undue danger to the person or to another]~~;

14       *(6)     SUFFERS FROM A MENTAL DISORDER AS DEFINED IN §*
15  *10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAS A HISTORY OF*
16  *VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER;*

17       (7)     HAS BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER §
18  3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

19       ~~(7)~~ (8)     HAS BEEN FOUND NOT CRIMINALLY RESPONSIBLE
20  UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

21       [(7)] ~~(8)~~ (9)     has been ~~[confined~~ VOLUNTARILY ADMITTED for more
22  than 30 consecutive days to~~] A PATIENT IN~~ a facility as defined in § 10–101 of the
23  Health – General Article ~~BEFORE OCTOBER 1, 2013[~~, unless the person has a
24  physician's certificate that the person is capable of possessing a regulated firearm
25  without undue danger to the person or to another] ~~AND;~~

26       ~~(I)~~ (10)     ~~HAS BEEN A VOLUNTARY OR AN INVOLUNTARY~~
27  ~~PATIENT FOR 30 CONSECUTIVE DAYS OR MORE; OR~~

28       ~~(II)     HAS BEEN DETERMINED BY A COURT TO BE UNABLE TO~~
29  ~~SAFELY    POSSESS    A    FIREARM    BASED    ON    CREDIBLE    EVIDENCE    OF~~
30  ~~DANGEROUSNESS TO OTHERS INVOLUNTARILY COMMITTED TO A FACILITY AS~~
31  ~~DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;~~

32       ~~(9)~~ (11)     ~~HAS BEEN ADMITTED TO A FACILITY AS DEFINED IN §~~
33  ~~10–101   OF   THE   HEALTH   –   GENERAL   ARTICLE   AS   THE   RESULT   OF   AN~~

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 426 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 38 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 38 of 62

38                              SENATE BILL 281

1    ~~EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH — GENERAL~~
2    ~~ARTICLE, UNLESS THE PERSON HAS A CERTIFICATE FROM THE FACILITY THAT~~
3    ~~THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT~~
4    ~~UNDUE DANGER TO THE PERSON OR TO ANOTHER;~~

5              *(10) HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS*
6    *DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;*

7              ~~(12)~~ *(11)* IS UNDER THE PROTECTION OF A GUARDIAN APPOINTED
8    BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS
9    ARTICLE *, EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS*
10   *SOLELY A RESULT OF A PHYSICAL DISABILITY;*

11             [(8)] ~~(10)~~ ~~(12)~~ ~~(13)~~ *(12)* except as provided in subsection (e) of this
12   section, is a respondent against whom [a current non ex parte civil protective order
13   has been entered under § 4–506 of the Family Law Article; or]:

14             (I)    A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER
15   HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

16             (II)    AN ORDER FOR PROTECTION, AS DEFINED IN §
17   4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF
18   ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR

19             [(9)] ~~(11)~~ ~~(13)~~ ~~(14)~~ *(13)* if under the age of 30 years at the time of
20   possession, has been adjudicated delinquent by a juvenile court for an act that would
21   be a disqualifying crime if committed by an adult.

22        (c)    (1)    A person may not possess a regulated firearm if the person was
23   previously convicted of:

24             (i)    a crime of violence;

25             (ii)    a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, §
26   5–613, or § 5–614 of the Criminal Law Article; or

27             (iii)    an offense under the laws of another state or the United
28   States that would constitute one of the crimes listed in item (i) or (ii) of this paragraph
29   if committed in this State.

30        (2)    (i)    Subject to paragraph (3) of this subsection, a person who
31   violates this subsection is guilty of a felony and on conviction is subject to
32   imprisonment for not less than 5 years and not exceeding 15 years.

JA0900

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 427 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 39 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 39 of 62

SENATE BILL 281                                    39

1          (ii)    The court may not suspend any part of the mandatory
2  minimum sentence of 5 years.

3          (iii)    Except as otherwise provided in § 4–305 of the Correctional
4  Services Article, the person is not eligible for parole during the mandatory minimum
5  sentence.

6       (3)    At the time of the commission of the offense, if a period of more
7  than 5 years has elapsed since the person completed serving the sentence for the most
8  recent conviction under paragraph (1)(i) or (ii) of this subsection, including all
9  imprisonment, mandatory supervision, probation, and parole:

10         (i)    the imposition of the mandatory minimum sentence is
11  within the discretion of the court; and

12         (ii)    the mandatory minimum sentence may not be imposed
13  unless the State's Attorney notifies the person in writing at least 30 days before trial
14  of the State's intention to seek the mandatory minimum sentence.

15       (4)    Each violation of this subsection is a separate crime.

16    (d)    (1)    Except as provided in paragraph (2) of this subsection, a person
17  who is under the age of 21 years may not possess a regulated firearm.

18       (2)    Unless a person is otherwise prohibited from possessing a
19  regulated firearm, this subsection does not apply to:

20         (i)    the temporary transfer or possession of a regulated firearm
21  if the person is:

22            1.    under the supervision of another who is at least 21
23  years old and who is not prohibited by State or federal law from possessing a firearm;
24  and

25            2.    acting with the permission of the parent or legal
26  guardian of the transferee or person in possession;

27         (ii)    the transfer by inheritance of title, and not of possession, of
28  a regulated firearm;

29         (iii)    a member of the armed forces of the United States or the
30  National Guard *while performing official duties* ~~while performing official duties~~;

31         (iv)    the temporary transfer or possession of a regulated firearm
32  if the person is:

Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 40 of 62

40                                    SENATE BILL 281

1                        1.    participating in marksmanship training of a
2    recognized organization; and

3                        2.    under the supervision of a qualified instructor;

4              (v)   a person who is required to possess a regulated firearm for
5    employment and who holds a permit under Subtitle 3 of this title; or

6              (vi)   the possession of a firearm for self–defense or the defense of
7    others against a trespasser into the residence of the person in possession or into a
8    residence in which the person in possession is an invited guest.

9       (e)   This section does not apply to a respondent transporting a regulated
10   firearm if the respondent is carrying a civil protective order requiring the surrender of
11   the regulated firearm and:

12             (1)    the regulated firearm is unloaded;

13             (2)    the respondent has notified the law enforcement unit, barracks, or
14   station that the regulated firearm is being transported in accordance with the civil
15   protective order; and

16             (3)    the respondent transports the regulated firearm directly to the law
17   enforcement unit, barracks, or station.

18   5–133.1.

19       (A)    IN THIS SECTION, "AMMUNITION" MEANS A CARTRIDGE, SHELL, OR
20   ANY OTHER DEVICE CONTAINING EXPLOSIVE OR INCENDIARY MATERIAL
21   DESIGNED AND INTENDED FOR USE IN A FIREARM.

22       (B)    A PERSON MAY NOT POSSESS AMMUNITION IF THE PERSON IS
23   PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133 (B) OR
24   (C) OF THIS SUBTITLE.

25       (C)    A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A
26   MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT
27   EXCEEDING 1 YEAR OR A FINE NOT EXCEEDING $1000 OR BOTH.

28   5–133.2.

29       (A)    (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE
30   MEANINGS INDICATED.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 429 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 41 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 41 of 62

SENATE BILL 281                                         41

1           (2)   "FACILITY" HAS THE MEANING STATED IN § 10–101 OF THE
2 HEALTH – GENERAL ARTICLE.

3           (3)   "NICS INDEX" MEANS THE FEDERAL BUREAU OF
4 INVESTIGATION'S NATIONAL INSTANT CRIMINAL BACKGROUND CHECK
5 SYSTEM.

6     (B)   (1)   A COURT SHALL PROMPTLY REPORT INFORMATION
7 REQUIRED IN PARAGRAPH (2) OF THIS SUBSECTION THROUGH A SECURE DATA
8 PORTAL APPROVED BY THE DEPARTMENT OF PUBLIC SAFETY AND
9 CORRECTIONAL SERVICES IF A COURT:

10           (I)   DETERMINES THAT A PERSON IS NOT CRIMINALLY
11 RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

12           (II)   FINDS THAT A PERSON IS INCOMPETENT TO STAND
13 TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE; OR

14           (III)   FINDS UNDER § 13–201(C) OR § 13–705 OF THE
15 ESTATES AND TRUST ARTICLE THAT A PERSON SHOULD BE UNDER THE
16 PROTECTION OF A GUARDIAN, *EXCEPT FOR CASES IN WHICH THE APPOINTMENT*
17 *OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*.

18           (2)   ON A FINDING OR DETERMINATION UNDER PARAGRAPH (1)
19 OF THIS SUBSECTION, THE FOLLOWING INFORMATION SHALL BE REPORTED TO
20 THE NICS INDEX:

21           (I)   THE NAME AND IDENTIFYING INFORMATION OF THE
22 PERSON; AND

23           (II)   THE DATE OF THE DETERMINATION OR FINDING.

24     (C)   (1)   A FACILITY SHALL REPORT INFORMATION REQUIRED IN
25 PARAGRAPH (2) OF THIS SUBSECTION REGARDING A PERSON ADMITTED TO THE
26 FACILITY UNDER § 10–609 OF THE HEALTH – GENERAL ARTICLE OR
27 COMMITTED TO THE FACILITY UNDER TITLE 10, SUBTITLE 6, PART III OF THE
28 HEALTH – GENERAL ARTICLE TO THE NICS INDEX THROUGH A SECURE DATA
29 PORTAL APPROVED BY THE DEPARTMENT OF PUBLIC SAFETY AND
30 CORRECTIONAL SERVICES, IF:

31           (I)   THE PERSON HAS BEEN ADMITTED ~~OR COMMITTED~~ TO A
32 FACILITY FOR 30 CONSECUTIVE DAYS OR MORE; OR

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 430 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 42 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 42 of 62

42                           SENATE BILL 281

1             (II)   IN THE CASE OF AN INVOLUNTARY ADMISSION TO A
2 FACILITY, A COURT MAKES A DETERMINATION THAT THE PERSON CANNOT
3 SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF
4 DANGEROUSNESS TO OTHERS THE PERSON HAS BEEN INVOLUNTARILY
5 COMMITTED TO A FACILITY.

