No. 21-2017 (L)

**In the
United States Court of Appeals
for the Fourth Circuit**

**MARYLAND SHALL ISSUE,** *et al.*,
Plaintiffs-Appellants

v.

**LAWRENCE HOGAN,** *et al.*,
Defendants-Appellees

On Appeal from the United States District Court
for the District of Maryland
No. 1:16-cv-03311-ELH (Hon. Ellen L. Hollander)

**JOINT APPENDIX VOLUME IV
JA1429-JA1871**

Cary J. Hansel, III
2514 N. Charles Street
Baltimore, MD 21218
Phone: 301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd.
Ste. C #1015
Baltimore, MD 21234
Phone: 301-873-3671
m.pennak@me.com

Counsel for Appellants

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
Connor M. Blair
Bradley Arant Boult Cummings LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: 202-393-7150
Facsimile: 202-347-1684
jsweeney@bradley.com

Counsel for Appellant Atlantic Guns, Inc.

# JOINT APPENDIX TABLE OF CONTENTS

| District Court Docket No.: | Description | Joint Appendix Page: |
|---|---|---|
| VOLUME I: JOINT APPENDIX | | |
|  | U.S. District Court District of Maryland (Baltimore) Civil Docket for Case #: 1:16-cv-03311-ELH | JA0001 |
| 14 | Amended Complaint | JA0020 |
| 34 | Memorandum and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Amended Complaint | JA0043 |
| 54 | Order Granting Plaintiff's Motion to Compel/Local Rule 104.7 and 104.8 | JA0073 |
| 125 | Defendants' Motion for Summary Judgment | JA0075 |
| 125-2 | Exhibit 2: Md. Code Ann., Pub. Safety § 5-117.1 | JA0077 |
| 125-3 | Exhibit 3: Testimony of Daniel W. Webster in Support of H.B. 294 | JA0083 |
| 125-4 | Exhibit 4: U.S. General Accounting Office, Firearms Purchased from Federal Firearm Licensees Using Bogus Identification, GAO–01–427 (2001) | JA0089 |
| 125-5 | Exhibit 5: Testimony of James W. Johnson (Mar. 1, 2013) | JA0112 |
| 125-6 | Exhibit 6: Testimony of Anthony W. Batts (Feb. 6, 2013) | JA0118 |
| 125-7 | Exhibit 7: Declaration of Captain Andy Johnson | JA0121 |
| 125-8 | Exhibit 8: Code of Maryland Regulations (COMAR) 29.03.01.26—.41 | JA0225 |
| 125-9 | Exhibit 9: Declaration of First Sergeant Donald Pickle | JA0234 |
| 125-10 | Exhibit 10: Declaration of Captain Andrew Rossignol | JA0238 |
| 125-11 | Exhibit 11: Declaration of Daniel W. Webster, ScD | JA0251 |
| 125-12 | Exhibit 12: Second Supplemental Declaration of Daniel W. Webster, ScD | JA0412 |
| VOLUME II: JOINT APPENDIX | | |
| 125-13 | Exhibit 13: Declaration of Captain James Russell | JA0480 |
| 125-14 | Exhibit 14: Declaration of James W. Johnson | JA0488 |
| 125-15 | Exhibit 15: Excerpts of deposition transcript of Gary Kleck | JA0495 |
| 125-16 | Exhibit 16: Declaration of Mary Scanlan | JA0498 |
| 133 | Motion to Strike Opinions of Defendants' Experts James Johnson, James Russell, and Daniel Webster | JA0501 |
| 133-2 | Exhibit 1: Deposition of James Johnson | JA0516 |
| 133-3 | Exhibit 2: Deposition of James P. Russell, Jr. | JA0535 |
| 133-4 | Exhibit 3: Deposition of Daniel Webster, Ph.D. | JA0542 |
| 133-5 | Exhibit 4: Supplemental Declaration of Gary Kleck | JA0555 |
| 135 | Plaintiffs' Cross-Motion for Summary Judgment | JA0590 |
| 135-2 | Exhibit 1: Declaration of Stephen Schneider (redacted) | JA0592 |

| 135-3 | Exhibit 2: Declaration of Mark W. Pennak, President, Maryland Shall Issue, Inc. | JA0595 |
|---|---|---|
| | Exhibit A: October 2013 Comments of MSI and of its Directors and Officers on Proposed Weapons Regulations | JA0608 |
| | Exhibit B: Maryland State Police Advisory regarding Alternative Ammunition for HQL Live Fire Training Component dated November 17, 2017 | JA0631 |
| | Exhibit C: Montgomery County, Maryland Department of Police Weapons Law Summary | JA0632 |
| 135-4 | Exhibit 3: Excerpts of the Deposition of Susan Brancato Vizas | JA0634 |
| 135-5 | Exhibit 4: Excerpts of the Deposition of Deborah Kay Miller | JA0644 |
| 135-6 | Exhibit 5: Excerpts of the Deposition of Daniel Webster, Ph.D. | JA0661 |
| 135-7 | Exhibit 6: Excerpts of the Deposition of Andy R. Johnson | JA0700 |
| 135-8 | Exhibit 7: Excerpts of the Deposition of James Johnson | JA0735 |
| 135-9 | Exhibit 8: Excerpts of the Deposition of James P. Russell, Jr. | JA0748 |
| 135-11 | Exhibit 10: Md. Code Ann., Pub. Safety § 5-118(b)(3)(x) (2003) | JA0772 |
| 135-12 | Exhibit 11: Excerpts of the Deposition of Diane S. Armstrong | JA0775 |
| 135-13 | Exhibit 12: J. Joseph Curran, *A Farewell to Arms: The Solution to Gun Violence in America* (October 20, 1999) | JA0800 |
| 135-14 | Exhibit 13: Senate Bill 281 – Enrolled Firearm Safety Act of 2013 | JA0863 |
| 135-15 | Exhibit 14: Defendant William M. Pallozzi's Third Supplemental Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories | JA0925 |
| VOLUME III: JOINT APPENDIX | | |
| 135-16 | Exhibit 15: Licensing Division Weekly Report 1/1/2018-1/4/2018, Licensing Division Weekly Report 12/28/2014-12/31/2014 & Licensing Division Weekly Report 12/23/2016-12/31/2016, respectively. | JA0934 |
| 135-17 | Exhibit 16: Excerpts of the Deposition of Dana J. Hoffman | JA0947 |
| 135-18 | Exhibit 17: Excerpts of the Deposition of Mark W. Pennak | JA0959 |
| 135-19 | Exhibit 18: LiveScan HQL Fingerprinting Costs as of 12/2/2017 | JA0967 |
| 135-20 | Exhibit 19: Excerpts of the Deposition of Stephen Schneider, Corporate Designee | JA0971 |
| 135-21 | Exhibit 20: Defendant William Pallozzi's Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories | JA0974 |
| 135-22 | Exhibit 21: Administrative Log | JA0996 |
| 135-23 | Exhibit 22: Maryland Crime Statistical Data | JA1195 |
| 135-24 | Exhibit 23: Declaration of Carlisle Moody | JA1250 |
| | Attachment A: Excerpt of Expert Report of Carlisle Mood. Data runs omitted. | JA1259 |
| 135-25 | Exhibit 24: Declaration of Gary Kleck | JA1286 |
| | Exhibit A: Expert Report of Gary Kleck | JA1295 |
| | Exhibit B: The Myth of Big-Time Gun Trafficking and the Overinterpretation of Gun Tracing Data | JA1367 |

| VOLUME IV: JOINT APPENDIX | | |
|---|---|---|
| 135-26 | Exhibit 25: Deposition of Scott Thomas Miller | JA1429 |
| 135-27 | Exhibit 26: Deposition of John Matthew Clark | JA1433 |
| 135-28 | Exhibit 27: Declaration of Connor M. Blair | JA1441 |
| 135-29 | Exhibit 28: Supplemental Declaration of Gary Kleck | JA1444 |
| 140-1 | Exhibit 17: Excerpts of deposition transcript of Daniel Webster | JA1479 |
| 140-2 | Exhibit 18: Supplemental Declaration of Daniel Webster | JA1485 |
| 140-3 | Exhibit 19: Third Supplemental Declaration of Daniel Webster | JA1494 |
| 140-4 | Exhibit 20: Excerpts of deposition transcript of Andy Johnson | JA1530 |
| 140-5 | Exhibit 21: Excerpts of deposition transcript of James Johnson | JA1551 |
| 140-6 | Exhibit 22: Excerpts of deposition transcript of Diane Armstrong | JA1560 |
| 140-7 | Exhibit 23: Excerpts of deposition transcript of Scott Miller | JA1568 |
| 140-8 | Exhibit 24: Excerpts of deposition transcript of John Clark | JA1582 |
| 140-9 | Exhibit 25: Excerpt of deposition transcript of Stephen Schneider, designee of Atlantic Guns | JA1595 |
| 140-10 | Placeholder for Exhibit 26 Filed Under Seal | JA1607 |
| 140-11 | Exhibit 27: Declaration of Lieutenant Padraic Lacy | JA1608 |
| 140-12 | Exhibit 28: Yearly Count of Firearm Transfer by Gun Type | JA1612 |
| 140-13 | Exhibit 29: Excerpts of deposition transcript of Captain James Russell | JA1614 |
| 140-14 | Exhibit 30: Excerpts of deposition transcript of Carlisle Moody | JA1618 |
| 140-15 | Exhibit 31: Supplemental Declaration of Mary Scanlan | JA1635 |
| 142-1 | Exhibit 1: Excerpts of deposition transcript of Daniel Webster | JA1637 |
| 145 | Defendants' Motion to Strike Opinions of Plaintiffs' Lay Witness Mark Pennak and Experts Gary Kleck and Carlisle Moody | JA1645 |
| 145-2 | Exhibit 1: Plaintiff Atlantic Guns, Inc.'s Rule 26(A)(2) Disclosures | JA1647 |
| 145-3 | Exhibit 2: Excerpts of deposition transcript of Carlisle Moody | JA1650 |
| 145-4 | Exhibit 3: Excerpts of deposition transcript of Gary Kleck | JA1667 |
| 150-1 | Exhibit 1: Email from Robert Scott to John Parker Sweeney and Ryan Dietrich re: Licensing Division FRS/HQL statistical data 2018-present | JA1684 |
| 150-2 | Exhibit 2: Letter from Dan Friedman, Counsel to the General Assembly, to Senator Brian Frosh re: Senate Bill 281, The "Firearm Safety Act of 2013" | JA1697 |
| 150-3 | Exhibit 3: Plaintiff Maryland Shall Issue's Answer to Defendant Lawrence Hogan's Interrogatories | JA1708 |
| 150-4 | Exhibit 4: Deposition of James Johnson | JA1716 |
| 151-1 | Exhibit 1: Plaintiff Maryland Shall Issue's Answer to Defendant Lawrence Hogan's Interrogatories | JA1720 |
| 151-2 | Exhibit 2: Prepared Testimony of Mark W. Pennak | JA1728 |
| 151-3 | Exhibit 3: Deposition of Carlisle Eaton Moody, Jr. | JA1740 |
| 151-4 | Exhibit 4: Richard Rosenfeld, *Documenting and Explaining the 2015 Homicide Rise: Research Directions* (June 2016) | JA1753 |
| 155-1 | Exhibit 4: Plaintiffs' Amended Rule 26(a)(1)(A) Disclosures | JA1760 |

| 156 | Memorandum Opinion (Motion to Strike) | JA1783 |
|---|---|---|
| 157 | Order (Motion to Strike) | JA1809 |
| 159 | Order (Cross-Motions for Summary Judgment) | JA1810 |
| 163 | Notice of Appeal | JA1811 |
| 171 | Redacted and Revised Memorandum Opinion (Cross-Motions for Summary Judgment) | JA1814 |
| VOLUME V: SEALED APPENDIX | | |
| 84 | Declaration of Stephen Schneider (Filed Under Seal) | JA1872 |
| 140-10 | Exhibit 26: Confidential Stipulation (Filed Under Seal) | JA1876 |
| 158 | Sealed Memorandum Opinion (Cross-Motions for Summary Judgment) | JA1879 |

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 6 of 449

Case 1:16-cv-03311-ELH    Document 135-26    Filed 01/28/21    Page 1 of 4
Case 1:16-cv-03311-ELH    Document 77-25    Filed 10/05/18    Page 1 of 4



**CONFIDENTIAL**

# Transcript of Scott Thomas Miller

**Date:** March 27, 2018
**Case:** Maryland Shall Issue, Inc., et al. -v- Hogan, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT
25

```
1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MARYLAND

3    MARYLAND SHALL ISSUE, INC.,   :

4    et al.                        :

5                        Plaintiffs,:

6       v.                         : Civil Case No.

7    LAWRENCE HOGAN, et al.        : 16-cv-3311-MJG

8                        Defendants.:

9                        -----------

10         CONTAINS CONFIDENTIAL INFORMATION

11          Deposition of SCOTT THOMAS MILLER

12                 Baltimore, Maryland

13                Tuesday, March 27, 2018

14                     2:07 p.m.

15

16

17

18

19

20   Job No.:  179483

21   Pages:  1 - 37

22   Reported By:  Dawn M. Hart, RPR/RMR/CRR
```

CONFIDENTIAL

Transcript of Scott Thomas Miller

Conducted on March 27, 2018                                24

```
1    you've been deterred from purchasing a handgun because

2    of the HQL requirements; is that correct?

3         A    Yes.

4         Q    And what is it about the HQL requirements

5    that you contend has deterred you from purchasing a

6    handgun?

7         A    I'm a busy guy and I don't like spending

8    money on things that I feel are unnecessary or not a

9    good value to me.  I know how to operate handguns

10   safely.  I'm a law abiding citizen.  My job is to help

11   people in need.  So I just feel it's mostly a matter

12   of principle.  I don't want to, you know, waste my

13   time and money.

14          But besides that, I'm very busy.  I mean, as

15   I told you, I work, you know, 10-hour shifts and

16   sometimes that leads to really long nights, and I'm

17   also in school.  So for me to, you know, go through

18   that, that's pretty much taking up my only day of the

19   week off, which is already going towards running

20   errands and, you know, doing other necessary tasks.

21        Q    So aside from the inconvenience that you

22   just described, is there anything else about the HQL
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 9 of 449

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                    25

```
 1   that has deterred you from purchasing a handgun?
 2        A    Well, thank you for mentioning the word
 3   inconvenience because I think that's the word I was
 4   searching for.
 5             No, I wouldn't say so.  I'm not a fan of
 6   firearm registration.  However, I have no reason to
 7   believe that I'd be barred from owning one, so it's
 8   mostly the inconvenience.  But I don't -- I just don't
 9   feel that there's a need to be licensed to own a
10   handgun when other types of firearms you can own
11   without any type of licensure.
12        Q    Assuming that you purchased a handgun, would
13   you plan to carry it with you, or keep it in your
14   home, or both?
15        A    I would certainly keep it in my home.  I
16   would not be carrying it with me because as you're
17   probably aware, the Maryland State Police is very
18   withholding of their conceal carry permits and they do
19   not recognize conceal carry permits from other states.
20   So I don't believe that there would be any way for me
21   to legally carry a handgun with me.
22        Q    So you don't have any plans to obtain a
```

USCA4 Appeal: 21-2017     Doc: 25-4     Filed: 08/03/2022     Pg: 10 of 449

Case 1:16-cv-03311-ELH   Document 135-27   Filed 01/28/21   Page 1 of 8
Case 1:16-cv-03311-ELH   Document 77-26   Filed 10/05/18   Page 1 of 8



**CONFIDENTIAL**

# Transcript of John Matthew Clark

**Date:** March 27, 2018
**Case:** Maryland Shall Issue, Inc., et al. -v- Hogan, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT
26

USCA4 Appeal: 21-2017    Doc: 25-4        Filed: 08/03/2022      Pg: 11 of 449

Case 1:16-cv-03311-ELH   Document 135-27   Filed 01/28/21   Page 2 of 8
Case 1:16-cv-03311-ELH   Document 77-26   Filed 10/05/18   Page 2 of 8

```
1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MARYLAND

3    MARYLAND SHALL ISSUE, INC.,   :

4    et al.                        :

5                     Plaintiffs,:

6       v.                         : Civil Case No.

7    LAWRENCE HOGAN, et al.        : 16-cv-3311-MJG

8                     Defendants.:

9                  -----------

10         CONTAINS CONFIDENTIAL INFORMATION

11           Deposition of JOHN MATTHEW CLARK

12                Baltimore, Maryland

13               Tuesday, March 27, 2018

14                    9:05 a.m.

15

16

17

18

19

20   Job No.:  179483

21   Pages:  1 - 33

22   Reported By:  Dawn M. Hart, RPR/RMR/CRR
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 12 of 449

Case 1:16-cv-03311-ELH   Document 135-27   Filed 01/28/21   Page 3 of 8
Case 1:16-cv-03311-ELH   Document 77-26   Filed 10/05/18   Page 3 of 8

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                    14

```
1         Q    How often do you use it?

2         A    Just occasionally, to punch holes in paper.

3    Target practice.

4         Q    Okay.  Got you.

5              Do you go to a range for that?

6         A    Yes.

7         Q    Which range?

8         A    Hap Baker in Carroll County.

9         Q    How far is that from your house?

10        A    Maybe two miles.

11        Q    Have you ever owned any other firearms?

12        A    No.

13        Q    How much did you pay for the gun?

14        A    Maybe 400 and change.

15        Q    Did you buy it new?

16        A    Yes.

17        Q    You have been identified in some discovery

18   responses in this case as someone who has been

19   deterred from purchasing a handgun by the requirements

20   of obtaining an HQL.  Are you aware of that?

21        A    Yes.

22        Q    Okay.  What is your understanding of what
```

USCA4 Appeal: 21-2017    Doc: 25-4       Filed: 08/03/2022    Pg: 13 of 449

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                    15

1   you would need to do to obtain an HQL?

2        A    See if I can remember.  I'm exempt from the

3   training because I previously owned a firearm, a

4   handgun, if I remember right.  I would have to find

5   some place to have fingerprints taken, and pay, I

6   believe it's a 75-dollar fee to the State, and I think

7   that's it.

8        Q    And these requirements have deterred you

9   from purchasing a handgun?

10       A    Yes.

11       Q    What other handgun do you want to buy?

12       A    I want to get -- mine's a small conceal

13   carry.  I wanted a larger, more comfortable to hold.

14       Q    And why do you want this larger gun?

15       A    Just more comfortable.

16       Q    Do you have a particular type of handgun in

17   mind that you want to purchase?

18       A    Another 9-millimeter.

19       Q    And have you shopped for that?

20       A    No.

21       Q    Do you know how much it would cost?

22       A    Probably about the same, four to 500.

Case 1:16-cv-03311-ELH   Document 77-26   Filed 10/05/18   Page 5 of 8

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                16

1        Q    Have you done any research to determine

2    where you could have your fingerprints taken if you

3    decided to apply for an HQL?

4        A    I did when it -- when the requirement first

5    came out.  The place I would have used was Carroll

6    County Sheriff's Office.  The new Sheriff dropped the

7    program.

8        Q    When you say you did the research when the

9    requirement first came out, are you saying in 2013?

10       A    Yes.

11       Q    So that would have been what time of the

12   year in 2013?  After you bought the gun that you have

13   now, or before?

14       A    After the law officially -- actually, it

15   would have been 2014 because it was after it became

16   law.

17       Q    And was there anything in particular that

18   prompted you to want to get this larger handgun at

19   that time?

20       A    When I bought the first one, I was beating

21   the clock for all the laws that were being enacted and

22   it was slim pickings so I didn't really have time to

USCA4 Appeal: 21-2017   Doc: 25-4   Filed: 08/03/2022   Pg: 15 of 449

Case 1:16-cv-03311-ELH   Document 135-27   Filed 01/28/21   Page 6 of 8
Case 1:16-cv-03311-ELH   Document 77-26   Filed 10/05/18   Page 6 of 8

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                          17

```
 1   really choose the one that I wanted.
 2        Q    And do you keep the gun for any other
 3   purpose other than target practice?
 4        A    Home defense.
 5        Q    Anything else?
 6        A    No.
 7        Q    You don't use it to hunt?
 8        A    No.
 9        Q    So other than -- well, when you found out
10   that -- how did you find out that the Sheriff in
11   Carroll County was no longer offering fingerprinting
12   services?
13        A    It was a bulletin on their website.
14        Q    Have you ever been fingerprinted before?
15        A    Yes.
16        Q    For what purpose?
17        A    Job at -- with the -- as a Defense
18   contractor.
19        Q    When was that?
20        A    1996, 1997.
21        Q    Is that the only time you've been
22   fingerprinted?
```

Case 1:16-cv-03311-ELH    Document 77-26    Filed 10/05/18    Page 7 of 8

CONFIDENTIAL

Transcript of John Matthew Clark

Conducted on March 27, 2018                                    18

```
1        A    I was fingerprinted once as a kid with some,
2    you know, I don't know what you call it.  It was in a
3    school, like with the child protection kidnaping
4    thing.
5        Q    Okay.  Any other times?
6        A    No.
7        Q    So once you found out that the Sheriff in
8    Carroll County was no longer offering fingerprinting
9    services, did you do any other research to determine
10   where you could get your fingerprints taken for an
11   HQL?
12       A    Just some very light research.
13       Q    What did you do?
14       A    Checked the forum messages at
15   Marylandshooters.com to see who else was looking in my
16   area.
17       Q    And did you -- is that a website?
18       A    Yes.
19       Q    And did you find out about any other
20   fingerprinting services that you could use to get an
21   HQL?
22       A    There were some.  I don't recall finding any
```

USCA4 Appeal: 21-2017    Doc: 25-4        Filed: 08/03/2022      Pg: 17 of 449

Case 1:16-cv-03311-ELH   Document 135-27   Filed 01/28/21   Page 8 of 8
Case 1:16-cv-03311-ELH   Document 77-26   Filed 10/05/18   Page 8 of 8

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                19

```
 1   in Carroll County, but there were others around with
 2   varying fees.
 3        Q    What were the fees, do you remember?
 4        A    I think some were as high as 150.
 5        Q    What was the low?
 6        A    Seventy-five, I think.
 7        Q    Did any of these places that offered
 8   fingerprinting services for HQL licenses tell you that
 9   you had to do the fingerprinting only during business
10   hours, Monday through Friday?
11        A    No, I did not go that far.
12        Q    So you don't know whether or not you could
13   have it done on a weekend or in the evenings; is that
14   correct?
15        A    Correct.
16        Q    Did you ever go on the Maryland State Police
17   website to look -- to research additional places where
18   you could have your fingerprints taken for an HQL
19   application?
20        A    I did once.
21        Q    And what was the result of that?
22        A    I honestly don't remember.  Their website
```

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC., et al.;**  )
  )
  )
**Plaintiffs,**  )
  )
       **v.**  )       **Case No.: 16-cv-3311-ELH**
  )
**LAWRENCE HOGAN, et al.;**  )
  )
  )
**Defendants.**  )
  )

## DECLARATION OF CONNOR M. BLAIR

I, Connor Blair, under penalty of perjury, declare and state as follows:

1.     I am an attorney at Bradley Arant Boult Cummings LLP. I am over the age of 18 and am competent to testify, upon personal knowledge, to the matters stated below.

2.     Attached as Exhibit 1 to Plaintiffs' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Cross-Motion") is a true and correct copy of the Redacted Declaration of Stephen Schneider, dated October 3, 2018. The unredacted declaration is filed under seal identified as ECF 77-01.

3.     Attached as Exhibit 2 to Plaintiffs' Cross-Motion is a true and correct copy of the Declaration of Mark Pennak, dated January 22, 2021, including true and correct copies of its accompanying exhibits.

4.     Identified as Exhibit 9 to Plaintiffs' Cross-Motion is a true and correct copy of the 77R Handgun Registration presentation produced by Defendants in this case, in CD-Rom format previously filed and identified as ECF 77-09.

EXHIBIT
27

5.      Attached as Exhibit 14 to Plaintiffs' Cross-Motion is a true and correct copy of Defendants William M. Pallozzi's Third Supplemental Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories and a true and correct copy of Assistant Attorney General Robert Scott's October 30, 2020 email that updates the number of HQL applications initiated but not submitted as final to the Maryland State Police.

6.      Attached as Exhibit 15 to Plaintiffs' Cross-Motion is a true and correct copy of Deposition Exhibits 48, 105, and 106 and a true and correct copy of Maryland State Police Firearm Transfer Data emailed by Mr. Scott on October 27, 2020.

7.      Attached as Exhibit 20 to Plaintiffs' Cross-Motion is a true and correct copy of Defendant William M. Pallozzi's Answers to Plaintiff Atlantic Guns, Inc.'s First Set of Interrogatories.

8.      Attached as Exhibit 21 to Plaintiffs' Cross-Motion is a true and correct copy of the Handgun License administrative log produced by Defendants in this case as bates MSP Supplemental Production Jan.2021_000001-Jan.2021_000199. To calculate the number of applications that were administratively denied after thirty days because the safety course instructor or fingerprint vendor had failed to timely submit the Firearms Safety Training Certificate to the Maryland State Police or live-scan fingerprints to the Central Repository, I reviewed the reasons for disapproval, identified applications added to the administrative log due to livescan, training, or instructor reasons, and added the total number of these applications.

9.      Attached as Exhibit 22 to Plaintiffs' Cross-Motion is a true and correct copy of a chart of Maryland crime statistical data and its accompanying exhibits that support the chart.

10.     Attached as Exhibit 23 to Plaintiffs' Cross-Motion is a true and correct copy of the Declaration of Carlisle Moody, dated October 3, 2018, including true and correct copies of its accompanying exhibits.

11.     Attached as Exhibit 24 to Plaintiffs' Cross-Motion is a true and correct copy of the Declaration of Gary Kleck, dated October 4, 2018, including true and correct copies of its accompanying exhibits.

12.     Attached as Exhibit 28 to Plaintiffs' Cross-Motion is a true and correct copy of the Supplemental Declaration of Gary Kleck, dated January 26, 2020, including true and correct copies of its accompanying exhibits.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


*/s/ Connor M. Blair*                            January 27, 2021_____
Connor M. Blair                                     Date

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.*, et al.*,

     *Plaintiffs,*

v.                               Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.,*

     *Defendants.*

---

**<u>SUPPLEMENTAL DECLARATION OF GARY KLECK</u>**

I, Gary Kleck, under penalty of perjury, declare and state:

1.     This supplemental declaration is a response to Daniel W. Webster's Second Supplemental Declaration, in which he cites three additional studies that purportedly buttress his opinion supporting Maryland's Handgun Qualification License ("HQL") law. In Part 1 I explain fundamental problems afflicting Webster's evaluation of background check laws, addressing problems characterizing all of his studies on this topic. Then, in Parts 2-4 I separately examine each of the three studies he newly cites in the Second Supplemental Declaration.

**Part 1 - Problems with the Webster Research Program as a Whole**

2.     Each of the individual studies on which Webster relies in his Second Supplement is fatally flawed in itself, but the entire series of studies on background check laws co-authored by Webster is misguided and misleading as a whole, showing all the earmarks of data-dredging to obtain chance findings and present them as if they were tests of a single *a priori* hypothesis formulated before looking at the data.

EXHIBIT
28

3.      "Data dredging" is a misuse of data analysis in which the analyst examines a large, complex body of data (such as the set of all the rates of firearm violence in all states over the past 80 years), identifies some chance (non-causal) associations, formulates a hypothesis after this peek at the data, conducts an analysis rediscovering these associations, then reports the results of the analysis as if it provides a test of a single *a priori* hypothesis, i.e. one formulated before examining the data.  The strategy is disreputable partly because it employs tests of significance that rely on the assumption that the analyst was only testing a single hypothesis (such as "firearm purchasing licensing laws that require the applicant to personally appear before law enforcement authorities reduce firearms homicide") when the analyst had actually tested dozens or hundreds of variants of the hypothesis (e.g., "some kind of gun control law (unspecified) reduces some kind of crime or violence").  Tests of statistical significance are supposed to assess the probability that a statistical result could be entirely the result of chance factors (rather than the product of actual causation), but the significance levels yielded when the analyst indulges in data dredging are grossly inaccurate, because the probability of a purely chance finding is far greater when the analyst performs dozens or hundreds of tests rather than the single test assumed by conventional significance computations (for a classic discussion of data dredging, see Selvin and Stuart 1966).

4.      The tactic is notably unreliable because it lends itself to cherry-picking unrepresentative subsets of the available data and reporting misleading results that confirm the researcher's expectations, and not reporting results contrary to those expectations.

5.      There have been thousands of changes in gun control law in the 50 states and the District of Columbia (DC) in past decades.  Further, over the past 80 years or so, homicide and suicide rates have increased about half the time and decreased about half the time (U.S. Federal Bureau of Investigation 2017; Kleck 1997, pp. 262-263, 289-290).  Thus, at any one time that a

new gun control law is passed or an old one is repealed there is roughly a 50% chance that enactment of the law will *coincide* with a reduction in the homicide or suicide rate – even if the policy has no actual effects. An unscrupulous analyst could dredge through decades of violence statistics, examine data for each of the 50 states and D.C., identify the many time points when firearms violence decreased in this or that state, and then selectively look for the states and years when the decreases coincidentally happened to be preceded by a change in gun law. Even if gun law changes had no actual causal effects on violence rates, there would be hundreds or thousands of such coincidences simply because there were so many changes in gun laws and so many years in which violence decreased. Under a no-effect assumption, it would be a reasonable expectation that roughly half of enactments of new gun laws would be followed by increases in firearm violence and half by decreases.

6.      If one were sufficiently selective, one would also be able to identify some very specific subtypes of gun laws for which violence decreases were *more* common in the post-law period than violence increases, just as other subtypes were more often followed by *increases* than decreases. The unethical analyst might be tempted to publish results pertaining to the former type of gun law, while ignoring the latter.

7.      Webster and his colleagues do not assert that firearm background check laws in general reduce firearms violence. Quite the contrary, they have explicitly rejected this position (McCourt, Crifasi, Stuart, Vernick, Kagawa, Wintemute, and Webster 2020, pp. 1546-1547). Rather, Webster has claimed that only very specific subtypes of background check laws, incorporating very specific elements, have this beneficial effect, though over time he has changed which elements he thinks are responsible for gun violence reductions.

8.      Webster has offered multiple speculations about which background check subtypes are consequential, and has changed over time which ones he has stressed as beneficial.  Thus, he cannot assert that, at the very start of his research on this topic, around 2013, he was going to test for the gun violence-reducing effects of one specific type of background check laws, such as those requiring fingerprinting.  Rather, he effectively revised his implied hypothesis as he and his colleagues examined more subsets of the available data, testing multiple specific versions of the general hypothesis that some kind of background check on firearms purchasers reduces gun violence.  There is nothing wrong with scholars changing their views about what an evolving body of evidence shows; indeed, flexibility is generally a scholarly virtue.  What is not desirable is: (1) selectively presenting only some research findings regarding a wide variety of hypotheses and not others; and (2) reporting erroneous significance tests as if the researcher had tested only a single version of his hypothesis.

9.      Webster's earliest empirical work in this area assessed the effect of repealing Missouri's permit-to-purchase ("PTP") law (which he now relabels a "purchaser licensing law") on firearms violence, finding that the repeal was followed by increases in firearms homicides (Webster, Crifasi, and Vernick 2014).  Since the repeal did not eliminate background checks on people trying to get guns from licensed dealers, he had to offer some kind of rationale for why Missouri's repeal of its PTP law would increase firearms violence.  The repealed law had to have some additional provisions that reduced gun violence when it was still in effect.  At that time (2014) Webster seemed to most strongly emphasize the fact that background checks were required for private transfers as well as dealer transfers, stressing that the repeal "eliminated mandatory background checks for handguns sold by unlicensed sellers" (p. 294; stressed again on p. 298).

10.     Recent research on states with universal background checks, however, indicates that it is highly unlikely that this element of Missouri law had any measurable pre-repeal effect on gun violence or criminal acquisition of guns, since few private sellers obey this legal requirement, and virtually none of the few prospective private transferees who do submit to background checks are denied.  Data from Colorado, Oregon, and California indicate that only about $1/10^{th}$ of 1% of private transfers of guns in those states were both: (1) subjected to the legally required background check; and (2) resulted in a denial of the transfer (Kleck 2020).  In this light, it is implausible that eliminating this feature of Missouri gun law could have had any measurable effect on rates of firearms violence.  Indeed, Webster's own recent research concludes that universal background checks - which he has relabeled "comprehensive background checks" ("CBC") - do not reduce firearms violence (McCourt et al. 2020).

11.     Webster also stressed that applicants for PTP permits in Missouri had to appear in person at some law enforcement agency to apply, asserting (though not documenting) that "most states with PTP handgun licensing require applicants to apply for the license directly at a law enforcement agency" (Webster, Crifasi, and Vernick 2014, p. 294).  He speculated that this might deter some criminal applicants who would have passed the checks (those who would not have passed the checks are irrelevant to this claim since they would have been denied anyway).

12.     By 2018 Webster and his colleagues (Crifasi et al. 2018) had obtained findings of *higher* firearms homicide rates in places with CBC laws, suggesting that violence-reducing effects of background check laws, including Missouri's pre-repeal law, were *not* due to background checks  covering private (nondealer) transfers.  Webster then argued that CBCs alone do not reduce firearms homicides, but that other elements of the permitting process do.  He and his colleagues then speculated that these crucial elements were either: (1) the longer times that permit laws often

allow for authorities to conduct the background check (p. 387); or (2) the requirement for a personal appearance of the applicant at a law enforcement agency.

13.    By 2020, however, Webster had become more ambivalent about the value of the personal appearance requirement for reducing gun violence.  The background check laws that he and his colleagues claimed reduce firearms violence were those that required *either*: (1) an in-person application; *or* (2) fingerprinting (Webster, McCourt, Crifasi, Booty, and Stuart 2020, p. 187).  In other places in that article, he alludes only to fingerprinting (p. 171).  Strictly speaking, by this point Webster was unwilling to unambiguously commit himself to the value of personal appearance of applicants, effectively hedging his bets by claiming it *might* reduce gun violence, or it might not, and that it may instead be fingerprinting requirements that account for the purported benefits of permit laws.

14.    Webster has never offered a credible explanation of why fingerprinting would strengthen the ability of background check laws to block criminals and other high-risk persons from getting guns.  A fingerprinting requirement does not increase the comprehensiveness of criminal background databases' coverage, nor does it widen the scope of persons who fall into a disqualified category.  Rather, the standard rationale for requiring applicants to be fingerprinted is simply to ensure that applicants really are who they claim to be, and minimize the use of fake documents to claim the identity of a person qualified to receive a gun.  Whether a fingerprinting requirement has a measurable effect on gun acquisition by disqualified persons is, then, a function of how often such persons use false ID to impersonate a qualified person.

15.    This tactic, however, appears to be extremely unusual.  According to a 2016 national survey of 24,848 prison inmates, most criminals who possessed a gun during the offense for which they were incarcerated did not get the gun from a licensed source of the type required to

perform a background check, and among those who use such sources, most used their own name. Only about 1.3% of gun-armed criminals got their gun from a retail source and used a false name (Alper and Glaze 2019, p. 8). A fingerprinting requirement therefore seems to be a solution to an extremely rare problem, and therefore unlikely to produce the enormous effects on firearms homicides claimed by Webster.

16.     In his most recent article on background check laws, Webster no longer stresses the personal appearance requirement at all - or even mentions it. In that article's conclusions, he and his co-authors primarily emphasize the purported benefits of authorities being allowed more time to conduct background checks (McCourt et al. 2020, p. 1550), though they also make a single brief allusion to "mandated fingerprinting" at the beginning of the article (p. 1546). Having dropped the stress on either universal background checks or personal appearance requirements (and possibly fingerprinting), he seems to now stress the waiting period element of the permitting process. The problem with this emphasis is that virtually all technically sound research indicates that waiting period laws have no measureable effect on homicide rates (Loftin and McDowall 1983; Kleck and Patterson 1993; Ludwig and Cook 2000; Lott and Whitley 2001; Makarios and Pratt 2012; Kleck, Kovandzic, and Bellows 2016). The authors cite a *single* study to support the contrary position (Luca, Malhotra, and  Poliquin 2017), which supposedly showed that "longer waiting periods between applying to purchase firearms and receiving the firearms are associated with lower rates of firearm homicides and suicides," but even this study's strongest findings did not find an association between waiting periods and either total homicide or total suicide that was significant at the conventional 5% level (Kleck 2017, pp. 8-9).

17.     Thus, Webster did not have, back in 2013, a single specific *a priori* hypothesis about a specific kind of background check law that he believed reduced gun violence. Rather,

over the years he tested for effects of many different variants of such laws, repeatedly changing which elements of those different laws were claimed to be responsible for supposed effects. He was testing multiple hypotheses, not just one. And the results of these multiple hypothesis test do not consistently support any one specific hypothesis about the benefits of permit laws.

18.     They certainly do not consistently support *Maryland's* HQL law. Maryland requires fingerprinting of handgun applicants, yet the results of Webster's research do not consistently support the effect of fingerprinting of permit applicants. His most recent research concludes that the law in Connecticut, which requires fingerprinting, reduces gun violence, but that Maryland's law, which also requires fingerprinting, does not reduce gun violence (McCourt et al. 2020, pp. 1548-1549).

19.     Nor are his results consistent regarding the view that allowing more time for background checks reduces gun violence. Maryland allows 30 days for the check to be completed, but Webster and his colleagues concluded that its law had no effect on firearms homicide, while concluding that Missouri's repealed permit law, which involved no wait at all, *did* reduce gun homicide (McCourt et al. 2020, pp. 1548-1549).

**Cherry-picking States to Study**

20.     At least 11 states plus DC have laws requiring a permit to purchase firearms (CT, HA, IA, MD, MI, NE, NJ, NC) or a license to own or purchase them (IL, MA, NY) (Giffords Law Center to Prevent Gun Violence 2021)(collectively referred to as "Purchaser Licensing" or "PL" laws). Why, then, did Webster study just four of these 12 jurisdictions? And if only four, why CT, MD, MO, PA in particular? These questions are crucial because if researchers decide to study just a few instances of a policy that has been implemented in many jurisdictions, there is a risk that researchers will cherry-pick one or two unrepresentative examples that appear to support a

preferred finding, even if analysis of all instances would have indicated that the average effect of the policy was zero.

21.     The danger can be illustrated by a simple example.  Suppose gun control policy X had no effect whatsoever on homicide rates, but a hypothetical researcher wanted to create the false impression that X was effective.  This is easy to do with any policy that has been implemented in numerous states.  In the long run, over the past 80 years or so, homicide rates have increased about half the time and decreased about half the time (U.S. Federal Bureau of Investigation 2017).  Thus, at any one time that a new state gun control law is passed, there is roughly a 50% chance that its introduction will be followed by a reduction in the homicide rate, even if the law has no effect on violence.  All the researcher would need to do to create the false impression that some kind of gun control law was effective in reducing homicide would be to dredge through data on homicide rates in the 50 states and DC, looking for declines in state firearms homicide rates occurring in any of the 80-some years for which state homicide statistics are available, and to then search for instances of new gun laws that happened to have been introduced just before the homicide declines began.  Each of the 4,000-plus state-years (51 x 80 = 4,080) would represent a potential opportunity to observe a homicide decline that began just after a new gun law was enacted, and roughly half of these state-years would be cases in which the homicide rate was lower than it had been the year before.  Consequently, there would be hundreds of instances where introduction of a new gun law was coincidentally followed by a drop in the firearms homicide rate.  The researcher could simply pick a few of them that happened to coincide with an especially strong drop in the firearm homicide rate to analyze and publish the results for these few nonrandomly selected states, as if they were the specific states that the researcher wanted to study all along.

10

22.    Studying just a small minority of a larger number of implementations of a given type of policy is prone to yielding misleading results for the foregoing reasons, and consequently is not accepted as a method by knowledgeable researchers.  The more accepted procedure is to study *all* implementations of a given type of gun law, estimating the average treatment effect of the full set, in either a cross-sectional analysis of states, counties, or cities (e.g. Kleck and Patterson 1993; Kleck, Kovandzic, and Bellows 2016) or a panel design in which all state-years are coded as to which ones had a given type of law in operation (e.g. Lott and Whitley 2001; Marvell and Moody 1995).  Either way, no one could claim that researchers using these methods had cherry-picked an unrepresentative subset of the instances of a given type of law being implemented.

23.    It is unhelpful to phrase research results in associational language, saying that changes in handgun purchasing licensing laws were "associated with" changes in firearms homicide or suicide.  This could charitably be interpreted as a sign of scientific caution, the authors refraining from making unwarranted claims about cause-and-effect.  Less charitably, it serves to obscure the actual meaning the authors were clearly trying to convey – that changes in gun law *caused* changes in firearms violence.  Webster and his colleagues conveyed their actual intended meaning in their abstract (and other places) when they admitted that they were trying to estimate "the *effects* of these laws on homicide and suicide rates" (p. 1546, emphasis added).  The word "effects" plainly denotes causal effects. But, policy cannot be based on merely coincidental statistical *associations* between violence rates and changes in law. Accordingly, for purposes of this supplemental report, I treat the authors' conclusions as if they pertained to the purported causal effects of changes in gun laws.

**Part 2 - Critique of the Hasegawa et al. (2019) Study**

24.    In his Second Supplement, Webster does not explain how the Hasegawa study adds anything to our understanding of the impact of Missouri's repeal of its PTP law or in what specific ways it improves on his original Missouri study (Webster et al. 2014). It fails to address the most glaring problems with that prior study.

25.    Hasegawa et al. appeared to believe that a serious problem with the original 2014 research was that it did not address "concerns about history interacting with group" (p. 371). As applied to this study, "history interacting with group" refers to the possibility that unmeasured confounding variables had different effects on firearms homicide rates in Missouri in the post-repeal period than in other states that did not change their purchase permit laws. It is crucial to stress what "interacting" means in this context. A confounder (or an historical event) "interacting with group" means that the confounding factor has different effects in one group (e.g., Missouri) than in another (e.g. a bordering control state such as Iowa). It does not mean the level of the variable changed over time more in one group than another. Rather, it means that the *degree of effect* differs across groups, e.g. the amount of change in firearms homicide caused by a one unit change in the confounder (or the historical event) differs between the groups.

26.    This is not a problem that afflicted Webster's 2004 study, and thus the solution is irrelevant to any of the actual problems with the earlier study (summarized in Kleck 2017). The most important problem with that study was uncontrolled confounders – variables beside the PTP repeal that affected firearms homicide rates, that were not controlled by Webster, and that changed over time more in Missouri than in control states. The problem was not "history interacting with group," but rather simple omitted variables bias. These "omitted variables" were uncontrolled variables that might well exert the same magnitude of effect, unit-for-unit, in both Missouri and

control states (and thus did *not* "interact with group"), both before and after the repeal, but simply changed more in Missouri than in the control states. This is not the problem addressed in the Hasegawa et al. study, and the procedures they employ do not solve it. The only way to solve it would be to measure and explicitly control for the omitted confounding variables, and this was not done in either the original Webster et al. (2014) study or in the Hasegawa et al. (2019) study.

27. Suppose, for example, that a spate of street gang violence occurred in Missouri for reasons completely unrelated to the PTP repeal, and resulted in more firearms homicides in Missouri in 2008, just after the repeal. The unit-for-unit impact on the firearms homicide rate of a given number of gang combats might be identical in both Missouri and in other states, and identical in both the pre-repeal and post-repeal period, so their effect does not interact with either group or period. Nevertheless, if the level of gang violence increased in Missouri more than in the control states, it would cause a larger increase in firearms homicide in Missouri than in other states. Since Webster did not control for the level of gang violence (or any other known confounders), he had no basis for attributing post-repeal homicide increases in Missouri to the PTP repeal (Kleck 2017).

28. In that earlier study, Webster did at least acknowledge in principle the need to control for confounders, and facially appeared to do that. A confounder in that study would be a variable that both affects the rate of firearms homicide and is correlated with the existence of a PTP law. The variables actually controlled by Webster, however, were not confounders, either because they showed no significant association with firearms homicide rates, or had no known association with the existence of a PTP law. For example, while Webster and his colleagues claimed to control for at least eight variables or sets of variables, results buried in their Supplemental Tables show that five of these showed no significant association with firearms

homicide rates (and thus could not be confounders), while two others showed nonsensical associations (they implied that more poverty *reduces* homicide, and that bans on Saturday Night Special handguns *increase* homicide) (Kleck 2017).

29.     The Hasegawa study likewise did nothing to correct any other serious defects of the 2014 study. One fundamental problem was simply the decision to assess the impact of just one state's change in PTP law, rather than studying the average impact of all state PTP laws. Focusing on a single state lends itself to cherry-picking an unrepresentative state, and ignoring the more typical effects in other states, or the average effect across all states with a PTP law. At the time this study was done there were at least nine states with PTP laws, raising the question: "Why study just Missouri?" (Kleck 2017). The Hasegawa study is also confined to just Missouri, so it simply repeats this problem.

30.     Another problem in the 2014 study left unsolved by the Hasegawa study was the extremely short pre-repeal time series, 1998-2007. Webster et al. had limited the pre-repeal period to just nine years, even though there were data for many times that many years. This decision to needlessly restrict the pre-intervention sample guaranteed more unstable results, particularly regarding how much post-repeal Missouri firearms homicide rates changed compared to the rates prevailing prior to the repeal. Hasegawa's analysis used exactly the same needlessly truncated pre-repeal time period (p. 375).

31.     Yet another problem with the 2014 study of Missouri was that Webster and his colleagues could not explain why repeal of the PTP law appeared to have all of its "effect" in a single year. All of the post-2007 increase in the firearms homicide rate in Missouri occurred from 2007 to 2008. Thereafter, there was no further increase during the period studied by Webster et al. The Missouri firearm homicide rates jumped from 4.6 per 100,000 in 2007 to 6.2 in 2008, but

by 2011 had returned to its pre-repeal 2005 rate of 5.2. (Kleck 2017).  If eliminating the PTP elements of background checks had actually caused a gun homicide increase, the effects should have persisted as long as those elements continued to be absent, i.e. right up through the end of the study period.  They did not.  Why would a persisting set of conditions for buying a gun have effects lasting only a year?

32.     More likely causes of this very short-lived jump in Missouri gun homicide would be short-lived developments in Missouri, such as a brief spate of inter-gang violence in which killings by one gang triggered retaliatory killings by another.  A similar development might be a brief elevation of homicide linked with conflicts over drug dealing.  Since nearly all homicides linked with street gang conflict or drug dealing are committed with firearms (U.S. FBI 2007, Expanded Homicide Data Table 10), one would expect the impact to be largely limited to the rate of firearms homicide.  This is precisely the pattern observed in Missouri, but one that Webster et al. touted as evidence that the increase was due to the PTP repeal.

33.     Nothing in either the original 2014 study or in the 2019 Hasegawa study even establishes that more Missouri criminals purchased guns after the 2007 repeal, which is clearly the reason why Webster et al. thought that eliminating the PTP law would cause increased gun homicide (2014, p. 294).  They claimed to have had measures of what they vaguely described as "illegal diversion" of guns to criminals (p. 299), a term they never defined, and asserted that this increased after the PTP law was repealed.  Their indicator of "illegal diversion" was the share of guns recovered by police that: (1) had been first sold at retail a relatively short time before recovery; and (2) came from a state outside of Missouri.  Neither is a valid indicator of gun trafficking or of criminals' gun acquisition (Kleck and Wang 2009).

34.     The repeal of the PTP law only changed one mechanism for acquiring guns - purchase.  Webster later concluded that extending background checks to cover private transfers does not affect gun homicide (McCourt et al. 2020), so repealing this element of Missouri's PTP law should not have affected criminal gun acquisition via purchases from private transfers.  Thus, he must believe criminal purchases of guns from dealers must have increased.  Since Missouri continued to have federally mandated background checks on purchases from gun dealers, one would expect that Webster might have checked whether an increased share of these checks in Missouri resulted in denials due to criminal records.  He did not - or at least did not report the results of such an inquiry.  Hasegawa et al. contribute nothing on this score – they provide no basis for believing that criminal purchases of guns increased after Missouri repealed its PTP law.

35.     The Hasegawa study repeats the critical error pervading all of the studies Webster has advanced addressing the purported impact of gun control laws.  He reports analyses confined to *firearms* violence.  Nothing in either Missouri study even addresses whether Missouri's PTP law saved lives while it was in effect, i.e. reduced the total number of homicides.  There is no public safety benefit in merely inducing criminals to murder people with different weapons, if there is no decrease in the total number murdered.  Webster, in both the 2014 study and in his 2019 study with Hasegawa, simply ignores this problem.  Consequently, nothing in either study – even if taken at face value – actually supports the view that PTP laws save any lives.

36.     In sum, Webster's new reliance on the Hasegawa study does not strengthen his opinion that PTP laws in general or the Maryland HQL provisions in particular reduce firearms violence.

**Part 3 - Critique of the Webster et al. (2020) Study**

37.    Webster, McCourt, Crifasi, Booty, and Stuart (2020) concluded, based on a panel study of annual state-level data, that the incidence of mass shooting incidents and the total number of fatalities linked with such incidents are reduced by purchaser licensing laws that require applicants to personally appear at a public safety agency or that require them to be fingerprinted, as well as bans on large-capacity magazines (LCM).  The conclusion regarding purchaser licensing is not supported by any technically sound methods, and is highly sensitive to exactly how a mass shooting is defined.

38.    Webster cites this study to support the claim that "handgun purchaser licensing laws requiring either in-person application with law enforcement or fingerprinting (of applicants) were associated with incidents of fatal mass shootings 56 percent lower than that of other states" (Webster Second Supplement, p. 3).  Webster in this Supplement, and in the cited article, used associational language, but in the Abstract of that article advanced the meaning that he and his colleagues actually intended to convey: causation.  They asserted that their findings indicate that "laws requiring firearms purchasers to be licensed through a background check supported by fingerprints and laws banning LCMs [large-capacity magazines] are the most *effective* gun policies for reducing fatal mass shootings" (Webster et al. 2020, p. 171, emphasis added).

**The Failure to Control Confounding Variables Means the Results Cannot Be Used to Support any Causal Effects of Purchaser Licensing Laws**

39.    Accurately inferring causation in this case would have required the authors to control for as many confounding variables as possible.  In this context, confounding variables would be other factors besides the two supposedly effective gun laws (PL laws and LCM bans)

that had both of two properties: (1) they affected the frequency or seriousness of mass shootings; and (2) they were correlated with the presence of absence of those two gun laws.

40. As far as can be determined from the authors' published findings, they did not actually control for *any* confounding variables, which are the only kind of controls that help establish causal effects of one's focal variables.

41. In the analysis reported in their Table 3, only two control variables (i.e. variables other than the two gun control laws) were even significantly related to incidence of fatal mass shootings, neither of which is known to be correlated with the presence/absence of purchaser permit laws or LCM bans. In the Table 3 analysis pertaining to number of victim deaths, *none* of the control variables were related to the outcome variable, and thus none could be regarded as confounders. In their Table 4 analyses limited to "domestic-linked" mass shootings, not a single control variable was significantly related to either outcome variable, and thus none could be regarded as confounders. Finally, in their Table 5 analyses, pertaining to mass shootings not linked to domestic violence, just *one* of the control variables was significantly related to either outcome variable, and the authors did not show this control variable to be correlated with their two preferred gun control laws. Thus, the authors did not control for a single known confounder in this analysis either. In particular, although they controlled for a few gun control laws unlikely to affect mass shootings, they did not even control for the one that would seem to be most likely to affect killings by mentally ill killers – bans on gun purchases by mentally ill persons. In sum, the authors simply did not control for variables that were actually confounders. The controls that they did introduce could not help isolate the effect of purchaser licensing laws because the variables they did control were not confounding variables, but rather were either irrelevant variables (i.e. variables that do

not affect the outcome variable) or variables that were relevant but uncorrelated with gun laws and consequently could not bias estimates of gun law effects.

**The Misleading Effects of an Ambiguous Definition of the Gun Law Variable**

42.    If one ignores the authors' failure to control for confounders, and takes at face value their estimates of the effect of firearm Purchaser License ("PL") laws, what do their findings mean? The key to understanding these findings lies in the curiously ambiguous way they defined PL laws, as "handgun purchaser licensing laws that require *either* in-person application *or* fingerprinting" (p. 174, emphasis added).  Any sensible analyst would obviously want to know which of these elements of PL laws reduce violence – it might be only the fingerprinting requirement, it might be only the personal appearance requirement, or it might be both.  The ambiguous way that Webster and his colleagues chose to define their PL variable makes it impossible to establish which element has violence-reducing effects.  Given that Maryland's PL law requires fingerprinting, but not a personal appearance, it would be especially important in the current case to know which element improves the law's potential for reducing violence.

43.    The authors could easily have created two separate variables, one of which measured whether a state had a PL law requiring fingerprinting (without regard to whether it also required a personal appearance), and another that measured whether a state had a PL law requiring a personal appearance (without regard to whether it also required fingerprinting).  This approach could have revealed which one worked.  From the standpoint of which approach gives better guidance as to policy makers in crafting better public policy, the separate variables approach is obviously superior, but the authors did not utilize this strategy.

44.    Since the authors do not report any results of analyses using the superior strategy, it cannot be known for certain what those results would have been.  Nevertheless some relevant

statistical insights can be confidently stated.  First, whether the PL/mass shooting association is statistically significant is a function of the standard error of the coefficient measuring this association.  The standard error is a measure of the instability of estimates of the coefficient.  The bigger the standard error, the less likely it is that a given estimate of the PL/mass shooting association is statistically significant.

45.    Second, the size of a standard error is a function of, among other things, the variation in the variables involved in the association – in this case, PL laws and mass shootings.  The more variation, the smaller the standard error.  Variation in a binary variable that merely measures the presence or absence of a PL law, as with any other binary variables, is a function of how common the thing being measured is.  If only two or three states have a specific kind of PL law, there is little variation, since nearly all states are the same, i.e. nearly all do *not* have the law.  Conversely, if nearly all states had that type of PL law, there would also be little variation since nearly all states would be the same in that they *did* have the law.  The greatest amount of variation, as with any binary variable, would be if half the states had the law and half did not.

46.    Consequently, the standard error of the coefficient for a specific PL law would be larger if few states had that law, smaller if the share was closer to half.  The rarer the specific type of PL law being tested, the bigger its coefficient's standard error would be, other things being equal, and the less likely the coefficient would be significant.  By definition, the number of states with a type of PL law that required fingerprinting would have to be smaller than the number of states that had *either* a fingerprinting requirement *or* a personal appearance requirement, unless all states with the former requirement also had the latter – something we know is not true.  Thus, there is less variation in a variable that specifically measures the presence of a PL law with a fingerprinting requirement, or a variable that specifically measures the presence of a PL law with

a personal appearance requirement, than there is in a variable that ambiguously measures whether a state has *either* provision. Consequently, the standard error will be smaller, other things being equal, using the ambiguous formulation used by the authors.

47.     This means that by choosing to use the more ambiguous way of defining their PL variable, the authors artificially increased their chances of getting a significant association between the PL variable and the incidence or seriousness of mass shootings.  Webster of all people should have been especially desirous of establishing which specific elements of a background check law reduce violence, since his own research indicates that some variants appear to be effective, while others do not.

48.     Webster's ambiguity about which elements of PL laws help reduce violence is especially problematic in connection with Maryland's HQL law.  It requires fingerprinting of applicants but does not require in-person application at a law enforcement agency.  Therefore it is critical to know which of these two provisions reduce violence.  If it is fingerprinting that matters, then Webster's results may support Maryland's HQL law as he claims.  If only the personal appearance requirement matters, his results do not support Maryland's HQL law.  As things stand, given the inherent ambiguity of Webster's definition of his PL law variable, it is impossible to tell whether the results of the Webster et al. (2020) study provide any support for Maryland's PL law.

**The Results of this Study Are Inconsistent and Dependent on Arbitrary Decisions as to How a Mass Shooting is Defined**

49.     Tables A14 and A15 of the appendix include findings based on analyses using different cut-offs for the minimum number of victims that must be killed in an incident for it to be defined as a mass shooting.  In the analysis reported in the main body of the article, there was a significant association between PL laws and the incidence of mass shootings, interpreted by the authors to means that PL laws "were associated with incidents of fatal mass shootings 56% lower

than that of other states" (p. 181).  This was based on a definition of mass shooting as an incident with more than three victims killed.  Since the exact numerical cut-off used is necessarily somewhat arbitrary, it is important to test whether the results are consistent if different cut-offs are used.

50.    When the authors changed their cut-off by just one, to "more than four victims," there was no longer any significant association between PL laws and mass shootings (Table A14). When the cut-off was changed to "more than five victims," the association was not only insignificant; it almost completely disappeared (Table A15).  The authors gloss over this glaring inconsistency by claiming that the magnitude of the association did not change much when the cut-off was changed (p. 187), but this is inaccurate.  The estimated association changed from one implying 56% fewer mass shootings in states with PL laws when the cut-off was more than three (Table 3) to a nonsignificant *13%* lower when the cut-off was more than five (Table A15). Describing these results as "similar," as the authors did (p. 187) is misleading.

**The Authors Analyzed a Biased Sample of Mass Shootings that Artificially Inflated
     Support for an Impact of Purchaser Licensing Laws**

51.    Background check laws of all types are most likely to affect gun acquisition by persons willing to submit to checks when trying to get a gun, i.e. the law-abiding.  Conversely, the people least likely to get guns from a source that would require them to submit to a background check would be hard-core criminals.  Surveys of prison inmates confirm that few serious criminals get guns from sources that require a background check, such as licensed gun dealers (Alper and Glaze 2019, p. 7).  Thus, PL laws are least likely to influence the kinds of repeat offenders who deal drugs or belong to gangs, and when addressing mass shootings, one would expect that PL laws would be least likely to affect mass shooters who commit massacres connected to gangs or drug dealing.

52.     This means that one could bias results in favor of the view that PL laws reduce mass shootings by simply not counting the kinds of massacres least likely to be affected.  This is precisely what the authors did.  They frankly admitted that "we excluded any case that was coded as having a connection to gang or narcotic activity" (p. 174).  They did not acknowledge the biasing effects of this exclusion.  Their justification for introducing this sample bias was that other researchers had altered their samples in the same way (p. 174).

53.     They further biased their sample by non-randomly excluding five states from their analyses (p. 174).  Their justification for these exclusions was that there were "Uniform Crime Reports (UCR)-SHR [Supplementary Homicide Reports] reporting issues over multiple years" (p. 374).  A justification based on problems with UCR/SHR data is particularly implausible given that the authors did not need to use these sources for counting up either the number of mass shootings in a given state or the number of deaths linked with these incidents (or for any other purpose). They could rely on either the "Stanford Mass Shootings in America" dataset or the data in the Gun Violence Archive for producing these counts, and indeed they did use these very sources to "remedy" the deficiencies in UCR/SHR data (p. 374).  Significantly, their "sensitivity analyses" (pp. 183-187) did not include any checks to see if their estimates of gun law effects were distorted by excluding these particular five states.

54.     In sum, the Webster et al. (2020) study does not provide a scientifically credible basis for estimating the effect of handgun purchaser license laws on mass shootings, and does not strengthen Daniel Webster's support for Maryland's Handgun Qualifying License law.

**Part 4 - Critique of the McCourt et al. (2020) Study**

**The Results Pertaining to Maryland**

55.    Before addressing why the McCourt et al. study cited by Webster is not credible, it is first important to note what its results bearing on Maryland, if taken at face value, imply for this case.  Webster claimed that the McCourt study showed "that State handgun purchaser licensing laws such as the Maryland law at issue in this case—which require a prospective buyer to apply for a license or permit from state or local law enforcement—are highly effective at reducing firearm homicide and suicide rates." (Webster Second Supplement, pp. 3-4).

56.    Webster uses the key phrase "laws *such as* the Maryland law," as opposed to simply "the Maryland law."  Webster stresses the McCourt et al. study's findings regarding Connecticut and Pennsylvania, but is silent on what that study found specifically regarding the purchaser licensing law of Maryland - the only state whose law is at issue in this case.  McCourt et al. only studied Maryland's "implementation of a CBC [comprehensive background check] law (1996-2013) (p. 1548). That is, they studied Maryland's pre-exiting and continuing background check law, and NOT the HQL that was adopted in 2013. And despite the fact they studied through the period of 2017, they failed to report what happened to the firearms homicide in Maryland after it implemented the HQL in 2013.   Instead they compare Maryland's pre-existing CBC with Connecticut's PL and failed to report the effects if any of Maryland's comparable law, the HQL. In sum, Webster's own most recent study does not support a claim that Maryland's gun law reduced firearms homicide.

**The Essential Analysis the Authors Failed to Do**

57.    There is no public health benefit in reducing the number of firearms homicides (or firearms suicides) if the number of *non-firearms* homicides (or *non-firearms* suicides) increases

by an equal or larger amount, so that the total number of people who are murdered or commit suicide is unchanged.  If such an outcome did result from a change in gun law, however, it would be impossible to detect if analysts never analyzed the impact of the change on the *total* (firearms and non-firearms homicides combined) homicide rate or the *total* suicide rate (firearms and non-firearms suicides combined).  For reasons the authors never explain, they never analyzed either total homicide rates or total suicide rates – or at least did not report the results of such an analysis.

58.     It is possible the authors fell prey to a fallacy widespread among scholars who publish in public health journals.  They accept, consciously or unconsciously, the following fallacious logic:  If X is: (1) significantly associated with the rate of *firearms* homicide (or suicide); and (2) X has *no* significant association with the rate of *non-firearms* homicide (or suicide); then (3) X must have a significant association with the *total* homicide (or suicide) rate.  In that case, the reasoning goes, it is unnecessary to actually show that X has a significant association with the total homicide/suicide rate.

59.     We can be certain this logic is fallacious because numerous empirical studies have obtained results directly contradicting the logic.  For example, many studies obtain findings of: (1) a significant positive association of gun ownership rates with *firearm* suicide rates; and (2) no significant association of gun ownership rates with *non-firearm* suicide rates, yet also find *no* significant association of gun ownership rates with *total* suicide rates.  For a sample of examples displaying this pattern, see Smith and Stevens (2003, p. 37), Miller et al. (2002, p. 32), Markush and Bartolucci (1984, p. 126), Lester (1987, p. 288), and Killias (1993, p. 294).

60.     Thus, if this is the logic the authors were relying on to believe that it was unnecessary to analyze total homicide or suicide rates, they were wrong.  Based on the findings the authors did report, even if one took these dubious findings at face value, *there was no*

*foundation in this study for believing that the changes in the four gun laws studied had any effect at all on either the total number of homicides or the total number of suicides.*  All of their results are completely consistent with the interpretation that these changes, if they had any actual impact at all, merely induced some people to change the weapons they used to kill others, or the methods they used to kill themselves, without any effect on the total number who died.

61.    This issue is critical to understanding the extremely misleading summary of previous studies the authors provide on p. 1547.  In study after cited study, the authors report that previous research found that purchaser licensing laws were significantly associated with rates of *firearm* homicide or *firearm* suicide (see their cited studies 11, 12, 14, and 15).  The crucial information the authors omitted, however, was that none of these four studies showed any impact of such laws on either *total* homicide or *total* suicide.  Three of the studies did not even address this crucial issue (or at least did not report the relevant findings), and the one that did (study 12, p. 48) found *no* significant association of the gun law with total suicide – a finding McCourt et al. did not feel obliged to share with readers.  In sum, as far as the authors knew, all four of these studies supported the view that these laws were useless for reducing either total homicides or total suicides.

**The Authors' Arbitrary Truncation of the Time Period Studied**

62.    The results of any statistical analysis can always be manipulated simply by arbitrarily picking unrepresentative subsets of the available data – in this case, unrepresentative sets of years – to analyze.  The authors cannot justify their truncation of their study period by claiming the necessary data were not available.  Official statistics on firearm and non-firearm homicides, and firearm and non-firearm suicides, have been available for every state and every year since at least as far back as 1933, in a volume titled Vital Statistics of the United States (year).

For example, the easily available online version of the 1933 data (and corresponding data for later years) may be found at https://www.cdc.gov/nchs/data/vsushistorical/mortstatsh_1933.pdf.   By arbitrarily starting their study period at 1985, leaving out 1933-1984 (52 years), the authors were omitting over 61% of the available data (1933-2017 – 85 years).

63.     This is especially harmful to their efforts to identify states that could effectively serve as components of the synthetic control because the efforts then rely on a needlessly reduced number of data points, which increases the probability that any correlation of pre-intervention trends found between the prospective control state and the target state is the mere result of a short-term coincidence prevailing only in the very brief 10-year pre-intervention period they chose to study.  More generally, using smaller samples leads to less stable statistical results, regardless of the topic studied or the statistical techniques employed.

64.     The authors themselves admit that their estimates of effects of the Connecticut law were smaller when they changed the end point of their study period from 2017 to 2012.  Deleting just five years from their time series reduced the estimated effect of the law on firearm homicide by 40% (compare their Table 2 with Table I in Appendix A).  In short, the results are extremely sensitive to exactly which set of years were analyzed.

65.     The data for some of the predictor variables the authors incorporated in their synthetic controls (listed on p. 1547) would not be available for some earlier years, but this is irrelevant to whether it was legitimate to exclude the earlier years.  The authors do not provide any evidence, in either their main article or the online supplement Appendix A, that these variables are essential or even helpful in predicting trends in homicide or suicide rates.  Therefore, there is no reason to believe that the absence of such data in earlier years would justify excluding most of the years for which data on homicide and suicide were available.

66.     The end points for some of the authors' study periods are also arbitrary.  The end point for their Maryland analysis is 2013 even though the authors had data for years at least up through 2017.  Having fewer post-intervention years makes their results more unstable and subject to chance findings, so one should have a very strong justification for this truncation, something the authors lack.  They say they truncated their study periods because another change in gun law occurred after their end-point year (2013 for the Maryland analysis, 2017 for Missouri).  If enactment of new laws really did mean that an analyst could not use years after such laws had been implemented, it would mean one could not use data for *any* year.  *Every* state legislature makes multiple changes in the criminal law that could affect violence rates in *every* year.  For example, over the period 1973 to 1992, the Florida legislature passed an average of 381 general bills (this total excludes resolutions), including 2.45 gun control bills, *per year* (Etten, 2002).  A cursory glance at the Session Laws of other states, including MO, MD, PA, and CT, supports the same general point - almost every enactment of a change in gun law is preceded or followed by numerous other changes in criminal law, many also intended to reduce crime.  If the occurrence of such changes were accepted as a legitimate reason for truncating a time series, every researcher would be entitled to trim their time series down to whatever subset of history generated results supporting a favored hypothesis.

67.     Here the reason given for cutting off the study at 2013 in Maryland was enactment of a criminal law, but they do not reveal that the law was the HQL, similar to Connecticut's.  Nor do they reveal that the homicide rates in Maryland increased during their study period – including 2017 – after that law's enactment.  *See* Everytown for Gun Safety, Gun Violence in Maryland, at

p. 1[1]; Daniel W. Webster, *et al*., Reducing Violence and Building Trust, at p. 12[2]; Violent Crime & Property Crime Statewide Totals: 1975 to Present.[3]

**The Synthetic Control Method is Unlikely to be Useful for Assessing Policy Impact**

68.     The authors tested the impact of changes in purchaser license laws on firearm homicide and firearm suicide rates using the "synthetic control" (SC) methodology.  This method itself theoretically might be useful for evaluating the impact of a policy, but only in extraordinarily rare circumstances.

69.     The basic logic of the design is that the researcher looks for areas (besides the target area that implemented the policy being evaluated) that had similar trends in the outcome variable (the firearms homicide or suicide rate in this case) as well as correlates of the outcome variable prior to the implementation of the new policy.  These areas are then combined into a single "synthetic control" unit whose trends in the outcome variable are used to simulate how that outcome variable would have trended in the intervention area during the post-intervention period, had that policy not been implemented.  The areas that more closely mirror the pre-treatment trends of the outcome variable are assigned greater weight in the computation of the synthetic control (SC).  If post-intervention trends in the outcome variable are more favorable (more of a decrease or less of an increase in violence) in the area with the new policy than in the synthetic control, the analyst tentatively concludes that the intervention was effective.

[1] https://maps.everytownresearch.org/wp-content/uploads/2020/04/Every-State-Fact-Sheet-2.0-042720-Maryland.pdf

[2] https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_docs/reducing-violence-and-building-trust-gun-center-report-june-4-2020.pdf

[3] https://opendata.maryland.gov/Public-Safety/Violent-Crime-Property-Crime-Statewide-Totals-1975/hyg2-hy98

70.     The utility of the SC method, then, relies entirely on the coincidence of there being other areas whose trends in the outcome variable closely mirror those prevailing in the area in which the policy was implemented.  In the present case, if there are no states whose trends in firearms homicide or suicide rates in the years prior to changes in purchaser licensing law happened to closely parallel those trends in the states experiencing such changes, the SC method cannot predict post-intervention trends and thus cannot generate an accurate estimate of the impact of the gun law change.  This is true regardless of what weights are attached to each state – if none of the states are much good for predicting trends in firearms homicide or suicide rates, the differing weights can only reflect the fact that some states are even worse than others.

71.     As it happens, there were no states whose trends in firearms homicide or firearms suicide closely matched those prevailing in the pre-intervention periods in the four states evaluated by the authors.

**The Authors' Synthetic Controls Were Not Effective in Tracking Gun Violence Trends**

72.     The authors' conclusion that the changes in gun laws caused changes in firearms homicide or suicide rates was entirely dependent on a single assumption: that their synthetic controls could accurately predict how these rates would have trended in the target states, had those states not changed their gun laws.  The empirical support for this assumption in turn consists entirely of the temporal correspondence of pre-intervention trends in the synthetic control and those trends in the target state.

73.     The authors' own results, however, uniformly indicate that their synthetic controls had a very poor pre-intervention correspondence with actual trends in rates of firearms violence.  Consider, for example, Figure 1 (p. 1550), focusing on pre-intervention trends in the firearm homicide rate (to the left of the dashed vertical line).  In the figure pertaining to the Missouri

analysis (Figure 1b), the synthetic Missouri increases from 1997 to 1998, in effect predicting that Missouri's gun homicide rate would increase as well.  In reality, the actual rate (solid line) *decreased*.  Not only did the authors' synthetic Missouri fail to predict the magnitude of the actual change in firearm homicide, it did not even get the *direction* of change correct – something one could guess correctly 50% of the time by flipping a coin.  One might think this was just an isolated failure, but the next year's change (1998-1999) indicates the same thing – the SC predicted a decline in firearms homicide, but Missouri actually experienced another increase.  Then the SC predicted a reversal of trend from increases to decreases between 1999 and 2000, but actual gun homicides did precisely the opposite of what the SC predicted.  Indeed, in *every single year from 1997 to 2002,* actual changes in firearms homicide rates were exactly the opposite of what the authors' SC predicted.  In the last year before Missouri changed its law, from 2006 to 2007, the SC again failed to predict the direction of the change in firearms homicide.  The same unsupportive patterns can be found in the figure pertaining to Connecticut (Figure 1a) – the direction of change predicted by the Connecticut synthetic control was wrong for 1986-1987, 1987-1988, 1989-1990, and 1991-1992.  Even when the synthetic control got the direction of change correct, the magnitude of change was often wrong.  For example, the SC predicted a sharp decline from 1993 to 1994, but Connecticut actually experienced only a mild decline.

74.    Results in the online supplement Appendix A[4] regarding Maryland (see their figures A and B) and Pennsylvania (see their figures J, K, and L) likewise indicate that the authors' synthetic controls for those two states do a poor job of tracking pre-intervention trends in firearm and non-firearm homicides and suicides, and thus provide no sound basis for forecasting post-intervention trends, or judging the impact of the changes in gun laws.  In sum, the authors did not

---

[4] https://ajph.aphapublications.org/doi/suppl/10.2105/AJPH.2020.305822

have effective synthetic controls for any of the four states they studied, and thus no scientifically

valid basis for judging the effects of changes in purchasing licensing laws. The statistical method

the authors contend to be "rigorous" (p. 1551) is anything but.

**The Authors' Interpretation of their Findings is Unwarranted**

75.    The authors claimed that, because post-intervention trends in homicide or suicide

rates deviated from what their synthetic controls predicted, the change in gun laws that they

happened to be studying caused the deviation. This interpretation is unwarranted for two reasons.

First, even if the authors' synthetic controls were effective in predicting post-intervention trends

(something we know is not true), their interpretation of the results would still be unwarranted. At

best, the SC method can only establish that *something* happened around the time of the intervention

to change firearms homicide or suicide rates. It cannot establish what specific factor (or, more

likely, factor*s*) changed at that time to produce the change. The authors' opinion that it was

changes in firearms purchaser license laws that caused the change is little more than speculation

based on the temporal coincidence of the law change and the shift in gun violence trends.

However, as previously noted, virtually every drop in violence will *coincide* with some change in

law simply because of the frequency of law making and the frequency of violence declines, so this

coincidence is essentially meaningless.

76.    Second, there is an obvious alternative explanation for the deviation of (a) post-

intervention trends in homicide or suicide in the target state from (b) post-intervention trends in

the synthetic control. Trends in the synthetic control's homicide or suicide are used as predictions

of future trends in homicide or suicide in the treated state, had no gun law changed. Predictions

of future trends, however, tend to get less and less accurate the further into the future they are

projected. For example, the weatherman can predict fairly well what the daily high temperature

will be tomorrow, and his predictions for a few days after that may be moderately accurate, but his predictions for two or three weeks into the future are usually much less accurate. Correspondingly, predictions of homicide or suicide for future years get worse and worse the more one tries to make predictions for times many years into the future. Thus, even if the purchaser licensing laws had no effect at all on homicide or suicides, one would still expect target states' trends in homicide or suicide to deviate more and more from what the synthetic control predicted the homicide or suicide would be, simply because the synthetic control's ability to predict future levels of violent crime degrades the further into the future the one goes.

77.     To summarize, the McCourt et al. study does not provide any credible evidence on the effects of background check laws. None of the three Webster-coauthored studies increases the scientific strength of Webster's support for Maryland's Handgun Qualifying License.

**References**

Alper, Mariel, and Lauren Glaze. 2019. Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016. Special Report. Bureau of Justice Statistics. Available online at https://www.bjs.gov/content/pub/pdf/suficspi16.pdf.

Etten, Tamryn. 2002. Gun Control in Florida. Unpublished paper, School of Criminal Justice, Rutgers University.

Giffords Law Center to Prevent Gun Violence. 2021. The Case for Firearm Licensing. Available online at file:///C:/Users/Gary/Downloads/Giffords-Law-Center.The-Case-for-Firearm-Licensing%20(1).pdf.

Hasegawa, Raiden B., Daniel W. Webster, and Dylan S. Small. 2019. "Evaluating Missouri's handgun purchaser law." Epidemiology 30:371-379.

Killias, Martin. 1993. "Gun ownership, suicide, and homicide: an international perspective."

Pp. 289–303 in Anna del Frate, Uglijesa Zvekic, and Jan J. M. van Dijk, eds.,

Understanding Crime: Experiences of Crime and Crime Control. Rome: UNICRI.

Kleck, Gary. 1997. Targeting Guns: Firearms and their Control. NY: Aldine de Gruyter.

Kleck, Gary. 2017. "The Impact of the Repeal of Missouri's Handgun Permit Law on

Homicide: Comment on Webster et al. (2014)." Paper available at the Social Science

Research Network, at https://www.ssrn.com/en/.

Kleck, Gary, Tomislav Kovandzic, and Jon Bellows. 2016. "Does gun control reduce violent

crime?" Criminal Justice Review 41:488-513.

Kleck, Gary, and E. Britt Patterson. 1993. "The impact of gun control and gun ownership levels

on violence rates." Journal of Quantitative Criminology 9(3):249-287.

Kleck, Gary, and Shun-yung Wang. 2009. "The myth of big-time gun trafficking." UCLA Law

Review 56(5):1233-1294.

Lester, David. 1987. "Availability of guns and the likelihood of suicide." Sociology and Social

Research 71:287-288.

Lott, John R., and John E. Whitley. 2001. "Safe-storage gun laws: accidental deaths, suicides,

and crime." The Journal of Law and Economics 44:659-689.

Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2017. "Handgun waiting periods

reduce gun deaths." Proceedings of the National Academy of Sciences of the United

States of America (PNAS).

Ludwig, Jens, and Philip J. Cook. 2000. "Homicide and suicide rates associated with

implementation of the Brady handgun violence prevention act." JAMA 284:585-591.

Makarios, Matthew D., and Travis C. Pratt. 2012. "The effectiveness of policies and programs

that attempt to reduce firearm violence: a meta-analysis." Crime & Delinquency

58(2):222-244.

Markush, Robert E., and Alfred A. Bartolucci. 1984. "Firearms and suicide in the United States."
    American Journal of Public Health 74:123-127.

Marvell, Thomas B,, and Carlisle E. Moody. 1995. "The impact of enhanced prison terms for
    felonies committed with guns." Criminology 33:247-281.

McCourt, Alexander D., Cassandra K. Crifasi, Elizabeth A. Stuart, Jon S. Vernick, Rose M. C.
    Kagawa, Garen J. Wintemute, and Daniel W. Webster. 2020. "Purchaser licensing, point-
    of-sale background check laws, and firearm homicide and suicide in 4 US states, 1985-
    2017." American Journal of Public Health 110:1546-1552.

Miller, Matthew, Deborah Azrael, and David Hemenway. 2002. "Firearm availability and suicide,
    homicide, and unintentional firearm deaths among women." Journal of Urban Health 79:26-
    38.

Smith, Tony, and Bradley R. Stevens. 2003. "A cross-national investigation of firearm
    availability and lethal violence." European Journal of Psychiatry 17:34–37.

Selvin, Hanan C., and Alan Stuart. 1966. "Data-dredging procedures in survey analysis." The
    American Statistician 20:20-23.

U.S. Federal Bureau of Investigation. 2007. Uniform Crime Reports, 2007. Available online at
    https://www2.fbi.gov/ucr/cius2007/offenses/expanded_information/data/shrtable_10.html

Webster, Daniel W., C. K. Crifasi, and J. S. Vernick. 2014. "Effects of the repeal of Missouri's
    handgun purchaser licensing law on homicides." Journal of Urban Health 91:293-302.

Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marissa D. Booty, Elizabeth
    A. Stuart. 2020. "Evidence concerning the regulation of firearms design, sale, and

carrying on fatal mass shootings in the United States." Criminology & Public Policy

19:171-212.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date: 1-26-21

Gary Kleck

# EXHIBIT 17

Daniel Webster

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,          :

et al.,                              :

                                     :   Case No:

          Plaintiffs                 :   16-cv-3311-MJG

                                     :

             -vs-                    :   Pages 1 - 337

                                     :

LAWRENCE HOGAN, in his              :

capacity of Governor of             :

Maryland, et al.,                   :

                                     :

          Defendants                 :

------------------------------X


Deposition of Daniel Webster, Ph.D.

Washington, D.C.

Wednesday, June 13, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409352


MAGNA LEGAL SERVICES

(866) 624-6221

JA1480

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 58 of 449

Daniel Webster

Page 29

1          Let's start out by reaching an

2    understanding on what it is that you mean on

3    permit-to-purchase laws.

4          A.    Sure.  These laws vary across the states

5    that have them.  I think most fundamentally they

6    require anyone who wants to purchase a firearm to --

7    pardon me -- to apply directly to law enforcement

8    for some form of, some call it a license, some call

9    it a permit, that demonstrates that they have met

10   each and every condition of obtaining that license.

11          That is the most fundamental thing, and I

12   guess the other thing is that having a valid permit

13   or license to purchase is required for virtually any

14   transfer of a regulated firearm.  Now, there are

15   some exceptions with respect to transfers among

16   family members, for example, but what we most

17   commonly think of as transfers between, permanent

18   transfers from non-family members to, you know,

19   someone else, that to do that lawfully you have to

20   have a valid permit or license that you applied for

21   and received directly from law enforcement or public

22   safety agencies.

Daniel Webster

Page 30

1      Q.    What do you mean by apply directly to law

2   enforcement?  What does that mean?

3      A.    What that means -- and, again, it varies

4   from state to state.  Sometimes that means a

5   face-to-face application at a local or state law

6   enforcement or public safety agency.  Sometimes that

7   means applying not face to face, but through mail or

8   there may be one case that allows an online process.

9      Q.    And what is the importance of the element

10   of applying directly to law enforcement?

11      A.    Right.  So, in my opinion, I think the

12   relevance is that it is a more meaningful, I guess,

13   application, perhaps, frankly, intimidating of sort

14   of underscoring what's at stake here.  The important

15   thing is the overall context of firearm

16   marketplaces, and we know from research that there

17   are a relatively small percentage of licensed gun

18   dealers who through a variety of kinds of evidence

19   suggest that they are not particularly rigorous in

20   vetting and sort of making sure that sales

21   applications are done in an accurate and lawful

22   manner.

Daniel Webster

Page 31

1            And in the context of straw purchase where

2    someone, usually, not always, but usually a

3    prohibited individual is asking someone, in essence,

4    to stick their neck out to purchase a gun for them,

5    that going into a less than reputable gun shop or

6    alternatively going to different private sales

7    venues, might be gun shows or other similar kind of

8    situations through online, that that appears to be

9    and probably, frankly, is a relatively risk-free

10   thing to do.

11           And I think that going directly to law

12   enforcement when a prohibited person is asking

13   someone to buy a gun for them, it likely causes

14   hesitancy to do so.

15       Q.   All right.  So I get the intimidating

16   factor being face to face with a law enforcement

17   officer at police headquarters, but what is the

18   intimidating effect of applying through the mail, as

19   you said, some of these PTPs allow?

20       A.   Yeah.  Honestly, I don't know.  I haven't

21   studied that.

22       Q.   And you also said that there's online

Daniel Webster

Page 32

1    applications for some of these, at least one of

2    these PTPs.  What's the intimidating effect to

3    applying to a law enforcement agency online?

4         A.   Yeah, again, I don't know.  I haven't

5    studied that specifically.

6         Q.   So in Maryland, for instance, is that the

7    example you were thinking that you can apply online

8    for your PTP?

9         A.   In Maryland you have to go to a certified

10   vendor, you know, that processes fingerprinting,

11   does the fingerprinting, so it's not -- you can't be

12   fingerprinted online.

13        Q.   But you apply online?

14        A.   Yeah.

15        Q.   But you apply directly to the Maryland

16   State Police online?

17        A.   Yes.

18        Q.   That would qualify under your definition

19   of applying directly to a law enforcement agency for

20   the permit; correct?

21        A.   Yes, but, again, I think it's distinct

22   from other states that allow that without a

# EXHIBIT 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,   *

     *Plaintiffs,*   *

     v.   *          Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.*,   *

     *Defendants.*   *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

### SUPPLEMENTAL DECLARATION OF DANIEL W. WEBSTER

I, Daniel W. Webster, under penalty of perjury, declare and state:

1.     I am Professor of Health Policy and Management, Co-Director for Research at the Center for the Prevention of Youth Violence, and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health. I am more than 18 years of age and am competent to testify, upon personal knowledge, to the matters stated below.

2.     I previously submitted an expert declaration in this case, dated August 15, 2018, in support of the Defendants' motion for summary judgment (ECF 59-19).

3.     I have reviewed the Plaintiffs' memorandum of law in support of their cross-motion for summary judgment and in opposition to the Defendants' motion for summary judgment (ECF 77) and the expert declarations submitted by Gary Kleck (ECF 77-24) and Carlisle Moody (ECF 77-23). I submit this supplemental declaration to specifically address

certain instances where Plaintiffs or their experts have misconstrued my work or my testimony in this case.

4.      First, Plaintiffs have cited my testimony as authority for their claim that the State of Maryland enacted the Handgun Qualification License requirement in order to intimidate law-abiding Marylanders from exercising their Second Amendment rights, by taking my deposition testimony out of context. In that testimony, Plaintiffs' counsel began by questioning me about my peer-reviewed research on the public safety benefits of permit-to-purchase requirements, such as Maryland's HQL requirement, specifically about the importance of applying to law enforcement for such a permit. My answer discussed the effect of the application to law enforcement on firearm marketplaces, and as I stated in my deposition testimony, "in the context of straw purchase where someone, usually, not always, but usually a prohibited person is asking someone, in essence, to stick their neck out to purchase a gun for them, that going into a less than reputable gun shop or alternatively going to different private sales venues, might be gun shows or other similar kind of situations through online, that that appears to be and probably, frankly, is a relatively risk-free thing to do. And I think that going directly to law enforcement when a prohibited person is asking someone to buy a gun for them, it likely causes hesitancy to do so." (Defs.' Ex. 24, Tr. of Daniel Webster Dep. at 30-31.) It was in this context of discussing permit-to-purchase laws on deterring straw purchases that I stated that the relevance of applying to law enforcement might be "intimidating." (*Id.*) Evidence that permit-to-purchase laws, such as Maryland's HQL requirement, reduce the diversion of guns for criminal use has been a central finding of my peer-reviewed research that I detail

2

in my expert report in this case. (ECF 59-19, Webster Decl. Ex. 2, Expert Report of Daniel Webster at 6-14.)

5.      To be clear, although my research and that of my peers has found that permit-to-purchase laws may act as a deterrent to straw purchases because of the intimidating factor of having to apply to law enforcement for a permit, and in the case of Maryland submit fingerprints through a State-certified vendor to a law enforcement agency, I do not have personal knowledge of PTP laws generally or the HQL requirement specifically acting as a deterrent to law-abiding citizens who wish to exercise their Second Amendment rights.  Nor am I familiar with any published research on that topic.

6.      Second, the plaintiffs cited to my testimony for the misleading proposition that the HQL requirement has not enhanced the Maryland State Police's ability to identify disqualified persons who own registered firearms.  I understand from evidence in this case that the fingerprint records submitted as part of the HQL application process are routinely used to generate reports when fingerprint records of HQL holders are implicated in subsequent arrests for potentially disqualifying offenses.  These fingerprint reports allow MSP personnel to track the disposition of these arrests and revoke a person's HQL upon conviction of a disqualifying offense.  In my deposition testimony, I accurately answered in the affirmative Plaintiffs' counsel's question as to whether "the Maryland State Police has a registry of handgun ownership such that, if I were to be convicted of a disqualifying offense, they could readily look me up, determine if I owned a handgun, and dispossess me of that handgun; correct?" (Tr. of Webster Dep. at 19-20.)  This query assumes, however, that the Maryland State Police has received information that an owner of a registered

3

firearm has been convicted of a disqualifying crime. Based on my gun policy research in the State of Maryland, I am aware that there is no such routine reporting of individuals convicted of all disqualifying offenses from local law enforcement agencies to the Maryland State Police. In contrast, the reports routinely generated based on the fingerprint records allow the Maryland State Police to track arrests without having to rely on reporting from local law enforcement.

7.    Third, Plaintiffs contend that there has been no showing that the HQL requirement has had any impact on illegal behaviors such as straw purchases in Maryland, despite clear evidence to the contrary described in my expert report. Since the enactment of the FSA, there has been a 76 percent reduction in the number of handguns recovered by Baltimore Police Department within 12 months or less from retail sale by someone other than the legal purchaser of the gun. The widespread consensus among leading researchers who study gun trafficking is that the number of firearms recovered within a year of retail sale from a possessor who was not the retail purchaser of record is a reliable indicator of firearm diversion through straw purchases. My research team's survey data showing that 40 percent of surveyed probationers and parolees in Baltimore reported that it is harder to acquire a handgun since the enactment of the FSA further bolsters this conclusion. Aggregate crime gun trace data for Maryland also shows a reduction in the share of all crime guns with retail sale to crime intervals that are 12 months or less and that a smaller percentage of guns used in crime in Maryland were originally sold by Maryland retail sellers.

4

8.      Plaintiffs' expert Gary Kleck in his expert declaration makes a number of misleading, unsupported criticisms of this peer-reviewed study and other peer-reviewed studies in which I was the lead or senior author.  Professor Kleck first criticizes my and my colleagues' use of firearms trace data based on the Bureau of Alcohol, Tobacco, Firearms and Explosives' disclaimer that the firearms trace data that it generates is not a representative sample of crime guns.  Although it is not possible to verify one way or another whether recovered, traced firearms are a representative sample of firearms used by criminals, this data has been widely used for years by scientific researchers to study the effects of gun policy on the supply of crime guns.  More broadly, volumes of research on crime are based on police reported incidents and arrests.  These data may not reflect all criminal behavior because not all behavior is recorded by police, yet invaluable lessons have been learned from data from police records. In contrast, Professor Kleck's suggestion that because crime gun data may not reflect the universe of gun crime then the data can tell us nothing about the effectiveness of gun policy on the diversion of guns to criminals is not widely accepted among the scientific community.

9.      Professor Kleck next relies on his law review article in which he criticizes the use of gun trace data by scientific researchers in peer-reviewed journals.  Professor Kleck's criticism has been roundly debunked by the leading experts in gun policy research in a peer-reviewed journal article that I discussed in my expert report.  (ECF 59-19, Webster Decl. Ex. 2, Expert Report of Daniel Webster at 6-7.)

10.      Further, Professor Kleck's opinion that "the most direct measure of firearms availability among people willing to kill is the percent of homicides committed with guns"

5

(ECF 77-24, Kleck Decl. ¶ 9) is not based on any peer-reviewed research.  In cities with longstanding problems with gangs and serious violence, a large share of homicides have always been committed with firearms. His use of this metric to determine whether the HQL requirement has affected gun availability to criminals is also flawed because it fails to account for the surge in gun violence that occurred in Baltimore City immediately following the in-custody death of Freddie Gray and the riots that were prompted by this death. Both Professor Kleck's opinion and the opinion of Plaintiffs' other expert Carlisle Moody regarding the impact of the FSA on the homicide rate in Maryland are highly flawed because neither of them took into account the effect of riots following the death of Freddie Gray on the number of homicides in Baltimore City.  They neglected to account for this historical event despite that it is well-documented that riots and civic unrest are often followed by sharp increases in violent crime.  (ECF 59-19, Webster Decl. Ex. 2, Expert Report of Daniel Webster at 16.)  Their failure to account for this significant event renders their analysis on the homicide rate following the enactment of the FSA fatally flawed.

11.    Professor Kleck's criticisms of the synthetic control method for estimating the impacts of public policies also are flawed. Synthetic control methods are widely used in studies of crime in recent years by researchers who understand how the selection of inappropriate controls in non-experimental studies can bias estimates of an intervention's (e.g., a gun law) effects when key determinants of crime are not systematically measured. We demonstrate in our peer-reviewed study that the synthetic control model we use very accurately predicts Connecticut's homicide rate trends during the decade preceding the adoption of the PTP law.  It is only after the PTP law has been in place for a few years that

Connecticut's trends depart dramatically lower from the counterfactual prediction from the synthetic control. Kleck argues that some other policies that we do not control for in our analyses might explain this dramatic decline in homicide rates in Connecticut following its adoption of a PTP law, but offers no specific data or even a compelling theory as to what that missing factor or policy was that led to the dramatic reduction in homicides in Connecticut from 1996 through 2005. He also does not explain why the synthetic control model works to predict Connecticut's homicide trends so well before the state introduced its PTP law, but the forecasted synthetic control trend is so starkly different than Connecticut's homicide trends after the law was in place. Kleck has long argued that gun laws do not affect gun violence and it is interesting that his explanation for our findings is that we did not control for other gun laws.

12.    Professor Kleck argues that research on the impact of Missouri's repeal of its PTP law does not demonstrate that Missouri's increase in firearm homicide rates are unique within the region, yet I demonstrate very clearly in my prior declaration that Missouri's per capita increase in firearm homicides from 1999-2006 vs. 2008-2016 was higher than any other US state other than Delaware. Kleck claims that Nebraska and Ohio experienced larger increases in firearm homicide rates than did Missouri, yet compared with the per capita increase in Missouri between these two periods (+1.41), was less than half as large as in Nebraska (+0.67) and one fifth as large as in Iowa (+0.24). Furthermore, a recent paper I co-authored with two statisticians at the University of Pennsylvania accepted for publication in the journal *Epidemiology* demonstrated with additional data and two additional analytic methods found a clear and statistically significant increase in

7

firearm homicide rates in Missouri associated with its PTP law repeal of the approximate magnitude that we estimated in my 2014 study.

13.     I have also read the Plaintiffs' motion to strike portions of my expert declaration in this case (ECF 79).  In it they criticize my reliance on the studies of the effects of permit-to-purchase laws in Connecticut (after enactment) and Missouri (after repeal) on the ground that the permit-to-purchase laws in those states are not identical to Maryland's HQL requirement.  Critically, although there are variations in the requirements across the states, the permit-to-purchase laws in Maryland, Connecticut, and formerly in Missouri all share the most important component of such laws, which is that in order to purchase a handgun, the purchaser first was required to apply to a law enforcement agency for a permit or a license.

I declare under penalty of perjury that the foregoing is true and correct.

Date: *Nov. 9, 2018*

_____
Daniel W. Webster

8

# EXHIBIT 19

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., *et al.*, | * | |
| *Plaintiffs,* | * | |
| v. | * | Civil Case No. 16-cv-3311-ELH |
| LAWRENCE HOGAN, *et al.,* | * | |
| *Defendants.* | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## THIRD SUPPLEMENTAL DECLARATION OF DANIEL W. WEBSTER

I, Daniel W. Webster, under penalty of perjury, declare and state:

1.     I am Bloomberg Professor of American Health in Violence Prevention in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health with a joint appointment in the School of Education. I am also Director of the Johns Hopkins Center for Gun Policy and Research and previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence.  I am more than 18 years of age and am competent to testify, upon personal knowledge, to the matters stated below.

2.     This declaration is submitted in response to the supplemental declaration of plaintiffs' expert Gary Kleck (ECF 135-29) filed in support of plaintiffs' cross-motion for summary judgment, which attempts to critique my expert opinions in this case and some of the research studies upon which my opinions are based.

3.      Kleck claims that the three studies that I have published with colleagues demonstrating that the repeal of Missouri's handgun permit-to-purchase (PTP) law (also known as handgun purchaser licensing) in 2007 was associated with a large and statistically significant increase in firearm homicides is a matter of "data dredging." [We also found similarly large and statistically significant increases in firearm suicide coincident with this same policy change (McCourt et al., 2020)[1], a 2-fold increase in the share of crime guns that moved unusually quickly from retail sale to crime involvement in Missouri (Webster et al., 2013)[2] and a 37 percent increase in the number of guns originally sold in Missouri that were later recovered in neighboring states of Illinois and Iowa with PTP laws (Webster et al. 2014)[3], and a more than two-fold increase in the rate of law enforcement officers nonfatally wounded in the line of duty by criminal suspects using handguns (Crifasi, Pollack & Webster, 2016)[4] – all conspicuously co-incident with Missouri's repeal of its

---

[1] McCourt, Alexander D., Cassandra K. Crifasi, Elizabeth A. Stuart, Jon S. Vernick, Rose M.C. Kagawa, Garen J. Wintemute, and Daniel W. Webster. (2020) Effects of Purchaser Licensing and Point-of-Sale Background Check Laws on Firearm Homicide and Suicide in Four States. *American Journal of Public Health* 110:1546-1552. doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20.

[2] Webster, Daniel W., Jon S. Vernick, Emma E. McGinty, and Ted Alcorn. (2013) "Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws," pp. 109-122 in Webster, Daniel W. & Jon S. Vernick, Eds. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis*. Baltimore, MD: Johns Hopkins University Press.

[3] Webster, Daniel W., Cassandra K. Crifasi, & Jon S. Vernick. (2014) Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health* 91:293-302. Erratum: *J Urban Health* 91:598-601.

[4] Crifasi, Cassandra K., Keshia Pollack, & Daniel W. Webster. (2016) The influence of state-level policy changes on the risk environment for law enforcement officers. *Injury Prevention* 22:274-8. doi: 10.1136/injuryprev-2015-041825. PMID: 26718550.

PTP law.]  Kleck implies that my colleagues and I poured over decades of data and many changes in gun laws and found one by chance that demonstrated an association, for a particular period of time, between a change in a PTP law and firearm homicide rates.  But the research I cite in my declarations reveal many points of evidence consistently linking multiple changes in PTP laws over a range of time periods with changes in firearm homicides and other key outcomes that are relevant to public safety and that are consistent with prior theory and evidence about the role of handgun purchaser licensing laws.  Kleck's argument that the evidence I put forward is based on a single outlier data point (Missouri's firearm homicide rate in 2008) is simply not true.  My conclusions are supported by peer-reviewed articles published in top scientific journals that use multiple sources of data and multiple analytic techniques  commonly used to estimate the effects of change in public policies on public safety outcomes, and multiple changes in PTP laws with remarkably consistent findings.

4.    Kleck criticizes the first scientific article I published that demonstrated a strong and statistically significant association between the repeal of Missouri's PTP law (Webster et al., 2014) and an increase in firearm homicide rates because I did not look at more changes in PTP laws over a longer period of time.  He fails to mention that my co-authors and I provide a strong rationale for using data beginning in 1999. The 15 years prior to 1999 included the most dramatic changes in firearm homicide rates in decades. The timing and magnitude of those changes were (1) far from uniform across states and (2) appear to have been driven by the emergence and turbulence of crack cocaine markets that are not easily measured in a standardized way that would readily allow for reliable direct

3

statistical controls. Importantly, the states most impacted by crack cocaine and its lethal firearm violence were far more urban and with more densely populated cities with highly-concentrated poverty among African Americans, and tended to have stricter gun laws than more rural states. Thus, the omitted and largely unmeasurable (in a standardized way) variable of volatile crack cocaine markets can easily bias estimates of the effects of gun laws enacted during this period (Donohue, Aneja & Weber, 2019).[5]

5.      Kleck suggests that any association that my research found between the repeal of Missouri's repeal of its PTP law and increased firearm homicide rates may have been due to a temporary increase in gang violence in a single city, e.g., St. Louis.  The data tell a very different story.  Comparing changes from the relatively stable period of 1999-2006, before Missouri repealed its PTP law on August 28, 2007, and the period after the law had been repealed (2008-2019), the average annual firearm homicide rate in St. Louis (its own county) increased by an astronomical rate from 22.3 to 33.9 per 100,000 population, a per capita increase of 11.6 firearm homicides per 100,000. That increase is nearly three times higher than that of the large central metro county with the next highest per capita increase over that period, Jackson County, Missouri (which includes Kansas City) where annual firearm homicide rates increased from 11.6 to 15.6 per 100,000 population.  Among the 64 large central metro counties in the United States, the two jurisdictions that experienced the largest increase in firearm homicide rates during the 12-

---

[5] Donohue, John J., Abhay Aneja, & Kyle D. Weber. (2019) Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis. *Journal of Empirical Legal Studies* Volume 16, Issue 2, 198–247.

year period after Missouri repealed its PTP law were both located in Missouri, St. Louis City (which is its own county) and Jackson County where Kansas City is located. Looking at all large central metro counties in the United States over these time periods, the average annual firearm homicide rate *declined* from 6.92 during 1999-2006 to 5.89 during 2008-2019, a decrease of 1.03 firearm homicides per 100,000 population (15 percent). Thus, the change in population risk of death from firearm homicide in Missouri's urban counties over the 12 years full years after the state repealed its PTP law was an extreme outlier compared to national trends.

6.  The increases in firearm homicide in Missouri following the repeal of its PTP law were not only an urban phenomenon. Other less urban counties saw their annual average firearm homicide rate increase from 2.37 to 3.73 between the period in which the PTP law was in place (1999-2006) and the 12-year period after the repeal (2008-2019), an increase of 36.4 percent. The increased risk for firearm homicide among Missouri residents was more than three times as large as what was experienced nationally for non-large-central-metro counties over those time periods (2.75 during 1999-2006 and 3.08 during 2008-2019). In summary, the large increase in firearm homicide that Missouri residents experienced after it repealed its PTP law relative to changes throughout the rest of the U.S. were not limited to a single jurisdiction or to a single year (2008)[6]; the surge in firearm homicides occurred throughout the state over the first 12 full years following the repeal. Furthermore, the rise in lethal violence did not abate in Missouri in 2020. In St. Louis,

---

[6]        Rice,        Glen        and        Kansas        City        Star. https://www.kansascity.com/news/local/crime/article246077040.html

5

homicides increased by 35 percent from 2019 to 2020, causing the homicide rate to be at a 50-year high (Hefferman, 2021).[7]  Kansas City had its highest homicide rate ever in 2020 as well (Willis 2021)[8].  Kleck's claim of a happenstance, 1-year blip in 2008 attributable to some local phenomenon could not be more discordant with the available data and contradicts the research he cites.

7.      In addition to an increase in firearm homicide rates, the repeal of Missouri's PTP law also was coincident with the two-fold increase in the share of crime guns recovered in Missouri (Webster et al., 2013).  Guns recovered from a criminal suspect or a crime scene less than 12 months after retail sale is widely accepted as an indicator of criminal diversion by the top researchers studying gun violence (Braga et al., 2012).[9] Missouri experienced a 37% increase in guns that were recovered from criminal suspects and crime scenes than neighboring states with PTP/handgun purchaser licensing laws

---

[7] Hefferman, Erin. (2021) St. Louis homicide rate in 2020 highest in 50 years with 262 killings. St. Louis Today. January 1.  https://www.stltoday.com/news/local/crime-and-courts/st-louis-homicide-rate-in-2020-highest-in-50-years-with-262-killings/article_b3c323a7-bc38-55bc-812b-08990b0eb289.html

[8] Willis, Jasmyn (2021) St. Louis 2020 homicide rate is the highest in 50 years and KC has deadliest year ever. KRCG-TV   https://krcgtv.com/news/local/st-louis-2020-homicide-rate-is-highest-in-50-years-kc-suffers-deadliest-year-ever#:~:text=But%20because%20the%20city's%20population,highest%20on%20record%20since%201970.

[9] Braga, Anthony A., Garen J. Wintemute, Glenn L. Pierce, Philip J. Cook, and Greg Ridgeway (2012) Interpreting the empirical evidence on illegal gun market dynamics. *Journal of Urban Health* 89(5):779-93.  DOI 10.1007/s11524-012-9681-y. Kleck cites an article he wrote with Shun-yung Wang that was published in the UCLA Law Review in 2009 as "evidence" that the indicators that I and other leading researchers use to measure the diversion of gun from lawful to criminal use are invalid because they do not correlate well with their preferred indicator – obliterated serial numbers. Of course, a law review article is a far cry from scientific peer review. Professors Braga, Wintemute, Pierce, Cook and Ridgeway represent some of the top researchers studying gun violence and illegal gun markets. The article referenced here is a scathing rebuttal of Kleck & Wang's claims published in an actual scientific peer-reviewed journal.

6

(Illinois and Iowa).  This represented a clear shift in the share of guns recovered by law enforcement in Missouri that originated with a retail sale within the state (Webster et al. 2013). The timing of these changes in the diversion and criminal misuse of firearms in Missouri also coincided with sharp increases in firearm homicide rates in the state relative to comparison states and controlling for other factors associated with suicide rates (Crifasi et al., 2015;[10] McCourt et al., 2020). Each of these data points are consistent with the theory that requiring a law enforcement-issued permit to purchase a handgun protects against illegal straw purchases, firearm trafficking, and impulsive high-risk handgun acquisitions with the potential to lead to lethal consequences. Kleck has not offered any explanation for the huge and statistically anomalous increases in multiple forms of firearm mortality that have occurred in Missouri over a twelve-year period nor did he explain the stark changes in the diversion of guns for criminal use shortly after retail sale by Missouri firearms dealers that are also co-incident with the repeal of Missouri's PTP law.

8.    Kleck offers a variety of warnings that the many estimates of the changes post-PTP-repeal that we find to be statistically significant may be attributable to unmeasured omitted variables.  The truth is that studies of this type cannot directly measure all important factors that could potentially influence changes in firearm homicide rates because we do not have standard ways to measure conditions such as gang feuds or important changes in local drug markets.  That is why we must identify the best available

---

[10] Crifasi, Cassandra K., John Speed Meyers, Jon S. Vernick, and Daniel W. Webster. (2015) Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. *Preventive Med.* Jul 23, 2015. pii: S00917435(15)00229-7. doi: 10.1016/j.ypmed.2015.07.013.

comparison states that are most likely to share similar unmeasured conditions that influence homicide rates and closely examine the data for consistency in the associations and base our estimates on *differential* changes in homicide rates between states that change PTP laws and similar states with similar baseline trends. Those similarities in baseline levels and trends between states that adopt new gun laws of interest and those that do not adopt those laws of interest, especially when preceded by a period when homicide rates are not particularly volatile, provide assurance that estimates of the impact of gun laws based on differential changes in homicide rates coincident with changes in laws are attributable to changes in gun laws. The 1999-2007 period prior to the repeal of Missouri's PTP law was a very stable period for annual firearm homicide rates, ideal for isolating the effects of a very meaningful change in state firearm policy. Why did we only examine this particular change in PTP law at that time of the first study isolating the change in Missouri's PTP law in Webster et al., 2014?  As stated in the article, it was the only change in a PTP law during that time period.  Another advantage to studying the repeal of a law as opposed to its initial implementation is that most statistical methods are best designed to contrast abrupt changes – legal requirements and procedures immediate change – as opposed to a less certain process of ramping up implementation of a new law.

9.      One of the articles that assesses the changes in firearm homicides in Missouri relative to changes in other states in the region uses sophisticated methods to identify the most appropriate comparisons for the state with a significant policy change.  This was published in one of the top journals for research methods in public health and safety, *Epidemiology*, (Hasegawa, Webster & Smart, 2019) and was recognized by the journal as

8

the second most outstanding research methods contribution of all of the articles published in 2019. The study showed that when compared with states within the region with baseline rates of firearm homicide comparably as high as Missouri's, Missouri's PTP repeal was associated with a 27 percent increase in firearm homicide rates through 2016. Our most recent research study uses another sophisticated analytic method designed to develop the most accurate counterfactual forecast for the purpose of deriving estimates of the effects of a policy change on relevant outcomes – synthetic control methods – and demonstrates that the approach produces highly-accurate prediction of Missouri's firearm homicide rates prior to the PTP repeal by using a weighted combination of comparison states and covariates that maximize prediction accuracy (McCourt et al., 2020). The synthetic control models revealed close concordance between Missouri's actual firearm homicide rates and its synthetic control until the PTP repeal went into effect. During 2008-2016, there was an immediate and consistent gap between Missouri's firearm homicide rate following the repeal and the forecasted counterfactual (see figure below). Based on this immediate and consistent difference between actual firearm homicide rates and those predicted by the synthetic control, we estimated a 47 percent increase in firearm homicide rates in Missouri associated with the policy change. What would explain such a large change in firearm homicide rates that was exactly coincident with PTP repeal and last for more than a decade?

9



10.    Kleck incorrectly argues that, because we found no protective effect of comprehensive background check (CBC) laws in Maryland (1996) and Pennsylvania (1995) that did not include purchaser permit/licensing requirements, that the repeal of Missouri's PTP law could not have impacted homicides due to criminals' acquisition of handguns from private parties. Our contention is that the addition of purchaser permit requirements, in particular requiring a prospective purchaser to apply directly at a law enforcement agency (as was the case in Missouri) and/or requiring purchasers to be fingerprinted and complete safety training (as is the case in Connecticut), is likely to be a significant deterrent to one of the most common ways in which prohibited purchasers obtain firearms – through straw purchases or from private unlicensed sellers who purchase firearms from licensed gun dealers and then sell them in the underground gun market to

10

criminals (Braga et al., 2012). In the same paragraph (34 on page 15), Kleck appears to suggest that the primary way to determine whether the repeal of Missouri's law impacted firearm homicide rates is to examine whether background checks led to increased denials due to criminal prohibitions on applicants. This makes no sense. The repeal of PTP eliminated the legal requirement for background checks if the transfer is between private parties and eliminated the legal requirement that handgun purchasers first obtain a permit from the local sheriff. These changes set the stage for virtually eliminating the risk for illegal straw sales that supply prohibited criminals with handguns. Prior to the repeal, a prospective straw purchaser was legally required to engage with the Sheriff's office to be vetted and then had the legal requirement to ensure that anyone who they sold their handgun to also had a valid permit to purchase. Thus, the repeal of these provisions would not lead more prohibited criminals trying to buy handguns from licensed dealers when the repeal made it far easier and less risky to acquire a handgun through a straw purchase and for traffickers to channel guns into the underground market. Indeed, the data from our research studies demonstrating an immediate two-fold increase in the share of crime guns that had been purchased within 12 months of crime involvement doubled following the law's repeal (Webster et al., 2013).

11.    Kleck suggests that my research on the impacts of Missouri's repeal of its PTP law does not show that the repeal was associated with a reduction in deaths because the first two studies showed that the repeal was followed by significant increases in firearm homicide rates, but does not examine the repeal's association with overall homicides. Here he is raising the familiar weapon substitution hypothesis, i.e., that persons prone to commit

11

lethal violence will substitute an equally lethal means of killing someone if access to firearms are restricted. He presents no actual evidence that this weapon substitution theory is supported in research. In the fields of criminology and public health, the heightened lethality of firearms compared to other personal weapons, e.g., objects such as knives, is settled and not controversial. If Kleck's suggestion that homicide rates did not really change in Missouri after the repeal of the state's PTP law, one would expect to see little difference in Missouri's overall homicide trends compared with its regional neighbors or all other states. Yet the data show Missouri's homicide rate increased significantly compared to other states (see figure below with data from CDC's WISQARS Fatal Injury Reports, 1999-2019 https://webappa.cdc.gov/sasweb/ncipc/mortrate.html).

Homicide rates per 100,000 population in Missouri, other Midwest states, and other states in the U.S., 1999 2019.



The gap between Missouri's homicide rates and its regional neighbors and with the rest of the country grows immediately after Missouri's PTP law is repealed. Comparing the mean

12

annual homicide rate for Missouri during the first 12 years after its PTP law was repealed (2008-2019) versus its mean annual homicide for the eight years prior to the repeal (1999-2006), Missouri's annual homicide rate increased from 6.82 to 8.37 per 100,000 population, an increase of 22.8 percent. Comparing the same time periods for all other states in the Midwest shows a decline of 2.7 percent (from 5.34 to 5.20) and for all other states shows a 11.6 percent decline (from 6.19 to 5.75). Had Missouri's homicides trends changed similarly to other states in the Midwest during 2008-2019, its annual homicide rate during that period would have averaged 6.64 rather than 8.37. That translates to 1,460 fewer homicides – 122 per year – that would have occurred had Missouri followed the regional trend rather than the one it did. Clearly, in Missouri, homicides committed by means other than firearms did not decline at a rate similar to the increase in firearm homicides after the PTP law was repealed. This was confirmed in the synthetic control statistical models for non-firearm homicide rates in Missouri that we published in McCourt et al. 2020.

12.    Kleck correctly states that prior studies that I have been involved in have found no statistically significant protective effect from laws that extend background check requirements to private transfers *but do not also require handgun purchasers to obtain a license or permit to purchase or own a handgun*. That does not mean that background check requirements for firearm sales are unnecessary or irrelevant to firearm violence. Dr. Garen Wintemute, a top researcher with whom I have collaborated, has presented persuasive arguments for why comprehensive background check (CBC) laws alone often yield minimal impacts on firearm fatalities in studies to date which have primarily focused

13

on law changes in the 1990s or early 2000s.  One of the key reasons for this is the inability

to both identify prohibited applicants and deter illegal straw purchases without a permit to

purchase (PTP) or licensing system in place (Wintemute 2019).[11]  PTP or purchaser

licensing systems that use law enforcement agencies and fingerprint verification of an

applicant's identity more effectively vet applications to purchase firearms than can be

accomplished by gun store owners and clerks who process these applications in the absence

of licensing systems or biometric identity markers. Background checks conducted with

only identification documents but without the applicant's fingerprints can lead to "false

negatives" – situations in which individuals are cleared to purchase and possess firearms

despite having a disqualifying criminal conviction. One tragic example of this occurred in

2019 when Gary Martin, who had received his Firearm Owner Identification card (FOID)

in January 2014 after passing a background check, used a handgun he acquired on March

6, 2014 with that FOID card to murder five co-workers, shoot another co-worker, and shoot

five police officers responding to the incident in Aurora, Illinois in 2019.  Mr. Martin also

died in the incident. Martin should have been denied his application to purchase the

handgun he used in this mass killing because he was convicted in 1995 in Mississippi of

felony aggravated assault.  On March 16, 2014, he applied for a concealed-carry permit

which, under Illinois law, requires applicants to be fingerprinted for the background check.

His fingerprints flagged him for the 1995 conviction in Mississippi and his application for

---

[11] Wintemute, Garen J.  (2019) Background Checks For Firearm Purchases: Problems And Recommendations To Improve Effectiveness. *Health Affairs* Vol. 38 (10) doi: 10.1377/hlthaff.2019.00671

14

a concealed carry permit was denied (Hanna, Karimi, & Almasy, 2019).[12] The FBI and most state law enforcement agencies have invested considerable resources in the development and maintenance of the Integrated Automated Fingerprint Identification System (IAFIS). The FBI uses the IAFIS to link criminal records for individuals because of the public safety risks for failing to link records of individuals who use false names and identification documents or linkage failures due to misspelling names or making mistakes on social security numbers (SEARCH Group, Inc., 1993).[13] As the authors of a General Accounting Office study reported, the "FBI provided us examples of actual cases in which IAFIS responses to law enforcement agencies prevented the premature release of arrested individuals who had used false names and were wanted in other jurisdictions." (General Accounting Office, 2004)[14]

13.    By requiring fingerprint verification of identity and/or in-person law enforcement agency scrutiny of purchaser applications and identification documents, purchasers are less likely to attempt to provide fraudulent or incorrect identifying information upon which the background check is conducted. The more rigorous systems for purchase applications under purchaser licensing versus CBC, in addition to such

---

[12] Hanna, Jason, Faith Karimi, and Steve Almasy. "Shooter in Deadly Illinois Rampage was not Supposed to own a gun. CNN, February 18, 2019. https://www.cnn.com/2019/02/16/us/illinois-aurora-shooting/index.html

[13] SEARCH, The National Consortium for Justice Information and Statistics. (1993) Use and Management of Criminal History Record Information: A Comprehensive Report. Prepared for the U.S. Bureau of Justice Statistics. https://www.bjs.gov/content/pub/pdf/CCHUSE.PDF

[14] General Accounting Office (2004) Information on Timeliness of Criminal Fingerprint Submissions to the FBI. GAO-04-260. https://www.gao.gov/assets/250/241267.html

requirements as mandatory safety training, are likely to dissuade individuals from agreeing to purchase firearms on behalf of another person who is legally prohibited or who is planning to use the firearm to commit a crime.

14.    The importance of fingerprinting and/or in-person application to a law enforcement agency is underscored by examining ATF crime gun trace data for 2017 [15] across the nine states that currently have some form of purchaser licensing. This data reveals a pattern consistent with previous research in state measures of within-state diversion to crime shortly after retail sale and the strength of the licensing law. We look at data for Illinois including Chicago and Illinois other than Chicago because Chicago has historically had very restrictive gun laws compared with the rest of the state. When Chicago data are excluded, Illinois, Iowa, and North Carolina – the only purchaser licensing states that don't require fingerprints – have notably higher percentages of crime guns with time to crime under one year (15.9%, 21.4%, and 16.7%, respectively) and higher percentages of crime guns originating from within-state sales (65.0%, 71%, and 72.5%, respectively) than is the case for other purchaser licensing states that require in-person application, fingerprint verification and/or safety training including Maryland (11% under 12 months between retail sale and crime and 47.1% originating from within state).[16] By 2019, the share of Maryland's crime guns with under 12 months to crime was 8% and 46% of the

---

[15] Data obtained from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) website for the year 2017 because Chicago Police Department released detailed crime gun trace data for that year. https://www.atf.gov/resource-center/firearms-trace-data-2017

[16] Hawaii has a relatively high percentage of its crime guns that were sold within a year of crime involvement; however, firearm ownership in Hawaii is very low and the number of crime guns traced (356) is a small fraction of the number of crime guns traced in other states.

state's crime guns originated from within state sales.[17]   This is a clear signal that Maryland's HQL requirements that include fingerprinting applicants are effective in preventing firearms sold within the state from being diverted for criminal misuse.

---

[17] https://www.atf.gov/file/147101/download

Percentage of crime guns recovered in 2017 within 12 months of sale and percentage of crime guns that were recovered in the source state among states with purchaser licensing handgun laws.

| | Fingerprints Taken | Total guns recovered and successfully traced to purchaser | Crime guns recovered within 12 months of sale n (%) | Total guns recovered and successfully traced to first retail seller | Guns recovered that were purchased within the state n (%) |
|---|---|---|---|---|---|
| **Connecticut** | Yes | 2,234 | 223 (**10.0**) | 2,330 | 1,330 (**57.1**) |
| **Hawaii** | Yes | 356 | 62 (**17.4**) | 382 | 175 (**45.8**) |
| **Illinois**<br><br>**Illinois minus Chicago** | No | 30,749<br>-18,526 Chicago<br>12,223 | 4,428 (14.4)<br>-2,483 Chicago<br>1,945 (**15.9**) | 31,336<br>-18,749 Chicago<br>12,587 | 15,752 (50.3)<br>-7,575 Chicago<br>8,177 (**65.0**) |
| **Iowa** | No | 4,462 | 953 (**21.4**) | 4,521 | 3,221 (**71.2**) |
| **Maryland** | Yes | 5,831 | 753 (**12.9**) | 5,886 | 2,775 (**47.1**) |
| **Massachusetts** | Yes | 4,243 | 498 (**11.7**) | 4,342 | 1,696 (**39.1**) |
| **New Jersey** | Yes | 9,263 | 747 (**8.1**) | 9,355 | 2,027 (**21.7**) |
| **New York** | Yes | 19,327 | 1,815 (**9.4**) | 19,610 | 5,679 (**29.0**) |
| **North Carolina** | No | 32,721 | 5,456 (**16.7**) | 34,107 | 24,730 (**72.5**) |

18

JA1512

15.     Kleck claims that it is simply not plausible that Missouri's PTP law or any handgun purchaser licensing law could impact firearm violence because relatively few criminals report that they obtained the firearms they used from licensed firearms dealers. There are two problems with that argument. First, the purchaser licensing requirement applies to private-party transfers as well as retail sales.  Second, the point of background checks and licensing systems is not only to screen out prohibited persons, but to prevent the diversion of firearms after retail sale into the underground market through straw purchasers and gun traffickers. As I reported in my prior declarations, research that my colleagues and I published demonstrated that the adoption of Maryland's HQL requirement, along with other provisions of the Firearm Safety Act (FSA), was followed by an immediate 76% reduction in the number of handguns recovered in crime by Baltimore police that had originally been sold by a Maryland firearms dealer after controlling for the number of handguns sold (as reflected in background checks) and seasonal factors (Crifasi et al., 2017).  In that study, we also conducted anonymous surveys of a sample of men on parole or probation in Baltimore. Among the respondents with history of involvement in the underground gun market, 40 percent said it became more difficult to get a gun after the 2013 FSA went into effect and 34 percent said it became more difficult to get someone to buy a gun for them after the law.

16.     Kleck's declaration reveals that he either does not have a good understanding of firearm laws or does not consider the specifics of the laws that he discusses. For example, he claims that my research does not support the effects of fingerprint requirements for handgun purchase permits because McCourt et al. (2020) finds no effect of Maryland's law

19

that requires fingerprints.  Kleck either fails to understand or misses the fact that the McCourt et al. (2020) study estimates the effects of Maryland's 1996 CBC law that extended background check requirement to private transfers but did not require fingerprints from purchase applicants. Of course, Maryland's requirements for fingerprints do not come into play until the Firearm Safety Act (FSA) went into effect in October 2013, the very law that is in question in this case.  As we document in a separate study, Maryland's FSA requirement that handgun purchasers obtain a HQL was associated with an immediate and dramatic decrease in the diversion of firearms for criminal use after sales by Maryland gun dealers even after controlling for a reduction in the number of handguns sold following the law (Crifasi et al., 2017).  Furthermore, 40 percent of persons on parole or probation for criminal offenses who were surveyed in Baltimore reported that it became harder to obtain firearms on the underground gun market following the 2013 law (Crifasi et al., 2017).

17.    Kleck raises the question of why our team decided to focus on in-depth study on changes of handgun purchase laws in the four states of Maryland, Pennsylvania, Connecticut, and Missouri when the answer was obvious to those who read the article. We focus on four changes in laws because while they each apply only to handgun purchases, two concern comprehensive background check (CBC) requirements for all transfers (Maryland and Pennsylvania) and two concern changes in background check requirements in addition to purchaser permit/license requirements (Connecticut and Missouri). The two CBC laws were adopted within 12 months of the CBC and handgun purchaser license requirement in Connecticut, thus allowing us to estimate the relative importance of adding a license/permit requirement in addition to the CBC requirement.  Of course, this is

20

precisely what Maryland did in 2013 when it added the HQL requirement to its CBC requirement that was enacted in 1996.

18.     Kleck also incorrectly claims that we cherry picked states with permit-to-purchase handgun or license-to-own laws to study and points to eight states with purchase permit/license laws and three states with license-to-own laws, citing Giffords Law Center. Two of the eight purchase permit/license laws Kleck and Giffords identify, Nebraska and Michigan, do not meet our criteria for such laws because prospective purchasers are not required to have a permit or license to purchase a handgun from licensed firearm dealers in those states; the purchase permit requirement in those statutes only applies to private transfers.[18] This is a significant departure from a full purchaser licensing requirement. Nearly two-thirds of firearm acquisitions nationally are purchases from licensed firearms dealers (Miller, Hepburn, & Azrael, 2017).[19] All states that had a permit or license to purchase or own requirement for nearly all transfers, whether by a licensed dealer or an unlicensed (for retail sale) private party, were included in our study of the effects of state gun laws on homicides in urban counties.  In this study, we estimate that these laws, on

---

[18] As noted in on the same Giffords Law Center webpage cited by Kleck, "Michigan requires either a license to carry a concealed handgun or a handgun purchase license, although a person who purchases a handgun from a licensed dealer does not need either license… Nebraska issues handgun certificates, although handgun purchasers outside Omaha who purchase from licensed dealers or who have a concealed weapons permit do not need a handgun certificate."                    https://giffords.org/lawcenter/gun-laws/policy-areas/owner-responsibilities/licensing/

[19] Miller, Matthew, Lisa Hepburn, and Deborah Azrael. (2017) Firearm acquisitions without background checks: Results from a national survey. *Annals of Internal Medicine*. https://www.acpjournals.org/doi/full/10.7326/M16-1590?journalCode=aim#t2-M161590

21

average, reduced firearm homicide rates by 11 percent (Crifasi et al., 2018).[20]  Thus, none

of the relevant state laws have been left out of our collective body of work.

19.    It is worth noting that some of the states with purchaser or owner licensing

laws (Massachusetts, New York, New Jersey, North Carolina) date back 50 to 100 years.

Our interest has been on understanding the impact of state gun laws in more recent years.

Kleck criticizes our research because we do not use data dating back to the early 1930s,

but he cites no published longitudinal studies that analyze changes in homicide trends over

80-90 years.  I know of no such studies. There are good reasons that this is not done in

research on the effects of public policies such as firearm laws. First, all statistical models

designed to estimate the association between a policy change and any outcome is based on

a projected counterfactual – what the model forecasts would have happened if there had

been no policy change – and what actually occurred (the observed).  Forecasting firearm

homicide or suicide rates based on temporal patterns observed 30 to 90 years ago simply

makes no sense and is likely to produce biased and inefficient (broader confidence

intervals) estimates of policy effects.  Forecasting counterfactuals over long periods after

a policy intervention has been introduced also provides more opportunities for historical

confounders to bias the estimates of policy impact. Whether you are forecasting the

weather, the stock market, or homicide rates, there is greater uncertainty and increased

---

[20] Crifasi, Cassandra K., Molly Merrill-Francis, Alexander D. McCourt, Jon S. Vernick, Garen J. Wintemute, and Daniel W. Webster. (2018) Association between Firearm Laws and Homicide in Large, Urban U.S. Counties, *Journal of Urban Health* 95(3):383-390. doi: 10.1007/s11524-018-0273-3.  Correction: Oct 2018; 95 (5):773-776.  10.1007/s11524-018-0306-y

room for error the longer period you are attempting to forecast.  Ironically, Kleck makes

this same point in his rebuttal to our work when he claims that we are forecasting for too

long of a period with our models.  He seems to want to have it both ways.  Some researchers

who use synthetic control methods for such purposes, as we did in McCourt et al. (2020)

and earlier studies of handgun purchaser licensing laws (Rudolph et al., 2015;[21] Crifasi et

al., 2016[22]), and do not generate estimates beyond a 10-year period in which a policy has

been in place due to concerns about the accuracy of forecasts over lengthy periods. Second,

in addition to increasing the likelihood of bias in policy impact estimates, there is the issue

of applicability to current times. While it would be interesting to know whether New

York's PTP law reduced firearm homicides in the 1920s, I am doubtful that we could infer

similar effects during the 21st century.  There have been significant changes in society over

those many decades that would influence rates of violent behavior, legal and illegal gun

markets, and the guns themselves. Kleck portrays our decisions as if they are made to

construct or inflate estimates to our liking when, in fact, these decisions are based on

realistic understanding of what statistical models can and cannot do to generate valid

estimates of the effects of laws. More historical data do not necessarily improve and can

---

[21]  Rudolph, Kara E., Elizabeth A. Stuart, Jon S. Vernick, and Daniel W. Webster. (2015)
Association between Connecticut's permit-to-purchase handgun law and homicides. *American
Journal of Public Health* 105(8):e49-54.
doi:10.2105/AJPH.2015.302703.

[22] Crifasi, Cassandra K., John Speed Meyers, Jon S. Vernick JS, and Daniel W. Webster. (2015)
Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide
rates.     *Preventive    Med*.    Jul    23,    2015.    pii:    S00917435(15)00229-7.    doi:
10.1016/j.ypmed.2015.07.013. [Epub ahead of print] PMID: 26212633.

23

seriously bias estimates of policy effects when the time periods under study include many unmeasurable factors that influence the outcomes and primary independent variables under study (Donohue et al., 2019).

20.      Kleck criticizes the study in which my colleagues and I show a strong negative association between handgun purchaser licensing laws and fatal mass shootings by suggesting that some unnamed confounder might explain the strong, statistically significant association – a 56 percent lower rate of the incidence of fatal mass shootings (Webster et al., 2020). There is no published research that suggests that any single factor could explain such a large difference in the rate of fatal mass shootings other than something that effectively restricts the availability of firearms, especially to persons at risk of committing violence.  Kleck then puts forward something that he claims could explain such a strong association – failing to account for the effects of laws that prohibit persons who are dangerous due to mental illness from possessing firearms.  However, if the estimated association between handgun purchaser licensing laws and a 56 percent lower rate of fatal mass shootings was due to our failure to control for laws that prohibit individuals from purchasing firearms due to mental illness, the following conditions would have to be met: (1) states and years with handgun purchaser licensing laws must have significantly broader mental health firearm prohibitions than states and years without handgun purchaser licensing; and (2) perpetrators of fatal mass shootings in states without handgun purchaser licensing laws must account for large majority of fatal mass shootings while close to no mass shooters in states with purchaser licensing laws would commit fatal mass shootings.  Regarding the first point, Federal law – that obviously applies to all states

24

– prohibits persons from accessing firearms who have been found by a court, board, commission, or other lawful authority to be a danger to self or others, or to "lack[] the mental capacity to contract or manage [their] own affairs," as a result of their mental condition or illness or who have been found incompetent to stand trial or not guilty of a crime due to mental incapacity.[23] Most state laws mimic the Federal prohibitions in their statues (Giffords Law Center to Prevent Gun Violence, 2021).[24] A few states with handgun purchaser licensing laws that require in-person application with law enforcement or mandatory fingerprinting of applicants have somewhat broader firearm prohibitions based on an applicant's mental illness than is the case under Federal law; yet those prohibitions still apply to a very small percentage of persons with a mental illness. During much of the study period (1984-2017), relatively few states submitted records for mental health disqualifiers into databases for background checks (Wintemute 2019). Only 5.3 percent of firearms transfer application denials in 2016 were for mental health related prohibitions

---

[23] Federal law, enacted in 1968, still uses archaic and offensive terminology to prohibit firearm access by people who have been "adjudicated as a mental defective." Federal regulations define that term to mean:
(a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease
(1) Is a danger to himself or to others; or
(2) Lacks the mental capacity to contract or manage his own affairs. Federal regulation also expressly clarifies that this firearm prohibition applies to:
(1) A finding of insanity by a court in a criminal case; and
(2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to [specified articles] of the Uniform Code of Military Justice. 27 CFR § 478.11
[24] Giffords Law Center to Prevent Gun Violence. Who Can Have a Gun? Firearm Prohibitions. Accessed February 20, 2021. https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/firearm-prohibitions/

25

(Connor, 2021).[25]  However, in 2007, only 0.8 percent of all denials for firearms transfers were due to mental health prohibitors (Federal Bureau of Investigation, 2007),[26] showing that the limited availability of mental health records during much of the study period greatly limited the ability of laws designed to keep firearms from people who are dangerous due to mental illness to impact gun violence.

21.      Data from the most comprehensive dataset (www.theviolenceproject.org) on fatal mass violence that includes incidents beginning in 1966 includes data on 172 perpetrators of fatal mass shootings.  The data indicate that 19.8 percent of the perpetrators had previously been hospitalized for psychiatric reasons and that psychosis played a primary role in 10.5 percent of the incidents (Peterson & Densley, 2021).[27] Typically, to be legally disqualified from acquiring firearms, someone must have been involuntarily committed for in-patient treatment for a mental illness or experienced a very lengthy (6+ months under Connecticut law) voluntary in-patient treatment that is very rare. Unfortunately, Peterson and Densley's (2021) data cannot reliably distinguish voluntary versus involuntary psychiatric hospitalizations. Involuntary civil commitments for psychiatric care are rare in comparison to voluntary psychiatric hospitalizations.  In a study of 22,780 individuals identified with a serious mental illness in Connecticut based on

---

[25] Brooks, Connor. (2021) Background Checks for Firearms Transfers, 2016-2017 – Statistical Tables. Bureau of Justice Statistics, Office for Justice Programs, U.S. Department of Justice. Washington, DC. NCJ 254757.  https://www.bjs.gov/content/pub/pdf/bcft15st.pdf
[26] Federal Bureau of Investigations. National Instant Criminal Background System: Operations 2007.  https://www.fbi.gov/file-repository/2007_operations_report.pdf/view
[27] Peterson, Jillian . (2021) Psychosis and Mass Shootings: A Systematic Examination using Publicly Available Data. Manuscript under review for publication.

administrative records from public mental health and criminal justice agencies, 1,086 (4.8 percent) had an involuntary civil commitment that prohibited firearm ownership and 1,122 (4.9 percent) had some kind of mental health prohibitor for possessing firearms and were not otherwise prohibited based on prior criminal convictions. Many perpetrators of mass shootings do, however, have histories of violence and criminality that would prohibit them from possessing firearms.  In the Peterson and Densley (2021) comprehensive study of mass shootings in the United States, two-thirds (111 out of 172) had criminal records, usually for violent crimes.  It is, therefore, far more likely that potential mass shooters are denied firearm purchases due to prior criminal offenses rather than for prohibiting conditions due to mental illness (Table 3).  Given the very small number of potential mass shooters who might be denied due to mental illness and the fact that Federal law prohibits many if not most such persons from purchasing firearms, it is virtually impossible that the large association between handgun purchaser licensing laws and lower incidence of fatal mass shootings could be explained away by stronger mental health disqualifications for firearm possession in states with handgun purchaser licensing.

22.    Kleck criticizes our article on state gun laws and fatal mass shootings because we did not demonstrate that the variables we controlled for in our models were, indeed, confounders for the relationship between purchaser licensing laws and fatal mass shootings.  But most studies of gun laws do not formally test for these conditions. The best we can do as researchers is identify the most plausible covariates that are collected in a standardized way across all 50 states over decades of time. Fatal mass shootings are relatively rare events and there is not a large body of research showing which population

27

characteristics are most predictive of rates of fatal mass shootings. The study controls for the presence of 15 types of firearm laws and 13 other measures of potential population risk or conditions that may impact fatal mass violence including estimates of gun ownership, the most likely confounder.

23.    Kleck also does not like that we did not tease apart the discrete impact of requiring fingerprints for handgun purchaser applicants versus the discrete impact of requiring applicants to apply for a handgun purchaser license in-person from a law enforcement agency. The reason we did not do this is that the study was designed to simultaneously assess the independent association between many different types of gun laws on a relatively rare outcome – fatal mass shooting with four or more deaths, not inclusive of the shooter.   Only two states that had handgun purchaser licensing requirements during the study period had in-person application without fingerprint requirements (Iowa and Missouri) and only one state (Maryland) had fingerprint requirements without in-person application and that change in October 2013 provided very few annual data points for a study period that ended in 2017.

24.    Kleck highlights the fact that the estimates for the association between handgun purchaser licensing laws and fatal mass shootings changed when we looked at the subset of cases in which more than five victims were killed versus our primary analyses with the commonly-used threshold of more than three victim fatalities.   What he fails to mention is that the sample of incidents shrunk from 604 to 92 with those two different thresholds – 85 percent fewer incidents in which to analyze. As you restrict the fatality count threshold to higher numbers of deaths in these mass shootings, you find a growing

28

prevalence of assault-style rifles with high-capacity magazines which are not subject to handgun purchaser licensing. It is not surprising that the relationship between handgun purchaser licensing and fatal mass shootings would decline as the number killed threshold rises and assault rifles become more relevant.

25.     Finally, Kleck claims that we biased our findings because we chose to exclude five states from our analysis for which there were many years of missing data from our primary source of data for the study – the FBI's UCR Supplemental Homicide Report. We used our secondary sources – Stanford Mass Shooting in America and Gun Violence Archive – that did not cover all of the study period but allowed us to fill major mass shootings in when localities that were not reporting data (e.g., Newtown, Aurora, Colorado).  Trying do to this for whole states for many years would have likely skewed our data.

26.     Kleck makes an argument at the top of page 25 of his declaration regarding the findings from McCourt et al. (2020): "All of their (McCourt et al.) results are completely consistent with the interpretation that these changes, if they had any actual impact at all, merely induced some people to change the weapons they used to kill others, or the methods they used to kill themselves, without any effect on the total number who died." The argument he puts forward is that firearm restrictions will just lead to method substitution such that changes in firearm homicide and suicide rates associated with changes in purchaser licensing laws would be negated by opposing changes in non-firearm homicide and suicide rates. A close inspection of the data in Table 2 on page 1549 of the article, puts that claim to rest. While we found that Connecticut's handgun purchaser

29

licensing law was associated with a 27.8 percent decline in firearm homicide rates, it was associated with a non-significant 0.7 percent decline in non-firearm homicide rates – in essence, no change. The estimated change in firearm suicide rates was 23 percent during the period prior to Connecticut's firearm removal law (precursor to Red Flag laws) and a combined reduction of 32 percent for the whole study period. Under Kleck's hypothesis, some significant amount of that reduction would be negated by an increase in non-firearm suicides.  Yet our models estimate a non-significant 3 percent decline in non-firearm suicide rates associate with Connecticut's purchaser licensing law. The same is true when we examine the data for Missouri. We estimate that the purchaser licensing law repeal was associated with a 47 percent increase in firearm homicide rates. These increases in firearm homicides were not negated by decreases in non-firearm homicides, which also increased but at a much smaller rate of 18 percent. The pattern for suicide rates changing in response to changes in handgun purchaser licensing laws follow the same pattern as with homicides. The 23.5 percent increase in firearm suicide rates following the repeal of Missouri's handgun purchaser law was not accompanied by a decline in non-firearm suicides, but a nonsignificant increase of 6.9 percent.  We present the data stratified by weapon type to show that the changes observed in response to changes in handgun purchaser licensing laws are specific to or primarily concentrated on changes in firearm homicide and suicide and have little or no impact on homicides and suicides by other means. Not a single analysis in McCourt et al. (2020) supported Kleck's method substitution hypothesis. The analyses simply reveal that the observed changes in homicide and suicide rates in response to

30

changes in purchaser licensing laws were highly concentrated in, if not exclusive to, changes in deaths due to firearms.

27.    Kleck says that the authors' study periods in McCourt et al. (2020) are arbitrary and provides our analysis of Maryland's CBC law as an example where our analysis ends at 2013 – 17 years of post-law data. As we state in our article, we truncate Maryland's time series at 2013 because our purpose is to contrast CBC versus handgun purchaser licensing laws and Maryland's begins requiring handgun purchaser licensing in October 2013. Adding four years of post-CBC data that included these new important law change would only bias our estimate of the CBC effects. Finally, Baltimore City's firearm homicide rates skyrocketed in May 2015 and have remained at high levels after massive destructive riots in response to the in-custody death of Freddie Gray.  Kleck disagrees with our decision to truncate our post-CBC time series for Maryland at 2013 and our post-PTP-repeal time series for Missouri to 2017 due to the adoption of significant changes firearm laws in those states that prior research has shown to impact firearm homicide rates. His argument is that gun laws change all of the time, so researchers are not justified in truncating data for any reason. This is foolhardy because many of the changes in gun laws are very modest in nature and unlikely to impact population-level homicide rates whereas other law changes are more substantial and have been shown to be associated with changes in firearm homicide rates. The purpose and study design for McCourt et al. (2020) was to isolate changes in key policies by analyzing trends over sufficiently long periods in which there are no other major policy changes. For Maryland's CBC law, we used 17 years of post-law change data and for Missouri we used 10 years of post-law data. Forecasting

31

counterfactuals beyond those time periods with significant policy changes coming into effect would not improve and would most likely bias our estimates of CBC and PTP law change effects.

28.     Kleck says of our analytic method for estimating the effects of policy changes on homicide and suicide rates – synthetic control methods – that they "might be useful for evaluating the impact of a policy, but only in extraordinary circumstances." Yet synthetic control methodology has become a widely accepted, and often preferred, method for estimating policy impacts. Synthetic control methodology has been called arguably the most important innovation in the policy evaluation literature in the last 15 years by two of the most prominent economists in the world who are studying policy impacts (Athey and Imbens, 2017),[28] and the key articles on synthetic control methodology have over 4,000 citations.  Other methods of estimating policy impacts, such as difference-in-difference estimates[29] from regression analysis with panel data are premised on assumptions of parallel trends in treated and untreated units prior to treatment (policy change in this case) and assumptions about the proper form of the relationship between the independent and dependent variables in the analysis. These conditions often do not hold in studies of state-level changes in homicides and suicides.  This is why my colleagues and I chose not to use data from the 1980s and 1990s in our studies of the impacts of Missouri's repeal of its

---

[28] Athey, Susan. and Guido W. Imbens (2017). The state of applied econometrics: Causality and policy evaluation. *Journal of Economic Perspectives* 31 (2), 3–32.
[29] Differences-in-differences refers to differences in dependent variables before and after policy change in the jurisdiction with the change versus the difference in the dependent variable over the same two time periods among jurisdictions that did not change the policy after controlling for changes in variables controlled for in the statistical model.

handgun purchaser licensing law when we used negative binomial regression models (Webster et al., 2014; Hasagawa, Webster & Smart, 2019). Synthetic control models minimize prediction error by allowing for different comparison states to receive different weights depending upon their ability to aid in the prediction of homicide or suicide trends in the state with the policy change under study. It is a mathematical process that is the opposite of "cherry picking" because it selects weights based on the weights' ability to minimize prediction error.   Kleck is incorrect in his statement that synthetic control methodology "relies entirely on the coincidence of there being other areas whose trends in the outcome variable closely mirror those prevailing in the area in which the policy is implemented."   Obviously, the more similar the comparison units are with respect to baseline levels and trends, the easier it is for the method to derive a good fit or prediction with the model. The estimation methodology does not rely upon parallel trends of comparison units and this is precisely the reason so many researchers use this method (Bouttell et al., 2017). My colleagues and I recently published a study that demonstrated substantial improvement in model fit when synthetic control methods were used in comparison to difference-in-difference estimates from regression analysis in a study of local gun violence prevention interventions in Baltimore neighborhoods – another type of study in which study units can be quite different and have unique, nonparallel trends.[30]

---

[30] Buggs, Shani A.L., Daniel W. Webster, and Cassandra K. Crifasi. (2021) Using synthetic control methodology to estimate effects of a Cure Violence intervention in Baltimore, Maryland. *Injury Prevention* Published Online First: 08 February 2021. http://dx.doi.org/10.1136/injuryprev-2020-044056.

29.     Kleck claims that the McCourt et al. (2020) study does not provide any evidence that the variables we used in our statistical models were essential in predicting homicide or suicide trends. Yet we provide model fit statistics and graphs of actual versus model-predicted values that show remarkable strong model fit and thus strong prediction based on the variables we used.  Kleck picks apart data point by data point yearly change in Missouri or Connecticut prior to the law change to support his claim that the synthetic control method we used did not work well.  But the approach is designed to estimate the value of the dependent variable for each year over a span of time, minimizing error in the mean values rather than minimizing error predicting a 1-year change. The graphs shows close concordance with the mean and general trend prior to the law's repeal in Missouri and Connecticut, especially close concordance during the years leading up to the policy change – key in any estimation of policy effects. The model fit statistics – mean square predictive error – for Missouri's firearm homicide rates and all other models were all less than 0.560.

30.     Finally, Kleck argues that we cannot conclude that firearm homicide and suicide rates changed dramatically in response to changes in handgun purchaser licensing laws in Missouri and Connecticut because it is possible that it was some other factor or set of factors that changed at the same time the laws were changing that dramatically influenced firearm homicide and suicide rates. While this is theoretically possible in any study of a law because we cannot run randomized experiments with laws, the pattern and consistency of the data are in accord with my inference that handgun purchaser licensing lowers population rates of firearm homicide and suicide. The effects are substantial and

34

long-lasting, are evident primarily with firearm homicides and suicides and not with homicides and suicides by other means. The changes in diversions of firearms for criminal use that coincide with the changes in firearm homicide rates are consistent with a causal connection.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Date:  February 24, 2021

Daniel W. Webster

# EXHIBIT 20

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,        :

et al.,                            :

                                   :   Case No:

        Plaintiffs                 :   16-cv-3311-MJG

                                   :

            -vs-                    :   Pages 1 - 169

                                   :

LAWRENCE HOGAN, in his             :

capacity of Governor of            :

Maryland, et al.,                  :

                                   :

        Defendants                 :

------------------------------X

Deposition of Andy R. Johnson

Baltimore, Maryland

Wednesday, April 11, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  393199

MAGNA LEGAL SERVICES

(866) 624-6221



JA1531

Page 79

1    conversations with Detective Sergeant Lopez.

2        Q.    To your knowledge, has Maryland State

3    Police ever had access to that information?

4        A.    That I don't know.

5        Q.    Item 23, the HQL's effect on handgun sales

6    in Maryland from 2013 through 2017.  You have a

7    note, "No response on effect."  What does that mean?

8        A.    It just means that I can't, I don't feel

9    that I can testify on the effect on the sales in

10   Maryland.

11       Q.    Do you have any information on the effect

12   of handgun sales in Maryland from the HQL?

13       A.    Only that today we're back to near record

14   numbers.

15       Q.    What's the basis of that statement?

16       A.    Just the information I reviewed here

17   today.

18       Q.    Show me exactly what you're pointing to.

19   Is that the -- well, just show me what you're

20   referring to.

21       A.    Sure.  So I have information on the MAFSS

22   yearly count of firearm transfer by gun type.



Page 80

1              MR. SCOTT:  Has it been previously marked?

2              THE WITNESS:  I believe it has, but I'm

3    not sure.

4              MR. SWEENEY:  We'll get a copy marked.

5              (Exhibit No. 92, MAFSS Yearly Count of

6    Firearm Transfer by Gun Type, was marked for

7    identification and retained by Mr. Scott.)

8              MR. SWEENEY:  Is this Bates number 3207?

9              THE WITNESS:  Yes, sir.

10             MR. SWEENEY:  Let's go ahead and mark that

11   as the next exhibit number.  We may have a duplicate

12   in the record.

13             MR. SCOTT:  That's all right.  No worries.

14   BY MR. SWEENEY:

15        Q.   We've marked as Exhibit 92 the document

16   with Bates stamp 3207 on it, and tell me what

17   specifically you're referring to in this document to

18   support the statement you just made.

19        A.   Just the transfer count.

20        Q.   All right.  And it's your understanding --

21   and are you looking at the transfer count column?

22   Is that what you're referring to, or are you looking



Page 81

1    at the handgun transfer column?

2        A.   The handgun transfer column.

3        Q.   All right.  And when you're saying near

4    record, you're comparing 52,101 handgun transfers

5    depicted here in 2017 with prior years?

6        A.   Yes, sir.

7        Q.   2013 had 90,090, almost twice as many.  So

8    you're not really near that record, are you, sir?

9        A.   Could you repeat the question?

10       Q.   Sure.  2013 had over 90,000 transfers, so

11   the 52,000 in 2017 isn't really near that record

12   year, is it?

13           MR. SCOTT:  Objection.  Go ahead.

14           THE WITNESS:  I would say that's a record

15   year.  And the next record year would be, looking at

16   this document, 47,348 in 2012, and 52,101 from 2017

17   is above that so that was my reference.

18   BY MR. SWEENEY:

19       Q.   All right.  And the total transfers

20   depicted here in 2014 and 2015 of 28,799 and 34,751

21   are significantly below those years; correct?

22           MR. SCOTT:  Objection.



JA1534

Page 82

1            THE WITNESS:  Below the years that are

2    listed here from 2000 to 2017, no, sir.

3    BY MR. SWEENEY:

4        Q.   All right.  So 28,000 and 34,000 is not

5    significantly below 52,000?

6        A.   It is below 52,000.  I was using the range

7    that we have here so that's what I was referring to.

8        Q.   Let me try to understand.  What do you

9    mean by a range?

10       A.   We have listed here on this document 2000

11   to 2017, the years 2000 through 2017.

12       Q.   Okay.

13       A.   The other document that I've used in the

14   past is the weekly report, which I believe we've

15   also provided to you for 2018.

16       Q.   We marked that as Exhibit 80 earlier

17   today.  Can you identify where on that document

18   you're referring?

19       A.   So, again, using the totals for -- these

20   are applications received from 2015 through 2018 and

21   a weekly average, as well as a yearly total, for

22   2015 to 2017 and as far back as 2014, I believe, on



Page 83

1    some of the older weekly reports.  And just that the

2    weekly average from 2015 to 2018 has gone up

3    significantly as well.

4        Q.    Now, what period of time is used to

5    calculate the weekly average that appears there, the

6    data that you're looking at?

7        A.    From the start of the calendar year,

8    January 1, through the current date of that weekly

9    report averaged out over the number of years.

10       Q.    So the last report for the year would be

11   cumulative for the entire year and provide an

12   average by week based on the total for the year?

13       A.    Yes, sir.

14       Q.    Are there any other documents that you're

15   basing your opinion on?

16            MR. SCOTT:  Objection to form.

17            MR. SWEENEY:  If I revise it and

18   substitute statement, will you remove your

19   objection?

20            MR. SCOTT:  If you restate the question.

21            MR. SWEENEY:  Sure.

22   BY MR. SWEENEY:



Page 132

1   administrative denial log as well or ledger I should

2   say.  I think we're getting hung up on the log

3   versus ledger, so I want to make sure I have the

4   other information in front of me.

5        Q.   I don't know if I have the disapproval

6   ledger with me.  What I do have is the -- we can

7   talk about what this is.  Pull it out.

8             MR. SWEENEY:  Let's mark that as 98.

9             (Exhibit No. 98, Administrative Denial

10  Ledger, was marked for identification and retained

11  by Mr. Scott.)

12  BY MR. SWEENEY:

13       Q.   Let me show you what we've marked as 98,

14  which is another log-like spreadsheet that we took

15  out of your document production.  What is it that

16  we're looking at that's identified as Bates

17  number 1218 through 1227?

18       A.   I believe that this is the administrative

19  denial ledger.  And this ledger is -- I know it's

20  hard to say without the redacted information, but I

21  believe it is the information that is given back to,

22  when the section receives a Rap Back or an ADR



JA1537

Page 133

1    report, the person is put on this log or ledger as a

2    person who's come back on that report.  That's what

3    I recognize this to be.

4         Q.   We had been calling this the revocation

5    log.

6         A.   Correct.

7         Q.   Does that make -- is that what you would

8    call it?

9         A.   Yes, sir.

10        Q.   And it is a different spreadsheet and

11   stream of data than the administrative log that we

12   marked as Exhibit 97; correct?

13        A.   Yes, sir.

14        Q.   And let me understand what's a Rap Back?

15        A.   I believe it's a record of arrest and

16   prosecution, if I'm not mistaken, or processing.

17   I'm sorry.  Not prosecution.

18        Q.   What does that mean?

19        A.   That's a term that they use when they are

20   getting this -- it's called an ADR report, Arrest

21   Disposition Report, sent back to the unit based on

22   someone's fingerprints who has now been charged with



JA1538

Page 134

1    a crime or arrested.

2        Q.    And what does the HQL unit do with that

3    information?  In other words, an HQL holder has been

4    fingerprinted in connection with an arrest.  That

5    information comes to the HQL unit.  It's reflected

6    in this log.  What then happens?

7        A.    If -- you can see there are some here that

8    have been revoked, so if the charge is prohibitor,

9    they would follow the disposition of the case; and

10   once the case had a disposition, if it is, in fact,

11   a disqualifier, they would then revoke the person's

12   HQL.  Those are highlighted in the blue on the color

13   copy we have here.

14       Q.    Do you know what the significance, if any,

15   of the yellow highlighting is?

16       A.    I believe those are cases that may still

17   be under disposition.  Actually, I don't know.  I

18   believe they were still -- they have not yet

19   received disposition, I believe.  That's my

20   understanding of what they are.

21              So, if you look at the majority of the

22   charges in white, they are either for the most part



JA1539

Page 135

1    not disqualifiers, nolle prossed, those kinds of

2    things, so if you look at the highlighted numbers,

3    they are from charges that have yet to have a

4    disposition.

5         Q.    All right.  You mentioned that this

6    process is triggered at least in terms of the

7    reporting to Maryland State Police by fingerprints

8    being taken incident to a criminal arrest and

9    matched to the fingerprints on file for an HQL

10   applicant; am I correct?

11        A.    Matched to the SID number from the

12   applicant.  State ID number, yes, sir.

13        Q.    And is there any other means of reporting

14   of an arrest of an HQL holder other than a match of

15   the fingerprint identification?

16        A.    Is there any means to what?  I'm sorry.

17        Q.    To report to Maryland State Police that an

18   HQL holder has been arrested, a potentially

19   disqualifying event, other than the fingerprinting?

20        A.    So that's a twofold question, and I'll

21   answer it's still by fingerprinting, but the only

22   other event that I know of would be, if the person



Page 136

1    has a handgun permit, the code for the fingerprints

2    is related to handgun permit.  They would be

3    notified.  They would then notify HQL.

4         Q.   All right.  So, before the HQL

5    fingerprinting requirement, if the owner of a

6    registered firearm in Maryland was arrested for a

7    potentially disqualifying crime, was there any

8    report of that arrest that went to anyone at

9    Maryland State Police?

10        A.   Not that I recall.

11        Q.   And other than reports that are triggered

12   by fingerprint matches, would the HQL fingerprint

13   data that's kept on file, there's no reporting to

14   Maryland State Police of the arrest of any HQL

15   holder now; correct?

16        A.   That is my understanding, yes, sir.

17        Q.   Going back to Exhibit 97, if you would for

18   a moment, and let's just look at the first item and

19   see -- it's on Bates stamp page 1214 and see if we

20   can understand it.

21             There appears to be a column that's been

22   redacted in black on the far left of the page.  Are



Page 139

1    the administrative log when the application in

2    question was submitted?

3         A.    I don't believe so.

4         Q.    Are the dates in which an application that

5    has been administratively disapproved is overturned

6    all occurring within 30 days of the submission of

7    that application to MSP?

8         A.    I'm going to have to have you repeat that.

9    I'm sorry.

10             MR. SWEENEY:  Please read that back,

11    Kathy.

12             (The reporter read back as requested.)

13             THE WITNESS:  Once the, the reason for

14    administrative denial has been corrected, it then

15    becomes a properly completed application.  Within

16    30 days of that happening, they are being

17    overturned, yes, sir.

18    BY MR. SWEENEY:

19         Q.    And I'm trying to find out what the time

20    period is between the submission of the application

21    and the overturning of the administrative

22    disapproval.  Is that within 30 days?



Page 140

1    A.   The time that it's denied and the

2    administrative approval?  In most cases it would be.

3    However, if it's not a properly completed

4    application, we can only make a decision on it once

5    we have a properly completed application.

6    Q.   What I'm trying to find out is how long

7    does that take?

8    A.   It varies.

9    Q.   And does it sometimes involve more than

10   30 days from the submission of the application?

11   A.   From the submission of a not properly

12   completed application to the time of overturn for a

13   denial, yes.

14   Q.   All right.  More than 30 days?

15   A.   Yes, sir.

16   Q.   And that's happened more than once;

17   correct?

18   A.   I would assume so.

19   Q.   All right.  And do you know how often it's

20   happened?

21   A.   I'm just told that it's, most of those

22   cases are still generally, once we have the reason



Page 141

1    for administrative denial corrected, that they are

2    all within 30 days.  However, most of them are still

3    corrected and approved within 30 days from the

4    initial application date.

5         Q.    But some are not, and we don't know how

6    many?

7         A.    Yes, sir, correct.

8         Q.    You don't keep the records of how long it

9    takes or how many don't do it within 30 days;

10   correct?

11        A.    No, sir.

12        Q.    All right.  On the same page we've been

13   looking at, 12/14, about three quarters of the way

14   down the page one of the reasons given is ARN

15   number/hunting license.  Can you tell us what that

16   means?

17        A.    I do not know.

18        Q.    All right.  Is the hunting license

19   accepted instead of the handgun safety training

20   under the HQL?

21        A.    Instead of the hunter's safety?

22        Q.    Instead of the handgun training.  Is a



Page 148

1              (Whereupon, a short recess was taken from

2      2:59 to 3:08 p.m.)

3              MR. SWEENEY:  Let's mark this as number

4      99.

5              (Exhibit No. 99, MAFSS Spreadsheet, was

6      marked for identification and retained by Mr.

7      Scott.)

8      BY MR. SWEENEY:

9          Q.   Captain Johnson, while we were off the

10     record, I marked as Exhibit 99 another spreadsheet

11     from MAFSS that looks very much like the spreadsheet

12     we marked and talked about as Number 92 with the

13     exception that the numbers are largely all

14     different, and it is Bates 3206.  Are you familiar

15     with that document, as well as with Document 92, and

16     can you explain the differences?

17         A.   I am, and the differences in the transfer

18     count are significantly higher on the Exhibit 99

19     than they are Exhibit 92.

20         Q.   And do you know why that is?

21         A.   When we saw the numbers that MAFSS

22     provided on the original Exhibit 99, we actually set



Page 149

1    a meeting with the information technology people at

2    MAFSS to try to find out why the data was the way it

3    is, and the only thing they could tell us is they

4    believe someone had written the script wrong to pull

5    the data.

6              And once we explained to them what we were

7    looking for and that those numbers we didn't feel

8    were accurate, they provided the second copy of

9    Exhibit 92 to us as a corrected copy.

10   Q.   What, if anything, did you do to satisfy

11   yourself that Exhibit 92 as corrected is correct?

12   A.   Those numbers appeared more accurate,

13   consistent with some of the information from our

14   weekly report than what was originally presented on

15   Exhibit 99 with the exception of the years 2014,

16   '15, '16.

17             Most recently in viewing the document, I

18   questioned why in those years under category S as a

19   single shot we had a significant increase over prior

20   years at which time I was advised that the

21   application for the 77R during those years had a

22   misprint on the back of the form which was



USCA4 Appeal: 21-2017    Doc: 25-4       Filed: 08/03/2022    Pg: 124 of 449

Page 150

1  categorizing semiautomatics with a category Code S

2  instead of A.

3          Therefore, when people were putting the

4  information in, the numbers for that year for single

5  shot were significantly higher than years past.

6      Q.   And what years did that form misprint

7  occur?

8      A.   I believe it was in 2014.

9      Q.   And who advised you of that?

10     A.   Sergeant Pickle.

11     Q.   And what was the basis of his information?

12     A.   He was in the registration section at the

13  time.

14     Q.   Do you know how long the single shot

15  category has been in the MAFSS system?

16     A.   I do not.  It appears since 2000.

17     Q.   Is there anything else you did to satisfy

18  yourself that the information on Exhibit 92 is

19  accurate?

20     A.   No, sir.

21          (Discussion held off the record.)

22          MR. SWEENEY:  Let's mark this.



JA1547

Page 158

1    report, as you understood it, indicate that Maryland

2    State Police had not followed the requirements of

3    the Maryland HQL law in requiring the paper

4    submission of HQL applications?

5        A.    That was not discussed.

6        Q.    Were you advised that the audit found that

7    Maryland State Police did not adequately ensure that

8    the handgun registration data in MAFSS was accurate?

9        A.    The handgun registration data in MAFSS?

10       Q.    Mm-hmm.

11       A.    I was advised that there were clerical

12   errors in the data, yes, sir.

13       Q.    Is it your understanding that it's the

14   responsibility of the Licensing Division under your

15   command to ensure that the handgun registration data

16   in MAFSS is accurate?

17       A.    Yes, sir.

18       Q.    All right.  And what does your Licensing

19   Division do to ensure itself that the handgun

20   registration data in MAFSS is accurate?

21       A.    Currently?

22       Q.    Yes.



JA1548

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 126 of 449

Page 159

1          A.    So the information currently that's put

2     into the portal, which went live January 1 of 2017,

3     has no longer required the -- what was required

4     prior was 100 percent quality assurance in each

5     application as the data was being entered into, at

6     that time, our Isabel system and then ultimately

7     transposed into the MAFSS database.

8                When that information was put into the

9     MAFSS database, there was always at least more than

10    one person looking at that information because it

11    was coming in on an electronic, a fax copy, and then

12    from there, once the data was entered and the

13    application came back to the Licensing Division,

14    what we call final date where that firearm was

15    considered transferred, that information was then

16    reviewed again upon entry into MAFSS, the firearm

17    data at this point.

18                Of those approximately 3 to 5 percent of

19    those applications are pulled for random samples,

20    and there's quality control done on those random

21    samplings.  Currently, with the portal the

22    information is already in the digital format.  It's



Page 160

1    taken right out of the digital application, the

2    electronic application, and placed into MAFSS and

3    the same quality control is conducted on those

4    random sampling of applications.

5         Q.   And the process you described is effective

6    as of January 1, 2017, when the new 77R electronic

7    portal became active?

8         A.   From the standpoint of the quality control

9    and directly from the electronic application, yes,

10   sir.  Prior to that was the 100 percent quality

11   assurance.  When that application came in, it was a

12   manual data entry from the fax copy into Isabel and

13   then ultimately into MAFSS.

14        Q.   Now, the audit report that we have here on

15   2015 found that there were some 4,000 out of 27,500

16   handgun records that were reviewed contained errors.

17   What, if anything, did Maryland State Police do

18   after receiving this audit report to look at all the

19   MAFSS firearms registration data to ensure it was

20   accurate?

21        A.   I don't know what was done prior to me as

22   far as this audit that was completed in, I believe,



JA1550

# EXHIBIT 21

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,         :

et al.,                             :

                                    :   Case No:

          Plaintiffs                :   16-cv-3311-MJG

                                    :

          -vs-                      :   Pages 1 - 109

                                    :

LAWRENCE HOGAN, in his              :

capacity of Governor of             :

Maryland, et al.,                   :

                                    :

          Defendants                :

------------------------------X


Deposition of James Johnson

Baltimore, Maryland

Tuesday, March 13, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  390081


MAGNA LEGAL SERVICES

(866) 624-6221



JA1552

```
                                                    Page 24

  1                THE WITNESS:  I'm not in a position to

  2    answer the question.

  3    BY MR. SWEENEY:

  4        Q.   Now, fingerprinting is not, per se, going

  5    to deter a straw purchaser; correct?  Because by

  6    definition a straw purchaser is an individual who

  7    can be positively identified and is qualified to

  8    purchase a handgun; correct?

  9                MS. KATZ:  Objection to form.  You can

 10    answer.

 11                THE WITNESS:  I believe that's an accurate

 12    statement.

 13    BY MR. SWEENEY:

 14        Q.   All right.  So what is it about the

 15    fingerprinting process that in any way discourages

 16    straw purchases?

 17        A.   I believe that an individual that knows

 18    that they have to render fingerprints is less likely

 19    to carry out the scheme.  I believe that most

 20    individuals have a great concern or a concern about

 21    rendering their fingerprints.

 22                It's been my experience throughout my
```



Page 51

1    one-month period of time the cost is $38 million as

2    a result of gun violence and accidental or suicide

3    by use of guns.  I believe this training could help

4    address one or more of those areas.

5        Q.   Can we try to pull apart your

6    understanding of the prevalence of accidental gun

7    injury and death as opposed to the other categories

8    of intentional criminal acts and suicide?

9        A.   I can tell you, as a police officer, I've

10   handled a number of accidental discharges involving

11   children and/or adults.  I'll bring your attention,

12   just last within the last 24 hours in Harford County

13   an individual cleaning his gun shot and killed

14   himself.  It's quite common.  It's quite frequent to

15   have accidental gun discharges.  Again, even amongst

16   police officers, it's not an infrequent event.

17       Q.   Can you point to any data that quantifies

18   quite common and quite frequent?  How many

19   accidental shootings are occurring each day, each

20   year in this country?

21       A.   I believe that material is available.  I

22   do not possess it.  Again, it would require



Page 52

1    research, time, and resources.

2         Q.   Which you have not done in advance of your

3    opinion in this case?

4         A.   No, sir.

5         Q.   All right.  And you also don't have any

6    such information specifically about Maryland;

7    correct?

8         A.   That's correct.

9         Q.   Item 7 of your testimony talks about the

10   live fire requirement.  We already discussed that.

11   Is there anything else about your opinion with

12   respect to the live fire requirement that you'd like

13   to address?

14        A.   Well, personally, I think just firing one

15   round is not adequate, but I do not think the

16   requirement to show proficiency in discharging a

17   round is unreasonable.  Again, I would draw your

18   attention to the process of actually chambering a

19   round, which is an exercise in and of itself.  And,

20   you know, the average individual that's new to guns,

21   I think, would struggle working that mechanism of

22   the weapon, and I'm sure that's a necessary



Page 53

1    component or process in actually discharging a

2    round.

3         Q.    Now, can this live fire training take

4    place anywhere or do you have to have it at a

5    special location?

6         A.    I believe that with the change in allowing

7    a marker-type round that can be conducted virtually

8    anywhere.  I do not believe that is discharging a

9    weapon in a metropolitan district, for example, so I

10   believe it could be done anywhere.  We use

11   simunition weapons in classrooms, at the academy.

12   We use simunition weapons in various locations.

13        Q.    So it's your opinion then that a

14   simunition live fire training can take place within

15   the city limits of Baltimore City?

16        A.    I do not think it's discharging a weapon

17   in a metropolitan district.

18        Q.    And so that could take place anywhere?  It

19   could take place, say, in a backyard or a home in

20   Baltimore City?

21        A.    When I think about this issue, I'm

22   thinking about a projectile that simply delivers a



Page 105

1    including live fire?  You don't mention that either

2    as a means to prevent gun trafficking in this

3    document, do you, sir?

4        A.   No.

5            MR. SWEENEY:  Thank you.  I have no

6    further questions, sir.  Thank you for your time

7    today.

8            MS. KATZ:  I'm just going to take a

9    one-minute break.  We'll be right back before we

10   close up shop.

11           (Whereupon, a short recess was taken from

12   1:16 to 1:17 p.m.)

13           EXAMINATION BY COUNSEL FOR THE DEFENDANTS

14   BY MS. KATZ:

15       Q.   A few quick questions.  Chief Johnson, in

16   your experience as a law enforcement officer in

17   Maryland, were you aware of any accidental

18   discharges of handguns in Maryland?

19       A.   Yes.

20       Q.   Can you estimate how many?

21       A.   Over 100.

22       Q.   Did you ever personally respond to a



Page 106

1    situation where there had been an accidental

2    discharge of a handgun?

3         A.   I'd have to say just numerous cases of

4    both police officer and private citizen.

5         Q.   Okay.  Do you recall being asked about the

6    live fire component of the training requirement?

7         A.   Yes.

8         Q.   And do you recall mentioning the

9    importance of the training having experience of

10   chambering a round?

11        A.   It's a credible component given the

12   technology of the current state-of-the-art weapons,

13   and what caused all of the accidental discharges in

14   Baltimore County were failure to recall, remember

15   that there was a round previously chambered, and

16   unfortunately, the person pulled the trigger unaware

17   that there was a round in the chamber thinking

18   ejection of the magazine was sufficient to safe the

19   weapon.

20        Q.   And how might the live fire component of

21   the training prevent that situation?

22        A.   I think it causes an individual to become



Page 107

1   accustom to the mechanism, the operation of the

2   weapon, and then just your muscle memory or

3   training, again, and repeat a process of clearing

4   the weapon before they determine, in fact, it's

5   safe.

6           MS. KATZ:  Okay.  I don't have any other

7   questions.

8           MR. SWEENEY:  I have no other questions.

9           (Whereupon, signature not having been

10  waived, the taking of the deposition concluded at

11  1:19 p.m.)

12                      *    *    *

13

14

15

16

17

18

19

20

21

22



# EXHIBIT 22

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,        :

et al.,                            :

                                   :    Case No:

         Plaintiffs                :    16-cv-3311-MJG

                                   :

             -vs-                  :    Pages 1 - 229

                                   :

LAWRENCE HOGAN, in his             :

capacity of Governor of            :

Maryland, et al.,                  :

                                   :

         Defendants                :

------------------------------X

Deposition of Diane S. Armstrong

Baltimore, Maryland

Friday, March 23, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  391104

MAGNA LEGAL SERVICES

(866) 624-6221



JA1561

Page 9

1      Q.   All right.  Now, what is your position

2  with the Maryland State Police?

3      A.   My position is office supervisor for the

4  civilian staff for the Handgun Qualification License

5  Unit.

6      Q.   All right.  I'm going to mark as

7  Exhibit 43 a copy of the deposition notice and

8  subpoena for today's deposition.

9           (Armstrong Exhibit No. 43, Notice of

10  Deposition and Subpoena, was marked for

11  identification and retained by Mr. Scott.)

12          (Mr. Hansel entered the deposition room.)

13          MR. SWEENEY:  Morning, Cary.

14          MR. HANSEL:  Morning.

15          MR. SWEENEY:  You didn't miss anything.

16          MR. HANSEL:  Good.

17  BY MR. SWEENEY:

18      Q.   Ms. Armstrong, I'd ask you to take a look

19  at the document I've marked as Exhibit 43.  The

20  first three pages are the deposition notice for the

21  Maryland State Police.  The next three pages are the

22  subpoena for that deposition, and then there are



Page 113

1   number of times that you've received these e-mails

2   and phone calls?

3        A.   I do not keep track of them individually.

4   You have all the e-mails that we've received, and

5   the phone calls, we don't keep track of the phone

6   calls so I cannot give you a number.

7        Q.   Referring you to paragraph eight of the

8   declaration, Exhibit 47, what do you do when asked

9   to assist citizens who have inadvertently created

10  multiple accounts and initiated multiple

11  applications?

12       A.   Well, we have one applicant that created

13  nine accounts, and when they create nine accounts or

14  multiple accounts, then we have to refer them over

15  or we refer it over to our IT section for them

16  'cause they have to delete the accounts.

17       Q.   All right.  So is it the practice when

18  individuals have initiated multiple accounts that

19  you refer them to IT for the deletion of those

20  multiple accounts?

21       A.   If we cannot figure out their information

22  on the phone with them, then we do not have the



Page 114

1    ability to move any further.

2         Q.   All right.  So at that point, the citizen

3    is referred to another part of the Maryland State

4    Police, its IT unit?

5         A.   No.  We contact the IT section on their

6    behalf, and then we get back to this applicant when

7    it's corrected.

8         Q.   And the correction in the instance of

9    multiple applications is the multiple applications

10   in the system are canceled out?

11        A.   I don't know the process on that so I

12   can't answer that.

13        Q.   What is it that you give back to the

14   applicant and tell them that has resolved the

15   problem of their multiple applications?  What do you

16   say to them?

17        A.   We give them the user ID and assist them

18   with resetting their passwords.

19        Q.   And you would be resetting it on one of

20   their existing applications in the system?

21        A.   Correct.

22        Q.   And to your knowledge, what happens to



Page 115

1    those other multiple applications that were in the

2    system when you reset the existing application?

3         A.    I can't -- I don't know what happens to

4    them.

5         Q.    In the course of doing that, do you obtain

6    the unique user name and password of any applicants?

7         A.    To reset their account?

8         Q.    Yes.

9         A.    No.  We have access to their user name,

10   but we don't have access to passwords.

11        Q.    Do you ever request the password of an

12   applicant?

13        A.    If they want us to reset the password for

14   them, they have to give us a password.

15        Q.    And do you do that?

16        A.    On occasion, yes.

17        Q.    Do you know how often you do that?

18        A.    Not very often.

19        Q.    And do you do anything special to

20   safeguard the password that you obtained from the

21   HQL applicant for that purpose?

22        A.    We don't write it down or, if we do, we



JA1565

Page 117

1    applicants that contain their passwords?

2              MR. SCOTT:  Objection.  Go ahead.

3              THE WITNESS:  I believe everything is

4    encrypted, but I can't answer on what the server

5    does, what the IT section does with those e-mails.

6    BY MR. SWEENEY:

7         Q.   Paragraph nine you refer to one qualified

8    handgun instructor creating fictional accounts in

9    order to walk his students through the HQL

10   application process; am I correct?

11        A.   Correct.

12        Q.   Earlier today we talked about a qualified

13   handgun instructor who had contacted you and talked

14   about creating a fictional account.  Is this the

15   same instructor?

16        A.   Yes.

17        Q.   Do you know if that instructor has ever

18   created more than one fictional account for the

19   purpose of walking his students through the HQL

20   application process?

21        A.   I do not know.

22        Q.   Do you know of any other qualified handgun



Page 124

1              THE WITNESS:  I can't answer that.  I

2    don't know their requirements.

3    BY MR. SWEENEY:

4        Q.    All right.  How many applications have

5    been initiated by individuals who are younger than

6    21 in the HQL system?

7        A.    I can't give you an answer to that.  I

8    don't know the number.

9        Q.    Is there anyone who can tell me that

10   number?

11       A.    Not to my knowledge.

12       Q.    In paragraph 11 you say, "MSP personnel

13   have initiated numerous applications for testing

14   purposes."  How do you know that?

15       A.    Because I, personally, have done it.

16       Q.    And how many applications have you

17   initiated for testing purposes?

18       A.    Five.

19       Q.    And do you know how many other

20   applications MSP personnel have initiated for

21   testing purposes?

22       A.    No, I do not know that.



JA1567

# EXHIBIT 23

```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MARYLAND

3   MARYLAND SHALL ISSUE, INC.,   :

4   et al.                        :

5                    Plaintiffs,  :

6     v.                          : Civil Case No.

7   LAWRENCE HOGAN, et al.        : 16-cv-3311-MJG

8                    Defendants.:

9                    -----------

10        CONTAINS CONFIDENTIAL INFORMATION

11        Deposition of SCOTT THOMAS MILLER

12             Baltimore, Maryland

13           Tuesday, March 27, 2018

14                 2:07 p.m.

15

16

17

18

19

20  Job No.:  179483

21  Pages:  1 - 37

22  Reported By:  Dawn M. Hart, RPR/RMR/CRR
```

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                              9

1    basically how it was.  They contacted me and said,

2    hey, we, you know, we see that you might be a good

3    member for this.  Are you willing to go forward with

4    it?  And I said yeah.

5        Q    Who contacted you about that?

6        A    Oh, man.  I've -- I do know that Mark -- I

7    have talked to Mark Penick about it.  However, I

8    remember speaking on the phone with a female and

9    giving her a little bit of my background, answering

10   some of her questions.  Unfortunately I can't remember

11   what her name is.

12       Q    How did the request for volunteers come to

13   you?

14       A    I want to say it was just a verbal request

15   at one of the meetings.  It would either be that or

16   through email, but I'm pretty sure they just said, you

17   know, anybody who's willing, just sign up, put your

18   name down, so I did that.

19       Q    What prompted you to join MSI a year and a

20   half ago?

21       A    I want to purchase and own a handgun for

22   self-defense, and I don't like jumping through hoops

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                              10

1    and paying for licenses and classes that I don't feel

2    are helpful or necessary.

3        Q    So it was -- was it the HQL law in

4    particular that prompted you to join MSI?

5        A    Yeah, that's one of the main things, yep.

6        Q    When did you first find out about the HQL

7    law?

8        A    Probably about two years ago when I went to

9    the sporting goods store and was hoping to purchase a

10   handgun and found out about it that way.

11       Q    When did you decide you wanted to buy a

12   handgun?

13       A    I wouldn't say there was any time when I

14   concretely made up my mind about it.  It's just that I

15   feel like as an adult male, I should be able to defend

16   my life and my home and my property.  And now that I

17   have, you know, a full-time job, I can afford things

18   like that.  So I mean, yeah, at least for two years

19   I've been wanting to own a handgun.

20       Q    Do you own any firearms right now?

21       A    I do.

22       Q    What do you own?

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                                    11

1       A    I just own one sporting shotgun.

2       Q    A long gun?

3       A    Yeah.

4       Q    And when did you get that?

5       A    That was given to me by my father last

6    Thanksgiving.

7       Q    And have you shopped for a handgun?  Do you

8    know what you would buy?

9       A    Yeah.  Yeah.  I mean I've done lots of

10   research online just in my free time.

11      Q    How much are you thinking about spending?

12      A    Like three or $400.

13      Q    And you have sufficient funds or credit that

14   would enable you to do that?

15      A    I can come up with the funds.  At this time

16   I wouldn't have the money to spend on that, but you

17   know, if I was eligible to purchase a handgun, I would

18   be able to save up and buy one within a reasonable

19   amount of time.

20      Q    What's your annual income?

21      A    I'm not salaried.  Do you want to know what

22   my gross income was last year?

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                    17

1       Q    So your off days, it looks like, would be
2   Tuesday, Thursday, Friday?
3       A    That's correct.  And I go to school on
4   Tuesday and Thursday afternoons.
5       Q    Where are you going to school?
6       A    Anne Arundel Community College.
7       Q    Do you have a computer at home?
8       A    I do.
9       Q    Do you have internet access?
10      A    I do.
11      Q    Do you have a credit or debit card?
12      A    I do.
13      Q    Do you have a Maryland driver's license?
14      A    Yes.
15      Q    Do you have access to a scanner?
16      A    Yes.
17      Q    Have you ever been the victim of criminal
18  violence?
19      A    No.
20      Q    And it's my understanding -- well, I think
21  you said it earlier -- that you've been deterred from
22  purchasing a handgun because of the requirements of

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                          18

1    the HQL law; is that right?

2              You have to say --

3        A    Oh, sorry.  Yes.

4        Q    And what is it about -- well, before I get

5    into that, what is your understanding of what you

6    would need to do in order to get an HQL?

7        A    My understanding is that you need to take a

8    handgun safety course, you need to be fingerprinted,

9    you need to submit an application for the HQL, pay a

10   fee, and then I suppose wait for the State Police to

11   issue you your card.

12       Q    And what is your understanding of how much

13   it would cost you to fulfill all those requirements?

14       A    I believe -- so my sister's boyfriend just

15   went through the process.  I think he paid about $160.

16   I think that was everything included.  I'm not sure

17   how much time it took him.  I think he just attended

18   like a week-long evening class.

19       Q    What's your understanding of how long the

20   handgun safety training takes?

21       A    I would imagine it's probably like a 10-hour

22   course.

USCA4 Appeal: 21-2017    Doc: 25-4       Filed: 08/03/2022      Pg: 152 of 449

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                              19

```
1        Q    And that's based on your conversation with
2   your sister's boyfriend?
3        A    Uh-huh.
4        Q    Is that right?
5        A    Yes.
6        Q    Have you done any research to determine how
7   long the courses are other than talking to your
8   sister's boyfriend?
9        A    Well, I have myself taken a hunter safety
10  course.  It was an online class which I was able to do
11  in between school semesters this winter, and I
12  completed that class.  However, they only -- the
13  only -- you have to go to a field day, and the only
14  field day they offered was in August.  So I'm waiting
15  until August to be able to go and prove that I learned
16  the material.
17       Q    Is this a Maryland hunter's safety course?
18       A    Yeah, uh-huh.
19       Q    So you've completed the actual coursework
20  but you need to go to one final --
21       A    Yeah.  You have to show up in person and
22  perform whatever operation of a firearm, and I think
```

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                           20

1    take a written test as well.

2          Q    And you're planning to do this in August?

3          A    Yes.

4          Q    How long did it take you to complete the

5    online training?

6          A    It was a significant training because it's

7    not just firearm safety, it's also hunter -- hunting

8    safety.  I would -- I would estimate 15 hours.

9          Q    Do you hunt?

10         A    No, not currently.

11         Q    Do you plan to?

12         A    Not concretely.  However, when I do go in

13   August that will enable me to get a hunting license,

14   so ...

15         Q    What is it that prompted you to want to get

16   a hunting license?

17         A    Well, actually the HQL because my main goal

18   is to be able to own a handgun, and pardon me for

19   saying this, but it just seemed silly to take a class

20   just to prove that you can operate a handgun.  And so

21   I researched it and my brother told me that instead of

22   taking the handgun class, you can take the Maryland

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                    21

1    hunting safety class and use that as your firearms

2    training.  And so I figured that if I did that, at

3    least now I'm learning something about hunting, get a

4    little bit more value for my time and money.

5         Q    How much did you pay for the hunter's safety

6    training?

7         A    I think it was only $20.

8         Q    Have you done any research to find out how

9    long it would take, if you took just the HQL handgun

10   safety training, how long that would take?

11        A    I -- I mean I couldn't state exactly how

12   long it would take.

13        Q    I just want to know if you went online and

14   did any research to determine how long it would take.

15        A    No, I can't say I did.

16        Q    Have you done any research -- well, what's

17   your understanding of the fingerprint requirement for

18   the HQL?

19        A    Well, I have been fingerprinted before

20   because I was a volunteer EMT and you have to be

21   fingerprinted for that.  And the process was just we

22   went to some government building and the sergeant at

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                              22

1    my fire department accompanied me and performed the

2    fingerprint scanning where you just (indicating),

3    electronically print all 10 of your fingers, I think.

4    But I'm pretty sure that there's a separate fee for

5    that.  And you know, even though I went through that

6    fingerprinting and passed all the checks, you know, in

7    order to get the HQL I'll have to do another

8    fingerprinting.

9          Q    And have you done any research to determine

10   how long that would take you?

11         A    No.

12         Q    Have you done any research to determine how

13   much it would cost to get fingerprinted for the HQL?

14         A    No.  I think it's like a 50-dollar fee.

15         Q    And what's your source of that belief?

16         A    Because my sister's boyfriend told me that

17   when he signed up for the class, he paid a little

18   extra so that he didn't have to go somewhere else to

19   do the fingerprinting.  They did it all in-house.  So

20   I think he told me that he paid like $50 extra to get

21   that one.

22         Q    Do you know where you would need to go to

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                                     23

1   get the fingerprints done for the HQL?

2        A    No, I don't know where I would go to do

3   that.

4        Q    Have you done any research to determine

5   where it's available?

6        A    No.

7        Q    Have you ever looked at the HQL application?

8        A    I think I have, yes.  I'm pretty sure I

9   have.

10       Q    Did you do that online?

11       A    Yeah, that would have been online.

12       Q    On the Maryland State Police website?

13       A    That must have been where I got it from.

14  I'm pretty sure I've reviewed the document, yeah.

15       Q    Have you ever started to fill one out?

16       A    No, because I knew that without, you know, a

17  certified training course and fingerprints, there's no

18  use.

19       Q    And do you know how much the fee is

20  associated with the HQL application?

21       A    I don't know.

22       Q    It's my understanding that you contend that

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                              24

1    you've been deterred from purchasing a handgun because

2    of the HQL requirements; is that correct?

3         A    Yes.

4         Q    And what is it about the HQL requirements

5    that you contend has deterred you from purchasing a

6    handgun?

7         A    I'm a busy guy and I don't like spending

8    money on things that I feel are unnecessary or not a

9    good value to me.  I know how to operate handguns

10   safely.  I'm a law abiding citizen.  My job is to help

11   people in need.  So I just feel it's mostly a matter

12   of principle.  I don't want to, you know, waste my

13   time and money.

14             But besides that, I'm very busy.  I mean, as

15   I told you, I work, you know, 10-hour shifts and

16   sometimes that leads to really long nights, and I'm

17   also in school.  So for me to, you know, go through

18   that, that's pretty much taking up my only day of the

19   week off, which is already going towards running

20   errands and, you know, doing other necessary tasks.

21        Q    So aside from the inconvenience that you

22   just described, is there anything else about the HQL

USCA4 Appeal: 21-2017   Doc: 25-4      Filed: 08/03/2022    Pg: 158 of 449

CONFIDENTIAL
Transcript of Scott Thomas Miller
Conducted on March 27, 2018                              25

1  that has deterred you from purchasing a handgun?

2       A    Well, thank you for mentioning the word

3  inconvenience because I think that's the word I was

4  searching for.

5            No, I wouldn't say so.  I'm not a fan of

6  firearm registration.  However, I have no reason to

7  believe that I'd be barred from owning one, so it's

8  mostly the inconvenience.  But I don't -- I just don't

9  feel that there's a need to be licensed to own a

10 handgun when other types of firearms you can own

11 without any type of licensure.

12      Q    Assuming that you purchased a handgun, would

13 you plan to carry it with you, or keep it in your

14 home, or both?

15      A    I would certainly keep it in my home.  I

16 would not be carrying it with me because as you're

17 probably aware, the Maryland State Police is very

18 withholding of their conceal carry permits and they do

19 not recognize conceal carry permits from other states.

20 So I don't believe that there would be any way for me

21 to legally carry a handgun with me.

22      Q    So you don't have any plans to obtain a

# EXHIBIT 24

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MARYLAND

 3    MARYLAND SHALL ISSUE, INC.,   :

 4    et al.                        :

 5                        Plaintiffs,:

 6       v.                         : Civil Case No.

 7    LAWRENCE HOGAN, et al.        : 16-cv-3311-MJG

 8                        Defendants.:

 9                        -----------

10        CONTAINS CONFIDENTIAL INFORMATION

11          Deposition of JOHN MATTHEW CLARK

12               Baltimore, Maryland

13               Tuesday, March 27, 2018

14                    9:05 a.m.

15

16

17

18

19

20    Job No.:  179483

21    Pages:  1 - 33

22    Reported By:  Dawn M. Hart, RPR/RMR/CRR
```

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                    13

```
 1        A    Yes.

 2        Q    Do you own any firearms?

 3        A    Yes.

 4        Q    How many?

 5        A    One.

 6        Q    What type?

 7        A    Handgun.

 8        Q    What type of handgun?

 9        A    9-millimeter.

10        Q    When did you get it?

11        A    September 2013.

12        Q    Does anybody else in the home own any

13  firearms?

14        A    No.

15        Q    Do you have an HQ -- do you know what an HQL

16  is?

17        A    Yes.

18        Q    Do you have one?

19        A    No.

20        Q    And the 9-millimeter gun that you have, how

21  is that stored?

22        A    A lockbox.
```

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                              14

1      Q     How often do you use it?

2      A     Just occasionally, to punch holes in paper.

3  Target practice.

4      Q     Okay.  Got you.

5            Do you go to a range for that?

6      A     Yes.

7      Q     Which range?

8      A     Hap Baker in Carroll County.

9      Q     How far is that from your house?

10     A     Maybe two miles.

11     Q     Have you ever owned any other firearms?

12     A     No.

13     Q     How much did you pay for the gun?

14     A     Maybe 400 and change.

15     Q     Did you buy it new?

16     A     Yes.

17     Q     You have been identified in some discovery

18  responses in this case as someone who has been

19  deterred from purchasing a handgun by the requirements

20  of obtaining an HQL.  Are you aware of that?

21     A     Yes.

22     Q     Okay.  What is your understanding of what

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 163 of 449

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                               15

1    you would need to do to obtain an HQL?

2         A     See if I can remember.  I'm exempt from the

3    training because I previously owned a firearm, a

4    handgun, if I remember right.  I would have to find

5    some place to have fingerprints taken, and pay, I

6    believe it's a 75-dollar fee to the State, and I think

7    that's it.

8         Q     And these requirements have deterred you

9    from purchasing a handgun?

10        A     Yes.

11        Q     What other handgun do you want to buy?

12        A     I want to get -- mine's a small conceal

13   carry.  I wanted a larger, more comfortable to hold.

14        Q     And why do you want this larger gun?

15        A     Just more comfortable.

16        Q     Do you have a particular type of handgun in

17   mind that you want to purchase?

18        A     Another 9-millimeter.

19        Q     And have you shopped for that?

20        A     No.

21        Q     Do you know how much it would cost?

22        A     Probably about the same, four to 500.

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                              16

1        Q     Have you done any research to determine

2   where you could have your fingerprints taken if you

3   decided to apply for an HQL?

4        A     I did when it -- when the requirement first

5   came out.  The place I would have used was Carroll

6   County Sheriff's Office.  The new Sheriff dropped the

7   program.

8        Q     When you say you did the research when the

9   requirement first came out, are you saying in 2013?

10       A     Yes.

11       Q     So that would have been what time of the

12  year in 2013?  After you bought the gun that you have

13  now, or before?

14       A     After the law officially -- actually, it

15  would have been 2014 because it was after it became

16  law.

17       Q     And was there anything in particular that

18  prompted you to want to get this larger handgun at

19  that time?

20       A     When I bought the first one, I was beating

21  the clock for all the laws that were being enacted and

22  it was slim pickings so I didn't really have time to

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 165 of 449

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                    17

```
 1   really choose the one that I wanted.
 2        Q    And do you keep the gun for any other
 3   purpose other than target practice?
 4        A    Home defense.
 5        Q    Anything else?
 6        A    No.
 7        Q    You don't use it to hunt?
 8        A    No.
 9        Q    So other than -- well, when you found out
10   that -- how did you find out that the Sheriff in
11   Carroll County was no longer offering fingerprinting
12   services?
13        A    It was a bulletin on their website.
14        Q    Have you ever been fingerprinted before?
15        A    Yes.
16        Q    For what purpose?
17        A    Job at -- with the -- as a Defense
18   contractor.
19        Q    When was that?
20        A    1996, 1997.
21        Q    Is that the only time you've been
22   fingerprinted?
```

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                    18

1      A    I was fingerprinted once as a kid with some,

2 you know, I don't know what you call it.  It was in a

3 school, like with the child protection kidnaping

4 thing.

5      Q    Okay.  Any other times?

6      A    No.

7      Q    So once you found out that the Sheriff in

8 Carroll County was no longer offering fingerprinting

9 services, did you do any other research to determine

10 where you could get your fingerprints taken for an

11 HQL?

12     A    Just some very light research.

13     Q    What did you do?

14     A    Checked the forum messages at

15 Marylandshooters.com to see who else was looking in my

16 area.

17     Q    And did you -- is that a website?

18     A    Yes.

19     Q    And did you find out about any other

20 fingerprinting services that you could use to get an

21 HQL?

22     A    There were some.  I don't recall finding any

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                              19

1    in Carroll County, but there were others around with

2    varying fees.

3          Q    What were the fees, do you remember?

4          A    I think some were as high as 150.

5          Q    What was the low?

6          A    Seventy-five, I think.

7          Q    Did any of these places that offered

8    fingerprinting services for HQL licenses tell you that

9    you had to do the fingerprinting only during business

10   hours, Monday through Friday?

11         A    No, I did not go that far.

12         Q    So you don't know whether or not you could

13   have it done on a weekend or in the evenings; is that

14   correct?

15         A    Correct.

16         Q    Did you ever go on the Maryland State Police

17   website to look -- to research additional places where

18   you could have your fingerprints taken for an HQL

19   application?

20         A    I did once.

21         Q    And what was the result of that?

22         A    I honestly don't remember.  Their website

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                    20

1    was not the easiest to navigate.

2         Q    And what year was it that you looked at the

3    MSP website?

4         A    2014.

5         Q    Have you done any research since 2014 to

6    find out where you could have your fingerprints taken

7    for an HQL license?

8         A    No.

9         Q    What specifically about the HQL laws has

10   deterred you from purchasing a handgun?

11        A    Its existence.

12        Q    What about -- I mean what -- when you say

13   its existence, are there specific aspects of the law

14   that have deterred you?

15        A    I believe it to be unconstitutional.

16        Q    I understand that.  I'm asking you what

17   about the law has deterred you from purchasing a

18   handgun.

19             MR. HANSEL:  Objection.  Asked and answered.

20        A    I -- well, I can't purchase one without the

21   HQL, and I have to go and spend extra money to get the

22   HQL.

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                           21

```
1        Q     So it's the money that's deterred you, the
2   cost?
3              MR. HANSEL:  Objection.
4        A     And the principle.
5        Q     When you say the principle, what do you
6   mean?
7        A     That I believe it to be unconstitutional.
8        Q     All right.  So the fact that you believe
9   it's unconstitutional has deterred you, the cost has
10  deterred you.  Is there anything else that's deterred
11  you from getting the HQL?
12       A     No.
13       Q     How did you learn that you needed an HQL to
14  purchase a handgun in Maryland?
15       A     The Marylandshooters.com website.
16       Q     And what is your -- so you told me that the
17  fingerprinting would cost, based on your research,
18  between 75 and $150, right?
19       A     Yes.
20       Q     And you said you believed that the HQL fee
21  that you have to pay to the State is $75, correct?
22       A     Correct.
```

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                          22

1        Q     Are there any other costs associated -- that
2   you believe are associated with obtaining an HQL?
3        A     Only -- I believe there is a renewal fee
4   every five years, I think.
5        Q     And how much is that?
6        A     I'm not sure.  I know it's less than -- I
7   believe it's less than 75.
8        Q     Are there any other costs that you believe
9   you have to pay to get or keep an HQL other than the
10  fingerprinting, the fee paid to the State and the
11  renewal fee?
12       A     For me personally, no.
13       Q     And you believe you're exempt from the
14  training requirement; is that right?
15       A     Yes.
16       Q     How did you learn that?
17       A     It was one of the exemptions listed on the
18  MSP website.
19       Q     Have you ever called anybody at MSP and
20  talked to them about an HQL application or the
21  requirements for an HQL permit?
22       A     No.

CONFIDENTIAL
Transcript of John Matthew Clark
Conducted on March 27, 2018                                    23

```
1         Q     Have you ever begun an HQL application?

2         A     No.

3         Q     Have you done any research to determine how

4    long it would take you to get your fingerprints done

5    for an HQL application?

6         A     No.

7         Q     So sitting here today, you don't know how

8    long that would take; is that correct?

9         A     I mean I could guess that it would be --

10              MR. HANSEL:  Don't guess.  Just answer.

11   He's asking if you know one way or the other.

12        A     No, I do not know.

13        Q     How often do you go to the shooting range

14   for target practice?

15        A     It varies.  Usually at least once a month.

16        Q     Have you ever been the victim of criminal

17   violence?

18        A     No.

19        Q     Has anybody in your family ever been the

20   victim of criminal violence?

21        A     Yes.

22        Q     Who?
```

# EXHIBIT 25

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3      - - - - - - - - - - - - -x

 4    MARYLAND SHALL ISSUE,     :

 5    INC., et al.,             :

 6             Plaintiffs,      :    Civil Case No.

 7       v.                     :    16-cv-3311-MJG

 8    LAWRENCE HOGAN, et        :

 9    al.,                      :

10             Defendants.      :

11      - - - - - - - - - - - - -x

12

13                     CONFIDENTIAL

14         Deposition of ATLANTIC GUNS, INC.

15       By and through its Corporate Designee,

16              STEPHEN SCHNEIDER

17              Baltimore, Maryland

18            Tuesday, March 6, 2018

19                  10:00 a.m.

20    Job No.:  178307

21    Pages:  1 - 75

22    Reported By:  Janet A. Hamilton, RDR
```

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                    20

1    question.

2        A   Oh, I'm sorry.

3        Q   Can you identify by name any of the

4    customers who have told you that it took more than

5    a month for them to get their HQL after the

6    application was submitted?

7        A   No, I cannot.

8        Q   Let me show you what was previously marked

9    in this case as Exhibit 2.  This is a copy of the

10   Amended Complaint that's been filed in the case.

11   On page 2, paragraph number 3, there is an

12   allegation that Maryland's Handgun Qualification

13   License is lengthy, expensive, and then

14   parentheses, totaling hundreds of dollars in fees,

15   costs and travel, not counting time off from work.

16       Other than the costs that you've already

17   identified are there any other costs that are

18   included in that hundreds of dollars that is

19   alleged in the complaint that it cost, allegedly

20   costs to get an HQL?

21       A   No, not that I can think of.

22       Q   Let me direct your attention to paragraph

USCA4 Appeal: 21-2017   Doc: 25-4     Filed: 08/03/2022     Pg: 175 of 449

```
 1   26 in the complaint which is Exhibit 2.  Feel free
 2   to take as much time as you need to look at it.
 3        A  Sure.
 4        Q  I'm going to direct your attention to some
 5   specific statements in this paragraph.  It says
 6   near the end of the paragraph, there's a sentence
 7   five lines from the bottom that starts "Atlantic
 8   Guns' customers routinely expressing interest in
 9   purchasing."  Do you see that sentence?
10        A  Yes, I do.
11        Q  It continues -- well, I'll start from the
12   beginning.  "Atlantic Guns' customers routinely
13   express an interest in purchasing handguns, but
14   Atlantic Guns cannot sell them handguns because of
15   the HQL requirement," and then the next sentence,
16   "Many of these customers are deterred from
17   completing the HQL application process because of
18   the expense and inconvenience of the HQL
19   application process and its constituents parts."
20   As Atlantic Guns' designee can you identify any
21   potential customers of Atlantic Guns that have
22   been deterred from completing the HQL application
```

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                                              22

1    process because of the expense and inconvenience

2    of the HQL requirements?

3        A   Are you asking me can I identify them by

4    specific name?

5        Q   Correct.

6        A   No, I cannot.

7        Q   Going back up in the same paragraph it

8    says that, this is about halfway down, it says,

9    "Atlantic Guns has suffered and continues to

10   suffer."  Do you see that?

11       A   Mm-hmm.

12       Q   Yes?

13       A   Yes, I do.

14       Q   "Atlantic Guns has suffered and continues

15   to suffer a significant reduction in business in

16   a" -- excuse me -- "a significant reduction in its

17   business due to the HQL requirement."  What

18   evidence does Atlantic Guns have that it has

19   suffered and continues to suffer a significant

20   reduction in business as a result of the HQL

21   requirement?

22           MR. HANSEL:  Objection.  Form.

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                                    23

1      A  We -- the -- our handgun sales have

2  suffered after the 2013 law went into effect.

3  We -- the number of firearm, handguns specifically

4  that we're selling has declined at both our

5  locations due to the law.

6      Q  And what evidence do you have that

7  demonstrates those assertions?

8          MR. SWEENEY:  Objection.

9          MR. HANSEL:  Objection as to "evidence."

10     A  Sales figures.  We have also -- we have a

11  count of the number of firearms that we've sold,

12  of handguns that we've sold that would also bear

13  that out.

14     Q  And we'll get into that in a second.  Is

15  there anything else other than the number of

16  handguns sold at your stores that demonstrates

17  that Atlantic Guns has suffered and continues to

18  suffer significant reduction in business due to

19  the HQL law?

20     A  Not that I can think of.  That's the

21  primary factor that we would use to judge that.

22     Q  And does Atlantic Guns have any evidence

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                           24

1    that the reduction in handgun sales at your stores

2    was caused exclusively by the HQL requirement and

3    not by anything else?

4          MR. HANSEL:  Objection.

5       A  I don't have any factual basis for that,

6    no.

7       Q  Can you quantify the reduction in business

8    that you contend Atlantic Guns has suffered as a

9    result of the HQL law?

10         MR. SWEENEY:  Objection.

11      A  I can quantify it, and I believe it is in

12   one of the exhibits that we have that shows both a

13   revenue figure and a total number of handguns sold

14   by specific years, I believe from 2010 through

15   2017.

16      Q  All right.  But -- and so you can't tell

17   me without looking at the documents?

18      A  I don't remember exactly in my head

19   exactly.

20      Q  All right.  Well, we'll look at those in a

21   bit.  Right now I'm just trying to get what you

22   can tell me without looking at the documents.

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                                    60

1    discovery from your attorney.  Can you tell me

2    what this is?

3        A   It is a document that we prepared,

4    Atlantic Guns prepared to give to our customers

5    that give information about the Handgun

6    Qualification License, what is required to obtain

7    a qualification, a Handgun Qualification License.

8        Q   So this is something that you give out to

9    potential customers when they make inquiry about

10   what they need to do to get an HQL; is that right?

11       A   That is correct.

12       Q   And this was prepared -- who -- did you

13   prepare this?

14       A   I had a hand in preparing it.  I can't say

15   that I was the one that solely prepared it.  I

16   think it was we prepared this probably several

17   years ago, maybe have updated it.  Some of my

18   employees may have also worked on it.  That I

19   cannot remember.

20       Q   Other than providing the information on

21   Exhibit 32 is there anything else that Atlantic

22   Guns does to provide assistance to customers or

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                    61

1   potential customers concerning the HQL process?

2        A   Yes.   Of course it's in our best interest

3   to qualify as many people or have qualified as

4   many people as possible to enable them to purchase

5   a handgun from us.   So, yes, we assist in any way

6   we possibly can.   In fact at the bottom of this

7   Exhibit 32 we note that if you're having trouble

8   with this process, Atlantic Guns would be happy to

9   help you at either one of our stores, and we do

10  this frequently by helping customers to navigate

11  the State Police's system explaining the process,

12  going through the process.

13           We have a number of elderly customers that

14  can't navigate computers, that are not computer

15  literate, and if we were not able to help them,

16  they would not be able to purchase a handgun

17  because they would not be able to get the HQL, and

18  that is also true with the process for the 77R

19  which is also automated as of 2017.

20       Q   Can you identify by name any elderly

21  customers that you contend would not be able to

22  get an HQL because they're not computer literate

USCA4 Appeal: 21-2017    Doc: 25-4       Filed: 08/03/2022    Pg: 181 of 449

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                           62

```
 1    but for the assistance of Atlantic Gun?

 2        A  I cannot.

 3        Q  Has Atlantic Guns had any communications

 4    with, any verbal communications with the Maryland

 5    State Police concerning the HQL law?

 6        A  Since the law went into effect I'm sure

 7    that we have had some communication with them

 8    concerning the implementation of the law and how

 9    it affects us.  I can remember one instance in

10    particular that I was involved in that pertained

11    to a law enforcement officer that was not a

12    Maryland -- that was a Maryland resident but was

13    not an officer of a Maryland agency or a federal

14    agency that wished to purchase a handgun as an

15    off-duty weapon.  He was a DC police officer that

16    lived in Maryland.  He did not own any personal

17    firearms.  He did not have an HQL.  We submitted

18    an application which was rejected because he was

19    not, because he was not a Maryland officer or

20    federal officer, and we were unaware at that time

21    that the law specifically excluded any law

22    enforcement officer that was not in those two
```

USCA4 Appeal: 21-2017    Doc: 25-4       Filed: 08/03/2022      Pg: 182 of 449

1  jurisdictions, either federally or state.  That

2  was one instance where I contacted the State

3  Police directly myself and asked them about that,

4  and they responded that, yes, the officer did need

5  an HQL, and in essence, to rub salt into the

6  wound, the officer had to take a four-hour

7  training course to get the HQL.

8      Q  And who did you talk to at the State

9  Police about this?

10     A  I cannot remember at the time.  It was

11  three, two or three, four years ago that that

12  happened.

13     Q  And do you have any specific recollection

14  of what this person that you spoke to at the

15  Maryland State Police said other than what you've

16  already told me?

17     A  Just that it, that the law was,

18  specifically stated that the only law enforcement

19  officers that were exempt from having an HQL were

20  ones that were an officer of a Maryland law

21  enforcement agency or federal law enforcement

22  agency.

CONFIDENTIAL
Transcript of Stephen Schneider, Corporate Designee
Conducted on March 6, 2018                                    64

1       Q   And can you identify by name this DC

2   police officer who had to go get the HQL?

3       A   I could.  It would take some time to do it

4   because he ended up getting an HQL which he was

5   very upset about.  I remember distinctly that it

6   was an officer in DC that -- I mean this goes back

7   three, four years.  He was attacked in his cruiser

8   by a man wielding a hammer and was beaten pretty

9   badly.  It made the news.  He came in the store to

10  get an off-duty firearm because he was, you know,

11  I guess afraid for himself and wanted an off-duty

12  weapon to keep at home as a Maryland resident.

13      Q   Right.  But my question is sitting here

14  today can you identify this officer by name?

15      A   I cannot.

16      Q   Do you have any recollection -- as

17  designee of Atlantic Guns, are you aware of any

18  other verbal communications with the Maryland

19  State Police concerning the HQL other than what

20  you've already described?

21      A   Myself personally, no, I cannot.

22      Q   Well, I'm asking you also as a designee of

Case 1:16-cv-03311-ELH   Document 140-10   Filed 03/08/21   Page 1 of 1

# PLACEHOLDER FOR
# EXHIBIT 26
# FILED UNDER SEAL

# EXHIBIT 27

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.,*    *

    *Plaintiffs,*    *

    v.    *    Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.,*    *

    *Defendants.*    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF LIEUTENANT PADRAIC LACY

I, Lieutenant Padraic Lacy, under penalty of perjury, declare and state:

1.    I am a Lieutenant in the Maryland State Police ("MSP").  I am more than 18 years of age and am competent to testify, upon personal knowledge, to the matters stated below.

2.    I have been a sworn officer with MSP for more than 27 years.  During that time, I have served in a variety of MSP units.  For the past three and a half years, I have worked in the Licensing Division of MSP.  I currently serve as Assistant Commander of the Licensing Division.

3.    As the Assistant Commander of the Licensing Division, I assist the Division Commander manage and oversee all day-to-day operations of the sworn and civilian personnel within the Licensing Division's Firearms Services Section and Professional Licensing Section.  Within the Firearms Services Section is the Handgun

JA1609

Qualification License ("HQL") Unit, Firearms Registration Unit, Handgun Permit Unit, and the Inspection and Compliance Billing Unit.

4.      Attached hereto as Exhibit 1 is a chart derived from the records of the Licensing Division showing the number of HQL applications and Firearms Registration Applications ("FRS") for the State of Maryland for calendar years 2017, 2018, 2019 and 2020.

5.      As reflected on Exhibit 1, the total number of applications for transfers of regulated firearms in the State of Maryland in 2020 was 104,440, or an average of 2,009 per week.

6.      As reflected on Exhibit 1, in 2020, the Licensing Division received 66,526 HQL applications, or an average of 1,279 HQL applications each week.  Only 2,118 of the 66,526 HQL applications received in 2020 were denied.

7.      As reflected on Exhibit 1, the Licensing Division has issued 192,506 HQLs since October 1, 2013.


I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date:   3/1/21

LT. Padraic Lacy
Lieutenant Padraic Lacy
Maryland State Police

2

# EXHIBIT 1

| Licensing Division Weekly (52) Report 12/25/2020 through 12/31/2020 | 2017 Totals | 2018 Totals | 2019 Totals | 2020 Totals | 2017 Weekly Avg. | 2018 Weekly Avg. | 2019 Weekly Avg. | 2020 Weekly Avg. | Current Week Totals (2020) |
|---|---|---|---|---|---|---|---|---|---|
| FRS Total Apps Received | 51,851 | 53,544 | 53,726 | 104,440 | 997 | 1,030 | 1,033 | 2,009 | 1,799 |
| FRS Disapprovals | 175 | 206 | 245 | 594 | 3.4 | 4 | 4.7 | 11.4 | 6 |
| | | | | | | | | | |
| HQL New | 23,888 | 21,727 | 20,083 | 66,526 | 459 | 417.8 | 386.2 | 1,279 | 840 |
| HQL "New Resident" Apps | 0 | 0 | 0 | 1,226 | 0 | 0 | 0 | 23.6 | 15 |
| HQL Disapprovals | 566 | 641 | 769 | 2,118 | 10.9 | 12.3 | 14.8 | 40.7 | 46 |

**HQL Since 10/1/2013:** 192,506

# EXHIBIT 28

Pg: 190 of 449

Filed: 08/03/2022

Doc: 25-4

USCA4 Appeal: 21-2017

| Maryland Automated Firearms Services System (MAFSS) | | | | | | |
|---|---|---|---|---|---|---|
| Yearly Count of Firearm Transfers By Gun Type | | | | | | |
| ALL DEALERS | | | | | | |
| YEAR | GUN TYPES | | | | | TRANSFER COUNT | Handgun Transfers |
| | A | O | R | S | X | | |
| 2000 | 19,258 | 2,120 | 9,384 | 690 | 1,016 | 32,468 | 29,332 |
| 2001 | 14,320 | 1,289 | 7,204 | 720 | 1,122 | 24,655 | 22,244 |
| 2002 | 13,382 | 980 | 5,849 | 477 | 1,088 | 21,776 | 19,708 |
| 2003 | 12,690 | 1,172 | 5,717 | 120 | 1,195 | 20,894 | 18,527 |
| 2004 | 11,640 | 850 | 5,496 | 97 | 1,427 | 19,510 | 17,233 |
| 2005 | 13,429 | 1,017 | 5,653 | 142 | 1,630 | 21,871 | 19,224 |
| 2006 | 14,782 | 1,333 | 5,665 | 152 | 1,914 | 23,846 | 20,599 |
| 2007 | 17,025 | 1,842 | 6,024 | 209 | 2,706 | 27,806 | 23,258 |
| 2008 | 20,125 | 2,107 | 6,609 | 148 | 3,695 | 32,684 | 26,882 |
| 2009 | 24,346 | 1,718 | 7,752 | 107 | 5,757 | 39,680 | 32,205 |
| 2010 | 22,743 | 1,394 | 7,075 | 53 | 4,508 | 35,773 | 29,871 |
| 2011 | 26,142 | 1,393 | 7,540 | 100 | 4,502 | 39,677 | 33,782 |
| 2012 | 37,707 | 2,775 | 9,368 | 273 | 8,110 | 58,233 | 47,348 |
| 2013 | 74,677 | 18,818 | 14,680 | 733 | 25,351 | 134,259 | 90,090 |
| 2014 | 18,674 | 3,574 | 4,965 | 5,160 | 1,687 | 34,060 | 28,799 |
| 2015 | 21,607 | 4,077 | 5,844 | 7,300 | 500 | 39,328 | 34,751 |
| 2016 | 34,978 | 6,755 | 6,982 | 5,764 | 476 | 54,955 | 47,724 |
| 2017 | 43,551 | 5,192 | 7,717 | 833 | 100 | 57,393 | 52,101 |



EXHIBIT

92

4/11/18

MSP003207

# EXHIBIT 29

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,      :

et al.,                          :

                                 :   Case No:

            Plaintiffs           :   16-cv-3311-MJG

                                 :

            -vs-                 :   Pages 1 - 205

                                 :

LAWRENCE HOGAN, in his           :

capacity of Governor of          :

Maryland, et al.,                :

                                 :

            Defendants            :

------------------------------X


Deposition of James P. Russell, Jr.

Baltimore, Maryland

Monday, June 11, 2018


Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409351


MAGNA LEGAL SERVICES

(866) 624-6221



JA1615

Page 85

1        A.   No, 'cause I get numerous requests, and it

2    then it sends to my e-mail, which is Maryland.gov,

3    and that's how I get responses.

4        Q.   Now, as an HQL instructor, do you charge

5    any money?

6        A.   I do not.  No, sir.  I've never charged

7    any money for any of my services that I provide,

8    whether it be HQL, LEOSA, and/or qualification of

9    sworn and civilian personnel.

10       Q.   All right.  These 25 or 30 individuals

11   that you have certified as instructed under the HQL,

12   how did they come to you for instruction?  How did

13   they find you?

14       A.   Via e-mail, friends or family, you know,

15   have contacted me in regards to it, associates of

16   places, YMCA that I still continue to hang out, and

17   they talk and know I'm a firearms instructor.

18   Mostly it's just through contacts and acquaintances

19   that I have in Cecil County.

20       Q.   And where do you hold classes for HQL

21   instruction?

22       A.   Sure.  There's three different locations



Page 86

1   that I utilize, Elk Neck State Park, which is

2   located on Eayrestown Road in Cecil County.  It's a

3   state park there.

4        Q.   And they have classroom facilities there

5   for you to use?

6        A.   Classroom facilities and/or a setting

7   where we can actually, yes, teach and do the

8   classroom portion of it.

9        Q.   Okay.  Does that cost anything for you to

10  rent?

11       A.   No, sir.  It's a state park, and I'll say

12  this.  Mondays the park is closed to the public, and

13  they allow myself as a firearms instructor to use it

14  on Mondays for those purposes.

15       Q.   So --

16       A.   Can I?  I didn't mean to interrupt.

17  Additionally, I use Broad Creek Range, which is the

18  Harford County Sheriff's Office range.

19       Q.   Is that open to members of the public?

20       A.   No, sir.  That's a closed range for the

21  Harford County Sheriff's Office located on

22  Flintville Road.



JA1617

# EXHIBIT 30

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3              FOR THE DISTRICT OF MARYLAND
 4   - - - - - - - - - - - - - - - - x
 5   MARYLAND SHALL ISSUE, INC.,      :
 6   et al.,                          :
 7                    Plaintiffs,     :
 8          v.                        : Civil Case No.
 9   LAWRENCE HOGAN, et al.,          : 16-cv-3311-MJG
10                    Defendants.     :
11   - - - - - - - - - - - - - - - - x
12        Deposition of CARLISLE EATON MOODY, JR.
13                   Washington, D.C.
14               Wednesday, May 9, 2018
15                     10:09 a.m.
16
17
18
19
20   Job No.: 188208
21   Pages: 1 - 62
22   Reported by:  Karen Young
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                           29

```
 1        A    I can't remember.  I presume so, but I --
 2        Q    All right.
 3        A    It's been a while.
 4        Q    Are you aware of any updated data for the
 5   period -- from September 2015 to the present on
 6   that point?
 7        A    No.
 8        Q    And what is the source for the data you
 9   use in your analysis of the firearm homicide rate
10   in your report?
11        A    The CDC.  I use the WONDER, CDC WONDER
12   database, interactive.
13        Q    Center -- what does CDC stand for?
14        A    Center for Disease Control.
15        Q    And this is publicly available?
16        A    Yes, it's on line.
17        Q    And you believe it's reliable?
18        A    Yes.
19        Q    Why?
20        A    Because it's official.
21        Q    Any other reasons?
22        A    No.  Well, no.  That's why.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    30

```
1        Q    You also note on page 3 of your report

2   that the firearm homicide data upon which you base

3   your study includes justifiable homicides, which

4   are not crimes, correct?

5        A    Yes.

6        Q    Is that a yes?

7        A    Yes.

8        Q    All right.  How many of the firearm

9   homicides in 2010 in Maryland were justifiable?

10       A    There's no way to know that I don't

11  believe.

12       Q    So you don't know.

13       A    No.

14       Q    And is that also true for 2011?

15       A    Yes.

16       Q    2012?

17       A    Yes.

18       Q    2013?

19       A    Yes.

20       Q    2014?

21       A    Yes.

22       Q    2015?
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                          31

```
 1        A    Yes.

 2        Q    2016?

 3        A    Yes.

 4        Q    Does the firearm homicide data upon which

 5   you base your report include homicides committed

 6   with long guns?

 7        A    Yes.

 8        Q    How many of the firearm homicides in

 9   Maryland in 2010 were committed with long guns?

10        A    I don't know.  I just use the total.

11        Q    Do you know how many of the firearm

12   homicides in Maryland in 2011 were committed with

13   long guns?

14        A    No.

15        Q    2012?

16        A    No.

17        Q    '13?

18        A    No.

19        Q    '14?

20        A    No.

21        Q    '15?

22        A    No.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    32

```
1        Q     '16?

2        A     No.

3        Q     Does the firearm homicide data upon which

4   you base your study include homicides in the entire

5   state of Maryland?

6        A     Yes.

7        Q     Do you know what percentage of those

8   firearm homicides in 2010 occurred in Baltimore

9   City as opposed to the rest of the state?

10       A     No.

11       Q     Do you know what percentage of the

12  homicide -- firearm homicides in your study in 2011

13  occurred in Baltimore City as opposed to some other

14  part of the state?

15       A     No.

16       Q     2012?

17       A     No.

18       Q     '13?

19       A     No.

20       Q     '14?

21       A     No.

22       Q     '15?
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 201 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                          33

```
 1        A    No.

 2        Q    '16?

 3        A    No.

 4        Q    Are you familiar with the term

 5   "historical confounder"?

 6        A    No.

 7        Q    Okay.  Are you familiar with the events

 8   involving Freddie Gray?

 9        A    Not very.

10        Q    What do you know?

11        A    I believe Freddie Gray was a suspect in a

12   crime, arrested, put in the back of a police

13   vehicle, from which his body was recovered.

14        Q    And what's your understanding of when

15   that took place?

16        A    I do not know the exact date.

17        Q    Do you know the year?

18        A    Not -- 2015 I think, but I don't -- I'm

19   not positive.

20        Q    Are you aware of the civil unrest that

21   occurred in the wake of Freddie Gray's death in

22   Baltimore?
```

USCA4 Appeal: 21-2017    Doc: 25-4      Filed: 08/03/2022    Pg: 202 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    34

```
 1        A     It was on the news, yes.

 2        Q     And what is your understanding of what

 3   took place?

 4        A     There were riots.

 5        Q     And what's your source for that

 6   information?  Just the news media?

 7        A     Yes.

 8        Q     Anything else?

 9        A     No.

10        Q     Have you done any research into the

11   unrest that followed Freddie Gray's death?

12        A     No.

13        Q     Are you aware of any empirical facts or

14   data that show whether the number of firearm

15   homicides increased in Baltimore as the result of

16   the events that unfolded in the wake of Freddie

17   Gray's death?

18        A     Read that back to me please.

19              THE REPORTER:  Question:  "Are you aware

20   of any empirical facts or data that show whether

21   the number of firearm homicides increased in

22   Baltimore as the result of the events that unfolded
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                      35

```
 1   in the wake of Freddie Gray's death?"

 2            THE WITNESS:  No.

 3            MR. SWEENEY:  Objection.

 4   BY MR. SCOTT:

 5       Q    Did you make any attempt in your analysis

 6   for this case to account for the impact of the --

 7   of the unrest that followed Freddie Gray's death on

 8   the number of firearm homicides in Maryland?

 9            MR. SWEENEY:  Objection.

10       A    I attempted to control for the increase

11   in firearms death that occurred nationwide as a

12   result of the Ferguson effect, occurred a year

13   earlier, and I presume that that was sufficient to

14   control for the Freddie Gray incident, which

15   occurred later.

16       Q    So other than the attempt that you made

17   to account for the Ferguson effect, you didn't do

18   anything else to account for the events that

19   occurred in the wake of Freddie Gray's death in

20   Baltimore; is that correct?

21       A    Correct.

22       Q    You just referred to the Ferguson effect.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                  36

1    What is that?

2         A    The Ferguson, Missouri incident with the

3    -- at the start of the Black Lives Matter movement.

4         Q    And what is the effect?  What's the

5    phenomenon?

6         A    The effect was a stepping back -- you

7    know, a number of police killings, killings of

8    suspects, for example, that was one that caught

9    people's attention and caused both an increase in

10   the number of ambush killings of policemen, and

11   presumably some decline in the enthusiasm with

12   which policemen do their job.

13        Q    You -- you brought us a copy of the

14   Wikipedia page for the Ferguson effect, which I'll

15   have that marked please.

16             (Deposition Exhibit Number 112 was marked

17   for identification.)

18   BY MR. SCOTT:

19        Q    This is Exhibit 112, and I believe you

20   cite to that in your report, correct?

21        A    Uh-huh, correct.

22        Q    All right.  Did you read -- did you read

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    37

```
1    any of the sources that are cited in that Wikipedia

2    article?

3         A     Not that I remember.

4         Q     Have you ever relied on Wikipedia in any

5    of your published articles?

6         A     No.

7         Q     Do you know who authored this Wikipedia

8    article?

9         A     No.

10        Q     Do you know the last date on which it was

11   updated?

12        A     No.

13        Q     Did you make any attempt to determine

14   whether that Wikipedia page accurately described

15   what the Ferguson effect is?

16        A     Please read it back to me.

17              THE REPORTER:  Question:  "Did you make

18   any attempt to determine whether that Wikipedia

19   page accurately described what the Ferguson effect

20   is?"

21        A     No, I assumed it accurate -- it

22   accurately described it.
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 206 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                        38

```
1        Q    Are you aware of any empirical facts or

2   data that show whether the number of firearm

3   homicides increased in Maryland as a result of the

4   Ferguson effect?

5        A    I do not know -- I know -- I cannot

6   attribute it to the Ferguson effect.  That was just

7   a -- I don't know what the word is.  Hunch on my

8   part.

9        Q    And what was your hunch?

10       A    My hunch was that since firearm homicides

11  -- homicides in general are going up, after going

12  -- in the last two or three years, after going down

13  for many years, had something to do with police

14  killings and Black Lives Matter and the response.

15       Q    But as far as empirical facts or data

16  that show whether the number of firearm homicides

17  increased in Maryland as a result of the Ferguson

18  effect, you don't -- you're not able to identify

19  any.

20       A    Correct, cannot identify that.

21       Q    On page 8 of your report, you cite to a

22  number of states that adopted permit to purchase
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 207 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    53

```
1              MR. SWEENEY:  Objection.

2        A     Yes, I agree to that.

3        Q     You mentioned earlier when we were

4    talking about the Freddie Gray situation, that you

5    had made an attempt to account in your analysis for

6    this case for the Ferguson effect?

7        A     Correct.

8        Q     Can you tell me how you did that?

9        A     I looked at data outside of Maryland.

10       Q     And how did you -- what data did you look

11   at?

12       A     All of the states outside of Maryland.

13       Q     And how did you incorporate that data

14   into your analysis?

15       A     I believe it's on figure 2.  Those are

16   firearm homicide rates -- no, no, no, figure 2 on

17   page 4.

18       Q     Oh, I'm sorry.  You have table 2 and

19   figure 2.

20       A     Yeah, I do, I have, I have.

21       Q     Trying to trick us up.  Okay.

22       A     Yeah.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    54

```
1        Q    Page 4, figure 2.  So this is national
2    firearm homicide rates.
3        A    Correct.
4        Q    And according to this chart, they ticked
5    up it looks like approximately 2014, 2013?
6        A    2013 is the vertical line.
7        Q    Okay, got you.
8        A    So yeah, a little after that.
9        Q    So -- and how did this data -- how did
10   you account for this trend in the conclusions that
11   you reach with respect to firearm homicides in
12   Maryland?
13       A    I compared it using a number of
14   techniques, difference and differences, synthetic
15   controls, just looking at means across different
16   states.
17       Q    And what is the significance of the
18   up-tick in firearm homicide rates reflected on
19   figure 2 in your report?
20            MR. SWEENEY:  Objection.
21       A    Well, the theory is if you look at
22   Maryland by itself before and after 2013, the
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    55

1    firearm homicide rate was higher than it was before

2    -- just before 2013, and so did that fact mean that

3    the HQL law failed and in fact, wound up with more

4    homicides than there was before the law, and if you

5    look at the data for all the U.S., you find that

6    indeed, firearm homicide rates are up everywhere,

7    and so that would mean that we need to look at what

8    would have happened in Maryland controlling for the

9    fact that firearm homicide rates are up everywhere.

10        Q    And did you attempt to do that?

11        A    Yes, I did.

12        Q    And you did that through the synthetic

13   firearm homicide rates that you came up for for

14   Maryland?

15        A    That, and if you notice just before that,

16   I compared the firearm -- on page 5 in the second

17   paragraph, I just compared the percent change in

18   the homicide rate after 2013 for Maryland and for

19   states that did not have permit to purchase laws,

20   and found that the growth rate for Maryland was

21   about twice as high as those states.

22        Q    And did you identify the states in your

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 210 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                56

1    report that you considered to be non-permit states?

2        A    Well, in the -- in the -- there were --

3    all the states other than the states that have had

4    it for a long time, if you look -- if you look on

5    page 5, first paragraph under synthetic controls

6    method, they have the six states that changed the

7    permit law and then one, two, three, four, five,

8    six, seven, eight -- one, two, three, four, five,

9    six, seven, eight -- eight law -- eight states that

10   have had permit laws since before 1970, so they did

11   not change the law.  They can't be -- no way to

12   compare Maryland to those states, but nevertheless,

13   those are the states that had the law.  All the

14   other ones do not have the law.

15       Q    So you say here you've got 30 states that

16   you use as the donor pool of control states.

17       A    Yes, so they also include the -- the

18   states Maine, New Hampshire, North Dakota, South

19   Dakota, Vermont and Wyoming, which have missing

20   data in the CDC WONDER database, so that gives you

21   a grand total of 20 states.

22       Q    Did you do any analysis of firearm

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    57

```
1    homicide rates in urban areas where there have been
2    publicized police killings of suspects during the
3    study period?
4         A     No.
5         Q     Do you know Professor Kleck?
6         A     By reputation.
7         Q     Have you ever met him?
8         A     He once reviewed a paper that I submitted
9    at a conference, and so he was the referee after --
10   after I gave my paper, he gave his.
11        Q     Which paper was that?
12        A     Oh, I can't remember.  None of these.
13        Q     Well, what about on your -- is it listed
14   on your C.V.?
15        A     Yes, but not -- it's not a refereed
16   publication.
17        Q     Okay, I thought you said that he refereed
18   it for you.
19        A     Well, what happens in these conferences
20   is that I give a paper, and then somebody comments
21   on that paper.  That's what I meant by refereeing,
22   so he commented on my paper.  That's --
```

# EXHIBIT 31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,   *

    *Plaintiffs,*   *

    v.   *       Civil Case No. 16-cv-3311-ELH

LAWRENCE HOGAN, *et al.*,   *

    *Defendants.*   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF MARY SCANLAN

I, Angela Maggitti, under penalty of perjury, declare and state:

1.    I am an executive associate in the Office of the Attorney General of Maryland. I am over the age of 18 and am competent to testify, upon personal knowledge, to the matters stated below.

2.    Attached as Exhibit 28 to Defendants' Reply Memorandum in Support of Motion for Summary Judgment and Response in Opposition to Plaintiffs' Cross-Motion for Summary Judgment is a true and correct copy of Exhibit 92 to Captain Andy Johnson's Deposition, Maryland Automated Firearms Services System (MAFSS) Yearly Count of Firearm Transfers by Gun Type.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date:  _3/5/2021_                               _____
                                        Mary Scanlan

# Exhibit 1

Daniel Webster

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,        :

et al.,                            :

                                   :   Case No:

          Plaintiffs               :   16-cv-3311-MJG

                                   :

              -vs-                 :   Pages 1 - 337

                                   :

LAWRENCE HOGAN, in his             :

capacity of Governor of            :

Maryland, et al.,                  :

                                   :

          Defendants               :

------------------------------X

Deposition of Daniel Webster, Ph.D.

Washington, D.C.

Wednesday, June 13, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  409352

MAGNA LEGAL SERVICES

(866) 624-6221

JA1638

Daniel Webster

Page 43

1          They did something that Nebraska does,

2    which is, if you are purchasing a regulated firearm

3    from a licensed firearm dealer, that you do not have

4    to produce a current valid permit or license for

5    those, for those exchanges.  So now there are nine

6    states that have those.

7          Q.    And what are those remaining nine states?

8          A.    Those remaining -- and the District of

9    Columbia as well has something that basically is the

10   same thing as a license, but, so the current states

11   that have these laws include Connecticut,

12   Massachusetts, New York, New Jersey, Hawaii,

13   Maryland, of course, Illinois, North Carolina, Iowa.

14         Q.    That's a total of nine.

15         A.    Okay.  I got the nine.  Okay.  Thank you.

16         Q.    I didn't want you to struggle if you got

17   them all.  I didn't want to cut anything off if you

18   had more in mind.

19         A.    No, that's the right number.

20         Q.    Now, do you know Connecticut's

21   requirements compared to Maryland?  Are they the

22   same?

Daniel Webster

Page 44

1      A.    No, they are not the same.  So no, none of

2  those states are exactly like Maryland.  So one

3  similarity between Connecticut and Maryland is that

4  they both require, they both require safety training

5  before you can get it.  They both require

6  fingerprinting.  They both require, in addition to

7  having a valid permit or license, that at a point of

8  sale there is still an initial background check

9  done.

10           Those are the things that I can recall

11  right now that are similar between Connecticut

12  and -- the issuance is different in that Connecticut

13  you go directly to the law enforcement agency as

14  opposed to Maryland.

15      Q.    All right.  And do you know what the

16  requirements for the training in Connecticut are

17  compared to Maryland?

18      A.    They are longer I know.  I know the course

19  requirement is, like, an eight-hour course as

20  opposed to a four-hour course.

21      Q.    They require the basic NRA pistol course

22  or equivalent; correct?

Daniel Webster

Page 177

 1   reapplication or a renewal of their license.  So

 2   very rarely that the State Police do anything.

 3          I mean, yes, you had to have a license, a

 4   state license, but their ability to actually make

 5   sure that dealers were in compliance was minimal.

 6   So I think that was a significant enhancement that

 7   was necessary and important.

 8          And then I think the firearms theft and

 9   loss reporting requirement is important as well

10   based upon some studies we've done and others

11   showing that these are correlated with, not having

12   these measures are correlated with more firearm

13   trafficking indicators.

14          So those provisions, I think, are

15   important, in addition to what was mentioned in my

16   testimony.

17      Q.   And you said that the Handgun

18   Qualification License you felt was the most

19   important of these?

20      A.   Yes.

21      Q.   Why was that?

22      A.   Basically, based upon the best data that

Daniel Webster

Page 178

1   we had, the states with permit-to-purchase licensing

2   had proportionally fewer of their guns used in

3   crime, actually came from guns that they sold and

4   were regulated under state law.  They had fewer

5   number of guns that made their way very quickly from

6   a retail sale to criminal involvement.

7            They generally had lower levels of firearm

8   mortality and a growing body of evidence in what we

9   had begun of our first iteration of the effect of

10  Missouri's repeal of a handgun purchaser licensing

11  system.  At that time, again, the evidence was

12  indicating that the purchaser licensing was

13  protective both against diversions of guns from

14  criminal use and against homicide rights, preventive

15  against homicide.

16           We now have additional research that makes

17  me feel even stronger that this is a type of policy

18  that is among our most effective at curtailing gun

19  violence.

20       Q.   So what did Missouri's permit-to-purchase

21  plan have in common with Maryland's HQL requirement?

22       A.   Well, first and foremost, if you were

Daniel Webster

Page 179

1    going to purchase a handgun, you needed to get a

2    permit.  And that was always step one.  I think

3    that's the most important.

4         Q.   And that was a permit that you had to

5    apply directly to a law enforcement agency in

6    Missouri to get; correct?

7         A.   Yes.

8         Q.   Unlike Maryland?

9              MR. SCOTT:  Objection.

10             THE WITNESS:  Correct.

11   BY MR. SWEENEY:

12        Q.   And Missouri didn't require fingerprinting

13   like Maryland requires fingerprinting, did it?

14        A.   That's right.

15        Q.   And it didn't require training either;

16   correct?

17        A.   That's correct.

18        Q.   So, if we're looking for a common

19   denominator, there's only one common denominator

20   between the Missouri PTP law and the HQL, and that's

21   the requirement of a permit in order to purchase; am

22   I correct?

Daniel Webster

Page 180

1        A.   Yes.

2        Q.   Do any of the components of the Firearms

3   Safety Act, other than the HQL, not have any effect

4   on firearms violence?

5        A.   I have to go through all of these

6   provisions.

7        Q.   Just the ones you talked about.  Would

8   they not have any effect at all or do you think

9   they'd have some effect on preventing firearms?

10       A.   I think some effects.  Some of them would

11  be more gradual than others.  So, for example, like

12  an enhanced regulatory capacity for State Police

13  with respect to licensed gun dealers, it may be that

14  is a more gradual effect as compliance increases and

15  the degree to which the State Police demonstrate

16  that there are consequences to not following the

17  laws.

18            So that is sort of a question mark of how

19  quickly that might impact laws.  The data we have

20  about licensing suggests that, when you have a new

21  law, there's generally some impact that grows a

22  little bit over time, but that's my own opinion is

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,    *

        *Plaintiffs*,    *

    v.    *    No. 1:16-cv-03311-ELH

LAWRENCE HOGAN, *et al.*    *

        *Defendants*.    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**DEFENDANTS' MOTION TO STRIKE OPINIONS OF PLAINTIFFS'
LAY WITNESS MARK PENNAK AND
EXPERTS GARY KLECK AND CARLISLE MOODY**

Defendants Governor Lawrence J. Hogan, Jr. and Superintendent of Maryland State Police Colonel Woodrow W. Jones, III,, both sued in their official capacities, hereby move to strike the opinions of the plaintiffs' lay witness Mark Pennak and experts Gary Kleck and Carlisle Moody, pursuant to Local Rule 105. The grounds for this motion are set forth in the Memorandum of Law filed herewith and incorporated by reference herein.

WHEREFORE, for the reasons stated herein, defendants respectfully request that the Court enter an order striking paragraphs 8-10, 13, 15-17, 18-19 and 21-23 of Mark Pennak's declaration (ECF 135-3) and strike the declarations of Carlisle Moody (ECF 135-24) and Gary A. Kleck (ECF 135-25 and ECF 135-29).

Respectfully Submitted,

BRIAN E. FROSH
Attorney General

  /s/ Robert A. Scott
ROBERT A. SCOTT (Fed. Bar #24613)
RYAN R. DIETRICH (Fed. Bar #27945)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-7055 (tel.); 410-576-6955 (fax)
rscott@oag.state.md.us

Dated: March 8, 2021                  Attorneys for Defendants

2

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.*, | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) **Case No. 16-cv-3311-MJG** |
| | ) |
| **LAWRENCE HOGAN, in his capacity of GOVERNOR OF MARYLAND,** *et al.*, | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF ATLANTIC GUNS, INC.'S RULE 26(A)(2) DISCLOSURES

Plaintiff, Atlantic Guns, Inc., by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 26(a)(2), hereby serves the attached reports of Professors Gary Kleck and Carlisle Moody as its initial expert disclosure to Defendants. Plaintiff makes this initial disclosure without waiver of any privilege, assertion of confidentiality, or ground for objection, and without waiver of Plaintiff's rights to supplement and/ or amend this initial disclosure at any time when additional information becomes available.

/s/ John Parker Sweeney
John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: (202) 719-8216
Facsimile: (202) 719-8316
JSweeney@bradley.com

*Attorneys for Plaintiff Atlantic Guns, Inc.*

JA1648

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 16th day of April, 2018, a copy of the foregoing Plaintiff

Atlantic Guns, Inc.'s Rule 26(A)(2) Disclosures and accompanying reports of Professors Gary

Kleck and Carlisle Moody were sent via electronic mail to:

> Jennifer L. Katz
> Robert A. Scott
> Assistant Attorneys General
> Maryland Office of the Attorney General
> 200 Saint Paul Street, 20th floor
> Baltimore, Maryland  21202
> jkatz@oag.state.md.us
> rscott@oag.state.md.us
>
> Cary J. Hansel
> 2514 N. Charles Street
> Baltimore, MD 21218
> cary@hansellaw.com
>
> /s/ John Parker Sweeney
> John Parker Sweeney, No. 08761

JA1649

# EXHIBIT 2

1

2              IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF MARYLAND

4    - - - - - - - - - - - - - - - x

5    MARYLAND SHALL ISSUE, INC.,      :

6    et al.,                          :

7                     Plaintiffs,     :

8              v.                     : Civil Case No.

9    LAWRENCE HOGAN, et al.,          : 16-cv-3311-MJG

10                   Defendants.      :

11   - - - - - - - - - - - - - - - x

12       Deposition of CARLISLE EATON MOODY, JR.

13                  Washington, D.C.

14              Wednesday, May 9, 2018

15                   10:09 a.m.

16

17

18

19

20   Job No.: 188208

21   Pages: 1 - 62

22   Reported by:  Karen Young

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    29

```
1        A    I can't remember.  I presume so, but I --
2        Q    All right.
3        A    It's been a while.
4        Q    Are you aware of any updated data for the
5    period -- from September 2015 to the present on
6    that point?
7        A    No.
8        Q    And what is the source for the data you
9    use in your analysis of the firearm homicide rate
10   in your report?
11       A    The CDC.  I use the WONDER, CDC WONDER
12   database, interactive.
13       Q    Center -- what does CDC stand for?
14       A    Center for Disease Control.
15       Q    And this is publicly available?
16       A    Yes, it's on line.
17       Q    And you believe it's reliable?
18       A    Yes.
19       Q    Why?
20       A    Because it's official.
21       Q    Any other reasons?
22       A    No.  Well, no.  That's why.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    30

```
 1        Q    You also note on page 3 of your report

 2   that the firearm homicide data upon which you base

 3   your study includes justifiable homicides, which

 4   are not crimes, correct?

 5        A    Yes.

 6        Q    Is that a yes?

 7        A    Yes.

 8        Q    All right.  How many of the firearm

 9   homicides in 2010 in Maryland were justifiable?

10        A    There's no way to know that I don't

11   believe.

12        Q    So you don't know.

13        A    No.

14        Q    And is that also true for 2011?

15        A    Yes.

16        Q    2012?

17        A    Yes.

18        Q    2013?

19        A    Yes.

20        Q    2014?

21        A    Yes.

22        Q    2015?
```

USCA4 Appeal: 21-2017    Doc: 25-4        Filed: 08/03/2022    Pg: 231 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                          31

```
 1          A     Yes.

 2          Q     2016?

 3          A     Yes.

 4          Q     Does the firearm homicide data upon which

 5    you base your report include homicides committed

 6    with long guns?

 7          A     Yes.

 8          Q     How many of the firearm homicides in

 9    Maryland in 2010 were committed with long guns?

10          A     I don't know.  I just use the total.

11          Q     Do you know how many of the firearm

12    homicides in Maryland in 2011 were committed with

13    long guns?

14          A     No.

15          Q     2012?

16          A     No.

17          Q     '13?

18          A     No.

19          Q     '14?

20          A     No.

21          Q     '15?

22          A     No.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    32

```
 1        Q     '16?

 2        A     No.

 3        Q     Does the firearm homicide data upon which

 4   you base your study include homicides in the entire

 5   state of Maryland?

 6        A     Yes.

 7        Q     Do you know what percentage of those

 8   firearm homicides in 2010 occurred in Baltimore

 9   City as opposed to the rest of the state?

10        A     No.

11        Q     Do you know what percentage of the

12   homicide -- firearm homicides in your study in 2011

13   occurred in Baltimore City as opposed to some other

14   part of the state?

15        A     No.

16        Q     2012?

17        A     No.

18        Q     '13?

19        A     No.

20        Q     '14?

21        A     No.

22        Q     '15?
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    33

```
 1        A    No.

 2        Q    '16?

 3        A    No.

 4        Q    Are you familiar with the term

 5   "historical confounder"?

 6        A    No.

 7        Q    Okay.  Are you familiar with the events

 8   involving Freddie Gray?

 9        A    Not very.

10        Q    What do you know?

11        A    I believe Freddie Gray was a suspect in a

12   crime, arrested, put in the back of a police

13   vehicle, from which his body was recovered.

14        Q    And what's your understanding of when

15   that took place?

16        A    I do not know the exact date.

17        Q    Do you know the year?

18        A    Not -- 2015 I think, but I don't -- I'm

19   not positive.

20        Q    Are you aware of the civil unrest that

21   occurred in the wake of Freddie Gray's death in

22   Baltimore?
```

USCA4 Appeal: 21-2017   Doc: 25-4      Filed: 08/03/2022   Pg: 234 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    34

```
 1        A     It was on the news, yes.

 2        Q     And what is your understanding of what

 3   took place?

 4        A     There were riots.

 5        Q     And what's your source for that

 6   information?  Just the news media?

 7        A     Yes.

 8        Q     Anything else?

 9        A     No.

10        Q     Have you done any research into the

11   unrest that followed Freddie Gray's death?

12        A     No.

13        Q     Are you aware of any empirical facts or

14   data that show whether the number of firearm

15   homicides increased in Baltimore as the result of

16   the events that unfolded in the wake of Freddie

17   Gray's death?

18        A     Read that back to me please.

19              THE REPORTER:  Question:  "Are you aware

20   of any empirical facts or data that show whether

21   the number of firearm homicides increased in

22   Baltimore as the result of the events that unfolded
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    35

1    in the wake of Freddie Gray's death?"

2              THE WITNESS:  No.

3              MR. SWEENEY:  Objection.

4    BY MR. SCOTT:

5        Q    Did you make any attempt in your analysis

6    for this case to account for the impact of the --

7    of the unrest that followed Freddie Gray's death on

8    the number of firearm homicides in Maryland?

9              MR. SWEENEY:  Objection.

10       A    I attempted to control for the increase

11   in firearms death that occurred nationwide as a

12   result of the Ferguson effect, occurred a year

13   earlier, and I presume that that was sufficient to

14   control for the Freddie Gray incident, which

15   occurred later.

16       Q    So other than the attempt that you made

17   to account for the Ferguson effect, you didn't do

18   anything else to account for the events that

19   occurred in the wake of Freddie Gray's death in

20   Baltimore; is that correct?

21       A    Correct.

22       Q    You just referred to the Ferguson effect.

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                              36

1    What is that?

2         A    The Ferguson, Missouri incident with the

3    -- at the start of the Black Lives Matter movement.

4         Q    And what is the effect?  What's the

5    phenomenon?

6         A    The effect was a stepping back -- you

7    know, a number of police killings, killings of

8    suspects, for example, that was one that caught

9    people's attention and caused both an increase in

10   the number of ambush killings of policemen, and

11   presumably some decline in the enthusiasm with

12   which policemen do their job.

13        Q    You -- you brought us a copy of the

14   Wikipedia page for the Ferguson effect, which I'll

15   have that marked please.

16            (Deposition Exhibit Number 112 was marked

17   for identification.)

18   BY MR. SCOTT:

19        Q    This is Exhibit 112, and I believe you

20   cite to that in your report, correct?

21        A    Uh-huh, correct.

22        Q    All right.  Did you read -- did you read

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    37

1    any of the sources that are cited in that Wikipedia

2    article?

3         A    Not that I remember.

4         Q    Have you ever relied on Wikipedia in any

5    of your published articles?

6         A    No.

7         Q    Do you know who authored this Wikipedia

8    article?

9         A    No.

10        Q    Do you know the last date on which it was

11   updated?

12        A    No.

13        Q    Did you make any attempt to determine

14   whether that Wikipedia page accurately described

15   what the Ferguson effect is?

16        A    Please read it back to me.

17             THE REPORTER:  Question:  "Did you make

18   any attempt to determine whether that Wikipedia

19   page accurately described what the Ferguson effect

20   is?"

21        A    No, I assumed it accurate -- it

22   accurately described it.

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    38

1        Q    Are you aware of any empirical facts or

2    data that show whether the number of firearm

3    homicides increased in Maryland as a result of the

4    Ferguson effect?

5        A    I do not know -- I know -- I cannot

6    attribute it to the Ferguson effect.  That was just

7    a -- I don't know what the word is.  Hunch on my

8    part.

9        Q    And what was your hunch?

10       A    My hunch was that since firearm homicides

11   -- homicides in general are going up, after going

12   -- in the last two or three years, after going down

13   for many years, had something to do with police

14   killings and Black Lives Matter and the response.

15       Q    But as far as empirical facts or data

16   that show whether the number of firearm homicides

17   increased in Maryland as a result of the Ferguson

18   effect, you don't -- you're not able to identify

19   any.

20       A    Correct, cannot identify that.

21       Q    On page 8 of your report, you cite to a

22   number of states that adopted permit to purchase

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    53

```
1                    MR. SWEENEY:  Objection.

2         A     Yes, I agree to that.

3         Q     You mentioned earlier when we were

4   talking about the Freddie Gray situation, that you

5   had made an attempt to account in your analysis for

6   this case for the Ferguson effect?

7         A     Correct.

8         Q     Can you tell me how you did that?

9         A     I looked at data outside of Maryland.

10        Q     And how did you -- what data did you look

11  at?

12        A     All of the states outside of Maryland.

13        Q     And how did you incorporate that data

14  into your analysis?

15        A     I believe it's on figure 2.  Those are

16  firearm homicide rates -- no, no, no, figure 2 on

17  page 4.

18        Q     Oh, I'm sorry.  You have table 2 and

19  figure 2.

20        A     Yeah, I do, I have, I have.

21        Q     Trying to trick us up.  Okay.

22        A     Yeah.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                  54

```
1        Q    Page 4, figure 2.  So this is national
2   firearm homicide rates.
3        A    Correct.
4        Q    And according to this chart, they ticked
5   up it looks like approximately 2014, 2013?
6        A    2013 is the vertical line.
7        Q    Okay, got you.
8        A    So yeah, a little after that.
9        Q    So -- and how did this data -- how did
10  you account for this trend in the conclusions that
11  you reach with respect to firearm homicides in
12  Maryland?
13       A    I compared it using a number of
14  techniques, difference and differences, synthetic
15  controls, just looking at means across different
16  states.
17       Q    And what is the significance of the
18  up-tick in firearm homicide rates reflected on
19  figure 2 in your report?
20            MR. SWEENEY:  Objection.
21       A    Well, the theory is if you look at
22  Maryland by itself before and after 2013, the
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    55

1    firearm homicide rate was higher than it was before

2    -- just before 2013, and so did that fact mean that

3    the HQL law failed and in fact, wound up with more

4    homicides than there was before the law, and if you

5    look at the data for all the U.S., you find that

6    indeed, firearm homicide rates are up everywhere,

7    and so that would mean that we need to look at what

8    would have happened in Maryland controlling for the

9    fact that firearm homicide rates are up everywhere.

10       Q    And did you attempt to do that?

11       A    Yes, I did.

12       Q    And you did that through the synthetic

13   firearm homicide rates that you came up for for

14   Maryland?

15       A    That, and if you notice just before that,

16   I compared the firearm -- on page 5 in the second

17   paragraph, I just compared the percent change in

18   the homicide rate after 2013 for Maryland and for

19   states that did not have permit to purchase laws,

20   and found that the growth rate for Maryland was

21   about twice as high as those states.

22       Q    And did you identify the states in your

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                          56

1    report that you considered to be non-permit states?

2         A    Well, in the -- in the -- there were --

3    all the states other than the states that have had

4    it for a long time, if you look -- if you look on

5    page 5, first paragraph under synthetic controls

6    method, they have the six states that changed the

7    permit law and then one, two, three, four, five,

8    six, seven, eight -- one, two, three, four, five,

9    six, seven, eight -- eight law -- eight states that

10   have had permit laws since before 1970, so they did

11   not change the law.  They can't be -- no way to

12   compare Maryland to those states, but nevertheless,

13   those are the states that had the law.  All the

14   other ones do not have the law.

15        Q    So you say here you've got 30 states that

16   you use as the donor pool of control states.

17        A    Yes, so they also include the -- the

18   states Maine, New Hampshire, North Dakota, South

19   Dakota, Vermont and Wyoming, which have missing

20   data in the CDC WONDER database, so that gives you

21   a grand total of 20 states.

22        Q    Did you do any analysis of firearm

USCA4 Appeal: 21-2017    Doc: 25-4        Filed: 08/03/2022    Pg: 243 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    57

1    homicide rates in urban areas where there have been

2    publicized police killings of suspects during the

3    study period?

4         A     No.

5         Q     Do you know Professor Kleck?

6         A     By reputation.

7         Q     Have you ever met him?

8         A     He once reviewed a paper that I submitted

9    at a conference, and so he was the referee after --

10   after I gave my paper, he gave his.

11        Q     Which paper was that?

12        A     Oh, I can't remember.  None of these.

13        Q     Well, what about on your -- is it listed

14   on your C.V.?

15        A     Yes, but not -- it's not a refereed

16   publication.

17        Q     Okay, I thought you said that he refereed

18   it for you.

19        A     Well, what happens in these conferences

20   is that I give a paper, and then somebody comments

21   on that paper.  That's what I meant by refereeing,

22   so he commented on my paper.  That's --

# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3

 4     ------------------------------x
       MARYLAND SHALL ISSUE, INC.,
 5
       et al.,
 6
                        Plaintiffs,
 7
        v.                            Civil Case No.
 8
       LAWRENCE HOGAN, et al.,        16-cv-3311-MJG
 9
                        Defendants.
10     ------------------------------x

11

12

13              Deposition of GARY KLECK

14               Baltimore, Maryland

15                May 18, 2018

16                 10:02 a.m.

17

18

19

20     Job No.:  190812

21     Pages:  1 - 52

22     Transcribed by:  Bobbi J. Fisher, RPR
```

Transcript of Gary Kleck
Conducted on May 18, 2018                               20

1          Q.    Have you done any study or analysis to

2    determine if the training required by the Maryland

3    HQL law has reduced the number of accidental

4    shootings in Maryland?

5          A.    No.

6          Q.    Are you aware of any such studies?

7          A.    No.

8          Q.    Are you aware of any empirical facts or

9    data that show whether the training required by the

10   Maryland HQL law has reduced the number of

11   accidental shootings in Maryland?

12         A.    No.

13         Q.    So in light of that testimony, you would

14   agree that you don't know one way or the other

15   whether the training required by Maryland's HQL law

16   has reduced accidental shootings in Maryland?

17              MR. SWEENEY:   Objection.

18         A.    That's correct.  I don't know one way or

19   the other.

20         Q.    Do you have an understanding of whether a

21   background check was required under Maryland and/or

22   federal law prior to the enactment of the HQL law?

Transcript of Gary Kleck
Conducted on May 18, 2018                                    21

1          A.    Yes.  My understanding was that it was

2     such a requirement.

3          Q.    And do you know what the prior background

4     check consisted of?

5          A.    I'm not sure I understand.  What do you

6     mean "consisted of"?  You mean who was prohibited

7     or --

8          Q.    No, no, no.

9                What background check was conducted?

10         A.    Well, the federal procedure that

11    prevailed before the HQL was implemented was that

12    you would go to the seller and identify yourself

13    and provide suitable identification and they would,

14    in turn, contact a law enforcement database and a

15    background check would be performed, and if you

16    passed, the sale would go through, and if you were

17    denied, it would, at least for a time, the sale

18    would not go through.

19         Q.    Do you have any understanding of whether

20    there is a difference between the background check

21    that was conducted prior -- in Maryland -- prior to

22    the HQL law and the background check that's

USCA4 Appeal: 21-2017     Doc: 25-4          Filed: 08/03/2022     Pg: 248 of 449

Transcript of Gary Kleck
Conducted on May 18, 2018                        22

1    required under the HQL law?

2         A.   I'm not aware of any difference.

3         Q.   Did the background check that was in

4    effect prior to the HQL require that the --

5         A.   Hold on; can I revise that answer?

6         Q.   Yes.

7         A.   My understanding is that, under the HQL,

8    the background check also applies to private

9    transfers of firearms; in other words, non-dealer

10   transfers, whereas, at least the federal background

11   check that prevailed before the HQL only covered

12   dealer transfers.

13        Q.   Do you have an understanding of whether

14   the -- whether Maryland law required a background

15   check or private sales of handguns prior to the HQL

16   law?

17        A.   I don't think it did, but I'm not certain

18   about that.

19        Q.   Did the background check that was

20   required by Maryland law prior to the HQL law

21   require that the applicant be fingerprinted?

22        A.   I don't know.

Transcript of Gary Kleck
Conducted on May 18, 2018                    23

1        Q.    You would agree that the purpose of

2    requiring a background check prior to the purchase

3    of a handgun is to prevent certain individuals who

4    were not qualified to own handguns from acquiring

5    them; is that correct?

6              MR. SWEENEY:   Objection.

7        A.    Yes.

8        Q.    And you would agree that, under federal

9    law and Maryland law, that certain persons are

10   prohibited from purchasing a handgun; correct?

11       A.    Yes.

12       Q.    And that includes convicted felons;

13   correct?

14       A.    Yes.

15       Q.    And includes individuals convicted of

16   certain misdemeanors involving violence; correct?

17       A.    Yes.

18       Q.    And it includes persons who have been

19   adjudicated mentally defective or who have been

20   committed to a mental institution; correct?

21       A.    Yes.

22       Q.    And it includes persons who are habitual

Transcript of Gary Kleck
Conducted on May 18, 2018                          24

1    drunkards or alcoholics; correct?

2         A.    Yes.

3         Q.    Have you done any study or analysis to

4    determine if the requirement under Maryland's HQL

5    law, that an applicant be fingerprinted, has

6    reduced the number of handguns possessed by

7    convicted felons in Maryland?

8         A.    No.

9         Q.    Are you aware of any such study?

10        A.    No.

11        Q.    Are you aware of any empirical facts or

12   data that show whether the requirement under

13   Maryland's HQL law, that an applicant be

14   fingerprinted, has reduced the number of handguns

15   possessed by convicted felons in Maryland?

16        A.    No.

17        Q.    So in light of that testimony, you would

18   agree that you don't know one way or the other

19   whether the requirement under Maryland's HQL law,

20   that an applicant be fingerprinted, has reduced the

21   number of handguns possessed by convicted felons in

22   Maryland?

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 251 of 449

Transcript of Gary Kleck
Conducted on May 18, 2018                          25

```
 1              MR. SWEENEY:  Objection.

 2        A.    Yes.

 3        Q.    Have you done any study or analysis to

 4   determine if the requirement under Maryland's HQL,

 5   that an applicant be fingerprinted, has reduced the

 6   number of handguns possessed by persons in Maryland

 7   who are not qualified to possess handguns under

 8   federal or state law?

 9        A.    No, I have not done such study, and I

10   don't know of anyone else who has.

11        Q.    Are you aware of any empirical facts or

12   data that show whether the requirement under

13   Maryland's HQL law, that an applicant be

14   fingerprinted, has reduced the number of handguns

15   possessed by persons in Maryland who are not

16   qualified to possess handguns under federal or

17   state law?

18        A.    No.

19        Q.    In light of that testimony, you would

20   agree that you don't know one way or the other

21   whether the requirement under Maryland's HQL law,

22   that an applicant be fingerprinted, has reduced the
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 252 of 449

```
1    number of handguns possessed by persons in Maryland

2    who are not qualified to possess handguns under

3    federal or state law?

4              MR. SWEENEY:  Objection.

5         A.   Yes.

6         Q.   Are you familiar with the term "straw

7    purchaser" of a handgun?

8         A.   Yes.

9         Q.   Have you done any study or analysis to

10   determine -- well, strike that.

11             What does that term mean to you?

12        A.   A straw purchaser is a person who is

13   legally eligible to buy a gun, and they represent

14   themselves to the seller as if they were the true

15   purchaser when, in fact, they are fronting for

16   someone else who is providing the money for the

17   purchase and who is presumably not qualified;

18   otherwise, they'd have no motive for doing it,

19   although that's not technically part of the

20   definition.

21        Q.   Have you done any study or analysis to

22   determine if the requirement under Maryland's HQL
```

Transcript of Gary Kleck
Conducted on May 18, 2018                    27

1    law, that an applicant be fingerprinted, has

2    reduced the number of straw purchases of handguns

3    in Maryland?

4         A.   No.

5         Q.   Are you aware of any empirical facts or

6    data that show whether the requirement under

7    Maryland's HQL law, that an applicant be

8    fingerprinted, has reduced the number of straw

9    purchases of handguns in Maryland?

10        A.   No.

11        Q.   In light of that testimony, you would

12   agree that you don't know one way or the other

13   whether the requirement under Maryland's HQL law,

14   that an applicant be fingerprinted, has reduced the

15   number of straw purchases of handguns in Maryland?

16             MR. SWEENEY:   Objection.

17        A.   Yes.

18        Q.   Have you done any study or analysis to

19   determine if the training required by Maryland's

20   HQL law has had any effect on compliance with

21   Maryland law regulating the storage of handguns in

22   the home?

Transcript of Gary Kleck
Conducted on May 18, 2018                                28

1          A.    No.

2          Q.    Are you aware of any empirical facts or

3     data that show whether the training required by

4     Maryland's HQL law has had any effect on compliance

5     with Maryland law regulating the storage of

6     handguns in the home?

7          A.    No.

8          Q.    In light of your testimony, you would

9     agree that you don't know one way or the other

10    whether the training required by Maryland's HQL has

11    enhanced compliance with Maryland law, regulating

12    the storage of handguns in the home?

13              MR. SWEENEY:  Objection.

14         A.    Yes.

15         Q.    Have you done any study or analysis to

16    determine if the enactment of Maryland's HQL law

17    has reduced the amount of gun crime in Maryland?

18         A.    Could you repeat that question, please?

19              MR. SCOTT:  Could you read it back,

20    please?

21              COURT REPORTER:  I cannot.

22              MR. SCOTT:  Oh, okay.

Transcript of Gary Kleck
Conducted on May 18, 2018                    29

1    BY MR. SCOTT:

2        Q.   Have you done any study or analysis to

3    determine if the enactment of Maryland's HQL law

4    has reduced the amount of gun crime in Maryland?

5        A.   No.

6        Q.   Are you aware of any such studies?

7        A.   I'm aware of Professor Webster's studies

8    where he attempted to do that, but I don't think

9    there's any reliable findings yielded by that

10   research.

11       Q.   Are you aware of any other such studies?

12       A.   No.

13       Q.   Are you aware of any empirical facts or

14   data that show whether the enactment of Maryland's

15   HQL law has reduced the amount of gun crime in

16   Maryland?

17       A.   Again, the answer would be the same,

18   given that homicide is one kind of crime, and so,

19   yes, I mean, Webster's attempted to evaluate that,

20   and I don't think it yielded any reliable

21   information.

22       Q.   All right.  So other than Professor

Transcript of Gary Kleck
Conducted on May 18, 2018                              30

1    Webster's study, you're not aware of any empirical

2    facts or data that show whether the enactment of

3    Maryland's HQL law has reduced the amount of gun

4    crime in Maryland?

5         A.    When I refer to Professor Webster's

6    research, I'm referring to three studies, not just

7    one study, and I would include, for example, the

8    Kerfazi (ph), et al., the "et al." including

9    Webster has one of the authors.

10        Q.    All right.  So other than those -- the

11   three studies involving Professor Webster, you're

12   not aware of any empirical facts or data that show

13   whether the enactment of Maryland's HQL law has

14   reduced gun crime in Maryland?

15             MR. SWEENEY:  Objection.

16        A.    Yes.

17        Q.    And in light of your testimony, you would

18   you don't know one way or the other whether the

19   enactment of Maryland's HQL law has reduced the

20   amount of gun crime in Maryland; correct?

21             MR. SWEENEY:  Objection.

22        A.    Yes.

Transcript of Gary Kleck
Conducted on May 18, 2018                                    31

1        Q.   Have you done any study or analysis to

2   determine if the enactment of Maryland's HQL law

3   has reduced the number of suicides by handguns in

4   Maryland?

5        A.   No.

6        Q.   Are you aware of any such studies?

7        A.   No.

8        Q.   Are you aware of any empirical facts or

9   data that show whether the enactment of Maryland's

10  HQL law has reduced the number of suicides by

11  handguns in Maryland?

12       A.   No.

13       Q.   And in light of that testimony, you would

14  agree that you don't know one way or the other

15  whether the enactment of Maryland's HQL law has

16  reduced the number of suicides by handguns in

17  Maryland?

18            MR. SWEENEY:  Objection.

19       Q.   Is that correct?

20       A.   Yes.

21       Q.   All right.  In your report, which is

22  Exhibit 118, you discuss Professor Webster's

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 258 of 449

Transcript of Gary Kleck
Conducted on May 18, 2018                          35

1    don't know what it indicates.

2        Q.   Are you -- do you have any legal

3    training?

4        A.   No.

5        Q.   Let's refer to your C.V., which is

6    included in the report.  It was previously marked

7    as Exhibit 118.  I believe your C.V. begins on page

8    46.

9             I notice that you have a separate section

10   under publications under C.V. for articles in

11   peer-reviewed journals.  That starts on page 49.

12   Is that correct?

13       A.   Yes.

14       Q.   And what is the significance of an

15   article being peer reviewed?

16       A.   When an author submits an article to a

17   professional journal, the journal will send it out

18   to people who are hopefully experts on the same

19   topic, and they'll make an evaluation and a

20   recommendation as to whether or not it ought to be

21   published.

22             So it serves as a screening purpose.  The

Transcript of Gary Kleck
Conducted on May 18, 2018                          36

1    purpose is, at least theoretically, to preclude the

2    worst research from being published.

3         Q.   Are peer-reviewed articles likely -- are

4    peer-reviewed articles more likely to be accepted

5    as valid by a researcher's colleagues than

6    non-peer-reviewed articles?

7         A.   Yes.  Rightly or wrongly, that's true.

8         Q.   Your report references an article that

9    you published in 2009 called "The Myth of Big-time

10   Gun Trafficking" in the "UCLA Law Review" with

11   Shun-Yung Wang; is that correct?

12        A.   Yes.

13        Q.   Was that article peer reviewed?

14        A.   I'm not sure.  Law reviews typically

15   don't have peer review, but on occasion, they do,

16   and it's possible they did in that case.  I really

17   don't remember.

18        Q.   But you would agree that articles in law

19   reviews are typically not peer reviewed?

20        A.   That is correct.

21        Q.   You also list a 2013 article in your C.V.

22   that was published in the Fordham Urban Law

Transcript of Gary Kleck
Conducted on May 18, 2018                          37

 1   Journal.  Was that article peer reviewed?

 2        A.   No.  I mean, it's misplaced and it

 3   probably should have been in the other articles

 4   section.

 5        Q.   What about the 1999 article in the

 6   St. Louis University Law Review?  Was that peer

 7   reviewed?

 8        A.   I'm not sure about that one.

 9        Q.   When were you first contacted about this

10   case?

11        A.   Oh, I couldn't really tell you for sure

12   but sometime in the past year or so.

13        Q.   And who contacted you initially?

14        A.   I think it might have been Jay -- Jay --

15   it's John's law firm, but I forget the guy's last

16   name.

17        Q.   So it was somebody at Mr. Sweeney's firm?

18        A.   It was.

19        Q.   Other than the documents that you

20   provided in response to the subpoena today, were

21   you provided with any factual information about

22   this case from anybody in Mr. Sweeney's firm?

**From:** "Scott, Robert" <rscott@oag.state.md.us>
**Date:** February 26, 2021 at 10:50:49 AM EST
**To:** "Sweeney, John P." <JSweeney@bradley.com>
**Cc:** "Dietrich, Ryan" <rdietrich@oag.state.md.us>
**Subject: Licensing Division FRS/HQL statistical data 2018-present**

[External Email]

Here is the data according to MSP's service provider, as of Jan. 15, 2021:

Total number of Applications started but not submitted from 2018-2020
2018 - 10561
2019 - 9346
2020 - 24135

Total number of Users who started an application but never submitted from 2018-2020
2018 - 9640
2019 - 8553
2020 - 22631

These numbers change on a daily basis as new application are submitted.

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us

**From:** Sweeney, John P. <JSweeney@bradley.com>
**Sent:** Thursday, February 25, 2021 4:55 PM
**To:** Scott, Robert <rscott@oag.state.md.us>
**Subject:** Fwd: Licensing Division FRS/HQL statistical data 2018-present

Please forgive my last email, Rob. Please advise ha**s MSP pulled together the number of users who initiated but did not submit completed applications?**

Thank you.

John Parker Sweeney
Cell: 410-458-5653ec

Begin forwarded message:

> **From:** "Scott, Robert" <rscott@oag.state.md.us>
> **Date:** February 25, 2021 at 12:31:25 PM EST
> **To:** "Sweeney, John P." <JSweeney@bradley.com>
> **Cc:** "Dietrich, Ryan" <rdietrich@oag.state.md.us>
> **Subject: RE: Licensing Division FRS/HQL statistical data 2018-present**
>
> [External Email]
>
> John -- I am writing to follow up on this.  Can you kindly advise as to your position on the stipulation I proposed below?

EXHIBIT 1

Kind regards,

Rob


Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us


-----Original Message-----
From: Scott, Robert
Sent: Friday, February 19, 2021 10:21 AM
To: Sweeney, John P. <JSweeney@bradley.com>
Cc: Dietrich, Ryan <rdietrich@oag.state.md.us>
Subject: RE: Licensing Division FRS/HQL statistical data 2018-present

John -- We propose to stipulate to the following:

1 - The MSP portal reflects the following 77R transfers for Atlantic Guns for 2018 to 2020:


        2018 – 2143

        2019 – 2093

        2020 – 3724


2 - That the data in the attached chart, which you attached to your brief, accurately reflects the number of Maryland
handgun transfer applications submitted to MSP and disapproved by MSP, as well as HQLs issued and HQLs denied by
MSP for the years on the chart.

We agree that item no. 1 can be deemed confidential.

Please confirm you are agreeable to this.

Rob


Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us


-----Original Message-----
From: Sweeney, John P. <JSweeney@bradley.com>
Sent: Saturday, February 6, 2021 10:53 AM
To: Scott, Robert <rscott@oag.state.md.us>
Cc: Dietrich, Ryan <rdietrich@oag.state.md.us>
Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Rob,

If you wish to use the summary data on a confidential basis we can reach a confidential stipulation as to what the MSP records say.

Atlantic Guns objects to your filing even under seal with the Court the records containing the detailed information regarding its customers. If that is your intent, please advise us promptly so we can seek relief in advance from the Court.

With best regards,

John Parker Sweeney
Cell: 410-458-5653

On Feb 5, 2021, at 9:12 AM, Scott, Robert <rscott@oag.state.md.us> wrote:

[External Email]

_____
John — Please see attached records reflecting Atlantic Guns 77R transfers for 2018-2020.

It is possible that we will use this information in our upcoming brief.  Please advise if you wish the information to be deemed confidential.

Rob

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>

From: Sweeney, John P. <JSweeney@bradley.com>
Sent: Thursday, February 4, 2021 1:47 PM
To: Scott, Robert <rscott@oag.state.md.us>
Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Thank you, Robb
John Parker Sweeney
Cell: 410-458-5653

On Feb 3, 2021, at 11:31 AM, Scott, Robert <rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>> wrote:

[External Email]

_____

John – I have confirmed that the numbers you provided below are consistent with the information in MSP Licensing Portal.  I do not have an answer for why the MAFSS data is different, but MSP believes the licensing portal data is accurate.

The MSP portal reflects the following 77R transfers for Atlantic Guns for 2018 to 2020:

2018 – 2143

2018 – 2093

2020 – 3724

I have the records that were pulled and reflect this information.  I will provide them to you once they have been processed and bates stamped.

Rob


Robert A. Scott

Assistant Attorney General

Deputy Chief of Litigation

Civil Division

Office of the Attorney General

200 St. Paul Place, 20th Floor

Baltimore, MD 21202

410-576-7055

rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>


From: Sweeney, John P.
<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>
Sent: Thursday, January 28, 2021 4:20 PM
To: Scott, Robert
<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>
Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Thank you, Rob. This is truly baffling.

Atlantic Guns Inc. opened a new location in Rockville in September 2020 under new license 103715. It closed its former Rockville (license 007515) and Silver Spring (license 007615) locations. Steven Schneider advises me that he logged into the MSP database into which he enters his transfer data and received the following information today:


Handguns and lower receivers transferred in 2020 by Atlantic Guns


1187 transfers at New Rockville (103715) 9-12/2020


1546 transfers at Old Rockville (007515) 1-12/2020

991 transfers at Silver Spring (007615) 1-12/2020

Total 3724 handguns and lowers 2020

John Parker Sweeney

Cell: 410-458-5653

On Jan 28, 2021, at 9:28 AM, Scott, Robert <rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>
wrote:

[External Email]
_____
John – DPSCS has double checked the numbers and confirmed they are correct:

Atlantic Guns has two locations (7515 and 7615).
Confirmed these are just for handguns.

The numbers below:

Total Transfer Count        Year

| | |
|---:|---|
| 9264 | 2018 |
| 8511 | 2019 |
| 10715 | 2020 |

The numbers below are for just one location (7515):

Total Transfer Count        Year
---------+---------+---------+--------

| | |
|---:|---|
| 4364 | 2018 |
| 3716 | 2019 |
| 5080 | 2020 |

Rob

Robert A. Scott

Assistant Attorney General

Deputy Chief of Litigation

Civil Division

Office of the Attorney General

200 St. Paul Place, 20th Floor

Baltimore, MD 21202

410-576-7055

rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>

From: Sweeney, John P.
<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>
Sent: Wednesday, January 27, 2021 9:02 AM
To: Scott, Robert
<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>
Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Thank you.
John Parker Sweeney
Cell: 410-458-5653

On Jan 27, 2021, at 8:47 AM, Scott, Robert <rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>
wrote:

[External Email]
_____
I have asked DPSCS to double check the numbers.

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>

From: Sweeney, John P.
<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>
Sent: Wednesday, January 27, 2021 8:45 AM
To: Scott, Robert
<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>
Subject: RE: Licensing Division FRS/HQL statistical data 2018-present

Thank you, Rob. Atlantic Guns does not keep records totaling handgun
sales or from which totals may be easily obtained. It can estimate

John Parker Sweeney
Partner | Bradley<http://www.bradley.com>
jsweeney@bradley.com<mailto:jsweeney@bradley.com>
202.719.8216

From: Scott, Robert

<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>

Sent: Tuesday, January 26, 2021 7:09 PM

To: Sweeney, John P.

<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>

Subject: RE: Licensing Division FRS/HQL statistical data 2018-present

[External Email]

_____

John – MSP cannot verify these numbers. The MAFSS data is in the possession of the Department of Public Safety and Correctional Services. I obtained this data from DPSCS. I will ask them to double check, but I do not know how long that may take.

Does your client not already have records reflecting the number handgun transfers it made during these years?

Robert A. Scott

Assistant Attorney General

Deputy Chief of Litigation

Civil Division

Office of the Attorney General

200 St. Paul Place, 20th Floor

Baltimore, MD 21202

410-576-7055

rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>

From: Sweeney, John P.

<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>

Sent: Tuesday, January 26, 2021 4:18 PM

To: Scott, Robert

<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>

Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Thank you, Robb. These numbers appear much too high - more than double AGI's prior best sales years and 4-5 times it's more typical annual sales. Can you kindly ask MSP to verify these?

John Parker Sweeney

Cell: 410-458-5653

On Jan 26, 2021, at 8:12 AM, Scott, Robert <rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>> wrote:

[External Email]

_____

John –

Yearly Count of Handgun Transfers by Atlantic Guns, Inc. for the years, 2018, 2019 and 2020 from the Maryland Automated Firearms Services System (MAFSS):

The number of handguns transferred by Atlantic Guns, per year is below

| TOT_TRANSFER_COUNT | YEAR |
|---|---|
| 9264 | 2018 |
| 8511 | 2019 |
| 10715 | 2020 |

Robert A. Scott

Assistant Attorney General

Deputy Chief of Litigation

Civil Division

Office of the Attorney General

200 St. Paul Place, 20th Floor

Baltimore, MD 21202

410-576-7055

rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>

From: Sweeney, John P.

<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>

Sent: Monday, January 25, 2021 1:30 PM

To: Scott, Robert

<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>

Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Thanks, Rob. Please keep me updated on MSP's progress in obtaining the number of users who initiated but never submitted an HQL application in each year from 2018-present. It is understandable that MSP is busy, but in 2018 it provided this information within two weeks of the Court's order on Atlantic Guns' motion to compel. Please also keep me updated on MSP's progress in obtaining the MAFSS data.

I do not believe we will need to modify the briefing schedule, so long as you do not object to us providing this information to the Court for the first time in our reply brief.

Thank you.

John Parker Sweeney

Cell: 410-458-5653

On Jan 25, 2021, at 8:10 AM, Scott, Robert <rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>> wrote:

[External Email]

John -- Good morning.

We have already provided the updated firearms transfer data, and the updated number of HQL applications submitted and denied for the years you requested.   We also have provided the number of HQL applications initiated but not completed.  All of this information was provided to you in October.

On January 6, 2021, you requested updated administrative logs, which we provided on January 15.

On January 6, you also requested, for the first time, "the number of users who initiated but never submitted any type of HQL application in each year from 2018-present." I have asked MSP to pull this information, but I am told the process is cumbersome and difficult. Your assertion that this information was subject to the Court's April 20, 2018 order compelling discovery is incorrect. That motion resolved a dispute over plaintiff's interrogatory no. 5, which asked for "the number of HQL applications not completed each year from 2013 through 2017." It did not seek the number of individual users. Although MSP's May 4, 2018 supplemental answer to interrogatory no. 5 provided the number of users in addition to the number of not completed applications, that information was provided voluntarily to provide additional context. We are willing to provide the information on the number of users for the years you have requested, provided that it can be obtained without undue burden. MSP is still working on it. I will follow up again. As I am sure you can understand, the ongoing pandemic has placed significant addition burdens on the MSP. They are doing the best they can to accommodate your requests.

With respect to the Maryland Automated Firearms Services System (MAFSS) Yearly Count of Handgun Transfers by Atlantic Guns, Inc., which you also requested on January 6, 2021, that information is in the possession of the Department of Public Safety and Correctional Services, not MSP. MSP has requested the data from DPSCS but as of last week, had not yet received it. I will follow up again.

Finally, to the extent that you believe you require additional time to prepare your motion in light of the foregoing, we would be agreeable to a reasonable adjustment of the briefing schedule.

Thanks.

Rob


Robert A. Scott

Assistant Attorney General

Deputy Chief of Litigation

Civil Division

Office of the Attorney General

200 St. Paul Place, 20th Floor

Baltimore, MD 21202

410-576-7055

rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>




-----Original Message-----

From: Sweeney, John P.

<JSweeney@bradley.com<mailto:JSweeney@bradley.com>>

Sent: Saturday, January 23, 2021 12:00 PM

To: Scott, Robert

<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>

Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Rob,

Please advise when I can receive this information. Our brief is due Wednesday. As you know, an order compelling production was entered and defendant has a duty to update upon request.

John Parker Sweeney
Cell: 410-458-5653

On Jan 15, 2021, at 4:31 PM, Scott, Robert <rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>> wrote:

[External Email]

_____

John – Please see attached supplemental production with some of the information you requested, specifically the updated administrative disapproval log and the administrative denial ledger updated through 4/18/2019.  MSP stopped updating the ledger at that time.

I'm still waiting to received the other information you requested.

Rob

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us<mailto:rscott@oag.state.md.us<mailto:rscott@oag
.state.md.us%3cmailto:rscott@oag.state.md.us>>

From: Sweeney, John P.
<JSweeney@bradley.com<mailto:JSweeney@bradley.com<mailto:JSweeney@brad
ley.com%3cmailto:JSweeney@bradley.com>>>
Sent: Thursday, January 7, 2021 10:10 AM
To: Scott, Robert
rscott@oag.state.md.us<mailto:rscott@oag.state.md.us>>
Subject: Re: Licensing Division FRS/HQL statistical data 2018-present

Rob,

Please forgive this follow on but could you also update the administrative denial ledger (MSP001218)? Thank you,

John Parker Sweeney

On Jan 6, 2021, at 3:31 PM, Sweeney, John P.
<JSweeney@bradley.com<mailto:JSweeney@bradley.com<mailto:JSweeney@bradley.com%3cmailto:JSweeney@bradley.com>>>
wrote:

Rob, Happy New Year!

Thank you for your previous response.

Please provide the number of users who initiated but never submitted any type of HQL application in each
year from 2018-present. Defendants previously provided this information for years 2013-2017. See Col.
Pallozzi's Third Supp. Rog. Resp., No. 5. Defendants provided this information in response to the Court's April
20, 2018 order (attached).

Please also supplement the Maryland Automated Firearms Services System (MAFSS) Yearly Count of
Handgun Transfers by Atlantic Guns, Inc. to include each year from 2018-present.

Please also supplement the "administrative log" (attached) to include information from 2018-present.

Thank you.

Best regards,

John Parker Sweeney
Cell: 410-458-5653

On Oct 27, 2020, at 10:27 AM, Scott, Robert
<rscott@oag.state.md.us<mailto:rscott@oag.state.md.us<mailto:rscott@oag.state.md.us%3cmailto:rscott@oag.state.md.us>>>
wrote:

[External Email]
_____

John – Pursuant to your request, please see below firearms transfer data from the State Police.  I am still
working on the other information you requested.

Rob

Robert A. Scott
Assistant Attorney General
Deputy Chief of Litigation
Civil Division
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7055
rscott@oag.state.md.us<mailto:rscott@oag.state.md.us<mailto:rscott@oag

.state.md.us%3cmailto:rscott@oag.state.md.us>>

Licensing Division

Weekly (39) Report

09/25/2020 through

10/1/2020

2017

Totals

2018

Totals

2019

Totals

2020

Totals

2017 Weekly

Avg.

2018

Weekly

Avg.

2019

Weekly

Avg.

2020

Weekly

Avg.

Current Week Totals

(2020)

FRS Total Apps Received

51,851

53,544

53,726

71,548

997

1,030

1,033

1,835

2,455

FRS Disapprovals

175

206

245

424

3.4

4

4.7

10.9

19

HQL New
23,888
21,727
20,083
46,903
459
417.8
386.2
1,203
1,854
HQL "New Resident" Apps
0
0
0
890
0
0
0
22.8
19
HQL Disapprovals
566
641
769
1,413
10.9
12.3
14.8
36.2
54

---

Confidentiality Notice: This e-mail is from a law firm and may be
protected by the attorney-client or work product privileges. If you have received this message in error,
please notify the sender by replying to this e-mail and then delete it from your computer.

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product
privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it
from your computer.

JA1696

DOUGLAS F. GANSLER
ATTORNEY GENERAL

KATHERINE WINFREE
Chief Deputy Attorney General

JOHN B. HOWARD, JR.
Deputy Attorney General



THE ATTORNEY GENERAL OF MARYLAND

OFFICE OF COUNSEL TO THE GENERAL ASSEMBLY

DAN FRIEDMAN
Counsel to the General Assembly

SANDRA BENSON BRANTLEY
BONNIE A. KIRKLAND
KATHRYN M. ROWE
Assistant Attorneys General

January 29, 2013

The Honorable Brian Frosh
Senate of Maryland
Miller Senate Office Building, Suite 2E
Annapolis, Maryland 21401

   Re:   Senate Bill 281, The "Firearm Safety Act of 2013"

Dear Senator Frosh:

      You have asked whether that portion of the Firearm Safety Act of 2013 that
establishes the requirement of a Handgun Qualification License for an individual to
purchase, rent, or receive a handgun is constitutional under the Second Amendment to the
United States Constitution.  I have no doubt that this proposal is constitutional.

### The Handgun Qualification License

      Under the terms of Senate Bill 281 as introduced, to be eligible to purchase, rent,
or receive a handgun, one must possess a Handgun Qualification License issued by the
Department of State Police.  To obtain a Handgun Qualification License, an applicant
must:

   (1)   be at least 21 years old;

   (2)   be a Maryland resident;

   (3)   have taken a firearms safety course (or be exempted
         from that requirement); and

   (4)   not be prohibited by federal or state law from owning
         or possessing a firearm.

Proposed §5-117.1(c).

104 LEGISLATIVE SERVICES BUILDING · 90 STATE CIRCLE · ANNAPOLIS, MARYLAND 21401-1991
410-946-5600 · 301-970-5600 · *Fax* 410-946-5601 · TTY 410-946-5401 · 301-970-5401

**EXHIBIT 2**

The Honorable Brian Frosh
January 29, 2013
Page 2

A Handgun Qualification License is valid for 5 years and may be renewed. Proposed §5-117.1(h).

### *The Legal Analysis*

The Second Amendment to the United States Constitution provides that, "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." In 2008, the United States Supreme Court held that the Second Amendment codifies a pre-existing "individual right to possess and carry weapons in case of confrontation." *Heller v. District of Columbia*, 554 U.S. 570, 592 (2008). But the *Heller* Court was also quick to point out, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626 (describing historical limitations on firearms rights).

The United States Court of Appeals for the Fourth Circuit has adopted a two-prong approach to analyzing laws under the Second Amendment. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under this approach, the first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at 680 (internal quotation marks omitted). If not, the challenged law is valid. If, on the other hand, the burdened conduct is found to be within the scope of the Amendment, then the second prong requires the application of "an appropriate form of means-end scrutiny." *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011) (adopting similar two-part test); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010) (same); *United States v. Marzzarella*, 6514 F.3d 85, 89 (3rd Cir. 2010) (same); *United States v. Skoien*, 614 F.3d 638, 639-43 (7th Cir. 2010) (*en banc*) (same). The Fourth Circuit—like nearly every other court to have considered the question—seems to have adopted intermediate scrutiny test as the appropriate test. *United States v. Masciandaro*, 638 F.3d 458, 471 (4th Cir. 2011). Under that test, the government bears the burden of demonstrating that the challenged regulation "is reasonably adapted to a substantial government interest." *Id.*; *see also. Chester*, 628 F.3d at 683 (under intermediate scrutiny, "the government must demonstrate ... that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective").

There is apparently a belief among some opponents of gun regulations that because there is a constitutional right to individual handgun possession, the right may not be subject to regulation. That belief, however, is not supported by either the *Heller* decision itself, which is clear that there are important limitations on the exercise of that right, *Heller*, 554 U.S. at 626-27, or by comparison to other constitutional rights, the

The Honorable Brian Frosh
January 29, 2013
Page 3

exercise of which is often regulated without constitutional violation. *E.g. Rosario v. Rockefeller*, 410 U.S. 752, 754-58 (1973) (upholding state voter registration requirements); *Perry Educ. Ass'n. v. Perry Local Educ. Ass'n.*, 460 U.S. 37, 44-46 (1983) (upholding time, place, and manner restrictions on free speech). Instead, proposed gun regulations must be analyzed under the various standards that courts have developed to implement the *Heller* decision.

### The Fourth Circuit Analysis

Applying the Fourth Circuit's two-part analysis to the Handgun Qualification License provisions of Senate Bill 281 requires us to turn back to the *Heller* decision. There, the Supreme Court provided a list of some "presumptively lawful regulatory measures":

> Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27 & n.26. Unfortunately, however, it is not clear whether the *Heller* Court meant that these "presumptively lawful" regulations were simply outside of the scope of the Second Amendment or whether such laws are within the scope of the Second Amendment but are nevertheless constitutional because they satisfy any applicable level of scrutiny. *Masciandaro*, 638 F.3d at 472-73 (describing but not resolving this "ambiguity" in the *Heller* opinion). In either case, however, we must take *Heller* at its word and, therefore, it is my view that a law, like Senate Bill 281, that "impos[es] conditions and qualifications on the commercial sale of arms" is "presumptively lawful" under the Second Amendment. *Heller*, 554 U.S. at 626-27 & n.26; *see also Justice v. Town of Cicero*, 577 F.3d 768, 773-74 (7th Cir. 2009) (affirming constitutionality of town handgun registration scheme). Moreover, as the *Heller* Court was careful to make clear, this paragraph is illustrative only and not exhaustive. *Id.* I think, therefore, that it is reasonable to infer that imposing identical "conditions and qualifications" on non-commercial transactions of regulated firearms as are imposed on commercial sales will also be "presumptively lawful." I cannot imagine why the commercial nature of the transaction would be relevant to the constitutional analysis. Thus, it is my view that under the law applied in this Circuit, the Handgun Qualification

The Honorable Brian Frosh
January 29, 2013
Page 4

License provisions of Senate Bill 281 are presumptively constitutional and no further means-end analysis should be required.

### The *Heller II* Test

The only extended judicial analysis of a handgun regulatory regime like that contemplated by Senate Bill 281, however, takes a slightly different analytical approach than I have suggested. In *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), the D.C. Circuit considered the constitutionality of a handgun registration regime that was enacted in the wake of the Supreme Court's original *Heller* decision. *Id.* at 1247. The D.C. Circuit, I think rather implausibly, read the above-quoted paragraph from *Heller* as if the modifier "longstanding" was applied to each of the three examples. Thus, according to the D.C. Circuit, only "longstanding" registration laws should be entitled to the presumption of constitutionality. *Id.* at 1253. The D.C. Circuit then found that some "basic" aspects of a registration system had long existed (albeit in other parts of the country) and were thus valid. *Id.* at 1253-55. The D.C. Circuit found other parts of the registration scheme to be "novel," *i.e.* not "longstanding," and therefore a potential burden on Second Amendment rights. *Id.* at 1255-56. The D.C. Circuit then remanded those "novel" aspects of the registration system to the District Court to determine whether they satisfied the intermediate scrutiny test. *Id.* at 1258-60.

Applying this *Heller II* test to Senate Bill 281, it is my view that the Handgun Qualification License provisions of the bill are both "basic" and "longstanding." In fact, I view those licensure requirements as merely an administrative means to improve compliance with existing Maryland laws regarding the qualifications of firearms purchasers. *See* Public Safety ("PS") Article, § 5-117 (requiring a firearm application for purchase, rental, or transfer of a regulated firearm)); PS § 5-118(b)(3)(i) (requiring a purchaser to be at least 21 years old); PS § 5-118(b)(3)(ii), (iii) (prohibiting transfer to persons disqualified by state law); PS § 5-118(3)(x) (requiring completion of a firearms safety training course). The only really new requirement under Senate Bill 281—as opposed to improved methods of implementing existing law—is the requirement of Maryland residency to obtain the Handgun Qualification License. I would argue, however, that this requirement is still just a "basic" registration requirement and despite being new here, is of "longstanding" vintage in other states including New York. *Osterweil v. Bartlett*, 819 F.Supp.2d.72 (N.D. NY, May 20, 2011) (holding the requirement of New York residency for New York gun registration). The *Heller II* Court was clear that such basic registration requirements are "self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot be reasonably considered onerous." *Heller II*, 670

The Honorable Brian Frosh
January 29, 2013
Page 5

F.3d at 1255. Thus, under even the *Heller II* test, it is my view that the provisions requiring a Handgun Qualification License are presumptively constitutional.

Finally, even if I am wrong about all of the foregoing, and some or all of the requirements to obtain a Handgun Qualification License are determined to be outside of the "presumptively lawful" category of regulations identified by the Supreme Court in *Heller*, they would still be constitutional if they satisfy the intermediate scrutiny test. That is to say, the requirements will be found to be constitutional if it can be shown that they are "reasonably adapted to a substantial government interest." *Masciandaro*, 638 F.3d at 471. I am already aware of significant scientific evidence demonstrating the efficacy of licensure systems in keeping handguns out of criminal hands. D.W. Webster, *et al, Relationship between licensing, registration, and other gun sales laws and the source state of crime guns*, 7 Injury Prevention 184 (2001) (attached hereto). A careful proponent should work to ensure that this and other such scientific and colloquial evidence is made a part of the legislative history, included in testimony before the relevant committees, and described in speeches on the floor of the legislature, so that a reviewing court will clearly understand why every aspect of the licensure system was selected as an appropriate means to an important end.

I hope that this assists in your consideration of Senate Bill 281.

Very truly yours,

Dan Friedman
Counsel to the General Assembly

184

*Injury Prevention* 2001;7:184–189

## ORIGINAL ARTICLES

# Relationship between licensing, registration, and other gun sales laws and the source state of crime guns

D W Webster, J S Vernick, L M Hepburn

**Abstract**

*Objective*—To determine the association between licensing and registration of firearm sales and an indicator of gun availability to criminals.

*Methods*—Tracing data on all crime guns recovered in 25 cities in the United States were used to estimate the relationship between state gun law categories and the proportion of crime guns first sold by in-state gun dealers.

*Results*—In cities located in states with both mandatory registration and licensing systems (five cities), a mean of 33.7% of crime guns were first sold by in-state gun dealers, compared with 72.7% in cities that had either registration or licensing but not both (seven cities), and 84.2% in cities without registration or licensing (13 cities). Little of the difference between cities with both licensing and registration and cities with neither licensing nor registration was explained by potential confounders. The share of the population near a city that resides in a neighboring state without licensing or registration laws was negatively associated with the outcome.

*Conclusion*—States with registration and licensing systems appear to do a better job than other states of keeping guns initially sold within the state from being recovered in crimes. Proximity to states without these laws, however, may limit their impact.

*(Injury Prevention* 2001;7:184–189)

Keywords: firearms; evaluation; law; gun control

Center for Injury Research and Policy, Center for Gun Policy and Research, Johns Hopkins University, Bloomberg School of Public Health, Baltimore
D W Webster
J S Vernick
L M Hepburn

Correspondence to:
Daniel W Webster, Center for Injury Research and Policy, Johns Hopkins School of Public Health, 624 N Broadway, Rm 593, Baltimore, MD 21205–1996, USA
dwebster@jhsph.edu

There is general consensus among scientists that firearm availability is positively associated with homicide risks[1]; assaults with firearms are, on average, much more lethal than assaults with other common weapons.[2] However, there is much less agreement about the effectiveness of government efforts to control firearm availability. Skeptics of gun control laws argue that criminals can easily evade regulations by acquiring guns through theft, straw purchases (those by legally eligible purchasers on behalf of individuals legally proscribed from purchasing guns), and other difficult-to-regulate private sales.[3][4] Cook and colleagues argue that restrictions on legal gun sales can reduce the supply and consequently raise the price of acquiring guns within illicit as well as licit gun markets. Restricted supplies and increased prices may reduce gun availability within these interconnected markets.[5][6]

In the United States, federal law proscribes gun sales to specific groups deemed to be potentially dangerous, such as persons convicted of serious crimes, and requires criminal background checks of persons buying guns from licensed dealers. But in many states this requirement is fulfilled via "instant check" procedures vulnerable to the use of falsified identification cards and straw purchasers.[7] Some states in the United States, however, have much more extensive regulatory systems that include registration of firearms, licensing of buyers, and very restrictive eligibility criteria for firearm purchases.

Permit-to-purchase licensing systems require prospective gun purchasers to have direct contact with law enforcement or judicial authorities that scrutinize purchase applications, and some allow these agencies broad discretion to disapprove applications. Some licensing laws require applicants to be fingerprinted and allow officials weeks or even months to conduct extensive background checks. Mandatory registration makes it easier to trace guns used in crime to their last known legal owner, and to investigate possible illegal transfers. In combination, these laws have the potential to significantly restrict gun acquisition by high risk individuals through stricter eligibility criteria, safeguards against falsified applications, and increased legal risks and costs associated with illegal gun transfers to proscribed individuals. Recently, several United States gun control groups have made licensing of buyers and registration of handguns the centerpiece of their advocacy agenda.

Most industrialized countries place broad restrictions on private ownership of firearms.[8][9] For example, Canada created a centralized registry for purchased handguns in 1951, and instituted very restrictive permit-to-purchase requirements for handguns in 1969. These restrictions were expanded to long guns in

Inj Prev: first published as 10.1136/ip.7.3.184 on 1 September 2001. Downloaded from http://injuryprevention.bmj.com/ on 3 December 2018 by guest. Protected by copyright.

185

1977.[8] Evaluations of the 1977 law were mixed, but suggested that the law was associated with a reduction in homicides.[10-12] In a cross sectional study of gun control laws in the United States, Kleck and Patterson also present mixed evidence that permit-to-purchase laws were associated with lower rates of homicide.[13]

With few exceptions,[14 15] previous evaluations of state gun sales laws have not examined the state in which the guns used to commit violence were sold. This study addresses this gap by examining whether states with licensing, registration, and other gun sales regulations have proportionately fewer of their crime guns that were originally purchased from within the state. Having a low proportion of crime guns with in-state origins would suggest that guns are relatively difficult for persons at risk for criminal involvement to obtain from in-state gun dealers, acquaintances, or homes that are burglarized. Interstate gun traffickers offer an alternative source of guns to criminals in states with restrictive gun laws, however the costs, risks, and inconvenience are likely to be greater. These added costs might curtail access to guns among high risk individuals[5 6] and consequently reduce rates of lethal violence.[2 16]

## Methods

STUDY SAMPLE AND DATA

This study uses city level data for 27 cities located in 23 states that have participated in a federally funded program called the Youth Crime Gun Interdiction Initiative (YCGII). Each of these cities agreed to submit information on *all* crime guns recovered by local law enforcement agencies to the Bureau of Alcohol, Tobacco, and Firearms (ATF) for tracing. (Despite its name, the YCGII was not limited to guns recovered from youth.) In most other jurisdictions, police only attempt to trace a non-random sample of the crime guns they recover, creating the possibility for selection bias.[17] A crime gun was defined by ATF as any firearm that was "illegally possessed, used in a crime, or suspected to have been used in a crime."[18]

Data were available for all 27 cities for all crime guns recovered by police from 1 August 1997 though 31 July 1998.[18] For 17 of the 27 cities, data were also available for guns recovered from 1 July 1996 through 30 April 1997.[19] To increase the reliability and sample size of our analyses, we combined data from the two reporting periods for those cities where it was available. Due to limited resources and the difficulty of tracing older guns, ATF did not always attempt to complete traces for guns that were manufactured before 1990. Therefore, in order to study a sample of crime guns that were comprehensively traced, we limited our analyses to recovered crime guns that were sold during or after 1 January 1990. With one exception, discussed below, all of the state licensing and registration laws of interest went into effect well before 1990.

*Proportion of crime guns from in-state gun dealers*
Our primary outcome measure is the proportion of traceable crime guns that were originally purchased from an in-state gun dealer. In our data, this outcome measure was positively correlated with another indicator of gun availability to high risk individuals—the proportion of homicides ages 15 and above that were committed with guns (Pearson's $r = 0.40$, $p=0.048$).

*State gun sales laws*
Our primary explanatory variable of interest is the set of state level firearm sales laws. Information about these laws was obtained from ATF and United States Department of Justice publications,[20 21] and through legal research. Two key laws of interest were permit-to-purchase licensing of firearm buyers and registration of firearms. Based on these laws, we grouped all states into three categories. In category A, we grouped states with both permit-to-purchase licensing *and* registration. Category B consisted of states with either licensing *or* registration (but not both). Category C groups those states with neither permit-to-purchase licensing nor registration.

Though our categorization was based on licensing and registration laws, states with both of these laws often have many additional firearm sales restrictions that could enhance the effectiveness of their gun regulatory system (see table 1). For example, states with permit-to-purchase laws often require relatively long maximum waiting periods and prohibit gun sales to persons convicted of certain misdemeanor crimes. In addition, states with both licensing and registration typically allowed criminal justice agencies to use discretion in issuing permits.

There was only one state with a change in its gun sales laws from 1 January 1990 though 31 July 1998 that would alter its category. Connecticut enacted its permit-to-purchase licensing and registration system beginning 1 October 1994; but permits for handgun sales were not mandatory until 1 October 1995. Before Connecticut's new law, Bridgeport (one of the YCGII cities) would have been placed in category C; after the law, it would be grouped in category A. Therefore, we excluded Bridgeport from our primary analyses. Instead, we conducted a separate analysis comparing the source state of Bridgeport's crime guns first purchased before and after its regulatory system became available in October 1994, and contrasted this pre-law versus post-law difference with other cities in category C. We chose the 1994 date because it was the earliest date after which handgun buyers were obtaining permits.

We also excluded Washington, DC from our primary analysis. In 1976, the District of Columbia banned most handgun possession and purchase. Therefore, its laws are not truly comparable to the other states we examined.

*Potential confounders*
Factors other than gun sales laws, such as proximity to persons living in other states, may

Inj Prev: first published as 10.1136/ip.7.3.184 on 1 September 2001. Downloaded from http://injuryprevention.bmj.com/ on 3 December 2018 by guest. Protected by copyright.

USCA4 Appeal: 21-2017     Doc: 25-4     Filed: 08/03/2022     Pg: 281 of 449

Case 1:16-cv-03311-ELH   Document 150-2   Filed 04/14/21   Page 8 of 11

*Table 1 State gun sales laws in effect in 25 Youth Crime Gun Interdiction Initiative cities, overall classification of the set of these laws, and the percentage of the city's crime guns that were first purchased from in-state gun dealers*

| Category of state's gun sales laws* | City, state | % Of city crime guns first purchased within the state | Permit to purchase | Registration† | Private purchases regulated‡ | Purchase restrictions: certain misdemeanors | Possession restrictions: youth <21 years old | Fingerprint required on purchase application | Maximum wait >7 days | One gun/month |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Boston, MA | 31.4 | X§ | X | | | | X | X | |
| | Detroit, MI | 47.5 | X§ | X | | | | | X | |
| | Jersey City, NJ | 13.0 | X§ | X | | | | X | X | |
| | New York, NY | 14.0 | X§ | X | | | | X | X | |
| | St Louis, MO | 62.9 | X | X | X | X | X | | | |
| B | Baltimore, MD | 73.0 | | X | X | X | X | | | X |
| | Chicago, IL | 64.7 | X | | X | | | | X | |
| | Inglewood, CA | 69.9 | | X | X | X | | | X | |
| | Los Angeles, CA | 78.0 | | X | X | X | | | X | |
| | Minneapolis, MN | 74.4 | X | | X | | | | | |
| | Philadelphia, PA | 66.7 | | X | X | X | | | | |
| | Salinas, CA | 82.3 | | X | X | X | | | X | |
| C | Atlanta, GA | 86.0 | | | | | | | | |
| | Birmingham, AL | 88.3 | | | | | | | | |
| | Cincinnati, OH | 67.4 | | | | | | | | |
| | Cleveland, OH | 85.6 | | | | | | | | |
| | Gary, IN | 89.3 | | | X | | | | | |
| | Houston, TX | 88.3 | | | | | | | | |
| | Memphis, TN | 70.8 | | | X | X | | X | X | |
| | Miami, FL | 90.1 | | | | | | | | |
| | Richmond, VA | 90.6 | | | | X | | | | X |
| | Milwaukee, WI | 80.9 | | | | | | | | |
| | San Antonio, TX | 90.0 | | | | | | | | |
| | Seattle, WA | 78.1 | | | X | X | X | | | |
| | Tucson, AZ | 89.0 | | | | | | | | |

*Category A = permit to purchase licensing and registration systems; category B = permit to purchase licensing or registration but not both; category C = neither permit to purchase licensing or registration.
†Includes those states where police retain records of handgun purchases.
‡Permit or background check required for sales through non-licensed dealers.
§Permit issued with law enforcement agency discretion.

also affect the source state of a city's crime guns. The following hypothesized determinants of the proportion of a city's crime guns originating from in-state gun dealers, in addition to gun sales laws, were considered in the analyses: (1) nearest driving distance from the city of interest to another state in category C, (2) the ratio of out-of-state to in-state population within a 50 or 100 mile radius of the city, (3) the proportion of the population within a 50 or 100 mile radius of the city that reside in a state in category C, (4) the proportion of the state's population that had moved from another state within the previous year,[23] and (5) the proportion of a city's crime guns that were recovered in cases involving drug crimes (illicit drug selling networks often extend across state borders).

Differences in gun ownership between states, attributable to cultural and demographic differences, may be an important determinant of whether restrictive gun sales laws are passed in a state. Lower levels of gun ownership within a state that are independent of the effects of those restrictive laws that are not controlled for in our analysis could bias our estimates of the laws' effects. Controlling for pre-law gun ownership levels is somewhat problematic, however, because direct measures of state level gun ownership are not available and the implementation dates of the laws differ across states. Therefore, we used the per cent of a state's suicides during 1996–97 that were committed with firearms as a proxy measure of gun ownership based on the rationale that this fraction will be strongly influenced by gun availability.[23] This measure, however, may underestimate the level of pre-law gun ownership not attributable to restrictive gun laws in states that subsequently passed such

restrictions because the laws may have depressed gun ownership levels in the effected states. If this is the case, this control variable may overcorrect the estimate of the laws' effects. We, therefore, included this covariate in a sensitivity analysis to provide a lower bound point estimate of the laws' effects.

Population data were obtained from the United States census,[24] and the population residing within a 50 and 100 mile radius of the center of each city was determined using the Census' Master Area Block Level Equivalency program.[25] Driving distances from central city locations to the borders of other states were determined using Map Expert 2.0 computer mapping software.[26]

DATA ANALYSIS
Analysis of variance of the mean proportion of crime guns originating in-state was used for comparisons across the three categories of gun sales laws. Dunnet's C statistic was used to compare between group means with unequal variances.[27] Ordinary least squares linear regression analysis was used to estimate the independent association between the hypothesized explanatory variables and the outcome. Theoretically relevant covariates were dropped from the model if their effects were not statistically significant and if their exclusion did not appear to influence the other estimates. Cook's distance[28] and the standardized difference in the beta values were examined to assess whether particular observations exerted undue influence on the regression coefficients.

## Results
For the 25 cities in our analysis, 108 000 crime guns were recovered by the police during the

Inj Prev: first published as 10.1136/ip.7.3.184 on 1 September 2001. Downloaded from http://injuryprevention.bmj.com/ on 3 December 2018 by guest. Protected by copyright.

JA1704



*Figure 1    Mean and 95% confidence interval for the percentage of crime guns first sold by in-state gun dealers by gun law category. Category A: licensing and permit to purchase and at least two other gun sales laws; category B: licensing or permit to purchase but not both; category C: neither licensing or permit to purchase.*

**Key points**

- Only a few states in the United States require firearm owners to be licensed and their guns to be registered.
- The proportion of a city's crime guns that come from in-state, verus out-of-state, is an important measure of how hard it is for criminals to get guns in those states.
- Cities in states with both licensing and registration have a much smaller proportion of their crimes guns coming from in-state.
- Licensing and registration laws can make it harder for criminals and juveniles to get guns.

study period. Because we limit our analysis to crime guns first purchased since 1990, to calculate the proportion of guns in our dataset successfully traced to a source state, it is first necessary to eliminate from the denominator those guns bought before 1990. Using information on the sales dates and ATF's reasons for not completing a trace, we estimated that 60 202 guns were first purchased before 1990. Of the remaining 47 798 guns, 35 000 (73.2%) were successfully traced by ATF[2] to a source state.

Table 1 depicts the categorization of the 25 YCGII cities based upon their gun sales laws. In general, the categories are ordered by the comprehensiveness of the laws. The mean percentage of crime guns with in-state origins for category A cities (33.7%) was significantly less than that for cities in category B (72.7%) and category C (84.2%) (both differences significant at p<0.001; see fig 1). Apparent in fig 1 and confirmed by a formal test (Levene statistic = 8.58, df1=2, df2=22, p=0.002) is that the variance in the outcome measure among the five cities in category A is larger than in categories B and C.

The regression analyses indicated that the large bivariate differences between cities in category A and those in categories B and C remained after controlling for potential confounders (table 2). The estimates from model 1 indicate that the percentage of crime guns with in-state origins was 48.5 percentage points lower in category A cities compared with category C cities (p<0.001). The percentage of crime guns with in-state origins in category B

cities was 12.8 percentage points lower than in category C cities (p=0.039). The percentage of the population within a 100 mile radius of a city that resided beyond the state border in a category C state was negatively associated with the percentage of crime guns with in-state origins (β = −19.9, SE(β) = 7.5, p=0.016).

Model 2 in table 2 presents our findings with the surrogate measure of gun ownership within the state added to the model. This indicator of gun ownership was positively associated with the percentage of crime guns that had been sold by in-state gun dealers (β = 0.682, SE(β) = 0.180, p=0.001). The magnitude of the estimate for the difference between category A and category C cities was reduced (β = −37.1, SE(β) = 5.88, p<0.001) but remained large and highly significant. However, the estimate for the difference between category B versus category C cities was reduced substantially and is no longer statistically significant (β = −4.25, SE(β) = 4.95, p=0.402).

Population migration into the state and the proportion of recovered guns associated with drug offenses were not significantly associated with the proportion of a city's crime guns first sold by an in-state gun dealer. Driving distance from the city to the nearest state border and distance to the nearest state with weaker gun sales laws were not included in the models due to colinearity with other covariates. The proportion of total population within a 50 mile radius of the city residing outside the state border was not included in the models because its inclusion lead to an extremely large Cook's distance statistic for one city. This covariate did not have a statistically significant effect on the outcome measure, and its exclusion from the models did not substantially effect the gun law estimates.

*Table 2    Results from ordinary least squares regression on the percentage of a city's crime guns that were originally purchased from in-state gun dealers*

| Explanatory variables | Model 1 | | | Model 2 | | |
|---|---|---|---|---|---|---|
| | β (SE) | Standardized β | Significance | β (SE) | Standardized β | Significance |
| Category A v C state gun sales laws | −48.5 (6.6) | −0.886 | <0.001 | −37.1 (5.9) | −0.678 | <0.001 |
| Category B v C state gun sales laws | −12.8 (5.8) | −0.261 | 0.039 | −4.3 (5.0) | −0.087 | 0.402 |
| Ratio of population within 100 mile radius living outside state border in category C state | −19.9 (7.5) | −0.239 | 0.016 | −17.4 (5.8) | −0.208 | 0.008 |
| Ratio of annual in-migration to total state population | −0.413 (2.6) | −0.019 | 0.876 | −0.965 (2.0) | −0.045 | 0.637 |
| % Of guns recovered from drug crimes | 0.548 (0.32) | 0.155 | 0.100 | 0.114 (0.27) | 0.032 | 0.676 |
| Proxy for state prevalence of gun ownership | | | | 0.682 (0.18) | 0.377 | 0.001 |
| Model statistics | $R^2 = 0.85$ | Adjusted $R^2 = 0.82$ | | $R^2 = 0.92$ | Adjusted $R^2 = 0.89$ | |

Inj Prev: first published as 10.1136/ip.7.3.184 on 1 September 2001. Downloaded from http://injuryprevention.bmj.com/ on 3 December 2018 by guest. Protected by copyright.

The percentage of Bridgeport's crime guns that had been sold by in-state dealers decreased from 84.9% (124/146) for guns purchased before Connecticut's licensing and registration laws went into effect to 81.5% (44/54) for guns purchased afterward. In contrast, among the other category C cities, the proportion of crime guns with in-state origins increased from 79.8% (6289/7883) to 87.9% (6798/7732) for guns sold during the same two time periods. While these divergent trends are suggestive of moderate effects from Connecticut's mandatory licensing and registration law, the 81.5% of Bridgeport's crime guns that had been sold by in-state dealers after the law's effective date was significantly higher than was observed in the five other category A cities.

### Discussion

We found great variation among cities in the percentage of their crime guns that originated from in-state gun dealers. This variation was largely explained by the presence or absence of comprehensive state regulations of gun sales that fit our definition of category A—permit-to-purchase licensing and mandatory registration of handguns—and to a lesser degree by proximity to people in states with minimal restrictions on gun sales. After adjusting for confounders, the percentage of crime guns recovered in cities in category A that had been purchased from in-state dealers was less than half as high as would have been expected if the weakest state laws (category C) had been in effect.

The wide variation in the proportion of crime guns from in-state dealers within category A suggests that there are important determinants of our outcome other than the presence of licensing and registration systems. Some of the variance within this category appears to be explained by complementary sales restrictions. Category A cities with the lowest proportion of their crime guns originating from in-state dealers—Boston, Jersey City, and New York—were in states that also allowed law enforcement discretion in issuing permits to purchase handguns, had longer waiting periods, and required purchase applicants to be fingerprinted. In contrast, St Louis, Missouri, with the highest proportion of crime guns sold by in-state gun dealers among category A cities, had none of these provisions.

The very strong cross sectional association between permit-to-purchase licensing and registration laws, and lower proportions of crime guns with in-state origins, is tempered somewhat by the modest change observed in Bridgeport after Connecticut adopted a licensing and registration system. This relatively modest change in Bridgeport may be due to the newness of law, the availability of older used guns purchased within the state prior to the new law, or to the lack of some of the other sales restrictions mentioned above that have been in place for years in other states with licensing and registration systems. In addition,

our use of the date the licensing and registration system became operational as the intervention point rather than the date, 12 months later, on which these regulations became mandatory may have created a conservative bias in our findings of the law's effect.

Interestingly, after adjusting for gun ownership as well as other potential confounders, there was no significant difference between cities in categories B and C in the proportion of their crime guns that had originated from in-state gun dealers. This finding suggests that state level gun control measures may not have a substantial impact on criminal gun availability unless the measures are very comprehensive, including both licensing, registration and other restrictions.

The potential benefits from comprehensive state gun control measures appear to be diminished by the lack of such controls in other states. Consistent with other research,[18][19][20] proximity to people living in states with weak gun laws increased the proportion of a city's crime guns originating from out-of-state gun dealers.

There are several potential limitations to this study. First, our outcome measure may seem somewhat removed from the most important public health outcomes such as homicides. However, there is general consensus among scholars that reduced access to guns among high risk individuals is likely to lead to reduced rates of lethal violence,[1] and the proportion of crime guns that originate from in-state gun dealers should be directly related to how easy it is for high risk individuals to obtain guns. Indeed, we found that the proportion of a city's crime guns that had been sold by an in-state gun dealer was positively associated with another indicator of gun availability to high risk individuals, the proportion of homicides of males ages 15 and above that were committed with firearms.

Criminals and delinquent youth tend to obtain guns in private transactions with acquaintances and to a lesser degree from thefts.[29][30] Although these transactions are difficult to regulate directly, laws that restrict legal gun ownership and gun transfers such as licensing and registration could constrain the supply of guns from these typical sources of crime guns.[5] With fewer guns from local sources, criminals and juveniles must identify out-of-state sources. But interstate traffickers face barriers and risks that may limit their ability to make up for significant in-state supply restrictions. Perhaps as a result of these supply constraints, street prices of guns in places with very restrictive gun control laws tend to be significantly higher than in places with more lax laws.[5]

Omission or inadequate measurement of confounders is always a potential limitation in evaluations of gun policies. By focusing on the effects of state gun sales law on the proportion of crime guns originating from in-state gun dealers, however, the findings from this study may be less vulnerable to certain threats to validity that can bias gun control evaluations that focus on the laws' effects on violent crime.

Inj Prev: first published as 10.1136/ip.7.3.184 on 1 September 2001. Downloaded from http://injuryprevention.bmj.com/ on 3 December 2018 by guest. Protected by copyright.

Inj Prev: first published as 10.1136/ip.7.3.184 on 1 September 2001. Downloaded from http://injuryprevention.bmj.com/ on 3 December 2018 by guest. Protected by copyright.

Violent crime is influenced by a large number of factors, many of which are difficult to measure adequately. In contrast, there are likely to be many fewer unmeasured factors that affect the proportion of crime guns from in-state gun dealers—our final models explained 82% and 89% of the variance in this outcome.

The relatively small, non-random sample of cities, selected by ATF for their willingness to submit information on all crime guns recovered by police, limits the generalizability of the findings. However, the cities in this study are diverse with respect to region and population size, and appear to be representative of their states based on the very high correlation between the cities' and states' measures of our outcome variable ($r = 0.97$, $p<0.001$).

Kleck has suggested that police in states with firearm registries may be less inclined to request an ATF trace of a crime gun that is registered within the state because much of the information from the ATF trace may be obtainable from the state registry.[17] If pervasive within YCGII cities, such practices could bias our findings. However, the police departments that submitted information for this study agreed to submit information to ATF on *all* recovered crime guns. ATF devoted considerable resources to assist local agencies making trace requests and to oversee the collection of data. ATF officials working on the YCGII indicate that the protocols for initiating ATF trace requests used by the participating police departments were generally independent from other police investigations, whether or not a state had a registration system. Furthermore, the proportion of crime guns sold by in-state dealers when the state had a registration system but no permit-to-purchase licensing system (five of the seven cities in category B) was quite high (67%–82%) indicating that the agencies were clearly submitting data to ATF for guns that should also be in the state registry.

Our analyses were limited to guns sold less than years years before recovery by the police because ATF did not trace all crime guns manufactured before 1990. Associations between state gun laws and in-state origins of crime guns may differ for older versus newer guns. Any differences between older and newer guns, however, would have to be quite substantial to negate the very large magnitude of effect for category A state laws.

Finally, the way we choose to categorize state gun sales laws limits our ability to estimate of the independent effects of each type of regulation of interest. Due to the high correlation between the presence of many of the laws we considered, preliminary analyses revealed substantial multicolinearity when we attempted to generated separate estimates for each law of interest.

## Implications for prevention

Understanding the effect of restrictive firearm sales laws can help policymakers to make informed legislative choices. Our findings suggest that comprehensive gun sales regulations that include permit-to-purchase licensing and registration can affect the availability of guns to criminals. Conversely, the absence of these regulations may increase the availability of guns to criminals in nearby states.

This study was supported by grant R49/CCR3028 from the Centers for Disease Control and Prevention to the Johns Hopkins Center for Injury Research and Policy.

1 Reiss AJ Jr, Roth JA, eds. *Understanding and preventing violence: panel on the understanding and control of violent behavior.* National Research Council. Washington, DC: National Academy Press, 1993.
2 Cook PJ. The technology of personal violence. In: Tonry M, ed. *Crime and justice: a review of research.* Vol 14. Chicago: University of Chicago Press, 1991: 1–72.
3 Jacobs JB, Potter KA. Keeping guns out of the "wrong" hands: the Brady law and the limits of regulation. *Journal of Criminal Law & Criminology* 1995;86:93–120.
4 Kleck G. *Targeting guns: firearms and their control.* New York: Aldine de Gruyter, 1997.
5 Cook PJ, Molliconi S, Cole TB. Regulating gun markets. *Journal of Criminal Law & Criminology* 1995;86:59–92.
6 Cook PJ, Leitzel J. Perversity, futility and jeopardy: an economic analysis of the attack on gun control. *Law and Contemporary Problems* 1996;59:91–118.
7 United States General Accounting Office. *Firearms purchased from federal firearms licences using bogus identification.* GAO-01-427. Washington, DC: General Accounting Office, March 2001.
8 Cukier W. Firearms regulation: Canada in the international context. *Chronic Dis Can* 1998;19:25–34.
9 Zimring FE, Hawkins G. *Crime is not the problem: lethal violence in America.* New York: Oxford University Press, 1997.
10 Mauser GA, Holmes RA. An evaluation of the 1977 Canadian firearms legislation, *Evaluation Rev* 1992;16:603–17.
11 Department of Justice, Canada. *A statistical analysis of the impacts of the 1977 firearms control legislation.* Ottawa: Programme Evaluation Section, Research, Statistics and Evaluation Directorate, July 1996.
12 Morrel-Samuels S. Homicide trends in Canada and the United States: 1962–1991: an examination of the effectiveness of gun control. Presented at the Annual Meetings of the American Public Health Association, November 1994.
13 Kleck G, Patterson BB. The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology* 1993;9:249–88.
14 Weil DS, Knox RC. Effects of limiting handgun purchases on interstate transfer of firearms. *JAMA* 1996;275:1759–61.
15 Vernick JS, Webster DW, Hepburn LM. Maryland's law banning Saturday night specials: effects on handgun sales and crime guns. *Inj Prev* 1999;5:259–63.
16 Zimring FE. Firearms, violence and public policy. *Scientific American* 1991(Nov):48–54.
17 Kleck G. BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals. *St Louis University Public Law Review* 1999;18:23–45.
18 Bureau of Alcohol, Tobacco, and Firearms. *The youth crime gun interdiction initiative: crime gun trace analysis reports: the illegal youth firearms markets in 27 communities.* Washington, DC: US Department of the Treasury, February 1999.
19 Bureau of Alcohol, Tobacco, and Firearms. *The youth crime gun interdiction initiative: crime gun trace analysis reports: the illegal youth firearms markets in 17 communities.* Washington, DC: US Department of the Treasury, July 1997.
20 Bureau of Alcohol, Tobacco, and Firearms. *State laws and published ordinances—firearms.* 1st Ed. Washington, DC: US Department of Treasury, 1998.
21 Bureau of Justice Statistics. *Survey of state procedures related to firearms sales, 1997.* Washington, DC: US Department of Justice, December 1998.
22 US Bureau of the Census. *Geographic mobility: March 1996 to March 1997.* Current Population Reports. Washington DC: Bureau of the Census, US Department of Commerce, 1998.
23 Cook PJ. The effect of gun availability on robbery and robbery murder. In: Haveman R, Zellner BB, eds. *Policy studies review annual.* Beverly Hills, CA: Sage, 1979: 743–81.
24 United States Census 1998 Population Estimates Update. www.census.gov/population/estimates.
25 Bureau of the Census. MABLE/GeoCorr Geographic Correspondence Engine, version 2.01. www.census.gov/plue.
26 DeLorme Mapping. *Map Expert version 2.0 for Windows.* Yarmouth, ME: DeLorme Mapping, 1993.
27 Dunnett CW. Pairwise multiple comparisons in the unequal variance case. *J Am Stat Assoc* 1980;75:796–800.
28 Cook RD. Detection of influential observation in linear regression. *Technometrics* 1977;19:15–18.
29 Wright JD, Rossi PH. *The armed criminal in America: a survey of incarcerated felons.* Washington, DC: National Institute of Justice, 1985.
30 Sheley JF, Wright JD. *In the line of fire: youth, guns, and violence in urban America.* New York: Aldine de Gruyter, 1995.

JA1707

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*

Plaintiffs

v.                                                          Civil Case No: 16-cv-03311 MJG

LAWRENCE HOGAN, et al.

Defendants

---

<u>**ANSWERS TO INTERROGATORIES**</u>

TO:       LAWRENCE HOGAN, et al., *Defendants*
          c/o Jennifer L. Katz, Esq.
          Robert A. Scott, Esq.
          Office of the Attorney General
          200 St. Paul Place
          Baltimore, MD 21202


FROM:     Maryland Shall Issue, *Plaintiff*
          c/o Cary J. Hansel
          HANSEL LAW, P.C.
          2514 North Charles Street
          Baltimore, MD 21218


        COMES NOW Plaintiff Maryland Shall Issue, by and through undersigned Counsel, and
pursuant to the Federal Rules of Civil Procedure, answers Defendant Lawrence Hogan's Interrogatories
to Plaintiff Maryland Shall Issue.

<u>**NOTICE**</u>

1.      The information supplied in these Answers is not based solely on the knowledge of the executing
party, but includes the knowledge of the party, agents, representatives, and attorneys, unless privileged.

2.      The word usage and sentence structure may be that of the attorney assisting in the preparation of
the Answers and thus does not purport to be the exact language of the party.

3.      These Answers furnish knowledge, facts, and information presently available and, if subsequent
or different information is obtained prior to trial, as requested, such information will be either formally
or informally communicated to all parties.

1

**EXHIBIT 3**

## GENERAL OBJECTIONS

1.    Plaintiff objects to any Interrogatories that seeks the disclosure of information protected by the attorney/client privilege, the work product doctrine, or any other applicable privilege. The inadvertent disclosure of privileged material shall not constitute a waiver of the applicable privilege.

2.    Plaintiff objects to any Interrogatories to the extent they call for information that is not relevant to the subject matter of this action, nor reasonably calculated to lead to the disclosure of admissible evidence, or otherwise beyond the scope of the applicable Rules.

3.    This Answer is made subject to inadvertent or undiscovered errors and are based upon and therefore limited by records and information still in existence, presently recollected and thus far discovered and reviewed in the course of preparing these responses. Discovery is ongoing at this time. Plaintiffs reserve the right to make any changes to the Answer if it appears that inadvertent erroneous inclusions, omissions or other errors have been made or additional or more accurate information becomes available including information from ongoing discovery.

4.    Plaintiff objects to any Interrogatory to the extent it seeks information not discoverable under the Federal Rules of Civil Procedure.

5.    Plaintiff objects to any Interrogatory to the extent it is irrelevant and is not reasonably calculated to lead to the discovery of admissible evidence.

6.    Plaintiff objects to Defendant's instructions to the extent they purport to create definitions or instructions greater than that provided by the Federal Rules of Civil Procedure.

7.    An objection on the ground that a particular Interrogatory is "vague and ambiguous" is an objection that the Interrogatory is vague, ambiguous, unintelligible, and indefinite.

8.    Each of the forgoing objections and responses applies to each individual Answer and is incorporated in the Plaintiff's Answer to each request as if fully set forth therein.

Without waiver of these objections, Plaintiff answers as set forth below.

## INTERROGATORIES

1.    Identify all members of MSI since October 1, 2013, and their primary residential addresses.

**Response No. 1:**    Objection. Irrelevant. Overly broad and unduly burdensome. Without waiving said objection, there are currently over 800 members. In addition to the objections above, MSI declines to produce the list for reasons of privacy, confidentiality and potential retaliation. Having so stated, MSI identifies the following members whose circumstances MSI relies upon in part to establish standing and other elements of its case:

2

| 1. | Deborah "Debbie" Kay Miller 297 Aston Forest Lane Crownsville, MD 21032 | Deterred by all HQL requirements, inconvenience, and health concerns of undergoing training. | Ms. Miller is a 56-year-old female with full-time employment at the DOD as a customer service representative. Ms. Miller possesses a physical disability card due to injuries associated with her back and feet. At work, she has disability consideration in that a special chair is provided for her. Ms. Miller does not currently own any guns, but does occasionally visit a shooting range. |
|---|---|---|---|
| 2. | John Matthew Clark 1240 Arnold Road Westminster, MD 21157 | Deterred by the cost of the HQL itself, training, the cost of 3rd-party fingerprinting, and the hassle of finding an "approved" fingerprint service provider. | Mr. Clark works as a computer/web server technician and is 47 years old. He would have to take a day off of work and use vacation time to have fingerprinting done. Mr. Clark reported that his county sheriff refuses to cooperate with HQL applicants. |
| 3. | Dana Hoffman 7051 Carroll Ave, Apt. 915 Takoma Park, MD 2091 | Deterred by the HQL requirements, especially the live fire and training requirements | Ms. Hoffman is 74 years old and is confined to a wheelchair. She has a medical condition that makes it impossible for her to obtain training, including the MSP live fire requirement. Ms Hoffman does not own any guns but wishes to purchase a handgun for self-defense in her home. |
| 4. | Scott Miller 1004 Murdoch Ct Crofton, MD 21114 | Deterred by cost and time requirement | Mr. Miller as a 27-year-old Emergency Medical Technician. Mr. Miller's ambulance was recently caught in a firefight in D.C., and was hit by 7 bullet rounds. Although he could not carry while on the job, Mr. Miller still wants to protect himself. Mr. Miller currently does not own any handguns or have any permit, as his lifelong residency in Maryland has effectively discouraged any such acquisitions. |

See also Response 3. As additional members with potential relevant circumstances are identified by MSI, they will be disclosed by way of supplementation of this response.

2.      Identify all MSI members who have obtained a Maryland Handgun Qualification License ("HQL").

**Response No. 2:**      Objection, irrelevant. Without waiver, MSI further states that MSI does not track such information for its members. MSI has numerous members who do not have an HQL, including the persons identified in the response to Question 1.

3

3.    Identify all members of MSI who have been a Qualified Handgun Instructor, as defined in § 5-101(q) of the Public Safety Article of the Maryland Code, at any time since October 1, 2013, and their primary residential addresses.

**Response No. 3:**    Objection, irrelevant.  Without waiver, MSI further states that MSI does not track such information for its members, but states further that most of the officers and members of the MSI Board of Directors are Qualified Handgun Instructors, including:

Mark W. Pennak,
7416 Ridgewood Ave.,
Chevy Chase, MD 20815
President, MSI

John Mountjoy
23202 Pembrook Drive
Hollywood, MD 20636
Vice President, MSI

Brook Powers
3501 Ward Lane
Frederick, MD 21704
Chairman of the Board, MSI

Gregory Gambill
3010 Parktowne Rd.
Parkville, MD 21234
Treasurer/Secretary, MSI

Daniel Carlin-Webber
2011 Frames Rd
Dundalk, MD 21222
Board Member, MSI

Brian Bissett
7088 Water Oak Road
Elkridge MD 21075-6525
Board Member, MSI

Michael Burke
PO Box 23111
Baltimore MD 21203
Board Member, MSI

Paul Sill
6515 Dundee Drive
Unit 236
Eldersburg, MD 21784

4

Board Member, MSI

4.      Identify all pricing information you have received regarding the firearms safety training requirement of Maryland's HQL process.

**Response No. 4:**      *See* documents produced.

5.      Identify all pricing information you have received regarding the fingerprinting requirement of Maryland's HQL process.

**Response No. 5:**      *See* documents produced.

6.      Identify any individuals, including but not limited to any individual members of MSI, who have been deterred from purchasing a handgun due to the expense and inconvenience of the HQL requirements.

**Response No. 6:**      Objection, outside the knowledge of the responding party.  Irrelevant.  Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime. Without waiving said objection, *see* Complaint and Response No. 1.

7.      Identify any individuals, including but not limited to any individual members of MSI, who have an urgent need for a handgun, but who, due to the expense and inconvenience of the HQL requirements, have been deterred from purchasing a handgun.

**Response No. 7:**      Objection, outside the knowledge of the responding party.  Irrelevant. Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

Without waiving said objection, *see* Complaint and Response No. 1.

8.      Identify any individuals, including but not limited to any individual members of MSI, who hunt for food and are in need of a handgun, but who, due to the expense and inconvenience of the HQL requirements, have been deterred from purchasing a handgun.

**Response No. 8:**      Objection, outside the knowledge of the responding party.  Irrelevant.  Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

9.      Identify any individuals, including but not limited to any individual members of MSI, who live in an urban area with no access to Maryland State Police ("MSP") certified handgun trainers and/or a shooting range and are in need of handgun, but who have been deterred from purchasing a handgun by the HQL live-fire requirement.

**Response No. 9:**      Objection, outside the knowledge of the responding party.  Irrelevant.  Without waiver said objections, MSI further states that MSI has no way of tracking what are likely thousands of

5

individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

Without waiving said objections, such persons lacking reasonable access would include every citizen of Maryland who does have reasonable access to one or more of the very few public ranges in an urban area that effectively bans the discharge of firearms in any place other than at a firing range. Such urban areas that impose such bans include most of Montgomery County (County Code Section 57-4), most of Prince Georges County (County Code Section 14-142), much of Baltimore County (County Code 12-2-101), and all of the City of Baltimore (City Code Section 59-2). On information and belief, MSI states that there are no public firing ranges in the City of Baltimore, only one such range in Montgomery County (Gilberts) and only two such public ranges in Prince Georges County (Maryland Small Arms Range and Fred's Outdoors). Such public ranges may also have their own rules and regulations that limit access. See also Complaint and Response 1.

10.    Identify any individuals, including but not limited to individual members of MSI, who live in an area with no access to MSP approved fingerprint vendors and are in need of a handgun, but who have been deterred from purchasing a handgun by the HQL live-scan fingerprinting requirement.

**Response No. 10:**    Objection, outside the knowledge of the responding party. Irrelevant. Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

Without waving said objection, every citizen living in western Maryland between the McHenry/ Oakland area and Cumberland and the small towns and vast rural areas in western Maryland outside those specific towns lacks such reasonable access. In addition, every person living in Thurmont and Emmitsburg, and Taneytown and surrounding vast rural areas and small towns in northern Maryland lacks such reasonable access. Every person living in La Plata and Newburg and St. Mary's City and Lexington Park as well as other small towns and in the vast rural areas in southern Maryland lacks such reasonable access. In addition, every person living in Fredericktown and Denton and Pocomoke City, and Chestertown and Crisfield as well as in other small towns and in the vast rural areas on the Eastern Shore of Maryland lack reasonable access to approved fingerprinting vendors. On information and belief, there is no State approved live-scan vendor currently located in any of the aforementioned towns and rural areas. See https://www.dpscs.state.md.us/publicservs/fingerprint.shtml. All these areas include current or potential MSI members. Every person who does not have the means to afford the cost or time associated with live-scan fingerprinting or the means to travel to a state-approved live-scan vendor lacks reasonable access, regardless of place of residence. Such persons include MSI members and potential members. See Response 1.

11.    If you contend that any defendant has made any admission and/or declaration against interest relating to any claims or defenses involved in this lawsuit, identify the person making each such admission or declaration, the substance of each such admission or declaration, the date of each such admission or declaration and identify all documents relating to each such admission or declaration.

**Response No. 11:**    *See* documents produced.

6

12.     Identify and describe all communications you had with anyone, other than your attorneys, concerning efforts to locate and identify individuals to serve as plaintiffs in this lawsuit, including in your answer the parties to each communication and the date and time of each communication.

**Response No. 12:**     Objection. Irrelevant. Further, this question, when posed by the government, impermissibly infringes on the First Amendment of the United States Constitution.

13.     Identify and describe all communications you had with anyone, other than your attorneys, concerning the factual basis for the matters alleged in the Complaint, including in your answer the parties to each communication, the subject matter of each communication and the date and time of each communication.

**Response No. 13:**     Objection.   Irrelevant, overly broad and unduly burdensome.   Without waiving said objection, MSI communicates with its members, the public, legislators and others regarding the referenced matters on a routine basis.  As part of its mission, the organization exists to communicate regarding these issues.  See, e.g., www.marylandshallissue.org.
It would be impossible to identify and describe every such communication and the date and time of each.  Without waiving said objections, see documents produced.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE BASED ON MY PERSONAL KNOWLEDGE AND BELIEF.**

Maryland Shall Issue, Inc.

By:     Mark W. Pennak, Esquire,          Dated:  January 26, 2018
        MSI President.


                                    RESPECTFULLY SUBMITTED,

                                    HANSEL LAW, P.C.

                                    Cary J. Hansel
                                    2514 North Charles Street
                                    Baltimore, MD 21218
                                    (301) 461-1040
                                    (443) 451-8606
                                    Cary@hansellaw.com
                                    *Counsel for the Plaintiff*

                                    7

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 26th day of January 2018, a copy of the foregoing Answers to Interrogatories to was mailed, by first class mail, postage prepaid, to:

Jennifer L. Katz, Esq.
Robert A. Scott, Esq.
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
*Counsel for Defendants*

John P. Sweeney, Esq.
T. Sky Woodward, Esq.
Bradley Arant Boult Cummings LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
*Counsel for Plaintiff Atlantic Guns, Inc.*

Cary J. Hansel

8

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------X

MARYLAND SHALL ISSUE, INC.,        :

et al.,                            :

                                   :    Case No:

        Plaintiffs                 :    16-cv-3311-MJG

                                   :

            -vs-                    :    Pages 1 - 109

                                   :

LAWRENCE HOGAN, in his             :

capacity of Governor of            :

Maryland, et al.,                  :

                                   :

        Defendants                 :

------------------------------X

Deposition of James Johnson

Baltimore, Maryland

Tuesday, March 13, 2018

Reported by:  Kathleen M. Vaglica, RPR, RMR

Job No:  390081

MAGNA LEGAL SERVICES

(866) 624-6221



**EXHIBIT 4**

JA1716

Page 106

1    situation where there had been an accidental

2    discharge of a handgun?

3        A.   I'd have to say just numerous cases of

4    both police officer and private citizen.

5        Q.   Okay.  Do you recall being asked about the

6    live fire component of the training requirement?

7        A.   Yes.

8        Q.   And do you recall mentioning the

9    importance of the training having experience of

10   chambering a round?

11       A.   It's a credible component given the

12   technology of the current state-of-the-art weapons,

13   and what caused all of the accidental discharges in

14   Baltimore County were failure to recall, remember

15   that there was a round previously chambered, and

16   unfortunately, the person pulled the trigger unaware

17   that there was a round in the chamber thinking

18   ejection of the magazine was sufficient to safe the

19   weapon.

20       Q.   And how might the live fire component of

21   the training prevent that situation?

22       A.   I think it causes an individual to become



Page 107

1    accustom to the mechanism, the operation of the

2    weapon, and then just your muscle memory or

3    training, again, and repeat a process of clearing

4    the weapon before they determine, in fact, it's

5    safe.

6            MS. KATZ:   Okay.   I don't have any other

7    questions.

8            MR. SWEENEY:   I have no other questions.

9            (Whereupon, signature not having been

10   waived, the taking of the deposition concluded at

11   1:19 p.m.)

12                        *    *    *

13

14

15

16

17

18

19

20

21

22



Page 109

1              CERTIFICATE OF NOTARY PUBLIC

2          I, Kathleen M. Vaglica, the officer before

3   whom the foregoing deposition was taken, do hereby

4   certify that the witness whose testimony appears in

5   the foregoing deposition was duly sworn by me; that

6   the testimony of said witness was taken by me in

7   stenotype and thereafter reduced to typewriting

8   under my direction; that said deposition is a true

9   record of the testimony given by said witness; that

10  I am neither counsel for, related to, nor employed

11  by any of the parties to the action in which this

12  deposition was taken; and, further, that I am not a

13  relative or employee of any attorney or counsel

14  employed by the parties hereto, nor financially or

15  otherwise interested in the outcome of the action.

16

17

18                          Notary Public in and for

19                          State of Maryland

20

21  My Commission Expires:

22  January 10, 2019



JA1719

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*

Plaintiffs

v.                                                               Civil Case No: 16-cv-03311 MJG

LAWRENCE HOGAN, et al.

Defendants

## ANSWERS TO INTERROGATORIES

TO:      LAWRENCE HOGAN, et al., *Defendants*
          c/o Jennifer L. Katz, Esq.
          Robert A. Scott, Esq.
          Office of the Attorney General
          200 St. Paul Place
          Baltimore, MD 21202

FROM:    Maryland Shall Issue, *Plaintiff*
          c/o Cary J. Hansel
          HANSEL LAW, P.C.
          2514 North Charles Street
          Baltimore, MD 21218

       COMES NOW Plaintiff Maryland Shall Issue, by and through undersigned Counsel, and pursuant to the Federal Rules of Civil Procedure, answers Defendant Lawrence Hogan's Interrogatories to Plaintiff Maryland Shall Issue.

## NOTICE

1.    The information supplied in these Answers is not based solely on the knowledge of the executing party, but includes the knowledge of the party, agents, representatives, and attorneys, unless privileged.

2.    The word usage and sentence structure may be that of the attorney assisting in the preparation of the Answers and thus does not purport to be the exact language of the party.

3.    These Answers furnish knowledge, facts, and information presently available and, if subsequent or different information is obtained prior to trial, as requested, such information will be either formally or informally communicated to all parties.

1

**EXHIBIT 1**

## GENERAL OBJECTIONS

1.    Plaintiff objects to any Interrogatories that seeks the disclosure of information protected by the attorney/client privilege, the work product doctrine, or any other applicable privilege.  The inadvertent disclosure of privileged material shall not constitute a waiver of the applicable privilege.

2.    Plaintiff objects to any Interrogatories to the extent they call for information that is not relevant to the subject matter of this action, nor reasonably calculated to lead to the disclosure of admissible evidence, or otherwise beyond the scope of the applicable Rules.

3.    This Answer is made subject to inadvertent or undiscovered errors and are based upon and therefore limited by records and information still in existence, presently recollected and thus far discovered and reviewed in the course of preparing these responses.  Discovery is ongoing at this time.  Plaintiffs reserve the right to make any changes to the Answer if it appears that inadvertent erroneous inclusions, omissions or other errors have been made or additional or more accurate information becomes available including information from ongoing discovery.

4.    Plaintiff objects to any Interrogatory to the extent it seeks information not discoverable under the Federal Rules of Civil Procedure.

5.    Plaintiff objects to any Interrogatory to the extent it is irrelevant and is not reasonably calculated to lead to the discovery of admissible evidence.

6.    Plaintiff objects to Defendant's instructions to the extent they purport to create definitions or instructions greater than that provided by the Federal Rules of Civil Procedure.

7.    An objection on the ground that a particular Interrogatory is "vague and ambiguous" is an objection that the Interrogatory is vague, ambiguous, unintelligible, and indefinite.

8.    Each of the forgoing objections and responses applies to each individual Answer and is incorporated in the Plaintiff's Answer to each request as if fully set forth therein.

Without waiver of these objections, Plaintiff answers as set forth below.

## INTERROGATORIES

1.    Identify all members of MSI since October 1, 2013, and their primary residential addresses.

**Response No. 1:**    Objection.  Irrelevant.  Overly broad and unduly burdensome.  Without waiving said objection, there are currently over 800 members.  In addition to the objections above, MSI declines to produce the list for reasons of privacy, confidentiality and potential retaliation.  Having so stated, MSI identifies the following members whose circumstances MSI relies upon in part to establish standing and other elements of its case:

2

JA1721

| 1. | Deborah "Debbie" Kay Miller 297 Aston Forest Lane Crownsville, MD 21032 | Deterred by all HQL requirements, inconvenience, and health concerns of undergoing training. | Ms. Miller is a 56-year-old female with full-time employment at the DOD as a customer service representative. Ms. Miller possesses a physical disability card due to injuries associated with her back and feet. At work, she has disability consideration in that a special chair is provided for her. Ms. Miller does not currently own any guns, but does occasionally visit a shooting range. |
|---|---|---|---|
| 2. | John Matthew Clark 1240 Arnold Road Westminster, MD 21157 | Deterred by the cost of the HQL itself, training, the cost of 3rd-party fingerprinting, and the hassle of finding an "approved" fingerprint service provider. | Mr. Clark works as a computer/web server technician and is 47 years old. He would have to take a day off of work and use vacation time to have fingerprinting done. Mr. Clark reported that his county sheriff refuses to cooperate with HQL applicants. |
| 3. | Dana Hoffman 7051 Carroll Ave, Apt. 915 Takoma Park, MD 2091 | Deterred by the HQL requirements, especially the live fire and training requirements | Ms. Hoffman is 74 years old and is confined to a wheelchair. She has a medical condition that makes it impossible for her to obtain training, including the MSP live fire requirement. Ms Hoffman does not own any guns but wishes to purchase a handgun for self-defense in her home. |
| 4. | Scott Miller 1004 Murdoch Ct Crofton, MD 21114 | Deterred by cost and time requirement | Mr. Miller as a 27-year-old Emergency Medical Technician. Mr. Miller's ambulance was recently caught in a firefight in D.C., and was hit by 7 bullet rounds. Although he could not carry while on the job, Mr. Miller still wants to protect himself. Mr. Miller currently does not own any handguns or have any permit, as his lifelong residency in Maryland has effectively discouraged any such acquisitions. |

See also Response 3. As additional members with potential relevant circumstances are identified by MSI, they will be disclosed by way of supplementation of this response.

2.      Identify all MSI members who have obtained a Maryland Handgun Qualification License ("HQL").

**Response No. 2:**      Objection, irrelevant. Without waiver, MSI further states that MSI does not track such information for its members. MSI has numerous members who do not have an HQL, including the persons identified in the response to Question 1.

3

3.    Identify all members of MSI who have been a Qualified Handgun Instructor, as defined in § 5-101(q) of the Public Safety Article of the Maryland Code, at any time since October 1, 2013, and their primary residential addresses.

**Response No. 3:**    Objection, irrelevant.  Without waiver, MSI further states that MSI does not track such information for its members, but states further that most of the officers and members of the MSI Board of Directors are Qualified Handgun Instructors, including:

Mark W. Pennak,
7416 Ridgewood Ave.,
Chevy Chase, MD 20815
President, MSI

John Mountjoy
23202 Pembrook Drive
Hollywood, MD 20636
Vice President, MSI

Brook Powers
3501 Ward Lane
Frederick, MD 21704
Chairman of the Board, MSI

Gregory Gambill
3010 Parktowne Rd.
Parkville, MD 21234
Treasurer/Secretary, MSI

Daniel Carlin-Webber
2011 Frames Rd
Dundalk, MD 21222
Board Member, MSI

Brian Bissett
7088 Water Oak Road
Elkridge MD 21075-6525
Board Member, MSI

Michael Burke
PO Box 23111
Baltimore MD 21203
Board Member, MSI

Paul Sill
6515 Dundee Drive
Unit 236
Eldersburg, MD 21784

4

Board Member, MSI

4.    Identify all pricing information you have received regarding the firearms safety training requirement of Maryland's HQL process.

**Response No. 4:**    *See* documents produced.

5.    Identify all pricing information you have received regarding the fingerprinting requirement of Maryland's HQL process.

**Response No. 5:**    *See* documents produced.

6.    Identify any individuals, including but not limited to any individual members of MSI, who have been deterred from purchasing a handgun due to the expense and inconvenience of the HQL requirements.

**Response No. 6:**    Objection, outside the knowledge of the responding party. Irrelevant. Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime. Without waiving said objection, *see* Complaint and Response No. 1.

7.    Identify any individuals, including but not limited to any individual members of MSI, who have an urgent need for a handgun, but who, due to the expense and inconvenience of the HQL requirements, have been deterred from purchasing a handgun.

**Response No. 7:**    Objection, outside the knowledge of the responding party. Irrelevant. Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

Without waiving said objection, *see* Complaint and Response No. 1.

8.    Identify any individuals, including but not limited to any individual members of MSI, who hunt for food and are in need of a handgun, but who, due to the expense and inconvenience of the HQL requirements, have been deterred from purchasing a handgun.

**Response No. 8:**    Objection, outside the knowledge of the responding party. Irrelevant. Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

9.    Identify any individuals, including but not limited to any individual members of MSI, who live in an urban area with no access to Maryland State Police ("MSP") certified handgun trainers and/or a shooting range and are in need of handgun, but who have been deterred from purchasing a handgun by the HQL live-fire requirement.

**Response No. 9:**    Objection, outside the knowledge of the responding party. Irrelevant. Without waiver said objections, MSI further states that MSI has no way of tracking what are likely thousands of

5

individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

Without waiving said objections, such persons lacking reasonable access would include every citizen of Maryland who does have reasonable access to one or more of the very few public ranges in an urban area that effectively bans the discharge of firearms in any place other than at a firing range. Such urban areas that impose such bans include most of Montgomery County (County Code Section 57-4), most of Prince Georges County (County Code Section 14-142), much of Baltimore County (County Code 12-2-101), and all of the City of Baltimore (City Code Section 59-2). On information and belief, MSI states that there are no public firing ranges in the City of Baltimore, only one such range in Montgomery County (Gilberts) and only two such public ranges in Prince Georges County (Maryland Small Arms Range and Fred's Outdoors). Such public ranges may also have their own rules and regulations that limit access. See also Complaint and Response 1.

10.    Identify any individuals, including but not limited to individual members of MSI, who live in an area with no access to MSP approved fingerprint vendors and are in need of a handgun, but who have been deterred from purchasing a handgun by the HQL live-scan fingerprinting requirement.

**Response No. 10:**    Objection, outside the knowledge of the responding party. Irrelevant. Without waiver, MSI further states that MSI has no way of tracking what are likely thousands of individuals who have been deterred from exercising a constitutional right by Maryland's repressive HQL regime.

Without waving said objection, every citizen living in western Maryland between the McHenry/ Oakland area and Cumberland and the small towns and vast rural areas in western Maryland outside those specific towns lacks such reasonable access. In addition, every person living in Thurmont and Emmitsburg, and Taneytown and surrounding vast rural areas and small towns in northern Maryland lacks such reasonable access. Every person living in La Plata and Newburg and St. Mary's City and Lexington Park as well as other small towns and in the vast rural areas in southern Maryland lacks such reasonable access. In addition, every person living in Fredericktown and Denton and Pocomoke City, and Chestertown and Crisfield as well as in other small towns and in the vast rural areas on the Eastern Shore of Maryland lack reasonable access to approved fingerprinting vendors. On information and belief, there is no State approved live-scan vendor currently located in any of the aforementioned towns and rural areas. See https://www.dpscs.state.md.us/publicservs/fingerprint.shtml. All these areas include current or potential MSI members. Every person who does not have the means to afford the cost or time associated with live-scan fingerprinting or the means to travel to a state-approved live-scan vendor lacks reasonable access, regardless of place of residence. Such persons include MSI members and potential members. See Response 1.

11.    If you contend that any defendant has made any admission and/or declaration against interest relating to any claims or defenses involved in this lawsuit, identify the person making each such admission or declaration, the substance of each such admission or declaration, the date of each such admission or declaration and identify all documents relating to each such admission or declaration.

**Response No. 11:**    *See* documents produced.

6

12.    Identify and describe all communications you had with anyone, other than your attorneys, concerning efforts to locate and identify individuals to serve as plaintiffs in this lawsuit, including in your answer the parties to each communication and the date and time of each communication.

**Response No. 12:**    Objection. Irrelevant. Further, this question, when posed by the government, impermissibly infringes on the First Amendment of the United States Constitution.

13.    Identify and describe all communications you had with anyone, other than your attorneys, concerning the factual basis for the matters alleged in the Complaint, including in your answer the parties to each communication, the subject matter of each communication and the date and time of each communication.

      **Response No. 13:**    Objection.  Irrelevant, overly broad and unduly burdensome.  Without waiving said objection, MSI communicates with its members, the public, legislators and others regarding the referenced matters on a routine basis.  As part of its mission, the organization exists to communicate regarding these issues.  See, e.g., www.marylandshallissue.org.
It would be impossible to identify and describe every such communication and the date and time of each.  Without waiving said objections, see documents produced.

**I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING INFORMATION IS TRUE BASED ON MY PERSONAL KNOWLEDGE AND BELIEF.**

Maryland Shall Issue, Inc.

By:    Mark W. Pennak, Esquire,          Dated:  January 26, 2018
       MSI President.


                              RESPECTFULLY SUBMITTED,

                              HANSEL LAW, P.C.

                              Cary J. Hansel
                              2514 North Charles Street
                              Baltimore, MD 21218
                              (301) 461-1040
                              (443) 451-8606
                              Cary@hansellaw.com
                              *Counsel for the Plaintiff*

7

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 26th day of January 2018, a copy of the foregoing Answers to Interrogatories to was mailed, by first class mail, postage prepaid, to:

Jennifer L. Katz, Esq.
Robert A. Scott, Esq.
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
*Counsel for Defendants*

John P. Sweeney, Esq.
T. Sky Woodward, Esq.
Bradley Arant Boult Cummings LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
*Counsel for Plaintiff Atlantic Guns, Inc.*

Cary J. Hansel

8

Prepared Testimony of Mark W. Pennak In Opposition to SB 281 and SB 445
1316 Brentland Road
Knoxville, MD 21758
(301) 834 8854
m.pennak@comcast.net
February 6, 2013

**Summary**

First, who I am. I am married, a father of two children, a 14-year-old daughter and a 19-year-old son, and a stepfather to a 13-year-old boy, a 20-year-old young man and 21-year-old young woman. I am the protector of my family. I am also a life-long registered Democrat. I have voted in every primary and every general election since I became a voter in 1971. I have also been a lawyer for 38 years and my litigation practice is at the highest levels in the federal courts. I am also a life-long hunter and owner of rifles, shotguns and handguns. I fully support effective gun control, designed to keep firearms out of the hands of people who should not have them and I support the mental health reporting provisions of SB 281 for that reason. However, I do not support the remaining parts of SB 281, which will serve only to promote years of litigation, result in massive criminalization of otherwise law-abiding people, and not effectively protect me or my family from violence. I also oppose the new restrictions imposed on holders of concealed weapons permits by SB 445. This letter is written solely on my own behalf, as a private citizen.

Given that others will focus on the SB 281's ban on scary looking rifles (aka "assault weapons"), I would like to limit my remarks here to three aspects of SB 281 and make one point as to gun free zones created by SB 445. First, SB 281 places substantial time and financial burdens on law-abiding persons who wish only to exercise their Second Amendment right to purchase a handgun. Those burdens are, *in toto*, among the most severe in the Nation and are of dubious constitutionality. Second, SB 281 effectively bans the mere possession of any type of ammunition by persons under the age of 21, thereby banning possession of ammunition by persons between the ages of 18-21 (including my son and stepson) even though these persons may lawfully purchase and possess long guns in this state. It effectively bans hunting by any person under the age of 21, including minors who are otherwise expressly permitted by state law to possess firearms at any age if they earn a hunter safety certificate. This ban on ammunition is irrational in its scope and impact and will not survive review in the courts. Third, SB 281 imposes a very short time to register the guns that the Bill bans (so called "assault weapons") and then imposes extreme legal sanctions on those who miss that short deadline. These provisions are grossly unreasonable and serve only to convert law-abiding citizens into criminals, who would then be subjected to a permanent, lifetime ban on the possession of any firearm under federal law. Fourth, SB 445 creates and perpetuates gun-free-zones and yet these zones are magnets for the deranged. If the State is going to mandate gun free zones, as our schools are currently designated, then the State has an affirmative obligation to protect those persons in those zones who are legally disarmed and thus prevented from protecting themselves.

*Testimony of Mark W. Pennak*

**EXHIBIT 2**

**The Burden On the Constitutional Right to Purchase A Handgun**

The Bill would require the prior registration of all handgun buyers who must obtain a "handgun qualification license" in order to purchase or rent a handgun. To obtain such a license, a person must pay a $100 application fee,"the fee authorized under § 10–221(B)(7)," and the "mandatory processing fee" for NICS checks. The applicant must also submit "two complete sets of the applicant's legible fingerprints," and "proof of satisfactory completion of a firearms safety training course approved by the Secretary" that must consist of "a minimum of 8 hours of instruction by a qualified handgun instructor" on specified subjects. The applicant bears the cost of all of these requirements. These costs are substantial. The Secretary of the State Police demands LiveScan computer fingerprinting, which costs a minimum of $75.00. The specified training course of 8 hours is roughly equivalent to the NRA's Basic Pistol course, which costs approximately $100, plus the cost of any ammunition that may be used for a personally owned pistol. The Bill does not set any limit on the cost that the Secretary may impose for this training and there is no statutory assurance that the NRA course will be deemed sufficient. The license. itself, is good only for five years, at which time the applicant must redo the entire process. The total cost of these requirements is roughly $385.00, every five years.

There can be little dispute that these requirements would substantially burden a law-abiding citizen's constitutional right to keep and bear arms under the Second Amendment, as construed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). This right is so fundamental that it has been incorporated into the Due Process Clause of the 14th Amendment and thus made applicable to the States. See *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010)("citizens must be permitted to use handguns for the core lawful purpose of self defense"). The burden is on the State to justify any burden on this core constitutional right, and SB 281 articulates no such justification and none is apparent. See *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (holding that Illinois ban on public possession of handguns outside the home was not supported by sufficient legislative facts).

Indeed, all handguns and so called assault weapons are heavily regulated by existing Maryland law. In Maryland, such purchases of handguns and "assault weapons" already require a separate form, a 7-day waiting period and a background check by the State Police of federal and state databases. MD Code, Public Safety, § 5-101. State law already requires the purchaser to complete a firearms course. MD Code, Public Safety, § 5-118. Maryland already requires background checks and a waiting period for sales of all regulated firearms by private sales. MD Public Safety Article, § 5-124. Maryland permits only one purchase of a handgun every 30 days. MD Code, Public Safety, § 5-128. Straw purchases are already banned under State law. MD Code, Public Safety, § 5-136. These provisions effectively prevent "gun-running" and other types of illegal sales. Few "gun-runners" or "straw purchasers" will endure a 7 day waiting period or accept the 30-day restriction between each individual purchase. There is no evidence that straw purchases are a significant problem in Maryland.

- 2 -

*Testimony of Mark W. Pennak*

There is also no evidence that the restrictions imposed by SB 281 on handgun purchases will be more effective in preventing any straw purchases that do occur. The lack of real evidence is of constitutional dimension. The State is not entitled to any presumption of constitutionality for this legislation as *Heller* directly holds that the "rational basis" test is off the table. Rather, the burden will be on the State to produce real evidence supporting these requirements. These requirements may well be subjected to strict scrutiny as they directly burden the right to be armed with a handgun in the home. But, even under a more relaxed standard of intermediate scrutiny, "the **government bears the burden** of demonstrating (1) that it has an important governmental 'end' or 'interest' and (2) that the end or interest is substantially served by enforcement of the regulation. *United States v. Carter*, 669 F.2d 411, 417 (4th Cir. 2012) (citations omitted). The State will face great difficulty in satisfying even this relaxed standard.

In fact, the new requirements appear only designed to discourage and burden the right to own and possess a handgun. That is not a legitimate or legally permissible justification. See, e.g., *Woollard v. Sheridan*, 863 F.Supp.2d 462 (D. Md. 2012), appeal pending, No. 12-1437 (4th Cir.) (argued Oct. 24, 2012) (holding that Maryland's restrictive gun licensing standard was unconstitutional because it operated as "a rationing system . . . [that] aims . . . simply to reduce the total number of firearms"). The State may not seek to discourage, repress or tax the exercise of Second Amendment rights any more than it may seek to discourage, repress or tax other constitutional rights. See, e.g., *Murdock v. Pennsylvania*, 319 U.S. 105, 112 (1943) (holding invalid a "a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment."); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights"). The principle is simple: states and localities may not charge people burdensome fees for the right to exercise their fundamental constitutional rights. People who exercise their constitutional right to own handguns are not some sort of subclass of humans, whom the state must oversee and supervise as potential miscreants.

Very few States impose any requirement to obtain a license to purchase a handgun. Such a license amounts to licensing the purchaser rather than any firearm and such a license requirement is itself of dubious constitutionality. See *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (D.C. Cir. 2011) (*Heller II*) (remand for a factual determination on whether the District's attempts at "licensing the owner of the firearm" were supported by actual evidence under intermediate scrutiny). The $100 application and other fees are prohibitive, and taken together with the cost of the other new requirements, would be at or near the Nation's highest. Current Maryland law requires one to submit an application form and pay a $10 application fee prior to the purchase of a handgun. Md. Code Ann., Pub. Safety §§ 5-117, 5-118(a)(2). Training under current law is free. As noted above, the costs imposed by the Bill approximates $385, which would mean that the costs of satisfying state requirements would leap from $10 to $385.00. That is extreme by any measure.

- 3 -                                    *Testimony of Mark W. Pennak*

These new requirements would also place Maryland on the outer most edge of extreme gun regulation in the Nation. The next highest cost is imposed by the City of New York, which, alone in New York State, imposes a $340 fee. That NYC fee has been challenged in litigation presently pending the federal court. *Kwong v. Bloomberg*, No. 12-1578 (2d Cir.) (argued Feb. 1, 2013). New York City's fees may well be struck down, but those fees are, in any event, limited to the City and do not apply state-wide, as SB 281 would here. Other residents of the State of New York pay only $10 (plus the $94.25 fingerprinting fee) to obtain a handgun license – and their licenses do not expire, unlike the five year life of the license created by SB 281. See N.Y. Penal Law § 400.00(10).

Similarly, Illinois also requires people to obtain licenses to keep handguns in their homes, but the fee is only $10 for a license and that license is valid for 10 years. See 430 Ill. Comp. Stat. 65/5, 65/7. The District of Columbia requires $25 to register a handgun for 3 years, plus $35 for fingerprinting and background checks. D.C. Code §§ 7-2502.03(d), 7-2502.05(b); 7-2502.07a(a); D.C. Mun. Regs. tit. 24, § 2320.3(c)(3), (g). D.C. requires a training class of only four hours, but provides that class for free. D.C. Code §§ 7-2502.03(a)(13). Even those fees and procedures are under constitutional attack in presently pending litigation, on remand from the D.C. Circuit's decision in *Heller II*. See *Heller v. D.C.*, No. 08-cv-01289 (D.D.C.). New Jersey requires a permit to purchase a handgun, but the cost of this permit is $2. N.J. Stat. Ann. § 2C:58-3(f). A person applying for the first time must submit fingerprints for an FBI background check, which costs an additional $60.25. N.J. Admin. Code §§ 13:54-1.4(d) & (g), 13:59-1.3. California requires a person to pay $25 to obtain a 5-year "handgun safety certificate" before purchasing a handgun, and to also pay background check fees totaling $14 any time they buy a gun. Cal. Penal Code §§ 27540(e), 28225(a), 31650(a). Plainly, the costs imposed by SB 281 on the right to buy a handgun are extreme, even as measured against the laws of other highly restrictive states.

The other burdens are also substantial. Under SB 281, the Secretary has a full 30 days to approve a license and there is no provision for expedited treatment of licenses. Given the staffing levels at the State Police, SB 281 would effectively impose a minimum 30 day waiting period just to obtain a license. Current Maryland law would still impose an additional 7 day waiting period to actually purchase the handgun. There are no consequences associated with a failure to issue a timely license and thus poor staffing levels would adversely affect the ability of the Secretary to meet even this 30 day standard. Since no handgun may be purchased without a license, a person is basically disarmed during any period of delay from employing the very firearm that *Heller* held was constitutionally protected. Unique among the states, SB 281 requires a full eight hours of training, including training that "demonstrates the person's proficiency and use of the firearm." By contrast, the D.C. government only requires only four hours of "firearms training and safety class provided free of charge by the Chief" and there are no requirement to show "proficiency."

Finally, under SB 281, there are very few limits on the Secretary's discretion. For example, the Secretary would be free to impose marksmanship requirements and other tests to demonstrate

- 4 -                                                *Testimony of Mark W. Pennak*

"proficiency." The scope of discretion provided to the Secretary SB 281 in designing and administering the course is virtually unlimited, as is the cost that may be imposed on the applicant. Such unfettered administrative discretion over the exercise of a fundamental constitutional right is unconstitutional. See, e.g., *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958). In sum, SB 281's restrictions on a simple purchase are unprecedented in American law. The burdens imposed by the Bill will quite likely draw immediate challenge in the courts. If the plaintiffs prevail, the State would be liable for substantial attorneys' fees and costs under federal civil rights law, 42 U.S.C. 1988. These fees can be quite substantial. For example, the City of Chicago has already paid in excess of $1.2 million in attorneys' fees to plaintiffs' counsel who have prevailed in Second Amendment litigation against the City.

**The Restrictions on Ammunition Possession Are Irrational On Their Face**

SB 281 creates a new section, 5-133.1 in the Maryland Public Safety Article. That new provision imposes a total ban on possession of ammunition that would ban all hunters under the age of 21 from hunting. It would ban persons between the ages of 18-21 from possessing ammunition for long guns that may be legally purchased and/or possessed by otherwise qualified persons between the ages of 18-21. This ban is irrational and will not survive judicial scrutiny under any standard of review.

The Bill does this by banning the possession of any ammunition of any type by any person who is barred from possessing a regulated firearm. The term "ammunition" is defined extremely broadly to including any sort of ammunition, including hunting rounds, shotgun shells, even .22 rimfire cartridges. Here is the language of SB 281:

> (A) in this section, "ammunition" means a cartridge, shell, or any other device containing explosive or incendiary material designed and intended for use in a firearm.
> (B) a person may not possess ammunition if the person is prohibited from possessing a regulated firearm under § 5–133 of 5 this subtitle.

A regulated firearm is, of course, any handgun and any of the so-called "assault weapons" that SB 281 also seeks to ban. SB 281 also amends surreptitiously MD Code, Public Safety, § 5-133(d) (1). Under Section 5-133(d), of current law, no person under the age of 21 may possess a regulated firearm **or ammunition** that is **"solely designed for a regulated firearm"** (unless supervised by a person over 21). MD Code, Public Safety, § 5-133(d)(2). The full text of current law, Section 5-133(d)(1), (2) is:

> Possession by person under age of 21 years prohibited; exceptions
> (d)(1) Except as provided in paragraph (2) of this subsection, a person who is under the age of 21 years may not possess a regulated firearm *or ammunition solely designed for a regulated firearm*.

- 5 -                                        *Testimony of Mark W. Pennak*

(2) Unless a person is otherwise prohibited from possessing a regulated firearm,
    this subsection does not apply to:
(i) the temporary transfer or possession of a regulated firearm or ammunition
    solely designed for a regulated firearm if the person is:
1. under the supervision of another who is at least 21 years old and who is not
    prohibited by State or federal law from possessing a firearm; and
2. acting with the permission of the parent or legal guardian of the transferee or
    person in possession.
(Emphasis added).

The text of SB 281 modifies current section 5-133(d)(1) to delete the reference to ammunition "solely designed for a regulated firearm," **but it does so without so indicating with brackets or otherwise**. SB 281 retains the possession ban on persons under 21 currently in 5-133(d)(1). SB 281 then adds Section 5-133.1 to broadly define ammunition to include the categorical ban on possession of any ammunition by any person who may not legally possess a regulated firearm as defined in 5-133. In this way, SB 281 surreptitiously amends 5-133(d)(1) to delete the existing reference to ammunition "solely designed for a regulated firearm" and then adds 5-133.1 to flatly ban possession of **any** ammunition by anyone under the age of 21. Section 5-133.1 then adds a severe punishment for any such possession, providing that "(c) a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 1 year or a fine not exceeding $1000 or both." SB 281 thus makes the mere possession of any ammunition by any person under 21 a serious criminal offense.

This total ammunition ban is flatly in conflict with existing Maryland law that SB 281 leaves untouched. Under current MD law, a person under the age of 16 may possess a firearm if that person has a hunter safety certificate. See MD Code, Criminal Law, § 4-104(b). Indeed, Maryland law expressly permits persons who are 18 years old to supervise the handling of firearms by persons who are not yet 16. See MD Code, Criminal Law, § 4-104(b) (allowing persons under the age of 16 to possess a firearm if supervised by a person 18 and older). There is no age restriction on obtaining a hunter safety certificate and such certification requires live fire. Yet, if SB 281 becomes law, a person under 21 with a hunter safety certificate may possess a firearm, but may not possess any ammunition for it. A person 18 years old could continue to supervise a person under 16 in the possession of firearms, but would not able to shoot or supervise the live fire of such firearm, as both he and the person under 16 would be barred from possessing any ammunition. The possession of a single round of .22 rimfire ammunition or one shotgun shell by a person under 21 could result in up to a year in prison and the imposition of a large fine. An arrest or conviction for this offense could also adversely affect such a person's future opportunities, such as education and employment, as well as greatly impair the ability of that person to join the military or hold a security clearance.

It gets worse. Under both federal and Maryland law, persons between the ages of 18 and 21 may legally purchase long guns. See 18 U.S.C. 922(x)(5). Indeed, the Governor has stated in promoting this legislation, that he did not intend to restrict the purchase of hunting rifles and

- 6 -         *Testimony of Mark W. Pennak*

shotguns. Indeed, Maryland only requires a person to be 21 to purchase **a regulated** firearm. MD Code, Public Safety, § 5-118. Nothing in Maryland law purports to limit the possession of long guns by persons between 18 and 21. SB 281, if enacted, would mean that such persons could continue to purchase long guns and yet may not possess any ammunition for the long gun thus purchased, thus effectively disarming such individuals in their homes. Such persons between the age of 18-21 have Second Amendment rights. See *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms,*700 F.3d 185, 207 (5th Cir. 2012) (sustaining federal age requirement of 21 for handgun purchases, but noting that this restriction did not unduly burden the self-defense Second Amendment rights of 18-21 year olds because, *inter alia,* "they may possess, use, and purchase long-guns."). Banning ammunition possession by such persons would effectively and completely disarm these individuals, thus stripping them of their Second Amendment rights.

The Bill would thus disarm and ban my 19 year old son and my 20 year old stepson, both legal adults, who may legally buy and possess any unregulated rifle or shotgun, from any possession of any sort of ammunition. By extension, the Bill would thus ban them both from hunting, even though my son is part of his college's ROTC unit, an experienced hunter and has a hunter safety certificate. A bill this irrational will not survive challenge.

### The Registration Requirements Are Onerous and the Penalties Severe

SB281 amends subtitle 3 of Article 4 of the Maryland criminal code to include all assault weapons (not just pistols) and criminalizes mere continued possession of the banned, so called "assault weapons." Thus, under Section 4-303, as amended by the Bill, the statute would provide:

> (a) Except as provided in subsection (b) of this section, a person may not:
> (1) transport an assault [pistol] WEAPON into the State; or
> (2) **possess**, sell, offer to sell, transfer, purchase, or receive an assault 29 [pistol] WEAPON.

A violation of subtitle 3 is punishable under 4-306, which provides:

> (a) A person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

In addition, as amended by the Bill, Section 4-304 would provide that:

> A law enforcement unit may seize as contraband and dispose of according to regulation an assault [pistol] WEAPON transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.

- 7 -                          *Testimony of Mark W. Pennak*

There are only two exceptions to this ban on mere possession of so called "assault weapons." First, existing Maryland owners of these banned long guns must "register" their guns. The Bill provides the only exception to this ban on possession and that is in Section 4-303, which provides:

> A person who lawfully possessed an assault long gun or a copycat weapon before October 1, 2013, and who registers the assault long gun or copycat weapon with the secretary of state police before November 1, 2013.

A new resident of Maryland is likewise given only 30 days to register if he wishes to possess lawfully the banned long guns. The Bill would provide in Section 5-143, as amended, as follows:

> A person who moves into the state with the intent of becoming a resident shall register all regulated firearms with the Secretary within 30 days after establishing residency

These provisions are severe. An existing Maryland resident who fails, for any reason, to register his banned long gun "before November 1, 2013," is not only subject to seizure of the banned gun as "contraband," but is also liable to a large fine and a 3 year prison term. A new Maryland resident who fails to register within 30 days of becoming a Maryland resident is subject to the same penalties. The Bill makes no allowance for excusable neglect or late registration, as the Bill does not allow any registration after the 30 day period. There is no specific intent or scienter requirement. Mere possession on or after November 1, 2013, by a current resident constitutes a major criminal offense. Indeed, an attempt to register after 30 days would presumably result in seizure and prosecution for illegal possession of the firearm. Yet, for existing Maryland residents, this registration requirement is redundant. These "assault weapons" have been treated as regulated firearms since 1996 in Maryland and the State Police already maintain a record of Maryland purchasers, rentals and transfers. See MD Code, Public Safety, § 5-123(d)(2) ("The Secretary shall maintain a permanent record of all notifications received of completed sales, rentals, and transfers of regulated firearms in the State").

Moreover, because the Bill provides that possession contrary to the Bill's provisions is "punishable" by imprisonment in excess of two years, conviction under these provisions would create federal disability under 18 U.S.C. 922(g)(1) for the possession of *any* firearm. See 18 U.S.C. 921(a)(20)(defining terms where the offense is a conviction for a state misdemeanor). Thus, a mere failure to register in time would mean that the owner would lose *all* of his or her modern firearms, rifles, handguns, shotguns, basically anything other than black powder. Violation of Section 922(g) is also punishable by imprisonment of up to five years under federal law. These extreme sanctions would obtain for a failure to register even in those cases in which the regulated firearm **was already registered** with the State Police under MD Code, Public Safety, § 5-123(d)(2).

- 8 -                                                    *Testimony of Mark W. Pennak*

Does the state truly wish to visit these incredibly severe consequences on otherwise law-abiding, productive citizens of the Maryland, who lawfully purchased and possessed these firearms prior to SB 281? Imagine, for example, a member of the military on active duty and deployed overseas, fighting in defense of our country. If that person failed to to register prior to November 1, 2013, because he was overseas, he or she would be, upon return to Maryland, immediately subject to prosecution under this Bill. Such person is accorded no way to cure his failure to register. He simply became a criminal on November 1, 2013, even though he was completely out of the country. That is quite a homecoming shock for those who put their lives on the line in defense of our liberty. The same conversion of law-abiding citizens into criminals would obtain for any other type of innocent failure to register within the 30 days. With all due respect, the penalties imposed by this Bill would constitute an abuse of the State's police power and should not be countenanced.

The Bill's intent to criminalize law-abiding citizens is all the more incomprehensible given the nature of the long guns banned by the Bill. For example, the Bill bans the AR-15 rifle, which is a semi-automatic rifle that fires the .223 Remington round. Yet, in terms of lethality, the AR-15 is utterly indistinguishable from the Ruger Mini 14 Ranch Rifle, which is also a semi-automatic rifle that fires the .223 Remington round. The AR-15 is banned and yet the Ruger is not. See MD Code, Public Safety, § 5-101(p)(2). The AR-15 has extended pistol grip and the Ruger Ranch Rifle has a conventional wooden stock and a regular pistol grip. Why the difference in treatment? Because the AR-15 looks scary. This emphasis on cosmetic differences obtains for other types of regulated long guns as well. See http://www.thetruthaboutguns.com/2012/11/foghorn/media-matters-thinks-cosmetic-differences -matter-for-an-assault-weapons-ban/. "Lethality" of a firearm is a function of the cartridge and the rate of fire. An extended pistol grip or a flash suppressor or an adjustable stock do not make a firearm more lethal.

The criminalization of citizens is even harder to understand in light of the fact, confirmed by the FBI, that rifles (any type of rifle) are the *least* likely weapon to be used in an actual crime. In Maryland in 2011, out of the 272 gun-related deaths, only two (2) were the caused by a rifle of any type. Accordingly to the FBI, Marylanders are more than 16 times more likely to die from "other weapons" (non-firearm) (34 deaths) than be killed by a rifle. See http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-2 0. Indeed, at 17 deaths, "hands and feet etc" caused more than eight times as many deaths as rifles. (Id.). In view of these hard numbers, the public safety justification for imprisoning the owners of these rifles simply disappears. Please do not make law-abiding, productive members of society into criminals.

### Gun Free Zones Are A Magnet For the Deranged

"John Lott, economist and gun-rights advocate, has extensively studied mass shootings and reports that, with just one exception, the attack on U.S. Rep. Gabrielle Giffords in Tucson, Arizona, in 2011, **every public shooting since 1950 in the U.S. in which more than three**

- 9 -                                                    *Testimony of Mark W. Pennak*

**people have been killed has taken place where citizens are not allowed to carry guns."**
http://www.cnn.com/2012/12/19/opinion/bennett-gun-rights/index.html.

Current Maryland law, MD Code, Criminal Law, § 4-102, creates a gun free zone for our
schools, such as the middle school my daughter and my stepson attend. While SB 281 does not
create more gun free zones, another bill pending before this Committee, SB 445, does create
numerous additional gun free zones by mandating new restrictions on where a concealed
weapon permit holder may legally carry the concealed weapon he is allowed to carry. In
particular, SB 445 amends Section 5-306 of the Public Safety Article to provide:

> (A) a person who holds a permit may not wear, carry, or transport a handgun
> while the person is on the real property of:
> (1) a church or other place of worship;
> (2) an establishment licensed to serve alcoholic beverages;
> (3) a government building;
> (4) a hospital;
> (5) a private school, university, or college;
> (6) a public school, university, or college;
> (7) a public library;
> (8) a theater or movie theater; or
> (9) a youth center.
> (B) a person who violates this section is guilty of a misdemeanor and on
> conviction is subject to imprisonment not exceeding 1 year or a fine not
> exceeding $1,000 or both.

Similarly, SB 281 would amend Criminal Law Section 4-203 to criminalize the carrying of a
concealed handgun under a permit in places or circumstances not otherwise allowed under
restrictions that Secretary may impose on permits under Section 5–307 of the Public Safety
Article. That would allow the State to punish any deviation, innocent or otherwise, from any
such restriction with imprisonment under Section 4-203. That would convert a mere,
inadvertent license violation into a major criminal offense. Indeed, the sanctions imposed by
Section 4-203 are severe, including mandatory jail time. On the very first conviction, a person
"is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not
less than $250 and not exceeding $2,500 or both." MD Code, Criminal Law, § 4-203(c)(2). A
conviction for this offense imposes a life-time bar on firearms ownership under federal law, 18
U.S.C. 922(g). The proper sanction for a license violation is suspension or revocation, not
mandatory prison time and a permanent firearms disability.

Maryland does little or nothing to provide armed security for the children who go to school in a
state-mandated gun free zone. Similarly, SB 445 does nothing to protect the persons in these
additional gun free zones. Creating gun free zones without protecting the persons in such zones
simply creates more "free-fire" zones for crazy people, who are drawn to gun free zones
precisely because they know full well that they will not encounter effective opposition. The

- 10 -                    *Testimony of Mark W. Pennak*

state ought to be promoting responsible gun owners, not imprisoning and restricting them. The proper approach is actually taken in existing Maryland law, MD Code, Criminal Law, § 4-203, which exempts persons who have carry permits from the restrictions otherwise imposed on the possession and transport of handguns by Section 4-203. That exemption also applies to the ban imposed on handgun possession in schools otherwise imposed by Section 4-203(a)(1)(iii). Of course, such persons are still bound by the broad ban on "weapons" imposed by MD Code, Criminal Law, § 4-102. Section 4-102 should thus be amended to contain the same exemption for permit holders found currently in Section 4-203.

Properly trained and willing permit holders should be able to carry in school zones and other areas not guarded by armed police officers or other armed guards.. A recent article in the **Atlantic Monthly** has an excellent discussion on this point, noting that gun free zones become free fire zones for lawless mass killers. See http://www.theatlantic.com/magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/. That article was not written by the NRA or a gun advocate, but rather by a self-avowed liberal Democrat, Jeffrey Goldberg. The points made by the article are entirely rational. The Aurora killer picked that particular Cinemark theater for his evil rampage because it was the only theater in his area showing the Batman film that also imposed a ban on guns. http://www.foxnews.com/opinion/2012/09/10/did-colorado-shooter-single-out-cinemark-theate.

In light of the reality that mass killings occur almost exclusively in gun free zones, no sane person would openly advertise that his or her home was a gun free zone. Yet, current Maryland law (with respect to schools) and SB 445 would effectively put a public sign in front of every specified location saying exactly that. If the State is serious about preventing mass killings, then the State must sharply limit gun free zones to those places in which effective, armed security is available. Post a armed security guard in every school or allow someone to be trained and armed in the school. President Clinton had such a program in the 1990s (Cops in School) and, yet, inexplicably, that program was allowed to lapse. Currently, federal law on gun free zones for schools allows concealed carry permit holders to possess a gun in a school zone "if the individual possessing the firearm is licensed to do so by the State in which the school zone is located." 18 U.S.C. 922(q)(2)(B)(ii). Such permit holders are typically fingerprinted and undergo extensive background checks and are among the most lawful citizens in the country.[1] Indeed, the crime rate for permit holders is at or under the crime rate for sworn police officers.

---

[1] For example, Texas compiles detailed information tracking the proclivity of handgun carry license permit holders to commit crimes. In 2011, of 63,679 serious criminal convictions in Texas, only 120—0.1884%— could be attributed to individuals licensed to carry handguns, though not all such crimes necessarily utilized guns, or used them in public settings. Conviction Rates for Concealed Handgun License Holders, http://www.txdps.state.tx.us/RSD/CHL/Reports/ConvictionRatesReport2011.pdf (last visited February 5, 2013).

- 11 -                    *Testimony of Mark W. Pennak*

A single armed permit holder could have prevented the slaughter at Newtown or Aurora or Virginia Tech, just as they have stopped similar attempts in other locales. A teacher or the principal at my daughter's and stepson's middle school could be similarly trained and armed. The mere prospect of such armed opposition would have a deterrent effect. Maryland should thus enact new concealed carry legislation that repeals the current, restrictive law limiting permits to those who can prove a "good and substantial reason" for carrying a concealed weapon, and allow such concealed carry permit holders, willing to do so, to be trained to carry in school zones and other places where they might be able to put a stop to these sorts of mass killings. Such an approach is embodied, in part, in SB 553, sponsored by Senator Jacobs. I support SB 553 for it at least has the potential of protecting my daughter and stepson in public school. Anything would be better than the current policy of free fire zones. If the State insists on disarming responsible individuals in gun free zones, then the state has an affirmative obligation to provide for armed guards for gun free zones. You simply cannot have it both ways. SB 445's creation of still more gun free zones creates an open, standing invitation to crazy people.

In sum, please resist the urge to "do something." Instead, do something effective that does not impair the right and ability of law-abiding citizens to defend themselves and their families. That something is legislation that keeps the guns out of the hands of crazy people by mental illness reporting to the NICS and protects our children with real security in the schools. Enact a state version of President Clinton's Cops in School program. Expand the availability of concealed weapon permits and abolish gun free zones for trained, permit holders. And please, don't create new gun free zones. Any legislatively created gun free zone should be guarded by armed security provided by the State. Banning scary looking rifles, and criminalizing law-abiding gun owners does nothing to protect me or my children.

Thank you. Mark W. Pennak, Frederick County Maryland.

- 12 -                                    *Testimony of Mark W. Pennak*

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
 3              FOR THE DISTRICT OF MARYLAND
 4    - - - - - - - - - - - - - - - - x
 5    MARYLAND SHALL ISSUE, INC.,      :
 6    et al.,                          :
 7                    Plaintiffs,      :
 8          v.                         : Civil Case No.
 9    LAWRENCE HOGAN, et al.,          : 16-cv-3311-MJG
10                    Defendants.      :
11    - - - - - - - - - - - - - - - - x
12        Deposition of CARLISLE EATON MOODY, JR.
13                    Washington, D.C.
14              Wednesday, May 9, 2018
15                    10:09 a.m.
16
17
18
19
20    Job No.: 188208
21    Pages: 1 - 62
22    Reported by:  Karen Young
```

EXHIBIT 3

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    33

```
1        A    No.

2        Q    '16?

3        A    No.

4        Q    Are you familiar with the term

5   "historical confounder"?

6        A    No.

7        Q    Okay.  Are you familiar with the events

8   involving Freddie Gray?

9        A    Not very.

10       Q    What do you know?

11       A    I believe Freddie Gray was a suspect in a

12  crime, arrested, put in the back of a police

13  vehicle, from which his body was recovered.

14       Q    And what's your understanding of when

15  that took place?

16       A    I do not know the exact date.

17       Q    Do you know the year?

18       A    Not -- 2015 I think, but I don't -- I'm

19  not positive.

20       Q    Are you aware of the civil unrest that

21  occurred in the wake of Freddie Gray's death in

22  Baltimore?
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                  34

```
 1        A    It was on the news, yes.

 2        Q    And what is your understanding of what

 3    took place?

 4        A    There were riots.

 5        Q    And what's your source for that

 6    information?  Just the news media?

 7        A    Yes.

 8        Q    Anything else?

 9        A    No.

10        Q    Have you done any research into the

11    unrest that followed Freddie Gray's death?

12        A    No.

13        Q    Are you aware of any empirical facts or

14    data that show whether the number of firearm

15    homicides increased in Baltimore as the result of

16    the events that unfolded in the wake of Freddie

17    Gray's death?

18        A    Read that back to me please.

19             THE REPORTER:  Question:  "Are you aware

20    of any empirical facts or data that show whether

21    the number of firearm homicides increased in

22    Baltimore as the result of the events that unfolded
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                              35

```
 1   in the wake of Freddie Gray's death?"

 2              THE WITNESS:  No.

 3              MR. SWEENEY:  Objection.

 4   BY MR. SCOTT:

 5       Q    Did you make any attempt in your analysis

 6   for this case to account for the impact of the --

 7   of the unrest that followed Freddie Gray's death on

 8   the number of firearm homicides in Maryland?

 9              MR. SWEENEY:  Objection.

10       A    I attempted to control for the increase

11   in firearms death that occurred nationwide as a

12   result of the Ferguson effect, occurred a year

13   earlier, and I presume that that was sufficient to

14   control for the Freddie Gray incident, which

15   occurred later.

16       Q    So other than the attempt that you made

17   to account for the Ferguson effect, you didn't do

18   anything else to account for the events that

19   occurred in the wake of Freddie Gray's death in

20   Baltimore; is that correct?

21       A    Correct.

22       Q    You just referred to the Ferguson effect.
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    36

1    What is that?

2         A     The Ferguson, Missouri incident with the

3    -- at the start of the Black Lives Matter movement.

4         Q     And what is the effect?  What's the

5    phenomenon?

6         A     The effect was a stepping back -- you

7    know, a number of police killings, killings of

8    suspects, for example, that was one that caught

9    people's attention and caused both an increase in

10   the number of ambush killings of policemen, and

11   presumably some decline in the enthusiasm with

12   which policemen do their job.

13        Q     You -- you brought us a copy of the

14   Wikipedia page for the Ferguson effect, which I'll

15   have that marked please.

16             (Deposition Exhibit Number 112 was marked

17   for identification.)

18   BY MR. SCOTT:

19        Q     This is Exhibit 112, and I believe you

20   cite to that in your report, correct?

21        A     Uh-huh, correct.

22        Q     All right.  Did you read -- did you read

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    37

1   any of the sources that are cited in that Wikipedia

2   article?

3        A    Not that I remember.

4        Q    Have you ever relied on Wikipedia in any

5   of your published articles?

6        A    No.

7        Q    Do you know who authored this Wikipedia

8   article?

9        A    No.

10       Q    Do you know the last date on which it was

11  updated?

12       A    No.

13       Q    Did you make any attempt to determine

14  whether that Wikipedia page accurately described

15  what the Ferguson effect is?

16       A    Please read it back to me.

17            THE REPORTER:  Question:  "Did you make

18  any attempt to determine whether that Wikipedia

19  page accurately described what the Ferguson effect

20  is?"

21       A    No, I assumed it accurate -- it

22  accurately described it.

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    38

1      Q    Are you aware of any empirical facts or

2   data that show whether the number of firearm

3   homicides increased in Maryland as a result of the

4   Ferguson effect?

5      A    I do not know -- I know -- I cannot

6   attribute it to the Ferguson effect.  That was just

7   a -- I don't know what the word is.  Hunch on my

8   part.

9      Q    And what was your hunch?

10     A    My hunch was that since firearm homicides

11  -- homicides in general are going up, after going

12  -- in the last two or three years, after going down

13  for many years, had something to do with police

14  killings and Black Lives Matter and the response.

15     Q    But as far as empirical facts or data

16  that show whether the number of firearm homicides

17  increased in Maryland as a result of the Ferguson

18  effect, you don't -- you're not able to identify

19  any.

20     A    Correct, cannot identify that.

21     Q    On page 8 of your report, you cite to a

22  number of states that adopted permit to purchase

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    53

```
1              MR. SWEENEY:  Objection.

2        A    Yes, I agree to that.

3        Q    You mentioned earlier when we were

4   talking about the Freddie Gray situation, that you

5   had made an attempt to account in your analysis for

6   this case for the Ferguson effect?

7        A    Correct.

8        Q    Can you tell me how you did that?

9        A    I looked at data outside of Maryland.

10       Q    And how did you -- what data did you look

11  at?

12       A    All of the states outside of Maryland.

13       Q    And how did you incorporate that data

14  into your analysis?

15       A    I believe it's on figure 2.  Those are

16  firearm homicide rates -- no, no, no, figure 2 on

17  page 4.

18       Q    Oh, I'm sorry.  You have table 2 and

19  figure 2.

20       A    Yeah, I do, I have, I have.

21       Q    Trying to trick us up.  Okay.

22       A    Yeah.
```

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 325 of 449

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                54

```
1        Q     Page 4, figure 2.  So this is national
2   firearm homicide rates.
3        A     Correct.
4        Q     And according to this chart, they ticked
5   up it looks like approximately 2014, 2013?
6        A     2013 is the vertical line.
7        Q     Okay, got you.
8        A     So yeah, a little after that.
9        Q     So -- and how did this data -- how did
10  you account for this trend in the conclusions that
11  you reach with respect to firearm homicides in
12  Maryland?
13       A     I compared it using a number of
14  techniques, difference and differences, synthetic
15  controls, just looking at means across different
16  states.
17       Q     And what is the significance of the
18  up-tick in firearm homicide rates reflected on
19  figure 2 in your report?
20             MR. SWEENEY:  Objection.
21       A     Well, the theory is if you look at
22  Maryland by itself before and after 2013, the
```

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    55

1    firearm homicide rate was higher than it was before

2    -- just before 2013, and so did that fact mean that

3    the HQL law failed and in fact, wound up with more

4    homicides than there was before the law, and if you

5    look at the data for all the U.S., you find that

6    indeed, firearm homicide rates are up everywhere,

7    and so that would mean that we need to look at what

8    would have happened in Maryland controlling for the

9    fact that firearm homicide rates are up everywhere.

10        Q      And did you attempt to do that?

11        A      Yes, I did.

12        Q      And you did that through the synthetic

13   firearm homicide rates that you came up for for

14   Maryland?

15        A      That, and if you notice just before that,

16   I compared the firearm -- on page 5 in the second

17   paragraph, I just compared the percent change in

18   the homicide rate after 2013 for Maryland and for

19   states that did not have permit to purchase laws,

20   and found that the growth rate for Maryland was

21   about twice as high as those states.

22        Q      And did you identify the states in your

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                    56

1    report that you considered to be non-permit states?

2         A    Well, in the -- in the -- there were --

3    all the states other than the states that have had

4    it for a long time, if you look -- if you look on

5    page 5, first paragraph under synthetic controls

6    method, they have the six states that changed the

7    permit law and then one, two, three, four, five,

8    six, seven, eight -- one, two, three, four, five,

9    six, seven, eight -- eight law -- eight states that

10   have had permit laws since before 1970, so they did

11   not change the law.  They can't be -- no way to

12   compare Maryland to those states, but nevertheless,

13   those are the states that had the law.  All the

14   other ones do not have the law.

15        Q    So you say here you've got 30 states that

16   you use as the donor pool of control states.

17        A    Yes, so they also include the -- the

18   states Maine, New Hampshire, North Dakota, South

19   Dakota, Vermont and Wyoming, which have missing

20   data in the CDC WONDER database, so that gives you

21   a grand total of 20 states.

22        Q    Did you do any analysis of firearm

Transcript of Carlisle E. Moody, Jr.
Conducted on May 9, 2018                                57

```
 1   homicide rates in urban areas where there have been

 2   publicized police killings of suspects during the

 3   study period?

 4        A    No.

 5        Q    Do you know Professor Kleck?

 6        A    By reputation.

 7        Q    Have you ever met him?

 8        A    He once reviewed a paper that I submitted

 9   at a conference, and so he was the referee after --

10   after I gave my paper, he gave his.

11        Q    Which paper was that?

12        A    Oh, I can't remember.  None of these.

13        Q    Well, what about on your -- is it listed

14   on your C.V.?

15        A    Yes, but not -- it's not a refereed

16   publication.

17        Q    Okay, I thought you said that he refereed

18   it for you.

19        A    Well, what happens in these conferences

20   is that I give a paper, and then somebody comments

21   on that paper.  That's what I meant by refereeing,

22   so he commented on my paper.  That's --
```

USCA4 Appeal: 21-2017   Doc: 25-4      Filed: 08/03/2022      Pg: 329 of 449

```
1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2           I, Karen Young, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true and

5    correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    requested, and that I am neither counsel for or

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13          IN WITNESS WHEREOF, I have hereunto set

14   my hand and affixed my notarial seal this 11th day

15   of May, 2018.

16

17   _____

18   NOTARY PUBLIC IN AND FOR

19   THE DISTRICT OF COLUMBIA

20

21   My commission expires:

22   July 31, 2019
```

**U.S. Department of Justice**
Office of Justice Programs
*National Institute of Justice*



National Institute of Justice

# Documenting and Explaining the 2015 Homicide Rise: Research Directions

Richard Rosenfeld*
University of Missouri – St. Louis

June 2016

*Dr. Rosenfeld prepared this paper with support from the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, under contract number 2010F_10097 (CSR, Incorporated). The opinions, findings, and conclusions or recommendations expressed in this publication are those of the authors and do not necessarily represent those of the Department of Justice.

NCJ 249895

EXHIBIT 4

USCA4 Appeal: 21-2017     Doc: 25-4     Filed: 08/03/2022     Pg: 331 of 449

Case 1:16-cv-03311-ELH   Document 151-4   Filed 04/14/21   Page 2 of 7
Documenting and Explaining the 2015 Homicide Rise: Research Directions                    18

change over time in the involvement in homicide, both as offenders and victims, of ex-prisoners under community supervision. If ex-prisoners contributed significantly to the homicide increase, researchers should observe a corresponding increase in the homicide rate of persons on parole and in the proportion of homicides committed by parolees in those cities exhibiting large increases in homicide. These data will have to be compiled from the records of local law enforcement agencies.

## FERGUSON EFFECT

What has become known as the "Ferguson effect" on the homicide increase, as noted, is subject to considerable controversy and evidence-free rhetoric. The term is also unfortunate, because it does not only apply to the police killing in Ferguson and because its precise meaning is unclear. The dominant de-policing interpretation is that highly publicized incidents of police use of deadly force against minority citizens, including but not limited to the Ferguson incident, caused police officers to disengage from their duties, particularly proactive tactics that prevent crime. Interestingly, however, that is not the interpretation of the individual who evidently coined the term. Sam Dotson, Chief of the St. Louis Metropolitan Police Department, used the term in an interview with a reporter in November of 2014, three months after Michael Brown was killed. "It's the Ferguson effect," Dotson said. "I see it not only on the law enforcement side, but the criminal element is feeling empowered by the environment" (Byers 2014).

It is important to emphasize both arguments Chief Dotson advanced in the interview.[15] He stated that the police in St. Louis were redeployed from their normal and more proactive responsibilities to address protest activities and civil disorder in Ferguson and elsewhere in the St. Louis area during the months immediately following Brown's death. As conditions returned to normal, so did police activity. For example, arrest rates returned to pre-Ferguson levels after decreasing during the late summer and fall of 2014.

In the view of the St. Louis police chief, changes in police deployment patterns did result in crime increases in St. Louis in the immediate aftermath of the Ferguson incident. But he does not believe that his officers engaged in de-policing in the conventional sense of a work slowdown or reluctance to engage in vigorous, proactive enforcement. That is where the second point becomes relevant. The Ferguson effect, in his view, was not simply a matter of altered police behavior. Criminals, according to Chief Dotson, became "empowered" by the police killing in Ferguson and ensuing protests and civil unrest. The question then becomes how such feelings and beliefs might have triggered a homicide increase that persisted at least another year after Ferguson.

Intentionally or not, the St. Louis police chief invoked an important strain of sociological and criminological thinking in his explanation of the Ferguson effect: the idea that violence escalates when individuals and communities are alienated from the legitimate means of social control. When persons do not trust the police to act on their behalf and to treat them fairly and with respect, they lose confidence in the formal apparatus of social

---

[15] The discussion in this section is based on Byers (2014) and personal communication with Chief Dotson.

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 332 of 449

Case 1:16-cv-03311-ELH   Document 151-4   Filed 04/14/21   Page 3 of 7
Documenting and Explaining the 2015 Homicide Rise: Research Directions                 19

control and become more likely to take matters into their own hands. Interpersonal disputes are settled informally and often violently. Honor codes develop that encourage people to respond with violence to threats and disrespect (Anderson 1999). Predatory violence increases because offenders believe victims and witnesses will not contact the police. Individuals engage in "self-help" and entire communities become "stateless" social locations (Black 1983, 2010).

Randolph Roth (2009) has distinguished the proximate and ultimate causes of historical changes in U.S. homicide rates. Proximate causes refer to conditions that criminologists typically point to as risk factors for violence (e.g., economic disadvantage, firearm carrying, drug and alcohol use). Ultimate causes are the more or less widespread popular beliefs that government and the legal system are legitimate and worthy of respect, and that government officials can be trusted. When the perceived legitimacy of government and trust in officials erode, according to Roth, homicide rates increase. Such historical periods include the years immediately preceding the American Revolution and the Civil War. Both Roth (2009) and Gary LaFree (1998) have attributed the rise in homicide during the 1960s and 1970s to the declining legitimacy of U.S. political institutions.

The police are the front line of government in disadvantaged urban communities. Following Roth (2009), the ultimate cause of violence in these communities is lack of confidence in the police. When the police are called to respond to a crime, they arrive at the scene late or not at all. They do not follow up with vigorous and thorough investigation, even of the most serious crimes (Leovy 2015). They harass innocent youth. And, too often, they use force unnecessarily and indiscriminately. What matters is not the factual accuracy of these beliefs in every instance; what matters is that they can metastasize into a pronounced "legal cynicism," especially in disadvantaged African-American communities (Sampson and Bartusch 1998). When people believe the procedures of formal social control are unjust, they are less likely to obey the law (Tyler 2006).

If this complex of "feelings and beliefs," in Roth's (2009) terms, is the ultimate cause of escalations in homicide, the more proximate cause could be widely publicized incidents of police use of force that seem to confirm the validity of the underlying belief system. Lack of confidence in the police among African-Americans predates the recent police killings in Ferguson, Cleveland, New York and elsewhere. But it is likely to be activated by such incidents, transforming longstanding latent grievances into an acute legitimacy crisis. If that led to the 2015 homicide increase, we should expect at least four empirical conditions to hold: (1) the increase should be concentrated in cities with large African-American populations, (2) the timing of the increase should correspond closely to controversial incidents of police use of force against African-Americans, (3) confidence in the police should be substantially lower among African-Americans than other groups and (4) the homicide increase should be greater among African-Americans than other groups.

The available evidence supports the first two expectations. We have seen that 10 cities with relatively large African-American populations accounted for two-thirds of the

Documenting and Explaining the 2015 Homicide Rise: Research Directions                     20



**Figure 8: Percentage of Adults With "a Great Deal/ Quite a Lot" of Confidence in the Police (2011-2014)**

Source: Gallup Poll

big-city homicide increase in 2015 (see Table 1 and Figure 3). Further, the homicide increase occurred in the immediate aftermath of controversial police use-of-force incidents. The timing of the increase provides stronger support for the Ferguson effect explanation, in either of its versions, than for explanations attributing the homicide rise to expanding drug markets or declining imprisonment. Neither hypothesis can easily account for the sheer abruptness of the increase in 2015 or, in the case of the drug market explanation, for why homicide rates did not begin to rise several years earlier. At the same time, researchers must be open to the possibility that the homicide increase predated the Ferguson events, at least in some cities (Rosenfeld 2015).

There is ample evidence in support of the third expectation regarding African-Americans' lack of confidence in the police. As shown in Figure 8, just 37 percent of blacks compared with 59 percent of whites expressed "a great deal" or "quite a lot" of confidence in the police in Gallup surveys conducted between 2011 and 2014.[16] The sizable racial gap in attitudes toward the police is not the result of Ferguson or other recent events. For example, in 1997, 60 percent of blacks compared with 30 percent of whites answered "yes" when asked in Gallup surveys whether the police treat blacks less fairly than whites, as shown in Figure 9 (see page 21). The racial difference in responses to this item increased over the next 10 years. Interestingly, the racial gap did not change appreciably between 2007 and 2015, the year after the Ferguson incident and other controversial episodes of police use of deadly force against African-Americans. Finally, the difference between blacks and whites in attitudes toward the police extends to the justice system as a whole, as shown in Figure 10 (see page 22). Fully two-thirds of black respondents and just a quarter of whites told Gallup in 2013 they believe the justice system is biased against blacks. After Ferguson in 2015, the percentage of blacks who believe the justice system is biased increased to 74 percent, although the comparable increase among whites was larger, rising to 42 percent.

---

[16] For source data for Figures 8-10, see http://www.gallup.com/poll/175088/gallup-review-black-white-attitudes-toward-police.aspx.

Documenting and Explaining the 2015 Homicide Rise: Research Directions                21





Source: Gallup Poll

There is little question that blacks and whites differ greatly in their confidence in the police, belief that the police treat blacks less fairly than whites, and belief that the justice system is racially biased. The racial gap in attitudes toward the police is not a recent development. Tensions between the police and the black community triggered the urban civil disorders of the 1960s (Report of the National Commission on Civil Disorders 1968). Lack of confidence in the police represents a smoldering reservoir of discontent among African-Americans that is ignited by heavily publicized episodes of police use of force — the ultimate and proximate causes, respectively, of the escalation of violence. This hypothesis regarding the recent homicide rise merits close scrutiny by researchers, along with the alternative version of the Ferguson effect that attributes the homicide increase to de-policing. Finally, if the legitimacy crisis explanation is correct, we should observe larger increases in homicide among African-Americans than whites or other groups. Further, the increases should be concentrated in the disadvantaged black communities of large cities where legal cynicism is most pronounced (Sampson and Bartusch 1998).

It will be easier to empirically evaluate the de-policing hypothesis than the legitimacy crisis explanation of the 2015 homicide increase. If de-policing was the operative mechanism, we should observe larger drops in arrests and other self-initiated police activities in cities that experienced the greatest homicide increases. The arrest data are readily available from the UCR, or will be when the 2015 UCR data are released in the fall of 2016. Data on pedestrian and traffic stops, building checks, and other self-initiated police activity will have to be obtained from local police departments. It should be noted, however, that the de-policing hypothesis presupposes a very large effect of policing on crime, large enough to explain homicide increases from de-policing of 50 percent or more in some cities. Effect sizes of that magnitude far surpass those revealed in research on the most effective policing strategies to prevent crime (Braga, Papachristos, and Hureau 2014).

Documenting and Explaining the 2015 Homicide Rise: Research Directions                    22



Figure 10: Is the Justice System Biased Against Black People? (% Yes)

Source: Gallup Poll

Testing the hypothesis that a police legitimacy crisis caused the homicide increase will be more difficult. The four empirical expectations discussed above are necessary but not sufficient conditions to rule out other explanations. The key question that must be answered concerns the mechanisms that translate community discontent with the police into escalating levels of violence. Very little is known about this hypothesized relationship. Does widespread discontent lead offenders to believe they can commit crime with impunity? That seems to be what the St. Louis police chief meant when he said criminals became "empowered" by the Ferguson events. Is community discontent with the police fertile soil for "stop snitching" campaigns? Even more basic criminological questions are at issue. Was the homicide increase fueled primarily by offenders and victims with extensive criminal records or did the violence spread beyond the already criminally involved population? In other words, was the increase spurred by a growing prevalence of criminal violence or by a heightened incidence of violence among active offenders?

The latter question might be addressed with data from ongoing longitudinal studies of delinquency and crime (e.g., Berg et al. 2016; Loeber and Farrington 2011). To determine whether discontent with the police reduced the willingness of African-Americans to report crimes to the police, police reporting rates by race can be accessed from the National Crime Victimization Survey when BJS releases the 2015 data and the results can be compared with those for previous years and across differing community types. The best and perhaps only way to address other questions pertaining to the hypothesized police legitimacy crisis is through ethnographic research in African-American communities that seeks to disclose how chronic discontent with the police may be activated by controversial incidents of police use of force and, in turn, may lead to a rise in violence.

In summary, there are several empirical indicators and methods to evaluate alternative explanations of the 2015 homicide rise. It may turn out that the three considered here, as well as others yet to be proposed, are not competing hypotheses so much as interacting components of a broader explanation. For example, we might expect offenders to feel

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 336 of 449

Case 1:16-cv-03311-ELH   Document 151-4   Filed 04/14/21   Page 7 of 7
Documenting and Explaining the 2015 Homicide Rise: Research Directions                    23

especially "empowered," not only in the context of community discontent and anger, but when they also believe, correctly or not, that the police have backed off as a result. Homicide increases owing to a Ferguson effect might have been greater in cities with expanding drug markets and a larger pool of recently released prisoners than elsewhere. The necessary research will take time to carry out and must await the release of key empirical indicators.

## TOWARD A 21ST CENTURY CRIME INFORMATION SYSTEM

At several points in this discussion, reference has been made to the need to wait for the release of data needed to document and explain the recent homicide increase. The FBI's UCR data cannot answer all of the empirical questions raised here, but they can be used to address some important ones, such as whether arrest rates fell in the large cities registering homicide increases or, indeed, whether the homicide increase extended beyond the large cities. FBI Director Comey has pointed to the importance of the data his agency compiles for understanding and responding to the homicide rise, noting that "without more reliable data, the task of identifying trends and remedies to fix them is far more challenging. . . . [I]t's important, because it gives us the full picture of what's happening" (Schmit and Apuzzo 2015).

Imagine how the public debate over the homicide rise might have differed had the FBI released monthly UCR data one or two months after the collection period. We would have known whether other crimes in addition to homicide were increasing. We would know whether smaller cities were experiencing crime increases. We would not have had to rely on newspaper reporters and policy advocates to gather data from small and nonrepresentative samples. Assuming the Supplementary Homicide Reports data were not far behind, researchers would have had some indication of whether drug-related homicides were on the rise. The debate over de-policing could have been informed by comparative data on arrest rates. Better and timelier data would not have ended the debate, but they would have placed it on sounder empirical footing.

There are no longer technical impediments to timely release of the nation's crime and arrest data by the FBI. That is largely because the national UCR program no longer compiles data directly from the 18,000 law enforcement agencies in the country. Rather, most of the data are compiled, checked and submitted by state UCR programs.[17] Many of the state programs submit the data on a monthly basis and those that do not can be encouraged to do so. Even if the FBI was able to release timely data for just five percent of the nation's law enforcement agencies, roughly 900 jurisdictions, that would constitute a much larger number of cases than currently available. Researchers could then construct reasonably representative samples from those data that would be far more useful than the

---

[17] According to the UCR Data Quality Guidelines: "For the most part, agencies submit monthly crime reports, using uniform offense definitions, to a centralized repository within their state. The state UCR Program then forwards the data to the FBI's UCR Program" (www.fbi.gov/about-us/cjis/ucr/data-quality-guidelines-new/#_ftn2).

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MARYLAND SHALL ISSUE, INC.,** *et al.*, | ) ) ) | |
| **Plaintiffs,** | ) ) ) | **Case No. 16-cv-3311-MJG** |
| v. | ) ) | |
| **LAWRENCE HOGAN, in his capacity of GOVERNOR OF MARYLAND,** *et al.*, | ) ) ) ) | |
| **Defendants.** | | |

## PLAINTIFFS' AMENDED RULE 26(a)(1)(A) DISCLOSURES

COME NOW the Plaintiffs Maryland Shall Issue, Inc., Atlantic Guns, Inc., Deborah Kay Miller, and Susan Brancato Vizas, ("Plaintiffs"), and provide required amended initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)("Amended Initial Disclosures"):

In accordance with Federal Rule of Civil Procedure 26(a)(1)(E), Plaintiffs are making their Amended Initial Disclosures based on information reasonably available to them at this time. These Amended Initial Disclosures reflect only the current state of Plaintiffs' knowledge, understanding, and belief regarding these subjects. Plaintiffs and counsel have not completed their investigation into the facts of this case. By making these Amended Initial Disclosures, Plaintiffs do not represent that they are identifying every document, tangible thing, or witness possibly relevant to this action. Plaintiffs' Amended Initial Disclosures represent a good faith effort to identify their claims or

defenses pursuant to Federal Rule of Civil Procedure 26(a)(1). Further discovery and developments in the case may dictate the need to identify additional persons with discoverable information, relevant documents, and tangible objects that Plaintiffs may use to support their claims or defenses.  In accordance with Federal Rule of Civil Procedure 26(e)(1)(A), Plaintiffs reserve the right to supplement their Amended Initial Disclosures if and when they identify additional persons, documents, and tangible objects that may be used to support their claims and defenses.

These Amended Initial Disclosures are made solely for the purpose of this action. These Amended Initial Disclosures are made subject to all objections as to competence, materiality, relevance, or other objection as to admissibility that may apply in the event that any such response, or the information it contains, is sought to be used in court. Plaintiffs expressly reserve all such objections. Pursuant to Federal Rule of Civil Procedure 26(b), Plaintiffs object to disclosure or production of documents and materials generated during the course of this litigation that constitute protected attorney work product or that contain privileged attorney-client communications, or confidential personal or proprietary information. These Amended Initial Disclosures are not a waiver of any protected attorney work product, privileged attorney-client communications, or confidential personal or proprietary information relating to the witnesses or documents described.

Plaintiffs have attempted to identify all persons, documents, and other materials within their knowledge, possession, custody, or control that may be used to support their

claims or defenses in this case. Counsel will provide copies of any identified document upon request.

**Rule 26(a)(1)(A)(i)**.  The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

**Response**: Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i), Plaintiffs identify the following individuals who may have discoverable information with respect to Plaintiffs' claims or defenses:

1.    Plaintiff Maryland Shall Issue, Inc. ("MSI"), for itself and its members

    1332 Cape St. Claire Road, Unit 342
    Annapolis, MD 21409
    (410) 849-9197
    *Contact through undersigned counsel*
    Subjects of discoverable information include but are not limited to: (1) the

membership of MSI, which includes individuals who do not possess an

HQL, desire to possess a handgun, and who are subject to the HQL

requirements; (2) individual members of MSI who, due to the expense and

inconvenience of the HQL requirements, have been deterred from

purchasing a handgun; (3) individual members of MSI who have an urgent

need for a handgun, but who, due to the expense and inconvenience of the

HQL requirements, have been deterred from purchasing a handgun; (4)

individual members of MSI who hunt for food and are in need of a

handgun, but who, due to the expense and inconvenience of the HQL

requirements, have been deterred from purchasing a handgun; (5)

individual members of MSI who live in an urban area with no access to

Maryland State Police ("MSP") certified handgun trainers and/or a shooting

range and are in need of handgun, but who, due to the expense and

inconvenience of the HQL live-fire requirement, have been deterred from

purchasing a handgun; (6) individual members of MSI who live in an area

with no access to MSP approved fingerprint vendors and are in need of a

handgun, but who, due to the expense and inconvenience of the HQL live-

scan fingerprinting requirements, have been deterred from purchasing a

handgun.

2.      Plaintiff Atlantic Guns, Inc.

944 Bonifant Street
Silver Spring, MD 20910
(301) 585-4448
*Contact through undersigned counsel*

Subjects of discoverable information include but are not limited to: (1)

Atlantic Guns' ownership and good standing of a business lawfully and

responsibly selling firearms throughout the state as a federally-licensed

firearms dealer and Maryland Regulated Firearms Dealer; (2) Atlantic

Guns' loss of business due to the burdensome requirements of the HQL,

which has deterred potential customers from purchasing handguns at

Atlantic Guns; (3) individual potential customers of Atlantic Guns who are

in need of a handgun, but who, due to the expense and inconvenience of the

HQL requirements, have been deterred from purchasing a handgun.

3.    Plaintiff Deborah Kay Miller

     297 Aston Forest Lane
     Crownsville, MD 21032-1605
     *Contact through undersigned counsel*

Subjects of discoverable information include but are not limited to: (1) Ms.

Miller's need for a handgun due to her employment as a Department of

Defense federal contractor and victim of a data breach which sacrificed the

security of her detailed personal information; (2) Ms. Miller's intent to

purchase a handgun for self-defense in the home, target practice, and other

lawful purposes; (3) Ms. Miller's inability to fulfill the burdensome

requirements of the HQL due to her inability to take time off from work;

(4) Ms. Miller's inability to fulfill the unnecessary four-hour training

requirement of the HQL due to health issues resulting from multiple

surgeries; (5) Ms. Miller being deterred from purchasing a handgun for the

aforementioned reasons; (6) Ms. Miller's confusion as to "receive" and

"receipt" pursuant to the HQL statutory language.

4.    Plaintiff Susan Brancato Vizas

     8002 Bull Rush Court
     Frederick, MD 21701-1508
     *Contact through undersigned counsel*

Subjects of discoverable information include but are not limited to: (1) Ms.

Vizas' successful fulfillment of Hunter Safety Training; (2) Ms. Vizas'

intent to purchase a handgun for self-defense in the home, target practice, and other lawful purposes; (3) Ms. Vizas being deterred from purchasing a handgun due to the expense and inconvenience of the additional HQL requirements.

5.   John Matthew Clark

1240 Arnold Road
Westminster, MD 21157
*Contact through undersigned counsel*

Deterred by the cost of the HQL itself, training, the cost of 3rd party fingerprinting, and the hassle of finding an "approved" fingerprint service provider. Mr. Clark works as a computer/web server technician and is 47 years old. He would have to take a day off work and use vacation time to have fingerprinting done. Mr. Clark reported that his county sheriff refuses to cooperate with HQL applicants.

6.   Dana Hoffman

7051 Carroll Avenue, Apt. 915
Takoma Park, MD 2091?
*Contact through undersigned counsel*

Deterred by the HQL requirements, especially the live fire and training requirements. Ms. Hoffman is 74 years old and is confined to a wheelchair. She has a medical condition that makes it impossible for her to obtain training, including the MSP live fire requirement. Ms. Hoffman does not own any guns but wishes to purchase a handgun for self-defense in her home.

6

7.    Scott Miller

1004 Murdoch Court
Crofton, MD 21114
*Contact through undersigned counsel*

Deterred by the cost and time requirement. Mr. Miller is a 27-year-old

Emergency Medical Technician. Mr. Miller's ambulance was recently

caught in a firefight in D.C., and was hit by 7 bullet rounds. Although he

could not carry while on the job, Mr. Miller still wants to protect himself.

Mr. Miller currently does not own any handguns or have any permit, as his

lifelong residency in Maryland has effectively discourages any such

acquisitions.

8.    Any person identified in Defendants' Rule 26 Disclosure Statements.

9.    Any person necessary to authenticate documents.

10.    Any person identified in any deposition, answer to interrogatory, response

to non-party production, request for production, or other document

produced in this case.

11.    Defendant William M. Pallozzi, in his capacity of Superintendent, MSP

1201 Reisterstown Road
Pikesville, MD 21208
(410) 486-3101

Subjects of discoverable information include but are not limited to: (1) the

operations of MSP in developing regulations and requirements to enforce

Md. Code Ann., Public Safety, § 5-117.1, and all persons involved in those

operations; (2) the deterrent effect of the HQL on handgun transfers in

7

Maryland; (3) the requests of citizens to be relieved of some or all of the

excess cost and burden of the HQL requirements; (4) the timeline for

processing and approving the HQL application; (5) the locations and

availability of vendors necessary to fulfill the HQL requirements; (6) the

MSP use of fingerprints submitted pursuant to the HQL application; (7) the

requests of citizens or citizen-members groups to define and/or clarify

"receive" or "receipt."

12.    Any person or persons involved in the MSP decision to establish the HQL

application fee at $50.

13.    Any person or persons involved in the MSP decision to establish the HQL

application "live fire" requirement.

14.    Any person with current licensing authority for the HQL.

**Rule 26(a)(1)(A)(ii)**. A copy—or a description by category and location—of all

documents, electronically stored information, and tangible things that the disclosing party

has in its possession, custody, or control and may use to support its claims or defenses,

unless the use would be solely for impeachment.

**Response**: Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(ii), Plaintiffs

identify the following documents, electronically stored information, and tangible things

that Plaintiffs have in their possession, custody or control that may be used to support

their claims or defenses:

1.    Md. Code Ann., Public Safety, § 5-117.1.

2.    Legislative History of Md. Code Ann., Public Safety, § 5-117.1.

3.  Legislative History of Maryland Senate Bill 281.

4.  2013 Laws of Maryland Chapter 427.

5.  General Assembly of Maryland, *2013 Regular Session Proceedings – House Audio, April 2, 2013, Session 2,* at 19:05 (April 2, 2013) *available at* http://mgaleg.maryland.gov/webmga/frmlegislation.aspx?id=2013rs_house_audio&stab=02&pid=legisnlist&tab=subject3&ys=2013rs

6.  MD COMAR ADC 29.03.01.01, *et seq.*

7.  MSP Standard Operating Procedure Index # 29-1403.

8.  Md. Code Ann., Public Safety, § 5-118.

9.  Md. Code Ann., Public Safety, § 5-122.

10. Md. Code Ann., Public Safety, § 5-123.

11. Md. Code Ann., Public Safety, § 5-124.

12. Md. Code Ann., Public Safety § 5-144.

13. Md. Code Ann., State Government, § 10-125(d).

14. Md. Code Ann., State Government, § 10-222(h)(3)(vii).

15. Maryland Constitution Art. V, § 7.

16. 2013 MD REG TEXT 338193 (NS) (Dec. 13, 2013).

17. Maryland Attorney General J. Joseph Curran, *A Farewell to Arms The Solution to Gun Violence in America* (Oct. 20, 1999) *available at* http://rkba.org/research/curran/guns.pdf

18. MSP Handgun Qualification License FAQ (last accessed Sept. 25, 2017) *available at*

http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/Lice
nsingDivision/FAQs.aspx.

19.  Maryland State Police, *Fingerprinting* (last accessed Sept. 25, 2017) *available at*
     http://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/Lice
     nsingDivision/Fingerprinting.aspx.

20.  NSSF Report 2017 Edition, Firearms Retailer Survey Report: Trend Data 2008-
     2016.

21.  NSSF Report, More Guns - Fewer Crimes: Favorable Trends.

22.  NSSF Report, Sport Shooting Participation in the United States in 2016.

23.  FBI Uniform Crime Reports for Maryland.

24.  March 1, 2013 Prepared Testimony of Mark W. Pennak In Opposition to HB
     294.

25.  February 21, 2017 Written Testimony of Mark Pennak, President of MSI, before
     the Maryland Handgun Permit Review Board.

26.  March 14, 2017 Written Testimony of Mark Pennak, President of MSI, in
     support of HB 875.

27.  March 14, 2017 Written Testimony of Mark Pennak, President of MSI, in
     support of HB 905.

28.  NRA's Basics of Pistol Shooting: Instructor Led Training. Lesson Plans &
     Shooting Qualifications.

29.  NRA's Defensive Pistol Module: Course Outline & Lesson Plans.

30.  Mark Pennak's NRA Instructor Certification & 2018 HQL certificate.

31. Deborah K. Miller's 2013 1040 form, 2013 502/ 502B forms, 2014 1040 form, 2014 502/ 502B forms, 2015 1040 form, 2015 502 form, 2016 1040 form, 2016 502 form.

32. Deborah K. Miller's 2010 W-2 form, 2010 W-2 and Earnings Summary, December 2017 Leave and Earnings Statement, April 2017 Leave and Earnings Statement, March 2012 Leave and Earnings Statement.

33. Deborah K. Miller's Quitclaim deed for road abandonment for a trail in Herald Harbor, 2001 deed for six lots in Herald Harbor on the Severn, affidavit that they will reside at the property in Crownsville, State of MD Land Instrument Intake Sheet for deed and deed of trust.

34. Deborah K. Miller's MD Certificates of Title for automobiles.

35. Deborah K. Miller's itemized bill from Ortho and Sports Medicine Center, doctor's note from Orthopaedics & Spine Care, MVA Parking placard/ license plates for individuals with a disability application.

36. Susan B. Vizas's PNC Bank Performance checking statements for January, February, March, May, June, July, August, September, October, November, and December 2016 as well as January, February, March, April, May, June, July, August, September, October, November 2017.

37. Susan B. Vizas's SAFE Federal Credit Union statements from every month in 2016 and January-November 2017.

38. Susan B. Vizas's 2016 1040 form, 2015 1040 form, 2014 1040 form, and 2013 1040 form.

39. Susan B. Vizas's Notary certified, signed document confirming they are first-time Maryland home buyers purchasing property.

40. Susan B. Vizas's MD Certificates of Title for automobiles.

41. Susan B. Vizas's Edward Jones Portfolio Summary for January, February, March, May, June, August, October, November, and December 2016 as well as January, February, March, April, May, June, July, August, September, October, and November 2017.

42. Colonel Thomas E. Hutchins, Maryland State Police Superintendent, Crime in Maryland: 2004 Uniform Crime Report.

43. Colonel Thomas E. Hutchins, Maryland State Police Superintendent, Crime in Maryland: 2005 Uniform Crime Report.

44. Colonel Thomas E. Hutchins, Maryland State Police Superintendent, Crime in Maryland: 2006 Uniform Crime Report.

45. Colonel Terrence B. Sheridan, Maryland State Police Superintendent, Crime in Maryland: 2007 Uniform Crime Report.

46. Colonel Terrence B. Sheridan, Maryland State Police Superintendent, Crime in Maryland: 2008 Uniform Crime Report.

47. Colonel Terrence B. Sheridan, Maryland State Police Superintendent, Crime in Maryland: 2009 Uniform Crime Report.

48. Colonel Terrence B. Sheridan, Maryland State Police Superintendent, Crime in Maryland: 2010 Uniform Crime Report.

49. Colonel Marcus L. Brown, Maryland State Police Superintendent, Crime in Maryland: 2011 Uniform Crime Report.

50. Colonel Marcus L. Brown, Maryland State Police Superintendent, Crime in Maryland: 2012 Uniform Crime Report.

51. Colonel Marcus L. Brown, Maryland State Police Superintendent, Crime in Maryland: 2013 Uniform Crime Report.

52. Colonel William M. Pallozzi, Maryland State Police Superintendent, Crime in Maryland: 2014 Uniform Crime Report.

53. Colonel William M. Pallozzi, Maryland State Police Superintendent, Crime in Maryland: 2015 Uniform Crime Report.

54. Colonel William M. Pallozzi, Maryland State Police Superintendent, Crime in Maryland: 2016 Uniform Crime Report.

55. Colonel William M. Pallozzi, Maryland State Police Superintendent, Crime in Maryland: 2017 Uniform Crime Report.

56. Justin Fenton, 'Over the top,' witness says: Bail bondsman tells of getting bags of stolen drugs from Sgt. Jenkins, The Baltimore Sun (2018), http://digitaledition.baltimoresun.com/infinity/article_share.aspx?guid=cf98cdcb-7216-4a98-9565-a4c99d4037d1 (last accessed Feb. 6, 2018).

57. Maryland Automated Firearms Services System (MAFSS) Yearly Count of Firearm Transfers by Gun Type (Case 1:13-cv-02841-CCB, Document 62-5, Filed 04/11/14).

58. Daniel W. Webster, ScD, MPH, Shani A.L. Buggs, MPH, and Cassandra K. Crifasi, PhD, MPH, *Estimating the Effects of Law Enforcement and Public Health Interventions Intended to Reduce Gun Violence in Baltimore* (January 11, 2018) *available at* https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/JHSPH-Gun-Violence-in-Baltimore.pdf.

59. Cassandra K. Crifasi, Molly Merrill-Francis, Daniel W Webster, Garen J Wintemute, Jon S. Vernick, *Changes in the legal environment and enforcement of firearm transfer laws in Pennsylvania and Maryland*. Injury Prevention. Published Online First: January 13, 2018.

60. SFS Training, Flyer on Firearms Training Requirement.

61. Letter from Sgt. James J. Kozlowski, Handgun Permit Unit Supervisor, to enclose new guidelines for the Firearm's Qualification for the H.Q.L. and Handgun Wear/Carry Permit, as well as the revised Qualification Form which should be utilized effective October 1, 2013 (September 16, 2013).

62. Frederick Chapter of the Izaak Walton League of America, Information on 2016 Courses.

63. Maryland State Police Licensing Division Weekly Reports dated September 29, 2017 through November 2, 2017.

64. Maryland State Police Advisory LD-HQL-17-003, *Interpretation of "Receive" in PS §5-117.1* (November 17, 2017).

65. Maryland Shooters Blog, *Number of active W&C/HQL as of August 2017* (September 19, 2017).

66. U.S. Gov't Accountability Off., GAO-01-427, *Firearms Purchased from Federal Firearm Licensees Using Bogus Identification* (March 2001).

67. Atlantic Guns e-mail communications with customers regarding the HQL.

68. Maryland State Police Advisory LD-HQL-Advisory-16-001, *Maryland Licensed Firearms Dealers – Removal of Handgun Qualification License (HQL) Card Photo* (June 21, 2016).

69. Maryland State Police Advisory LD-HQL-17-004, *Alternative Ammunition for Handgun Qualification License (HQL) Live Fire Training Component* (November 17, 2017).

70. Atlantic Guns' Handgun Qualification License (HQL) Information Sheet.

71. Atlantic Guns' website printouts reflecting the make and model and price of handguns in Plaintiff's inventory (last accessed Feb. 6, 2018).

72. Alison Knezevich, Baltimore County residents concerned over rise in violent crime, The Baltimore Sun (March 19, 2018), *available at* http://www.baltimoresun.com/news/maryland/crime/bs-md-co-county-crime-20180315-story.html (last accessed March 22, 2018).

73. Atlantic Guns Handgun Sales Gross Revenue and Number of Handguns Sold By Year.

74. 77R handgun training video used prior to the HQL implementation to satisfy the then-existent training requirement.

75. Maryland Automated Firearms Services System (MAFSS), Yearly Count of Handgun Transfers by Atlantic Guns, Inc., 2000 through 2017.

76. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data Report for January 1, 2017 – December 31, 2017

77. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data Report for January 1, 2016 – December 31, 2016, *available at* https://www.atf.gov/firearms/docs/undefined/2016tracestatsmarylandpdf/ download.

78. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data Report for January 1, 2015 – December 31, 2015, *available at* https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download.

79. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data Report for January 1, 2014 – December 31, 2014, *available at* https://www.atf.gov/about/docs/report/maryland-firearms-trace-data- %E2%80%93-2014/download.

80. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data Report for January 1, 2013 – December 31, 2013, *available*

*at* https://www.atf.gov/resource-center/docs/143894-
mdatfwebsite13pdf/download.

81. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and
Explosives, Office of Strategic Intelligence and Information, United States
Federal Firearms Licensee Thefts/Losses Firearms Tracing System Data Report
for January 1, 2017 – December 31, 2017, *available at*
https://www.atf.gov/resource-center/docs/report/theftdatausa2017pdf/download.

82. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and
Explosives, Office of Strategic Intelligence and Information, United States
Federal Firearms Licensee Thefts/Losses Firearms Tracing System Data Report
for January 1, 2016 – December 31, 2016, *available at*
https://www.atf.gov/resource-center/docs/undefined/osii508fflthefts-
lossescy16pdf/download.

83. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and
Explosives, Office of Strategic Intelligence and Information, United States
Federal Firearms Licensee Thefts/Losses Firearms Tracing System Data Report
for January 1, 2015 – December 31, 2015, *available at*
https://www.atf.gov/firearms/docs/report/2015-summary-firearms-reported-lost-
and-stolen/download.

84. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and
Explosives, Office of Strategic Intelligence and Information, United States
Federal Firearms Licensee Thefts/Losses Firearms Tracing System Data Report

for January 1, 2014 – December 31, 2014, *available at*

https://www.atf.gov/resource-center/docs/2014-summary-firearms-reported-lost-

and-stolenpdf/download.

85. U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and

Explosives, Office of Strategic Intelligence and Information, United States

Federal Firearms Licensee Thefts/Losses Firearms Tracing System Data Report

for January 1, 2013 – December 31, 2013, *available at*

https://www.atf.gov/resource-center/docs/2013summary-

firearmsreportedlostandstolenpdf/download.

86. Maryland Coordination and Analysis Center Data, Homicides per Month per

Jurisdiction by Type of Weapon for the period of October 1, 2012 through

December 31, 2017.

87. Maryland Coordination and Analysis Center Data, Non-Fatal Shootings per

Month per Jurisdiction for the period of October 1, 2012 through December 31,

2017.

88. 2A Maryland, Maryland Homicides by Month and Modality for the period of

October 1, 2012 through December 31, 2017.

89. 2A Maryland, Maryland Homicides & Shootings: Total Homicides, Firearm

Homicides & Non-Fatal Shootings for the period of October 1, 2012 through

December 31, 2017.

90. 2A Maryland, Maryland Homicides, Average Temperatures, Precipitation by

Month for the period of October 1, 2012 through December 31, 2017.

USCA4 Appeal: 21-2017    Doc: 25-4    Filed: 08/03/2022    Pg: 356 of 449

91. 2A Maryland, Homicides in Maryland by Jurisdiction for the period of October 1, 2012 through September 30, 2017.

92. FBI NICS Data Related to Handgun Background Checks for 2006 through 2017.

93. Declaration of Delaine Brady submitted in Kolbe v. O'Malley (Case 1:13-cv-02841-CCB, Document 44-10, Filed 02/14/14) and any attachments thereto.

94. Declaration of Delaine Brady submitted in Kolbe v. O'Malley (Case 1:13-cv-02841-CCB, Document 62-5, Filed 04/11/14) and any attachments thereto.

95. United States of America v. Police Department of Baltimore City, et. al. (Case 1:17-cv-00099-JKB, Document 2-2, Filed 01/12/17), Consent Decree, *available at* https://www.justice.gov/opa/file/925056/download

96. Maryland State Police Licensing Division Firearms Services Section, 2015 Maryland Firearms Dealer Seminar PowerPoint, *available at* http://mdsp.maryland.gov/Organization/Licensing%20Division%20Documents/Dealer%20Seminar%202015%20Final.pdf

97. Maryland State Police Licensing Division Firearms Services Section, 2014 Maryland Firearms Dealer Seminar PowerPoint, *available at* http://mdsp.maryland.gov/Organization/Licensing%20Division%20Documents/Dealer_Presentation_CW2.pdf

98. Maryland State Police Licensing Division Firearms Registration Section, 2013 Maryland Firearms Dealer Seminar PowerPoint, *available at* http://mdsp.maryland.gov/Organization/Licensing%20Division%20Documents/DealerPPT.pdf

JA1779

99.   Plaintiffs' Expert Reports and references therein.

100.  Defendants' Expert Reports and references therein.

101.  All documents exchanged during discovery.

102.  All documents referenced in discovery responses.

103.  All documents used as exhibits in any deposition in this case.

**Rule 26(a)(1)(A)(iii)**. A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

**Response**: Plaintiffs have not asserted a claim for damages in this action, but reserve the right to supplement their response and reserve the right to seek and recover damages equal to the costs incurred in pursuing this action, including attorney's fees under 42 U.S.C. § 1988(b).

**Rule 26(a)(1)(A)(iv)**. For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**Response**: Not applicable.

Respectfully submitted,

20

/s/ Cary J. Hansel_____
Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, MD 21218
Phone: (301) 461-1040
Facsimile: (443) 451-8606
cary@hansellaw.com

*Attorney for Plaintiffs*

/s/ John Parker Sweeney_____
John Parker Sweeney (Bar No. 08761)
T. Sky Woodward (Bar No. 10823)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Phone: (202) 719-8216
Facsimile: (202) 719-8316
JSweeney@bradley.com

*Attorneys for Plaintiff Atlantic Guns, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of April, 2018, a copy of the foregoing

Rule 26(a)(1)(A) Amended Disclosures of Plaintiffs was sent via electronic mail to:

> Jennifer S. Katz
> Robert A. Scott
> Assistant Attorneys General
> Maryland Office of the Attorney General
> 200 Saint Paul Street, 20th floor
> Baltimore, Maryland  21202
> jkatz@oag.state.md.us
> rscott@oag.state.md.us
>
>
> /s/ John Parker Sweeney_____
> John Parker Sweeney (Bar No. 08761)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., et al. | * | |
| | * | |
| v. | * | Civil Case No. ELH-16-3311 |
| | * | |
| LAWRENCE HOGAN, Jr. et al. | * | |
| | * | |

**\*\*\*\*\*\*\*\***

**MEMORANDUM OPINION**

This litigation involves a challenge to the constitutionality of Maryland's handgun licensing requirement, embodied in Maryland's Firearm Safety Act of 2013 (the "FSA" or the "Act"), Md. Code (2018 Repl. Vol.), § 5-117.1 of the Public Safety Article ("P.S."). Plaintiffs Maryland Shall Issue, Inc. ("MSI"); Atlantic Guns, Inc. ("Atlantic Guns"); Deborah Kay Miller; and Susan Vizas have filed suit against defendant Lawrence Hogan, Jr., in his capacity as Governor of Maryland, and defendant William M. Pallozzi, in his capacity as Secretary and Superintendent of the Maryland State Police. The suit concerns the provision of the FSA that requires a prospective handgun buyer to obtain a Handgun Qualification License ("HQL") as a condition for purchasing a handgun. *See* P.S. § 5-117.1; ECF 1 ("Complaint"); ECF 14 ("First Amended Complaint").[1] In plaintiffs' view, the HQL requirement violates their rights under the Second Amendment to the Constitution.

Cross-motions for summary judgment are pending. *See* ECF 125; ECF 135. But, this Memorandum Opinion addresses only the parties' respective motions to strike certain opinions of the opposing side's witnesses. ECF 133 (Plaintiffs' Motion); ECF 145 (Defendants' Motion). The declarations of the relevant witnesses are attached as exhibits to the motions for summary

---

[1] I shall refer to the defendants collectively as the "State."

JA1783

judgment. *See* ECF 125-11; ECF 125-12; ECF 125-14; ECF 125-15; ECF 135-3; ECF 135-24; ECF 135-25.

Plaintiffs have moved to strike the opinions of defendants' three expert witnesses under Rule 702 of the Federal Rules of Evidence ("F.R.E."): Daniel Webster; Captain James P. Russell of the Maryland State Police ("MSP"); and James Johnson, former Chief of the Baltimore County Police Department ("BCPD"). ECF 133. Defendants oppose Plaintiffs' Motion. ECF 142. And, plaintiffs have replied. ECF 152.

Defendants have moved to exclude part of the testimony of plaintiffs' two expert witnesses, also under Rule 702. They are Gary Kleck, Ph.D. and Carlisle Moody, Ph.D. In addition, under F.R.E. 701, they seek to exclude the opinion testimony of a lay witness, MSI President Mark Pennak. ECF 145. The motion is supported by a memorandum. ECF 145-1 (collectively, the "Defendants' Motion"). Plaintiffs oppose Defendants' Motion (ECF 151), and defendants have replied. ECF 155.

No hearing is necessary to resolve the pending motions. *See* Local Rule 105(6). For the reasons that follow, I shall grant the Defendants' Motion in part and deny it in part, and I shall deny Plaintiffs' Motion.[2]

## I.    The FSA

In 2013, the Maryland General Assembly enacted the FSA. In relevant part, the FSA provides: "A dealer or any other person may not sell, rent, or transfer a handgun to a purchaser, lessee, or transferee unless the purchaser, lessee, or transferee presents to the dealer or other person

---

[2] I incorporate the facts set forth in my Memorandum Opinion of March 31, 2019. ECF 98.

2

a valid handgun qualification license issued to the purchaser, lessee, or transferee by the Secretary [of the Maryland State Police.]" P.S. § 5-117.1(b).

To obtain an HQL, a person must satisfy a handful of conditions.  Of relevance here, an applicant must "complete a minimum of 4 hours of firearms safety training within the prior three years" and, "based on an investigation," the individual may not be "prohibited by federal or State law from purchasing or possessing a handgun." *Id.* § 5-117.1(d). The safety training, which is undertaken at the applicant's expense, must cover classroom instruction on "State firearm law[,] home firearm safety[,] and handgun mechanisms and operation," along with a live-fire "firearms orientation component that demonstrates the person's safe operation and handling of a firearm." *Id.* § 5-117.1(d)(3).  In addition, an applicant must complete a written application and pay a non-refundable application fee in an amount not to exceed $50.  *Id.* § 5-117.1(g).  Moreover, the application must include "a complete set of the applicant's legible fingerprints taken in a format approved by" the Maryland Department of Public Safety and Correctional Services ("DPSCS"). *Id.* § 5-117.1(f)(3)(i).

Once the HQL application is received, the Secretary shall apply to the Criminal Justice Information System Central Repository of the DPSCS and "for a State and national criminal history records check for each applicant[.]" *Id.* § 5-117.1(f)(2). The Secretary "shall issue" a decision to the applicant "[w]ithin 30 days after receiving a properly completed application." *Id.* § 5-117.1(h)(1).

## II.    Legal Standard

### A.

The parties have styled their motions as motions "to strike" opinion testimony.  *See* ECF 133; ECF 145.  Pursuant to F.R.E. Rule 104(a), the court is responsible for determining

"preliminary questions concerning the qualification of a person to be a witness" and "the admissibility of evidence." This includes the admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence ("F.R.E.") and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

In *Daubert*, the Supreme Court made clear that scientific evidence is admissible under F.R.E. 702 if "it rests on a reliable foundation and is relevant." Thereafter, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court extended the principles pertaining to scientific expert testimony to all expert testimony requiring technical or specialized knowledge.

F.R.E. 702 governs expert testimony. It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Pursuant to Rule 702, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue, and the testimony is both reliable and relevant. *See United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019); *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019). The rule "was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F. 3d 257, 261 (4th Cir. 1999).

To be admissible, "'the proffered expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation . . . .'" *United States v. Landersman*,

886 F.3d 393, 412 (4th Cir. 2018) (citation omitted). And, the party seeking to present expert testimony has the burden to establish its admissibility by a preponderance of the evidence. *See Cady v. Ride-Away Handicap Equipment Corp.*, 702 Fed. App'x 120, 124 (4th Cir. 2017) (citing *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)); *Maryland Casualty Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 783 (4th Cir. 1998); *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011); *Casey v. Geek Squad ® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011).

The trial court serves a "gatekeeping role" by making pretrial determinations "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. This gatekeeper role helps to ensure that the expert's testimony "rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see Landersman*, 886 F.3d at 412; *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 577 (4th Cir. 2017).

However, the Supreme Court did not intend the gatekeeper role to "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596); *see United States v. Moreland*, 437 F. 3d 424, 431 (4th Cir. 2006) (recognizing that "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). Because the district court "is not intended to serve as a replacement for the adversary system . . . the rejection of expert testimony is the exception rather then the rule." *In re Lipitor*

JA1787

*(Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No. II),* 892 F.3d 624, 631 (4th Cir. 2018) (citation and quotation marks omitted).

As noted, to be admissible, scientific evidence must be both reliable and relevant. *Daubert*, 509 U.S. at 597. To be reliable, the testimony must be grounded "in the methods and procedures of science," and it must be something more than subjective belief or unsupported assumptions. *Id.* at 589–90; *see Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). An expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'" *Belville*, 919 F.3d at 232 (citation omitted). Put another way, the evidence or testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert* 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017); *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017); *United States v. Forrest*, 429 F.3d 73, 80–81 (4th Cir. 2005).

Helpfulness to the trier of fact is "the 'touchstone'" under Rule 702. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (citation omitted). And, "'[d]oubt regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility.'" *Mack v. Amerisource Bergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (citation omitted). In effect, a tie goes to the proponent of the expert evidence.

With regard to an expert's qualifications, the Advisory Committee's notes to Rule 702 provide that experience alone, or in conjunction with "other knowledge, skill, training or education," can provide sufficient foundation for expert testimony. *See Kumho Tire Co.*, 526 U.S. at 156 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). On the other hand, an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise. *See Berry*

6

*v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Smith v. Central Admixture Pharm. Servs., Inc.*, AW–07–3196, 2010 WL 1137507, at *3 (D. Md. Mar. 19, 2010) ("It is well established that 'general expertise is not sufficient to qualify [an expert] to testify on a matter that requires particularized knowledge, training, education, or experience.'" (quoting *Fitzgerald v. Smith & Nephew Richards, Inc.*, JFM-95-3870, 1999 WL 1489199, at *3 (D. Md. Dec. 30, 1999), *aff'd sub nom. Fitzgerald v. Smith & Nephew, Inc.*, 11 F. App'x 335 (4th Cir. 2001)).

*Daubert* articulated five non-exhaustive factors that the trial court should consider in evaluating the reliability of an expert's reasoning or methodology: (1) whether the particular scientific theory has been or can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether there are standards controlling the method; and (5) whether the technique has gained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94; *see also United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021); *Belville*, 919 F.3d at 233; *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003).

Notably, the factors are "'not exhaustive.'" *Belville*, 919 F.3d at 233 (citation omitted). Moreover, the evaluation "is always a flexible one . . . ." *Oglesby*, 190 F.3d at 250. As a whole, the factors are meant to ensure that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Thus, the factors are meant to be "helpful, not definitive," and not all factors necessarily apply in a given case. *Id.* at 151; *see Nease*, 848 F.3d at 229. Indeed, the Supreme Court has said that the factors are not a "checklist." *Kumho Tire Co.*, 526 U.S. at 150.

The trial court "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004); *see Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017). But, expert testimony need not be "'irrefutable or certainly correct'" in order to be admissible. *Moreland*, 437 F. 3d at 431 (citation omitted); *see Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195; *Westberry*, 178 F.3d at 261. Therefore, "'questions regarding the factual underpinnings of the [expert witness's] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility." *Bresler,* 855 F.3d at 195 (citation omitted).

On the other hand, a court should exclude testimony based on "belief or speculation," *Oglesby*, 190 F.3d at 250, or when not supported by the record. *See Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005); *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *Casey*, 823 F. Supp. 2d at 340. Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Similarly, a court may exercise its "discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered.'" *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting *Joiner*, 522 U.S. at 146).

Further, proposed testimony that concerns matters within the common knowledge and experience of a lay juror does not pass muster. *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995); *Kopf*, 993 F.2d at 377. "While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact . . . an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion.'" *Shreve v. Sears, Roebuck*

*& Co.*, 166 F. Supp. 2d 378, 392–393 (D. Md. 2001) (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)).

In contrast to the common law, F.R.E. 704(a) permits expert testimony that "embraces an ultimate issue to be decided by the trier of fact." *United States v. Campbell*, 963 F.3d 309, 313 (4th Cir. 2020), *cert. denied sub nom. Washington v. United States*, ___ U.S. ___, 141 S. Ct. 927 (2020); *see United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006); *United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002). As the *Campbell* Court observed, the decision whether to permit such testimony turns on an analysis of Rule 702. *Campbell*, 963 F.3d at 314.

In any event, under Rule 702 the party who seeks admission of evidence is not relieved of the burden of meeting the requirements of other applicable federal rules. This includes Rule 401, concerning relevance, and Rule 403's instruction that evidence may be excluded for undue prejudice, confusion of the issues, or a potential to mislead the jury. *Casey*, 823 F. Supp. 2d at 341; *see Westberry*, 178 F.3d at 261 ("[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded.").

**B.**

Rule 701 of the F.R.E. governs lay witness testimony. It provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702

Thus, in accordance with Rule 701, a lay witness may offer an opinion only if it is "rationally based on [his] perception." *United States v. Smith*, 962 F.3d 755, 766 (4th Cir. 2020) (internal

quotations omitted), *reh'g denied* (July 14, 2020), *cert. denied*, ___ U.S. ___, 141 S. Ct. 930 (2020).

Rule 701 was amended in 2000, adding subsection (c), in order "to prohibit the inappropriate admission of expert opinion under Rule 701." *United States v. Perkins*, 470 F.3d 150, 155 n.8 (4th Cir. 2006) (quoting *United States v. Garcia*, 291 F. 3d 127, 139 n.8 (2d Cir. 2002)) (internal quotations omitted). This amendment "ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Cim. P. 16 by simply calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee note to 2000 amendment. Put differently, "Rule 701 forbids the admission of expert testimony dressed in lay witness clothing." *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010) (quoting *Perkins*, 470 F.3d at 156). Thus, for a witness to provide an opinion that is "based on scientific, technical, or other specialized knowledge[,]" the witness *must* be presented as an expert pursuant to Rule 702. *Smith*, 962 F.3d at 766.

### III.    Plaintiffs' Motion

#### A.  Law Enforcement Officers James Johnson and James Russell

Plaintiffs have moved to exclude paragraphs 7-15 and 17-18 of Johnson's Declaration (ECF 125-14) and paragraphs 13 and 17-25 of Russell's Declaration (ECF 125-13). ECF 133 at 4. In the paragraphs at issue, Johnson opines on the value of firearm safety training and identification requirements in relation to public safety. ECF 125-14, ¶¶ 7-15, 17-18. And, Russell discusses the public benefits of firearm safety training, such as reducing accidental discharges, promoting responsible gun storage, reducing firearm access by criminals, and encouraging responsible gun ownership. ECF 125-13, ¶¶ 13, 17-25.

10

Plaintiffs argue that these opinions are "not based on sufficient data and are therefore inadmissible under Federal Rule of Evidence 702(b)." *Id.* Although plaintiffs concede that Johnson has "'an extensive amount of knowledge of local and national gun law,'" they argue that "his deposition testimony revealed numerous gaps in relevant knowledge and a dearth of statistical or empirical evidence in support of his positions." *Id.* As to Russell, plaintiffs assert: "Aside from his '13 years of being on a live firing range,' . . . Russell possesses little empirical knowledge to support his opinions . . . ." *Id.* at 7-8 (citing ECF 125-13, ¶ 10).

The State counters that the "text of Rule 702 'expressly contemplates that an expert may be qualified on the basis of experience.'" ECF 142 at 2 (citing Fed. R. Evid. 702 advisory committee note to 2000 amendment); *see Kumho Tire*, 526 U.S. at 156 (noting that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"). It argues: "Chief Johnson and Captain Russell both opined about the potential public safety benefits of the Handgun Qualification License ('HQL') requirement based on their extensive experience as law enforcement officers and their knowledge, training, and observations during their law enforcement careers." ECF 142 at 2-3.

Plaintiffs rely principally upon *Higginbotham v. KCS Int'l, Inc.*, 85 F. App'x 911 (4th Cir. 2004), to support their argument. ECF 133 at 4. In *Higginbotham*, the Fourth Circuit affirmed the exclusion of expert testimony regarding the design of a ladder in a products liability case when the expert had "no training in metallurgy nor . . . in ladder design." *Higginbotham*, 85 F. App'x at 917.

In contrast, Johnson has thirty-nine years of experience with firearm safety in the context of law enforcement. ECF 125-14, ¶ 2. Johnson joined the BCPD in January 1979, and he served as its Chief of Police from 2007 until his retirement in 2017. *Id.* Moreover, Johnson has "conducted hundreds of presentations on firearm safety, including trainings on the safe handling, cleaning,

unlocking, securing, transporting, storing, and firing of firearms." *Id.* ¶ 3. More recently, he "provided in-service training on how to reduce accidental discharges and how to properly safeguard a service weapon." *Id.*

Similarly, Russell has twenty-one years of experience with law enforcement. ECF 125-13, ¶ 2. He joined the MSP in 1997 and has served in several units, including routine patrol, criminal investigations, domestic violence, firearms training, recruiting, and field operations. *Id.* He also holds a "certification as a firearms instructor from the Maryland Police Training Commission" and previously "provided firearms training to more than 300 trooper candidates" at the MSP Academy. *Id.* ¶¶ 3, 4. After leaving the Academy, he continued to provide firearm training to officers, retired officers, and citizens. *Id.* ¶¶ 6, 8, 9. In 2013, he was "certified to teach the four-hour safety training required under Maryland law to obtain a Handgun Qualification License." *Id.* ¶ 12.

Furthermore, despite plaintiffs' argument that this testimony "is not based on sufficient facts or data," the *Daubert* factors are explicitly flexible. ECF 133 at 4; *Kumho Tire*, 526 U.S. at 150 ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'") (citation omitted). As discussed, the court has "'broad discretion' in choosing which *Daubert* factors to apply and how to consider them." *Belville*, 919 F.3d at 233 (quoting *Oglesby*, 190 F.3d at 250). And, the Fourth Circuit has upheld the admission of expert experiential testimony from members of law enforcement.

For example, in the context of narcotics cases, the Fourth Circuit has explained that "'experiential expert testimony' [is] different from scientific testimony and [is] allowable from 'law enforcement officers with extensive drug experience.'" *United States v. Campbell*, 851 F. App'x 370, 373 (4th Cir. 2021) (quoting *United States v. Wilson*, 484 F.3d 267, 274-75 (4th Cir. 2007)). In assessing the foundation of such testimony, the Fourth Circuit has said that there are

"meaningful differences in how reliability must be examined with respect to expert testimony that is primarily experiential in nature as opposed to scientific." *Wilson*, 484 F.3d at 274. In *Wilson*, for example, the Court said that an officer could testify as to the meaning of coded words in drug trafficking, so long as he could "explain" the basis for his opinion. *Id.* at 276 (internal quotation and citation omitted). In this regard, the Fourth Circuit emphasized the officer's extensive experience in law enforcement. *See id.* ("[The officer] was a nine-year veteran of the Baltimore County Police Department. He spent most of his career investigating narcotics traffickers and had participated in hundreds of drug investigations and arrests.").

And, in another Maryland case challenging the FSA, Judge Blake admitted the testimony of three law enforcement officers, despite the objection that their opinions were "outside the scope of [the officers'] expertise." *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 780 (D. Md. 2014), *aff'd in part, vacated in part,* 813 F.3d 160 (4th Cir. 2016), *aff'd on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017). Judge Blake noted that the testimony at issue was not about expert ballistics but instead "based on [the officers'] personal knowledge and experiences" with shotguns and other assault rifles. *Kolbe*, 42 F. Supp. 3d at 781.

As indicated, in the paragraphs at issue with respect to Johnson (ECF 125-14, ¶¶ 7-15, 17-18), Johnson opines on the value of firearm safety training and identification requirements in relation to public safety. *See id.* In particular, he asserts that certain HQL requirements will help reduce access to handguns by criminals, accidental discharges, and straw purchases, while also promoting responsible gun ownership, among other things. *See id.*

Johnson's opinions regarding the effectiveness of specific HQL requirements do not rest on empirical data or statistics. *See* ECF 133-2 at 6, 7, 10, 13, Tr. 23, 25, 35, 51. Rather, his opinions regarding the value of training and identification checks are predicated on his experience with the

13

BCPD, as well as "hundreds of hours of research into issues related to gun violence, attendance at law enforcement meetings and conferences, and hundreds of conversations with other law enforcement officers regarding their experience." ECF 125-14, ¶ 4. Such experiential testimony is admissible to the extent it supports the claim that firearm safety training generally promotes public safety.

The case for the admission of Russell's testimony is equally clear. In the paragraphs at issue (ECF 125-13, ¶¶ 13, 17-25), Russell discusses the public safety benefits of firearm safety training, such as reducing accidental discharges, promoting responsible gun storage, reducing firearm access by criminals, and encouraging responsible gun ownership. Russell's comments are based upon "thousands of hours over the last 13 years teaching firearms safety training to hundreds of police candidates, sworn officers, retired officers, and others." *Id.* ¶ 10. Moreover, Russell was certified in the "four-hour firearms safety training required under Maryland law to obtain a Handgun Qualifying License." *Id.* ¶ 12.

Russell's opinions are based on his extensive experience. He has observed the efficacy of the training prior to and after the implementation of the HQL and drew conclusions based on this comparison. To the extent that Russell opines on the value of firearm safety training, his testimony is admissible.

### B.  Professor Daniel Webster

Plaintiffs seek to exclude portions of Webster's declarations. ECF 133. Webster holds several professional positions, as follows:  "Professor of Health Policy and Management, Director of Health and Public Policy Ph.D. Program, Deputy Director for Research at the Center for the Prevention of Youth Violence, and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health."  ECF 125-11, ¶ 1. Webster's

14

research focuses primarily on gun-related injuries and violence; he has directed numerous studies related to gun violence and its prevention, and he has published over 100 peer-reviewed articles. *Id.* ¶ 4. During the legislative hearings in 2013 concerning the FSA, the Maryland General Assembly heard testimony from various public policy and law enforcement experts with regard to the HQL, and Webster was one of them. *See* ECF 125-3.

In his declarations and expert report, Webster discusses why he believes that laws that require citizens to obtain a permit to purchase a firearm, including Maryland's HQL, promote public safety and reduce firearm violence. *See* ECF 125-11; ECF 125-12. Plaintiffs argue that paragraphs 8-20 of Webster's Declaration (ECF 125-11) and paragraphs 5-8 of Webster's Supplemental Declaration (ECF 125-12) should be excluded because Webster's opinions do not fit the facts of this case. ECF 133 at 8.

In particular, plaintiffs posit that the "studies relied upon by Professor Webster are factually distinguishable, clearly the result of data dredging, and all ignore the actual effect of the HQL requirement during the relevant time period in Maryland," so they "tell us nothing about the potential effects of the HQL requirement." *Id.* at 12. According to plaintiffs, Webster's reliance on the studies of permit-to-purchase laws in Missouri and Connecticut is misplaced because there are "numerous and substantive" differences between the laws of Missouri, Connecticut, and Maryland. ECF 152 at 8.

In response, defendants tout Webster's qualifications and assert that "plaintiffs simply misunderstand the nature of Professor Webster's testimony." ECF 142 at 6. According to defendants, Webster relied on the studies of permit-to-purchase laws "in other states to opine on the effect of such laws generally and what impact Maryland's similar law might have on reducing the negative effects of gun violence." *Id.* at 6-7.

15

As noted, the evidence or testimony of an expert witness must be relevant to the extent that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591; *see also In re Lipitor*, 892 F.3d at 631; *Nease*, 848 F.3d at 229; *Forrest*, 429 F.3d at 80–81. And, an expert's testimony is relevant if it has "'a valid scientific connection to the pertinent inquiry.'" *Belville*, 919 F.3d at 232 (citation omitted).

As plaintiffs point out, there are significant differences between the permit laws in Connecticut, Missouri, and Maryland. In Missouri, for example, the permit law did not require fingerprinting or safety training. And, the law in Connecticut requires an eight-hour training course, rather than the four-hour course in Maryland, and Connecticut also requires photo identification on its permits to purchase. ECF 133 at 9. Despite the differences between the laws, Webster used those studies to predict whether Maryland's licensing requirements might have an impact on reducing gun violence.

The Court must determine, *inter alia*, whether Maryland's decision to enact the HQL law was based on substantial evidence. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997). The General Assembly considered Webster's testimony in deciding to enact the FSA. The General Assembly would have known of the distinctions in the laws of Missouri and Connecticut. Moreover, in *Heller v. District of Columbia*, 45. F. Supp. 3d 35 (D.D.C. 2014), *aff'd in part*, 801 F.3d 264 (D.C. Cir. 2015), the court addressed challenges to a firearm registration law with requirements similar to Maryland's HQL law. The *Heller* Court considered some of the same opinions that Webster has offered in this case, including those as to the study of the permit-to-purchase law in Missouri. *Id.* at 52-53. As in *Heller*, Webster's analysis here with regard to the studies conducted in Connecticut and Missouri does not render his testimony inadmissible.

16

Further, plaintiffs take issue with paragraph 17 of Webster's Declaration. There, Webster discusses a study that he conducted to assess the FSA's impact on the homicide rate in Maryland. ECF 125-11, ¶ 17.  Based on that study, Webster concluded that the HQL requirements were associated with a 48% reduction in firearm homicide rates in Anne Arundel, Montgomery, and Prince Georges' counties. *Id.*

According to plaintiffs, paragraph 17 is inadmissible because it relies on "incorrect data" and "fails to demonstrate (or even explicitly state) that the HQL requirement caused" any change in the firearm homicide rates in Maryland. ECF 133 at 13-14. As noted, they also assert that the data on which Webster relies in his Supplemental Declaration is "flawed" and the product of "cherry picking" and "data dredging." *Id.* at 10-12.

In my view, plaintiffs' arguments pertain to the weight of the witness's conclusions, not admissibility. *See Bresler*, 855 F.3d at 195 (noting that "'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility'") (quoting *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)) (alteration in *Bresler*).  Indeed, other courts have admitted Webster's expert opinions, similar to those advanced here. *See, e.g.*, *Kolbe*, 42 F. Supp. 3d at 780; *Heller*, 45. F. Supp. 3d at 41-42.

Accordingly, I shall deny plaintiffs' motion to exclude portions of Webster's declarations.

## IV.    Defendants' Motion

### A.  Carlisle Moody

Moody is a professor of economics at the College of William and Mary, where he teaches econometrics, mathematical economics, and time series analysis. ECF 135-24, ¶ 2. According to Moody, he has "researched guns, crime, and gun policy for almost 20 years and published 12

17

JA1799

articles related directly to these topics." *Id.* For this case, Moody "used four different methods to study the FSA's impact" on Maryland's firearm homicide rate and concluded that the "FSA has had no beneficial impact…." *Id.* ¶ 4.

Defendants seek to exclude Moody's expert opinion (ECF 135-24) in full for failure to satisfy the requirements of Rule 702. *See* ECF 145-1. In particular, the State asserts that Moody's testimony "is not based on sufficient facts or data and is not the product of reliable principles and methods" because Moody "failed to account for justifiable homicides, homicides committed with long guns, or the effect of the events in 2015 surrounding the death of Freddie Gray in his analysis." *Id.* at 4.[3] In other words, defendants contend that Moody did not "control for [the] Freddie Gray effect" in his analysis. *Id.* at 5. Thus, defendants posit, his conclusions are unreliable.

Plaintiffs counter that "it is clear that this effect [of the events in 2015] was accounted for in Professor Moody's methodology." ECF 151 at 5. Specifically, Moody explained that he relied on a Wikipedia page to understand the Freddie Gray phenomenon. ECF 145-3 (Moody Dep.) at 12. And, he said that he implicitly accounted for the "Freddie Gray" effect when he compared "the percent change in the homicide rate after 2014 for Maryland and for states that did not have permit to purchase laws." *Id.* at 15.

To be sure, there may be some lacunae in Moody's reasoning. But, defendants' challenge primarily "amounts to a disagreement with the values" Moody chose to assign to certain variables in his research. *Bresler*, 855 F.3d at 195. As with Webster, "such challenges to the accuracy of [Moody's] calculations 'affect the weight and credibility' of [Moody's] assessment, not its admissibility." *Id.* at 196 (quoting *Zoltek Corp.*, 543 F.3d at 997); *see also Heckman v. Ryder Truck*

---

[3] The civic unrest in Baltimore City in late April and May 2015 occurred after the death of Freddie Gray, who was injured while in police custody. The unrest occurred some 18 months after the HQL requirement went into effect (October 2013).

*Rental, Inc.*, CCB-12-664, 2014 WL 3405003 (D. Md. July 9, 2014) (finding that expert's failure to account for certain variables did not make the testimony inadmissible, but should only go to weight of the testimony). Accordingly, I decline to strike his testimony.

### B. Gary Kleck

Plaintiffs also identified Gary Kleck as an expert. ECF 145-2; *see* ECF 135-25 (Kleck Expert Report and Declaration); ECF 135-29 (Kleck Supplemental Declaration). He is a Professor of Criminology and Criminal Justice at Florida State University. ECF 135-25 at 11. Kleck's research focuses on the impact of firearms and gun control on violence, and he has authored or co-authored a number of books and articles addressing topics in this field. *Id.* Kleck's Declaration focuses on his view of the flaws in Webster's studies and conclusions. *See generally* ECF 135-25.

The State seeks to exclude Kleck's testimony in full on the basis that it "is not based on peer-reviewed research, has not been widely accepted, and is irrelevant to the issues in this case." ECF 145-1 at 7. In response, plaintiffs emphasize that whether an expert opinion is subject to peer review is just one factor to consider when determining whether expert testimony should be admitted. ECF 151 at 9. Furthermore, plaintiffs argue: "Professor Kleck's qualifications more than compensate for whatever peer review Defendants claim is lacking." *Id.* at 10 (citing *Peabody Coal Co. v. Dir., Off. of Workers' Compensation Programs*, 201 F.3d 436(Table), 1999 WL 1020530, at *4 (4th Cir. 1999) ("Qualifications of expert witnesses can buttress the reliability of their opinions.")).

With respect to the issue of relevance, defendants assert that the "issue in this case [is] whether there is substantial evidence in the record to support the General Assembly's predictive judgment that enacting the HQL law would further public safety." ECF 145-1 at 8. According to

the State, Kleck's criticism of the methods Webster employs "do not bear on [] the question [at hand] . . . ." *Id.* But, Kleck's opinions are relevant for the same reason as Webster's.

The State next complains that Kleck's testimony is not based on "peer-reviewed research." ECF 145-1 at 7. For example, the State points out that "Kleck relies primarily on a law review article that he co-authored and that appeared in the UCLA Law Review in 2009 for the assertion that ATF gun 'trace data' is not a reliable indicator of straw gun purchases." *Id.* (citing ECF 135-25, ¶ 7). When questioned at his deposition regarding the law review article, Kleck stated, ECF 145-4 at 16: "Law reviews typically don't have peer review, but on occasion, they do, and it's possible they did in that case. I really don't remember."

Kleck's testimony is admissible for two primary reasons. First, Kleck references other reputable sources, including the Bureau of Alcohol, Tobacco, and Firearms ("ATF") in support of his contentions. *See, e.g.,* ECF 135-25, ¶ 7 (noting that "ATF explicitly cautions potential users of their trace data that 'the firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe."). Second, the Fourth Circuit has explained: "'The fact of publication (or lack thereof) in a peer reviewed journal will be a relevant, *though not dispositive*, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.'" *Nease*, 848 F.3d at 229 (4th Cir. 2017) (emphasis added) (citing *Daubert*, 509 U.S. at 594). That Kleck relies on some studies that are not peer reviewed is not dispositive.

The State also claims that "Professor Kleck's criticisms of the use of firearm trace data as an indicator of straw purchases have been discredited in a peer-reviewed article authored by the leading social science experts who study gun violence." ECF 145-1 at 8 (citing ECF 140-2

(Webster Supplemental Declaration), ¶¶ 8-10). However, this does not render Kleck's opinion on trace data inadmissible. Again, this argument goes to weight, not admissibility.

In sum, under the flexible *Daubert* factors, I conclude that Kleck's testimony is based on research that he was entitled to consider.  Moreover, his testimony is relevant. Accordingly, I shall deny the motion to strike Kleck's expert testimony.

### C.  Mark Pennak

Plaintiffs seek to admit the lay opinions of Mark Pennak concerning the HQL training requirements under F.R.E. Rule 701. He is the president of MSI and a qualified handgun instructor. ECF 145-1 at 1-4.  Defendants seek to exclude several paragraphs from Pennak's Declaration (ECF 135-3).

The Fourth Circuit has recognized that "'the line between lay opinion testimony under 701 and expert testimony under Rule 702 is a fine one.'" *United States v. Farrell*, 921 F.3d 116, 143 (4th Cir. 2019) (quoting *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir. 2010)), *cert. denied*, __ U.S. __, 140 S. Ct. 269 (2019).  The "'guiding principle' in distinguishing a lay opinion from an expert opinion is that lay testimony must 'be based on personal knowledge.'" *Farrell*, 921 F.3d at 143 (internal citation omitted). In making this determination, the court is "afforded a good deal of discretion." *Smith*, 962 F.3d at 767.

Notably, the Advisory Committee Notes to Rule 701 provide that testimony based on "'the particularized knowledge that the witness has by virtue of his or her position in [a] business'" may be admissible under Rule 701 because "it is not based on 'experience, training or specialized knowledge within the realm of an expert[.]'" *Lord & Taylor, LLC*, 849 F.3d at 576 (quoting Fed. R. Evid. 701 advisory committee note to 2000 amendment); *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1217 (11th Cir. 2003) (testimony that charges

21

billed for repairs were "reasonable" did not constitute expert testimony because "testimony by business owners and officers is one of the prototypical areas [of lay opinions] intended to remain undisturbed" by the amendment); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (a business owner is permitted to give lay opinion testimony as to damages, as it is based on his knowledge and participation in the day-to-day affairs of the business).

Further, the Fourth Circuit has specified that "if a witness's firsthand observations are 'common enough' and require applying only a 'limited amount of expertise,' they may fairly come in under Rule 701." *Smith*, 962 F.3d at 767 (quoting *Perkins*, 470 F.3d at 156). On the other hand, "opinions resulting 'from a process of reasoning which can be mastered only by specialists in the field' must be admitted through Rule 702." *Smith*, 962 F.3d at 767 (quoting *United States v. Howell*, 472 F. App'x 245, 246 (4th Cir. 2012) (quoting Fed. R. Evid. 701 advisory committee note to 2000 amendment)).

As noted, Pennak is the president of MSI and a qualified handgun instructor within the meaning of P.S. § 5-117.1(d)(3)(i). ECF 135-3, ¶ 4. He is also a "National Rifle Association ('NRA') certified instructor in Rifle, Pistol, Personal Protection in the Home, Personal Protection Outside the Home and Muzzelloading" and an "NRA certified Range Safety Officer." *Id.* Pennak has "given instruction and training to students seeking" an HQL on "numerous occasions." *Id.*

In his Declaration, Pennak provides his opinion regarding the HQL training requirements, including the live-fire requirement. *See* ECF 135-3. He has not been designated as an expert witness, however.

In particular, defendants seek to exclude the opinions Pennak offers in paragraphs 8-10, 13, 15-17, 18-19 and 21-23 of his Declaration. ECF 145-1 at 1-4. The pertinent details of these paragraphs are set forth, *infra*. Defendants argue that Pennak's opinions "are based on his

22

JA1804

specialized knowledge of firearm safety training and, thus, are not properly admissible as Rule 701 lay opinion testimony." *Id.* at 2.

Plaintiffs counter that Pennak's opinions are admissible as lay testimony under Rule 701 because they are "derived from firsthand observation" and are "not based on specialized knowledge, skill, or experience." ECF 151 at 1. They emphasize that Pennak's testimony is "predicated on his previous experience[,]" *id.* (citing *Lord & Taylor, LLC*, 849 F.3d at 576), and the opinions are "offered 'on the basis of relevant historical or narrative facts that the witness has perceived.'" ECF 151 at 2 (quoting *MCI Telecommunications Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990)).

In paragraph 8, Pennak opines on the use of live ammunition during the firearm safety training, as required under P.S. § 5-117.1(d)(3)(iii), and the typical orientation that his students receive regarding the "'functionality and the safe operation and handling of all these types of handguns without live ammunition[.]'" ECF 145-1 at 3 (quoting ECF 135-3, ¶ 8). These statements are admissible under Rule 701 because they are based on Pennak's firsthand observations as well as his "particularized knowledge" from his experience as an instructor. ECF 135-3, ¶ 8; *see Perkins*, 470 F.3d at 153 (admitting opinion testimony of police officers as to the reasonableness of an officer's use of force because "their testimony was framed in terms of their eyewitness observations and particularized experience as police officers, . . . their opinions were admissible."). Similarly, Pennak's testimony regarding his own classroom instruction, set forth in paragraph 10, constitutes a firsthand observation. ECF 135-3, ¶¶ 8, 10.

However, Pennak's conclusion in paragraph 10 that "[f]iring one live round accomplishes no training objective at all[]" is not admissible. This is a conclusion regarding firearm safety training in general, rather than one regarding Pennak's specific programs. *Id.* And, unlike Pennak's

statement about basic safety in paragraph 8, this is an opinion that could not be derived from a simple understanding of commonly accessible procedures. *Id.* ¶ 8. As the defense correctly points out, Pennak "brought the wealth of his experience . . . to bear on [his] observations and made connections." *United States v. Oriedo*, 498 F.2d 593, 603 (7th Cir. 2007). This requires a "process of reasoning which can be mastered only by specialists in the field." ECF 155 at 2. Thus, I shall exclude the last sentence in paragraph 10.

Likewise, in ECF 135-3, ¶ 9, Pennak provides an in-depth explanation of the "composition and functioning of 'snap cap' dummy rounds." Further, he notes that the use of such "dummy rounds" permits a student to mimic real ammunition by "allowing the slide of a semi-automatic handgun to chamber a round in the same way as it would with a live round." This is outside the realm of observation or common knowledge. *See Smith*, 962 F.3d at 767 (quoting *Perkins*, 470 F.3d at 156).

Of relevance here, the F.R.E. 701 Advisory Committee Note to the 2000 Amendment explains that "courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the subject is established." *Id.* (citing *United States v. Westbrook*, 896 F.2d 330 (8th Cir. 1990)). But, the Committee notes that if "that witness were to describe how a narcotic was manufactured, or to describe the intricate workings of a narcotic distribution network, then the witness would have to qualify as an expert under Rule 702." Fed. R. Evid. 701, advisory committee note to 2000 Amendment (citing *United States v. Figueroa-Lopez*, 125 F.2d 1241 (9th Cir. 1997)). Here, the intricate, internal functioning of the rounds and the firearms are unquestionably "scientific, technical, or other specialized knowledge," analogous to explaining the manufacture of a narcotic. *Smith*, 962 F.3d at 766. Thus, paragraph 9 is not admissible.

The State calls into question Pennak's statement in paragraph 13 that the "live-fire requirement 'requires the use of a firing range, as even firing one live round of ammunition can only be done safely on a properly constructed range[.]'" ECF 145-1 at 3 (citing ECF 135-3, ¶ 13). Further, Pennak points out that "the discharge of ammunition is generally banned in the more populated areas of Maryland, except at established firing ranges." ECF 135-3, ¶ 13. These statements are admissible under Rule 701 because they are based on knowledge "common enough" to constitute a lay opinion and contain information that one could obtain through familiarity with local custom and practice. *Smith*, 962 F.3d at 767 (quoting *Perkins*, 470 F.3d at 156).

As to paragraphs 15-17, 18-19, and 21-23, defendants complain that Pennak uses his "specialized knowledge of simunition rounds" to opine on the "'safe' use and training purposes of simunition rounds" as well as the "modifications required to fire simunition rounds" and the "purported effect of local ordinances on the use of simunition rounds and the live-fire requirement." ECF 145-1 at 3.

In paragraph 15, Pennak provides an in-depth analysis of the difference between simunition rounds and "paint ball" rounds. In doing so, he describes how "compressed air or CO2" is used as "a propellant." In paragraphs 16 and 17, Pennak addresses the decibel level produced by firing simunition ammunition and the modification equipment needed to use simunition ammunition. Such information is clearly beyond the scope of common knowledge or knowledge gained by firsthand observation. In my view, it is analogous to the manufacture of narcotics described in the Committee Notes. *See* Fed. R. Evid. 701, advisory committee note to 2000 amendment.

In paragraph 18, Pennak opines on state law and local regulations as they relate to the firing of simunition rounds. Even if Pennak formed these opinions as a result of his job-related experience, they fall outside the boundaries of lay expertise. *See United States v. Vega*, 813 F.3d

386 (1st Cir. 2016) (finding that opinions by two lay witnesses in Medicare fraud prosecution that depended on their understanding technical Medicare laws should not have been admitted without first qualifying witnesses as experts).

In paragraphs 19 and 21-23, Pennak addresses, *inter alia*, shooting ranges in the Montgomery County area (ECF 135-3, ¶ 19), and the impact of the live fire requirement on Pennak's ability to provide HQL training. *Id.* ¶¶ 21-23. To the extent the information concerns Pennak's firsthand experience as a firearm safety instructor, it is "common enough" to satisfy the requirements of Rule 701. Additionally, the Advisory Committee Notes to the 2000 Amendment state that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as accountant, appraiser, or similar expert." Fed. R. Evid. 701, advisory committee note to 2000 amendment. Here, Pennak shares his opinions as to the projected challenges of his business, so he need not qualify as an expert.

Considering Pennak's firsthand experience as a firearm safety instructor, and upon review of the relevant paragraphs, I am satisfied that paragraphs 8, 10 (with the exception of the last sentence), 13, 19, and 21-23 are admissible under Rule 701. But, I shall exclude from consideration paragraph 9, the last sentence of paragraph 10, and paragraphs 15-18.

## I.    Conclusion

For the reasons set forth above, I shall grant Defendants' Motion in part and deny it in part. And, I shall deny Plaintiffs' Motion.

An Order follows, consistent with this Memorandum Opinion.

Dated: July 27, 2021                                    _____/s/_____
                                                        Ellen L. Hollander
                                                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., et al. | * | |
| | * | |
| | * | |
| v. | * | Civil Case No. ELH-16-3311 |
| | * | |
| LAWRENCE HOGAN, et al. | * | |
| | * | |

*********

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is this 27th day of July, 2021, by the United States District Court for the District of Maryland, ORDERED:

1) Plaintiffs' Motion (ECF 133) is DENIED;

2) Defendants' Motion (ECF 145) is GRANTED in part and DENIED in part. In particular, I shall grant defendants' motion to strike paragraph 9; the last sentence of paragraph 10; and paragraphs 15-18 of Pennak's Declaration (ECF 135-3). The motion is otherwise denied.

_____/s/_____
Ellen L. Hollander
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., et al. | * | |
| | * | |
| v. | * | Civil Case No. ELH-16-3311 |
| | * | |
| LAWRENCE HOGAN, et al. | * | |

*********

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is this 12th day of August, 2021, by the United States District Court for the District of Maryland, ORDERED:

1) The Clerk shall substitute Colonel Woodrow W. Jones, III as a defendant, in lieu of Colonel William M. Pallozzi;

2) Defendants' Motion for Summary Judgment (ECF 125) is GRANTED;

3) Plaintiffs' Motion for Summary Judgment (ECF 135) is DENIED;

4) The Memorandum Opinion has been filed under seal. By August 23, 2021, the parties shall advise the Court as to whether they object to the lifting of the seal or, alternatively, whether the Court should file a redacted version, limited to pages 17 and 53.

5) If either side requests the filing of a redacted version, the proposed redaction(s) should be submitted by August 23, 2021.

_____/s/_____
Ellen L. Hollander
United States District Judge

JA1810

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **MARYLAND SHALL ISSUE, INC., et al.** ) | |
| ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ) | Case No. 16-cv-3311-ELH |
| **LAWRENCE HOGAN, et al.** ) | |
| ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

<u>**NOTICE OF APPEAL**</u>

Notice is given that Plaintiffs Maryland Shall Issue, Inc., Atlantic Guns, Inc., Deborah Kay Miller, and Suzan Vizas, appeal to the United States Court of Appeals for the Fourth Circuit from an order granting Defendants' Motion for Summary Judgment and denying Plaintiffs' Motion for Summary Judgment, entered on the 12th day of August, 2021, and from an order granting in part and denying in part Defendants' motion to strike the opinion testimony of lay witness Mark Pennak and denying Plaintiffs' motion to strike the opinions of Defendants' expert witnesses, entered on the 27th day of July, 2021.

JA1811

Respectfully submitted,

HANSEL LAW, PC

BRADLEY ARANT BOULT
CUMMINGS, LLP

_____ /s/ _____

_____ /s/ _____

Cary J. Hansel (Bar No. 14722)
2514 N. Charles Street
Baltimore, Maryland 21218
cary@hansellaw.com
Phone: 301-461-1040
Facsimile: 443-451-8606

John Parker Sweeney (Bar No. 08761)
James W. Porter, III (Bar No. 19416)
Marc A. Nardone (Bar No. 18811)
1615 L Street N.W., Suite 1350
Washington, DC 20036
jsweeney@bradley.com
Phone: 202-393-7150
Facsimile: 202-347-1684

*Counsel for Plaintiffs*

*Counsel for Plaintiff Atlantic Guns, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of September, 2021, I caused the foregoing to be filed via the Court's electronic filing system, which will make service on all parties entitled to service.

_____/s/_____
John Parker Sweeney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MARYLAND SHALL ISSUE, INC., et al. | * | |
| | * | **REDACTED** |
| v. | * | Civil Case No. ELH-16-3311 |
| | * | |
| LAWRENCE HOGAN, Jr. et al. | * | |

### MEMORANDUM OPINION

This Memorandum Opinion resolves a challenge under the Second Amendment to the constitutionality of Maryland's handgun licensing requirement, embodied in Maryland's Firearm Safety Act of 2013 (the "FSA" or the "Act"). The FSA, codified in Md. Code (2018 Repl. Vol.), § 5-117.1 of the Public Safety Article ("P.S."), was enacted by the Maryland General Assembly in the aftermath of the 2012 tragedy in Newtown, Connecticut, when 20 first-graders and six adults were brutally murdered by a 20-year-old individual who killed the victims with an AR-15-type Bushmaster rifle.

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), for itself and approximately 1,900 members; Atlantic Guns, Inc. ("Atlantic Guns"); Deborah Kay Miller; and Susan Vizas filed suit against defendant Lawrence Hogan, Jr., in his capacity as Governor of Maryland, and defendant Colonel William M. Pallozzi, in his capacity as the Secretary and Superintendent of the Maryland State Police ("MSP").[1] ECF 1 (Complaint); ECF 14 (First Amended Complaint or "FAC").[2] I shall refer to the defendants collectively as the "State."

---

[1] Colonel Woodrow W. Jones, III has since succeeded Pallozzi as Secretary and Superintendent of the MSP. Neither party sought to substitute Jones for Pallozzi, but defendants specify that their motion for summary judgment (ECF 125) is brought on behalf of Governor Hogan and Col. Jones. The Clerk shall substitute Jones as a defendant.

[2] This case was initially assigned to Judge Marvin Garbis. It was reassigned to me on July 26, 2018, due to the retirement of Judge Garbis. *See* Docket.

In particular, plaintiffs challenge the provision of the Act that requires a Handgun Qualification License ("HQL") as a condition for purchasing a handgun in Maryland. The First Amended Complaint (ECF 14) contains three counts. Count I asserts a claim alleging that the HQL contravenes the Second Amendment. Count II asserts a violation of the Due Process Clause of the Fourteenth Amendment, based, *inter alia*, on statutory vagueness. In Count III, plaintiffs assert an ultra vires claim under Md. Code (2014 Repl.), § 10-125(d) of the State Government Article, challenging alleged rulemaking by the MSP.

As discussed, *infra*, I previously found that the plaintiffs lacked Article III standing as to their claims. ECF 98. On appeal, the Fourth Circuit affirmed in part and reversed in part and remanded for further proceedings. *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020). Only the Second Amendment claim remains.

Cross-motions for summary judgment are now pending. Defendants' motion (ECF 125) is supported by a memorandum (ECF 125-1) (collectively, "Defendants' Motion") and 15 exhibits. ECF 125-2 to ECF 125-16. They argue that plaintiffs have failed to present a genuine dispute of material fact to support their Second Amendment challenge to the HQL law. ECF 125-1 at 8. Moreover, defendants assert that the Act "easily satisfies intermediate scrutiny" review. *Id.*

Plaintiffs have filed a combined cross-motion for summary judgment and opposition to Defendants' Motion (ECF 135), supported by a memorandum (ECF 135-1) (collectively, "Plaintiffs' Motion") and 28 exhibits. ECF 135-2 to ECF 135-29. They argue that the "undisputed facts" demonstrate that the "HQL requirement is unconstitutional because it effects a ban on handgun acquisition that is inconsistent with the Second Amendment's text, history, and tradition." ECF 135-1 at 12. Further, plaintiffs argue that the Act is subject to strict scrutiny, but they maintain that, even under intermediate scrutiny, defendants cannot meet their burden because the

requirements as to the HQL are "unnecessary and ineffective." *Id.* at 27. Plaintiffs take issue with the "30-day delay" in obtaining the HQL, the fingerprint requirement, and the safety course with the live-fire requirement. *Id.* at 46-48. Moreover, plaintiffs argue that the HQL process is "burdensome," *id.* at 12, as well as "superfluous" and "redundant," in light of the "pre-existing and still-continuing handgun registration process," identified by them as the "77R Handgun Registration." *Id.* at 11.

Defendants have filed a combined opposition to Plaintiffs' Motion and a reply in support of their own motion (ECF 140), along with 15 additional exhibits. Plaintiffs have replied (ECF 150) and submitted four additional exhibits.

With leave of Court (ECF 128), Everytown For Gun Safety ("Everytown"), a gun-violence-prevention organization, filed an amicus brief in support of Defendants' Motion. ECF 129 ("Amicus Brief"). The Amicus Brief includes 13 exhibits. Everytown argues that the HQL law is constitutional for three reasons: 1) the background check process that the law requires "is longstanding and lawful" under *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller I*"); 2) the training requirement is consistent with the original understanding of the Second Amendment; and 3) the licensing fees are consistent with fees and taxes that states have been historically imposed on individuals seeking to obtain a firearm. ECF 129 at 11-12.

No hearing is necessary to resolve the pending motions. *See* Local Rule 105(6). For the reasons that follow, I conclude that the HQL law is constitutional. Accordingly, I shall grant Defendants' Motion and deny Plaintiffs' Motion.

## I.    Procedural Summary

Plaintiff MSI is a non-profit membership organization that is "'dedicated to the preservation and advancement of gun owners' rights in Maryland.  It seeks to educate the

community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public.'" ECF 135-3 (Decl. of Mark W. Pennak, MSI President), ¶ 2 (internal citation omitted). MSI's purpose includes "promoting and defending the exercise of the right to keep and bear arms" and "defending the Constitutional right of law-abiding persons to lawfully purchase, own, possess and carry firearms and firearms accessories." *Id.* As of January 2021, MSI had approximately 1,900 members throughout Maryland. *Id.*

Plaintiff Atlantic Guns is a licensed federal firearms dealer that was founded in 1950. ECF 135-2 (Decl. of Stephen Schneider, owner of Atlantic Guns, dated 10/3/2018), ¶¶ 2, 3. According to Schneider, handguns are the most popular firearm of choice for Atlantic Guns' customers and the HQL requirement has "severely impacted" Atlantic Guns' business. *Id.* ¶¶ 6, 7. In particular, Schneider states, *id.* ¶ 8: "Atlantic Guns turns away would be customers every week [because of the HQL requirement], totaling at least in the hundreds over the five years since the Handgun License requirement took effect. Sometimes prospective customer[s] place a deposit on a handgun, which we then hold pending their obtaining a Handgun License. Some of these customers later request refunds and the sale is not consummated."

The individual plaintiffs, Miller and Vizas, are MSI members. They claim that they would like to own a handgun, but have not attempted to purchase one and do not intend to obtain an HQL.

Miller has never owned a firearm, but her husband owns both handguns and long guns. ECF 135-5 at 7, Tr. 17. In 2017, Miller decided that she wanted to purchase a handgun because she "wanted to be able to defend [herself] in [her] home." *Id.* at 8-9, Tr. 18-19. Further, she decided that she needed to have a gun for herself, rather than use her husband's gun, because she was concerned that under the "new law," using her husband's gun would constitute "receipt," potentially subjecting her to prosecution. *Id.* at 9, Tr. 19. Miller claimed that the "time for the

training" is an "inconvenience that has deterred" her from obtaining an HQL. *Id.* at 12, Tr. 33. Specifically, Miller explained that she has "back issues" that make it difficult to sit for the four-hour course and it would also be burdensome to take time off from work. *Id.*

Vizas decided in 2015 that she wanted to purchase a handgun. ECF 135-4 at 5, Tr. 18. She explained that she wanted to "just have it." *Id.* at 7, Tr. 25. Vizas took a "hunter safety training" course in Maryland in 2016 because her children wanted to attend the class. *Id.* at 9, Tr. 37. But, she claimed that the "expense" of the required HQL class and the "time to take the class, to get fingerprints, [and] to wait for a background check" are an "inconvenience that has deterred [her] from obtaining an HQL." *Id.* at 10, Tr. 43.

In the course of this litigation, MSI has also identified other members who do not possess an HQL but who wish to acquire a handgun. ECF 135-27 (Dep. of John Matthew Clark); ECF 135-17 (Dep. of Dana Hoffman); ECF 135-26 (Dep. of Scott Miller). None of these individuals has actually applied for an HQL. But, they claim that the HQL requirements have deterred them from acquiring licenses and purchasing handguns. Mr. Miller, for example, explained that "the inconvenience" associated with the HQL requirements has deterred him from purchasing a handgun. ECF 135-26 at 3, Tr. 24. But, he also said, *id.*: "I have no reason to believe that I'd be barred from owning one…" *See also* ECF 135-17 at 11-12, Tr. 23-24 (Hoffman explaining that going to the required training would be problematic because of her medical conditions).

As noted, the FAC originally contained three counts. Defendants moved to dismiss. ECF 18. Judge Marvin Garbis, to whom the case was then assigned, issued a Memorandum and Order (ECF 34), granting the motion as to the Instructor Certification Requirement of the Act with respect to Count II. But, he denied the motion as to all other claims. *Id.*

At the conclusion of discovery, the parties filed cross-motions for summary judgment. By Memorandum Opinion (ECF 98) and Order (ECF 99) of March 31, 2019, I concluded that plaintiffs lacked Article III standing as to all claims in the FAC. Therefore, I granted the defendants' summary judgment motion (ECF 59) and denied plaintiffs' cross motion for summary judgment (ECF 77). *See* ECF 102 ("Redacted Memorandum Opinion"). Plaintiffs subsequently appealed to the Fourth Circuit. ECF 103.

On appeal, the Fourth Circuit affirmed in part and reversed in part, and remanded the case for further proceedings. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020). The Court determined that Atlantic Guns has standing to assert a Second Amendment claim, both "to bring its own, independent Second Amendment claim" and to bring a Second Amendment claim "on behalf of potential customers" under the doctrine of third-party standing. *Id.* at 214, 216. And, "because standing for one party on a given claim is sufficient to allow a case to proceed in its entirety on that issue," the other plaintiffs (Vizas, Miller, and MSI) also had standing to bring a Second Amendment claim. *Id.* at 210, 216.

Notably, the Fourth Circuit "state[d] no opinion…on the merits of Atlantic Guns' asserted second amendment claims." *Id.* at 214 n.5. Moreover, the Fourth Circuit affirmed the decision as to Counts II and III, concluding that plaintiffs lacked standing to bring the constitutional due process claim and the challenge to the MSP regulations as ultra vires. *Id.* at 216-20. Thus, the Court said, *id.* at 216: "In light of our conclusion that Atlantic Guns has both independent and third-party standing, we reverse the district court's judgment in favor of the State Defendants as to the Second Amendment claims [in Count I] and remand with instructions that the claims proceed to trial."

Accordingly, only Count I remains at issue.  Following the remand by the Fourth Circuit, the parties submitted a proposed scheduling order, which provided for additional discovery.  ECF 120.  I approved the parties' proposed schedule. ECF 121. The cross-motions for summary judgment followed.

## II.    Factual Background[3]

### A.    Handgun Laws in Maryland

In 1941, Maryland enacted a "Pistols" subtitle to the Maryland Code, which banned the sale or transfer of a handgun to a person convicted of a crime of violence or a fugitive. *See* Md. Code (1941), Art. 27, §§ 531(A)–(G), now codified at P.S. § 5-118.  Since 1966, Maryland has enacted four statutes intended to prevent prohibited persons from acquiring handguns.  In 1966, the Maryland General Assembly enacted the 77R Handgun Registration Requirement.  It was followed by the Gun Violence Act of 1996; the Responsible Gun Safety Act of 2000; and the Firearm Safety Act of 2013.

The 77R Handgun Registration Requirement ("77R" or "Handgun Registration") has several requirements. Plaintiffs assert that they "are not challenging the 77R background check process." ECF 14, ¶ 50 n.1.

The application under the Handgun Registration statute requires the purchaser to provide, *inter alia*, his or her "name, address, Social Security number…driver's [license] or photographic identification soundex number…" *See* Md. Code (1966), Art. 27, § 442, now codified at P.S. § 5-

---

[3] I incorporate here the facts set forth in my earlier opinion (ECF 98), as supplemented by the new factual material submitted by the parties with their summary judgment motions. In general, when citing to an exhibit, I have identified the exhibit at least once, but not repeatedly. In addition, when citing to the parties' submissions, I use the electronic pagination, which does not always correspond to the page numbers on the submissions.

118. This information is used by the MSP to conduct a background check as to a prospective purchaser. P.S. § 5-121; ECF 135-6 (Dep. of Daniel Webster) at 14, Tr. 73.

Under 77R, firearms dealers are prohibited from transferring a handgun to a prospective purchaser "until after seven days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee…and forwarded by the prospective seller…to the Superintendent of the Maryland State Police." Md. Code (1966), Art. 27, § 442; *see* P.S. §§ 5-118, 5-120, 5-123.

The Gun Violence Act of 1996 made the 77R Handgun Registration requirement applicable to all handgun transfers, including gifts and private sales. Md. Code (1996), Art. 27, § 445, now codified at P.S. § 5-124. And, the Responsible Gun Safety Act of 2000 added the requirement that all prospective handgun purchasers must complete "a certified firearms safety training course that the Police Training Commission conducts…." ECF 135-11; *see* Md. Code (2003), P.S. § 5-118(b)(3)(x). Pursuant to this requirement, the Police Training Commission created an hour-long, online course for prospective handgun purchasers. ECF 135-1 at 19.

## B. The FSA

The Maryland General Assembly enacted the FSA in 2013, and it went into effect on October 1, 2013. In relevant part, the Act requires most Maryland handgun purchasers to first obtain an HQL. Subject to certain exemptions not pertinent here,[4] "[a] dealer or any other person may not sell, rent, or transfer a handgun" to a second person, and the second person "may not purchase, rent, or receive a handgun" from the first person, unless the buyer, lessee, or transferee

---

[4] Active and retired members of law enforcement agencies and the military are not required to obtain an HQL. P.S. § 5-117.1(a). The FSA also does not apply to "licensed firearms manufacturer[s]" or "a person purchasing, renting, or receiving an antique, curio, or relic firearm," as defined by federal law. *Id.*

presents a valid HQL.  P.S. § 5-117.1(b), (c).  A person who violates the Act is guilty of a

misdemeanor, and is subject to imprisonment for up to five years and/or a fine not exceeding

$10,000.  *Id*. § 5-144(b).

To obtain an HQL, a person must satisfy a handful of conditions.  Of relevance here, an

applicant must "complete a minimum of 4 hours of firearms safety training within the prior three

years" and, "based on an investigation," the individual may not be "prohibited by federal or State

law from purchasing or possessing a handgun." *Id.* § 5-117.1(d).[5] The safety training, which is

undertaken at the applicant's expense, must cover classroom instruction on "State firearm law[,]

home firearm safety[,] and handgun mechanisms and operation," along with a live-fire "firearms

orientation component that demonstrates the person's safe operation and handling of a firearm."

*Id.* § 5-117.1(d)(3).

An applicant must complete a written application, in a manner designated by the Secretary

of the MSP (the "Secretary").  *See* P.S. § 5-101(u) (defining "Secretary").  As authorized by the

Act, the MSP adopted regulations to effectuate the HQL requirements. *See* P.S. §§ 5-105; 5-

117.1(n); Code of Maryland Regulations ("COMAR") 29.03.01.26-.41.

The application must include the applicant's "name, address, driver's license or

photographic identification soundex number," along with other identifiers and a nonrefundable

---

[5] The applicant must also be at least 21 years of age to obtain an HQL. P.S. § 5-117.1(d).
But *see Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 410 (4th
Cir. 2021) (concluding that federal criminal statutes making it unlawful for federal firearms
licensees to sell handguns to people under 21 years of age violate the Second Amendment), *vacated
as moot*, ___ F.4th ___, 2021 WL 4301564 (4th Cir. Sept. 22, 2021). The age requirement is not
at issue in this case.

I note that *Hirschfeld* was vacated after this Memorandum Opinion was first issued, but
prior to its designation by West for publication.  Therefore, I have added the change in *Hirschfeld's*
status.

9

application fee of $50. P.S. § 5-117.1(g); COMAR 29.03.01.28. Moreover, the application must include "a complete set of the applicant's legible fingerprints taken in a format approved by" the Maryland Department of Public Safety and Correctional Services ("DPSCS") and the Federal Bureau of Investigation ("FBI"). P.S. § 5-117.1(f)(3)(i); *see* ECF 125-7 (Decl. of MSP Captain Andy Johnson) at 1-9. The applicant's fingerprints must be taken by a State-certified vendor using "livescan" technology. P.S. § 5-117.1(f)(3)(i); ECF 125-7, ¶ 23.[6] In addition, the applicant must submit proof of completion of the training requirement, and a statement under oath that the applicant is not prohibited from gun ownership. P.S. § 5-117.1(g).

Using the fingerprints provided in a completed application, the Secretary must apply to DPSCS for a criminal history records check for all HQL applicants. *Id*. § 5-117.1(f)(2). And, if DPSCS receives criminal history information "after the date of the initial criminal history records check," it must share that information with MSP; MSP may subsequently revoke the HQL of a person who becomes ineligible to possess the handgun. *Id*. § 5-117.1(f)(7); *see* ECF 125-7, ¶¶ 23, 24; ECF 140-4 (Dep. of Andy Johnson) at 9-10, Tr. 133-134 (explaining how DPSCS reports arrests and prosecutions to MPS and if the charge is a "disqualifier" for an HQL, then MSP will revoke the individual's HQL); ECF 125-9 (Affidavit of First Sgt. Donald Pickle, Assistant Commander of MSP's Licensing Div.), ¶ 6.

In order to obtain a valid HQL, most applicants must complete a four-hour, live firearms safety training course, taught by a qualified handgun instructor ("QHI"), consisting of both classroom instruction and "a firearms orientation component that demonstrates the person's safe

---

[6] Plaintiffs complain that there are "hardly any [State-certified] private fingerprinting vendors in rural areas." ECF 135-1 at 25. But, according to the State's website, there are at least 86 vendors across the State that provide fingerprinting services. *See* https://www.dpscs.state.md.us/publicservs/fingerprint.shtml.

10

operation and handling of a firearm." P.S. § 5-117.1(d)(3).  In particular, the safety training must cover classroom instruction on "State firearm law"; "home firearm safety"; and "handgun mechanisms and operation." *Id.* And, as part of the "firearms orientation component," which "demonstrates" the "safe operation and handling of a firearm," § 5-117.1(d)(3)(iii), the applicant must "safely fire[] at least one round of live ammunition."  COMAR, 29.03.01.29. The safety course is not provided by the MSP, but the MSP has a sample lesson plan for the course on its website for use by QHIs.  ECF 135-7 (Dep. of Andy Johnson) at 8-9, Tr. 68-69; ECF 135-9 (Dep. of MSP Captain James Russell) at 5-6, Tr. 70-71; *Id.* at 14, Tr. 114.[7]

A person can become a QHI if he or she has: "A valid Qualified Handgun Instructor License issued by the Secretary"; "Been recognized by the Maryland Police and Correctional Training Commission"; or "A valid instructor certification issued by a nationally recognized firearms organization." COMAR, 29.03.01.37. An individual may obtain a Qualified Handgun Instructor License from the Secretary by providing, among other things, proof of "formal training in the care, safety, and use of handguns, including a minimum qualification score of 80 percent on a practical police course," and proof of a "minimum of 1 year of experience in instruction in the care, safety and use of handguns." *Id.* 29.03.01.38.

HQL applicants are required to locate, arrange, and pay for training at their own expense. However, an applicant is exempt from the training requirement under certain conditions, including prior completion of a safety training course, lawful ownership of a "regulated firearm," which

---

[7] As of November 17, 2017, the MSP permits the use of "non-lethal marking projectiles" to satisfy the HQL's "live fire" training requirement. *See* ECF 125-7 at 100. Moreover, since July 2020, because of the COVID-19 pandemic, the Licensing Division has permitted the instruction component of the training course to be done via "real time, bi-directional audio and video connection." ECF 125-10, ¶ 12.

includes a handgun, or "an honorably discharged member of the armed forces of the United States or the National Guard." P.S. §§ 5-117.1(e), 5-101(r).

The Act requires the MSP to process any completed application within 30 days of its receipt. *Id.* § 5-117.1(h). For the most part, HQL applications are processed in the order that they are submitted to MSP. ECF 125-7, ¶ 6. According to the two Commanders of the Licensing Division of MSP, all "properly completed application[s]" that have been received by the MSP since the inception of the HQL law have been processed within this mandated 30-day time frame. *Id.* ¶ 12; ECF 125-10 (Decl. of MSP Captain Andrew Rossignol), ¶ 15. If the application is missing components at the 30-day mark, then the application will receive an administrative denial that can be overturned once all of the components of the applications are submitted. ECF 135-7 at 33-35, Tr. 138-140. This means that some applications are not fully processed within 30 days. *Id.* at 35, Tr. 140.

Once an applicant receives an HQL, then the applicant must comply with P.S. § 5-118 before taking possession of the gun. Section 5-118 requires an individual to complete an application (known as the 77R form) confirming that he or she is not prohibited from acquiring a handgun, among other things, and pay a $10 application fee. Unless an application is disapproved by the MSP within seven days of submitting the 77R form, the applicant may take possession of the gun. P.S. §§ 5-122, 5-123; *see* ECF 135-6 (Dep. of Daniel Webster, Director of the Johns Hopkins University Center for Gun Policy and Research) at 11, Tr. 38. The HQL is valid for ten years (P.S. § 5-117.1(i)) and may be renewed without completion of another firearms safety course or the resubmission of fingerprints. *Id.* § 5-117.1(j); COMAR, 29.03.01.34.

If the HQL is not approved, the Secretary must provide a written denial, along with a statement of reasons and notice of appeal rights. *Id*. § 5-117.1(h). A person whose application is

not approved may request a hearing with the Secretary within 30 days of the denial, and thereafter may seek judicial review in State court. *Id*. §§ 5-117.1(I)(1), (3).

According to plaintiffs, the process of obtaining fingerprints, taking the training course, and submitting an application to the MSP may cost an applicant more than $200. ECF 135-1 at 26. For starters, an applicant may have to pay at least $50 for live-scan fingerprints and from $50 to more than $100 for the required safety course. *See* ECF 135-19 ("LiveScan HQL Fingerprinting Costs as of 12/2/2017"); ECF 135-20 (Dep. of Schneider) at 3, Tr. 17; ECF 135-18 (Dep. of Pennak) at 4-5, Tr. 22-23. Then, as noted, an applicant must submit a $50 application fee to MSP with the completed application. P.S. § 5-117.1(g)(2).

In legislative hearings concerning the FSA, the General Assembly heard testimony from various public policy and law enforcement experts advocating for the licensing requirement generally, and the fingerprint and training requirements in particular. *See* ECF 125-3; ECF 125-5; ECF 125-6. Dr. Daniel Webster, ScD, MPH, Director of the Johns Hopkins University Center for Gun Policy and Research, was one of the experts. He testified, ECF 125-3 at 2: "Arguably, the most important objective of a state's gun laws is to prevent dangerous individuals from possessing firearms. Although Maryland has some useful laws to accomplish this task, the system is especially vulnerable to illegal straw purchases and the individuals using false identification in their applications to purchase regulated firearms."

In support of the Act, Webster discussed various studies of gun violence and public policies. He relied, *inter alia*, on a study conducted by the U.S. Government Accountability Office ("GAO"), in which five "agents acting in an undercover capacity used ... counterfeit driver's licenses in attempts to purchase firearms from gun stores and pawnshops that were licensed by the federal government to sell firearms." ECF 125-4 (GAO–01–427, FIREARMS PURCHASED

13

JA1826

FROM FEDERAL FIREARM LICENSEES USING BOGUS IDENTIFICATION 2 (2001))
("GAO Study"), at 5-6.[8] The investigators conducted the study in states that relied on "the instant
background check," but which "do not require fingerprinting or a waiting period" for firearm
purchases. *Id.* Based on these results, the report concluded that "the instant background
check . . . cannot ensure that the prospective purchaser is not a felon or other prohibited person
whose receipt and possession of a firearm would be unlawful." *Id.* at 5.

Further, Webster explained that the District of Columbia and five states—Connecticut,
Iowa, Massachusetts, New Jersey, and New York—require individuals to apply directly with a law
enforcement agency and be photographed and fingerprinted before they can purchase handguns.
ECF 125-3 at 3. Those states, according to Webster, "have some of the lowest age-adjusted firearm
mortality rates per 100,000 population in the nation for the period 2006-2010—Connecticut 5.1,
Iowa 6.4, Massachusetts 3.5, New Jersey 5.2, and New York 5.0—compared with the overall rate
for the nation of 9.5." *Id.* Missouri, however repealed a licensing law that it had in place in 2007.
According to Webster, "[i]mmediately following the repeal of Missouri's permit-to-purchase
licensing law [in 2007], the share of guns recovered by Missouri police agencies that had an
unusually short time interval from retail sale to crime indicative of trafficking more than doubled."
*Id.* Further, he explained, *id.*: "Preliminary evidence suggests that the increase in the diversion of
guns to criminals linked to the law's repeal may have translated into increases in homicides
committed with firearms."

---

[8] The states in which the GAO conducted its study had adopted the National Instant
Criminal Background Check System ("NICS"), *see* 18 U.S.C. § 922(t), under which the following
information is required of each individual who undergoes a NICS check: (1) name, (2) sex, (3)
race, (4) date of birth, and (5) state of residence. 28 C.F.R. § 25.7. A dealer may, in addition, report
the purchaser's Social Security Number or other identifying number and physical description. *Id.*

The General Assembly also heard testimony from then-Baltimore County Police Chief James Johnson. *See* ECF 125-5. He maintained that the HQL requirement would "reduce the number of non-intentional shootings by ensuring that gun owners know how to safely use and store firearms"; "will decrease illegal gun sales and purchases by ensuring that all licensees are eligible to possess firearms under Federal and State law"; and "will reduce murder rates." *Id.* at 4. As to the fingerprint requirement, Johnson said that it "will help law enforcement identify people involved in gun crimes," and it "is not an inconvenience" for Marylanders. *Id.* at 4. Further, with respect to the training requirement, Johnson noted: "The current viewing requirement – viewing a 30-minute video – is insufficient." *Id.* at 5. And, he averred that the training would deter straw purchasers because they would not be inclined to "sit through a four-hour training program." *Id.*[9]

Similarly, then-Baltimore City Police Commissioner Anthony Batts testified that most "of the homicides and non-fatal shootings that plague Baltimore are perpetrated by prohibited persons with illegal guns." ECF 125-6 at 2. According to Batts, the training and fingerprint requirement will "ensur[e] that the applicant is not prohibited from possessing a handgun" and will serve "as a deterrent to straw buyers of handguns." *Id.* at 2-3.

From October 1, 2013, when the FSA went into effect, through the end of 2020, a total of 192,506 Marylanders have successfully obtained an HQL. ECF 140-11 at 4. And, between 2015 through 2020, 180,423 HQL applications were submitted to the Licensing Division of the MSP, of which 5,001 were denied. ECF 135-16 at 1 (MSP Licensing Division Report, 1/4/2018); ECF 140-11 at 4 (MSP Licensing Division Report, 12/31/2020).

---

[9] "Straw purchases are transactions in which persons who are legally prohibited from purchasing a firearm (due to criminal history or other disqualifying events) recruit third-parties to purchase guns for them." ECF 125-11, ¶ 8.

According to the evidence, from October 1, 2013 through 2020, some 93,056 HQL applications were initiated but not submitted to the MSP. ECF 135-15 (Pallozzi Third Supp. Interrog. Resp.) at 3-4, 8. Colonel Pallozzi postulated that there "are a number of reasons why an individual might initiate but not submit an application." *Id.* at 4. For example, he noted that "an application may be created for training purposes, or by an individual who has no intention of submitting an application." *Id.* Further, he explained, *id.*: "MSP personnel who process applications routinely receive communications from individuals who are ineligible for an HQL, including because of their age, immigration status, residency status, or criminal history, who have initiated an application but ultimately decide not to submit the application because they are ineligible for an HQL."

Also of relevance, plaintiffs have provided the following Maryland crime data, gathered from the Maryland Uniform Crime Reports and U.S. Department of Justice Federal Bureau of Investigation, Criminal Justice Information Services Division, ECF 135-23:

| Year | Homicides | Shooting Homicides | Handgun Homicides | Shooting Homicide Rate | Handgun Homicide Rate | Recovered Handguns Used in Crime |
|------|-----------|--------------------|--------------------|------------------------|------------------------|----------------------------------|
| 2009 | 440 | 308 | 299 | 5.40 | 5.24 | 4,359 |
| 2010 | 426 | 296 | 278 | 5.12 | 4.81 | 4,378 |
| 2011 | 398 | 272 | 265 | 4.66 | 4.54 | 4,515 |
| 2012 | 372 | 281 | 271 | 4.77 | 4.60 | 4,546 |
| 2013[10] | 387 | 272 | 268 | 4.58 | 4.52 | 4,611 |

---

[10] Plaintiffs omitted data for 2013. But, because the data is publicly available and is subject to judicial notice under Federal Rule of Evidence 201, I have included it. *See* MD Uniform Crime Report 2013 at 14, 17, https://pilot-mdsp.maryland.gov/Document%20Downloads/Crime%20in%20Maryland%202013UCR.pdf; Recovered Handguns Used in Crime data available online is from U.S. Department of Justice

16

| | | | | | | |
|---|---|---|---|---|---|---|
| 2014 | 363 | 245 | 231 | 4.09 | 3.86 | 4,487 |
| 2015 | 553 | 419 | 398 | 6.97 | 6.62 | 4,963 |
| 2016 | 534 | 402 | 368 | 6.68 | 6.11 | 5,291 |
| 2017 | 569 | 441 | 401 | 7.28 | 6.62 | 5,269 |
| 2018 | 489 | 452 | 401 | 7.48 | 6.64 | 6,832 |
| 2019[11] | 543 | 514 | 462 | 8.50 | 7.64 | 5,971 |

The parties also dispute whether the HQL has negatively impacted gun sales in Maryland. The following chart documents the number of handguns sold by Atlantic Guns in Maryland from 2009 through 2020. *See* ECF 84-1[12]; ECF 141-1 [SEALED].

| Year | Guns transferred |
|---|---|
| 2009 | |
| 2010 | |
| 2011 | |
| 2012 | |
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |
| 2017 | |
| 2018 | |
| 2019 | |
| 2020 | |

Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Strategic Intelligence and Information, Maryland Firearms Tracing System Data 2013 Report, https://www.atf.gov/resource-center/docs/143894-mdatfwebsite13pdf/download.

[11] The data for 2020 is not yet available.

[12] This exhibit was filed in 2018 with plaintiffs' first summary judgment motion. *See* ECF 75. Plaintiffs again refer the Court to the document. *See* ECF 135-1 at 15 n.1.

17

The summary indicates that gun sales fell in the years immediately following the enactment of the FSA. However, during the past four years, Atlantic Guns has ███████████████████ than it did during the four years immediately preceding the enactment of the FSA.

Additional facts are included, *infra*.

### III.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Market Development Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016);

18

*Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including any reasonable inferences to be drawn, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Where there is conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*

*Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a genuine dispute of material fact. *Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "[t]he mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

When, as here, the parties have filed cross-motions for summary judgment, the court must "'consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because multiple parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate. Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact." 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

Notably, there are no material facts in dispute.  Rather, the parties disagree over the application of the law to the facts.  And, in particular, they disagree about the decision-making of the Maryland General Assembly.


# IV.   Discussion

## A.  The Second Amendment Generally

The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  *See* U.S. Const. amend. II.  In *Heller I*, 554 U.S. at 592, the Supreme Court determined that, by its operative clause, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."

According to the *Heller I* majority, the Second Amendment's "core protection" is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 634-35. Accordingly, the Court found that a complete prohibition on handguns—the class of weapon "overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]" in the home—infringed on the central protection of the Second Amendment and thus failed any level of constitutional scrutiny. *Id.* at 628–29; *see also Woollard v. Gallagher*, 712 F.3d 865, 874 (4th Cir. 2013) (noting that self-defense in the home is the "core protection" of the Second Amendment right).

Nevertheless, the Court recognized that "the right secured by the Second Amendment is not unlimited," in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller I*, 554 U.S. at 626; *see Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 419 (4th Cir. 2021), *vacated as moot*, ___

F.4th ___, 2021 WL 4301564 (4th Cir. Sept. 22, 2021); *Walker v. Donahoe*, 3 F.4th 676, 689 (4th

Cir. 2021). Indeed, the Court has made clear that the Second Amendment permits "reasonable

firearms regulations." *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010); *see Caetano v.

Massachusetts*, 577 U.S. 411 (2016) (per curiam); *see also Kolbe v. Hogan*, 849 F.3d 114, 132

(4th Cir. 2017) (en banc), *cert. denied*, __ U.S. __, 138 S. Ct. 469 (2017); *United States v. Chester*,

628 F.3d 673, 675 (4th Cir. 2010).

The *Heller I* Court provided a non-"exhaustive" list of "presumptively lawful regulatory

measures," including "longstanding prohibitions" on firearm possession by certain groups of

people, and "laws imposing conditions and qualifications on the commercial sale of arms." *Heller

I*, 554 U.S. at 626–27 & n.26; *see McDonald*, 561 U.S. at 786 (noting that the Court's holding in

*Heller* "did not cast doubt on such longstanding regulatory measures…['']laws imposing conditions

and qualifications on the commercial sale of arms.'") (quoting *Heller I*, 554 U.S. at 626-27). And,

in *Kolbe*, 849 F.3d at 121, the Fourth Circuit concluded that the FSA's ban on assault weapons did

not contravene the Second or Fourteenth Amendments, because such weapons are not protected

by the Second Amendment. Alternatively, it ruled that, even if the banned weapons "are somehow

entitled to Second Amendment protection," the provision was properly subjected to intermediate

scrutiny and is "constitutional under that standard of review." *Id.*

The Fourth Circuit, like several other circuits, has adopted a two-pronged approach to

analyzing Second Amendment challenges. *Chester*, 628 F.3d at 680; *see Hirschfeld*, 5 F.4th at

414-15; *see also Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021) ("Like our sister circuits,

we apply a two-prong approach in considering as-applied Second Amendment challenges.");

*Kolbe*, 849 F.3d at 132 ("Like most of our sister courts of appeals, we have concluded that "a two-

part approach to Second Amendment claims seems appropriate under *Heller*." (internal citation

omitted)); *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (holding that courts "generally engage in the ... two-pronged [*Chester*] analysis for facial Second Amendment challenges"); *see, e.g., Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012). Under this approach, the court must first determine "'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.'" *Kolbe*, 849 F.3d at 133 (quoting *Chester*, 628 F.3d at 680). If it does not impose a burden, then the challenged law is valid. *Kolbe*, 849 F.3d at 133. "If, however, the challenged law imposes a burden on conduct protected by the Second Amendment, [the Court must] next 'apply[ ] an appropriate form of means-end scrutiny.'" *Id.* In other words, the court must determine whether to apply strict scrutiny or intermediate scrutiny; this "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* (internal quotations omitted) (noting that courts should look to the First Amendment as a guide in determining the applicable standard of review); *see Hirschfeld*, 5 F.4th at 415 ("Just as the First Amendment employs strict scrutiny for content-based restrictions but intermediate scrutiny for time, place, and manner regulations, the scrutiny in this context 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'") (quoting *Chester*, 628 F.3d at 682).

Courts "are at liberty to" avoid ruling on the first prong of the test, and "assume that a challenged statute burdens conduct protected by the Second Amendment and focus instead on whether the burden is constitutionally justifiable." *Hosford*, 843 F.3d at 167. Indeed, the Fourth Circuit has found it "prudent" not to rest on the first prong's historical inquiry. *Id.*; *see Woollard*, 712 F.3d at 875 ("[W]e are not obliged to impart a definitive ruling at the first step of the *Chester*

inquiry. And indeed, we and other courts of appeals have sometimes deemed it prudent to instead resolve post-*Heller* challenges to firearm prohibitions at the second step."); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (assuming that the Second Amendment was implicated by a statute prohibiting possession of firearms in national parks and applying intermediate scrutiny); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 789 (D. Md. 2014) ("Nevertheless, the court need not resolve whether the banned assault weapons and LCMs are useful or commonly used for lawful purposes… and will assume, although not decide, that the Firearm Safety Act places some burden on the Second Amendment right."), *aff'd in part, vacated in part,* 813 F.3d 160 (4th Cir. 2016), *aff'd on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

As to what level of scrutiny to apply, the Fourth Circuit has instructed that when a law severely burdens "the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home," it is subject to the strict scrutiny test. *Kolbe*, 849 F.3d at 138. But, if a law "does not severely burden" that core protection, then intermediate scrutiny is the appropriate standard. *Id.*; *see Chester*, 628 F.3d at 682 ("A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right … may be more easily justified."); *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) ("*NYSRPA*") ("Heightened scrutiny need not … be akin to strict scrutiny when a law burdens the Second Amendment—particularly when that burden does not constrain the Amendment's core area of protection." (internal quotation marks omitted)).

To satisfy strict scrutiny, "the government must prove that the challenged law is 'narrowly tailored to achieve a compelling governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Abrams v. Johnson*, 521 U.S. 74, 82 (1997)). This is a demanding standard that requires the government to

establish that "'no less restrictive alternative' would serve its purpose." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (*citing United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)); *see Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 237 (D. Md. 2020).

"The less onerous standard of intermediate scrutiny requires the government to show that the challenged law 'is reasonably adapted to a substantial governmental interest.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 471). Stated differently, the government must prove "that there is a reasonable fit between the challenged regulation and a substantial governmental objective." *Chester*, 628 F.3d at 683 (internal quotation marks omitted); *see Hirschfeld*, 5 F.4th at 415; *Harley*, 988 F.3d at 769.

Unlike strict scrutiny, intermediate scrutiny "does not demand that the challenged law 'be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.'" *Kolbe*, 849 F.3d at 133 (quoting *Masciandaro*, 638 F.3d at 474). Rather, the State must demonstrate that there is "a fit that is 'reasonable, not perfect.'" *Woollard*, 712 F.3d at 878 (quoting *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012)) (cleaned up); *see Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) ("In applying intermediate scrutiny, we ask 'whether the statutes at issue are substantially related to the achievement of an important governmental interest.'") (internal citation omitted); *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) ("Intermediate scrutiny requires the lesser showing of 'a reasonable fit between the challenged regulation and an important government objective.'") (citation omitted), *cert. denied*, __ U.S.__, 141 S. Ct. 1397 (2021). In fact, a "statute may meet this standard despite being overinclusive in nature." *Harley*, 988 F.3d at 769.

## B. Text, History, and Tradition

Plaintiffs urge the Court to analyze their Second Amendment claim based on "text, history, and tradition," rather than the two-pronged approach discussed earlier. ECF 135-1 at 34-37; s*ee Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition ...."). As recently as July 2021, the Fourth Circuit applied the two-step framework in analyzing a Second Amendment claim. *Hirschfeld*, 5 F.4th at 414-15; *see also Harley*, 988 F.3d at 769; *Kolbe*, 849 F.3d at 141 (two-step framework "is entirely faithful to the *Heller* decision and appropriately protective of the core Second Amendment right"). As part of the inquiry, however, the Court must also "consider text, structure, history, and practice to reveal the original public meaning of the Second Amendment." *Hirschfeld*, 5 F.4th at 419. Therefore, I shall proceed under the two-pronged approach.[13]

### C.  HQL's burden on the Second Amendment

---

[13] Even if I were to analyze the dispute based only on the "text, history, and tradition," this would not compel a finding that the HQL is unconstitutional. *Heller I* and *McDonald* "did not hold that a state's firearms licensing laws were unconstitutional[.]" *Libertarian Party of Erie Cty. v. Cuomo*, 300 F. Supp. 3d 424, 434 (W.D.N.Y. 2018). Rather, the *Heller I* Court found unconstitutional a total ban on handguns, but the Court declined to address the constitutionality of a handgun licensing requirement. *See Heller I*, 554 U.S. at 631. Thus, the Second Circuit, for example, rejected the argument that New York State's firearms licensing laws were unconstitutional under *Heller I* and *McDonald*, concluding that so holding "would stretch the conclusions of both decisions well beyond their scope." *Libertarian Party*,  970 F.3d at 127; *see also, e.g., United States v. Focia*, 869 F.3d 1269, 1283 (11th Cir. 2017) (rejecting claim that federal statute was "an impermissible prior restraint in violation of the Second Amendment because it criminalizes dealing in firearms without a license," and collecting cases from the First, Second, Third, Fourth, and Seventh Circuits rejecting similar claims); *Berron v. Illinois Concealed Carry Licensing Review Board*, 825 F.3d 843, 847 (7th Cir. 2012) ("If the state may set substantive requirements for ownership, which *Heller* says it may, then it may use a licensing system to enforce them.... Courts of appeals uniformly hold that some kind of license may be required."); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 379 (D. Mass. 2013) ("[T]he requirement of prior approval by a government officer, or a licensing system, does not by itself render [a firearms] statute unconstitutional on its face.") (internal quotation marks omitted), *aff'd*, 783 F.3d 332 (1st Cir. 2015).

The parties vigorously disagree as to the analysis under the two-step framework. Plaintiffs contend that the HQL "requirement burdens conduct within the Second Amendment's guarantee," and they insist that strict scrutiny "is the only appropriate level of scrutiny because the HQL requirement burdens the Second Amendment's core right." ECF 135-1 at 40. According to plaintiffs, the HQL requirements fail the intermediate scrutiny test because (1) the recited harms do not exist and, in any event, the HQL requirement will not "alleviate these harms in a direct and material way," and (2) they dispute "that the HQL requirement is narrowly tailored to serve a substantial government interest." *Id.* at 59.

Conversely, defendants argue that the HQL law does not impose a burden on the exercise of Second Amendment rights because it "does not deprive any 'law-abiding, responsible citizen' of the right to possess a handgun for in-home self-defense." ECF 125-1 at 20 (*quoting Heller I*, 554 U.S. at 635). However, even if the HQL law did impose such a burden, defendants maintain that intermediate scrutiny would be the appropriate test because the law does not severely limit the possession of firearms or prevent individuals from possessing a firearm. *Id.* at 21.  And, they insist that the law would survive under the intermediate scrutiny test because Maryland has a substantial interest in promoting public safety, and the HQL requirements are reasonably adapted to that interest. ECF 140 at 26-39.

The Fourth Circuit recently clarified the appropriate approach in *Hirschfeld*, 5 F.4th 407, which involved "several federal laws and regulations that prevent federally licensed gun dealers from selling handguns to any 18-, 19-, or 20-year-old." It said, *id.* at 418: "At step one of the *Chester* inquiry, we ask 'whether the conduct at issue was understood to be within the scope of the right *at the time of ratification*.'" (Quoting *Chester*, 628 F.3d at 680) (emphasis in *Hirschfeld*). The *Hirschfeld* Court also said, 5 F.4th at 418-19:

The government bears the burden to show that the regulation clearly falls outside the scope of the Second Amendment. *See* [*Chester*, 628 F.3d] at 681–82; *Ezell* [*v. City of Chicago*], 651 F.3d [684], [] 702–03 [(7th Cir. 2011)]; *Tyler* [*v. Hillsdale*], 837 F.3d [678], [] 688 [(6th Cir. 2016)]. And in the face of historical silence or ambiguity, we assume the conduct is protected. *Chester*, 628 F.3d at 680–82. At the very least, this inquiry requires us to consider text, structure, history, and practice to reveal the original public meaning of the Second Amendment. *See Heller*, 554 U.S. at 576–628, 128 S.Ct. 2783. The relevant question is: What did the right to keep and bear arms mean to the public at the time of ratification?

I need not delve into a historical analysis in this case, however, because the Supreme Court has already determined that the type of firearm at issue under the HQL law—the handgun—unquestionably falls within the scope of the Second Amendment. Indeed, the Supreme Court has characterized the handgun as "the quintessential self-defense weapon" and observed that handguns are "the most popular weapon chosen by Americans for self-defense in the home." *Heller I*, 554 U.S. at 629 (deeming the District of Columbia's handgun ban to be unconstitutional because it prohibited "an entire class of arms that is overwhelmingly chosen by American society for [self-defense]" (internal quotation marks omitted)); *see Kolbe*, 849 F.3d at 131.

The requirements for the purchase of a handgun, as set out in the HQL law, undoubtedly burden this core Second Amendment right because they "make it considerably more difficult for a person lawfully to acquire and keep a firearm…for the purpose of self-defense in the home." *Heller II*, 670 F.3d at 1255; *see Libertarian Party of Erie County*, 300 F. Supp. 3d at 441 (finding that a firearm licensing law burdens conduct protected by the Second Amendment). Thus, I must proceed to the second step of the two-prong inquiry.

### D. Level of Scrutiny

### 1.

The Second Amendment protects the right of "a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 682-83 (emphasis in original); *see* ECF

135-1 at 44-45. As indicated, the handgun is the "quintessential self-defense weapon." *Heller I*, 554 U.S. at 629. And, the licensing law implicates the core of the Second Amendment right because it places a burden on the ability of law-abiding citizens to own firearms for self-defense in the home.

Because the handgun is protected by the Second Amendment, the Court must decide the level of scrutiny to apply in evaluating the constitutionality of the Act. *See Hirschfeld*, 5 F.4th at 440 ("Having found that 18-year-olds are protected by the Second Amendment, our precedent requires that we apply 'an appropriate form of means-end scrutiny.'") (internal citation omitted). In addition to considering the "nature of the conduct being regulated," the Court must consider "the degree to which the challenged law burdens the right." *Chester*, 628 F.3d at 682; *see Fyock v. City of Sunnyvale*, 779 F.3d 991, 998-99 (9th Cir. 2015) (determining appropriate level of scrutiny by considering "how severely, if at all, the law burdens [the Second Amendment] right"); *Heller II*, 670 F.3d at 1261 (determining "the appropriate standard of review by assessing how severely the prohibitions burden the Second Amendment right"). Thus, the applicable level of scrutiny is determined by whether and to what extent the challenged regulation burdens the core Second Amendment right.

Heightened scrutiny is appropriate where the law imposes a severe burden on Second Amendment protections. A law severely burdens the core right if it "effectively disarm[s] individuals or substantially affect[s] their ability to defend themselves." *Kolbe*, 849 F.3d at 139. But, there is no substantial burden "'if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.'" *Libertarian Party of Erie Cty.*, 300 F. Supp. 3d at 442 (quoting *NYSRPA*, 804 F.3d at 259). And, "intermediate scrutiny is the appropriate standard [where the challenged provision] does not severely burden the core protection of the Second Amendment, i.e.,

the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe*, 849 F.3d at 138; *see Chester*, 628 F.3d at 682 ("A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right ... may be more easily justified.").

The record is clear that plaintiffs and others like them are readily able to acquire handguns in Maryland for self-defense if they obtain an HQL. In fact, the plaintiffs do not provide evidence establishing that *any* law-abiding, responsible citizen who applied for an HQL was denied the HQL. *See Libertarian Party of Erie Cty*, 970 F.3d at 127–28. Moreover, the HQL requirements place no more than "marginal, incremental, or even appreciable restraint on the right to keep and bear arms." *NYSRPA*, 804 F.3d at 259 (quoting *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012)).

Only "the narrow class of persons who are adjudged to lack the characteristics necessary for the safe possession of a handgun" face a substantial burden on the core Second Amendment protection as a result of the HQL. *Aron v. Becker*, 48 F. Supp. 3d 347, 371 (N.D.N.Y. 2014). In contrast, "law-abiding, responsible citizens face nothing more than time" and a reasonable "expense" in order to possess a handgun. *Libertarian Party of Erie Cty.*, 300 F. Supp. 3d at 443. I note that plaintiffs have no quarrel with the 77R law, an earlier statute that also included a training requirement, a waiting period, and a fee.

Although the HQL law implicates the core Second Amendment right, the burden is not so severe as to require strict scrutiny. Other courts addressing challenges to registration and licensing requirements have applied intermediate scrutiny on the ground that "none of the … requirements prevents an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose." *Heller II* , 670 F.3d at 1258; *see NYSRPA*, 804

F.3d at 260 (applying intermediate scrutiny where "[t]he burden imposed by the challenged legislation is real, but it is not 'severe'" (citation omitted)); *United States v. Marzzarella*, 614 F.3d 85, 96–97 (3d Cir. 2010) (noting that registration requirements "do[ ] not severely limit the possession of firearms"); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1329 (S.D. Cal. 2020) (noting that the disputed provision "does not categorically ban the possession of arms used for self-defense. It therefore does not impose a substantial burden on the Second Amendment, and allows for intermediate rather than strict scrutiny.").

Indeed, "there has been near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *Mai v. United States*, 952 F.3d 1106, 1115 (9th Cir. 2020); *see, e.g., Hirschfeld*, 5 F.4th at 440-41 (applying intermediate scrutiny without deciding "how close to the core of the Second Amendment these laws strike"); *Kolbe*, 849 F.3d at 138 (applying intermediate scrutiny where the law "does not severely burden the core protection of the Second Amendment"); *Hosford*, 843 F.3d 161, 168 (4th Cir. 2016) (declining to apply strict scrutiny to a firearms prohibition that "addresses only conduct occurring outside the home," without deciding if or when strict scrutiny applies to a law reaching inside the home); *Woollard*, 712 F.3d at 876 (applying intermediate scrutiny to requirement that an individual demonstrate a "good and substantial reason" for carrying a handgun in public before he can obtain a permit to do so); *Carter*, 669 F.3d at 417 (applying intermediate scrutiny on review of a Second Amendment challenge to prohibition of firearms for users of marijuana); *Masciandaro*, 638 F.3d at 471 (applying intermediate scrutiny to a regulation barring the carrying of loaded weapons in a motor vehicle in a national park); *Chester*, 628 F.3d at 682-83 (applying intermediate scrutiny when reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by a person convicted of a

misdemeanor crime of domestic violence); *see also Sibley v. Watches*, 460 F. Supp. 3d 302, 313-14 (W.D.N.Y. May 18, 2020) ("The Second Circuit and district courts in this Circuit have continually chosen to apply intermediate scrutiny to general challenges under the Second Amendment.") (internal quotation marks omitted); *Doe No. 1 v. Putnam Cty.*, 344 F. Supp. 3d 518, 538 n.12 (S.D.N.Y. 2018) ("[T]he Second Circuit has not yet applied [strict] scrutiny to any statute in the Second Amendment context ....").

Accordingly, because the licensing law implicates the core Second Amendment right, but does not severely burden it, I shall apply intermediate scrutiny.

**2.**

As a threshold matter, the parties disagree over the precise contours of the intermediate scrutiny test. According to plaintiffs, the Supreme Court's most recent iteration of the test is that "'to survive intermediate scrutiny, a law must be 'narrowly tailored to serve a significant governmental interest.'" ECF 135-1 at 49 (quoting *Packingham v. N.C.*, ___ U.S. ___, 137 S. Ct. 1730, 1732 (2017) (internal citation omitted)). Indeed, as the Fourth Circuit recently noted, *Hirschfeld*, 5 F.th at 441 n.56: "Exactly what intermediate scrutiny requires in a given situation remains unclear. *Compare Chester*, 628 F.3d at 683 ('reasonable fit'), *with Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) ('substantially related')." I shall apply the test as it has been articulated by the Fourth Circuit in its most recent Second Amendment opinions. *See Hirschfeld*, 5 F.4th 407; *Harley*, 988 F.3d 766; *Kolbe*, 849 F.3d 114.

"Under the standard of intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged law and a substantial governmental objective." *Harley*, 988 F.3d at 769; *see Hirschfeld*, 5 F.4th at 440-41. But, the fit need not be perfect or even the least intrusive means of accomplishing the desired objective. *United States v. Staten*, 666 F.3d

32

JA1845

154, 162 (4th Cir. 2011). Rather, the defendants must show "'reasonable inferences based on substantial evidence' that the statutes are substantially related to the governmental interest." *NYSRPA*, 804 F.3d at 264; *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) ("*Turner I*").

"Various evidence can be mustered to meet [the intermediate scrutiny] standard but 'reference to legislative findings, academic studies, or other empirical data is necessary.'" *Hirschfeld*, 5 F.4th at 441 (quoting *Tyler*, 837 F.3d at 694). Further, "while 'case law, and even common sense' may be relied on, the government may not 'rely upon mere anecdote and supposition.'" *Hirschfeld*, 5 F.4th at 441 (quoting *Tyler*, 837 F.3d at 694 (internal quotations and citation omitted)); *see also Hirschfeld*, 5 F.4th at 449 ("Congress may not pass intermediate scrutiny by relying on unsupported conclusory testimony to justify its desired outcome."); *Heller v. District of Columbia*, 801 F.3d 264, 279 (D.C. Cir. 2015) ("*Heller III*") ("[T]he Supreme Court has 'permitted litigants to justify ... restrictions ... based ... on history, consensus, and simple common sense' when the three are conjoined." (internal citation omitted)).

Plaintiffs argue that intermediate scrutiny in the "Second Amendment context does not allow deference to the legislature's findings." ECF 135-1 at 51. But, plaintiffs cite one Second Amendment case in support of this argument: *Duncan v. Becerra*, 970 F.3d 1133, 1166 (9th Cir. 2020), *reh'g granted*, *opinion vacated*, 988 F.3d 1209 (9th Cir. 2021) (en banc). Of relevance here, the Supreme Court has said that, "[i]n reviewing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of [the legislature].'" *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*"); *accord Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013). And, the Fourth Circuit has instructed courts to "accord substantial

deference to the predictive judgments of [the legislature]." *Kolbe*, 849 F.3d at 140 (internal citation and quotation omitted); *see Hirschfeld*, 5 F.4th at 448-49.

Especially in the "context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner I*, 512 U.S. at 665); *accord Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (same). Significantly, "the Fourth Circuit has urged courts to approach Second Amendment claims with particular caution, giving due respect to the limits of their Article III powers." *Hirschfield v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 417 F. Supp. 3d 747, 758 (W.D. Va. 2019), *vacated*, 5 F.4th 407. In *Masciandaro*, 638 F.3d at 475, for example, the Court said: "To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."

To be sure, even with deference, meaningful review is required. *Hirschfeld*, 5 F.4th at 448-49. As the *Hirschfeld* Court said, *id.* at 448: "It is true that we sometimes give weight to Congress's 'predictive judgments' under *Turner*.... But this does not mean that we should blindly abdicate our obligation to review Congress's actions under heightened scrutiny." (Quoting *Turner I*, 512 U.S. at 665-66); *see Heller II*, 670 F.3d at 1259 ("Although we do accord substantial deference to the predictive judgments of the legislature when conducting intermediate scrutiny, the State is not thereby insulated from meaningful judicial review." (Internal quotations omitted)). But, the court's

34

role is only "to assure that, in formulating its judgments, [Maryland] has drawn reasonable inferences based on substantial evidence." *Turner II*, 520 U.S. at 195.

### 3.

For starters, defendants' interest in promoting public safety in Maryland is clearly a substantial and compelling interest. *See Hirschfeld*, 5 F.4th at 441 ("To begin, the government's interests in preventing crime, enhancing public safety, and reducing gun violence are 'not only substantial, but compelling.'") (quoting *Kolbe*, 849 F.3d at 139). The Fourth Circuit has expressly found that the State has a substantial interest in providing for public safety and preventing crime. *See Kolbe*, 849 F.3d at 139; *Woollard*, 712 F.3d at 877-78; *see also Masciandaro*, 638 F.3d at 473 (finding that the government has a substantial interest in providing for public safety in national parks). And, plaintiffs do not attempt to argue otherwise.

Rather, plaintiffs argue that Maryland's "purported public safety interests are an unconstitutional pretext for preventing law-abiding Maryland citizens from acquiring and possessing handguns." ECF 135-1 at 37. In their view, the HQL requirements were enacted to "'intimidate' the citizens of Maryland from acquiring handguns." *Id.* (citing ECF 135-6 at 7-9, Tr. 30-31). Further, they claim that the FSA was the culmination of an effort led by former Maryland Attorney General J. Joseph Curran to "'restrict the future sale of handguns to those who can show a real, law enforcement need for one.'" ECF 135-1 at 22-23 (citing Symposium: Guns as a Consumer Product: New Public Health and Legal Strategies to Reduce Gun Violence, 4 J. Health Care L. & Pol'y 1, 5 (2000)).

Former Attorney General Curran did not hold elected office at the time of the passage of the FSA. Nor does the legislative record indicate that he had any role in the enactment of the FSA. Thus, Curran's views are irrelevant to the law at issue in this case. Moreover, the other evidence

cited by plaintiffs in support of this argument merely supports the idea that defendants intended to limit the sale of handguns to unlawful purchasers.

Plaintiffs also argue that the defendants have no evidence that there are any actual harms associated with handgun purchases and usage in Maryland. ECF 135-1 at 52.  Yet, this contention is belied by the evidence, which establishes that handguns are the firearms most frequently used for criminal activity in Maryland. In 2012, for example, just prior to the passage of the FSA, there were 372 homicides in Maryland. ECF 135-23 at 1.  And, out of 281 homicides by firearm, 271 involved a handgun. *Id.* In other words, handguns were used in 73 percent of the reported murders in 2012.[14] This powerful evidence indicates the high rate of handgun usage for unlawful purposes and the significant risks associated with inadequate precautions in the sale and distribution of handguns.

Further, the record indicates that background checks conducted by firearm dealers, without fingerprints, are susceptible to fraud. *See*, *e.g.*, ECF 125-3; ECF 125-4. According to defendants' experts, the firearm registration system in place in Maryland prior to passage of the FSA was "especially vulnerable" and resulted in "illegal straw purchases and…individuals using false identification in their applications to purchase regulated firearms." ECF 125-3 at 2 (noting that prospective purchasers could more easily put inaccurate information on their application forms…in order to avoid a denial of the application"); *see* ECF 125-14 (Decl. of Chief Johnson), ¶ 11 (noting that prior to passage of HQL he was "aware of cases in Baltimore County involving straw purchases of handguns for prohibited person"); ECF 140-3 (Webster's Third Supplemental Decl.), ¶ 12 ("Background checks conducted with only identification documents but without the

---

[14] In 2019, there were 543 homicides in Maryland. And, out of 514 homicides by firearm, 462 involved a handgun. *See* ECF 135-23 at 1.

applicant's fingerprints can lead to 'false negatives' – situations in which individuals are cleared to purchase and possess firearms despite having a disqualifying criminal conviction."). The experts' concern as to fraud is consistent with the findings of the GAO Study that background checks conducted by firearm dealers "cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful." ECF 125-4 at 2.

Plaintiffs claim that the GAO Study is inapplicable here because it predates the REAL ID Act, 49 U.S.C. § 30301; 6 C.F.R. § 37.14(a)-(b). *See* ECF 135-1 at 63. Further, plaintiffs claim that "[b]ecause Maryland is now a REAL ID compliant state, there is no likelihood that false Maryland identification will be used" to purchase a handgun. *Id.* at 29. However, plaintiffs misstate the facts. The U.S. Department of Homeland Security has extended until May 3, 2023, the national deadline for REAL ID compliance. *See* Maryland Dept. of Transportation, https://mva.maryland.gov/Pages/mdotmva-current-operations.aspx#realid (last accessed, July 27, 2021). Moreover, plaintiffs do not provide any evidence that the REAL ID Act would eliminate the problem of false identification in this context. In any event, as discussed, *infra*, the addition of another prevention measure is not dispositive.

The susceptibility to fraud has resulted in actual problems. Chief Johnson explained in his testimony before the General Assembly, ECF 125-5 at 4: "In law enforcement, we know that criminals prohibited from buying guns attempt to use straw purchasers…. Often, the people recruited to make a straw purchase are intellectually unsophisticated or coerced into straw purchasing attempts. In a recent case in Baltimore County, an intellectually disabled person was used to purchase numerous weapons, some of which were recovered and confirmed as having been used in crimes of violence." *See also* ECF 140-3, ¶ 10 (Webster noting that "one of the most

common ways in which prohibited purchasers obtain firearms" is "through straw purchases or from private unlicensed sellers who purchase firearms from licensed gun dealers and then sell them in the underground gun market to criminals").

Handguns often fall into the wrong hands. Testifying before the General Assembly, then Baltimore City Police Commissioner Batts explained: "Most of the homicides and non-fatal shootings that plague Baltimore are perpetrated by prohibited persons with illegal guns." ECF 125-6 at 2. To illustrate, he stated that in 2012 "79% of all homicide suspects arrested had prior records and approximately 45% had firearms offenses in their criminal histories." *Id.*

In addition, there are risks associated with handgun users who are not properly trained in handgun use and storage. For example, MSP Capt. James Russell averred, ECF 125-13, ¶ 14: "In my experience, prior to taking a training course, the vast majority of firearms safety students lack a sufficient working knowledge of a handgun to handle and operate it safely." And, Chief Johnson testified at his deposition that he was aware of over 100 accidental discharges of handguns during his time in law enforcement in Maryland. *See* ECF 140-5 at 7-8, Tr. 105-106. These accidental discharges, according to Johnson, are often caused by people who mistakenly pulled the trigger, "unaware that there was a round in the chamber" because they thought ejecting the magazine was "sufficient" to render the weapon safe. *Id.* at 8, Tr. 106. And, as to the problem of improper storage, Chief Johnson stated, ECF 125-14, ¶ 15: "I am aware of at least two instances in which minors accessed improperly-stored firearms within the home, brought the weapons to school, and discharged them at school."

Further, under the video training requirement that preceded the FSA, the MSP could not guarantee that prospective purchasers were actually watching the training material. ECF 125-14, ¶ 7 ("A further advantage of classroom training is that an instructor can verify that an individual

attended the training, as opposed to watching a video, which cannot be verified."); ECF 125-13, ¶ 26 (noting that "…students watching a video may leave the room while the video is playing"); ECF 125-5 at 5 (noting that the "current viewing requirement – viewing a 30-minute video—is insufficient").

Based on this evidence, the General Assembly concluded that the risks and challenges associated with the purchase and use of handguns in Maryland required a more robust identification and training requirement, in order to reduce the risks outlined above and to promote public safety. And, it "is beyond cavil that [the State has a] 'substantial, indeed compelling, governmental interest[] in public safety and crime prevention.'" *NYSRPA*, 804 F.3d at 261 (*Kachalsky*, 701 F.3d at 96).

## 4.

The Court must next decide whether the HQL requirements "are a reasonable fit to" the State's interest in public safety. *See Hirschfeld*, 5 F.4th at 441. In particular, I must determine whether the fingerprinting requirement and the firearm safety training are substantially related to the government's interest in promoting public safety.  In addition, I must ascertain whether the requirements impose more burden on the Second Amendment right than necessary to achieve that interest.

As to the fingerprint requirement, defendants posit that it serves "three critical public safety functions," ECF 125-1 at 26: (1) It "enables MSP to ensure that the applicant is positively identified and not using false identification or altering his or her identification information"; (2) "a fingerprint record can be used to determine if an HQL licensee is convicted of a disqualifying offense subsequent to passing the initial background investigation"; and (3) the fingerprint

requirement, "through its inherent and lasting reliability, acts as a deterrent to straw purchasers and those intending to purchase firearms solely for criminal purposes."

Plaintiffs counter that the fingerprint requirement is unnecessary because the preexisting registration requirement already "positively identif[ied] handgun purchasers" and allowed law enforcement "to locate and disarm handgun owners who were subsequently disqualified from handgun ownership." ECF 135-1 at 28. In particular, they point out, ECF 135-1 at 18, that the 77R Handgun Registration application required the prospective purchaser's identifying information, including "name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver's [license] or photographic identification soundex number, [and] occupation." *See* Md. Code (2003), P.S. § 442. And, the MSP used this information to conduct a background check on the prospective firearm purchaser. *See* ECF 135-6 at 14, Tr. 73 (Webster noting that prior to the HQL, there was a requirement that MSP conduct a background check on prospective purchasers).

According to plaintiffs, the HQL fingerprint requirement "is beneficial only for stopping a potential purchaser whose fingerprints are already in the Central Repository and who attempts to use a false government issued photographic identification of another individual who does not have a criminal record." ECF 135-1 at 29. They assert that defendants "have no evidence that anyone in Maryland has ever attempted to purchase a handgun in such circumstances." *Id.* And, in any event, plaintiffs posit that the "REAL ID" diminishes the "likelihood that false Maryland identification will be used for such a purchase." *Id.* Further, plaintiffs take issue with the evidence that defendants used to establish that the fingerprint requirement is substantially related to serving public safety. *Id.* at 54-58.

Defendants' experts are in agreement that a fingerprint requirement helps to prevent fraud, ensure the identity of gun purchasers, and deter straw purchasers. In particular, two members of law enforcement and Webster provided testimony to the General Assembly as to the benefits of a fingerprinting requirement. *See* ECF 125-3; ECF 125-5; ECF 125-6. Chief Johnson, for example, explained that the fingerprinting requirement would "help law enforcement to identify people involved in gun crimes." ECF 125-5 at 5. And, Commissioner Batts noted that the fingerprint requirement would help "ensur[e] that the applicant is not prohibited from possessing a handgun." ECF 125-6 at 2-3.

In their testimony in support of the FSA, Webster, Johnson, and Batts relied on empirical evidence, in addition to their personal expertise. *See* ECF 125-3; ECF 125-5; ECF 125-6. As noted, during Webster's testimony before the General Assembly, he shared the conclusions of an array of empirical studies as to the benefits of licensing laws that require fingerprinting. *See* ECF 125-3. For instance, Webster explained that five states that require citizens to apply directly with a law enforcement agency and be fingerprinted before they can purchase handguns "have some of the lowest age-adjusted firearm mortality rates per 100,000 population in the nation for the period 2006-2010." *Id.* at 3. Johnson and Batts also referenced research from states with licensing requirements. ECF 125-5 at 4 (noting that "other states with licensing requirements have shown such a reduction"); ECF 125-6 ("States like New York, New Jersey and Massachusetts have shown that licensing will also serve as a deterrent to the straw buyers of a handgun.").

Webster and Johnson reaffirmed and emphasized the benefit of the fingerprint requirement in their expert declarations and deposition testimony for this case. *See Kolbe*, 849 F.3d at 140 n.14 (noting that the court may look to evidence outside of the legislative record in order to confirm the reasonableness of the legislature's predictions). For instance, Chief Johnson averred, ECF 125-14,

41

¶ 8: "Based on my law enforcement experience and conversations with other law enforcement personnel, it is my opinion that an individual who has to render a set of fingerprints to obtain an HQL will be deterred from falsely identifying him or herself during the application process. In contrast, a background investigation based solely on photographic identification can be defeated with false identification." *See also, e.g., id.* ¶ 9 ("[I]t is my opinion that an individual who knows they have to render a set of fingerprints to obtain an HQL is less likely to engage in a straw purchase on behalf of a disqualified individual."); ECF 135-8 at 2-3 (Dep. of Chief Johnson), Tr. 19-20 ("I believe the fingerprint itself is a more robust element that determines one's true identity. The [previous background check] obviously can be defeated with false identification…."); ECF 140-11, ¶ 12 (Webster explaining that "purchaser licensing systems that use law enforcement agencies and fingerprint verification of an applicant's identity more effectively vet applications to purchase firearms than can be accomplished by gun store owners and clerks who process these applications in the absence of licensing systems or biometric identity markers."). Defendants' witnesses also stressed the importance of the fingerprint requirement to prevent firearms from falling into, or remaining in, the hands of convicted criminals. *See, e.g.*, ECF 125-7 (Decl. of Captain Andy Johnson), ¶¶ 23, 24; ECF 125-11 (Decl. of Webster), ¶ 10.

Plaintiffs counter that, even without the fingerprint requirement, MSP *could have* dispossessed individuals of their registered firearms if they were subsequently disqualified from gun ownership. ECF 135-1 at 28-29. However, before 2013, there was no "systematic or routine reporting" of criminal history record information of registered gun owners. First Sgt. Donald Pickle, Assistant Commander of MSP's Licensing Division, averred, ECF 125-9, ¶ 12: "While it is true that MSP was able to locate and disarm handgun owners prior to the fingerprint requirement when MSP was notified that the individual was subsequently disqualified from handgun

ownership, I am unaware of any systematic or routine reporting of this information from any law enforcement agency, court system, or other criminal justify agency prior to enactment of the Firearm Safety Act and the HQL fingerprint requirement." *See also* ECF 140-2 (Webster Supplemental Decl.), ¶ 6 ("Based on my gun policy research in the State of Maryland, I am aware that there is no such routine reporting of individuals convicted of all disqualifying offenses from local law enforcement agencies to the Maryland State Police.").

The FSA obviates any dependency on reporting by local law enforcement. "Using the fingerprint record generated as part of the HQL application process, DPSCS is able to provide MSP with licensees' updated criminal history information." ECF 125-7 (Decl. of Capt. Andy Johnson), ¶ 23; *see also* ECF 140-2, ¶ 6 (Webster noting that "the reports routinely generated based on the fingerprint records allow the Maryland State Police to track arrests without having to rely on reporting from local law enforcement"); *see* FSA § 5-117.1(f)(7). "This information enables MSP to revoke the HQLs of persons who become ineligible to possess them and to notify the Firearms Enforcement Unit, which is responsible for removing firearms from disqualified individuals. The Firearms Enforcement Unit investigates whether the person is still in possession of firearms and, if so, is responsible for retrieving those firearms." ECF 125-7, ¶ 23. And, as even plaintiffs' expert concedes, it is undeniable that the ability to identify when an HQL licensee subsequently becomes disqualified is beneficial for public safety. ECF 125-15 (Dep. of Kleck) at 3, Tr. 49 (agreeing that there are potential public safety benefits to identifying an HQL licensee who becomes disqualified after receiving an HQL).

Plaintiffs vigorously dispute some of the empirical studies on which defendants have relied. In particular, in his declarations and expert report, Webster argues that empirical evidence from studies conducted about permit-to-purchase firearm laws in Connecticut and Missouri demonstrate

that such laws "are an effective means of reducing (1) the diversion of guns for criminal purposes; (2) firearm homicides; and (3) suicides with firearms." ECF 125-11, ¶ 13; *see id.* ¶¶ 14-16. Plaintiffs, through Kleck, question the methodology and conclusions of Webster's studies. ECF 135-1 at 55-57. Kleck posits, for example, that Webster's conclusions are the result of "data dredging" and that the studies' choice of control variables and control areas were "cherry-pick[ed]." *Id.* at 57; *see* ECF 135-25, ¶¶ 13-23.

In *Heller III*, 801 F.3d at 275-76, the D.C. Circuit upheld a fingerprinting requirement for handgun registration based, in part, on testimony from Webster and another law enforcement expert, as well as the conclusions of the GAO Study. *Id.* at 275-76. The plaintiffs in *Heller III* argued that "the District [*i.e.*, the defendant] has not experienced a problem with fraud in the registration of firearms" and the problem of fraud "is unlikely to arise, given the increased difficulty of manufacturing fraudulent identification documents today, as compared to 2001, when the GAO concluded its investigation." *Id.* at 276. That argument is similar to the contention advanced here by plaintiffs.

In response to the plaintiffs' argument, the D.C. Circuit reasoned, *id.*: "Even if this is true, however, a prophylactic disclosure measure such as the one at issue here survives intermediate scrutiny if the deterrent value of the measure will materially further an important governmental interest." The *Heller III* Court noted that the "GAO study indicates the fingerprinting requirement would help deter and detect fraud and thereby prevent disqualified individuals from registering firearms," and the experts' testimony affirmed that using fingerprints "'to positively identify an individual is far more effective than relying simply on a name and social security number.'" *Id.* (internal citation omitted). Thus, the court concluded that "the District has adduced substantial evidence from which it reasonably could conclude that fingerprinting…registrants will directly

and materially advance public safety by preventing at least some ineligible individuals from obtaining weapons...." *Id.* at 277.

In the face of these "conflicting views" of Webster's work, the Court need not "put [its] imprimatur" on his research and conclusions. *Turner II*, 520 U.S. at 208. Rather, "'[i]t is the legislature's job,'" not the job of the Court, "to weigh conflicting evidence and make policy judgments.'" *Kolbe*, 849 F.3d at 140 (quoting *Woollard*, 712 F.3d at 881) (alterations in *Kolbe*). The Court's role is merely to decide whether defendants have provided "substantial evidence" to support the General Assembly "making the judgment that it did." *Turner II*, 520 U.S. at 208; *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (courts should give legislatures "wide discretion to pass legislation in areas where there is ... scientific uncertainty") (collecting cases).

Substantial evidence was presented to the Maryland legislature, from which it was entitled to conclude that the fingerprinting of prospective handgun purchasers would promote public safety. The State relied on expert testimony, empirical evidence, and "simple common sense" to reasonably infer that a fingerprinting requirement would facilitate identification of a gun's owner, both at the time of licensing and upon any subsequent disqualifying activity. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) ("[W]e have permitted litigants to justify ... restrictions [under intermediate scrutiny] by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense."). Moreover, the General Assembly was of the view that such a requirement would deter straw purchases.

As the Fourth Circuit stated in *Kolbe*, 849 F.3d at 140, with respect to another FSA provision: "The judgment made by the General Assembly of Maryland in enacting the FSA is precisely the type of judgment that legislatures are allowed to make without second-guessing by a

court." I am satisfied that the State "adduced substantial evidence" that the fingerprinting requirement will help effectuate public safety by, among other things, preventing fraud and facilitating the removal of firearms from disqualified individuals.

**5.**

With respect to the live training and live-fire requirement, defendants argue that it "will reduce accidental discharges and access of firearms to ineligible persons, including minors." ECF 140 at 34. In addition to the testimony presented to the General Assembly (ECF 125-3; ECF 125-5; ECF 125-6), defendants primarily rely on affidavits from Capt. Russell and former Chief Johnson to establish that the training requirement is reasonably adapted to achieve the government's purported interests and is superior to the video training required under the earlier registration scheme. ECF 125-13; ECF 125-14.

According to the defense experts, the training requirement creates an additional deterrent because "straw purchasers will [not] sit through a four-hour training program." ECF 125-5 at 5; *see* ECF 125-14, ¶ 11 (noting that straw purchasers would be deterred by "taking a four-hour firearms safety training that included an overview of State firearms law"). Further, the experts opine that the training contemplated by the HQL law promotes safe handling, operation, and storage of firearms which reduces the risk of accidental discharges and access of firearms to minors and criminals. ECF 125-13, ¶¶ 19-21; ECF 125-14, ¶ 14-16. Additionally, a live training course, in contrast with video training, "allows for dialogue…such that students can ask questions," ECF 125-14, ¶ 17, and "receive feedback from the instructor." ECF 125-13, ¶ 26. Live training also allows an instructor "to verify that an individual attended the training." ECF 125-14, ¶ 17; ECF 125-13, ¶¶ 22-23; *see also* ECF 125-14, ¶ 17.

Plaintiffs maintain that the new training requirement is unnecessary because it is "substantively identical to the 77R Handgun Registration online presentation." ECF 135-1 at 60. If the law is "substantively identical" to the earlier training program, however, then it is difficult to understand the basis of plaintiffs' complaint.  In any event, plaintiffs cite no evidence to support their contention that the four-hour training is identical to the one-hour video training.  In the end, plaintiffs are unhappy with the inconvenience of the requirement. The four-hour classroom requirement for the HQL is a minor inconvenience; it does not violate the Second Amendment.[15]

Both defense experts also stressed the benefits of the live-firing requirement. Capt. Russell, for example, averred that the live-fire requirement "is a significant step toward ensuring responsible and safe gun ownership." ECF 125-13, ¶ 25. According to Chief Johnson, the live fire component of the training could prevent accidental discharges because it would make an individual "accustom[ed] to the mechanism, the operation of the weapon" and the "process of clearing the weapon" to render it safe. ECF 140-5 at 9, Tr. 107; *see* ECF 135-9 at 12, Tr. 107 (Capt. Russell noting that his students say that they "feel so much [more] comfortable with the nomenclature, how to make it safe, and…shooting procedures" after the live-fire training).

As plaintiffs point out, Chief Johnson also stated that he thinks "just firing one round [of live ammunition] is not adequate." ECF 135-8 at 10, Tr. 52. But, just because the requirement does not go as far as it could have or should have does not mean it is unconstitutional. *See Mance v. Sessions*, 896 F.3d 699, 701, 704, 708–09 (5th Cir. 2018) (per curiam) (finding that federal laws

---

[15] Maryland has established training requirements as a condition for licensing in various contexts. To be sure, the training requirements do not always implicate constitutional rights.  But, these requirements reflect the legislative approach to licensing.  For instance, to qualify for a Maryland driver's license for the first time, individuals must participate in 30 classroom hours of instruction and spend six hours behind the wheel. *See* Motor Vehicle Administration (https://mva.maryland.gov/drivers/Pages/rookie-driver-general-learners.aspx) (last accessed, July 22, 2021).

preventing federally licensed dealers from directly selling handguns to out-of-state buyers survived strict scrutiny despite their underinclusivity, as governments "need not address all aspects of a problem in one fell swoop"). Moreover, Chief Johnson also noted, ECF 135-8 at 10, Tr. 52: "I do not think the requirement to show proficiency in discharging a round is unreasonable." Thus, even if he did not think the requirement went far enough, he still thought it was reasonable.

Plaintiffs' primary argument as to the live fire requirement is that it "effectively bans completion of the HQL training in almost all urban areas of Maryland because there is nowhere to legally discharge a firearm except at an established firing range." ECF 150 at 13; *see* ECF 135-3 (Decl. of Pennak), ¶ 22. Although the live firing requirement may present a slight burden on prospective purchasers who live in urban areas, and who therefore must travel outside their immediate neighborhoods to complete the training, the requirement is certainly not the equivalent of a "ban" on the completion of the training. *See Connecticut Citizens Defense League, Inc. v. Lamont*, 465 F. Supp. 3d 56, 73 (D. Conn. 2020) ("The U.S. Constitution permits the States to set out a procedural road to lawful handgun ownership, rather than simply allowing anyone to acquire and carry a gun…. That road may be long…. It may be narrow…. It may even have tolls.") (citations omitted); *Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 754 (N.D. Ill. 2015) ("[A] slight diversion off the beaten path is no affront to ... Second Amendment rights.").

As discussed, despite this requirement, thousands of Maryland citizens have applied for and successfully received HQL licenses since 2013. Moreover, most of plaintiffs' witnesses who were allegedly deterred from purchasing a handgun by the HQL had already taken firearm safety courses or were exempt from the training requirement. *See* ECF 140-8 (Dep. of Clark) at 5, Tr. 15; ECF 140-7 (Dep. of Mr. Miller) at 9, Tr. 20; ECF 135-4 (Dep. of Vizas) at 9, Tr. 37; *but see* ECF 135-5 at 12, Tr. 33 (Ms. Miller noting that she was deterred from taking the training because of

her back problems). For example, Ms. Vizas, one of the named plaintiffs, had already participated in a hunter safety training course in 2016 simply because her children wanted to attend the class. ECF 135-4 at 9, Tr. 37. Thus, the training requirement is hardly the obstacle that plaintiffs suggest.

Plaintiffs make two additional arguments in attempting to demonstrate that the training requirement is unnecessary, ineffective, and illegal. Both are unpersuasive.

First, plaintiffs argue that there is "no evidence that the training courses actually being taught bear any relationship to any of the asserted government interests." ECF 150 at 24. But, plaintiffs do not present any evidence to demonstrate that the substance of the training courses is problematic. And, the Act provides that the safety training *must* cover "State firearm law[,] home firearm safety[,] and handgun mechanisms and operation." P.S. § 5-117.1(d)(3); *see* COMAR, 29.03.01.29 (setting out the "minimum curricula" relating to each statutory subject). Additionally, the MSP provides instructors with a sample lesson plan for the course. ECF 135-7 (Dep. of Johnson) at 8-9, Tr. 68-69; ECF 135-9 (Dep. of Russell) at 5-6, Tr. 70-71; *id.* at 14, Tr. 114 (noting that the MSP recommends instructors use the sample lesson plan, although it is not a requirement). And, instructors must meet certain requirements in order to become qualified to teach the course. *See* COMAR, 29.03.01.37, .38.

Second, plaintiffs assert that the exceptions to the safety course illustrate "the pretextual nature of the Defendants' claimed interest." ECF 135-1 at 39. As noted, the Act does not require HQL training for individuals, for example, who already own registered firearms or have passed hunter safety training. P.S. §§ 5-117.1(e). According to plaintiffs, this indicates that the video training course is sufficient to ensure public safety. ECF 135-1 at 39-40. However, the State's experts specifically disputed that claim. Chief Johnson, for example, stated, ECF 125-14, ¶ 17: "I am aware that prior to the enactment of the HQL requirement, purchasers of handguns were

required to view a video that, in my opinion, did not amount to training on the safe operation and handling of a firearm. Based on my 39-year career in law enforcement, I do not consider merely watching a video to be training….” And, as noted with respect to the live-fire requirement, just because a law does not address every “facet of a problem at once” does not mean it is unconstitutional. *See Hirschfeld*, 5 F.4th at 450.

Additionally, both sides rely on *Heller III*, 801 F.3d 264, to support their contentions as to the training requirement. Plaintiffs' reliance is misplaced.

*Heller III* addressed a challenge to the District's training requirement that mandated a one-hour firearms safety course, available online, and a test about local gun laws. The D.C. Circuit said, *id.* at 278-79: “The District has presented substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms, but has presented no evidence from which it could conclude that passing a test of knowledge about local gun laws does so. The safety training, therefore, is constitutional; the test of legal knowledge is not.”

As to the training course requirement, the “District's experts each testified to their belief in the value of training to prevent accidents,” and the District “offered anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional consensus in favor of safety training.” *Id.* at 279 (citation omitted). Thus, even though the District did not present empirical evidence about the benefits of mandatory training, the court was satisfied that the requirement was justified. *Id.* But, as to the “test” requirement, the court found that the District had not presented sufficient evidence to demonstrate that “knowledge of the District's gun laws will promote public safety.” *Id.*

Although the HQL training requirement is more extensive than the training requirement in *Heller III*, the D.C. Circuit's reasoning is instructive. Defendants submitted declarations from two law enforcement experts who, speaking from "experience and common sense," and based on "hundreds of conversations with other law enforcement officers regarding their experience," expressed their belief in the value of live training to prevent accidents, among other things. ECF 125-14, ¶ 4; *see* ECF 125-13, ¶¶ 18-21. And, unlike the law at issue in *Heller III*, the HQL training requirement does not require applicants to demonstrate their knowledge of State laws that are unrelated to public safety. Plaintiffs do not contend otherwise.

Therefore, as in *Heller III*, I am satisfied that the expert opinions of the State's witnesses, as well as common sense, comprise substantial evidence that the State's training requirement will help to prevent handgun accidents and deter straw purchasers and thus promote public safety.

**6.**

Overall, plaintiffs argue that the expense and time associated with HQL requirements impose too great a burden on prospective purchasers for its limited benefits. In particular, plaintiffs complain that the HQL requirement is time-consuming because it "imposes an additional statutorily-permissible 30-day waiting period." ECF 135-1 at 24. And, in addition to the 30-day waiting period, plaintiffs complain that "completing an HQL application takes time" and money— at least $200. *Id.* at 24, 26. Specifically, to complete the application, prospective handgun purchasers "must begin an application, find a firearm instructor, complete a half day of firearm instruction in a classroom format, complete the live-fire requirement, locate a live-scan fingerprint vendor, obtain fingerprints, and complete their application online." *Id.*

However, courts have regularly found that "reasonable" fees and waiting periods are constitutional. *See, e.g., Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (noting that "[t]here

is … nothing new in having to wait for the delivery of a weapon" and upholding 10-day waiting period); *Heller III*, 801 F.3d at 278 (finding that "reasonable fees associated with constitutional requirements of registration and fingerprinting are also constitutional"); *Kwong v. Bloomberg*, 723 F.3d 160, 165–69 (2d Cir. 2013) (holding constitutional a $340 fee for a license to possess a handgun in one's home); *see also Cox v. New Hampshire*, 312 U.S. 569, 577 (1941) (holding, in response to a First Amendment challenge to a parade licensing statute, that a government may impose a fee "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed"); *Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010) (recognizing, in the firearms licensing context, "that administrative determinations may require a non-trivial amount of time to complete").

In order to demonstrate the significance of the burden, plaintiffs assert that the HQL requirement "discouraged nearly one-quarter of Maryland citizens who wished to exercise their fundamental Second Amendment rights and who were motivated enough to begin an HQL application from completing it and obtaining their HQL." ECF 135-1 at 13. However, this claim is based on the number of users who initiated an HQL application on MSP's server but did not complete the application. *Id.* Plaintiffs do not cite to any evidence demonstrating that the applications were not completed *because of* the HQL requirements.  As defendants point out, there are many reasons why an application may not be completed. ECF 140 at 11-12; *see* ECF 140-6 (Dep. of Diane Armstrong, supervisor for the Handgun Qualification License Unit); ECF 135-15 (MSP Col. Pallozzi Third Supp. Interrog. Resp.) at 3-4, 8. For example, individuals sometimes inadvertently create multiple accounts and initiate multiple applications on those accounts, but only complete an application on one account. ECF 140-6 at 4, Tr. 8. It is also conceivable that

some applications were not completed because the applicants recognized that they would not qualify, perhaps because of a prior criminal record.

Moreover, plaintiffs claim that the FSA has caused a significant decline in gun sales. They point to Atlantic Guns' average yearly handgun sales for the four-year period before the enactment of the FSA, from 2009 to 2012, and compare those sales to its average yearly handgun sales for the four-year period subsequent to the FSA, from 2014 to 2017.  The comparison shows a 20 percent reduction in sales, according to plaintiffs. ECF 135-1 at 43; ECF 84, ¶ 9 [SEALED].

To be clear, the Court does not dispute the fact that Atlantic Guns may have lost sales and revenue as a result of the FSA. *See Maryland Shall Issue*, 971 F.3d at 211-12 (noting that after the FSA took effect, the dealer's handgun sales suffered). However, plaintiffs excluded the sales for 2013 from their calculation. And, in 2013, Atlantic Guns' sales were ███████████ the yearly average from the preceding four years. *See* ECF 84-1 [SEALED].[16]

Further, the four-year period of 2014-2017 does not tell the whole story.  Atlantic Guns' sales data from 2017-2020 indicates that the FSA may not have any long-term effect on sales. In the last year four years, Atlantic Guns sold, on average, ████████████████ ██████████████████████████████████ *See* ECF 141-1. And, other than the plaintiffs' witnesses who were purportedly deterred from purchasing handguns, there is no evidence as to whether the law has actually *prevented* any law-abiding, eligible citizens from purchasing handguns.

In addition, throughout their arguments, the parties vigorously dispute whether the Act has actually had the intended effect of promoting public safety. Defendants tout two studies conducted

---

[16] It is plausible that the sizeable increase in gun sales in 2013 might have had an offsetting effect on gun sales in the following years.

by Webster that purport to assess the FSA's impact on (1) the supply of handguns diverted to criminal use in Baltimore and (2) the homicide rate in Maryland. ECF 125-1 at 29-30; *see* ECF 125-11, ¶¶ 17-18. In response, plaintiffs point out everything that they believe is wrong with those studies. ECF 135-1 at 54-55.

The first study, according to Webster, "shows a strong association between the adoption of Maryland's HQL law and a reduction in the number of handguns diverted to criminals in Baltimore." ECF 125-11, ¶ 18 & n.6 (citing Cassandra K. Crifasi et al., *The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore*, 3(5) The Russel Sage Foundation Journal for the Social Sciences 128–40 (2017)) ("2017 Study"). In particular, Webster explained that the "study showed that the FSA with the HQL requirement was associated with a 76 percent reduction in the number of handguns originally sold in Maryland that were (1) recovered by police in connection with a crime within one year of retail sale; and (2) where the person from whom the gun was recovered was not the same as the person who purchased the gun originally." ECF 125-11, ¶ 18. The study also surveyed probationers and parolees in Baltimore, 40% of whom reported that obtaining a handgun was more difficult after the HQL's enactment. *Id.* ¶ 19.

Relying on Kleck's analysis, plaintiffs take issue with Webster's conclusions, stating, ECF 135-1 at 55: "Although [the 2017 Study] concludes that the FSA caused a reduction in the supply of crime handguns in Baltimore, this conclusion is not based on any actual (or reliable) data on the supply of handguns in Baltimore or anywhere else." According to Kleck, the 2017 Study used firearms trace data, which "cannot legitimately be used to assess the supply of crime guns" because the Bureau of Alcohol, Tobacco, Firearms and Explosives states that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the

larger universe of all firearms used by criminals, or any subset of that universe." ECF 135-25, ¶¶ 6, 7. Further, with respect to the survey of Baltimore probationers and parolees, Kleck asserts that the "convenien[t] sample of criminals was not representative of criminals…" and there is no "evidence whatsoever that any of these individuals had actually tried to acquire a gun before or after the FSA went into effect." *Id.* ¶ 11.

Additionally, as to homicide rates, Webster concluded that the HQL requirements were associated with a 48% reduction in firearm homicide rates in Maryland based on data collected from Anne Arundel, Montgomery, and Prince George's counties. ECF 125-11, ¶ 17. Webster purportedly excluded Baltimore City from the statistical model because "the study period included 2015, when firearm homicide rates surge[d] in Baltimore City immediately following the riots over the in-custody death of Freddie Gray, Jr.," so "estimates of the law's impacts in Baltimore or statewide would be biased in the direction of more homicides due to the historical confounder of major riots." *Id.*

Plaintiffs criticize Webster's decision to exclude Baltimore City from his statistical model and emphasize that the HQL requirement is actually associated with an increased homicide rate in Baltimore City, and Maryland as a whole. ECF 135-1 at 30-31; ECF 150 at 20-21. To be sure, it is undisputed that the number of handgun homicides in Maryland has increased overall since 2013. *See* ECF 135-23 at 1. But, the data is not as clear as plaintiffs suggest. The firearm homicide rate decreased immediately following the passage of the FSA in 2013 and only began to rise again in 2015. And, as defendants contend, that rise may be associated with the aftermath of "the death of Freddie Gray and the ensuing unrest." ECF 140 at 14. And, it is also quite plausible that, without the HQL the disturbing number of homicides might have been even greater.

Given the array of variables, it may be impossible to determine the effectiveness of the law at this juncture, or at any juncture. *See Hirschfeld*, 5 F.4th at 451 ("While we recognize that it would be difficult to determine the effectiveness of these laws now…."); *see also id.* at 483 (Wynn, J., dissenting) ("[A]s the majority recognizes, it '[is] difficult to determine the effectiveness of these laws now.'… Given this conceded uncertainty, I would not have this Court stray far beyond its area of expertise to strike down a long-established law because of its perceived ineffectiveness."). In the face of such uncertainty, I would be straying beyond my authority to strike down a law because of its perceived ineffectiveness. *See Masciandaro*, 638 F.3d at 475–76 ("We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights…. If ever there was an occasion for restraint, this would seem to be it.").

In any event, the "Supreme Court has stated explicitly that the government satisfies intermediate scrutiny if its predictions about the effect of a challenged law are rational and based on substantial evidence—it need not establish with certitude that the law *will actually achieve* its desired end." *Heller v. District of Columbia*, 45. F. Supp. 3d 35, 41-42 (D.D.C. 2014) (emphasis added) (citing *Turner I*, 512 U.S. at 666 (stating that, to survive intermediate scrutiny, government must show that "in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence")), *aff'd in part*, 801 F.3d 264 (D.C. Cir. 2015).

### V.    Conclusion

The record demonstrates a reasonable fit between Maryland's HQL law and the State's important interest in promoting public safety. As noted, the evidence indicates that there are real safety risks associated with the misuse of handguns and the possession of handguns by those who are barred under the law from gun possession. And, as discussed above, the fingerprinting and

JA1869

training requirements align directly with the State's need to verify the identity of gun purchasers, deter straw purchasers, and ensure that handgun users have sufficient knowledge about guns, so as to mitigate safety risks.

The fingerprinting and training requirements are reasonably adapted to serve the State's overwhelming interest in protecting public safety. Moreover, the time and expense associated with the requirements are reasonable. *See Heller II*, 670 F.3d at 1249 n.* (noting that "administrative ... provisions incidental to the underlying regime"—which include reasonable fees associated with registration—are lawful insofar as the underlying regime is lawful). "Simply put, the State has shown all that is required: a reasonable, if not perfect, fit between the FSA and Maryland's interest in protecting public safety." *Kolbe*, 849 F.3d at 140-41. I decline to usurp the legislative role by invalidating the measures that the Maryland General Assembly enacted based on substantial evidence that such measures would promote public safety.

As Judge Wilkinson aptly noted in his concurrence in *Kolbe*, 849 F.3d at 150: "No one really knows what the right answer is with respect to the regulation of firearms," but "the profound ambiguities of the Second Amendment" are not "an invitation to courts to preempt this most volatile of political subjects and arrogate to themselves decisions that have been historically assigned to other, more democratic actors." Further, he stated, *id.*: "Disenfranchising the American people on this life and death subject would be the gravest and most serious of steps. It is their community, not ours. It is their safety, not ours. It is their lives, not ours. To say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design their destiny—this would deliver a body blow to democracy as we have known it since the very founding of this nation."

For the reasons set forth above, I shall grant Defendants' Motion and deny Plaintiffs'

Motion. An Order follows, consistent with this Memorandum Opinion.[17]


Dated:  August 12, 2021                              _____/s/_____
                                                     Ellen L. Hollander
                                                     United States District Judge

---

[17] The Memorandum Opinion will be filed under seal because it contains confidential business information filed under seal by a party. Therefore, the Court will file a redacted version of the Memorandum Opinion or, alternatively, after consultation with counsel, it will lift the seal. By August 23, 2021, the parties shall advise the Court as to whether they object to the lifting of the seal or, alternatively, whether the Court should file a redacted version, limited to pages 17 and 53. If either side requests the filing of a redacted version, the proposed redaction(s) should be submitted by August 23, 2021.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of August, the foregoing was served, via electronic delivery, to all parties' counsel via the Court's appellate CM/ECF system which will forward copies to Counsel of Record.


/s/ John Parker Sweeney
John Parker Sweeney