**No. 21-2017**

# In the
# United States Court of Appeals
# for the Fourth Circuit

◆

MARYLAND SHALL ISSUE, et al.,

*Plaintiffs-Appellants*,

v.

LAWRENCE HOGAN, et al.,

*Defendants-Appellees.*

◆

**Appeal from the United States District Court
for the District of Maryland
No. 1:16-cv-03311-ELH (Hon. Ellen L. Hollander)**

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION,
FPC ACTION FOUNDATION, AND INDEPENDENCE
INSTITUTE IN SUPPORT OF APPELLANTS AND REVERSAL**

◆

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

JOSEPH G.S. GREENLEE
*Counsel of Record*
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org

Counsel for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**Firearms Policy Coalition** has no parent corporation, and as a non-stock nonprofit corporation, no publicly held corporation could own any share of its stock.

**FPC Action Foundation** has no parent corporation, and as a non-stock nonprofit corporation, no publicly held corporation could own any share of its stock.

**Independence Institute** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF *AMICI CURIAE* ..................................................... 1

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ....................................................................................... 4

   I.  The Second Amendment's plain text covers the right to keep arms, so Maryland's licensing and training requirements are presumptively unconstitutional. ....................................................... 4

   II.  No free American was ever required to obtain a license to possess a firearm in the colonial, founding, or early republic periods. ........................................................................................ 6

      A.  Colonial Laws. ..................................................................... 7

      B.  Founding Era. ...................................................................... 8

      C.  The 19th Century. ............................................................. 11

      D.  Post-Civil War. ................................................................. 17

      E.  The racist historical licensing laws do not establish a tradition of firearm regulation. ................................................. 18

   III.  Historically, Americans never had to train to possess arms. ...... 24

CONCLUSION .................................................................................. 32

CERTIFICATE OF COMPLIANCE ..................................................... 34

CERTIFICATE OF SERVICE ............................................................. 35

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)................................................................8, 11, 12, 19

*Gamble v. United States*,
   139 S. Ct. 1960 (2019) ........................................................... 17

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010).............................................................16, 17, 19, 21

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ...................................................................*passim*

**Other Cases**

*Aldridge v. Commonwealth*,
   4 Va. 447 (1824) ......................................................................... 12, 21, 22

*State v. Newsom*,
   27 N.C. 250 (1844) ...................................................................... 14, 21, 22

*Waters v. State*,
   1 Gill 302 (Md. 1843) ................................................................ 14

*Watson v. Stone*,
   148 Fla. 516 (1941) ..................................................................... 18, 21, 23

**Constitutional Provisions**

U.S. Const. amend. II...................................................................*passim*

U.S. Const. amend. XIV..............................................................6, 17, 25

U.S. Const. art. I, § 8, cl. 16 .......................................................... 24

## Federal Statutes and Regulations

Civil Rights Act, 14 Stat. 27 (1866) ............................................ 17

Civil Rights Act, 17 Stat. 13 (1871) ............................................ 17

Freedmen's Bureau Act, 14 Stat. 173 (1866) ............................. 17

## State Statutes and Regulations

1715 Md. Laws 117 ...................................................................... 19

1740 S.C. Acts 168 ....................................................................... 19

1797 Del. Laws 104 ...................................................................... 19

1799 Laws of the Miss. Terr. 113 ................................................. 19

1893 Fla. Laws 71 ........................................................................ 18

COMAR 29.03.01.29 ..................................................................... 24

Md. Code Ann., Pub. Safety § 5-117.1(d)(3) ............................... 24

## State Law Compendia

A CODIFICATION OF THE STATUTE LAW OF GEORGIA (William A. Hotchkiss ed., 1848) ................................................................ 19

A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE, vol. 1 (2d ed. 1814) ...................................................... 9

A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE LAWS OF A PUBLIC AND GENERAL NATURE, IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY 1833 (John G. Aikin ed., 2d. ed. 1836) ................................... 10

A DIGEST OF THE STATUTE LAW OF KENTUCKY, vol. 2 (William Littell & Jacob Swigert eds., 1822) ................................................... 9

ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA
PASSED AT THE SESSIONS OF 1864–65 (1866) ........................................ 15

AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL
AND REVOLUTIONARY ERA GOVERNANCE, vol. 1 (Jon Wakelyn ed.,
2006) (Concessions and Agreements, Jan. 11, 1664) ........................... 29

Geyer, Henry S., A DIGEST OF THE LAWS OF MISSOURI TERRITORY
(1818) ...................................................................................................... 11

Gould, Josiah, A DIGEST OF THE STATUTES OF ARKANSAS; EMBRACING
ALL LAWS OF A GENERAL AND PERMANENT CHARACTER IN FORCE
AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY OF 1856
(1858) ...................................................................................................... 13

