No. 21-2017

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**MARYLAND SHALL ISSUE, INC.**, *et al.*,

*Plaintiffs-Appellants*,

**v.**

**LAWRENCE HOGAN**, *et al.*,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(Ellen L. Hollander, District Judge)

_____

**BRIEF OF APPELLEES**

_____

BRIAN E. FROSH
Attorney General of Maryland

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

October 17, 2022　　　　　　　Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2017__    Caption: __Maryland Shall Issue, Inc. v. Lawrence Hogan, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Lawrence J. Hogan,Jr., Woodrow Jones, III, in their official capacities__
(name of party/amicus)

_____

 who is _____Appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Robert A. Scott_____    Date: ___October 17, 2022___

Counsel for: Appellees_____

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

ISSUE PRESENTED FOR REVIEW ....................................................2

STATEMENT OF THE CASE ...............................................................2

    Maryland Firearm Safety Act of 2013..............................................2

        Legislative History ............................................................2

        The Handgun-Qualification-License Process .......................4

        The Public Safety Benefits of the FSA ................................8

    Procedural Background ...................................................................11

SUMMARY OF ARGUMENT...............................................................14

ARGUMENT ........................................................................................16

I.    THE STANDARD OF REVIEW IS DE NOVO. .................................16

II.   RESTRICTING POSSESSION OF FIREARMS BY DANGEROUS INDIVIDUALS AND GROUPS IS CONSISTENT WITH THE HISTORICAL TRADITION OF THE SECOND AMENDMENT. ....................................................16

III.  THE SUPREME COURT HAS ENDORSED THE CONSTITUTIONALITY OF NON-DISCRETIONARY FIREARM-LICENSING REGIMES THAT "ARE DESIGNED TO ENSURE ONLY THAT THOSE BEARING ARMS IN THE JURISDICTION ARE, IN FACT, 'LAW-ABIDING, RESPONSIBLE CITIZENS.'".......23

IV.  MARYLAND'S HANDGUN-QUALIFICATION-LICENSE REQUIREMENT SURVIVES AN INDEPENDENT ANALYSIS UNDER APPLICABLE CONSTITUTIONAL PRINCIPLES. ....................................................27

    A.   Predicating the Exercise of a Constitutionally Protected Right on Compliance with a Reasonable, Non-Discriminatory Licensing Regime Is Consistent with Broader Constitutional Principles............27

B. Maryland's Handgun-Qualification-License Law Survives Constitutional Scrutiny Because It Does Not Impose Unnecessary or Arbitrary Burdens and Is Guided by Objective, Non-Discretionary Criteria ..................................................................31

 1. The Handgun-Qualification-License Requirement Enforces Limitations Consistent with the Underlying Substantive Right. ....................................................................31

  a. The Background-Check Requirement of Maryland's Handgun-Qualification-License Law Embodies Restrictions on Firearm Possession Set Forth in Federal and Maryland Law That Are Rooted in the Historical Limitations on the Second Amendment Right.............................................................32

  b. The Firearm-Safety-Course Requirement of the Handgun-Qualification-License Law Is Consistent with the Second Amendment's Historical Tradition of a Responsible Citizenry Trained in the Use of Firearms. ..........................................................................34

 2. The Handgun-Qualification-License Law Employs Objective Criteria. ....................................................................37

 3. The Minimal Administrative Burdens Imposed by the Handgun-Qualification-License Law Are Neither Unnecessary nor Arbitrary. ....................................................38

  a. The Burden Imposed by the Handgun-Qualification-License Law Is De Minimis. ....................38

  b. The Fingerprinting and Firearm-Safety-Course Requirements Further the State's Interest in Limiting Handgun Access to Law-Abiding, Responsible Citizens.........................................................42

CONCLUSION ........................................................................................48

REQUEST FOR ORAL ARGUMENT ....................................................48

CERTIFICATE OF COMPLIANCE .......................................................49

## TABLE OF AUTHORITIES

Page

### Federal Cases

*Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244 (4th Cir. 2022) .....16

*Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843
   (7th Cir. 2016).................................................................................................28

*Center for Auto Safety Inc. v. Athey*, 37 F.3d 139 (4th Cir. 1994) ........................41

*County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573
   (1989).............................................................................................................24

*Cox v. New Hampshire*, 312 U.S. 569 (1941)................................................ 27, 41

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Doe I v. Governor of Pa.*, 977 F.3d 270 (3d Cir. 2020) .........................................22

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .........................................37

*Folajtar v. Attorney Gen. of the U.S.*, 980 F.3d 897 (3d Cir. 2020)........... 20, 21, 33

*Green v. City of Raleigh*, 523 F.3d 293 (4th Cir. 2008) ........................................38

*Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017) ........................................ 20, 32

*Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021) ........................................ 21, 33

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............................13

*Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010)......................29

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)...................... passim

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012)......................................28

*Hirschfield v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
   5 F.4th 407 (4th Cir. 2021) ............................................................................33

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)................................................ 17, 21

*Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010) ......................................28

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ................................41

*Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 (2d Cir. 2020)...... 17, 28

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020) .......... 12, 38, 39

*McCravy v. Metropolitan Life Ins. Co*., 690 F.3d 176 (4th Cir. 2012)...................25

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) ............................................. passim

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ...............................20

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................36

*National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ...............................................................20

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) .......... passim

*New York State Rifle & Pistol Ass'n v. City of N.Y.*, 140 S. Ct. 1525
    (2020).................................................................................... 14, 22, 36

*Powell v. Tompkins*, 926 F. Supp. 2d 367 (D. Mass. 2013) ....................................28

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ..........................................40

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ....................................30

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................................39

*Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016)...............22

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011)............................................20

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) .......................... 19, 21

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ...................................... 17, 22

*United States v. Carter*, 750 F.3d 462 (4th Cir. 2014) ...........................................33

*United States v. Daniels*, ___ F. Supp. 3d ___, 2022 WL 2654232
    (S.D. Miss. July 8, 2022) .....................................................................20

*United States v. Davis*, 690 F.3d 226 (4th Cir. 2012)..............................24

*United States v. Fareed*, 296 F.3d 243 (4th Cir. 2002) ..........................25

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016)..........................30

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) .................... 21, 32

*United States v. Smoot*, 690 F.3d 215 (4th Cir. 2012)..............................32

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010).......................20

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ...........................20

*Virginia Uranium, Inc. v. Warren*, 848 F.3d 590 (4th Cir. 2017) ................... 24, 25

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ..............................36

## Constitutional Provisions

U.S. Const. amend. II........................................................................ passim

## Statutes

1778 N.J. Sess. Laws ...................................................................34

1782 Del. Sess. Laws ...................................................................34

1786 N.Y. Sess. Laws ...................................................................34

1792 Conn. Sess. Laws .................................................................34

1792 N.H. Sess. Laws ...................................................................34

1793 Mass. Acts.............................................................................35

1794 R.I. Sess. Laws......................................................................35

18 U.S.C. § 922(g) .........................................................................32

18 U.S.C. § 922(g)(3).....................................................................32

18 U.S.C. § 922(g)(6).....................................................................32

18 U.S.C. § 922(g)(1).....................................................................32

2013 Md. Laws ch. 427.................................................................................2

Md. Code Ann., Pub. Safety § 5-101(q) (LexisNexis 2018) ....................................4

Md. Code Ann., Pub. Safety § 5-117 (LexisNexis 2018)....................................2, 6

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(i) (LexisNexis 2018).......................4

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(ii) (LexisNexis 2018) ......................5

Md. Code Ann., Pub. Safety § 5-117.1(d)(3)(iii) (LexisNexis 2018) ......................5

Md. Code Ann., Pub. Safety § 5-117.1(e) (LexisNexis 2018) ...........................5, 39

Md. Code Ann., Pub. Safety § 5-117.1(f)(2) (LexisNexis 2018) .............................6

Md. Code Ann., Pub. Safety § 5-117.1(f)(3)(i) (LexisNexis 2018) .........................6

Md. Code Ann., Pub. Safety § 5-117.1(f)(7) (LexisNexis 2018) .............................6

Md. Code Ann., Pub. Safety § 5-117.1(g)(2) (LexisNexis 2018) ..........................41

Md. Code Ann., Pub. Safety § 5-117.1(h) (LexisNexis 2018) .................................7

Md. Code Ann., Pub. Safety § 5-117.1(h)(1) (LexisNexis 2018) ..........................41

Md. Code Ann., Pub. Safety § 5-117.1(i) (LexisNexis 2018) ..................................7

Md. Code Ann., Pub. Safety § 5-117.1(j) (LexisNexis 2018) ..................................7

Md. Code Ann., Pub. Safety § 5-117.1(l)(1) (LexisNexis 2018) .............................7

Md. Code Ann., Pub. Safety § 5-117.1(l)(3) (LexisNexis 2018) .............................7

Md. Code Ann., Pub. Safety § 5-118(a) (LexisNexis 2018) ...................................7

Md. Code Ann., Pub. Safety § 5-118(b) (LexisNexis 2018) ..............................7, 42

Md. Code Ann., Pub. Safety § 5-121(LexisNexis 2018)..........................................7

Md. Code Ann., Pub. Safety § 5-123 (LexisNexis 2018).........................................7

Md. Code Ann., Pub. Safety § 5-133(b) (LexisNexis 2018) .................................32

Md. Code Ann., Pub. Safety § 5-133(b)(1) (LexisNexis 2018) .............................32

## Rules

Fed. R. Civ. P. 56(a) ................................................................... 16

## Regulations

COMAR 12.04.02.03–.05 ............................................................ 46

COMAR 12.04.02.03.10(D) ....................................................... 46

COMAR 29.03.01.26 – .41 ........................................................... 5

COMAR 29.03.01.28(C) ............................................................... 6

COMAR 29.03.01.29 ..................................................................... 5

COMAR 29.03.01.34 ..................................................................... 7

## Miscellaneous

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) ...... 25

Colonial Records of Ga., Vol. 19, Pt. 2 (1784) ........................................ 34

Joyce Malcolm, *To Keep and Bear Arms* (1994) .................................... 34

Michael Wald, *The Second Amendment* (2014) ...................................... 35

No. 21-2017

———————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

**MARYLAND SHALL ISSUE, INC.,** *et al.*,

*Plaintiffs-Appellants*,

v.

