No. 21-2017
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

**MARYLAND SHALL ISSUE, INC.,** *et al.,*

*Plaintiffs-Appellants,*

**v.**

**WES MOORE,** *et al.,*

*Defendants-Appellees.*
_____

On Appeal from the United States District Court for the District of Maryland
(Ellen L. Hollander, District Judge)
_____

## PETITION FOR REHEARING *EN BANC*
_____

ANTHONY G. BROWN
Attorney General of Maryland

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

December 5, 2023                    Attorneys for Appellees

**TABLE OF CONTENTS**

Page

RULE 35(B)(1) STATEMENT ........................................................................1

STATEMENT OF THE CASE ........................................................................2

    Statutory Background .............................................................................2

    Proceedings in the District Court............................................................5

    The Supreme Court Decides Bruen .................................................6

    The Panel Decision .................................................................................9

REASONS FOR GRANTING REHEARING *EN BANC* ........................................13

CONCLUSION ...........................................................................................17

CERTIFICATE OF COMPLIANCE ...................................................................18

**RULE 35(B)(1) STATEMENT**

This appeal presents a Second Amendment challenge to a Maryland law that requires most Marylanders obtain a handgun qualification license ("HQL") before purchasing a handgun. Appellees seek rehearing *en banc* on the questions of whether this law, which requires applicants to satisfy objective, non-discretionary criteria, (1) "infringes" on an applicant's Second Amendment right to keep and bear arms, and (2) is otherwise consistent with this Nation's historical tradition of firearm regulation. These are questions of exceptional importance for the following reasons:

1.  The panel's majority opinion is inconsistent with the Supreme Court's pronouncement in *New York State Rifle and Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n. 9 (2022), that, as a general matter, "shall-issue" licensing regimes do not offend Second Amendment principles. As discussed below, the Supreme Court in *Bruen* expressly approved of licensing schemes that, like Maryland's, "require applicants to undergo a background check or pass a firearms safety course, [and thus] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*.

2.  As the dissent in this case notes, "the majority's hyperaggressive view of the Second Amendment" has far-ranging implications for other firearms restrictions not challenged here. (Slip Op. at 22.) Contrary to the Supreme Court's express approval of shall-issue license regimes, the majority's analysis "would

render presumptively unconstitutional most non-discretionary laws in this country requiring a permit to purchase a handgun[.]" (*Id.*)  Indeed, under the majority's reasoning, any licensing scheme that causes any delay in an individual's exercise of Second Amendment rights (which is practically all licensing schemes, including the ones expressly approved in *Bruen*) would be constitutionally suspect.   This reasoning, which frustrates Maryland's ability to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" thus has significant public safety consequences.

## STATEMENT OF THE CASE

### Statutory Background

Under Maryland's HQL law, the Secretary of the Maryland Department of State Police ("MSP") "shall issue" an HQL to an applicant who (1) is at least 21 years old; (2) is a Maryland resident; (3) has completed a firearm-safety course within three years of application; and (4) "is not prohibited by federal or State law from purchasing or possessing a handgun." Md. Code Ann., Pub. Safety § 5-117.1 (LexisNexis 2018).

The required firearm-safety course must include at least four hours of instruction by a qualified handgun instructor, *id.* § 5-117.1(d)(3)(i), on (1) "State firearm law," (2) "home firearm safety," and (3) "handgun mechanisms and operation," *id.* § 5-117.1(d)(3)(ii).  The course must contain "a firearms orientation

component that demonstrates the person's safe operation and handling of a firearm."

*Id.* § 5-117.1(d)(3)(iii). As part of this component, an applicant must "safely fire[]

at least one round of live ammunition." COMAR 29.03.01.29. The firearm-safety-

course requirement is waived for a person who, among other exemptions, already

lawfully owns a handgun or has completed certain other training courses. Pub.

Safety § 5-117.1(e).

