No. 21-2017

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**MARYLAND SHALL ISSUE, INC.,** *et al.,*

*Plaintiffs-Appellants,*

**v.**

**WES MOORE,** *et al.,*

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(Ellen L. Hollander, District Judge)

_____

**SUPPLEMENTAL BRIEF OF APPELLEES**

_____

ANTHONY G. BROWN
Attorney General of Maryland

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rdietrich@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

March 1, 2024                    Attorneys for Appellees

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................2

I. THE SUPREME COURT'S PRONOUNCEMENT IN *BRUEN* IS CONTROLLING IN THIS CASE. ...................................................................................................2

II. EVEN IF THIS COURT LOOKS BEYOND *BRUEN*'S CLEAR PRONOUNCEMENT, SHALL-ISSUE PERMIT-TO-PURCHASE LICENSING REGIMES SUCH AS MARYLAND'S HQL LAW ARE CONSTITUTIONAL BECAUSE THEY ARE PROCEDURAL MECHANISMS DESIGNED TO IMPLEMENT SUBSTANTIVELY-PERMISSIBLE LIMITATIONS ON THE SECOND AMENDMENT RIGHT. .......................................................................10

    A. Maryland's HQL Law is Constitutional Because It Enforces Substantively-Permissible Limitations on the Second Amendment Right. ..........................................................................11

    B. Maryland's HQL Law is Constitutional Because It Employs Objective Criteria and Imposes Only a De Minimis Burden on Those Seeking to Acquire a Handgun. ............................................16

CONCLUSION ..............................................................................................21

CERTIFICATE OF COMPLIANCE ...............................................................22

# TABLE OF AUTHORITIES

Page

## Cases

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ............................ 5, 12, 15, 16

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) ................................... 15

*Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843
    (7th Cir. 2016) ............................................................................................ 12

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ..................................................... 18

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) .............. 17

*City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004) ............................... 14

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ....................... 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................... 4, 8, 12

*Duncan v. Bonta*, No. 23-55805 (9th Cir.) ............................................................ 6

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ........................... 16

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) .................................................. 19

*Giambalvo v. Suffolk County*, 656 F. Supp. 3d 374 (E.D.N.Y. 2023) .................... 7

*Green v. City of Raleigh*, 523 F.3d 293 (4th Cir. 2008) ........................................ 17

*Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010) ..................... 19

*Koons v. Platkin*, __ F. Supp. 3d. __, 2023 WL 3478604
    (D.N.J. May 16, 2023) ................................................................................ 6

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) .............................................. 19

*Lee v. Virginia State Board of Elections*, 843 F.3d 592 (4th Cir. 2016) ................ 13

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038
    (4th Cir. 2023) .................................................................................... passim

*McDonald v. Chicago*, 561 U.S. 742 (2010) ......................................................4, 8

*New York State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022)...............*passim*

*Oregon Firearms Federation v. Kotek*, __ F. Supp. 3d __, 2023
    WL 4541027 (D. Ore. July 14, 2023) ............................................................ 6

*Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992)........18, 19

*Range v. Attorney General United States*, 69 F.4th 96 (3d Cir. 2023) ...................15

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ........................................................12

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) ........................................17, 18

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012) ................................11

*United States v. Childs*, 1:22-cr-327-LMM-LTW-11, 2023 WL 6845830 (N.D. Ga.
    Oct. 16, 2023) ............................................................................................ 7

*United States v. Fareed*, 296 F.3d 243 (4th Cir. 2002) ........................................ 7

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) ........................................19

*United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023) ...................................12

*United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023)........................................15

*Virginia Uranium, Inc. v. Warren*, 848 F.3d 590 (4th Cir. 2017) .......................... 7

*Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989)................................13

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ............................................................14

**Statutes**

Am. Jur. Licenses § 17....................................................................................19

Md. Code Ann., Pub. Safety § 5-117.1(d) (LexisNexis 2018) ...............................18

**Miscellaneous**

*Proceedings of the Board of Aldermen of the City of New York from January 7 to
    March 26, 1878*, Vol. CXLIX, at 60 (1878) .....................................................16

No. 21-2017

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

## MARYLAND SHALL ISSUE, INC., *et al.*,

*Plaintiffs-Appellants*,

v.

