**No. 21-2017**

═══════════════════════

**In the**
**United States Court of Appeals for the Fourth Circuit**
_____

MARYLAND SHALL ISSUE, INC., for itself and its members; ATLANTIC GUNS, INC.;
DEBORAH KAY MILLER; SUSAN BRANCATO VIZAS,
*Plaintiffs-Appellants*,

v.

WES MOORE, in his capacity as Governor of Maryland;
WOODROW W. JONES, III, Colonel,
*Defendants-Appellees*.

_____

**On Appeal from the**
**United States District Court for**
**the District of Maryland**
_____

Brief *Amicus Curiae* of
Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of
California, Heller Foundation, Virginia Citizens Defense League, Grass Roots
North Carolina, Rights Watch International, Tennessee Firearms Association,
Tennessee Firearms Foundation, America's Future, U.S. Constitutional Rights
Legal Defense Fund, and Conservative Legal Defense and Education Fund
in Support of Plaintiffs-Appellants and Reversal

_____

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Ave.
  Suite 460
  Nashville, TN  37203

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record
*Attorneys for Amici Curiae*
March 1, 2024

═══════════════════════

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    MARYLAND'S HANDGUN LICENSE REQUIREMENT IS
      UNCONSTITUTIONAL, BURDENSOME, AND COSTLY, MAKING
      ACQUISITION DEPENDENT ON THE PERMISSION OF THE STATE . . . . . . . . . . 3

II.   AFTER *HELLER* AND BEFORE *BRUEN*, THIS COURT USED THE TWO-STEP
      TEST, REJECTING THE METHODOLOGY SET OUT IN *HELLER* AND
      *MCDONALD* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.   *United States v. Masciandaro* (2011) . . . . . . . . . . . . . . . . . . . . . . 7
      B.   *Kolbe v. Hogan* (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      C.   *Harley v. Wilkinson* (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      D.   *Bianchi v. Frosh* (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  THIS COURT HAS A DUTY TO APPLY FAITHFULLY THE *BRUEN* TEST . . . . . 10

IV.   MARYLAND'S LAW FAILS TO PASS MUSTER UNDER THE *BRUEN* TEST . . . . 12

      A.   Acquiring a Handgun Is Covered By the Second Amendment . . . . . 12
      B.   There Is No Historical Analogue to Support Maryland's
           Permitting and 30-Day Waiting Period Requirements . . . . . . . . . . 13

V.    BY PREVENTING THE EXERCISE OF THE RIGHT OF SELF DEFENSE UNTIL
      STATE APPROVAL, MARYLAND EVISCERATES THE RIGHT, WHICH CAN
      HAVE DEADLY CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

Page

U.S. CONSTITUTION

Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

Amendment II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

STATUTES

Md. Public Safety Code Ann. § 5-117.1 . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

CASES

*Bianchi v. Brown*, 2024 U.S. App. LEXIS 974 (4th Cir. 2024) . . . . . . . . . . . . . 10

*Bianchi v. Frosh*, 142 S. Ct. 2898 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

*Bianchi v. Frosh*, 858 Fed. Appx. 645 (4th Cir. 2021) . . . . . . . . . . . . . . . . . 6, 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . 3, *passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . 6, 9

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) . . . . . . . . . . . . . . . . . . 6, 8, 9, 15

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) . . . . . . . . . . . . . . . . . . 8

*Lynchburg Range & Training v. Northam*, 105 Va. Cir. 159
       (Lynchburg Cir. Ct. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*McDonald v. Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*N.Y. State Rifle and Pistol Association v. Bruen*, 591 U.S. 1 (2022) . . . . 2, *passim*

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) . . . . . . . . . . . . . 12

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . 6, 7, 9

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . 6, 7

*Watson v. Stone*, 148 Fla. 516 (Fla. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

MISCELLANEOUS

P. Chiaramonte, "'No one helped her': NJ woman murdered by ex while
       awaiting gun permit," *Fox News* (June 10, 2015) . . . . . . . . . . . . . . . . . . 17