6             (2)   ON ADMISSION TO A FACILITY THE FOLLOWING INFORMATION
7 SHALL BE REPORTED TO THE NICS INDEX:

8             (I)   THE NAME AND IDENTIFYING INFORMATION OF THE
9 PERSON ADMITTED OR COMMITTED;

10            (II)   THE DATE THE PERSON WAS ADMITTED OR COMMITTED
11 TO THE FACILITY; AND

12            (III)   THE NAME OF THE FACILITY TO WHICH THE PERSON
13 WAS ADMITTED OR COMMITTED.

14 5–133.3.

15      (A)   IN THIS SECTION, "HEALTH DEPARTMENT" MEANS THE
16 DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

17      (B)   A PERSON SUBJECT TO A REGULATED FIREARMS
18 DISQUALIFICATION UNDER § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11),
19 OR (12) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN DISQUALIFICATION UNDER
20 § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE MAY BE
21 AUTHORIZED TO POSSESS A FIREARM IF:

22            (1)   THE PERSON IS NOT SUBJECT TO ANOTHER FIREARMS
23 RESTRICTION UNDER STATE OR FEDERAL LAW; AND

24            (2)   THE HEALTH DEPARTMENT, IN ACCORDANCE WITH THIS
25 SECTION, DETERMINES THAT THE PERSON MAY POSSESS A FIREARM.

26      (C)   A PERSON WHO SEEKS RELIEF FROM A FIREARMS
27 DISQUALIFICATION SHALL FILE AN APPLICATION WITH THE HEALTH
28 DEPARTMENT IN THE FORM AND MANNER SET BY THE HEALTH DEPARTMENT.

29      (D)   (1)   AN APPLICANT SHALL PROVIDE COMPLETE AND ACCURATE
30 DATA ON ALL INFORMATION REQUIRED IN AN APPLICATION UNDER THIS
31 SECTION.

SENATE BILL 281                          43

1    (2) THE APPLICANT SHALL INCLUDE THE FOLLOWING
2    INFORMATION IN THE APPLICATION:

3    (I) THE REASON WHY THE APPLICANT IS PROHIBITED FROM
4    POSSESSING A REGULATED FIREARM UNDER § 5–133(B)(6), (7), (8), OR (9) (9),
5    (10), OR (11) (11), OR (12) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN UNDER §
6    5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE AND WHY
7    THE APPLICANT SHOULD BE RELIEVED FROM THAT PROHIBITION;

8    (II) A CERTIFICATE ON A FORM APPROVED BY THE HEALTH
9    DEPARTMENT AND SIGNED BY AN INDIVIDUAL LICENSED IN THE STATE AS A
10   PHYSICIAN WHO IS BOARD CERTIFIED IN PSYCHIATRY OR AS A PSYCHOLOGIST
11   AND LISTED IN THE NATIONAL REGISTER OF HEALTH SERVICE PROVIDERS IN
12   PSYCHOLOGY THAT PROVIDES:

13   1. THAT THE CERTIFICATE WAS ISSUED WITHIN 30
14   DAYS OF THE DATE OF THE FILING OF THE PETITION;

15   2. THAT THE APPLICANT HAS BEEN EVALUATED AND
16   THE SIGNATORY REASONABLY BELIEVES THAT THE APPLICANT IS COMPETENT
17   TO UNDERSTAND AND COMPLY WITH THE RULES, REGULATIONS, AND LAW
18   GOVERNING FIREARM OWNERSHIP AND POSSESSION AND THE RISKS AND
19   RESPONSIBILITIES INHERENT TO FIREARM OWNERSHIP;

20   3. THAT THERE IS NO REASON TO BELIEVE THAT THE
21   PERSON WILL BECOME INCOMPETENT IN THE FORESEEABLE FUTURE;

22   4. AN OPINION AS TO WHETHER THE APPLICANT
23   WILL BE LIKELY TO ACT IN A MANNER THAT IS DANGEROUS TO SELF OR PUBLIC
24   SAFETY; AND

25   5. AN OPINION ON WHETHER GRANTING A FIREARM
26   HANDGUN QUALIFICATION LICENSE UNDER § 5–117 § 5–117.1 OF THIS
27   SUBTITLE OR AUTHORIZING A PERSON TO POSSESS A RIFLE OR SHOTGUN
28   WOULD BE CONTRARY TO THE PUBLIC INTEREST;

29   (III) A SIGNED AUTHORIZATION, ON A FORM APPROVED BY
30   THE HEALTH DEPARTMENT ALLOWING THE HEALTH DEPARTMENT TO ACCESS
31   ALL RELEVANT HEALTH CARE, MENTAL HEALTH, DISABILITY, GUARDIANSHIP,
32   AND CRIMINAL JUSTICE RECORDS, INCLUDING COURT ORDERED OR REQUIRED
33   MENTAL HEALTH RECORDS, OF THE APPLICANT FOR USE WITH THE
34   DISQUALIFICATION AND HEARING PROCESS;

44                                    SENATE BILL 281

1                     (IV)   THREE STATEMENTS ON A FORM DESIGNATED BY THE
2    HEALTH DEPARTMENT ATTESTING TO THE APPLICANT'S REPUTATION AND
3    CHARACTER RELEVANT TO FIREARM OWNERSHIP OR POSSESSION; AND

4                     (V)    ANY OTHER INFORMATION REQUIRED BY THE HEALTH
5    DEPARTMENT.

6            (3)      (I)    AT LEAST TWO OF THE STATEMENTS REQUIRED UNDER
7    PARAGRAPH (2)(IV) OF THIS SUBSECTION SHALL BE PROVIDED BY AN
8    INDIVIDUAL WHO IS NOT RELATED TO THE APPLICANT.

9                     (II)   STATEMENTS PROVIDED UNDER PARAGRAPH (2)(IV) OF
10   THIS SUBSECTION MUST BE SIGNED AND DATED WITHIN 30 DAYS OF
11   SUBMISSION TO THE HEALTH DEPARTMENT AND PROVIDE CONTACT
12   INFORMATION FOR EACH INDIVIDUAL PROVIDING A STATEMENT.

13           (4)      IF THE APPLICANT IS PROHIBITED FROM FIREARM
14   OWNERSHIP UNDER § 5–133(B)(9) § 5–133(B)(11) § 5–133(B)(12) OF THIS
15   SUBTITLE OR § 5–205(B)(11) § 5–205(B)(12) OF THIS TITLE, THE FOLLOWING
16   ADDITIONAL INFORMATION SHALL BE INCLUDED IN AN APPLICATION FOR
17   RELIEF FROM THE PROHIBITION:

18                   (I)    A COPY OF ALL PLEADINGS, AFFIDAVITS, AND
19   CERTIFICATES SUBMITTED INTO EVIDENCE AT THE GUARDIANSHIP
20   PROCEEDING; AND

21                   (II)   ALL ORDERS ISSUED BY THE COURT RELATING TO THE
22   GUARDIANSHIP, INCLUDING, IF APPLICABLE, AN ORDER INDICATING THAT THE
23   GUARDIANSHIP IS NO LONGER IN EFFECT.

24           (5)      IF THE APPLICANT IS PROHIBITED FROM FIREARM
25   OWNERSHIP UNDER § 5–133(B)(6), (7), OR (8) (8), (9), OR (10) (10), OR (11) OF
26   THIS SUBTITLE OR § 5–205(B)(6), (7), (8), (9), OR (10) (10), OR (11) OF THIS
27   TITLE, THE CERTIFICATE REQUIRED UNDER PARAGRAPH (2)(II) OF THIS
28   SUBSECTION SHALL ALSO INCLUDE:

29                   (I)    AN OPINION AS TO WHETHER THE APPLICANT HAS
30   SYMPTOMS OF A MENTAL DISORDER OR DEVELOPMENTAL DISABILITY THAT
31   CAUSES THE APPLICANT TO BE A DANGER TO SELF OR OTHERS;

32                   (II)   IF THE APPLICANT HAS NO SYMPTOMS THAT CAUSE THE
33   APPLICANT TO BE A DANGER, HOW MANY MONTHS THE APPLICANT HAS NOT HAD
34   SYMPTOMS OF A MENTAL DISORDER OR DEVELOPMENTAL DISABILITY THAT
35   CAUSED THE APPLICANT TO BE A DANGER TO SELF OR OTHERS;

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 433 of 460

SENATE BILL 281                    45

1        (III)   THE  TIME  PERIOD  THE  APPLICANT  HAS  BEEN
2   COMPLIANT  WITH  TREATMENT  RECOMMENDATIONS  FOR  THE  INDIVIDUAL'S
3   MENTAL ILLNESS;

4        (IV)   THE  NAME, ADDRESS, AND TELEPHONE NUMBER OF ALL
5   MENTAL HEALTH PROVIDERS OR SERVICE PROVIDERS SEEN WITHIN THE LAST
6   12 MONTHS;

7        (V)   IF THE APPLICANT WAS FOUND NOT GUILTY BY REASON
8   OF INSANITY OR NOT CRIMINALLY RESPONSIBLE, A STATEMENT ATTESTING TO
9   WHETHER THE APPLICANT IS ON CONDITIONAL RELEASE UNDER § 3–114 OF THE
10  CRIMINAL PROCEDURE ARTICLE; AND

11       (VI)   IF  THE  APPLICANT  WAS  FOUND  NOT  COMPETENT  TO
12  STAND  TRIAL  AND  DANGEROUS,  A  WRITTEN  STATEMENT  REGARDING  THE
13  STATUS OF THE RELATED CRIMINAL CHARGE.