Hening, William Waller, THE STATUTES AT LARGE; BEING A
COLLECTION OF ALL THE LAWS OF VIRGINIA, vols. 1, 2, 3, 4
(1823) ................................................................................... 7, 27, 28, 29

Iredell, James, A DIGESTED MANUAL OF THE ACTS OF THE GENERAL
ASSEMBLY OF NORTH CAROLINA, FROM THE YEAR 1838 TO THE YEAR
1846, INCLUSIVE (1847) ......................................................................... 13

LAWS OF NEW HAMPSHIRE: FIRST CONSTITUTIONAL PERIOD, 1784–
1792, vol. 5 (1916) ................................................................................. 31

LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, 1702–1745, vol. 2
(1913) ...................................................................................................... 29

LAWS OF NEW HAMPSHIRE: REVOLUTIONARY PERIOD, 1776–1784,
vol. 4 (1916) ..................................................................................... 29, 30

LAWS OF THE STATE OF DELAWARE, FROM THE SIXTEENTH DAY OF
JANUARY, ONE THOUSAND EIGHT HUNDRED AND THIRTY, TO THE
THIRTEENTH DAY OF FEBRUARY, ONE THOUSAND EIGHT HUNDRED
AND THIRTY-FIVE, vol. 8 (1841).............................................................. 13

LAWS OF THE STATE OF DELAWARE, FROM THE TWENTY-THIRD DAY
OF JULY, ONE THOUSAND EIGHT HUNDRED AND THIRTY-FIVE, TO
THE TWENTY-EIGHTH DAY OF FEBRUARY, ONE THOUSAND EIGHT
HUNDRED AND FORTY-THREE, vol. 9 (1843) .......................................... 13

v

LAWS OF THE STATE OF MISSISSIPPI, PASSED AT A REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, OCTOBER, NOVEMBER AND DECEMBER, 1865 (1866) .............................. 15

PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8—SEPTEMBER 1664 (William Hand Browne ed, 1883) ...................................................................................... 27

PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636–1667 (1965 Reprint) ....................................................................... 27

Ryden, George H., DELAWARE–THE FIRST STATE IN THE UNION (1938) ............................................................................... 30

Shepherd, Samuel, THE STATUTES AT LARGE OF VIRGINIA, FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, vol. 3 (1836) ............................................................................... 11

THE ACTS AND RESOLUTIONS ADOPTED BY THE GENERAL ASSEMBLY OF FLORIDA AT ITS FOURTEENTH SESSION (1866) ........................................ 15

THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION, vol. 1 (1896) ..................................................... 29

The Colonial Records of the State of Georgia (Allen D. Candler ed., 1904) .................................................................................. 8

THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH (William Brigham ed., 1836) ................................. 28

THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY (Aaron Leaming & Jacob Spicer eds., 1881) (2002 Reprint) ............................................................... 19

THE REVISED STATUTES OF THE STATE OF MISSOURI, REVISED AND DIGESTED BY THE EIGHTEENTH GENERAL ASSEMBLY, DURING THE SESSION OF ONE THOUSAND EIGHT HUNDRED AND FIFTY-FOUR AND ONE THOUSAND EIGHT HUNDRED AND FIFTY-FIVE, vol. 2 (Charles H. Hardin ed., 1856) ............................................................. 14

THE STATUTES AT LARGE OF SOUTH CAROLINA, vol. 7 (David J. McCord ed., 1840) ..................................................... 7

VERMONT STATE PAPERS: BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT (William Slade ed., 1823) ..................................................... 30

## Other Authorities

Cramer, Clayton E., LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE (2018) ........................................... 22

Halbrook, Stephen P., THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS (2008) ..................................... 22

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019) ......................... 26

MESSAGE OF THE PRESIDENT OF THE UNITED STATES, AND ACCOMPANYING DOCUMENTS, TO THE TWO HOUSES OF CONGRESS, AT THE COMMENCEMENT OF THE THIRTY-NINTH CONGRESS (1866) ............................................... 16, 22

Tucker, St. George, DISSERTATION ON SLAVERY: WITH A PROPOSAL FOR THE GRADUAL ABOLITION OF IT, IN THE STATE OF VIRGINIA (1796) (1861 Reprint) ................................................. 8

Wells, Ida B., SOUTHERN HORRORS: LYNCH LAW IN ALL ITS PHASES (1892) ............................................................. 18

## STATEMENT OF *AMICI CURIAE*[1]

**Firearms Policy Coalition (FPC)** is a nonprofit organization devoted to advancing individual liberty and defending individual rights, including those protected by the Constitution. FPC accomplishes its mission through legislative, regulatory, legal, and grassroots advocacy, education, and outreach programs. FPC Law is the nation's first and largest public interest legal team focused on the right to keep and bear arms and adjacent rights, and the leader in the Second Amendment litigation and research space.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs. The scholarship and amicus briefs of the Foundation's Director of Constitutional Studies, Joseph Greenlee, have been cited in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022); *Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020);

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *amici* and their members contributed money intended to fund its preparation or submission.