**LAWRENCE HOGAN,** *et al.*,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the District of Maryland
(Ellen L. Hollander, District Judge)

———————————

## BRIEF OF APPELLEES

———————————

## INTRODUCTION

Plaintiffs challenge specific aspects of Maryland's handgun-qualification-license law, which requires handgun-permit applicants to pass a background check and take a firearm-safety-training course, thereby ensuring that those who acquire handguns are "law-abiding, responsible citizens." *See District of Columbia v. Heller*, 554 U.S. 570, 626-27, 635 (2008) ("*Heller I*"). The district court correctly found that Maryland's law furthers that permissible goal through objective, clearly

defined criteria and minimal administrative requirements that do not prevent ordinary law-abiding, responsible citizens from obtaining handgun licenses. (J.A. 1843-45, 1869.)  Accordingly, the district court should be affirmed.

## ISSUE PRESENTED FOR REVIEW

Is Maryland's handgun-qualification-license law consistent with the historical tradition of the Second Amendment where the law (1) is designed to ensure that only law-abiding, responsible individuals may obtain a handgun, and (2) does so through non-discretionary criteria and with minimal administrative burdens?

## STATEMENT OF THE CASE

### Maryland Firearm Safety Act of 2013

#### Legislative History

The Firearm Safety Act of 2013 ("FSA") was enacted to enhance public safety regarding the lawful transfer and handling of firearms.  2013 Md. Laws ch. 427.  As relevant here, the FSA requires that most Marylanders obtain a handgun-qualification license ("HQL") before purchasing a handgun.  Md. Code Ann., Pub. Safety § 5-117 (LexisNexis 2018).  Covered persons may not "sell, rent, or transfer a handgun," or "purchase, rent, or receive a handgun" unless the receiving person presents a valid HQL.  *Id.* § 5-117.1(b), (c).

Before enacting the FSA, the General Assembly heard testimony from public-policy and law-enforcement experts advocating for the HQL prerequisite and, in

particular, its fingerprinting and safety-training requirements. The Director of the Johns Hopkins Center for Gun Policy and Research, Daniel W. Webster, ScD, testified that, under the State's prior regulatory regime, which did not require a fingerprint background check, Maryland's "system [was] especially vulnerable to illegal straw purchases . . . and individuals using false identification in their applications to purchase regulated firearms." (J.A. 84.) Professor Webster relayed the findings of a study conducted by the United States General Accounting Office ("GAO") that concluded that background checks based only on photographic identification were inadequate to "ensure that the prospective purchaser [of firearms] is not a felon." (J.A. 84; J.A. 90-111.) Peer-reviewed research showed the positive effects on public safety of state laws with requirements similar to Maryland's HQL law. (J.A. 84-87.)

Then-Baltimore County Police Chief James W. Johnson testified that the HQL requirement "will reduce the number of non-intentional shootings by ensuring that gun owners know how to safely use and store firearms"; "will decrease illegal gun sales and purchases by ensuring that all licensees are eligible to possess firearms under Federal and State law"; and "will reduce murder rates" as such laws have done in other States. (J.A. 115.) He advocated for the fingerprinting requirement, which "will help law enforcement to identify people involved in gun crimes" but not be "an inconvenience" for law-abiding, responsible Marylanders. (J.A. 115.) And the four-

hour training course was an improvement over the "insufficient" prior requirement that handgun purchasers view a 30-minute video and would also deter straw purchasers.  (J.A. 116.)  Similarly, then-Baltimore City Police Commissioner, Anthony Batts, testified that the fingerprint requirement would allow a comprehensive background investigation, thus "ensuring that the applicant is not prohibited from possessing a handgun," and both the fingerprinting and training requirements would deter straw purchasers.  (J.A.119-20.)

### The Handgun-Qualification-License Process

The Secretary of the Maryland Department of State Police ("MSP") shall issue an HQL to an applicant who (1) is at least 21 years old; (2) is a Maryland resident; (3) has completed a firearm-safety course within three years of application; and (4) "is not prohibited by federal or State law from purchasing or possessing a handgun."

The required firearm-safety course must include at least four hours of instruction by a qualified handgun instructor ("QHI"),[1] *id.* § 5-117.1(d)(3)(i), on (1) "State firearm law," (2) "home firearm safety," and (3) "handgun mechanisms and

---

[1] A QHI is "a certified firearms instructor who: (1) is recognized by the Maryland Police and Correctional Training commissions; (2) has a qualified handgun instructor license issued by the Secretary; or (3) has a certification issued by a nationally recognized firearms organization."  Pub. Safety § 5-101(q).  *See* https://emdsp.mdsp.org/verification/ (providing searchable database of contact information for over 1,000 qualified handgun instructors in Maryland).

operation,"[2] *id.* § 5-117.1(d)(3)(ii).  The course must contain "a firearms orientation component that demonstrates the person's safe operation and handling of a firearm." *Id.* § 5-117.1(d)(3)(iii).  As part of this component, an applicant must "safely fire[] at least one round of live ammunition."  COMAR 29.03.01.29 (J.A. 228).  The firearm-safety-course requirement is waived for a person who, among other exemptions, already lawfully owns a handgun or has completed certain other training courses.  Pub. Safety § 5-117.1(e).

An applicant shall submit (1) "an application in the manner and format designated by the Secretary;" (2) an application fee "to cover the costs to administer

---

[2] Regulations promulgated under the FSA flesh out the "minimum curricula" relating to each statutory subject:

(1)    State Firearm Law.  Overview of the State firearm laws, including discussion of what constitutes a regulated firearm, how to properly purchase or transfer a firearm, where allowed to carry or transport a firearm, when necessary to possess a carry permit, and who is prohibited from possessing firearms.

(2)    Home Firearm Safety.  Overview of handgun and firearm safety in the home, including discussion of access to minors, locking and storing of firearms, and use of safety devices, such as secure lock boxes.

(3)    Handgun Mechanisms and Operation.  Overview of the proper operation and safe handling of a handgun, including cleaning and maintenance, the loading and unloading of ammunition, and the differences between revolvers and semi-automatic handguns.

COMAR 29.03.01.29; 29.03.01.26 – .41 (J.A. 226-33.)

the program of up to $50;"[3] (3) proof of completion of the safety course requirement; (4) any other information or documentation required by the Secretary; and (5) a statement under oath that the individual is not prohibited from possessing a handgun. *Id.* § 5-117.1(g).

The FSA requires the Secretary of MSP to apply to the Maryland Department of Public Safety and Correctional Services ("DPSCS") for a state and national criminal-history-records check for each HQL applicant. *Id.* § 5-117.1(f)(2). To facilitate that process, the HQL application must include "a complete set of the applicant's legible fingerprints taken in a format approved by" DPSCS and the FBI.[4] *Id.* § 5-117.1(f)(3)(i). In accordance with fingerprint rules promulgated by DPSCS in 2012, HQL applicants must submit their fingerprints to DPSCS via livescan technology.[5] (J.A. 127 ¶ 23; J.A. 202-03.)

---

[3] The HQL application fee is set at the statutory cap of $50, COMAR 29.03.01.28(C), which is less than the processing and production costs associated with each HQL application and does not account for other costs associated with administering the program. (J.A. 125-26 ¶¶ 15-18; J.A. 198, 200.)

[4] DPSCS must update MSP regarding the criminal history information of HQL applicants and licensees. *Id.* § 5-117.1(f)(7). This enables MSP to revoke the HQLs of persons who become ineligible to possess them and, where necessary, retrieve firearms from disqualified persons. (J.A. 127 ¶¶ 23-24; J.A. 205-14.)