An applicant shall submit (1) "an application in the manner and format

designated by the Secretary;" (2) an application fee "to cover the costs to administer

the program of up to $50;"[1] (3) proof of completion of the safety course requirement;

(4) any other information or documentation required by the Secretary; and (5) a

statement under oath that the individual is not prohibited from possessing a handgun.

*Id.* § 5-117.1(g).

Maryland's HQL law requires the Secretary of MSP to apply to the Maryland

Department of Public Safety and Correctional Services ("DPSCS") for a state and

national criminal-history-records check for each HQL applicant. *Id.* § 5-117.1(f)(2).

To facilitate that process, the HQL application must include "a complete set of the

---

[1] The HQL application fee is set at the statutory cap of $50, COMAR 29.03.01.28(C), which is less than the processing and production costs associated with each HQL application and does not account for other costs associated with administering the program. (J.A. 125-26 ¶¶ 15-18; J.A. 198, 200.)

applicant's legible fingerprints taken in a format approved by" DPSCS and the FBI.[2]

*Id.* § 5-117.1(f)(3)(i).

Within 30 days of receiving a complete application, the Secretary shall either issue an HQL or provide a written denial accompanied by a statement of the reason for the denial and notice of appeal rights. *Id.* § 5-117.1(h). All properly completed applications received by MSP since the inception of the HQL requirement have been processed within this mandated timeframe. (J.A. 124-25 ¶ 12; J.A. 241 ¶ 15.)

An HQL licensee who then wishes to purchase a handgun must complete an application confirming that the applicant is not prohibited from acquiring a handgun and pay an application fee of $10. *Id.* § 5-118(a), (b). Unless an application is disapproved by the MSP within seven days (during which time the MSP conducts a review of the application and background check), the applicant may take possession of the handgun. *Id.* §§ 5-121 – 5-123.

From October 1, 2013, when Maryland's HQL law went into effect, through the end of 2020, a total of 192,506 Marylanders obtained an HQL, and the number of handgun transfers boomed. During each of the years from 2017 to 2020, the yearly figure for handgun transfers exceeded every year prior to 2013, when the law

---

[2] DPSCS must update MSP regarding the criminal history information of HQL applicants and licensees. Pub. Safety § 5-117.1(f)(7). This enables MSP to revoke the HQLs of persons who become ineligible to possess them and, where necessary, retrieve firearms from disqualified persons.

was enacted. (*Compare* J.A. 1611 *with* J.A. 1613.) The number of handgun transfers in 2020 (104,400) *exceeded* the number of transfers in 2013 (90,090), when Maryland experienced vastly increased handgun sales in the run up to the law's effective date. (*Compare* J.A. 1611 *with* J.A. 1613.)

**Proceedings in the District Court**

Plaintiffs first brought their challenge to Maryland's HQL law in 2016, raising Second Amendment and other constitutional theories. Initially, the district court disposed of their claims on standing grounds. This Court then affirmed in part, reversed in part, and remanded the case. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020). At that point, only plaintiffs' Second Amendment claims remained.

On remand, the district court granted the State's motion for summary judgment. In addressing plaintiffs' claim, the district court applied the then-applicable two-prong approach to analyzing Second Amendment challenges that had been adopted by this Court (and nearly all other federal courts of appeal). *Maryland Shall Issue v. Hogan*, 566 F. Supp. 3d 404, 421 (D. Md. 2021). This two-prong approach determined "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" and, if so, "next appl[ies] an appropriate form of means-end scrutiny." *Id.* (citing *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2016) (en banc)). Although the district court first

5

concluded that the administrative requirements of the HQL law burdened Second Amendment rights, it also found no "evidence establishing that any law-abiding, responsible citizen who applied for an HQL was denied the HQL." *Id*. at 424-25. The district court thus concluded that "the HQL requirements place no more than 'marginal, incremental, or even appreciable restraint on the right to keep and bear arms,'" and that intermediate scrutiny was the appropriate level of scrutiny to be applied. *Id*. at 425-26. Applying that since-abrogated framework, the court concluded that the "fingerprinting and training requirements are reasonably adapted to serve the State's overwhelming interest in protecting public safety," and "the time and expense associated with the requirements are reasonable." *Id*. at 440.