## WES MOORE, *et al.*,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(Ellen L. Hollander, District Judge)

_____

## SUPPLEMENTAL BRIEF OF APPELLEES

_____

## INTRODUCTION

In *New York State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022), the United States Supreme Court expressly approved of "shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course, [and thus] are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" Maryland's handgun qualification license ("HQL") regime, which employs objective criteria and merely

requires that applicants take a firearms safety course and pass a background check, falls squarely within the type of "shall-issue" licensing regimes referenced above. Simply stated, the Supreme Court's pronouncement in *Bruen* is controlling, and this Court's analysis need not proceed any further.

But even looking beyond the Supreme Court's clear and specific guidance, Maryland's HQL law passes constitutional muster. Indeed, Maryland's HQL law implements the uncontroversial constitutional premise that, where there are substantive limitations on a particular constitutional right, a government may enact objective procedural measures to enforce those limitations. Here, because Maryland's HQL law is consistent with these generally-applicable constitutional principles, and enforces substantive limitations on the right to keep and bear arms through measures that do not otherwise "infringe" the right itself, this Court should uphold the constitutionality of Maryland's HQL law and affirm the judgment of the district court.

## ARGUMENT

### I. THE SUPREME COURT'S PRONOUNCEMENT IN *BRUEN* IS CONTROLLING IN THIS CASE.

In *Bruen* the Supreme Court considered a challenge to New York's "may-issue" public-carry-licensing scheme. Specifically at issue was New York's "proper cause" requirement, which limited the issuance of public carry permits to those

individuals who could demonstrate a special need for self-defense. Clarifying and then applying its "text, history, and tradition" test, the Supreme Court invalidated that aspect of the licensing regime because there was no historical tradition of "requir[ing] law-abiding, responsible citizens to 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public." *Bruen*, 597 U.S. at 70.

The Supreme Court, however, noted that although only a handful of States had "may-issue" licensing regimes similar to that of New York, nearly all States had some form of firearms licensing scheme. Acknowledging this fact, the Court emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" because the shall-issue regime's objective criteria do "not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* at 38 n.9. Accordingly, although the Court invalidated New York's subjective requirement that an applicant convince a government official of the applicant's atypical need to carry for self-defense, the Court did not invalidate licensing schemes generally. To the contrary, the Court recognized the constitutionality of objective "shall-issue" licensing regimes. *Id.* The Court held that these licensing regimes, which "often require applicants to undergo a background check or pass a firearms safety course," are not constitutionally

problematic because they were "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id*. These regimes "appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion'—features that typify proper-cause standards like New York's." *Id*. (citation omitted).

Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to underscore this point: "New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense." *Id*. at 79. This was so, he reasoned, because, like the regimes struck down in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), the "features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.'" *Bruen,* 597 U.S. at 79. Like the majority, Justice Kavanaugh contrasted New York's licensing scheme with the "objective shall-issue licensing regimes" enacted by the majority of States. These regimes, he noted, "may require a license applicant to undergo fingerprinting, a background check, a mental health

records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id*. at 80.

As the State has consistently argued, *Bruen*'s analytical framework controls the outcome in this case. Each of the challenged aspects of Maryland's HQL regime—the background check, fingerprinting, the firearms training course, and even a statutorily-capped licensing fee—were all given express approval by the Supreme Court in *Bruen*. And perhaps most notably, *Bruen* gave its blessing to the use of licensing regimes generally, notwithstanding that the very nature of a licensing regime "require[s] advance permission" from the government, *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1046 (4th Cir. 2023), and inherently involves some amount of delay.

It is thus not surprising that, since *Bruen*, federal courts have had no trouble upholding the constitutionality of shall-issue licensing regimes without looking beyond the Supreme Court's express approval in that case. *See Antonyuk v. Chiumento*, 89 F.4th 271, 315 n.24 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 22, 2024)[1] (discussing the panel decision of this Court in *Maryland Shall Issue* and noting that its conclusion that "firearm licensing regimes based on a

---

[1] Although the petition seeks review of the Second Circuit's rejection of a challenge to New York's "good moral character" aspect of its firearms licensing scheme, the petitioners do not challenge the constitutionality of the underlying licensing regime itself.