R. Churchill, "Gun Regulation, the Police Power, and the Right to Keep
       Arms in Early America: The Legal Context of the Second
       Amendment," 25 LAW AND HISTORY REVIEW 139 (Spring 2007) . . . . . . . 13

Gun Owners of America, "GOA laments first 'Brady victim,'"
       *GunOwners.org* (Mar. 30, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

D. Kopel, "Colorado bill forcing delay of firearms acquisition on shaky
       constitutional ground" *Complete Colorado* (Mar. 1, 2023) . . . . . . . . . 13, 14

iii

D. Kopel, "Why gun waiting periods threaten public safety,"
    *Independence Institute* (Sept. 21, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

J. Lovitt, "Survival for the armed," *USA Today* (May 4, 1992) . . . . . . . . . . . . . 17

B. Maranzani, "Behind Martin Luther King's Searing 'Letter from
    Birmingham Jail,'" *History.com* (Apr. 16, 2013) . . . . . . . . . . . . . . . . . . . . 15

S. Hrg 100-256, Handgun Violence Prevention Act of 1987, hearing before
    the Subcommittee on the Constitution of the Committee on the
    Judiciary, U.S. Senate, 100th Congress, 1st sess., on S. 466, a bill to
    provide for a national waiting period before the sale, delivery, or
    transfer of a handgun, June 16, 1987. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iv

## INTEREST OF *AMICI CURIAE*

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Heller Foundation, Virginia Citizens Defense League, Grass Roots North Carolina, Rights Watch International, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are exempt from federal income taxation under either section 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law.[1]

## STATEMENT OF THE CASE

In 2013, the state of Maryland enacted a handgun license qualification law, requiring that in order to acquire a handgun, a Maryland citizen must first provide fingerprints to the state, pass a background check, complete a four-hour firearm-safety training course including firing at least one live round, and wait 30 days for approval. Failure to complete these all steps leaves a citizen disqualified from seeking a license to possess a handgun.

---

[1] No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

In 2016, Appellants sued the State of Maryland, challenging the handgun qualification license requirement. The district court initially dismissed on standing grounds. This Court reversed and remanded for a decision on the merits, in *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020). On remand, and prior to the U.S. Supreme Court's decision in *N.Y. State Rifle and Pistol Association v. Bruen*, 591 U.S. 1 (2022), the district court upheld Maryland's handgun-licensure law. *Maryland Shall Issue, Inc. v. Hogan*, 2021 U.S. Dist. LEXIS 139795 (D. Md. 2021). The plaintiffs appealed that decision to this Court.

On November 21, 2023, applying *Bruen*, a panel of this Court struck down the Maryland law, ruling that the requirement to "qualify" for a license to exercise the Second Amendment right did in fact burden that right. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1045 (4th Cir. 2023) (vacated by *reh'g en banc*). The panel further found that Maryland's proposed historical analogues of "dangerousness" statutes were not relevantly similar, as such laws permitted seizure of weapons from persons adjudicated as dangerous, while Maryland's law required all citizens to first prove they are not "dangerous" as a precondition to a license to own a firearm at all. *Id.* at 1047.

2

Maryland then sought and was granted *en banc* rehearing in this Court, vacating the panel opinion. *Maryland Shall Issue, Inc. v. Moore*, 2024 U.S. App. LEXIS 766 (4th Cir. 2024).

## ARGUMENT

### I.    MARYLAND'S HANDGUN LICENSE REQUIREMENT IS UNCONSTITUTIONAL, BURDENSOME, AND COSTLY, MAKING ACQUISITION DEPENDENT ON THE PERMISSION OF THE STATE.

This Court has ordered supplemental briefing, allowing it to obtain additional input on the manner in which this Second Amendment challenge should be evaluated under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). In *Bruen*, the Supreme Court followed the pattern in *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008), comparing the exercise of Second Amendment rights to the exercise of First Amendment rights. *See, e.g., Heller* at 582, 595, 635; *Bruen* at 24-25, 28, 37, 70. The High Court has also made it clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The same is true for the Second Amendment.