14    (E)   THE HEALTH DEPARTMENT MAY NOT APPROVE AN APPLICATION
15  UNDER THIS SECTION IF A DETERMINATION IS MADE THAT:

16       (1)   THE  APPLICANT  SUPPLIED  FALSE  INFORMATION  OR  MADE  A
17  FALSE STATEMENT;

18       (2)   THE APPLICATION IS NOT PROPERLY COMPLETED; OR

19       (3)   ON  REVIEW  OF  THE  APPLICATION  AND  SUPPORTING
20  DOCUMENTATION  AND  ANY  OTHER  INFORMATION  RELATING  TO  THE
21  APPLICATION REQUESTED BY THE HEALTH DEPARTMENT, THE APPLICANT HAS
22  NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THE APPLICANT WILL
23  BE UNLIKELY TO ACT IN A MANNER DANGEROUS TO SELF OR PUBLIC SAFETY
24  AND  THAT  GRANTING  A  PERMIT  TO  POSSESS  A  REGULATED  FIREARM  OR
25  AUTHORIZING  THE  POSSESSION  OF  A  RIFLE  OR  SHOTGUN  WOULD  NOT  BE
26  CONTRARY TO THE PUBLIC INTEREST.

27    (F)   (1)   IF  THE  HEALTH  DEPARTMENT  DETERMINES  THAT  THE
28  APPLICATION SHALL BE APPROVED ON REVIEW UNDER SUBSECTION (E)(3) OF
29  THIS SECTION, THE HEALTH DEPARTMENT SHALL PROVIDE THE APPLICANT
30  WITH A CERTIFICATE AFFIRMING THE APPLICANT'S MENTAL COMPETENCE TO
31  POSSESS A REGULATED FIREARM.

32       (2)   A  CERTIFICATE  UNDER  THIS  SUBSECTION  SHALL  BE
33  PRESENTED TO THE DEPARTMENT OF STATE POLICE AS EVIDENCE OF THE
34  APPLICANT'S ELIGIBILITY TO POSSESS A REGULATED FIREARM.

Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 46 of 62

46                          SENATE BILL 281

1      (G)   AN APPLICANT WHO IS AGGRIEVED BY THE ACTION OF THE HEALTH
2  DEPARTMENT MAY REQUEST A HEARING BY WRITING TO THE SECRETARY OF
3  HEALTH AND MENTAL HYGIENE WITHIN 30 DAYS AFTER THE HEALTH
4  DEPARTMENT MAILS THE DECISION TO THE APPLICANT.

5      (II)   THE HEARING SHALL BE HELD IN ACCORDANCE WITH TITLE 10,
6  SUBTITLE 2 OF THE STATE GOVERNMENT ARTICLE WITHIN 60 DAYS AFTER THE
7  HEALTH DEPARTMENT RECEIVES THE REQUEST.

8      (I)   IF THE APPLICANT REQUESTS A HEARING, THE ADMINISTRATIVE
9  LAW JUDGE SHALL CONDUCT A HEARING AT WHICH THE APPLICANT MAY
10 TESTIFY AND PROVIDE OTHER EVIDENCE.

11     (J)   AT A HEARING, THE APPLICANT IS REQUIRED TO PROVIDE
12 EVIDENCE THAT:

13         (1)   THE APPLICANT DOES NOT HAVE SYMPTOMS OF A MENTAL
14 DISORDER THAT WOULD CAUSE THE APPLICANT TO BE A DANGER TO SELF OR
15 OTHERS AND HAS NOT HAD SYMPTOMS OF A MENTAL DISORDER FOR AT LEAST 6
16 MONTHS;

17         (2)   THE APPLICANT DOES NOT HAVE A MENTAL DISORDER OR
18 MENTAL HEALTH CONDITION THAT PREVENTS THE APPLICANT FROM
19 UNDERSTANDING THE RULES, REGULATIONS, AND LAWS GOVERNING FIREARM
20 OWNERSHIP AND POSSESSION, OR THE RESPONSIBILITIES AND RISKS INVOLVED
21 IN FIREARM OWNERSHIP AND POSSESSION;

22         (3)   THE APPLICANT IS NOT LIKELY TO ACT IN A MANNER
23 DANGEROUS TO PUBLIC SAFETY;

24         (4)   GRANTING RELIEF WOULD NOT BE CONTRARY TO PUBLIC
25 INTEREST; AND

26         (5)   THE APPLICANT IS NOT OTHERWISE PROHIBITED FROM
27 OWNING OR POSSESSING A FIREARM.

28     (K)   AT A HEARING UNDER THIS SECTION, THE HEALTH DEPARTMENT IS
29 A PARTY AND SHALL PROVIDE EVIDENCE REGARDING:

30         (1)   THE CIRCUMSTANCES UNDER WHICH THE FIREARMS
31 PROHIBITION WAS IMPOSED UNDER STATE OR FEDERAL LAW; AND

1    (2)    THE APPLICANT'S RECORD, INCLUDING THE APPLICANT'S
2   MENTAL HEALTH AND CRIMINAL HISTORY RECORDS.

3    (L)    IF THE ADMINISTRATIVE LAW JUDGE FINDS THAT THE APPLICANT
4   HAS MET, BY CLEAR AND CONVINCING EVIDENCE, THE STANDARDS OF
5   SUBSECTION (J) OF THIS SECTION THE ADMINISTRATIVE LAW JUDGE SHALL:

6    (1)    ISSUE A WRITTEN DETERMINATION THAT THE APPLICANT IS
7   RELIEVED FROM THE FIREARMS DISQUALIFICATION IMPOSED BY 18 U.S.C. §
8   922(D)(4) AND (G)(4) AND § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11),
9   OR (12) OF THIS SUBTITLE OR § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR
10  (12) OF THIS TITLE; AND

11   (2)    PROVIDE TO THE NICS INDEX, THROUGH A SECURE DATA
12  PORTAL APPROVED BY THE DEPARTMENT OF STATE POLICE PUBLIC SAFETY
13  AND CORRECTIONAL SERVICES:

14   (I)    THE NAME AND IDENTIFYING INFORMATION OF THE
15  APPLICANT; AND

16   (II)    THE DATE OF THE DETERMINATION.

17   (M)    AN APPLICANT OR THE HEALTH DEPARTMENT MAY SEEK JUDICIAL
18  REVIEW OF A DETERMINATION OF THE ADMINISTRATIVE LAW JUDGE ON AN
19  APPLICATION UNDER THIS SECTION FOR RELIEF FROM A FIREARMS
20  PROHIBITION IN ACCORDANCE WITH §§ 10–222 AND 10–223 OF THE STATE
21  GOVERNMENT ARTICLE.

22   (N)    AFTER A DETERMINATION ON THE MERITS OF A HEARING
23  REQUESTED UNDER THIS SECTION, AN APPLICANT MAY NOT REQUEST A
24  SUBSEQUENT HEARING WITHIN 1 YEAR AFTER THE COMPLETION OF THE
25  HEARING PROCESS AND ANY JUDICIAL REVIEW OF THE ADMINISTRATIVE
26  DECISION.

27   (O)    THE HEALTH DEPARTMENT SHALL ENTER INTO A MEMORANDUM
28  OF UNDERSTANDING WITH THE DEPARTMENT OF STATE POLICE TO ASSIST IN
29  CLINICAL CONSULTATION AND IMPLEMENTATION OF THIS SECTION.

30  *5–133.3.*

31   *(A)    IN THIS SECTION, "HEALTH DEPARTMENT" MEANS THE*
32  *DEPARTMENT OF HEALTH AND MENTAL HYGIENE.*

Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 48 of 62

48                              SENATE BILL 281

1    (B)    A PERSON SUBJECT TO A REGULATED FIREARMS DISQUALIFICATION
2    UNDER § 5–133(B)(6), (7), (8), (9), (10), OR (11) OF THIS SUBTITLE, A RIFLE OR
3    SHOTGUN DISQUALIFICATION UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11)
4    OF THIS TITLE, OR PROHIBITED FROM THE SHIPMENT, TRANSPORTATION,
5    POSSESSION, OR RECEIPT OF A FIREARM BY 18 U.S.C. §§ 922(D)(4) OR (G)(4) AS
6    A RESULT OF AN ADJUDICATION OR COMMITMENT THAT OCCURRED IN THE
7    STATE MAY BE AUTHORIZED TO POSSESS A FIREARM IF:

8            (1)    THE PERSON IS NOT SUBJECT TO ANOTHER FIREARMS
9    RESTRICTION UNDER STATE OR FEDERAL LAW; AND

10           (2)    THE HEALTH DEPARTMENT, IN ACCORDANCE WITH THIS
11   SECTION, DETERMINES THAT THE PERSON MAY POSSESS A FIREARM.

12   (C)    A PERSON WHO SEEKS RELIEF FROM A FIREARMS
13   DISQUALIFICATION SHALL FILE AN APPLICATION WITH THE HEALTH
14   DEPARTMENT IN THE FORM AND MANNER SET BY THE HEALTH DEPARTMENT.