1

and *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting).

**Independence Institute** is the nation's second-oldest state level think tank, founded in 1985 on the eternal truths of the Declaration of Independence. The scholarship and amicus briefs of the Institute's Research Director, David Kopel, and of the Institute's Senior Fellow in Constitutional Jurisprudence, Robert G. Natelson, have been cited in nine U.S. Supreme Court cases, by Justices Alito, Breyer, Kagan, Roberts, Stevens, and Thomas, and also by then-Judges Gorsuch and Kavanaugh. The cases include *Heller* and *McDonald*, under the name of lead amicus International Law Enforcement Educators and Trainers Association (ILEETA), and *Bruen*.

## SUMMARY OF ARGUMENT

Since the Second Amendment's plain text protects the right to keep arms, Maryland can justify its licensing and training requirements only by demonstrating that they are consistent with the nation's historical tradition of firearm regulation.

The government's burden for justifying Second Amendment regulations is demanding. The Supreme Court has demonstrated that three colonial statutes, seven state laws, and five laws from the Western Territories during the relevant time periods are insufficient to establish a historical tradition of regulation. Here, the government's burden is not nearly satisfied.

No law during the colonial, founding, or early republic periods required any American citizen to obtain a license before possessing a firearm. Only overtly racist licensing laws existed, which targeted slaves, free African Americans, and Indians—all of whom were denied Second Amendment protections. These discriminatory laws do not justify Maryland's licensing law, and to the contrary, reveal its unconstitutionality.

Nor is there any historical precedent for Maryland's training law. No historical law ever required training before acquiring a firearm. Many colonial and founding era laws required firearm ownership without requiring training. And some persons who were required to be armed were specifically exempted from training.

Since Maryland's licensing and training requirements burden the right to keep arms and neither has historical support, the restrictions violate the Second Amendment.

## ARGUMENT

### I.   The Second Amendment's plain text covers the right to keep arms, so Maryland's licensing and training requirements are presumptively unconstitutional.

Under the Supreme Court's "text, as informed by history" test, the "standard for applying the Second Amendment is as follows":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127, 2129–30 (2022) (quotation omitted).

By requiring residents to acquire a license and complete training before keeping arms, Maryland burdens "[t]he right of the people to keep . . . Arms," which the Second Amendment's plain text covers. U.S. CONST. amend. II. Maryland therefore must prove that each regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. "*Only then* may a court" uphold the law. *Id.* (emphasis added).

To be sure, establishing a "historical tradition of firearm regulation" is a tall order. *Bruen* held that the historical record compiled by respondents does not demonstrate a tradition," *id.* at 2138, where the respondents produced three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *id.* at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875

5

Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one late-19th-century Western State law (1881 Kansas), *id.* at 2155–56.[2]

As the following analyses show, there is far less historical support—virtually none—for licensing or training requirements to own a firearm.

## II.   No free American was ever required to obtain a license to possess a firearm in the colonial, founding, or early republic periods.

From the earliest colonial days through the ratification of the Fourteenth Amendment, free Americans always had the right to possess firearms without a government license. The only regulations comparable to Maryland's were racist laws that applied to persons without recognized rights, namely African Americans and American Indians. These laws required licenses from either local government officials or slave masters.

---

[2] The Court did not necessarily agree with the government's reading of the colonial laws or the early state laws, but the Court stated that "even if" the government's reading were correct, the record would not justify the challenged regulation. *Bruen*, 142 S. Ct. at 2144.

## A. Colonial Laws.

*Bruen* valued colonial laws to the extent that they informed the original understanding of the Second Amendment. 142 S. Ct. at 2142–44. Some licensing laws existed in colonial America, but they were all overtly racist.

The first American law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro, mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." 4 William Waller Hening, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 131 (1823). An exception was provided, however, for "negroes, mullattos, or indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.*

In 1740 South Carolina, slaves could only "make use of fire arms" outside "the presence of some white person" if they acquired a "ticket or license, in writing, from his master, mistress, or overseer." 7 THE STATUTES AT LARGE OF SOUTH CAROLINA 404 (David J. McCord ed., 1840). Georgia copied the South Carolina law in 1755 and re-enacted it in 1768.

7

THE COLONIAL RECORDS OF THE STATE OF GEORGIA 76–78, 117–18 (Allen D. Candler ed., 1904).

### B. Founding Era.

"Not all history is created equal"—because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" founding era history is paramount. *Bruen*, 142 S. Ct. at 2136 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008)) (emphasis in *Bruen*).