[5] The fingerprint policy is available on MSP's website at http://mdsp.maryland.gov/Organization/Documents/NewFingerprintRules.2.pdf, and MSP provides a link to a DPSCS website listing commercial livescan fingerprinting services that are located throughout the State, at https://www.dpscs.state.md.us/publicservs/fingerprint.shtml.

Within 30 days of receiving a complete application, the Secretary shall either issue an HQL or provide a written denial accompanied by a statement of the reason for the denial and notice of appeal rights. *Id.* § 5-117.1(h). All properly completed applications received by MSP since the inception of the HQL requirement have been processed within this mandated timeframe. (J.A. 124-25 ¶ 12; J.A. 241 ¶ 15.)

An HQL is valid for ten years.[6] Pub. Safety § 5-117.1(i). A person who is denied an HQL, or whose HQL is revoked, may request a hearing from the Secretary within 30 days of the action and thereafter may seek judicial review. *Id.* § 5-117.1(l)(1), (3).

An HQL licensee who wishes to purchase a handgun must complete an application confirming that the applicant is not prohibited from acquiring a handgun and pay an application fee of $10. *Id.* § 5-118(a), (b). Unless an application is disapproved by the MSP within seven days (during which time the MSP conducts a review of the application and background check), the applicant may take possession of the handgun. *Id.* §§ 5-121 – 5-123.

From October 1, 2013, when the FSA went into effect, through the end of 2020, a total of 192,506 Marylanders obtained an HQL (J.A. 1610-11), and the number of handgun transfers boomed. During each of the years from 2017 to 2020,

---

[6] A person seeking to renew their HQL license need only pay a $20 renewal fee. Pub. Safety § 5-117.1(j); COMAR 29.03.01.34.

the yearly figure for handgun transfers exceeded every year prior to 2013. (*Compare* J.A. 1611 *with* J.A. 1613.) The number of handgun transfers in 2020 (104,400) *exceeded* the number of transfers in 2013 (90,090), when Maryland experienced vastly increased handgun sales in the run up to the effective date of the FSA.[7] (*Compare* J.A. 1611 *with* J.A. 1613.)

### The Public Safety Benefits of the FSA

The fingerprinting and firearm-safety-course components of the FSA have significant public safety benefits. The fingerprinting requirement makes it more difficult for an unqualified person to obtain a firearm using false or altered identification. (J.A. 84; J.A. 126 ¶ 20; J.A. 198; J.A. 252 ¶ 8; 491 ¶¶ 8-9.) Fingerprinting also enables MSP to obtain updated and reliable criminal history information about an HQL licensee from other law-enforcement agencies and court systems. (J.A. 127 ¶¶ 23-24.) This allows MSP to determine whether an HQL licensee has been convicted of a disqualifying offense after passing the initial background investigation. (J.A. 127 ¶¶ 23-24; J.A. 205-14.) This, in turn, permits MSP to revoke a disqualified person's HQL and, where necessary, retrieve unlawfully possessed firearms. (J.A. 127 ¶¶ 23-24; J.A. 205-14.)

---

[7] As the data show, the number of handgun transfers in 2013 was nearly double that of 2012 and nearly triple that of 2011. (J.A. 1613.)

The fingerprint requirement also acts as a deterrent to straw purchasers and those intending to purchase firearms solely for criminal purposes. (J.A. 254 ¶ 8; J.A. 491-92 ¶¶ 8-9, 11.)  Empirical studies of the effects of laws that require individuals to obtain a license to purchase a firearm and pass a background check based on fingerprints show that these laws are associated with a reduction in the flow of guns to criminals.  (J.A. 254-59 ¶¶ 8-9, 13-15, 18-20; J.A. 308-19, 345.)  Permit-to-purchase laws, like Maryland's HQL law, are associated with an 11 percent reduction in firearm homicide rates.  (J.A. 257 ¶ 17; J.A. 392-97.)  In Maryland, the FSA's HQL requirement led to drastically reduced firearm homicide rates in large urban counties with the exception of Baltimore City.  (J.A. 257 ¶ 17.)  Further, the HQL requirement is associated with a significant reduction in the number of handguns that have been diverted to criminals in Baltimore soon after retail purchase.  (J.A. 258 ¶18; J.A. 398-411.)[8]

The record also shows that the FSA's firearm-safety training requirement promotes public safety.  Captain Russell and former Chief Johnson attested that the firearm-safety-training component of the FSA encourages responsible gun ownership.  (J.A. 483 ¶ 13; J.A. 492 ¶ 10.)  They affirmed that the training enhances

---

[8] This conclusion was also supported by studies involving Connecticut's and Missouri's permit-to-purchase laws.  (J.A. 256 ¶ 14-16; J.A. 355-81; J.A. 413-14, ¶¶ 2, 4; J.A. 419-29, 472-79.)

compliance with state laws and reduces unauthorized access to firearms by unqualified persons, including children. (J.A. 484 ¶ 17; J.A. 492-93 ¶¶ 11, 15). They attested that the training promotes safe handling and operation of firearms, which reduces the risk of accidental discharges and the risk of potentially fatal accidents. (J.A. 484-85 ¶ 19; J.A. 493 ¶ 14). They also affirmed that the training reduces the likelihood of theft, thereby reducing criminals' and unqualified persons' access of firearms. (J.A. 484-85 ¶¶ 18, 21; J.A. 492-93 ¶¶ 12, 15). Further, these law-enforcement experts attested that requiring that the applicant demonstrate the safe operation and handling of a firearm, including a practice component in which the applicant safely fires at least one round of ammunition, promotes public safety by reducing accidental discharges. (J.A. 485 ¶ 20; J.A. 493 ¶ 14.)

Captain Russell and former Chief Johnson also both attested that the four-hour training component is superior to the former training by which handgun purchasers merely had to watch a short instructional video. (J.A. 485-86 ¶¶ 22-23, 26; J.A. 494 ¶ 17.) They both affirmed that watching a video is not sufficient training on the safe handling and operation of a handgun, and that the addition of the requirement that applicants safely fire one round of live ammunition improves the effectiveness of the training by ensuring that applicants have handled a handgun and have demonstrated an ability to safely fire and clear the weapon. (J.A. 486 ¶¶ 24, 25; J.A. 494 ¶¶ 17-18.) Both Captain Russell and former Chief Johnson also explained that

the instruction requirement is superior to the video because, unlike a prerecorded presentation, the live instruction (1) allows the instructor to verify that the applicant attended the training, and (2) "provides the [applicant] an opportunity to ask questions and receive feedback from the instructor." (J.A. 486 ¶¶ 23-26; J.A. 494 ¶ 17.)[9]

### Procedural Background

The operative amended complaint alleged that Maryland's HQL law violated the Second Amendment because the requirements it imposed did not "implicate historically recognized limitations or prohibitions on Second Amendment activity" and its "onerous, expensive and lengthy application process" deterred individuals from exercising their Second Amendment rights. (J.A. 31-32.) Plaintiffs also alleged that (1) the FSA's failure to define "receive" or "receipt" was unconstitutionally vague, and (2) certain aspects of the HQL requirement imposed through regulation, such as the live-fire requirement, were not authorized by statute and thus were ultra vires. (J.A. 33-40.)

Initially, the district court disposed of plaintiffs' claims on standing grounds. This Court affirmed in part, reversed in part, and remanded the case. *Maryland Shall*

---

[9] In response to the COVID-19 pandemic, in July 2020 the MSP Licensing Division permitted this instruction component to be done via real time bi-directional audio and video connection. (J.A. 241 ¶ 12; J.A. 246-47.) This format preserved the ability to ask questions and receive feedback.

*Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020). This Court held that, because "the HQL requirement undoubtedly constrains Atlantic Guns' ability to sell handguns and limits its potential customer base," Atlantic Guns had standing to pursue a Second Amendment claim on its own and, under the third-party standing doctrine, "on behalf of potential customers like the Individual Plaintiffs and other similarly situated persons." *Id*. at 212, 217. This Court, however, affirmed the district court's ruling that the individual plaintiffs did not have standing to pursue their vagueness claim because there was no credible threat of prosecution for the types of protected acts that plaintiffs identified. *Id*. at 216-18. And this Court affirmed the lack of standing for individual plaintiffs to pursue their ultra vires claims. *Id*. at 219-20. Therefore, only plaintiffs' Second Amendment claim remained.

On remand, the district court granted the State's motion for summary judgment.[10] In addressing plaintiffs' claim, the district court applied the two-prong

---

[10] In addition to cross-motions for summary judgment, the parties filed motions to strike the testimony of each other's experts. The district court denied plaintiffs' motion in its entirety (J.A. 1792-99), and plaintiffs do not challenge that denial here on appeal. The district court granted the State's motion in part and denied it in part. (J.A. 1799-1808.) Although the State filed a notice of appeal of that decision, the State is not pursuing that claim.

approach to analyzing Second Amendment challenges that had been adopted by this Court.[11]  (J.A. 1835 (citations omitted).)

> Under this approach, the court must first determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." If it does not impose a burden, the challenged law is valid. "If, however, the challenged law imposes a burden on conduct protected by the Second Amendment, [the Court must] next apply[] an appropriate form of means-end scrutiny."