**The Supreme Court Decides Bruen**

After the case had been decided by the district court, the United States Supreme Court decided *Bruen*.[3] *Bruen* involved a challenge to certain aspects of New York's "may-issue" public-carry-licensing scheme. As a threshold matter, the Supreme Court rejected the two-prong test that applied tiers of scrutiny depending on "how close the law comes to the core of the Second Amendment and the severity of the law's burden on that right," 142 S. Ct. at 2126. The Court stated:

> In keeping with [*District of Columbia v. Heller*, 554 U.S. 570 (2008)], we hold that when the Second Amendment's plain text covers an

---

[3] This Court had ordered this appeal to be held in abeyance pending the resolution of *Bruen*.

individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.*; *see id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."). After finding that the right to carry firearms in public fell within the text of the Second Amendment, the Court ruled that there was no historical tradition of "requir[ing] law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public." *Id.* at 2156.

The Court, however, noted that although only a handful of States had "may-issue" licensing regimes similar to that of New York, nearly all States had some form of handgun licensing scheme. Acknowledging this fact, the Court emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" because the shall-issue regime's objective criteria do "not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* at 2138 n.9. Accordingly, although the Court invalidated New York's requirement that an applicant convince a government official of the applicant's atypical need to carry for

self-defense, the Court did not invalidate licensing schemes generally. To the contrary, the Court recognized the constitutionality of "shall-issue" licensing regimes. *Id*. The Court held that these licensing regimes, which "often require applicants to undergo a background check or pass a firearms safety course," are not constitutionally problematic because they were "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. These regimes "appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'—features that typify proper-cause standards like New York's." *Id*.

Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to underscore this point: "New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense." *Id*. at 2162. This was so, he reasoned, because, like the regime struck down in *Heller*, the "features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" *Id*. Like the majority, Justice Kavanaugh contrasted New York's licensing scheme with the "objective shall-issue licensing regimes" enacted by the

8

majority of States. These regimes, he noted, "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.*

**The Panel Decision**

On November 21, 2023, a three-judge panel of this Court issued its decision. Writing for himself and Judge Agee, Judge Richardson concluded that Maryland's HQL law "fails the new *Bruen* test." (Slip Op. at 7.) The majority first determined that the HQL burden "regulates a course of conduct that falls within the Amendment's plain text." (*Id.* at 11.) In doing so, the majority noted that the HQL law precluded individuals who did not already have a handgun from acquiring one unless they complied with the law. (*Id.* at 9.) And, although the HQL law does not permanently prohibit individuals from acquiring a handgun, and the law requires individuals only to satisfy objective criteria, the majority found this of no constitutional significance because "it still prohibits them from owning handguns *now*." (*Id.* at 10.)

In a footnote, the majority addressed *Bruen*'s discussion of shall-issue licensing regimes, finding that it "does not bless Maryland's law." (*Id.* at 12 n.9.) The majority rejected any substantive reliance on the Court's shall-issue discussion, concluding that *Bruen*'s broader principles of "text, history, and tradition"

9

superseded it. (*Id*. at 13 n. 9.) The majority also drew a distinction between the public-carry-licensing regimes at issue in *Bruen* and the Maryland HQL law's regulation of the acquisition of handguns, arguing that the principles in the shall-issue discussion were not applicable here because the burden imposed by the HQL law was greater than that of the public-carry licensing regimes. (*Id*.)

On the second prong of the *Bruen* test, the majority concluded that Maryland had not shown that the HQL law was consistent with the Nation's historical tradition of firearm regulation. (*Id*. at 14.) The majority first determined that, assuming there is a historical tradition of prohibiting "dangerous" people from owning firearms, the HQL law was "not 'relevantly similar' to the laws allegedly comprising that tradition." (*Id*. at 15.) The majority noted that, although "[t]he historical 'dangerousness' laws targeted people already deemed dangerous by the state," the HQL law "prohibits *all* people from acquiring handguns until they can *prove* that they are not dangerous." (*Id*. at 16.) The majority also rejected the State's argument that the firearms training aspect of the HQL was supported by a historical tradition of requiring militia training. This tradition was not sufficient, the majority posited, because the historical militia laws "placed no restrictions on acquiring or owning firearms," and thus "did not burden a Second Amendment right at all." (*Id*. at 17-18.)