determination of 'dangerousness' are constitutionally impermissible" "runs directly against *Bruen*'s clear guidance on shall-issue regimes"); *Oregon Firearms Federation v. Kotek*, __ F. Supp. 3d __, 2023 WL 4541027, *46 (D. Ore. July 14, 2023) (concluding that Oregon's permit-to-purchase regime is "constitutional under *Bruen* [because it] constitutes a *shall-issue* licensing regime" (emphasis in original))[2]; *Koons v. Platkin*, __ F. Supp. 3d. __, 2023 WL 3478604, *28 (D.N.J. May 16, 2023) (concluding that, although "[t]he State has not come forward with any historical laws to support Chapter 131's new application requirements," "the new requirements are permissible under the Second Amendment because 'they serve to ensure that only law-abiding citizens who are not a danger to themselves or others are authorized to possess firearms,'" and "are precisely the type of legitimate regulation that *Bruen* spoke of approvingly" (citation omitted))[3]; *Giambalvo v.*

---

[2] The plaintiffs have noted an appeal in *Kotek*. However, because *Kotek* also involved a challenge to an Oregon law regulating high-capacity magazines, and because a challenge to the constitutionality of high-capacity magazines is currently pending before the en banc Ninth Circuit in *Duncan v. Bonta*, No. 23-55805 (9th Cir.), the *Kotek* appeal has been stayed pending the resolution of *Duncan*. Separately, an Oregon state court has concluded that Oregon's permit-to-purchase regime violates the Oregon state constitution and has therefore enjoined enforcement of that regime. Oregon's appeal of that state-court decision is currently pending.

[3] The plaintiffs in *Koons* have noted an appeal. However, plaintiffs' challenge on appeal with respect to the licensing system relates only to the substantive basis for certain licensing components, and not the underlying licensing scheme itself. *See* Principal Brief for Siegel Appellees, Nos. 23-1900, 23-2043 (3d Cir.), Doc. 87 at 18-19 (noting *Bruen*'s approval of shall-issue licensing regimes generally but arguing that certain permitting requirements (such as an insurance mandate) are

*Suffolk County*, 656 F. Supp. 3d 374, 381 (E.D.N.Y. 2023), *appeal docketed*, No. 23-208 (2d Cir.) (relying on *Bruen*'s shall-issue discussion to conclude that "certain state handgun licensing regimes are constitutionally permissible"); *cf. United States v. Childs*, 1:22-cr-327-LMM-LTW-11, 2023 WL 6845830, *5 (N.D. Ga. Oct. 16, 2023) (referencing Justice Kavanaugh's concurrence and stating: "If such administrative burdens on the carrying of firearms are permissible, it follows that administrative steps required to purchase firearms are also permissible").

Although attempts have been made to explain why *Bruen*'s express approval of shall-issue licensing regimes is not controlling in this case, none of them withstands scrutiny. First, although the Supreme Court's shall-issue discussion may not have been necessary to the resolution of the discrete question before the Court of the constitutionality of discretionary "may-issue" licensing regimes, this Court is "still . . . bound to follow it considering the obvious importance of the analysis to the opinion." *Virginia Uranium, Inc. v. Warren*, 848 F.3d 590, 609 n.14 (4th Cir. 2017); *see also United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (noting that lower federal courts are "'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statement.'" (citation omitted)). Here, the shall-issue discussion was

---

unconstitutional because they "have no more grounding in this Nation's historical tradition than the ['proper cause'] condition rejected in *Bruen*.").

patently intended to provide guidance and direction on the constitutionality of objective shall-issue licensing regimes. The Supreme Court recognized that its decision, which on its face implicated only one facet of the challenged licensing regimes, inherently called into question the fundamental legitimacy of all aspects of licensing regimes generally. Fully aware that lower courts were grasping for clarity on the many questions left unanswered by *Heller* and *McDonald*, *Bruen*'s shall-issue discussion was thus carefully crafted to provide a framework for lower courts as to how they might reconcile *Bruen*'s primary holding with potential challenges to licensing schemes, like the one challenged here, that rely only on objective criteria and are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" Indeed, as discussed above, courts since *Bruen* have accorded the shall-issue discussion dispositive status.

Accordingly, any assertion that *Bruen*'s shall-issue discussion was simply a throwaway discussion overlooks this clear context. Moreover, the Supreme Court's shall-issue discussion followed a lengthy examination and clarification of its "text, history, and tradition" standard. It thus strains credulity to suggest that, in giving express approval to shall-issue licensing regimes, the Supreme Court did not consider how those regimes would fare under its own articulation of that standard.