Unquestionably, Maryland's 2013 handgun qualifications licensing law ("HQL") is designed not to facilitate the exercise of Second Amendment rights, but to impair their exercise. It erects numerous barriers between a Maryland

3

citizen and his constitutional right to purchase a handgun — the arm which the

Supreme Court described as "the quintessential self-defense weapon." *Heller* at

629. The Maryland law applies whether the transferor is a federal firearms

licensee ("FFL") or a private party, and whether the firearm is purchased or given

away. It applies even to "renting" of handguns. It appears that applications may

only be made through the Maryland State Police Licensing Portal, and a copy of

the license application apparently cannot even be read until a citizen registers

through the portal.

Any applicant for a handgun qualification license must be fingerprinted (Md.

Public Safety Code Ann. § 5-117.1(f)(3)(i)) and must submit to the Secretary of

the State Police:

> (1) an application in the manner and format designated by the Secretary [a
> MSP 77R Application and Affidavit];
> (2) a nonrefundable application fee to cover the costs to administer the
> program of up to $50;
> (3) (i) proof of satisfactory completion of:
>     1. a firearms safety training course...; or
>     2. a course of instruction in competency and safety in the handling of
>     firearms...; or
>      (ii) a valid firearms instructor certification;
> (4) any other identifying information or documentation required by the
> Secretary; and
> (5) a statement made by the applicant under the penalty of perjury that the
> applicant is not prohibited under federal or State law from possessing a
> handgun. [*Id*. at (g).]

The statute grants the Secretary unlimited discretion to demand that applicants submit "any other identifying information or documentation," which provision causes the Maryland HQL to be much more discretionary than other "shall issue" statutes. Before a license is issued, the Secretary of State Police must find that the applicant:

> (1) is at least 21 years old;
> (2) is a resident of the State;
> (3) ... has demonstrated satisfactory completion, within 3 years prior to the submission of the application, of a firearms safety training course approved by the Secretary that includes:
>> (i) a minimum of 4 hours of instruction by a qualified handgun instructor;
>> (ii) classroom instruction on:
>>> 1. State firearm law;
>>> 2. home firearm safety; and
>>> 3. handgun mechanisms and operation; and
>> (iii) a firearms orientation component that demonstrates the person's safe operation and handling of a firearm; and
> (4) based on an investigation, is not prohibited by federal or State law from purchasing or possessing a handgun. [*Id.* at (d).]

It can take weeks if not months for a Marylander to meet these requirements and to complete and file an application. And if the applicant manages to satisfy all these tests, the state can still delay granting of a license for up to 30 days. *Id.* at (h). Once received, the license is valid for 10 years and must be renewed every 10 years. *Id.* at (j). If an applicant's new or renewal application is denied, the applicant may appeal to the Secretary within 30 days of denial, for a hearing

within 15 days. *Id.* at (l). The law contains no provision allowing handgun

qualification licenses for adults under 21 years of age. The panel noted that the

costs for complying with the training requirements, "according to the record, can

range 'anywhere from $50 to in the several hundred dollars.' J.A. 973; *see also*

J.A. 961-62." *Maryland Shall Issue* at 1041 n.3.

This Maryland law truly does treat the Second Amendment right to a handgun

as a second-class right.

## II.    AFTER *HELLER* AND BEFORE *BRUEN*, THIS COURT USED THE TWO-STEP TEST, REJECTING THE METHODOLOGY SET OUT IN *HELLER* AND *MCDONALD*.

Beginning in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), this Court

applied the two-step test rejected in *Bruen*. The *Bruen* decision referenced three

of this Court's decisions reviewing Second Amendment challenges to firearm

restrictions. *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), was identified as an

example of the two-step test it was rejecting. *See Bruen* at 18-19. It also

referenced *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) and *Harley*

*v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021). *See Bruen* at 15 and 19, n.4. A week

after *Bruen*, the Supreme Court vacated this Court's decision in *Bianchi v. Frosh*,

858 Fed. Appx. 645 (4th Cir. 2021), and remanded it for reconsideration in light of

*Bruen*. *See Bianchi v. Frosh*, 142 S. Ct. 2898 (2022).