15   (D)    AN APPLICATION FOR RELIEF FROM A FIREARMS DISQUALIFICATION
16   SHALL INCLUDE:

17           (1)    A COMPLETE AND ACCURATE STATEMENT EXPLAINING THE
18   REASON WHY THE APPLICANT IS PROHIBITED FROM POSSESSING A REGULATED
19   FIREARM UNDER § 5–133(B)(6), (7), (8), (9), (10), OR (11) OF THIS SUBTITLE OR
20   A RIFLE OR SHOTGUN UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) OF THIS
21   TITLE, OR IS PROHIBITED FROM THE SHIPMENT, TRANSPORTATION,
22   POSSESSION, OR RECEIPT OF A FIREARM BY 18 U.S.C. §§ 922(D)(4) OR (G)(4) AS
23   A RESULT OF AN ADJUDICATION OR COMMITMENT THAT OCCURRED IN THE
24   STATE;

25           (2)    A STATEMENT WHY THE APPLICANT SHOULD BE RELIEVED
26   FROM THE PROHIBITION DESCRIBED IN ITEM (1) OF THIS SUBSECTION;

27           (3)    IF THE APPLICANT IS SUBJECT TO A PROHIBITION DESCRIBED
28   IN ITEM (1) OF THIS SUBSECTION, A CERTIFICATE ISSUED WITHIN 30 DAYS OF
29   THE SUBMISSION OF THE APPLICATION ON A FORM APPROVED BY THE HEALTH
30   DEPARTMENT AND SIGNED BY AN INDIVIDUAL LICENSED IN THE STATE AS A
31   PHYSICIAN WHO IS BOARD CERTIFIED IN PSYCHIATRY OR AS A PSYCHOLOGIST
32   STATING:

33           (I)    THE LENGTH OF TIME THAT THE APPLICANT HAS NOT
34   HAD SYMPTOMS THAT CAUSE THE APPLICANT TO BE A DANGER TO THE
35   APPLICANT OR OTHERS, OR, IF THE DISQUALIFICATION RELATES TO AN
36   INTELLECTUAL DISABILITY, THE LENGTH OF TIME THAT THE APPLICANT HAS

SENATE BILL 281                 49

1   *NOT ENGAGED IN BEHAVIORS THAT CAUSE THE APPLICANT TO BE A DANGER TO*
2   *THE APPLICANT OR OTHERS;*

3           *(II)    THE LENGTH OF TIME THAT THE APPLICANT HAS BEEN*
4   *COMPLIANT WITH THE TREATMENT PLAN FOR THE APPLICANT'S MENTAL*
5   *ILLNESS, OR, IF THE DISQUALIFICATION RELATES TO AN INTELLECTUAL*
6   *DISABILITY, THE LENGTH OF TIME THAT THE APPLICANT HAS BEEN COMPLIANT*
7   *WITH ANY BEHAVIOR PLAN OR BEHAVIOR MANAGEMENT PLAN;*

8           *(III)   AN OPINION AS TO WHETHER THE APPLICANT, BECAUSE*
9   *OF MENTAL ILLNESS, WOULD BE A DANGER TO THE APPLICANT IF ALLOWED TO*
10  *POSSESS A FIREARM AND A STATEMENT OF REASONS FOR THE OPINION; AND*

11          *(IV)    AN OPINION AS TO WHETHER THE APPLICANT, BECAUSE*
12  *OF MENTAL ILLNESS, WOULD BE A DANGER TO ANOTHER PERSON OR POSES A*
13  *RISK TO PUBLIC SAFETY IF ALLOWED TO POSSESS A FIREARM;*

14          *(4)   IF THE APPLICANT IS PROHIBITED FROM POSSESSING A*
15  *FIREARM UNDER § 5–133(B)(11) OF THIS SUBTITLE OR § 5–205(B)(11) OF THIS*
16  *TITLE:*

17          *(I)    A COPY OF ALL PLEADINGS, AFFIDAVITS, AND*
18  *CERTIFICATES SUBMITTED INTO EVIDENCE AT THE GUARDIANSHIP*
19  *PROCEEDING; AND*

20          *(II)    ALL ORDERS ISSUED BY THE COURT RELATING TO THE*
21  *GUARDIANSHIP, INCLUDING, IF APPLICABLE, AN ORDER INDICATING THAT THE*
22  *GUARDIANSHIP IS NO LONGER IN EFFECT;*

23          *(5)   A SIGNED AUTHORIZATION, ON A FORM APPROVED BY THE*
24  *HEALTH DEPARTMENT, ALLOWING THE HEALTH DEPARTMENT TO ACCESS ANY*
25  *RELEVANT HEALTH CARE, MENTAL HEALTH, DISABILITY, GUARDIANSHIP, AND*
26  *CRIMINAL JUSTICE RECORDS, INCLUDING COURT ORDERED OR REQUIRED*
27  *MENTAL HEALTH RECORDS, OF THE APPLICANT FOR USE IN DETERMINING*
28  *WHETHER THE APPLICANT SHOULD BE RELIEVED FROM A FIREARMS*
29  *DISQUALIFICATION;*

30          *(6)   THREE STATEMENTS SIGNED AND DATED WITHIN 30 DAYS OF*
31  *SUBMISSION TO THE HEALTH DEPARTMENT ON A FORM DESIGNATED BY THE*
32  *HEALTH DEPARTMENT ATTESTING TO THE APPLICANT'S REPUTATION AND*
33  *CHARACTER RELEVANT TO FIREARM OWNERSHIP OR POSSESSION INCLUDING:*

34          *(I)    AT LEAST TWO STATEMENTS PROVIDED BY AN*
35  *INDIVIDUAL WHO IS NOT RELATED TO THE APPLICANT; AND*

50                                  SENATE BILL 281

1              *(II)* *CONTACT INFORMATION FOR EACH INDIVIDUAL*
2    *PROVIDING A STATEMENT; AND*

3              *(7)  ANY OTHER INFORMATION REQUIRED BY THE HEALTH*
4    *DEPARTMENT.*

5         *(E)  THE HEALTH DEPARTMENT MAY NOT APPROVE AN APPLICATION*
6    *UNDER THIS SECTION IF A DETERMINATION IS MADE THAT:*

7              *(1)  THE APPLICANT SUPPLIED INCOMPLETE OR FALSE*
8    *INFORMATION OR MADE A FALSE STATEMENT;*

9              *(2)  THE APPLICATION IS NOT PROPERLY COMPLETED; OR*

10             *(3)  ON REVIEW OF THE APPLICATION AND SUPPORTING*
11   *DOCUMENTATION AND ANY OTHER INFORMATION RELATING TO THE*
12   *APPLICATION REQUESTED BY THE HEALTH DEPARTMENT, INCLUDING ANY*
13   *CRIMINAL HISTORY RECORDS AND MENTAL HEALTH RECORDS OF THE*
14   *APPLICANT, THE APPLICANT HAS NOT SHOWN BY A PREPONDERANCE OF THE*
15   *EVIDENCE THAT THE APPLICANT WILL BE UNLIKELY TO ACT IN A MANNER*
16   *DANGEROUS TO THE APPLICANT OR TO PUBLIC SAFETY AND THAT GRANTING A*
17   *LICENSE TO POSSESS A REGULATED FIREARM OR AUTHORIZING THE*
18   *POSSESSION OF A RIFLE OR SHOTGUN WOULD NOT BE CONTRARY TO THE PUBLIC*
19   *INTEREST.*

20        *(F)  (1)  IF THE HEALTH DEPARTMENT DETERMINES THAT THE*
21   *APPLICATION SHALL BE APPROVED, THE HEALTH DEPARTMENT SHALL PROVIDE*
22   *THE APPLICANT WITH A CERTIFICATE AFFIRMING THE APPLICANT'S MENTAL*
23   *COMPETENCE TO POSSESS A FIREARM.*

24             *(2)  A CERTIFICATE PROVIDED UNDER PARAGRAPH (1) OF THIS*
25   *SUBSECTION OR A WRITTEN STATEMENT THAT THE INDIVIDUAL IS NOT*
26   *MENTALLY COMPETENT TO POSSESS A FIREARM SHALL BE PROVIDED TO THE*
27   *APPLICANT WITHIN 60 DAYS FROM THE HEALTH DEPARTMENT'S RECEIPT OF A*
28   *COMPLETED APPLICATION, WHICH INCLUDES ANY RECORDS NECESSARY TO*
29   *REVIEW AN APPLICATION.*

30             *(3)  A CERTIFICATE ISSUED UNDER PARAGRAPH (1) OF THIS*
31   *SUBSECTION SHALL BE PRESENTED TO THE DEPARTMENT OF STATE POLICE AS*
32   *EVIDENCE OF THE APPLICANT'S ELIGIBILITY TO POSSESS A FIREARM.*

33        *(G)  (1)  AN APPLICANT WHO IS AGGRIEVED BY THE ACTION OF THE*
34   *HEALTH DEPARTMENT UNDER SUBSECTION (E) OF THIS SECTION MAY REQUEST*

SENATE BILL 281    51

1    A HEARING IN WRITING TO THE SECRETARY OF HEALTH AND MENTAL HYGIENE
2    WITHIN 30 DAYS AFTER THE HEALTH DEPARTMENT MAILS NOTICE OF THE
3    DECISION TO THE APPLICANT.

4    (2)   (I)   THE HEARING REQUESTED UNDER PARAGRAPH (1) OF
5    THIS SUBSECTION SHALL BE HELD IN ACCORDANCE WITH TITLE 10, SUBTITLE 2
6    OF THE STATE GOVERNMENT ARTICLE WITHIN 60 DAYS AFTER THE HEALTH
7    DEPARTMENT RECEIVES THE REQUEST.

8    (II)   AT THE HEARING, THE INFORMATION DESCRIBED IN
9    SUBSECTIONS (D) AND (E) OF THIS SECTION SHALL BE CONSIDERED AND USED
10   TO DETERMINE WHETHER THE APPLICANT, IF ALLOWED TO POSSESS A FIREARM,
11   WOULD NOT BE LIKELY TO ACT IN A MANNER DANGEROUS TO THE PUBLIC
12   SAFETY AND WHETHER GRANTING THE RELIEF WOULD NOT BE CONTRARY TO
13   THE PUBLIC INTEREST.