Founding era licensing laws, like those from the colonial era, were discriminatory and never applied to free citizens. They applied only to slaves, freedmen, and Indians, who were considered not to be among "the people" who were secured the right "to keep and bear Arms" through the Bill of Rights. U.S. CONST. amend. II. Thus, St. George Tucker listed "to keep or carry a gun" among the "many actions" that African Americans had less freedom to engage in than whites. St. George Tucker, DISSERTATION ON SLAVERY: WITH A PROPOSAL FOR THE GRADUAL ABOLITION OF IT, IN THE STATE OF VIRGINIA 63 (1796) (1861 reprint).

A 1792 Virginia law provided that "[n]o negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon

whatsoever, offensive or defensive," with the exception that "every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves." 1 A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC & PERMANENT NATURE, AS ARE NOW IN FORCE 263 (2d ed. 1814).

Kentucky enacted a similar law in 1798, providing that "[n]o negro, mulatto, or Indian, whatsoever, shall keep or carry any gun," except that "every free negro, mulatto or Indian, being a house-keeper, may be permitted to keep one gun," and "all negroes, mulattoes and Indians, bond or free, living at any frontier plantation, may be permitted to keep and use guns . . . by license from a justice of the peace." 2 A DIGEST OF THE STATUTE LAW OF KENTUCKY 1150 (William Littell & Jacob Swigert eds., 1822).

9

An 1805 Mississippi law provided that "any justice of the peace may grant, in his proper county, permission in writing, to any slave, on application of his master, or overseer to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year." A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE LAWS OF A PUBLIC AND GENERAL NATURE, IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY 1833, at 391 (John G. Aikin ed., 2d. ed. 1836). Alabama passed a similar law the following year, under which "any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to . . . use a gun." A DIGEST OF THE LAWS OF THE STATE OF ALABAMA: CONTAINING ALL THE STATUTES OF A PUBLIC AND GENERAL NATURE IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY, IN JANUARY, 1833, at 392 (John G. Aikin ed., 1823). One year after that, in 1806, Virginia required every "free negro or mulatto" to first "obtain[] a license from the court of the county or corporation in which he resides" before keeping "any fire-lock of any kind, any military weapon, or any powder or lead." 3 Samuel

Shepherd, THE STATUTES AT LARGE OF VIRGINIA, FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806, at 274 (1836).

**C. The 19th Century.**

*Bruen* reiterated that "evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represented a 'critical tool of constitutional interpretation.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). But the Court cautioned "against giving postenactment history more weight than it can rightly bear," *id.*, and emphasized that "to the extent later history contradicts what the text says, the text controls," *id.* at 2137.

Continuing the founding era tradition of discriminatory licensing schemes, Missouri passed a law in 1818 that was similar to Virginia's 1792 law. It forbade any "slave or mulatto" to "keep or carry a gun, powder, shot, club or other weapon," with the exception of "housekeeper[s]" as well as "negroes or mulattoes bond or free, living at any frontier plantation" who obtained a "license from a justice of the peace." Henry S. Geyer, A DIGEST OF THE LAWS OF MISSOURI TERRITORY 374 (1818).

Soon after, as *Heller* noted, "[a] Virginia case in 1824 [held] that the Constitution did not extend to free blacks," 554 U.S. at 611. The Virginia court explained:

> Notwithstanding the general terms used in the Bill of Rights, it is undeniable that it never was contemplated, or considered, to extend to the whole population of the State. Can it be doubted, that it not only was not intended to apply to our slave population, but that the free blacks and mulattoes were also not comprehended in it? . . . The numerous restrictions imposed on this class of people in our Statute Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States, as respects the free whites, demonstrate, that, here, those instruments have not been considered to extend equally to both classes of our population. We will only instance the restriction upon the migration of free blacks into this State, and upon their right to bear arms.

*Aldridge v. Commonwealth*, 4 Va. 447, 449 (1824).

Delaware established the most elaborate licensing law to date in 1832. A "free negro or free mulatto" could "have use and keep in his posession a gun or fowling piece" if "one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun." 8 LAWS OF THE STATE OF DELAWARE

208 (1841). Nearly a decade later, Delaware began charging "twenty-five cents" for "licenses to negroes to keep a gun." 9 LAWS OF THE STATE OF DELAWARE 430 (1843). But in 1843, Delaware repealed the licensing law altogether. *Id.* at 552.

An 1838 Arkansas statute provided that "[n]o free negro shall be suffered to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose, from some justice of the peace of the county in which such free negro or mulatto resides." Josiah Gould, A DIGEST OF THE STATUTES OF ARKANSAS; EMBRACING ALL LAWS OF A GENERAL AND PERMANENT CHARACTER IN FORCE AT THE CLOSE OF THE SESSION OF THE GENERAL ASSEMBLY OF 1856, at 557 (1858).