(J.A. 1836) (citations and some quotation marks omitted). First, the district court focused on the administrative requirements of the HQL scheme and concluded that they "undoubtedly burden th[e] core Second Amendment right because they 'make it considerably more difficult for a person lawfully to acquire and keep a firearm . . . for the purpose of self-defense in the home." (J.A. 1841 (citing *Heller v. District of Columbia*, 670 F.3d 1244, 1255 (D.C. Cir. 2011 ("*Heller II*").)

Evaluating those administrative burdens, the district court found no "evidence establishing that any law-abiding, responsible citizen who applied for an HQL was denied the HQL." (J.A. 1843.) The court thus concluded that "the HQL requirements place no more than 'marginal, incremental, or even appreciable restraint on the right to keep and bear arms,'" and that intermediate scrutiny was the

---

[11] Although the district court declined to apply plaintiffs' proffered "text, history, and tradition" standard, the district court nonetheless noted that this standard "would not compel a finding that the HQL [law] is unconstitutional" given that licensing schemes served the purpose of enforcing "substantive requirements for ownership" of firearms. (J.A. 1839 n.13.)

13

appropriate level of scrutiny to be applied. (J.A. 1843-45.) Applying that since-abrogated framework, the court concluded that the "fingerprinting and training requirements are reasonably adapted to serve the State's overwhelming interest in protecting public safety," and "the time and expense associated with the requirements are reasonable." (J.A. 1869.)

## SUMMARY OF ARGUMENT

In *Heller I*, the Supreme Court held that the Second Amendment encompasses the right of "law-abiding, responsible citizens" to possess a handgun in their home for self-defense. Relying on *Heller I*, the courts of appeals, including this Court, have held that certain groups of individuals, such as criminals, the mentally ill, and other "persons perceived to be dangerous," fall outside of the Second Amendment's protections and thus may be precluded from possessing firearms.

Earlier this year, in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that the right recognized in *Heller I* also encompasses a "similar right to carry handguns publicly for . . . self-defense." 142 S. Ct. at 2122. Implementing that holding, the Court struck down a "may-issue" public-carry licensing scheme, but only to the extent that it vested discretion in a government official to deny the license unless an applicant demonstrated, to the satisfaction of that official, "a special need for self-defense." *Id*. at 2138, 2156. The Court did not invalidate licensing schemes generally but endorsed the

constitutionality of "shall-issue" licensing regimes. *Id*. at 2138 n.9. In doing so, the Court noted that these regimes, "which often require applicants to undergo a background check or pass a firearms safety course," and which "contain only 'narrow, objective, and definite standards,'" "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*.

Maryland's FSA is constitutional for these same reasons. To obtain an HQL, an applicant need only apply, be fingerprinted (to facilitate a background check), undergo four hours of firearm-safety training, and pay a $50 fee. The FSA, like the licensing schemes approved in *Bruen*, is designed to, and does, "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" There are no discretionary standards to be met: Applicants who pass the background check shall be issued a permit and may thereafter purchase a handgun. Finally, the minimal administrative burdens imposed are substantially related to fulfilling the State's interest in ensuring that firearms are not acquired by dangerous or irresponsible individuals. Accordingly, because the FSA is consistent with the historical traditions and substantive limitations of the Second Amendment, employs objective criteria, and presents no more than a minimal burden on applicants, it does not violate the Constitution.

# ARGUMENT

## I.    THE STANDARD OF REVIEW IS DE NOVO.

This Court "review[s] a summary judgment award de novo, 'based on [its] independent review of the entire record.'" *Bellon v. PPG Emp. Life & Other Benefits Plan*, 41 F.4th 244, 251 (4th Cir. 2022) (citations omitted). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id*. (quoting Fed. R. Civ. P. 56(a)).

## II.    RESTRICTING POSSESSION OF FIREARMS BY DANGEROUS INDIVIDUALS AND GROUPS IS CONSISTENT WITH THE HISTORICAL TRADITION OF THE SECOND AMENDMENT.

### A.    The Right to Keep and Bear Arms Extends Only to Law-Abiding, Responsible Citizens.

In *Heller I*, the Court struck down the District of Columbia's handgun law as violative of the Second Amendment because the law "totally ban[ned] handgun possession in the home." 554 U.S. at 628. In reaching that conclusion, the Court analyzed the Second Amendment's text, history, and tradition and held that the amendment encompasses "a *pre-existing* right" of an individual to possess firearms for self-defense that could not be extinguished by legislative fiat. 554 U.S. at 592 (emphasis in original). But, the Court cautioned, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," and the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose." *Id*. at 626. And, in broad terms, the Court

made clear that the Second Amendment's historical protections extended only to

"law-abiding, responsible citizens," 554 U.S. at 625, 635, and therefore could be

denied to those falling outside that description.[12] Underscoring that the right belongs

only to the law-abiding and responsible citizen, the Court gave express approval to

certain limitations that it deemed "presumptively lawful":

> [N]othing in our opinion should be taken to cast doubt on longstanding
> prohibitions on the possession of firearms by felons and the mentally
> ill, or laws forbidding the carrying of firearms in sensitive places such
> as schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.

*Heller I*, 554 U.S. at 626-27 & n.26; *see McDonald v. City of Chi.*, 561 U.S. 742,

786 (2010) (reiterating that the Second Amendment right is not absolute and does

not "imperil every law regulating firearms"); *accord Bruen*, 142 S. Ct. at 2128; *id*.

142 S. Ct. at 2162 (Kavanaugh, J., concurring) (joining the majority opinion with

---

[12] Lower courts often note this fundamental qualification. *See, e.g.*, *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2797 (2021) ("The Supreme Court [in *Heller I*]. . . identified the core . . . protections by reference not only to particular uses and particular weapons but also to particular persons, namely, those who are law-abiding and responsible." (citation omitted)); *cf. Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("Legislative power to strip the right from certain people or groups was nonetheless a historically accepted feature of the pre-existing right that the Second Amendment protects."); *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Carter I*") ("The weight of the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right.").

the understanding that these limitations endure).  The relief ordered in *Heller I*

further underscored these limitations by requiring the District to issue to Mr. Heller

the requested license to possess a handgun in his home, "[a]ssuming he [Mr. Heller]

is not *disqualified* from the exercise of Second Amendment rights . . . ."  *Heller I*,

554 U.S. at 635 (emphasis added).

In *Bruen*, the Court reaffirmed that the Second Amendment right may be

limited to those who are "law-abiding, responsible citizens."  *Bruen* involved a

challenge to certain aspects of New York's public-carry-licensing scheme.  As a

threshold matter, the Court rejected the two-prong test that applied tiers of scrutiny

depending on "how close the law comes to the core of the Second Amendment and

the severity of the law's burden on that right," 142 S. Ct. at 2126.

> In keeping with *Heller*, we hold that when the Second Amendment's
> plain text covers an individual's conduct, the Constitution
> presumptively protects that conduct.  To justify its regulation, the
> government may not simply posit that the regulation promotes an
> important interest.  Rather, the government must demonstrate that the
> regulation is consistent with this Nation's historical tradition of firearm
> regulation.  Only if a firearm regulation is consistent with this Nation's
> historical tradition may a court conclude that the individual's conduct
> falls outside the Second Amendment's "unqualified command."

*Id*.; *see id*. at 2131 ("The test that we set forth in *Heller* and apply today requires

courts to assess whether modern firearms regulations are consistent with the Second

Amendment's text and historical understanding.").  After finding that the right to

public carry fell within the text of the Second Amendment, the Court ruled that there

was no historical tradition of "requir[ing] *law-abiding, responsible citizens* to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public." *Id.* (emphasis added).

**B.    Under the Historical Tradition of the Second Amendment, Governments May Prohibit the Possession of Firearms by Dangerous Individuals and Groups.**

Since *Heller I* and *McDonald* (and in the wake of *Bruen*), this Court and other courts of appeals have been presented with challenges to numerous firearm regulations, including laws that disqualify certain groups from possessing firearms. Given *Heller I*'s acknowledgement that prohibitions on possession by certain groups are "presumptively lawful," these courts have upheld these and similar restrictions. Although the Supreme Court did not explain why certain limitations on handgun ownership and possession were "presumptively lawful," the courts of appeals have considered text, history, and tradition in upholding firearm-safety laws.