Judge Keenan dissented.  Unlike the majority, Judge Keenan expressed the view that the principles espoused in *Bruen*'s discussion of shall-issue regimes were directly applicable to the resolution of this case.  (*Id*. at 22.)  Judge Keenan noted that, in the shall-issue discussion, "the Court provided explicit cautionary language, warning that the Court's opinion about may-issue regimes should not be interpreted as 'suggest[ing] the unconstitutionality of . . . 'shall-issue' licensing regimes,' and adding that such regimes do not 'necessarily prevent "law-abiding, responsible citizens"' from exercising their Second Amendment rights."  (*Id*. at 28.)  Judge Keenan observed that Maryland's HQL law, which "allows any law-abiding, responsible person who seeks to obtain a handgun qualification license to do so by completing the objective criteria outlined in the statute," was substantively similar to "the shall-issue regimes contemplated by the Supreme Court in *Bruen*."  (*Id*. at 28.)  She rejected the notion that the HQL law was unconstitutional because its objective requirements prevented an individual from acquiring a handgun immediately, noting that the requirements expressly approved in *Bruen*—background checks and firearm safety courses—would similarly result in at least some delay.  (*Id*. at 29.)  Judge Keenan also focused on the *Bruen* Court's "contrasting example" of what might make a shall-issue regime unconstitutional: "*lengthy* wait times . . . or *exorbitant* fees [that] *deny* ordinary citizens their right to public carry."  (*Id*.)  Judge Keenan concluded:  "The difference between a facially

11

permissible shall-issue regime and a facially impermissible shall-issue regime thus is not whether any burden is imposed or any delay results from the regulatory measures, but whether any requirements imposed by the regime are so onerous that they operate to 'deny' law-abiding, responsible individuals their Second Amendment rights." (*Id*.)  "The shall-issue discussion plainly signals the Supreme Court's thinking that, going forward, successful constitutional challenges to shall-issue statues ordinarily will be limited to challenges involving uniquely burdensome requirements such as 'lengthy wait times in processing license applications' or 'exorbitant fees.'" (*Id*. at 35.)

Judge Keenan found support in the text of the Second Amendment, which prohibits the "infringe[ment]" of the pre-existing right embodied in the Amendment. (*Id*. at 31.)  She noted that, in contrast to this case, "[i]n the [Supreme] Court's seminal Second Amendment decisions, the Court has considered only laws that banned or effectively banned individuals from possessing or carrying firearms." (*Id*. at 30 (citing *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Bruen*, and *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016)).)  Judge Keenan noted that, by judging any licensing regime that delayed the exercise of a Second Amendment right unconstitutional, the majority's reasoning "has created a constitutional test that would render presumptively unconstitutional most, if not all, shall-issue permitting laws." (*Id*. at 32.)

12

Finally, Judge Keenan argued that the appropriate resolution of this case was for the Court to remand the matter to the district court. Judge Keenan first expressed the view that, because the district court did not have the opportunity to engage in an analysis under *Bruen*, the district court should be allowed to do so. (*Id*. at 35-38.) She also stated that remand was appropriate to allow the district court to conduct a severability analysis. (*Id*. at 38-40.)

## REASONS FOR GRANTING REHEARING *EN BANC*

As noted above, in *Bruen* the Supreme Court expressly approved of shall-issue licensing regimes that, through objective criteria, are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 142 S. Ct. at 2138 n.9. The majority opinion in this case, however, improperly brushes aside this unequivocal language, and in its place advances its own "hyperaggressive" understanding of Second Amendment principles. Because the majority's analysis presents a square conflict with clear guidance from the Supreme Court, this Court should grant *en banc* review.