Further, the Supreme Court's language is unequivocal. The shall-issue discussion goes out of its way to give express approval to the very same requirements

that are being challenged in this case: background checks and firearms training courses. And there is no indication that the Supreme Court's shall-issue discussion was limited to public-carry, as opposed to permit-to-purchase, regimes. Indeed, such a conclusion would be directly contrary to the fundamental principle animating *Bruen*: that the right to "keep" and the right to "bear" are on equal footing. *See Bruen*, 597 U.S. at 32, 70 (noting that "[n]othing in the Second Amendment's text draws a home/public distinction," and that the right to public carry was "not a 'second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees'"). Likewise, it ignores the fact that the acquisition of a firearm gives rise to the owner's ability to "bear" that firearm, even if possession is confined to the home. *See Bruen*, 597 U.S. at 32 (acknowledging that the use of a firearm for self-defense while in the home implicates the right to "bear" arms).

Finally, any conclusion that *Bruen*'s shall-issue discussion need not be followed has far-reaching implications. Contrary to the Supreme Court's express directive, disavowing *Bruen*'s unequivocal pronouncement would "render presumptively unconstitutional most non-discretionary laws in this country requiring a permit to purchase a handgun[.]" *Maryland Shall Issue*, 86 F.4th at 1049 (Keenan, J., dissenting)). More importantly, setting aside the shall-issue discussion would have the practical effect of rendering presumptively unconstitutional *any* law, whether it be a shall-issue licensing regime, waiting period, or other objective

regulatory measure, whose incidental effect is to delay the exercise of Second Amendment rights. Yet, as set forth above, not only is this result contrary to the express approval of such measures in *Bruen* (and the practical effects of that approval), but also undermines *Bruen*'s guarantee that governments may enact measures to "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" No court has adopted this "hyperaggressive" view of the Second Amendment, and this Court should reject it as well.

## II. EVEN IF THIS COURT LOOKS BEYOND *BRUEN*'S CLEAR PRONOUNCEMENT, SHALL-ISSUE PERMIT-TO-PURCHASE LICENSING REGIMES SUCH AS MARYLAND'S HQL LAW ARE CONSTITUTIONAL BECAUSE THEY ARE PROCEDURAL MECHANISMS DESIGNED TO IMPLEMENT SUBSTANTIVELY-PERMISSIBLE LIMITATIONS ON THE SECOND AMENDMENT RIGHT.

As noted above, to resolve this matter this Court need look no further than *Bruen*'s clear pronouncement that shall-issue licensing regimes are presumptively constitutional. But should this Court wish to engage further, it will find that the basic postulate underlying the Supreme Court's shall-issue discussion—that licensing schemes themselves are generally not constitutionally problematic—is a noncontroversial application of widely-applicable principles of constitutional law. And under this constitutional framework, Maryland's HQL law passes constitutional review.

**A.    Maryland's HQL Law is Constitutional Because It Enforces Substantively-Permissible Limitations on the Second Amendment Right.**

As the State argued in its opening brief, the Supreme Court has distinguished between substantive limitations on constitutional rights and the administrative regimes that implement those limitations.  (Doc. 38 at 27-29.)  Yet, as explained below, each of these aspects is subject to a different analysis.  In short, precedent instructs that any substantive limitation that is enforced through a licensing scheme must itself be justified by the historical traditions of the regulated right.  But in contrast, the procedural mechanisms of the administrative licensing scheme that implements those substantively-permissible limitations need only be evaluated to determine whether the burdens they impose otherwise amount to an "infringe[ment]" of the underlying right.

In its opening brief, the State set forth at length the historical tradition of restricting possession of firearms by dangerous individuals and groups.[4]  (Doc. 38 at

_____

[4] In its decision, the panel majority in *Maryland Shall Issue* declared that, although the State "first asserts that its law is justified by the 'historical limitations' on the ability of 'dangerous' people to own firearms, . . . Maryland points to no historical laws for support."  86 F.4th at 1046.  But, as the State pointed out, the heavy lifting had already been done by this Court.  (Doc. 38 at 19-22.)  Indeed, in *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012), this Court engaged in a historical analysis of the limitations on the Second Amendment right—ranging from the English Bill of Rights, colonial-era laws, Founding-era debates, and beyond—to conclude that its protections were limited to "law-abiding, responsible citizens."  And the State cited case law from other circuits, which, using the same historical record, all arrived at the same unremarkable conclusion.  No court has

16-23, 31-37.)  And the State identified several cases in which courts had affirmed a government's ability to use a licensing scheme to enforce this substantive limitation on Second Amendment rights.  *See* (Doc. 38 at 27-29) (citing, *e.g.*, *Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) (explaining that, because under *Heller* "the State may set substantive requirements for [handgun] ownership," the State "may use a licensing system to enforce them")). But these principles are not limited to the Second Amendment context and apply across the spectrum of individual constitutional rights.  For example, in the voting rights context, in addition to approving voter registration generally, *see Rosario v. Rockefeller*, 410 U.S. 752, 754-58 (1973), courts have upheld voting restrictions that are designed to ensure that individuals are in fact eligible to vote in a particular jurisdiction.  Thus, in *Lee v. Virginia State Board of Elections*, this Court approved of Virginia's law requiring voters to show photographic identification, noting that "photo identification is one effective method of establishing a voter's qualification

_____

concluded otherwise.  Instead, as the Second Circuit recently observed, "there is widespread consensus (notwithstanding some disputes at the margins) that restrictions which prevent dangerous individuals from wielding lethal weapons are part of the nation's tradition of firearm regulation."  *Antonyuk*, 89 F.4th at 312.

To the extent that this Court seeks a more exhaustive cataloging and examination of the particular statutes and traditions that underly this substantive limitation, the State directs this Court to, and incorporates herein, pages 10 to 27 of the Brief for the United States in *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), which is currently pending before the United States Supreme Court.

to vote." 843 F.3d 592, 606 (4th Cir. 2016) (citing *Crawford v. Marion County Election Board*, 553 U.S. 181, 193 (2008)). Similarly, in the now-abrogated abortion rights context, Justice O'Connor concluded that a law precluding a doctor from performing an abortion prior to 20 weeks without first conducting a test to determine if the fetus is viable was constitutional because "the State's compelling interest in potential life postviability renders its interest in determining the critical point of viability equally compelling." *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 531 (1989) (O'Connor, J. concurring).

These cases make clear that the primary step in evaluating an administrative burden imposed by a licensing scheme is to determine whether it acts to implement an additional substantive limit on the right being regulated. The Supreme Court's central holding in *Bruen* bears that out. There, the Court concluded that New York's "proper cause" requirement, and its heightened standard for the exercise of the right to public carry, was unconstitutional because it placed a nontextual, ahistorical *substantive* limit on the right of law-abiding citizens to carry publicly for self-defense. 597 U.S. at 70. The Court contrasted New York's may-issue regime with a shall-issue regime, which did not offend the Constitution because, despite limiting the exercise of the constitutional right to carry publicly until and unless a license was acquired, the shall-issue regime's objective criteria did "not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right

to public carry." *Id*. at 38 n.9.  The Supreme Court has employed this benchmark in other contexts, upholding (or striking down) an administrative regulation by evaluating whether it (1) enacts a new substantive limitation on who may exercise the right, or (2) simply establishes an administrative burden that any otherwise-eligible person may overcome.  *See City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 783 (2004) (holding that an adult-business license ordinance was constitutional because it applied "criteria unrelated to the content of the expressive materials that an adult business may sell or display"); *Zablocki v. Redhail*, 434 U.S. 374, 387 (1978) (concluding that a statute restricting the ability to marry infringed that right because "[s]ome of those in the affected class, like appellee, will never be able to obtain the necessary court order" required by the restriction).

Evaluating *Bruen*'s shall-issue discussion through this lens reveals that it is simply an unexceptional application of the principles discussed above.  By giving express *approval* to licensing schemes that require background checks and firearms training, the Supreme Court recognized that those provisions are consistent with substantive limitations on the Second Amendment right.  Indeed, the Second Circuit recently acknowledged this, concluding that *Bruen*'s shall-issue discussion "reflects a recognition that such regulations are not inherently inconsistent with the Second

Amendment or our historical traditions."[5] *Antonyuk*, 89 F.4th at 314. In other words, as the State argued in its opening brief (and as *Bruen* plainly counsels), background check and firearms training course requirements (such as those in Maryland's HQL law) further the historical tradition of "ensur[ing] only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"[6] Accordingly, because

---

[5] In addition to challenging certain aspects of New York's firearms licensing application process, the *Antonyuk* plaintiffs challenged the requirement that permit applicants engage in firearms training. Yet although the district court struck down several of the application requirements (including its "good moral character" requirement), the district court found no constitutional infirmity as to the training requirement. *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 312 (N.D.N.Y. 2022). The district court concluded that colonial laws relating to militia service and training were a proper analogue to the challenged law in that both "require[] that those persons without familiarity of firearms must become familiar with them if those persons are to exercise their" Second Amendment rights. *Id.* at 313. The district court found further support in the fact "that historically Americans' familiarity with firearms was far more common than it is today." *Id.* The *Antonyuk* plaintiffs did not pursue their challenge to the training requirements on appeal.

[6] There is ongoing debate over whether this substantive limitation on the right to keep and bear arms is (1) a matter of text, in that the "people" referenced in the Second Amendment's text is limited only to "law-abiding, responsible citizens," *see, e.g.*, *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023), or (2) a matter of tradition, in that governments have historically limited the right to keep and bear arms to "law-abiding, responsible citizens," *see, e.g.*, *Range v. Attorney General United States*, 69 F.4th 96, 98 (3d Cir. 2023) (en banc). Indeed, this debate is reflected in the panel's decision in this case, where the dissent argued that this case should be resolved under *Bruen's* "textual" first step, while the majority concluded that the case implicated the "historical tradition" second step. But this debate need not be resolved, or even addressed, in this case. This is because, no matter what its underlying basis, the Supreme Court affirmed that such a substantive limitation may be enforced through its conclusion that States may impose background checks and firearms training courses in furtherance of that limitation.

Maryland's HQL regime enforces substantively-permissible limitations on the Second Amendment right, it survives constitutional challenge.[7]

### B. Maryland's HQL Law is Constitutional Because It Employs Objective Criteria and Imposes Only a De Minimis Burden on Those Seeking to Acquire a Handgun.

In addition to the substantive limitations discussed above, challenges to licensing regimes may also involve an evaluation of the administrative burdens that are imposed by the regime. This analysis generally encompasses two separate inquiries.

First, Supreme Court precedent commands that an administrative regime must be guided by "narrow, objective, and definite standards to guide the licensing authority." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969)). Applying this

---

[7] Jurisdictions have long implemented these substantive limitations through firearms licensing schemes. For example, in 1878 New York City enacted an ordinance that prohibited the public carry of pistols without a license, which would only be issued upon a showing that an applicant is "a proper and law-abiding person." New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York (Jan. 7, 1878), in *Proceedings of the Board of Aldermen of the City of New York from January 7 to March 26, 1878*, Vol. CXLIX, (1878). Although, as explained above, licensing that enforces substantively-permissible limitations on a particular right is presumptively constitutional regardless of whether there is a demonstrable historical tradition of regulating that right through licensing, these laws nonetheless demonstrate a historical tradition of licensing that provides an alternative basis for affirmance in this case. *See Antonyuk*, 86 F.4th at 312 ("Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment.").

principle, the Supreme Court struck down an ordinance that allowed a government official to deny a permit for a newspaper rack because it was "not in the public interest," noting that the ordinance's absence of "explicit limits" on this otherwise broad standard unconstitutionally conferred essentially unbridled discretion on the official. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 769-70 (1988). In contrast, this Court in *Green v. City of Raleigh* upheld as constitutional a permitting scheme for those engaging in picketing because it "set forth clear requirements regulating picketing and extend[ed] to City officials *no* discretion to prohibit picketing that complies with these requirements." 523 F.3d 293, 306 (4th Cir. 2008) (emphasis in original).

*Bruen* once again provides an exemplar of the applicable principles. Although the Court's decision rested primarily on its conclusion that the substantive "proper cause" requirement was not consistent with the Second Amendment's historical tradition, the Court also was concerned about the discretion given to government officials under that standard. Thus, in approving of shall-issue licensing regimes, the Court noted that such regimes "appear to contain only 'narrow, objective and definite standards' guiding licensing officials, . . . rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion[.]'" 597 U.S. at 38 n.9 (citing *Shuttlesworth*, 394 U.S. at 151 and *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).

Similarly, Maryland's HQL law satisfies this analysis. As set forth in the State's opening brief (Doc. 38 at 37-38), and as the panel majority concluded in this case, *Maryland Shall Issue*, 86 F.4th at 1043 n.6, Maryland's HQL law is a non-discretionary "shall-issue" regime: If the applicant fills out an application, pays the fee, submits fingerprints, completes a firearms safety course, and passes a background check (which itself implements the objective criteria of Maryland and federal law), the applicant "shall" be issued an HQL. Md. Code Ann., Pub. Safety § 5-117.1(d) (LexisNexis 2018).

The second inquiry looks to whether a licensing scheme subjects an applicant to administrative burdens that, though otherwise permissible, nonetheless have the individual or aggregate effect of imposing such a substantial burden as to destroy the viability of the substantive right itself. The Supreme Court has recognized that, with respect to "all liberties," "not every law which makes a right more difficult to exercise is ipso facto, an infringement of that right." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 873 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022). As a result, "[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise a constitutional right] cannot be enough to invalidate it." *Id*. at 874; *see also Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (applying the "undue

burden" standard from the abortion rights context to conclude that firearms regulations, even if grounded in otherwise-permissible substantive limitations, "cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms"); *Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) ("[T]he fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it 'substantially burdens' that right."). Although this principle applies across individual constitutional rights, it has its roots in due process, and is "violated by licensing legislation only where the legislation is so unreasonable or extravagant so as to arbitrarily and unnecessarily interfere with, or destroy" the exercise of the right. Am. Jur. Licenses § 17; *see also United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) ("Neither the application procedure nor the fee are so prohibitive as to turn this condition or qualification into a functional prohibition."); *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 190 (D.D.C. 2010), *aff'd in part, vacated in part*, 670 F.3d 1244 (D.C. Cir. 2011) (noting that "the Supreme Court has held that registration and licensing schemes are permissible in other contexts so long as they do not excessively impinge on the constitutional right"); *cf. Casey*, 505 U.S. at 874 ("Only where state regulation imposes an undue burden [on the exercise of a constitutional right] does the power of the State reach into the heart of the liberty protected by the Due Process Clause.").

Yet again, *Bruen*'s shall-issue discussion reflects how these principles might play out. There, notwithstanding the Court's general approval of shall-issue licensing regimes, the Court noted that "any permitting scheme can be put toward abusive ends," and did not "rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9. And in his concurrence where he amplified his approval of shall-issue regimes as "constitutionally permissible," Justice Kavanaugh noted a foundational caveat: "subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Id*. at 80. These principles thus acknowledge that the "mechanism matters," *Maryland Shall Issue*, 86 F.4th at 1049, but only as part of an independent constitutional evaluation as to whether that mechanism, in practice, otherwise amounts to a destruction (or "infringe[ment]") of the right.[8]

Accordingly, given that Maryland's HQL law has the same attributes as the "constitutionally permissible" shall-issue regimes referenced in *Bruen*, the only remaining question is whether Maryland's HQL law "operates in that matter in

---

[8] To explain it differently, a court's evaluation of the mechanism used to enforce limitations on a constitutional right is not initially part of the analysis of the substantive contours of the right (as the panel majority concluded), but rather an additional, after-the-fact safeguard that independently considers the burdens imposed by a particular administrative regime.

practice." *Bruen*, 597 U.S. at 80.  Yet as demonstrated in the State's opening brief (Doc. 38 at 38-42), and as the district court already determined (J.A. 1859, 1861), there is nothing about Maryland's HQL law that is facially problematic.[9] Accordingly, there is no basis to conclude that the administrative burdens that Maryland's HQL law imposes amount to a destruction of the Second Amendment right.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ryan R. Dietrich

_____
ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

Attorneys for Appellees

_____

[9] As no individual plaintiff has actually applied for an HQL, this case presents only a facial challenge to the law.

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B), and this Court's February 2, 2024 Order (Doc. 83), because this brief contains 4,964 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Ryan R. Dietrich

_____

Ryan R. Dietrich

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

|  |  |  |
|---|---|---|
| | * | |
| MARYLAND SHALL ISSUE, INC., ET AL., | * | |
| *Plaintiffs-Appellants*, | * | No. 21-2017 |
| v. | * | |
| WES MOORE, ET AL., | * | |
| *Defendants-Appellees*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### CERTIFICATE OF SERVICE

I certify that, on this 1st day of March, 2024, the Supplemental Brief of Appellees was filed electronically and served on counsel of record who are registered CM/ECF users.


/s/ Ryan R. Dietrich
_____
Ryan R. Dietrich