6

All of these decisions came after *Heller*, but none faithfully followed *Heller*'s rejection of interest balancing.  The approach taken in those cases now has been clearly rejected in *Bruen* (*see Bruen* at 17), so there is no continuing basis for confusion or uncertainty as to the Supreme Court's directions.  It is time for this Court to make a clean break with its own flawed precedents and address the challenge here by carefully following the *Bruen* methodology, as set out in Section III and IV, *infra*.

**A.  *United States v. Masciandaro* (2011).**

In *United States v. Masciandaro,* 638 F.3d 458 (4th Cir. 2011), this Court upheld a conviction for possession of a firearm on National Park Service property. It rejected a Second Amendment challenge to the conviction by using the two-step analysis that it had previously adopted in *Chester*.  Ignoring *Heller*'s *express* disavowal of interest balancing (*Heller* at 634), *Masciandaro* used intermediate scrutiny.  Its rationale was that *Heller* "expressly avoided deciding what level of scrutiny should be applied when reviewing a law burdening the right to keep and bear arms." *Masciandaro* at 469.  This Court then judicially interest-balanced away the Second Amendment and upheld the Maryland law.

7

**B.** *Kolbe v. Hogan* **(2017).**

In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), this Court affirmed a decision of the district court in Maryland upholding another section of the Maryland 2013 Firearms Safety Act ("Act") which bans (i) so-called "assault weapons" and (ii) so-called "large-capacity magazines" that hold more than 10 rounds of ammunition.

The district court assumed without deciding that the Maryland Act constituted an "infringement" on Second Amendment rights, but upheld the law nonetheless. *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 789 (D. Md. 2014).  On appeal, some of these *amici* filed an *amicus* brief in this Court in support of a challenge to that ruling.[2]  That *amicus* brief exposed the factual errors in the district court's opinion which formed the basis for its flawed legal analysis.  First, in *Heller*, the Supreme Court had held that the District of Columbia could not ban weapons that are "'in common use' … for lawful purposes."  *Heller* at 624.  Somehow, the district court came to the conclusion that so-called "assault rifles" like the AR-15 and the AK-47 — likely the most popular rifles in the United States — are not in common use.  Second, the district court then applied "intermediate scrutiny" to the

---

[2] Brief *Amicus Curiae* of Gun Owners of America, Inc., et al., *Kolbe v. O'Malley*, No. 14-1945 (Nov. 12, 2014).

8

Maryland law, but the *amicus* brief argued that Second Amendment rights are not to be subject to judicial interest balancing, as *Heller* taught.

This Court found no problem with the district court's approach, describing it as "sound analysis." *Kolbe*, 849 F.3d at 135. It continued to use the two-step test adopted in *Chester*, and found first that so-called "assault weapons" and large-capacity magazines are "most useful in military service," and distorted *Heller*'s holding to say that as a result they are not protected by the Second Amendment. *Id.* at 137. Alternatively, it found that, even if those objects are within the scope of the Second Amendment, it would have upheld the Act under intermediate scrutiny. *Id*. at 138.

**C. *Harley v. Wilkinson* (2021).**

In *Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021), this Court once again applied the two-step test and upheld the federal ban on firearms possession by a person who has been convicted of a misdemeanor crime of domestic violence. The plaintiff in that case had brought an as-applied challenge to his lifetime ban based on a misdemeanor conviction from 1993. This Court applied intermediate scrutiny and rejected the challenge. Judge Julius Richardson dissented and would have applied *Heller*'s "text, history, and tradition" analysis to support plaintiff's as-applied challenge. *Id*. at 774 (Richardson, J., dissenting).

**D. *Bianchi v. Frosh* (2021).**

*Bianchi v. Frosh*, 858 Fed. Appx. 645 (4th Cir. 2021), involved another

challenge to Maryland's Firearm Safety Act, and this Court rejected the challenge

as foreclosed by the *en banc* decision in *Kolbe* in a one-paragraph *per curiam*

opinion.  On remand from the Supreme Court (*Bianchi v. Frosh*, 142 S. Ct. 2898

(2022)), this Court received supplemental briefing and heard oral argument in

December 2022, and then did nothing on the case throughout all of 2023.  Then on

January 12, 2024, prior to the issuance of any panel opinion, rehearing *en banc*

was ordered.  *See Bianchi v. Brown*, 2024 U.S. App. LEXIS 974 (4th Cir. 2024).

## III.   THIS COURT HAS A DUTY TO APPLY FAITHFULLY THE *BRUEN* TEST.

The *Bruen* Court began by stating "we decline to adopt [the] two-part

approach" (*Bruen* at 17) used by most circuit courts, including this circuit.

However, the essence of *Bruen*'s methodology continues to have two components

which this Court must now follow.  First:

> In keeping with *Heller,* we hold that when the Second Amendment's **plain
> text** covers an individual's conduct, the Constitution **presumptively
> protects** that conduct.  [*Id.* (emphasis added)].

Next, the burden shifts to Maryland to make a sufficient showing of relevant

historical analogues to limit plaintiffs' presumptively protected right:

> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, **the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation**. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*Bruen* at 17 (emphasis added).]

At this point, plaintiffs can respond to the state's proffered historical analogues. Here, the Court's scheduling order for simultaneous supplemental *en banc* briefing provides for no responsive briefings to be filed before oral argument on March 21. While simultaneous briefing is not unusual, it makes it difficult for this Court to follow the methodology required by *Bruen*. Although both parties previously briefed historical analogues to the panel, the *en banc* briefing deprives the appellants of the opportunity to respond to newly identified claims of historical analogues and requires appellants to anticipate what those might be. This is not a minor point. The *Bruen* Court made clear the burden was on the government no fewer than seven times:

- "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen* at 17.
- "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition." *Id*. at 19.
- "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.
- "[A]nalogical reasoning requires … that the government identify a well-established and representative historical *analogue*." *Id.* at 30.

11

- "[A]gain, the burden rests with the government to establish the relevant tradition of regulation." *Id*. at 58, n.25.
- "Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden." *Id.* at 60.
- "[W]e conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id*. at 70.

## IV. MARYLAND'S LAW FAILS TO PASS MUSTER UNDER THE *BRUEN* TEST.

### A. Acquiring a Handgun Is Covered By the Second Amendment.

Acquiring a handgun falls squarely within the plain text of the Second Amendment. *Heller* cited Cunningham's 1771 dictionary that defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller* at 581. *Heller* made clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. Indeed, the *Heller* Court noted that "the American people have considered the handgun to be the quintessential self-defense weapon." *Id.* at 629. A prohibition on acquisition of arms is also necessarily a prohibition on "keeping" (*i.e.,* having) weapons. One cannot lawfully "keep" a weapon one cannot lawfully acquire.[3]

---

[3] *See, e.g.*, *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017); *Lynchburg Range & Training v. Northam*, 105 Va. Cir. 159, 162 (Lynchburg Cir. Ct. 2020) ("'The right to possess firearms for protection implies a corresponding

**B. There Is No Historical Analogue to Support Maryland's Permitting and 30-Day Waiting Period Requirements.**

There is no relevant historical analogue to support the ability of a state to impose an additional "licensing" or "permitting" requirement. In fact, "at no time between 1607 and 1815 did the colonial or state governments of what would become the first 14 states exercise a police power to restrict the ownership of guns by members of the body politic. In essence, American law recognized a zone of immunity surrounding the privately owned guns of citizens."[4]

Eventually, states began to impose licensing requirements. But, as Professor David Kopel notes, "[a]ll of the pre-1900 licensing laws were systemically racist, an enduring problem for some gun control laws, then and now. With one exception (Florida 1893), all of the licenses were textually applicable only to people of color. The Florida law was textually neutral, but was never enforced against white people."[5] Indeed, in 1941, in a concurring opinion, a Florida judge

---

right to acquire and maintain proficiency in their use....'").

[4] R. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 LAW AND HISTORY REVIEW 139, 142 (Spring 2007).

[5] D. Kopel, "Colorado bill forcing delay of firearms acquisition on shaky constitutional ground," *Complete Colorado* (Mar. 1, 2023).

noted the overtly racist intent and enforcement of the one facially neutral 19th

century licensing law:

> **[T]he Act was passed for the purpose of disarming the negro** laborers ...
> and to give the white citizens in sparsely settled areas a better feeling of
> security.  The statute **was never intended to be applied to the white
> population** and in practice **has never been so applied**.  We have no
> statistics available, but it is a safe guess to assume that more than 80% of
> the white men living in the rural sections of Florida have violated this
> statute....  **[T]here has never been, within my knowledge, any effort of
> enforce the provisions of this statute as to white people**, because **it has
> been generally conceded to be in contravention to the Constitution and
> non-enforceable if contested**.  [*Watson v. Stone*, 148 Fla. 516, 524 (Fla.
> 1941) (Buford, J., concurring) (emphasis added).]

With regard to waiting periods to purchase firearms, "there is not an iota of

pre-1900 historical precedent for waiting period laws."  Kopel, *supra*.  Indeed,

only 10 states and the District of Columbia impose waiting periods even today.[6]

"Forced delays in firearms acquisition by adults did not exist when the Second

Amendment was ratified in 1791, nor in 1868, when the Fourteenth Amendment

was ratified."[7]  Thus, "[u]nder modern Supreme Court doctrine, this is an easy

case.  There were no waiting periods on firearms or other arms anywhere in the

United States before 1900.  The first waiting period law was enacted in California

in 1923, a one-day wait for handgun sales."  *Id.*  Neither the licensing requirement

---

[6]  "[Waiting periods for guns by state](#)," *WorldPopulationReview.com*.

[7]  Kopel, *supra*.

14

nor the up to 30-day waiting period is in any way "consistent with this Nation's historical tradition."

## V.    BY PREVENTING THE EXERCISE OF THE RIGHT OF SELF DEFENSE UNTIL STATE APPROVAL, MARYLAND EVISCERATES THE RIGHT, WHICH CAN HAVE DEADLY CONSEQUENCES.

In *Kolbe v. Hogan*, Judge Wilkinson concurred in the decision and viewed the limitations of the Second Amendment as "impair[ing] the ability of government to act prophylactically," fearful that the Court would have to "bide our time until another tragedy is inflicted or irretrievable human damage has once more been done." *Kolbe* at 150 (Wilkinson, J., concurring).  Constitutional rights cannot be properly interpreted by judges who are fearful of what the Founders provided. Preventing Marylanders from purchasing firearms in a timely fashion, without imposing costs and burdens, in many cases costs lives.  As Justice Alito explained, the Second Amendment is not "the only constitutional right that has controversial public safety implications."  *McDonald v. Chicago*, 561 U.S. 742, 783 (2010).

In April 1963, in the jail in Birmingham, Alabama, Dr. Martin Luther King, Jr., penned the words, "justice too long delayed is justice denied."[8]  His words retain all their force today.  This is all the more true in the case of the right to bear arms,

---

[8]  B. Maranzani, "Behind Martin Luther King's Searing 'Letter from Birmingham Jail,'" *History.com* (Apr. 16, 2013).

15

where the right of self-defense is "the *central component* of the right." *Heller* at 599.

A few examples should suffice to illustrate the problem of delaying access to handguns for self-defense purposes. In one famous case, Igor Hutorsky was a Russian immigrant who was a co-owner of a furniture store in Brooklyn. In 1983, his partner, Aron Amolrood, applied for a permit to keep a handgun in his store.[9] While the owners awaited a permit, Hutorsky was shot and killed during a robbery of the store. Four months after the murder, the police had still not approved Amolrood's permit request. *Id.*

In March 1991, Bonnie Elmasri called to inquire about getting a firearms permit to protect herself from an abusive husband who had threatened to kill her.[10] She was told she could not purchase a weapon until a 48-hour waiting period expired. "But unfortunately, Bonnie was never able to pick up her gun. She and

---

[9] This story was included in testimony before a Senate Subcommittee by a witness for Gun Owners of America. S. Hrg 100-256, Handgun Violence Prevention Act of 1987, hearing before the Subcommittee on the Constitution of the Committee on the Judiciary, U.S. Senate, 100th Congress, 1st sess., on S. 466, a bill to provide for a national waiting period before the sale, delivery, or transfer of a handgun, June 16, 1987, at 107.

[10] Gun Owners of America, "GOA laments first 'Brady victim,'" *GunOwners.org* (Mar. 30, 2021).

her two sons were killed the next day by an abusive husband of whom the police were well aware." *Id.*

After the Los Angeles race riots of 1992, *USA Today* reported that Californians were seeking to buy guns in record numbers to protect themselves:

> Shopkeepers said some gun buyers were lifelong gun-control advocates, running to buy an item they thought they'd never need – only to find themselves blocked by gun-control legislation that requires Californians to wait 15 days. "The customers were angry about the waiting period but they bought the guns anyway," says Barry Kahn, who owns B&B Sales, one of the region's largest gun outlets. "These people were different from my usual customers. They were definitely first-time buyers."[11]

Desperate to defend themselves against widespread looting, "many buyers beat the restrictions, purchasing exempt 'antique' firearms, made before 1941." *Id*.

On April 21, 2015, Carol Bowne applied for a firearms license in New Jersey.[12] She had obtained a protective order against ex-boyfriend Michael Eitel. The local police chief took no action on her application, and in June, Eitel went to Bowne's home and stabbed her to death. *Id.* The protective order provided no protection, and the delay in approving her firearms license application proved fatal.

The consequences of denial of the Second Amendment right are more severe and involve greater finality than most constitutional violations:

---

[11] J. Lovitt, "Survival for the armed," *USA Today* (May 4, 1992).

[12] P. Chiaramonte, "'No one helped her': NJ woman murdered by ex while awaiting gun permit," *Fox News* (June 10, 2015).

A person who is falsely imprisoned by the state can get out of jail a week later, with perhaps no permanent harm done.  Newspapers which libel a person by mistake can always publish corrective stories the next day.  A person who is denied the right to bear arms for a week may, at the end of the week, be dead.[13]

The Supreme Court in *Bruen* recognized the principle that, in the case of the Second Amendment, "a right delayed is a right denied."  The *Bruen* Court recognized the validity of "constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  *Bruen* at 38, n.9.  The Court made clear that the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."  *Id.* at 70 (quoting *McDonald v. City of Chicago* at 780).  With few exceptions, Maryland does not require a license to exercise a First Amendment right, let alone imposing a delay of  30 days.  Maryland even allows a resident to register to vote on **the same day** as exercising the right to vote.[14]  Yet, Maryland has shown itself eager to erect barriers to the exercise of what its laws treat as a "second class right" — the Second Amendment right of effective self-defense.  This Court

---

[13]  D. Kopel, "Why gun waiting periods threaten public safety" at 52, *Independence Institute* (Sept. 21, 1993).

[14]  *See* Maryland State Board of Elections, The Registration Process, "When may I apply to register to vote?"  ("You can also register to vote during early voting or on election day.")

should not sanction Maryland's rights-destroying scheme which violates the text of the Second Amendment and has no historical analogue.

## CONCLUSION

For the foregoing reasons, the district court should be reversed and the Maryland handgun license qualifications law should be found to violate the Second Amendment rights of Marylanders.

Respectfully submitted,

  /s/ *William J. Olson*

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN  37203

RICK BOYER
  INTEGRITY LAW FIRM
  P.O. Box 10953
  Lynchburg, VA  24506

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
*Attorney of Record

March 1, 2024
*Attorneys for Amici Curiae*

19

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.  That the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al*., in Support of Plaintiffs-Appellants and Reversal complies with the page limitation set forth by this Court's February 2, 2024 order, because this brief contains 4,289 words, excluding the parts of the brief exempted by Rule 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

    /s/ *William J. Olson*
    William J. Olson
    Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Plaintiffs-Appellants and Reversal, was made, this 1st day of March, 2024, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

　　　　　　　　　　　／s／ *William J. Olson*　　
　　　　　　　　　　William J. Olson
　　　　　　　　　　Attorney for *Amici Curiae*