14   (3)   (I)   JUDICIAL REVIEW OF THE DETERMINATION ON AN
15   APPLICATION UNDER THIS SECTION FOR RELIEF FROM A FIREARMS
16   PROHIBITION MAY BE SOUGHT IN ACCORDANCE WITH §§ 10–222 AND 10–223 OF
17   THE STATE GOVERNMENT ARTICLE.

18   (II)   NOTWITHSTANDING THE PROVISIONS OF § 10–222 OF
19   THE STATE GOVERNMENT ARTICLE, THE CIRCUIT COURT MAY GIVE DEFERENCE
20   TO THE FINAL DECISION OF THE HEALTH DEPARTMENT AND MAY IN ITS
21   DISCRETION RECEIVE ADDITIONAL EVIDENCE THAT IT DETERMINES TO BE
22   NECESSARY TO CONDUCT AN ADEQUATE REVIEW.

23   (H)   THE BOARD OF REVIEW OF THE HEALTH DEPARTMENT DOES NOT
24   HAVE JURISDICTION TO REVIEW A FINAL DECISION OF THE HEALTH
25   DEPARTMENT UNDER THIS SECTION.

26   (I)   AFTER A DETERMINATION ON THE MERITS OF A HEARING
27   REQUESTED UNDER THIS SECTION, AN APPLICANT MAY NOT REQUEST A
28   SUBSEQUENT HEARING WITHIN 1 YEAR AFTER THE COMPLETION OF THE
29   HEARING PROCESS AND ANY JUDICIAL REVIEW OF THE ADMINISTRATIVE
30   DECISION.

31   (J)   THE SECRETARY OF HEALTH AND MENTAL HYGIENE MAY ADOPT
32   REGULATIONS ESTABLISHING FEES TO COVER THE ADMINISTRATIVE COSTS
33   ASSOCIATED WITH THE IMPLEMENTATION OF THIS SECTION.

34   (K)   AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS
35   BOARD CERTIFIED IN PSYCHIATRY, OR A PSYCHOLOGIST WHO, IN GOOD FAITH
36   AND WITH REASONABLE GROUNDS, ACTS IN COMPLIANCE WITH THIS SECTION,

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 440 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 52 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 52 of 62

52                              SENATE BILL 281

1    *MAY NOT BE HELD CIVILLY OR CRIMINALLY LIABLE FOR ACTIONS AUTHORIZED*
2    *BY THIS SECTION.*

3    5–143.

4        (A)    (1)    A PERSON WHO MOVES INTO THE STATE WITH THE INTENT OF
5    BECOMING A RESIDENT SHALL REGISTER ALL REGULATED FIREARMS WITH THE
6    SECRETARY WITHIN ~~30~~ *90* DAYS AFTER ESTABLISHING RESIDENCY.

7                (2)    THE SECRETARY SHALL PREPARE AND, ON REQUEST OF AN
8    APPLICANT, PROVIDE AN APPLICATION FORM FOR REGISTRATION UNDER THIS
9    SECTION.

10       (B)    AN APPLICATION FOR REGISTRATION UNDER THIS SECTION SHALL
11   CONTAIN:

12               (1)    THE MAKE, MODEL, MANUFACTURER'S SERIAL NUMBER,
13   CALIBER, TYPE, BARREL LENGTH, FINISH, AND COUNTRY OF ORIGIN OF ~~THE~~
14   *EACH* REGULATED FIREARM; AND

15               (2)    THE FIREARM APPLICANT'S NAME, ADDRESS, SOCIAL
16   SECURITY NUMBER, PLACE AND DATE OF BIRTH, HEIGHT, WEIGHT, RACE, EYE
17   AND HAIR COLOR, SIGNATURE, DRIVER'S OR PHOTOGRAPHIC IDENTIFICATION
18   SOUNDEX NUMBER, AND OCCUPATION.

19       (C)    ~~EACH~~ *AN* APPLICATION FOR REGISTRATION FILED WITH THE
20   SECRETARY OF STATE POLICE SHALL BE ACCOMPANIED BY A NONREFUNDABLE
21   *TOTAL* REGISTRATION FEE OF $15, *REGARDLESS OF THE NUMBER OF FIREARMS*
22   *REGISTERED.*

23       (D)    REGISTRATION DATA PROVIDED UNDER THIS SECTION IS NOT OPEN
24   TO PUBLIC INSPECTION.

25   [5–143.] *5–144.*

26       (a)    Except as otherwise provided in this subtitle, a dealer or other person
27   may not:

28               (1)    knowingly participate in the illegal sale, rental, transfer, purchase,
29   possession, or receipt of a regulated firearm in violation of this subtitle; or

30               (2)    knowingly violate § 5–142 of this subtitle.

SENATE BILL 281                        53

1      (b)    A person who violates this section is guilty of a misdemeanor and on
2  conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding
3  $10,000 or both.

4      (c)    Each violation of this section is a separate crime.

5  **5–145.**

6      **(A)    (1)    A LICENSED DEALER SHALL KEEP RECORDS OF ALL
7  RECEIPTS, SALES, AND OTHER DISPOSITIONS OF FIREARMS AFFECTED IN
8  CONNECTION WITH THE LICENSED DEALER'S BUSINESS.**

9          **(2)    THE SECRETARY SHALL ADOPT REGULATIONS SPECIFYING:**

10              **(I)    SUBJECT TO PARAGRAPH (3) OF THIS SUBSECTION, THE
11  INFORMATION THAT THE RECORDS SHALL CONTAIN;**

12              **(II)    THE TIME PERIOD FOR WHICH THE RECORDS ARE TO BE
13  KEPT; AND**

14              **(III)    THE FORM IN WHICH THE RECORDS ARE TO BE KEPT.**

15          **(3)    THE RECORDS SHALL INCLUDE:**

16              **(I)    THE NAME AND ADDRESS OF EACH PERSON FROM WHOM
17  THE DEALER ACQUIRES A FIREARM AND TO WHOM THE DEALER SELLS OR
18  OTHERWISE DISPOSES OF A FIREARM;**

19              **(II)    A PRECISE DESCRIPTION, INCLUDING MAKE, MODEL,
20  CALIBER, AND SERIAL NUMBER OF EACH FIREARM ACQUIRED, SOLD, OR
21  OTHERWISE DISPOSED OF; AND**

22              **(III)    THE DATE OF EACH ACQUISITION, SALE, OR OTHER
23  DISPOSITION.**

24          **(4)    ~~THE SECRETARY MAY PROVIDE THAT RECORDS~~ RECORDS
25  MAINTAINED UNDER 18 U.S.C. § 923(G)(1)(A) MAY BE USED TO SATISFY THE
26  REQUIREMENTS OF THIS SECTION,** *IF THE SECRETARY IS GRANTED ACCESS TO
27  THOSE RECORDS.*

28      **(B)    (1)    WHEN REQUIRED BY A LETTER ISSUED BY THE SECRETARY, A
29  LICENSEE SHALL SUBMIT TO THE SECRETARY THE INFORMATION REQUIRED TO
30  BE KEPT UNDER SUBSECTION (A) OF THIS SECTION FOR THE TIME PERIODS
31  SPECIFIED BY THE SECRETARY.**

54                        SENATE BILL 281

1          (2)   THE SECRETARY SHALL DETERMINE THE FORM AND METHOD
2    BY WHICH THE RECORDS SHALL BE MAINTAINED.

3          (C)   WHEN A FIREARMS BUSINESS IS DISCONTINUED AND SUCCEEDED
4    BY A NEW LICENSEE, THE RECORDS REQUIRED TO BE KEPT UNDER THIS
5    SECTION SHALL REFLECT THE BUSINESS DISCONTINUANCE AND SUCCESSION
6    AND SHALL BE DELIVERED TO THE SUCCESSOR LICENSEE.

7          (D)   (1)   A LICENSEE SHALL RESPOND WITHIN 48 HOURS AFTER
8    RECEIPT OF A REQUEST FROM THE SECRETARY FOR INFORMATION CONTAINED
9    IN THE RECORDS REQUIRED TO BE KEPT UNDER THIS SECTION WHEN THE
10   INFORMATION IS REQUESTED IN CONNECTION WITH A BONA FIDE CRIMINAL
11   INVESTIGATION.

12         (2)   THE INFORMATION REQUESTED UNDER THIS SUBSECTION
13   SHALL BE PROVIDED ORALLY OR IN WRITING, AS REQUIRED BY THE
14   SECRETARY.

15         (3)   THE SECRETARY MAY IMPLEMENT A SYSTEM BY WHICH A
16   LICENSEE CAN POSITIVELY ESTABLISH THAT A PERSON REQUESTING
17   INFORMATION BY TELEPHONE IS AUTHORIZED BY THE SECRETARY TO REQUEST
18   THE INFORMATION.

19         (E)   THE SECRETARY MAY MAKE AVAILABLE TO A FEDERAL, STATE, OR
20   LOCAL LAW ENFORCEMENT AGENCY ANY INFORMATION THAT THE SECRETARY
21   OBTAINS UNDER THIS SECTION RELATING TO THE IDENTITIES OF PERSONS WHO
22   HAVE UNLAWFULLY PURCHASED OR RECEIVED FIREARMS.

23         (F)   THE SECRETARY:

24         (1)   SHALL INSPECT THE INVENTORY AND RECORDS OF A
25   LICENSED DEALER AT LEAST ONCE EVERY 2 YEARS; AND

26         (2)   MAY INSPECT THE INVENTORY AND RECORDS AT ANY TIME
27   DURING THE NORMAL BUSINESS HOURS OF THE LICENSED DEALER'S BUSINESS.

28         (G)   (1)   A PERSON WHO VIOLATES THIS SECTION IS SUBJECT TO A
29   CIVIL PENALTY NOT EXCEEDING $1,000 IMPOSED BY THE SECRETARY.

30         (2)   FOR A SECOND OR SUBSEQUENT OFFENSE, A PERSON WHO
31   KNOWINGLY VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND IS
32   SUBJECT TO IMPRISONMENT NOT EXCEEDING 3 YEARS OR A FINE NOT
33   EXCEEDING $10,000 OR BOTH.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 443 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 55 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 55 of 62

SENATE BILL 281                55

1      *(3)   THE PENALTIES PROVIDED IN THIS SUBSECTION ARE NOT*
2   *INTENDED TO APPLY TO INCONSEQUENTIAL OR INADVERTENT ERRORS.*

3   *5–146.*

4      *(A)   A DEALER OR ANY OTHER PERSON WHO SELLS OR TRANSFERS A*
5   *REGULATED FIREARM SHALL NOTIFY THE PURCHASER OR RECIPIENT OF THE*
6   *REGULATED FIREARM AT THE TIME OF PURCHASE OR TRANSFER THAT THE*
7   *PURCHASER OR RECIPIENT IS REQUIRED TO REPORT A LOST OR STOLEN*
8   *REGULATED FIREARM TO THE LOCAL LAW ENFORCEMENT AGENCY AS REQUIRED*
9   *UNDER SUBSECTION (B) OF THIS SECTION.*

10     *(B)   IF A REGULATED FIREARM IS LOST OR STOLEN, THE OWNER OF THE*
11  *REGULATED FIREARM SHALL REPORT THE LOSS OR THEFT TO THE LOCAL LAW*
12  *ENFORCEMENT AGENCY WITHIN 72 HOURS AFTER THE OWNER FIRST DISCOVERS*
13  *THE LOSS OR THEFT.*

14     *(C)   ON RECEIPT OF A REPORT OF A LOST OR STOLEN REGULATED*
15  *FIREARM, A LOCAL LAW ENFORCEMENT AGENCY SHALL REPORT TO THE*
16  *SECRETARY AND ENTER INTO THE NATIONAL CRIME INFORMATION CENTER*
17  *(NCIC) DATABASE, TO THE EXTENT KNOWN, THE CALIBER, MAKE, MODEL,*
18  *MANUFACTURER, AND SERIAL NUMBER OF THE REGULATED FIREARM AND ANY*
19  *OTHER DISTINGUISHING NUMBER OR IDENTIFICATION MARK ON THE*
20  *REGULATED FIREARM.*

21     *(D)   (1)   A KNOWING AND WILLFUL FIRST–TIME VIOLATION OF THIS*
22  *SECTION IS A CIVIL OFFENSE PUNISHABLE BY A FINE NOT EXCEEDING $500.*

23           *(2)   A PERSON WHO KNOWINGLY AND WILLFULLY VIOLATES THIS*
24  *SECTION FOR A SECOND OR SUBSEQUENT TIME IS GUILTY OF A MISDEMEANOR*
25  *AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 90 DAYS*
26  *OR A FINE NOT EXCEEDING $500 OR BOTH.*

27     *(E)   THE IMPOSITION OF A CIVIL OR CRIMINAL PENALTY UNDER THIS*
28  *SECTION DOES NOT PRECLUDE THE PURSUIT OF ANY OTHER CIVIL REMEDY OR*
29  *CRIMINAL PROSECUTION AUTHORIZED BY LAW.*

30  5–205.

31     (A)   THIS SUBTITLE DOES NOT APPLY TO A RIFLE OR SHOTGUN THAT IS
32  AN ANTIQUE FIREARM AS DEFINED IN § 4–201 OF THE CRIMINAL LAW ARTICLE.

33     (B)   A PERSON MAY NOT POSSESS A RIFLE OR SHOTGUN IF THE PERSON:

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 444 of 460

56                                 SENATE BILL 281

1          (1)    HAS BEEN CONVICTED OF A DISQUALIFYING CRIME AS
2    DEFINED IN § 5–101 OF THIS TITLE;

3          (2)    HAS BEEN CONVICTED OF A VIOLATION CLASSIFIED AS A
4    CRIME UNDER COMMON LAW AND RECEIVED A TERM OF IMPRISONMENT OF
5    MORE THAN 2 YEARS;

6          (3)    IS A FUGITIVE FROM JUSTICE;

7          (4)    IS A HABITUAL DRUNKARD AS DEFINED IN § 5–101 OF THIS
8    TITLE;

9          (5)    IS ADDICTED TO A CONTROLLED DANGEROUS SUBSTANCE OR
10   IS A HABITUAL USER AS DEFINED IN § 5–101 OF THIS TITLE;

11         (6)    SUFFERS FROM A MENTAL DISORDER AS DEFINED IN §
12   10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAS A HISTORY OF
13   VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER, UNLESS THE PERSON
14   HAS A PHYSICIAN'S CERTIFICATE THAT THE PERSON IS CAPABLE OF
15   POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON
16   OR TO ANOTHER;

17         (7)    HAS BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER §
18   3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

19         (8)    HAS BEEN FOUND NOT CRIMINALLY RESPONSIBLE UNDER §
20   3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

21         (9)    HAS BEEN BEFORE OCTOBER 1, 2013, WAS *HAS BEEN*
22   VOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS TO A
23   FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

24         (10)   HAS BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101
25   OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY
26   EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE, UNLESS
27   THE PERSON HAS A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS
28   CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO
29   THE PERSON OR TO ANOTHER;

30         (10) (11) *(10)*    HAS BEEN INVOLUNTARILY COMMITTED TO A
31   FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

USCA4 Appeal: 21-2017      Doc: 25-2      Filed: 08/03/2022      Pg: 445 of 460

SENATE BILL 281                                          57

1      ~~(11)~~ ~~(12)~~ *(11)*      IS UNDER THE PROTECTION OF A GUARDIAN
2  APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND
3  TRUSTS ARTICLE, *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A*
4  *GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY;*

5      ~~(6)~~ ~~(12)~~ ~~(13)~~ *(12)* EXCEPT AS PROVIDED IN SUBSECTION (C) OF THIS
6  SECTION, IS A RESPONDENT AGAINST WHOM:

7             (I)      A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER
8  HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

9             (II)      AN ORDER FOR PROTECTION, AS DEFINED IN §
10  4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF
11  ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR

12      ~~(7)~~ ~~(13)~~ ~~(14)~~ *(13)* IF UNDER THE AGE OF 30 YEARS AT THE TIME OF
13  POSSESSION, HAS BEEN ADJUDICATED DELINQUENT BY A JUVENILE COURT FOR
14  AN ACT THAT WOULD BE A DISQUALIFYING CRIME IF COMMITTED BY AN ADULT.

15      ~~[(a)] (C)   Unless the person possesses a physician's certificate that the~~
16  ~~person is capable of possessing a rifle or shotgun without undue danger to the person~~
17  ~~or to another, a person may not possess a rifle or shotgun if the person:~~

18             ~~(1)    suffers from a mental disorder as defined in § 10–101(f)(2) of the~~
19  ~~Health – General Article and has a history of violent behavior against the person or~~
20  ~~another; or~~

21             ~~(2)    has been confined for more than 30 consecutive days in a facility as~~
22  ~~defined in § 10–101 of the Health – General Article.~~

23      ~~(D)~~ (C)      THIS SECTION DOES NOT APPLY TO A PERSON TRANSPORTING
24  A RIFLE OR SHOTGUN IF THE PERSON IS CARRYING A CIVIL PROTECTIVE ORDER
25  REQUIRING THE SURRENDER OF THE RIFLE OR SHOTGUN AND:

26             (1)      THE RIFLE OR SHOTGUN IS UNLOADED;

27             (2)      THE PERSON HAS NOTIFIED THE LAW ENFORCEMENT UNIT,
28  BARRACKS, OR STATION THAT THE RIFLE OR SHOTGUN IS BEING TRANSPORTED
29  IN ACCORDANCE WITH THE CIVIL PROTECTIVE ORDER; AND

30             (3)      THE PERSON TRANSPORTS THE RIFLE OR SHOTGUN DIRECTLY
31  TO THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION.

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 446 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 58 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 58 of 62

58                                      SENATE BILL 281

1       [(b)] (E) (D) A person who violates this section is guilty of a misdemeanor and
2    on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding
3    $1,000 or both.

4       (E)    A PERSON WHO IS DISQUALIFIED FROM OWNING A RIFLE OR
5    SHOTGUN UNDER SUBSECTION (B)(6), (7), (8), (9), (10), OR (11) OF THIS
6    SECTION MAY SEEK RELIEF FROM THE DISQUALIFICATION IN ACCORDANCE
7    WITH § 5–133.3 OF THIS TITLE.

8    5–206.

9       (a)    A person may not possess a rifle or shotgun if the person was previously
10   convicted of:

11              (1)    a crime of violence AS DEFINED IN § 5–101 OF THIS TITLE;

12              (2)    a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613,
13   or § 5–614 of the Criminal Law Article; or

14              (3)    an offense under the laws of another state or the United States
15   that would constitute one of the crimes listed in item (1) or (2) of this subsection if
16   committed in this State.

17      (b)    A person who violates this section is guilty of a felony and on conviction is
18   subject to imprisonment not exceeding 15 years.

19      (c)    Each violation of this subsection is a separate crime.

20   5–301.

21      (a)    In this subtitle the following words have the meanings indicated.

22      (b)    "Board" means the Handgun Permit Review Board.

23      (c)    "Handgun" has the meaning stated in § 4–201 of the Criminal Law
24   Article.

25      (d)    "Permit" means a permit issued by the Secretary to carry, wear, or
26   transport a handgun.

27      (E)    "QUALIFIED HANDGUN INSTRUCTOR" HAS THE MEANING STATED IN
28   § 5–101 OF THIS TITLE.

29      [(e)] (F)    "Secretary" means the Secretary of State Police or the Secretary's
30   designee.

USCA4 Appeal: 21-2017    Doc: 25-2      Filed: 08/03/2022    Pg: 447 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 59 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 59 of 62

SENATE BILL 281                    59

1    5–306.

2        (a)    Subject to subsection [(b)] (C) of this section, the Secretary shall issue a
3    permit within a reasonable time to a person who the Secretary finds:

4            (1)    is an adult;

5            (2)    (i)    has not been convicted of a felony or of a misdemeanor for
6    which a sentence of imprisonment for more than 1 year has been imposed; or

7                (ii)    if convicted of a crime described in item (i) of this item, has
8    been pardoned or has been granted relief under 18 U.S.C. § 925(c);

9            (3)    has not been convicted of a crime involving the possession, use, or
10   distribution of a controlled dangerous substance;

11           (4)    is not presently an alcoholic, addict, or habitual user of a controlled
12   dangerous substance unless the habitual use of the controlled dangerous substance is
13   under legitimate medical direction; [and]

14           **(5)    EXCEPT AS PROVIDED IN SUBSECTION (B) OF THIS SECTION,**
15   **HAS SUCCESSFULLY COMPLETED PRIOR TO APPLICATION AND EACH RENEWAL,**
16   **A FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY THAT**
17   **INCLUDES:**

18               (I)    **1.    FOR AN INITIAL APPLICATION, A MINIMUM OF 16**
19   **HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR; OR**

20                   **2.    FOR A RENEWAL APPLICATION, 8 HOURS OF**
21   **INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;**

22               (II)    **CLASSROOM INSTRUCTION ON:**

23                   **1.    STATE FIREARM LAW;**

24                   **2.    HOME FIREARM SAFETY; AND**

25                   **3.    HANDGUN MECHANISMS AND OPERATION; AND**

26               (III)    **A    FIREARMS    QUALIFICATION    COMPONENT    THAT**
27   **DEMONSTRATES THE APPLICANT'S PROFICIENCY AND USE OF THE FIREARM;**
28   **AND**

29           [(5)] **(6)**    based on an investigation:

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 448 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 60 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 60 of 62

60                                    SENATE BILL 281

1                          (i)    has not exhibited a propensity for violence or instability that
2      may reasonably render the person's possession of a handgun a danger to the person or
3      to another; and

4                          (ii)    has good and substantial reason to wear, carry, or transport
5      a handgun, such as a finding that the permit is necessary as a reasonable precaution
6      against apprehended danger.

7          (B)    AN APPLICANT FOR A PERMIT IS NOT REQUIRED TO COMPLETE A
8      CERTIFIED FIREARMS TRAINING COURSE UNDER SUBSECTION (A) OF THIS
9      SECTION IF THE APPLICANT:

10             (1)    IS A LAW ENFORCEMENT OFFICER OR A PERSON WHO IS
11     RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT
12     AGENCY OF THE UNITED STATES, THE STATE, OR ANY LOCAL LAW
13     ENFORCEMENT AGENCY IN THE STATE;

14             (2)    IS A MEMBER OR, RETIRED MEMBER, OR HONORABLY
15     DISCHARGED MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE
16     NATIONAL GUARD; OR:

17             (3)    IS CURRENTLY A CERTIFIED FIREARMS INSTRUCTOR WHO:

18                 (I)    IS RECOGNIZED BY THE MARYLAND POLICE AND
19     CORRECTIONAL TRAINING COMMISSIONS;

20                 (II)    HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE
21     ISSUED BY THE SECRETARY; OR

22                 (III)    HAS A CERTIFICATION ISSUED AND RECOGNIZED BY A
23     NATIONAL ORGANIZATION A QUALIFIED HANDGUN INSTRUCTOR; OR

24             (3) (4)    HAS COMPLETED A FIREARMS TRAINING COURSE
25     APPROVED BY THE SECRETARY.

26         [(b)] (C)    An applicant under the age of 30 years is qualified only if the
27     Secretary finds that the applicant has not been:

28             (1)    committed to a detention, training, or correctional institution for
29     juveniles for longer than 1 year after an adjudication of delinquency by a juvenile
30     court; or

31             (2)    adjudicated delinquent by a juvenile court for:

USCA4 Appeal: 21-2017   Doc: 25-2   Filed: 08/03/2022   Pg: 449 of 460

Case 1:16-cv-03311-ELH   Document 135-14   Filed 01/28/21   Page 61 of 62
Case 1:16-cv-03311-ELH   Document 77-13   Filed 10/05/18   Page 61 of 62

SENATE BILL 281                          61

1          (i)      an act that would be a crime of violence if committed by an
2  adult;

3          (ii)     an act that would be a felony in this State if committed by
4  an adult; or

5          (iii)    an act that would be a misdemeanor in this State that
6  carries a statutory penalty of more than 2 years if committed by an adult.

7      **(D)    THE SECRETARY MAY ISSUE A HANDGUN QUALIFICATION LICENSE,**
8  **WITHOUT AN ADDITIONAL APPLICATION OR FEE, TO A PERSON WHO:**

9          **(1)    MEETS THE REQUIREMENTS FOR ISSUANCE OF A PERMIT**
10 **UNDER THIS SECTION; AND**

11         **(2)    DOES NOT HAVE A HANDGUN QUALIFICATION LICENSE ISSUED**
12 **UNDER § 5–117.1 OF THIS TITLE.**

13                      *Article – State Government*

14 *10–616.*

15     *(a)    Unless otherwise provided by law, a custodian shall deny inspection of a*
16 *public record, as provided in this section.*

17     *(V)    (1)    EXCEPT AS PROVIDED IN PARAGRAPHS (2) AND (3) OF THIS*
18 *SUBSECTION, A CUSTODIAN SHALL DENY INSPECTION OF ALL RECORDS OF A*
19 *PERSON AUTHORIZED TO:*

20         *(I)    SELL, PURCHASE, RENT, OR TRANSFER A REGULATED*
21 *FIREARM UNDER TITLE 5, SUBTITLE 1 OF THE PUBLIC SAFETY ARTICLE; OR*

22         *(II)    CARRY, WEAR, OR TRANSPORT A HANDGUN UNDER*
23 *TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE.*

24         *(2)    A CUSTODIAN SHALL ALLOW INSPECTION OF FIREARM OR*
25 *HANDGUN RECORDS BY:*

26         *(I)    THE INDIVIDUAL NAMED IN THE RECORD; OR*

27         *(II)    THE ATTORNEY OF RECORD OF THE INDIVIDUAL NAMED*
28 *IN THE RECORD.*

29         *(3)    THE PROVISIONS OF THIS SUBSECTION MAY NOT BE*
30 *CONSTRUED TO PROHIBIT THE DEPARTMENT OF STATE POLICE OR THE*

USCA4 Appeal: 21-2017     Doc: 25-2     Filed: 08/03/2022     Pg: 450 of 460

Case 1:16-cv-03311-ELH    Document 135-14    Filed 01/28/21    Page 62 of 62
Case 1:16-cv-03311-ELH    Document 77-13    Filed 10/05/18    Page 62 of 62

62                             SENATE BILL 281

1   *DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES FROM*
2   *ACCESSING FIREARM OR HANDGUN RECORDS IN THE PERFORMANCE OF THAT*
3   *DEPARTMENT'S OFFICIAL DUTY.*

4         *SECTION 2. AND BE IT FURTHER ENACTED, That, on or before October 1,*
5   *2013:*

6         *(a)    The Department of State Police shall investigate illegal transfers,*
7   *possession, and transport of firearms within the State, including the number and types*
8   *of firearms seized by the Department of State Police and the best information available*
9   *as to the source of the seized firearms.*

10        *(b)    On or before December 31, 2015, the Department of State Police shall*
11  *report its findings to the Governor and, in accordance with § 2–1246 of the State*
12  *Government Article, the General Assembly.*

13        SECTION ~~2.~~ *3.* AND BE IT FURTHER ENACTED, That this Act shall take
14  effect October 1, 2013. *Section 2 of this Act shall remain effective for a period of 3 years*
15  *and, at the end of September 30, 2016, with no further action required by the General*
16  *Assembly, Section 2 of this Act shall be abrogated and of no further force and effect.*

Approved:

_____

                                                Governor.

_____

                                        President of the Senate.

_____

                                Speaker of the House of Delegates.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.,*   *

    *Plaintiffs,*   *

    v.   *   Civil Case No. 16-cv-3311-MJG

LAWRENCE HOGAN, *et al.,*   *

    *Defendants.*   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### DEFENDANT WILLIAM M. PALLOZZI'S THIRD SUPPLEMENTAL ANSWERS TO PLAINTIFF ATLANTIC GUNS, INC.'S FIRST SET OF INTERROGATORIES

Defendant, William M. Pallozzi, by his attorneys, hereby supplements his responses to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories and states as follows:

A.    The word usage and sentence structure used in these answers is that of the attorneys who in fact prepared these answers and the language does not purport to be the exact language of the executing party.

B.    The Interrogatories have been interpreted and answered in accordance with the Federal Rules of Civil Procedure.

C.    Defendant Col. Pallozzi expressly reserves the right to supplement these answers at a later date should it become necessary to do so.

### GENERAL OBJECTIONS

1.    Col. Pallozzi objects to every Interrogatory to the extent it seeks information and/or documents protected by the attorney-client and/or work product privileges.

EXHIBIT
14

USCA4 Appeal: 21-2017     Doc: 25-2          Filed: 08/03/2022     Pg: 452 of 460

Case 1:16-cv-03311-ELH   Document 135-15   Filed 01/28/21   Page 2 of 9
Case 1:16-cv-03311-ELH   Document 77-14   Filed 10/05/18   Page 2 of 7

2.      Col. Pallozzi objects to the extent that the Interrogatories, including subparts, exceed the number permitted under the Federal Rules of Civil Procedure.

3.      Col. Pallozzi objects to the extent the Interrogatories seek information in possession of parties other than Col. Pallozzi or the Maryland State Police ("MSP").  These answers are based solely on the knowledge and information in the possession of Col. Pallozzi and MSP, and not on knowledge or information possessed by any other person or entity.

4.      Subject to and without waiving the foregoing general objections, Col. Pallozzi responds to the Interrogatories as follows:

### ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 5:**      Identify the number of HQL applications not completed each year from 2013 through 2017.

**ANSWER:**   Col. Pallozzi objects to this interrogatory on the ground that the term "not completed" is undefined, vague and ambiguous.  Without waiving these objections, Col. Pallozzi states that MSP does not have this information within its possession.

**SUPPLEMENTAL ANSWER:**  In response to Atlantic Guns' clarification that this interrogatory seeks "information on the number of HQL applications which were started in the MSP system . . . but were never submitted as final to the MSP," Col. Pallozzi objects to this interrogatory on the grounds that it seeks information that is not relevant to any party's claims or defenses under Rule 26(b)(1) nor proportional to the needs of the case, and is overly broad and unduly burdensome.  In support of these objections,

USCA4 Appeal: 21-2017     Doc: 25-2         Filed: 08/03/2022       Pg: 453 of 460

Case 1:16-cv-03311-ELH   Document 135-15   Filed 01/28/21   Page 3 of 9
Case 1:16-cv-03311-ELH   Document 77-14   Filed 10/05/18   Page 3 of 7

Col. Pallozzi states that although this information is not currently tracked by MSP, it would be possible for the Licensing Division's information technology personnel to capture the raw number of applications that have been initiated through MSP's website and the raw number of applications that have been submitted as final. Given the large number of applications on the server, it would take approximately one week to 10 days just to capture this raw data. Moreover, this raw data would not indicate whether an applicant who initiated an application that has not yet been submitted as final intends to submit the application in the future. Further, because an application cannot be deleted once it has been initiated, this raw data would not indicate if an applicant began one type of application (a standard application, a training-exempt application, or a permit-exempt application) and then began another type of application, thus never submitting the initial application. Nor would this raw data indicate why an application was initiated but not submitted as final.

**SECOND SUPPLEMENTAL ANSWER:** Without waiving his objections, Col. Pallozzi states that the numbers of HQL *applications* that were initiated but not submitted as final to MSP in each year from 2013 through 2017 are as follows:

2013: 3,535
2014: 9,776
2015: 12,946
2016: 14,424
2017: 14,875
Total: 55,556

Col. Pallozzi further states that the numbers of *users* who initiated but never submitted any type of HQL application in each year from 2013 through 2017 are as follows:

2013: 1,420
2014: 4,637

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 454 of 460

Case 1:16-cv-03311-ELH   Document 135-15   Filed 01/28/21   Page 4 of 9
Case 1:16-cv-03311-ELH   Document 77-14   Filed 10/05/18   Page 4 of 7

2015: 6,786
2016: 8,438
2017: 9,596
Total: 30,877

Col. Pallozzi further states that this data does not indicate whether an applicant who initiated an application that has not yet been submitted as final intends to submit an application in the future. Nor does this data indicate why an application was initiated but not submitted as final. There are a number of reasons why an individual might initiate but not submit an application. For example, an application may be created for training purposes, or by an individual who has no intention of submitting an application. Further, MSP personnel who process applications routinely receive communications from individuals who are ineligible for an HQL, including because of their age, immigration status, residency status, or criminal history, who have initiated an application but ultimately decide not to submit the application because they are ineligible for an HQL.

JA0928

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 455 of 460

Case 1:16-cv-03311-ELH   Document 135-15   Filed 01/28/21   Page 5 of 9
Case 1:16-cv-03311-ELH   Document 77-14   Filed 10/05/18   Page 5 of 7

BRIAN E. FROSH
Attorney General


/s/ Jennifer L. Katz
JENNIFER L. KATZ (Fed. Bar # 28973)
ROBERT A. SCOTT (Fed. Bar # 24613)
Assistant Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7005 (tel.); 410-576-6955 (fax)
jkatz@oag.state.md.us


May 4, 2018                     Attorneys for Defendants

USCA4 Appeal: 21-2017    Doc: 25-2       Filed: 08/03/2022    Pg: 456 of 460

Case 1:16-cv-03311-ELH   Document 135-15   Filed 01/28/21   Page 6 of 9
Case 1:16-cv-03311-ELH   Document 77-14   Filed 10/05/18   Page 6 of 7

**VERIFICATION**

    I, Col. William M. Pallozzi hereby execute these supplemental answers to interrogatories in my official capacity as Superintendent of the Maryland State Police. Some of the information set forth in these answers was collected by others and such information is not necessarily within my personal knowledge. However, in my official capacity, I solemnly affirm under the penalties of perjury that the foregoing Answers to Interrogatories are true to the best of my knowledge, information and belief.

_____
Date

_____
Signature

6

USCA4 Appeal: 21-2017    Doc: 25-2    Filed: 08/03/2022    Pg: 457 of 460

Case 1:16-cv-03311-ELH   Document 135-15   Filed 01/28/21   Page 7 of 9
Case 1:16-cv-03311-ELH   Document 77-14   Filed 10/05/18   Page 7 of 7

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that, on this 4th day of May, 2018, a copy of the foregoing

Defendant's Third Supplemental Responses to Interrogatories was sent by electronic mail

to:

    John Parker Sweeney, Esq. (JSweeney@bradley.com)
    T. Sky Woodward, Esq. (SWoodward@bradley.com)
    Bradley Arant Boult Cummings LLP
    1615 L Street N.W., Suite 1350
    Washington, D.C. 20036

    Cary J. Hansel (cary@hansellaw.com)
    2514 N. Charles Street
    Baltimore, MD 21218

               __/s/ Jennifer L. Katz_____
               Jennifer L. Katz

JA0931

| | |
|---|---|
| **From:** | Scott, Robert |
| **To:** | Sweeney, John P. |
| **Cc:** | Porter, Jay; Cary Hansel; Dietrich, Ryan |
| **Subject:** | RE: Licensing Division FRS/HQL statistical data 2018-present |
| **Date:** | Friday, October 30, 2020 8:34:40 AM |

**[External Email]**

John –

Pursuant to your request, the number of HQL applications initiated but not submitted are as follows:

2018 – 10731
2019 – 9578
2020 – 17191

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us

**From:** Sweeney, John P. <JSweeney@bradley.com>
**Sent:** Wednesday, October 28, 2020 4:03 PM
**To:** Scott, Robert <rscott@oag.state.md.us>
**Cc:** Porter, Jay <jporter@bradley.com>; Cary Hansel <cary@hansellaw.com>; Dietrich, Ryan <rdietrich@oag.state.md.us>
**Subject:** RE: Licensing Division FRS/HQL statistical data 2018-present

Thank you, Rob. Please continue pursuit of the other information requested in my September 28th email. We are particularly interested in information and summary documents for calendar years 2018, 2019, and year to date 2020 that show the number of HQL applications initiated and the number of HQL applications initiated but not completed.

**John Parker Sweeney**
Partner | Bradley
jsweeney@bradley.com
202.719.8216

**From:** Scott, Robert <rscott@oag.state.md.us>
**Sent:** Tuesday, October 27, 2020 10:27 AM
**To:** Sweeney, John P. <JSweeney@bradley.com>
**Cc:** Porter, Jay <jporter@bradley.com>; Cary Hansel <cary@hansellaw.com>; Dietrich, Ryan <rdietrich@oag.state.md.us>
**Subject:** Licensing Division FRS/HQL statistical data 2018-present

**[External Email]**

John – Pursuant to your request, please see below firearms transfer data from the State Police.  I am still working on the other information you requested.

Rob

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General

200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us

| Licensing Division Weekly (39) Report 09/25/2020 through 10/1/2020 | 2017 Totals | 2018 Totals | 2019 Totals | 2020 Totals | 2017 Weekly Avg. | 2018 Weekly Avg. | 2019 Weekly Avg. | 2020 Weekly Avg. | Current Week Totals (2020) |
|---|---|---|---|---|---|---|---|---|---|
| FRS Total Apps Received | 51,851 | 53,544 | 53,726 | 71,548 | 997 | 1,030 | 1,033 | 1,835 | 2,455 |
| FRS Disapprovals | 175 | 206 | 245 | 424 | 3.4 | 4 | 4.7 | 10.9 | 19 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| HQL New | 23,888 | 21,727 | 20,083 | 46,903 | 459 | 417.8 | 386.2 | 1,203 | 1,854 |
| HQL "New Resident" Apps | 0 | 0 | 0 | 890 | 0 | 0 | 0 | 22.8 | 19 |
| HQL Disapprovals | 566 | 641 | 769 | 1,413 | 10.9 | 12.3 | 14.8 | 36.2 | 54 |

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of August, the foregoing was served, via electronic delivery, to all parties' counsel via the Court's appellate CM/ECF system which will forward copies to Counsel of Record.

/s/ John Parker Sweeney
John Parker Sweeney