A few years later, in 1841, North Carolina required "any free negro, mulatto, or free person of color" to "obtain[] a license . . . from the Court of Pleas and Quarter Sessions of his or her county" in order to "keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife." James Iredell, A DIGESTED MANUAL OF THE ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA, FROM THE YEAR 1838 TO THE YEAR 1846, INCLUSIVE 73 (1847). In 1844, the Supreme Court of North

13

Carolina upheld a licensing requirement for free African Americans to carry arms because "the white men of the country are exempt" from the licensing law and "free people of color" are treated "as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation." *State v. Newsom*, 27 N.C. 250, 252 (1844). Thus, the court concluded, "free people of color cannot be considered as citizens" and therefore do not have constitutional rights. *Id.* at 254.[3]

An 1845 Missouri law stated that "[n]o free negro or mulatto shall be suffered to keep or carry any firelock, or weapon of any kind, or any ammunition, without license first had and obtained for the purpose, from a justice of the peace." 2 The Revised Statutes of the State of Missouri, Revised and Digested by the Eighteenth General Assembly, During the Session of One Thousand Eight Hundred and Fifty-Four and One Thousand Eight Hundred and Fifty-Five 1094 (Charles H. Hardin ed., 1856).

---

[3] One year prior, a Maryland court noted that free African Americans were "treated as a vicious or dangerous population" in Maryland and thus "laws have been passed to prevent their migration to this State," including restrictions that "make it unlawful for them to bear arms." *Waters v. State*, 1 Gill 302, 309 (Md. 1843).

After the Civil War, southern states continued to use licensing laws to discriminate against African Americans. For example, under South Carolina's 1865 law, no African American could, "without permission in writing from the District Judge or Magistrate, be allowed to keep a fire arm." ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF SOUTH CAROLINA PASSED AT THE SESSIONS OF 1864–65, at 275 (1866). Florida's 1865 law provided that "it shall not be lawful for any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any . . . fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate" based on "the recommendation of two respectable citizens of the county certifying the peaceful and orderly character of the applicant." THE ACTS AND RESOLUTIONS ADOPTED BY THE GENERAL ASSEMBLY OF FLORIDA AT ITS FOURTEENTH SESSION 25 (1866). And Mississippi's 1865 law stated that "no freedman, free negro or mulatto . . . shall keep or carry fire-arms," unless "licensed so to do by the board of police." LAWS OF THE STATE OF MISSISSIPPI, PASSED AT A REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, OCTOBER, NOVEMBER AND DECEMBER, 1865, at 165 (1866).

15

In *McDonald v. City of Chicago*, the Supreme Court pointed to the licensing laws from Florida and Mississippi as examples of the "systematic efforts" of "the States of the old Confederacy" to "disarm . . . blacks." 561 U.S. 742, 771 (2010); *see also Bruen*, 142 S. Ct. at 2151 ("After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted.").

Indeed, the Mississippi law was highlighted in General Ulysses S. Grant's 1866 report arguing for a continued federal military presence in the South, which was presented to the United States Congress. Grant's report included a report by Brevet Major General Thomas Wood, who complained that "[t]he [Mississippi] statute prohibiting the colored people from bearing arms, without a special license, is unjust, oppressive, and unconstitutional." MESSAGE OF THE PRESIDENT OF THE UNITED STATES, AND ACCOMPANYING DOCUMENTS, TO THE TWO HOUSES OF CONGRESS, AT THE COMMENCEMENT OF THE THIRTY-NINTH CONGRESS 56 (1866).

Soon, the federal government acted against such laws. Congress passed the Freedmen's Bureau Act of 1866, which secured to all persons the "full and equal benefit of all laws and proceedings for the security of

16

person and estate including the constitutional right of bearing arms." 14 Stat. 173, 176–77 (1866). "The Civil Rights Act of 1866, 14 Stat. 27, which was considered at the same time as the Freedmen's Bureau Act, similarly sought to protect the right of all citizens to keep and bear arms." *McDonald*, 561 U.S. at 774. The Civil Rights Act of 1871, and most importantly, the Fourteenth Amendment, served the same purpose. *Id.* at 776–78.

### D. Post-Civil War.

*Bruen* deemed late-19th-century evidence relevant only to the extent that it provided "confirmation of what . . . had already been established" by earlier history. 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)). The Court was clear that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154. In fact, the Court did not even bother to "address any of the 20th-century historical evidence." *Id.* at 2154 n.28.

After the federal government cracked down on explicitly racist licensing laws, Florida enacted a facially neutral—but discriminatorily applied—licensing law in 1893. The year after Ida B. Wells wrote that a

17

"Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give," Ida B. Wells, SOUTHERN HORRORS: LYNCH LAW IN ALL ITS PHASES 16 (1892), Florida made it "unlawful to carry or own a Winchester or other repeating rifle . . . without first taking out a license from the County Commissioners." 1893 Fla. Laws 71. As Florida Supreme Court Justice Rivers H. Buford later explained, the licensing law "was passed . . . for the purpose of disarming the negro laborers" in the state and "was never intended to be applied to the white population." *Watson v. Stone*, 148 Fla. 516, 524 (1941) (Buford, J., concurring). Justice Buford noted that "there had never been any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested." *Id.*

### E. The racist historical licensing laws do not establish a tradition of firearm regulation.

*Bruen* makes clear that the history of racist licensing laws presented above does not establish a tradition of firearm regulation that can justify Maryland's licensing law.

First, there were dozens of discriminatory laws throughout the colonial, founding, and early republic periods requiring African

Americans to acquire licenses to carry arms in public, yet *Bruen* did not even consider such laws in its historical analysis of the right to bear arms.[4] This Court should similarly disregard such laws in its historical analysis of the right to keep arms.

Second, *Bruen* noted "two metrics" to help identify whether a tradition of firearm regulation exists: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. Because "individual self-defense is 'the *central component*' of the Second Amendment right . . . whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)) (quotation marks omitted) (emphasis in *Bruen*).

---

[4] *See, e.g.*, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 340–41 (Aaron Leaming & Jacob Spicer eds., 1881) (2002 Reprint) (1694 New Jersey); 1715 Md. Laws 117; 1740 S.C. Acts 168; A CODIFICATION OF THE STATUTE LAW OF GEORGIA 812 (William A. Hotchkiss ed., 1848) (1768 Georgia); 1797 Del. Laws 104; 1799 Laws of the Miss. Terr. 113.

To apply for a Handgun Qualification License, as Plaintiffs explain, "a Maryland citizen must submit: (1) an online application; (2) proof of completion of a qualifying firearms safety course with a live-fire requirement; (3) a complete set of fingerprints; and (4) a statement made by the applicant under the penalty of perjury that the applicant is not prohibited under federal or State law from possessing a handgun." Appellants' Br. at 8–9. "Once the prospective purchaser obtains an HQL [Handgun Qualification License], he may begin the process required by the pre-existing firearms laws for an actual purchase, including undergoing another background check." *Id.* at 9. Thus, the licensing requirement effectively serves as a handgun prohibition until considerable time, money, and resources are spent by the person desiring to exercise his fundamental right to keep arms. And because Marylanders must undergo an additional background check before acquiring a handgun, the licensing scheme involves unnecessarily "lengthy wait times" and "exorbitant fees," making it unduly burdensome. *Bruen*, 142 S. Ct. at 2138 n.9.

No comparable historical burden on Americans with Second Amendment rights ever existed. Every historical licensing law applied to

groups who were deprived of Second Amendment protections. *See Aldridge*, 4 Va. at 449 ("the Bill of Rights . . . was not intended to apply to our slave population," and "free blacks and mulattoes were also not comprehended in it"); *Newsom*, 27 N.C. at 254 ("free people of color cannot be considered as citizens"). The only exception, Florida's 1893 law, was enacted too late to "contradict[] earlier evidence," *Bruen*, 142 S. Ct. at 2154, and "was passed . . . for the purpose of disarming the negro laborers," *Watson*, 148 Fla. at 524 (Buford, J., concurring), as part of "systematic efforts" to "disarm . . . blacks," *McDonald*, 561 U.S. at 771; *see also Bruen*, 142 S. Ct. at 2151.

Because no historical burden comparable to Maryland's licensing law ever existed, no comparable justification exists, and *Bruen*'s two metrics—"how and why the regulations burden a law-abiding citizen's right to armed self-defense," 142 S. Ct. at 2133—demonstrate the unconstitutionality of Maryland's licensing law.

Third, *Bruen* explained that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with

the Second Amendment." *Bruen*, 142 S. Ct. at 2131. Firearm crime and accidents were certainly well-known problems in 18th- and 19th-century America. *See* Clayton E. Cramer, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE 111–18 (2018) (discussing crime); Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 19 (2008) (discussing accidents). The fact that many states applied licensing laws to disfavored noncitizens but never to free Americans indicates a recognition that such laws would violate the Constitution.

Fourth, *Bruen* stated that if similar proposals to the challenged law "were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." 142 S. Ct. at 2131. While no historical source suggests that requiring a license to keep arms would be constitutional, several suggest that it would not. *Newsom* and *Aldridge* were decided on the basis that African Americans were not protected by the Second Amendment, General Grant's report called Mississippi's licensing law "unjust, oppressive, and unconstitutional," MESSAGE OF THE PRESIDENT OF THE UNITED STATES, at 56, and Justice Buford stated that Florida's licensing law "has been generally conceded

to be in contravention of the Constitution and non-enforceable if contested," *Watson*, 148 Fla. at 524 (Buford, J., concurring).

Finally, it is important to note that like earlier laws, Maryland's licensing law has racial implications. As Plaintiffs explain, "Maryland's Handgun Qualification License process is lengthy (averaging a month), expensive (totaling hundreds of dollars in fees, costs and travel, not counting time off of work), invasive (including fingerprints and a full background investigation), and completely unnecessary." Amended Complaint, D.Ct. Dkt. 13, at 2. Although the current Maryland statute, unlike its predecessors, is not facially discriminatory, lower-income people often cannot afford a licensing process costing hundreds of dollars and requiring time off work. Systems imposing severe barriers on poor people have disparate racial impact. This disparate impact is especially unjustifiable here, because federal law already requires a thorough background check. A licensing law that forbids in-home self-defense with a handgun for over a month—or perhaps permanently in the case of a poor person—is one of the particular evils that the Fourteenth Amendment was enacted to remedy.

23

## III.   Historically, Americans never had to train to possess arms.

To satisfy the training requirement, an applicant for a Handgun Qualification License must complete "a firearms safety training course approved by the Secretary that includes: (i) a minimum of 4 hours of instruction by a qualified handgun instructor; (ii) classroom instruction on: 1. State firearm law; 2. home firearm safety; and 3. handgun mechanisms and operation; and (iii) a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." Md. Code Ann., Pub. Safety § 5-117.1(d)(3). In addition to the explicit statutory requirements, the Maryland State Police has imposed additional requirements, interpreting § 5-117.1 as mandating, among other things, a practice component in which the applicant fires live ammunition. COMAR 29.03.01.29.

To be sure, Plaintiffs do not challenge Maryland's authority to require militia training—which is directly addressed by U.S. CONST. art. I, § 8, cl. 16 ("reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress"); *see also* Md. CONST. art. IX, § 1 ("The General Assembly shall make, from time to time, such provisions for

24

organizing, equipping and disciplining the Militia, as the exigency may require, and pass such Laws to promote Volunteer Militia organizations as may afford them effectual encouragement."). Rather, Plaintiffs challenge Maryland's authority to require extensive training to exercise their constitutional right to keep arms in their homes.

No law prior to the Fourteenth Amendment's ratification—including the colonial, founding, and early republic periods—preconditioned firearm ownership on training. Not the many historical laws that required people to possess arms, nor the discriminatory licensing laws that applied to slaves, freedmen, and Indians, discussed in Part II, *supra*. In fact, some statutes expressly exempted firearm owners from militia training.

Throughout the colonial and founding eras, statutes in every state mandated gun ownership for ordinary Americans. Cumulatively, there were hundreds of legislative revisions of militia statutes. The many statutes created or retained a requirement that militiamen—typically, all able-bodied men of suitable age—keep firearms, ammunition, and edged weapons at home. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–

89 (2019) (covering the militia laws of the 13 original States and their colonial predecessors, plus Vermont, New Haven Colony, and Plymouth Colony).

At the time of the Second Amendment's ratification, every state required ordinary citizens to own firearms. *Id.* at 537–38 (New Jersey), 542–43 (Maryland), 547–48 (North Carolina), 550 (South Carolina), 554–55 (New Hampshire), 557–58 (Delaware), 562–63 (Pennsylvania), 567 (New York), 569 (Rhode Island), 573 (Vermont), 583 (Virginia), 585 (Massachusetts), 587 (Georgia), 589 (Connecticut). These 1791 state arms mandates were continuations of mandates that had existed in the colonies since their early days—the exception being Pennsylvania, which had no arms mandate until 1777.

Many statutes also mandated firearm ownership by women and non-militiamen. These often applied to everyone old enough to conduct particular activities, such as keeping house.

A 1638/9 Maryland act provided "that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one

26

Serviceable fixed gunne." PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8—SEPTEMBER 1664, at 77 (William Hand Browne ed, 1883).[5] If a household lacked the mandated arms, the government provided them. *Id.* Yet only households with three or more men had to send anyone for militia service. *Id.* at 78. A female "house keeper" had to keep a gun in "her" house, but she did not participate in militia training or service. The same requirements were included in a 1658 law. 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636–1667, at 345 (1965 Reprint).

Virginia required arms to travel, attend church, work in the fields, and attend court. 1 Hening, THE STATUTES AT LARGE, at 127 (1623 law requiring arms to travel); *id.* (1624, requiring arms to work in the field); *id.* (1624, requiring farmers to possess arms); *id.* at 173 (1632, travel); *id.* (1632, working in the field); *id.* (1632, men to carry arms to church); *id.* at 263 (1643, "masters of every family" to carry arms to church); 2 *id.* at

---

[5] The dual years for some colonial statutes (e.g., 1638/9) are used to account for the change from the Old Style calendar to the New Style. Under the New Style, the new year begins on January 1. Under Old Style, the new year began on March 25. So what we today would call "February 1639" was considered by Marylanders of the time to be "February 1638." The English and their colonies adopted the New Style in 1752.

27

333 (1676, attending church or court). More broadly, a 1639 law mandated that "ALL persons except negroes to be provided with arms and ammunition or be fined." 1 *id.* at 226. Laws in 1659 and 1662 required all men capable of bearing arms to own a firearm. *Id.* at 525; 2 *id.* at 126. And a 1762 law required persons exempt from militia training to keep at home the same arms as militiamen. 4 *id.* at 534, 537. To the extent that women of any age farmed, traveled, or engaged in other listed activities, the arms mandates applied to them.

A 1632 Plymouth law required that "every freeman or other inhabitant of this colony provide for himselfe and each under him able to beare armes a sufficient musket and other serviceable peece." THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 31 (William Brigham ed., 1836). At the time, the colony had no militia law.

To promote immigration, North Carolina issued land grants starting in 1664—but only to settlers who were "armed with a good firelock or matchlock."[6] 1 AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 210–11 (Jon Wakelyn

---

[6] The "matchlock" and "firelock" were the most common types of firearms in that era. The firelock was more advanced and is what we today call a "flintlock."

28

ed., 2006) (Concessions and Agreements, Jan. 11, 1664). Additional land was provided for each person over 14 who kept the same arms. *Id.* In 1701, Virginia required recipients of land grants to keep someone who possessed arms on the land. 3 Hening, THE STATUTES AT LARGE, at 205.

New York in 1684 mandated that "all persons though freed from [militia] Training by the Law . . . be obliged to Keep Convenient armes and ammunition in Their houses as the Law directs to others." 1 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 161 (1896). Like other colonies, New York exempted certain persons from militia training based on occupational status (e.g., clergy, physicians), but exempted persons still had to keep arms. *Id.* at 49.

Starting in 1718, New Hampshire obliged every head of household to own firearms. 2 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, 1702–1745, at 285 (1913). In 1776, New Hampshire required all males between 16 and 50 not in the militia to own firearms. 4 LAWS OF NEW HAMPSHIRE: REVOLUTIONARY PERIOD, 1776–1784, at 46 (1916). Then in 1780, New Hampshire ordered males under 70 who were exempt from militia training to keep militia arms at home, so that they could defend the community if attacked. *Id.* at 276.

29

Delaware required "every Freeholder and taxable Person" starting in 1741 to "provide himself with . . . One well fixed Musket or Firelock," and "to keep such Arms and Ammunition by him, during the Continuance of this Act." George H. Ryden, DELAWARE–THE FIRST STATE IN THE UNION 117 (1938). So, all female freeholders or taxable persons, as well as males over fifty, had to possess arms, but they did not participate in militia training.

Beginning in 1779, "every listed soldier and other householder" in Vermont had to "always be provided with, and have in constant readiness, a well fixed firelock . . . or other good fire-arms." VERMONT STATE PAPERS: BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT 307 (William Slade ed., 1823) (emphasis added). Although being a "householder" and not a "soldier" implied no duty of militia training, arms ownership was still mandatory.

Under a 1780 New Hampshire law, males exempt from "Common and ordinary Trainings" for the militia were nevertheless required to "be in all respects Equipped with [the] Arms & Accoutrements" of militiamen. 4 LAWS OF NEW HAMPSHIRE: REVOLUTIONARY PERIOD, at 276. When New

Hampshire ratified the Second Amendment on January 25, 1790, the alarm list—which did not have to train—consisted of "all Male persons from forty to sixty . . . exempted . . . from common and ordinary Training." Again, the alarm list had to keep the same arms as the militia. 5 LAWS OF NEW HAMPSHIRE: FIRST CONSTITUTIONAL PERIOD, 1784–1792, at 178–179 (1916).

In sum, no historical law ever required training before acquiring a firearm. Many colonial and founding era laws required firearm ownership without requiring training. And some persons who were required to be armed were specifically exempted from training. Thus, there is no historical precedent for Maryland's training requirement.

Additional considerations from *Bruen* further demonstrate the lack of a historical tradition of relevant regulations. First, *Bruen*'s metrics of "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense" weigh against the training requirement. 142 S. Ct. at 2133. Like the licensing requirement, the extensive training requirement effectively serves as a handgun prohibition until considerable time, money, and resources are spent by the person desiring to exercise his fundamental right to keep arms. No historical regulation

imposed a "comparable burden." Training was never a prerequisite to possessing a common arm, nor did any analogous prerequisites exist. Therefore, no comparable historical justification existed either.

Moreover, as explained *supra*, firearm accidents were a known problem in the 18th and 19th centuries, but no "distinctly similar historical regulation addressing that problem" was ever enacted—which "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

## CONCLUSION

Maryland's licensing and training requirements burden conduct that the Second Amendment's plain text covers and are inconsistent with America's historical tradition of firearm regulation. The restrictions should therefore be declared unconstitutional, and the district court's judgment should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,253 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*

34

## CERTIFICATE OF SERVICE

I certify that on August 10, 2022, I served the foregoing brief with the

Clerk of the Court using the CM/ECF System, which will send notice of

such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
*Counsel of Record*