In *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012), this Court engaged in an "historical analysis," not only to confirm that the right recognized in *Heller I* did not extend beyond "law-abiding, responsible citizens," but also to explore who falls within that group. This Court began with the limitation's roots in classical republican political philosophy: "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous

citizens.'" *Id.* at 979 (citation omitted).[13]  This Court explained how these theoretical underpinnings had been implemented in the pre-constitutional Founding era, citing colonial laws "bar[ring] 'potential subversives' from owning firearms," laws disarming citizens who refused to swear allegiance to the government, and the disarmament of those who participated in Shays' Rebellion.  *Id.*  This Court then moved on to the development of, and debates surrounding the adoption of, the Second Amendment, noting that various States' iterations of the underlying right limited the right to "peaceable citizens" or those who "are or have been in actual rebellion."  *Id.*  Finally, this Court noted that these limitations were consistent with the pre-Founding English right to bear arms (as expressed in the English Bill of Rights), which "allowed the government to disarm those it considered disloyal or dangerous."[14]  *Id.*

---

[13] This "republican virtue" theory has been adopted by several other circuits. *See, e.g.*, *Folajtar v. Attorney Gen. of the U.S.*, 980 F.3d 897, 902 (3d Cir. 2020); *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019); *United States v. Bena*, 664 F.3d 1180, 1883 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *see also National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) ("In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally.").  Post-*Bruen*, courts continue to adhere to this theoretical underpinning.  *See United States v. Daniels*, ___ F. Supp. 3d ___, 2022 WL 2654232, *4 (S.D. Miss. July 8, 2022).

[14] This Court reaffirmed its "endorse[ment]" of the "'virtuous citizen' justification" in *Hamilton v. Pallozzi*, 848 F.3d 614, 625 & n.9 (4th Cir. 2017).

Although the republican virtue theory has been questioned by some jurists, there is firm agreement that the "law-abiding, responsible citizens" entitled to the protections of the Second Amendment do not include those who are "dangerous." *See Harley v. Wilkinson*, 988 F.3d 766, 780 n.7 (4th Cir. 2021) (Richardson, J., dissenting) ("There is ongoing debate on whether felons have historically been disarmed because of the danger they pose to the public or because of their lack of virtue."); *Folajtar*, 980 F.3d at 919 (Bibas, J., dissenting) (rejecting "virtue" and asserting instead that "the touchstone is danger[ousness]"); *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (rejecting the "virtuous citizen" theory and concluding that "[t]he historical evidence . . . support[s] a different proposition:  that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety").

Indeed, whether based on history or common sense (or both), this and other courts have recognized the proposition, grounded in Founding-era history, that governments may preclude the acquisition of firearms by individuals who are dangerous or whose possession would otherwise be contrary to the public safety. *See United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) ("The Government offers substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'"); *Carpio-Leon*, 701 F.3d at 979 ("The Court was

careful to note that its opinion should not be read to limit the government's ability to disarm individuals who cannot be trusted with firearms." (discussing *Heller I*); *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Carter I*") ("Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous."); *see also New York State Rifle & Pistol Ass'n v. City of N.Y.*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., dissenting) ("[*Heller I*] recognized that history supported the constitutionality of . . . laws . . . prohibiting possession [of firearms] by felons *and other dangerous individuals*." (emphasis added)); *Doe I v. Governor of Pa.*, 977 F.3d 270, 273 (3d Cir. 2020) (concluding that "the historically-barred class of mentally ill individuals who were excluded from Second Amendment protection" "consists of 'individuals who were considered dangerous to the public or to themselves'"); *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 691 (6th Cir. 2016) (noting that, in *Heller I*, the Supreme Court "understood that Congress's power to enact categorical disqualifications was 'part of the original meaning' of the Second Amendment" and that legislatures have the "power to categorically prohibit certain presumptively dangerous people from gun ownership").

III. **THE SUPREME COURT HAS ENDORSED THE CONSTITUTIONALITY OF NON-DISCRETIONARY FIREARM-LICENSING REGIMES THAT "ARE DESIGNED TO ENSURE ONLY THAT THOSE BEARING ARMS IN THE JURISDICTION ARE, IN FACT, 'LAW-ABIDING, RESPONSIBLE CITIZENS.'"**

At the heart of the challenge to New York's "may-issue" public-carry-licensing regime was the scheme's requirement that, to obtain a license to carry a handgun publicly, an applicant had to show "a special need for self-protection distinguishable from that of the general community." *Bruen*, 142 S. Ct. at 2123. In deciding this issue, the Supreme Court explained the meaning and import of its precedent governing the scope of the Second Amendment right to bear arms, a question essential to its ultimate determination that the Second Amendment right encompasses the right of "'law-abiding, responsible citizens'" to exercise their Second Amendment right to public carry. 142 S. Ct. at 2138 n.9 (quoting *Heller I*, 554 U.S. at 635).

After concluding that the right to carry publicly was squarely within the text of the Second Amendment's right to "bear" arms, the Court ruled that the historical record did not support a tradition of "broadly prohibit[ing] the public carry of commonly used firearms for personal defense." *Id*. at 2156. And pertinent to the challenged aspect of the New York law, the Court concluded that the historical record failed to establish a tradition of "requir[ing] *law-abiding, responsible citizens* to 'demonstrate a special need for self-protection distinguishable from that of the

general community' in order to carry arms in public." *Id*. (emphasis added). In that context, the Court emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes" because the shall-issue regime's objective criteria do "not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* at 2138 n.9.

Thus, although the Court invalidated New York's requirement that an applicant convince a government official of the applicant's atypical need to carry for self-defense, the Court did not invalidate licensing schemes generally.[15] To the contrary, the Court recognized the constitutionality of "shall-issue" licensing regimes.[16] *Id*. at 2138 n.9. These licensing regimes, which "often require applicants

---

[15] As in *Heller I*, the plaintiffs in *Bruen* did not challenge the underlying authority of the government to enact a licensing scheme. *Bruen*, 20-843, Oral Arg. Tr. 50 (Nov. 3, 2021). Plaintiffs rely on *Bruen*, but they do not mention the Court's explicit approval of licensing schemes generally, nor its approval of the fingerprinting, background checks, and safety courses in particular.

[16] "[T]he Supreme Court's analysis" supporting and justifying the constitutionality of non-discretionary licensing schemes "is not dicta, but is the rationale supporting the Court's application of" pertinent principles. *United States v. Davis*, 690 F.3d 226, 256 n.34 (4th Cir. 2012); *see County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring and dissenting) ("[S]tare decisis directs us to adhere not only to the holdings of [the Supreme Court's] prior cases, but also to their explications of the governing rules of law."); *Virginia Uranium, Inc. v. Warren*, 848 F.3d 590, 609 n.14 (4th Cir. 2017) ("Dictum is statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral,

to undergo a background check or pass a firearms safety course," are not constitutionally problematic because they were "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. These regimes "appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'—features that typify proper-cause standards like New York's." *Id*.

Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to underscore this point: "New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart

---

may not have received the full and careful consideration of the court that uttered it." (citation omitted)), *aff'd*, 139 S. Ct. 1894 (2019).

    Even if this part of *Bruen* "were dicta, which it is not," this Court "would still be bound to follow it considering the obvious importance of the analysis to the opinion." *Virginia Uranium*, 848 F.3d at 609 n.14. Lower federal courts are "'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (citations omitted). When faced with what is arguably "mere dictum," a lower court "cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court." *McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176, 182 n.2 (4th Cir. 2012). And, even if dictum, like *Heller I*'s approval of certain "presumptively lawful regulatory measures," *Bruen*'s approval of licensing schemes and common features of those schemes is dictum of "the strongest sort." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1372 (2009).

from self-defense." *Id*. at 2162. This was so, he reasoned, because, like the regime struck down in *Heller I*, the "features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" *Id.* at 2162. Like the majority, Justice Kavanaugh contrasted New York's licensing scheme with the "objective shall-issue licensing regimes" enacted by the majority of States. These regimes, he noted, "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id*.

Maryland's HQL law is valid under *Bruen*'s analytical framework. Other than file an application and pay a modest fee, an HQL applicant need only do what the Court has already said is permissible: "undergo fingerprinting" (as part of "undergo[ing] a background check") and "pass a firearms safety course." *Bruen*, 142 S. Ct. at 2138 n.9; *id*. at 1262 (Kavanaugh, J., concurring). And these features, as with the regimes approved in *Bruen*, are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. at 2138 n.9. Because *Bruen* controls the analysis in this case, plaintiffs' facial challenge to the law must fail.

IV.   **MARYLAND'S HANDGUN-QUALIFICATION-LICENSE REQUIREMENT SURVIVES AN INDEPENDENT ANALYSIS UNDER APPLICABLE CONSTITUTIONAL PRINCIPLES.**

   A.   **Predicating the Exercise of a Constitutionally Protected Right on Compliance with a Reasonable, Non-Discriminatory Licensing Regime Is Consistent with Broader Constitutional Principles.**

*Bruen* makes clear that using a licensing regime to determine whether a citizen meets the substantive requirements for gun ownership is constitutional. 142 S. Ct. at 2138 n.9.  This is consistent with broader constitutional principles.  In *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941), the Court upheld a law that required a permit to hold a parade or procession on a public street.  In doing so, the Court explained that constitutional rights were not absolute, but rather existed against a backdrop of non-substantive administration regulation:

> Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses.  The authority of a municipality to impose regulations to assure the safety and convenience of the people . . . has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.

*Id*. at 574.

In analyzing the constitutionality of licensing schemes, the Supreme Court has distinguished between substantive limitations on constitutional rights (which must themselves be justified by the text and historical traditions of the regulated right) and the administrative regimes that implement those limitations.  As Judge Easterbrook,

27

writing for the Seventh Circuit, has explained, because, under *Heller I*, "the State may set substantive requirements for [handgun] ownership," the State "may use a licensing system to enforce them." *Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) (citing *Heller I*, 554 U.S. at 626-27, 635). That is because "[l]icensure is how states determine whether the requirements have been met." *Id.* *See Libertarian Party of Erie County*, 970 F.3d at 128 (concluding that there is "a close relationship between [New York's home-possession handgun] licensing regime and the State's interest in public safety and crime prevention—as well as solicitude for the Second Amendment rights of citizens who are responsible and law abiding"); *Heller v. District of Columbia*, 801 F.3d 264, 276 (D.C. Cir. 2015) ("*Heller III*") (noting that a handgun-registration scheme had the permissible objective of "prevent[ing] disqualified individuals from registering firearms"); *see also Hightower v. City of Boston*, 693 F.3d 61, 74-75 (1st Cir. 2012) (concluding that a prohibition on possession of a firearm by a person who lied on a firearms application is constitutional because it "helps ensure the integrity of the system of keeping prohibited persons from possessing firearms"); *Kuck v. Danaher*, 600 F.3d 159, 166 (2d Cir. 2010) ("Connecticut clearly has a strong and compelling interest in ensuring that firearm permits are not issued to those 'lacking the essential character or temperament necessary to be entrusted with a weapon."); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 379 (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir.

2015) ("The Supreme Court . . . has exhibited a rather favorable posture toward licensure, especially when the practice is used to moderate law and order.").[17]

Thus, the validity of an administrative regulation is judged by evaluating whether it (1) enacts a new substantive limitation on who may exercise the right, or (2) establishes an administrative burden that any otherwise-eligible person may overcome. *See Heller v. District of Columbia*, 698 F. Supp. 2d 179, 190 (D.D.C. 2010), *aff'd in part, vacated in part*, 670 F.3d 1244 (D.C. Cir. 2011) (noting that "the Supreme Court has held that registration and licensing schemes are permissible in other contexts so long as they do not excessively impinge on the constitutional right").

*Bruen* held that New York's "proper cause" requirement, and its heightened standard for the exercise of the Second Amendment right to public carry, failed the first prong of the analysis and was therefore unconstitutional because the requirement placed a substantive limit on the right of law-abiding citizens to carry publicly for self-defense. 142 S. Ct. at 2156. Consistent with this analysis, lower federal courts have upheld restrictions that do not act as broad barriers to gun ownership by the law-abiding. *See Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir.

---

[17] Another example of a type of non-substantive administrative regulation in the Second Amendment context is "laws imposing conditions and qualifications on the commercial sale of arms," which were explicitly referenced in *Heller* as "presumptively lawful regulatory measures[.]" 554 U.S. at 626-27 & n.26.

2016), *cert. denied sub nom. Silvester v. Becerra*, 138 S. Ct. 945 (2018) (concluding that a waiting period, as applied to subsequent gun purchasers, was constitutional because, in furthering public safety, "[t]he regulation does not prevent, restrict, or place any conditions on how guns are stored or used after a purchaser takes possession"); *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) ("Though framed as a prohibition against unlicensed firearm dealing, the law is in fact a requirement that those who engage in the commercial sale of firearms obtain a license.  A prospective dealer who wishes to obtain a license need only submit an application, be at least 21 years old, pay a fee, and establish lawful premises for selling firearms."); *id.* at 166 ("Neither the application procedure nor the fee [is] so prohibitive as to turn this condition or qualification into a functional prohibition.").

*Bruen* held that New York's law also failed at the second stage of the analysis because, unlike the objective criteria characteristic of shall-issue licensing schemes, New York's discretionary criteria prevented "'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry."  *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller I*, 554 U.S. at 635).

**B.    Maryland's Handgun-Qualification-License Law Survives Constitutional Scrutiny Because It Does Not Impose Unnecessary or Arbitrary Burdens and Is Guided by Objective, Non-Discretionary Criteria.**

**1.    The Handgun-Qualification-License Requirement Enforces Limitations Consistent with the Underlying Substantive Right.**

The Court in both *Heller I* and *Bruen* made clear that the pre-existing right embodied in the Second Amendment encompassed historical limitations on the possession of firearms by groups and individuals that are dangerous to the public safety. Consistent with these limitations, Maryland's HQL law, which requires a background check (facilitated by fingerprints) and a firearm-safety course, acts to ensure that only those who are "law-abiding, responsible citizens" may obtain firearms. Indeed, plaintiffs do not dispute that they "and others like them are readily able to acquire handguns in Maryland for self-defense if they obtain an HQL." (J.A. 1843.) Nor can they, as the district court observed, "provide evidence establishing that *any* law-abiding responsible citizen who applied for an HQL was denied the HQL." (J.A. 1843 (emphasis in original).). Here, as the district court noted, there was nothing preventing the individual plaintiffs from acquiring an HQL other than their plain refusal to do so. (J.A. 1843.)

Because plaintiffs have failed to show that the HQL law has the substantive effect of preventing law-abiding, responsible citizens from acquiring a handgun, the HQL meets this first prong.

31

a.    **The Background-Check Requirement of Maryland's Handgun-Qualification-License Law Embodies Restrictions on Firearm Possession Set Forth in Federal and Maryland Law That Are Rooted in the Historical Limitations on the Second Amendment Right.**

The background-check requirement involves a determination that an applicant "is not prohibited by federal or State law from purchasing or possessing a handgun." Pub. Safety § 5-117.1(d)(4).  Both Maryland law and federal law prohibit handgun possession by felons (and certain other offenders), fugitives, persons addicted to drugs, the mentally ill, and individuals subject to a protective order, although the specific provisions of the laws differ slightly.  *Id.* § 5-133(b); 18 U.S.C. § 922(g). In addition, federal law prohibits possession of a handgun by those dishonorably discharged from the armed forces.  18 U.S.C. § 922(g)(6).

All these statutory prohibitions reflect limitations on those who may properly be deemed to be dangerous.  Indeed, applying the touchstone of dangerousness, this Court has approved of restrictions on firearms ownership for essentially all these statutory categories:  violent felons (18 U.S.C. § 922(g)(1)), *United States v. Smoot*, 690 F.3d 215, 222 (4th Cir. 2012); non-violent felons (18 U.S.C. § 922(g)(1)), *Pruess*, 703 F.3d at 246-47[18]; those addicted to a controlled substance (18 U.S.C.

---

[18] *See also Hamilton v. Palozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (considering § 5-133(b)(1) of the Public Safety Article but analogizing to 18 U.S.C. § 922(g) (1)).

§ 922(g)(3)), *United States v. Carter*, 750 F.3d 462, 470 (4th Cir. 2014) ("*Carter II*"); and those who have been convicted of a domestic violence misdemeanor, 18 U.S.C. § 922(g)(9), *Harley*, 988 F.3d at 771.[19]   *Accord, e.g.*, *Folajtar*, 980 F.3d at 905 ("[N]o one . . . denies these historically grounded and sensible explanations behind the exceptions:  Legislatures have authority . . . to impose lifetime gun-possession bans on felons as a safety measure and as a legitimate consequence of a felony conviction[.]"  (citation omitted)).   Accordingly, because the background-check requirement seeks to prohibit acquisition of handguns by only those individuals who have properly been deemed to be outside of the scope of the Second Amendment right, that aspect of the law is consistent with the historical limitations of that right.

---

[19] An exception is this Court's decision in *Hirschfield v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 435 (4th Cir. 2021), since vacated as moot, 14 F.4th 322 (4th Cir. 2021), which held that that 18- to 20-year-olds could not be categorically excluded from the Second Amendment right.  But even there, the touchstone was dangerousness, as this Court's decision was premised on the conclusion that 18- to 20-year-olds were not historically considered a dangerous group.  *Id*. at 436.

**b.      The Firearm-Safety-Course Requirement of the Handgun-Qualification-License Law Is Consistent with the Second Amendment's Historical Tradition of a Responsible Citizenry Trained in the Use of Firearms.**

Maryland's requirement that HQL applicants complete a firearm-safety course ensures that handgun possession is limited to law-abiding, responsible citizens by making sure that individuals who may use a handgun have some knowledge and training to do so safely.  This fundamental exercise of Maryland's police power is supported by the historical traditions of the Second Amendment.

At the time of the Founding, most men had to participate in their State's militia.  *Heller I*, 554 U.S. at 595.  And, consistent with the English tradition, mandatory training obligations came with this militia service.  Indeed, prior to the ratification of the Constitution (and the Second Amendment), many States had enacted laws that required training in the use of firearms.  *See* 1778 N.J. Sess. Laws 21, at 42, 46, §§ 14-15; 1782 Del. Sess. Laws, at 1, 3, §§ 1, 5-6; Colonial Records of Ga., Vol. 19, Pt. 2, at 350-51 (1784); 1786 N.Y. Sess. Laws, at 220, 222; *see also* Joyce Malcolm, *To Keep and Bear Arms* 150 (1994) (noting that, after independence, the States sought to preserve the citizen or "general" militia model, and that "[s]uch a militia required general ownership of firearms, and general skill in their use").

The year after the Second Amendment was ratified, the Second Congress enacted the Uniform Militia Act of 1792. This law required that able-bodied male citizens between the ages of 18 and 45 "be enrolled in the militia," and imposed "the duty of the commanding officer at every muster . . . to cause the militia to be exercised and trained agreeably to the [] rules of discipline." 1 Stat. 271, 273. To implement the Militia Act, several more States enacted laws requiring training. *See* 1792 Conn. Sess. Laws 423, 428; 1792 N.H. Sess. Laws 441-42; 1793 Mass. Acts 172, 185, § 25; 1794 R.I. Sess. Laws 14, 22 § 12. These laws did not just reflect common sense and a practical commitment to state security; they were contemplated by the Second Amendment's text. *See, e.g.*, *Heller I*, 554 U.S. at 598 (noting that "the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training" and that "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny"); *id*. at 617 (noting that "a well-regulated militia . . . cannot exist unless the people are trained to bearing arms" (citation omitted)). And these laws would have also had the complementary effect of ensuring that the men of the community, starting in their youth, would be provided with the training necessary to handle and use firearms safely in any context.

In the first decades of the 19th century, as the country "grew more democratic and rambunctiously individualistic, the duty-bound concept of militia service withered." Michael Wald, *The Second Amendment* 67 (2014). "By the 1850's, the

perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense." *McDonald*, 561 U.S. at 770.

That the vibrancy of the right depends on a responsible citizenry is woven throughout the Second Amendment historical tradition. *See, e.g.*, *Heller*, 554 U.S. at 619 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right [under the Second Amendment]." (citation omitted)). For example, in his opinion dissenting from a finding of mootness in *New York State Rifle & Pistol Association, Inc. v. City of New York*, Justice Alito recognized that "a necessary concomitant" of the core Second Amendment right to keep a handgun in the home for self-defense "is to take a gun to a range in order to gain and maintain the skill necessary to use it *responsibly*." 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting) (emphasis added). *See also, e.g.*, *Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017) ("The point of the Amendment [is] that guns would be available to each *responsible citizen* as a rule[.]" (emphasis in original)); *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("A person who carries a gun in public but is not well trained in the use of firearms is a menace to himself and others.");

*Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("[T]he core right wouldn't mean much without the training and practice that make it effective.").

This backdrop makes clear that regulations designed to ensure that those who exercise the right know how to do so responsibly—such as the firearm-safety course requirement of Maryland's HQL law—fall well within the type of "reasonable firearms regulations" that are interwoven within the Second Amendment's affirmative self-defense right. *See McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." (quoting *Heller I*, at 626-27)).

### 2.    The Handgun-Qualification-License Law Employs Objective Criteria.

Maryland's HQL law is non-discretionary:  If the applicant fills out an application, pays the fee, submits fingerprints, completes a firearm-safety course, and passes a background check (which itself implements the objective criteria of Maryland and federal law), the applicant shall be issued an HQL.  Because the HQL law does not employ subjective criteria, and it does not vest the licensing authority

with any discretion to deny an HQL to a qualified applicant, the HQL is constitutional under this prong of the analysis.  *See Green v. City of Raleigh*, 523 F.3d 293, 306 (4th Cir. 2008) (upholding as constitutional a permitting scheme for those engaging in picketing because it "set forth clear requirements regulating picketing and extend[ed] to City officials *no* discretion to prohibit picketing that complies with these requirements." (emphasis in original)).

### 3. The Minimal Administrative Burdens Imposed by the Handgun-Qualification-License Law Are Neither Unnecessary nor Arbitrary.

#### a. The Burden Imposed by the Handgun-Qualification-License Law Is De Minimis.

As the district court concluded, the HQL requirement imposes only "minor inconvenience[s]" that amount to a "slight" burden.[20]  (J.A. 1859, 1861.)  An HQL applicant need only (1) complete the online application and pay the $50 fee, (2) undergo fingerprinting, and (3) complete a four-hour firearm-safety course. Although plaintiffs do complain about these inconveniences, their struggle to do so demonstrates what this Court has already ascertained:  that "plaintiffs do not claim

_____

[20] Plaintiffs in this case have presented a facial challenge to Maryland's HQL law.  Thus, to the extent that any individual plaintiff might be deemed to be challenging the HQL law based on how that law burdens them in a way not applicable to the public, they lack standing.  *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 219-20 (4th Cir. 2020) (noting that, because the individual plaintiffs "have indicated they will not acquire a handgun unless the HQL requirement itself is eliminated," they "stand in the shoes of all members of the public who happen to disagree with a particular law" and therefore lack standing).

to be injured by the specific requirements of the HQL—they claim to be injured by the existence of the HQL itself." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 219 (4th Cir. 2020).  Mere discontent with having to comply with a government regulation, however, is not grounds for relief. *See Teixeira v. County of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) ("[T]he Second Amendment does not elevate convenience and preference over all other considerations.").

Moreover, their complaints are overblown.  The four-hour firearm-safety class can be completed in a single morning or afternoon.  This minimal time commitment speaks for itself.  As the district court noted, the four-hour firearm-safety course is significantly less than what is required in other licensing contexts. (J.A. 1859 (noting that an individual seeking to be licensed to drive in Maryland "must participate in 30 classroom hours of instruction and spend six hours behind the wheel.").)  And it is much less than what might have been required of them during the Founding era.[21]

Next, plaintiffs claim that Maryland's fingerprinting requirement is "uniquely burdensome because it mandates that fingerprints be taken only at State-approved, private 'live-scan' vendors, which are not found in rural areas of the State." (Appellants' Br. 29.)  But, as the district court noted in rejecting plaintiffs'

---

[21] The lack of a burden is demonstrated also by the fact that certain groups, such as those who already owned handguns, are exempt from the firearm safety course requirement.  Pub. Safety § 5-117.1(e).

complaint, "there are at least 86 vendors across the State that provide fingerprinting services." (J.A. 1823 n.6.) A visit to the MSP website referenced in the filings below (*see* footnote 5 *supra*) demonstrates that there are vendors located all throughout the State, including in such places as Eldersburg, Frederick, Silver Spring, and Prince Frederick, either in the town or near to where each individual plaintiff resides.

That these burdens are insignificant is demonstrated by the actual effect of the law on law-abiding Marylanders seeking to acquire handguns. Nearly 200,000 Marylanders obtained HQLs during the period from the enactment of the FSA through the end of 2020. (J.A. 1610-11.) And far from having the "effect [of] discourag[ing] and ration[ing] the exercise of the Second Amendment fundamental constitutional right to purchase or acquire a handgun" (J.A. 33), Marylanders have been acquiring handguns at a record pace ever since the law went into effect. (J.A. 1610-11.) These facts demonstrate that, with respect to plaintiffs, any burden is of their own making. *Cf. Rosario v. Rockefeller*, 410 U.S. 752, 754-58 (1973) (rejecting a challenge to a filing deadline for voter registration by noting that "if [the petitioners'] plight [could] be characterized as disenfranchisement at all, it was not caused by [the law], but by their own failure to take timely steps to effect their enrollment").

Because "reasonable fees associated with the constitutional requirements" of firearm licensing "are also constitutional," plaintiffs' challenge to the $50 application fee to cover the costs of administering the HQL program fails. *Heller III*, 801 F.3d at 278 (finding registration fees of $13 per firearm and $35 for fingerprinting were constitutional); *see also Kwong v. Bloomberg*, 723 F.3d 160, 165-67 (2d Cir. 2013) (approving $350 licensing fee). Just as in the First Amendment context, the State may impose licensing fees when the fees are designed "to meet the expense incident to the administration" of the licensing statute. *Cox*, 312 U.S. at 577 (citation omitted) (upholding parade licensing statute that imposed a sliding fee); *see also Center for Auto Safety Inc. v. Athey*, 37 F.3d 139, 145 (4th Cir. 1994) (holding that charitable registration fees furthered legitimate government purpose in "enabl[ing] the state to prevent fraud by charities soliciting funds in Maryland"). Here, the statute limits the allowable fee to the amount "to cover the costs to administer the program," Pub. Safety § 5-117.1(g)(2), and, in 2018, the costs to administer the program exceeded $50 per application. (J.A. 125-26 ¶¶ 15-18; J.A. 198, 200.) Similarly, because the fingerprinting and training provisions are constitutional, the "additional requirement" that applicants bear the cost of complying with them "is but a corollary necessary to implement those requirements" and, thus, also constitutional. *Heller III*, 801 F.3d at 277.

Finally, plaintiffs challenge the length of time it takes for the State to issue the HQL after an application is submitted, which is statutorily capped at 30 days. Pub. Safety § 5-117.1(h)(1). But this is not, as plaintiffs suggest, a mandatory waiting period. Instead, this time frame is necessary to ensure that the background check required by the law is completed. HQL licenses are sent to approved individuals as soon as the administrative process is completed, even if they are completed in less than 30 days. (J.A. 125 ¶ 14.) Plaintiffs presented no evidence to the contrary.

> **b.    The Fingerprinting and Firearm-Safety-Course Requirements Further the State's Interest in Limiting Handgun Access to Law-Abiding, Responsible Citizens.**

Plaintiffs have failed to show that the HQL law imposes anything more than a de minimis burden, thus dooming their claim on that basis alone. But the record also demonstrates that the fingerprinting and firearm-safety-course requirements are reasonably adapted to furthering the State's permissible interest in ensuring that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens."

The fingerprinting requirement enables MSP to ensure that the applicant is not using false identification, which makes it more difficult for a prohibited person to obtain access to a firearm. (J.A. 84; J.A. 126 ¶ 20; J.A. 198; J.A. 252 ¶ 9; J.A. 491 ¶¶ 8-9.); *see also Heller III*, 801 F.3d at 276-77 (holding that the District of Columbia could reasonably conclude that its fingerprint requirement would

"advance public safety by preventing at least some ineligible individuals from obtaining weapons").

Although Maryland handgun purchasers were required to undergo a background check as part of the purchase process before the HQL law, that background check was inadequate because it is based only on state-issued identification, not fingerprints. Pub. Safety § 5-118(b). Thus, prior to the HQL requirement, Maryland lacked sufficient tools to ensure that prohibited persons were not prevented from obtaining handguns. (J.A. 84.) The General Assembly heard testimony from Professor Webster about the GAO investigation in which undercover agents using counterfeit driver's licenses succeeded, without exception, in purchasing firearms from federally licensed firearms dealers in five states. (J.A. 84.) The GAO report concluded that federal background checks conducted by the firearm dealers without fingerprinting "cannot ensure that the prospective purchaser is not a felon or other prohibited person whose receipt and possession of a firearm would be unlawful." (J.A. 93.) Although the GAO report did not involve purchases in the District of Columbia, the D.C. Circuit nonetheless relied on this report to credit the District's evidence demonstrating that "background checks using fingerprints are more reliable than background checks conducted without fingerprints, which are more susceptible to fraud." *Heller III*, 801 F.3d at 276.

Moreover, unlike with a background check based solely on state-issued identification, a fingerprint record can be used to determine if an HQL licensee is convicted of a disqualifying offense after passing the initial background investigation. Fingerprinting enables MSP to obtain updated criminal history information from other law-enforcement agencies and court systems and, if appropriate, revoke a disqualified person's HQL and, where necessary, retrieve unlawfully possessed firearms. (J.A. 127 ¶¶ 23-24; J.A. 205-14.) This enhances the State's ability to identify and disarm individuals who are not eligible to possess firearms. (J.A. 254 ¶ 10; J.A. 307.) Indeed, plaintiffs' own expert witness agreed in his deposition testimony in this case that this advantage of the fingerprint requirement benefits public safety. (J.A. 497.) This feature did not exist prior to the enactment of the FSA. (J.A. 237 ¶¶ 10-12.)

The fingerprint requirement also acts as a deterrent to straw purchasers and those intending to purchase firearms solely for criminal purposes. (J.A. 254 ¶ 8; J.A. 491-92 ¶¶ 8-9, 11.) Empirical studies show that laws requiring background checks based on fingerprints are associated with a reduction in the flow of guns to criminals. (J.A. 254-59 ¶¶ 8-9, 13-15, 18-20; J.A. 308-19, 345.) Permit-to-purchase laws like Maryland's HQL law are associated with a reduction in firearm homicide rates. (J.A. 257 ¶ 17; J.A. 392-97.) The HQL requirement has resulted in a significant reduction in the number of handguns that have been diverted to criminals in Baltimore soon

after retail purchase. (J.A. 258 ¶18; J.A. 398-411.) This evidence strongly supports the conclusion that the HQL requirement reduces straw purchases and other diversion to individuals otherwise prohibited by law from possessing handguns.[22]

Empirical evidence, expert testimony, case law, and common sense also support the conclusion that requiring HQL applicants to receive four hours of firearm-safety training promotes public safety consistent with the historical traditions of the Second Amendment. *See Heller III*, 801 F.3d at 278-79 (holding that the District's mandatory firearm-safety training was constitutional based on the District's presentation of "substantial evidence from which it could conclude that training in the safe use of firearms promotes public safety by reducing accidents involving firearms").

Training on the proper storage of firearms reduces the likelihood that a member of a household who is not eligible to possess a firearm will gain access to one. This is important because the majority of school shootings are committed by minors with guns brought from home. (J.A. 255 ¶ 11; J.A. 307; *see also* J.A. 493 ¶ 15 (describing such incidents in Maryland).) Surveys of gun owners show that unsafe gun storage is common, but that gun owners who complete firearm-safety

---

[22] This conclusion was also supported by studies involving Connecticut's and Missouri's permit-to-purchase laws. (J.A. 256 ¶14-16; J.A. 355-81; J.A. 413-14, ¶ 2, 4; J.A. 419-29, 472-79.)

training are more likely to store their guns locked and unloaded.  (J.A. 255 ¶ 11; J.A. 307.)  Requiring that applicants receive four hours of firearm-safety training also has the incidental effect of deterring straw purchasers who, unlike "law-abiding, responsible citizens" seeking to possess handguns for in-home self-defense, are seeking only to engage in illegal transactions.  (J.A. 254 ¶ 9; J.A. 306.)

Captain Russell and former Chief Johnson, with a combined total of more than 60 years of law-enforcement experience, both attested that the firearm-safety-training component of the FSA encourages responsible gun ownership and has numerous public-safety benefits.  (J.A. 483 ¶ 13; J.A. 492 ¶ 10.)  They affirmed that the training enhances knowledge of and compliance with state laws that are designed to reduce access of firearms to persons, including children, who are prohibited by law from possessing firearms. (J.A. 484 ¶ 17; J.A. 492-93 ¶¶ 11, 15).  They also attested that such training promotes safe handling and operation of firearms, reducing the risk of accidental discharges and injury or death by gunshot.  (J.A. 484-85 ¶¶ 18-19, 21; J.A. 493 ¶¶ 14-15).

Common sense further supports the State's judgment in enacting the firearm safety training requirement.  In Maryland, law-enforcement officers are required to receive extensive training on the operation, handling, and storage of handguns, including in the home.   COMAR 12.04.02.03–.05; 12.04.02.03.10(D).   These longstanding training requirements strongly support the utility of the four hours of

training that civilian handgun purchasers must receive. *See Heller III*, 801 F.3d at 279 & n.3 (relying on "anecdotal evidence showing the adoption of training requirements 'in most every law enforcement profession that requires the carrying of a firearm' and a professional consensus in favor of safety training"). Given the popularity of handguns for in-home self-defense, *see Heller I*, 554 U.S. at 628, and the potential dangers that arise when handguns are improperly stored or handled in the home, Maryland's requirement of a four-hour training course is reasonably adapted to the State's goal of ensuring that handguns are possessed only by those who are law-abiding, responsible citizens.

\*     \*     \*

In 2010, the Supreme Court in *McDonald v. City of Chicago* assured the states that, consistent with historical tradition, "experimentation with reasonable firearms regulations [may] continue under the Second Amendment." 561 U.S. at 785. Maryland heeded that call in enacting its HQL law. Indeed, true to the substantive limitations of the Second Amendment, the HQL law is designed to, and does in effect, "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9. And because it does so without imposing any constitutionally significant burdens on a law-abiding, responsible Maryland citizen who seeks to acquire a handgun, it is constitutional.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Robert A. Scott

_____
ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

Attorneys for Appellees

## REQUEST FOR ORAL ARGUMENT

The Appellees respectfully request that the Court hear oral argument in this appeal.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,224 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Robert A. Scott

_____

Robert A. Scott

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARYLAND SHALL ISSUE, INC.,    *
*et al.*,

                                 *

        *Plaintiff-Appellant*,

    v.    *    No. 21-2017

LAWRENCE HOGAN, *et al.*,    *

        *Defendant-Appellee*.    *

   *    *    *    *    *    *    *    *    *    *    *    *    *

## CERTIFICATE OF SERVICE

I certify that, on this 17th day of October 2022, the Brief of Appellee was filed electronically and served on counsel of record who are registered CM/ECF users.

        Mark W. Pennak, Esq.
        1332 Capt Saint Claire Road #342
        Annapolis, Maryland  21409
        mpennak@marylandshallissue.org

        Cary J. Hansel, Esq.
        2514 North Charles Street
        Baltimore, Maryland  21218
        cary@hansellaw.com

        John Parker Sweeney, Esq.
        1615 L Street. N.W., Suite 1350
        Washington, District of Columbia 20036
        jsweeney@bradley.com

        /s/ Robert A. Scott
        _____

        Robert A. Scott