Although the majority attempts to explain why it is not bound by the Supreme Court's express approval of shall-issue licensing regimes, its reasoning does not withstand scrutiny. First, although the Supreme Court's shall-issue discussion may not have been necessary to the resolution of the discrete question before the Court of the constitutionality of "may-issue" licensing regimes, this Court is "still . . .

13

bound to follow it considering the obvious importance of the analysis to the opinion." *Virginia Uranium, Inc. v. Warren*, 848 F.3d 590, 609 n.14 (4th Cir. 2017); *see also United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (noting that lower federal courts are "'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statement.'" (citation omitted)).  Here, the shall-issue discussion was patently intended to provide guidance and direction on the constitutionality of objective shall-issue licensing regimes.  The Court recognized that its decision, which on its face implicated only one facet of the challenged licensing regimes, inherently called into question the fundamental legitimacy of all aspects of licensing regimes generally.  Fully aware that lower courts were grasping for clarity on the many questions left unanswered by *Heller* and *McDonald*, *Bruen*'s shall-issue discussion was thus carefully crafted to provide a framework for lower courts as to how they might reconcile *Bruen*'s primary holding with potential challenges to licensing schemes, like the one challenged here, that rely only on objective criteria and are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"

Accordingly, the majority's assertion that the shall-issue discussion was simply a throwaway discussion of no real significance is incorrect.  As the majority notes, the Supreme Court's shall-issue discussion followed a lengthy examination of

14

its "text, history, and tradition" standard. (Slip Op. at 12-13 n.9.) It thus strains credulity to suggest, as the majority does, that, in giving express approval to shall-issue licensing regimes, the Supreme Court had not considered how those regimes would fare under its own articulation of that standard.

Moreover, the Supreme Court's language is unequivocal. Whether it relates to *Bruen*'s second step (as the majority asserts, slip op. at 11 n.8) or first step (as the dissent asserts, slip op. at 34-38), the shall-issue discussion gives express approval to the very same requirements that are being challenged in this case: background checks and firearm training courses. And there is no indication that the Court's shall-issue discussion was limited to public-carry, as opposed to permit-to-purchase, regimes. Indeed, such a conclusion would be directly contrary to the fundamental principle animating *Bruen*: that the right to keep and the right to bear are on equal footing. *See Bruen*, 142 S. Ct. at 2134, 2156 (noting that "[n]othing in the Second Amendment's text draws a home/public distinction," and that the right to public carry was "not a 'second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees'").

Finally, the majority's analysis has far-reaching implications. As the dissent noted, contrary to the Supreme Court's express directive, the majority's analysis "render[s] presumptively unconstitutional most non-discretionary laws in this country requiring a permit to purchase a handgun[.]" (Slip Op. at 22.) More

15

importantly, its practical effect is to render presumptively unconstitutional *any* law, whether it be an objective shall-issue licensing regime, waiting period, or other regulatory measure, whose incidental effect is to delay the exercise of Second Amendment rights. Yet, as set forth above, not only is this result contrary to the express approval of such measures in *Bruen*, but also impacts public safety by undermining *Bruen*'s guarantee that governments may enact measures to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" That is especially true here, as the majority's decision has eliminated an important—and demonstrably effective—tool for reducing firearm violence.

Stated simply, the Supreme Court spoke clearly in *Bruen* when it expressly approved shall-issue regimes like Maryland's HQL law. The majority's decision incorrectly cast aside this binding precedent. *En banc* review is thus necessary to allow this Court the opportunity to provide a faithful application of *Bruen*'s shall-issue discussion.

16

## CONCLUSION

This Court should grant rehearing *en banc*.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich

_____

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

Attorneys for Appellee

17

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 3,644 words, excluding the parts exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich

**CERTIFICATE OF SERVICE**

I certify that, on this 5th day of December, 2023, the forgoing Petition for Rehearing En Banc was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich