**No. 21-2017**

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

—————————————————

MARYLAND SHALL ISSUE, INC., ET AL.,

*Plaintiffs-Appellants*,

v.

WES MOORE, ET AL.,

*Defendants-Appellees*.

—————————————————

On Appeal from the United States District Court
for the District of Maryland
No. 1:16-cv-03311-ELH (Judge Ellen L. Hollander)

—————————————————

## BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES, AND MARYLANDERS TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLEES

—————————————————

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street NE
Washington DC 20002
(202) 370-8100

William T. Clark
GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147
New York, NY 10016
(917) 680-3472

George J. Hazel
Katherine Moran Meeks
Claire Madill
Hayley Lawrence
Kirsten Bleiweiss
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

Esther Sanchez-Gomez
GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE
268 Bush St., # 555
San Francisco, CA 94104
(415) 433-2062

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street, #3417
New York, NY 10008
(913) 991-4440

*Counsel for* Amici Curiae

## DISCLOSURE STATEMENT

Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, March for Our Lives, and Marylanders to Prevent Gun Violence state that they have no parent corporations, they do not have stock, and no publicly held company owns 10% or more of their stock.

*/s/ George J. Hazel*

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE*.................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................3

ARGUMENT ................................................................................................3

I.   Laws Dating to the Reconstruction Era Provide Ample
     Historical Support for Maryland's Permitting Regime. ..................3

     A.   Each Component of Maryland's Law Has a Specific
          Historical Analogue...............................................................5

          1.   Age Restrictions ...........................................................5

          2.   Residency.......................................................................6

          3.   Permitting .....................................................................7

          4.   Training..........................................................................10

     B.   Maryland's Permitting Scheme Serves the Same
          Consistent Purposes as Reconstruction-Era Firearms
          Regulations............................................................................13

II.  Striking Down Maryland's Law Would Seriously
     Compromise Critical Background Check Requirements...............17

CONCLUSION ...........................................................................................18

APPENDIX A .............................................................................................22

APPENDIX B .............................................................................................26

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ..................... 5, 9, 10

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) ............ 10, 12

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023)............................... 17

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................. 7, 8, 11, 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................... 4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........... passim

## Statutes

1771 N.J. Laws 346 ...................................................................................... 6

1821 Tenn. Pub. Acts 63, ch. 55 ............................................................... 13

1837 Vt. Acts & Resolves 38...................................................................... 13

1873 S.C. Acts 404........................................................................................ 6

1879 Md. Laws 173....................................................................................... 6

1893 Fla. Laws 71–72 .................................................................................. 9

1902 Ga. Laws 427 ....................................................................................... 9

1902 N.J. Laws 780 ...................................................................................... 6

1905 N.C. Sess. Laws 545 ........................................................................... 9

Ga. Code Ann. § 348(a)–(d) (1910) ......................................................... 10

Jersey City, N.J., Ordinance to Re-organize the Local Government of
Jersey City, § 3 (1874)............................................................................ 9

Md. Code Pub. Safety § 5-117(d)...................................................... 6, 7, 10

N.Y.C., N.Y., Ordinances ch. 8, art. 27 § 265 (1881) ............................ 7, 9

## Other Authorities

1 J. of The Second Session of The Senate of The United States Of
America, Jan. 4th, 1790 (1820) ........................................................... 11

37 Documentary History of the Ratification of the Constitution (John P. Kaminski et al. eds., 2020) .................................................................. 12

Alexander D. McCourt et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985–2017*, 110 Am. J. of Pub. Health 1546 (2020) ................. 16

Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, *in* Reducing Gun Violence in America: Informing Policy with Evidence and Analysis 109 (Daniel W. Webster & Jon S. Vernick eds., 2013) .................................................. 16

Jonathan E. Lowy, *Comments on Assault Weapons, The Right to Arms, and the Right to Live*, 43 Harv. J.L. & Pub. Pol'y 375 (2020) ............. 17

Joseph Blocher, *Rights As Trumps Of What?*, 132 Harv. L. Rev. F. 120 (2019) ........................................................................................................ 18

Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill of Rights J. 93 (2022) .................... 11

Joseph Vince, Jr. et al., *Firearms Training and Self-Defense*, Mt. St. Mary's U. & the Nat'l Gun Victims Action Council (2015), http://tinyurl.com/46as2h49 ............................................................... 17

Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-differences Analyses*, British Med. J. 370 (2020), http://tinyurl.com/3b8szu8u ............................................................... 15

Kurt T. Lash, *Respealing the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439  (2022) ................................................ 5

Mitch Doucette et al., *Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981–2019*, J. Criminology & Pub. Pol'y 1 (2023) ................................................................................ 16

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 J. L. & Contemp. Probs. 55 (2017) ........... 14, 15

Samuel Irwin, *Reports of Cases At Law and In Chancery* 566 (Vol. 278, 1917) .......................................................................................................... 10

Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-*

*Civil War America*, 55 U.C. Davis L. Rev. Online 65, 89 (2021)....8, 14, 15

*Summary of Initial Findings from CDC-Funded Firearm Injury Prevention Research*, CDC (Oct. 5, 2023), https://shorturl.at/fquDL..15

*What Science Tells Us About the Effects of Gun Policies*, RAND (Jan. 10, 2023), http://tinyurl.com/53zumtwd ....................................................18

## Constitutional Provisions

Ga. Const. of 1868, art. I, § 14 ....................................................14

Tenn. Const. of 1870, art. I, § 26...........................................14

Va. Decl. of Rights § 13 (1776) ...............................................11

## INTEREST OF *AMICI CURIAE*[1]

Brady Center to Prevent Gun Violence ("Brady") is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live and in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.

Giffords Law Center to Prevent Gun Violence ("Giffords") is a nonprofit policy organization that seeks to reduce gun violence and improve the safety of communities.[2] It was founded over 25 years ago following a shooting at a San Francisco law firm and was renamed the Giffords Law Center in 2017 after joining forces with the gun-safety

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part; no party or counsel contributed money intended to fund this brief's preparation or submission; and no person, other than *amici*, their members, or their counsel, contributed money intended to fund the brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

[2] Giffords Law Center's website, www.giffords.org/lawcenter, is one of the premier clearinghouses for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

organization led by former Congresswoman Gabrielle Giffords. Giffords researches, drafts, and defends laws, policies, and programs proven to reduce gun violence.

Marylanders to Prevent Gun Violence ("MPGV") is a nonprofit dedicated to evidence-based solutions for reducing all types of gun violence in Maryland. Through public education and programming, MPGV works to unite those dedicated to reducing gun violence and finding effective solutions to this public health crisis.

March for Our Lives ("MFOL") is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action to achieve sensible gun violence prevention policies. MFOL arose in the wake of the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida in 2018. It organized the largest protest against gun violence in the nation's history, and six years later, MFOL has established itself as one of the foremost authorities on youth-led activism and advocacy to prevent gun violence.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Maryland's firearm permitting regime survives Second Amendment review because it is "consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). Each specific component of Maryland's permitting law has a historical analogue dating to at least the Reconstruction period. Maryland's permitting law also serves the same consistent purposes as its historical counterparts: to promote public safety by keeping firearms out of the hands of dangerous individuals. This Court should therefore affirm the district court's judgment upholding the law.

## ARGUMENT

## I. Laws Dating to the Reconstruction Era Provide Ample Historical Support for Maryland's Permitting Regime.

*Bruen* "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" when the regulation implicates the plain text of the Second Amendment. 597 U.S. at 26. To survive Second Amendment review, a state must show that its "distinctly modern" law is "relevantly similar" to historical firearms regulations. *Id.* at 28–29. One way it may satisfy that standard is by showing similarities in "how

3

and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. But *Bruen* does not demand an identical match between a contemporary law and a historical analogue, a requirement that would amount to a "regulatory straightjacket." *Id.* at 30. Instead, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* This test acknowledges that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated," even as "its meaning is fixed according to the understandings of those who ratified it." *Id.* at 28.

*Bruen* also does not demand that states identify a Founding-era counterpart to their firearms regulations, and instead explicitly allows for analogy to Reconstruction-era laws. *See Bruen*, 597 U.S. at 27, 60 (analyzing Reconstruction-era evidence). That makes good sense: the Second Amendment applies to the states only by virtue of the Fourteenth Amendment, which was ratified in 1868. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). "When the people adopted the Fourteenth

Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk v. Chiumento*, 89 F.4th 271, 305 (2d Cir. 2023).

Maryland's handgun permitting scheme satisfies *Bruen* because, as more fully explained below, it is similar to historical firearms laws in "how and why" it regulates "a law-abiding citizen's right to armed self-defense." 597 U.S. at 29.

### A.    Each Component of Maryland's Law Has a Specific Historical Analogue.

Maryland's permitting law satisfies *Bruen* because its age restrictions and residency, permitting, and training requirements each have specific analogues dating to at least the Reconstruction era.

### 1.    Age Restrictions

Age restrictions on gun possession were commonplace before and during the Reconstruction era. As detailed thoroughly in the appendices

to this brief, states criminalized the sale of firearms or related items (like cartridges) to "minors," individuals "under the age of twenty-one years," and those "under eighteen years of age." *See* Appendix A. Municipalities enacted similar restrictions. *See* Appendix B. Thus, Maryland's requirement that applicants for a handgun license be at least 21 years old has strong historical foundations. Md. Code Pub. Safety § 5-117.1(d)(1).

### 2.    Residency

Maryland's residency requirement for handgun permits, Md. Code Pub. Safety § 5-117.1(d)(2), is also consistent with history and tradition. In 1771, New Jersey prohibited non-residents from carrying guns on any landowner's property. 1771 N.J. Laws 346.[3] And in 1855, South Carolina prohibited non-residents from hunting with a gun within the state. *See* 1873 S.C. Acts 404. Maryland enacted the same requirement in 1879, as did New Jersey in 1902. 1879 Md. Laws 173; 1902 N.J. Laws 780.

Municipalities enacted similar laws. In 1881, New York City required any "non-resident" doing "business in the city of New York" who

---

[3] Most of the laws cited in this brief can be found at the Duke Center for Firearms Law's Repository of Historical Gun Laws. That site is: https://firearmslaw.duke.edu/repository-of-historical-gun-laws.

"ha[d] occasion to carry a pistol while in said city" to file with the local police precinct an "application for permission" to carry. N.Y.C., N.Y., Ordinances ch. 8, art. 27 § 265 (1881). If that office was "satisfied that the applicant is a proper and law-abiding person," it would "give said person a recommendation to the superintendent of police," who was then required to "issue a permit to the said person, allowing him to carry a pistol of any description." *Id.*

### 3. Permitting

The Second Amendment right to keep and bear arms applies only to "law-abiding" and "responsible" citizens. *Bruen*, 597 U.S. at 26 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)). Maryland's permitting law aims to limit firearm possession to these categories of people by, among other things, requiring a background investigation and ensuring that an individual has adequate knowledge and experience to operate a handgun responsibly. Md. Code Pub. Safety § 5-117(d). Permitting schemes that seek to keep guns out of the hands of individuals who are not "law-abiding" or "responsible" have a solid historical core. *Antonyuk*, 89 F.4th at 312 ("Licensing . . . is part of this

nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment.").

Permitting schemes emerged in the Reconstruction era and became "the dominant model of firearms regulation in America" as gun violence emerged as a grave and novel societal problem. Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. Online 65, 89 (2021); *see also infra*, at 13–14 (noting association between gun violence and the rise of white nationalist groups during Reconstruction). These "ordinances were first enacted by municipalities" and "were soon emulated by states." Cornell, *supra*, at 89. By the end of the 19th century, "[r]esidents in the ten most populous cities in America . . . all lived under some form of restrictive public carry regime: permit schemes, complete bans on concealed carry, or some type of total ban with a specified threat and self-defense exception." *Id.* at 84.

These permitting schemes, like Maryland's law, required a threshold showing that the applicant was a "law-abiding, responsible citizen." *Heller*, 554 U.S. at 635. Florida made it "unlawful to carry or own a Winchester or other repeating rifle . . . without first taking out a

license from the County Commissioner," and such license was "conditioned on the proper and legitimate use of the gun." 1893 Fla. Laws 71–72. The law also required the county commissioners to maintain "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same." *Id.* North Carolina and Georgia delegated to localities the power to license, regulate, or even bar the commercial sale of firearms. *See, e.g.*, 1905 N.C. Sess. Laws 545, 547; 1902 Ga. Laws 427, 434–35.

Localities also imposed licensing requirements that sought to ensure that those possessing and carrying firearms were "law-abiding, responsible citizens." *Bruen*, 597 U.S. at 70. For example, Jersey City mandated that an applicant demonstrate that he "is temperate, of adult age, and capable of exercising self-control" and further required "written endorsement of the propriety of granting a permit from at least three reputable freeholders." Jersey City, N.J., Ordinance to Re-organize the Local Government of Jersey City, § 3 (1874); *see also* N.Y.C., N.Y., Ordinances ch. 8, art. 27 § 265 (1881). Oakland, California also implemented a licensing regime in the 1880s. *See Antonyuk*, 89 F.4th at 321.

9

This pattern continued into the 20th century. Georgia required those who wished to carry "any pistol or revolver" to obtain a license. Ga. Code Ann. § 348(a)–(d) (1910). The license was "conditioned upon the proper and legitimate use of said weapon," and it also required that the person "be at least eighteen years old" and provide "a bond payable to the Governor." *Id.* Chicago similarly required applicants for a gun permit to show the police superintendent that they were "a person of good moral character," that they had not "been convicted of any crime," and that they were not minors. Samuel Irwin, *Reports of Cases At Law and In Chancery* 566 (Vol. 278, 1917).

### 4. Training

A long historical tradition likewise supports the training and education requirements in Maryland's permitting scheme. Md. Code Pub. Safety § 5-117.1(d)(3).

"Historically Americans' familiarity with firearms was far more common than it is today." *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 313 (N.D.N.Y. 2022), *aff'd in part, vacated in part, remanded sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023). "In colonial America, arms proficiency was required for survival," and citizens were

obligated to train in the handling of firearms as part of their militia service.  Joseph G.S. Greenlee, *The Right to Train: A Pillar of the Second Amendment*, 31 Wm. & Mary Bill of Rights J. 93, 107–08 (2022).  But this tradition of training started well before the Founding: "England ha[d] an extensive tradition of training mandates" dating back to 1363.  *Id.* at 99.  That tradition continued into America's early years, as "the American colonies enacted hundreds of militia laws . . . intended to ensure that the populace possessed arms and could use them effectively."  *Id.* at 108.  In fact, President Washington used his first address to a joint session of Congress to remind Americans that "a free people ought not only to be armed, but *disciplined*."  1 J. of The Second Session of The Senate of The United States Of America, Jan. 4, 1790 (1820) (emphasis added).

The text of the Second Amendment makes clear that these militia laws were constitutional: "'*well-regulated*' implies . . . the imposition of proper discipline and training."  *Heller*, 554 U.S. at 597 (emphasis added); *see also* Va. Decl. of Rights § 13 (1776) (referring to "a well-regulated militia, composed of the body of the people, *trained to arms*" (emphasis added)).  Indeed, during the constitutional debates, George Mason advocated that the Second Amendment define a well-regulated militia as

11

"composed of the body of the people trained to arms." 37 Documentary History of the Ratification of the Constitution 253 (John P. Kaminski et al. eds., 2020).

In 1780 and 1782, New York enacted laws requiring training in the use of firearms as part of mandatory militia service. *Antonyuk*, 639 F. Supp. 3d at 313. Similarly, a federal militia act from 1792 required that "each and every free able-bodied white male citizen" "be enrolled in the militia," and that the commanding officer shall "cause the militia to be exercised *and trained*." *Id.* (emphasis added). These laws mandating firearms training as part of militia service support the principle that "those persons without familiarity of firearms must become familiar with them if those persons are to exercise their right [to] use firearms to defend themselves in public." *Id.* And "the aim of these laws appears to be to deny the possession of a firearm to all militia members who, due to their unfamiliarity with a firearm, pose a danger to themselves or others." *Id.*

Continuing into the 19th century, states required militia members and other gun owners to train with their weapons. For example, Tennessee mandated that members of the infantry "meet at the place of

holding their battalion musters . . . , armed with a rifle, musket, or shot gun . . . *for the purpose of being trained* . . . at regimental drills." 1821 Tenn. Pub. Acts 63, ch. 55, §§ 2-3 (emphasis added); *see also* 1837 Vt. Acts & Resolves 38, ch. 9, art. 20 (referencing mandatory "company training").

These historical examples confirm that training and education requirements are presumptively lawful. *See Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring); *see also Heller*, 554 U.S. at 626–27 ("nothing in our opinion should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms").

### B. Maryland's Permitting Scheme Serves the Same Consistent Purposes as Reconstruction-Era Firearms Regulations.

Maryland's handgun permitting scheme also satisfies *Bruen* because it advances the same substantial interests that motivated Reconstruction-era firearms regulations: preventing gun violence and keeping firearms out of dangerous hands. 597 U.S. at 29 (noting that "why [a] regulation burden[s] a law-abiding citizen's right to armed self-defense" is relevant to the "consistent with the Second Amendment" test).

The Reconstruction era saw an uptick in firearms regulations motivated by fear of gun violence. "America's early governmental

preoccupation with gun possession, storage, and regulation was tied to the overarching concern for public safety, even as it intruded into citizens' private gun ownership and habits." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 J. L. & Contemp. Probs. 55, 58 (2017). By "Reconstruction, gun violence had emerged as a serious problem in American life," as "interpersonal gun violence and the collective terrorist violence perpetuated by groups such as the Ku Klux Klan" "intensified." Cornell, *supra*, at 68–69. States responded to this crisis by restricting access to and use of firearms, including through permitting regimes "limiting the sale of firearms" and "imposing limits on the access of minors to weapons." *Id.* at 78. Indeed, some southern states rejoining the Union went so far as to expressly codify their authority to regulate guns. *See, e.g.*, Tenn. Const. of 1870, art. I, § 26 ("the Legislature shall have the power, by law, to regulate the wearing of arms with a view to prevent crime"); Ga. Const. of 1868, art. I, § 14 (similar). In short, "Reconstruction ushered in a period of expansive regulation" when "[c]ourts, legislators, and commentators . . . recognized that the robust power to regulate firearms, particularly in public, was not

14

only constitutional, but essential to preserve ordered liberty." Cornell, *supra*, at 89.

Maryland's regulatory scheme serves these precise purposes. Each of Maryland's prerequisites for obtaining a handgun helps achieve the 19th-century goals of reducing gun violence, Cornell, *supra*, at 68, and promoting "public safety," Spitzer, *supra*, at 58. Age restrictions promote public safety by limiting access to firearms to those mature enough to handle dangerous weapons. In the United States, firearms are the leading cause of death for people younger than 20. *Summary of Initial Findings from CDC-Funded Firearm Injury Prevention Research*, CDC (Oct. 5, 2023), https://shorturl.at/fquDL. States that require handgun purchasers to be at least 21 years old have fewer adolescent suicides than those states that set the limit at 18. Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-differences Analyses*, British Med. J. 370 (2020), http://tinyurl.com/3b8szu8u.

Similarly, permitting promotes public safety by decreasing firearms-related deaths. For example, Connecticut saw a 28% decrease in its firearm homicide rate and a 33% decrease in its firearm suicide rate

following passage of its licensing law. Alexander D. McCourt et al., *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985–2017*, 110 Am. J. of Pub. Health 1546, 1546 (2020).

Permitting regimes also reduce gun trafficking. States with stronger licensing laws, including permit-to-purchase laws, are better able to track firearms possessed illegally or used or suspected to have been used in a crime, and therefore have lower interstate trafficking rates than states without strong licensing laws. Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals through Effective Firearm Sales Laws*, *in* Reducing Gun Violence in America: Informing Policy with Evidence and Analysis 109, 116–17 (Daniel W. Webster & Jon S. Vernick eds., 2013).

Similarly, training requirements are associated with decreased firearm assaults. *See* Mitch Doucette et al., *Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981–2019*, J. Criminology & Pub. Pol'y 1, 12 (2023). One study observed that people with training were less likely to misfire (that is, shoot an innocent bystander or police officer) in a simulated self-defense scenario. Joseph

Vince, Jr. et al., *Firearms Training and Self-Defense*, Mt. St. Mary's U. &
the Nat'l Gun Victims Action Council (2015),
http://tinyurl.com/46as2h49.

## II. Striking Down Maryland's Law Would Seriously Compromise Critical Background Check Requirements.

The panel effectively held that *any* wait before being able to
purchase a firearm is too long.  That holding cannot be squared with the
fact that numerous states and localities historically adopted permitting
schemes which, by their very nature, required waits.  *See* pp. 7–10, *supra*.
Further, such precedent would seriously compromise constitutionally
permissible, highly effective, and widely popular background check laws
across the country.  *See Bruen*, 597 U.S. at 80 (noting that the "43 States"
that "employ objective shall-issue licensing regimes . . . may require a
license applicant to undergo" a "background check"); *Atkinson v.
Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (noting that *Bruen* "seemed
to find no constitutional fault with a state requiring a criminal
background check before issuing a public carry permit").[4]

---

[4] *See also* Jonathan E. Lowy, *Comments on Assault Weapons, The Right
to Arms, and the Right to Live*, 43 Harv. J.L. & Pub. Pol'y 375, 379 (2020)
("[O]ver ninety-five percent of Americans support background checks for

Background check requirements reduce firearm homicides when both private-seller background checks and universal background checks are required in a state. *What Science Tells Us About the Effects of Gun Policies*, RAND (Jan. 10, 2023), http://tinyurl.com/53zumtwd. Waiting periods reduce suicide and homicide rates. *Id.* And since its enactment in 1994, Brady Background Checks have prevented over 4.9 million unlawful gun transfers and permit acquisitions. Background checks are essential to keeping guns out of the hands of dangerous people and would be placed in jeopardy were the panel's decision to remain in force.

## CONCLUSION

This Court should affirm the district court's judgment rejecting the Second Amendment challenge to Maryland's firearm permitting law.

---

all gun sales. That may be the most popular legislative proposal in America."); Joseph Blocher, *Rights As Trumps Of What?*, 132 Harv. L. Rev. F. 120, 129 (2019) (noting that the Senate's consideration of the "expansion of background checks in the wake of the Newtown massacre . . . was overwhelmingly popular, even among gun owners").

Dated:  March 1, 2024                Respectfully submitted,

                                     /s/ George J. Hazel

Douglas N. Letter                    George J. Hazel
Shira Lauren Feldman                 Katherine Moran Meeks
BRADY CENTER TO PREVENT GUN          Claire Madill
VIOLENCE                             Hayley Lawrence
840 First Street NE                  Kirsten Bleiweiss
Washington DC 20002                  GIBSON, DUNN & CRUTCHER LLP
(202) 370-8100                       1050 Connecticut Avenue, N.W.
                                     Washington, D.C.  20036
William T. Clark                     (202) 955-8500
GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147
New York, NY 10016
(917) 680-3472

Esther Sanchez-Gomez
GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE
268 Bush St., # 555
San Francisco, CA 94104
(415) 433-2062

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street, #3417
New York, NY 10008
(913) 991-4440

                    *Counsel for* Amici Curiae

19

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 29(a)(5) and this Court's order of February 2, 2024, because it contains 3,486 words, excluding the appendix and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionately spaced 14-point, Century Schoolbook.

Dated: March 1, 2024        */s/ George J. Hazel*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 1, 2024, a true and correct copy of the foregoing brief was filed electronically and served on all counsel through this Court's CM/ECF system.

*/s/ George J. Hazel*
_____

## Appendix A

### Examples of State Laws Placing
### Age-Restrictions on Firearms Sales

| State | Year Enacted | Statute | Statutory Language |
|---|---|---|---|
| Indiana | 1875 | An Act to Prohibit the Sale, Gift, or Bartering of Deadly Weapons or Ammunition Therefor, to Minors, ch. 40, §§ 1-2, 1875 Ind. Laws 59, 59. | "[I]t shall be unlawful for any person to sell, barter, or give to any other person, **under the age of twenty-one years**, any pistol . . . or to sell, barter, or give to any person, **under the age of twenty-one years**, any cartridges manufactured and designed for use in a pistol." |
| Alabama | 1877 | Ala. Code § 4230 (1876). | "Any person who sells, gives, or lends, to any boy **under eighteen** years of age, any pistol, . . . must on conviction, be fined not less than fifty, nor more than five hundred dollars." |
| Mississippi | 1878 | An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 1-3, 1878 Miss. Laws 175-76. | "It shall not be lawful for any person to sell to any **minor** . . . , any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge" |

22

| | | | |
|---|---|---|---|
| Delaware | 1881 | An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1, 1881 Del. Laws 987. | "That if any person . . . shall knowingly sell a deadly weapon to a **minor** other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court." |
| Nevada | 1881 | An Act to Prohibit the Carrying of Concealed Weapons by Minors, ch. 104, § 1, 1881 Nev. Stat. 143. | **"Every person under the age of twenty-one (21) years who shall wear or carry any . . . pistol**, . . . or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor" |
| Illinois | 1881 | An Act to Regulate the Traffic in Deadly Weapons, and to Prevent the Sale of Them to Minors, 1881 Ill. Laws 73. | "Whoever . . . shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any **minor** within this state, any pistol, revolver . . . capable of being secreted upon the person, shall be guilty of a misdemeanor[.]" |

23

| | | | |
|---|---|---|---|
| Wisconsin | 1882 | Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, Page 847, Image 889 (1883) available at The Making of Modern Law: Primary Sources. | "It shall be unlawful for any dealer in pistols or revolvers, or any other person to sell, loan or give any pistol or revolver to any **minor** in this state." |
| Maryland | 1882 | An Act to Prohibit the Sale of "Deadly Weapons to Minors," ch. 424, § 2, 1882 Md. Laws 656. | "[I]t shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor **under the age of twenty-one years**." |
| Kansas | 1883 | An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 105, §§ 1-2, 1883 Kan. Sess. Laws 159. | "Any **minor** who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, . . . shall be deemed guilty of a misdemeanor" |
| Louisiana | 1890 | An Act Making it a Misdemeanor for Any Person to Sell, Give or Lease, to | "[I]t shall be unlawful, for any person to sell, or lease or give through himself or any other |

24

| | | | |
|---|---|---|---|
| | | Any Minor, Any Pistol, Bowie-Knife, Dirk or Any Weapons, Intended to be Carried or Used as a Concealed Weapon, § 1, 1890 La. Acts 39. | person, any pistol . . . which may be carried concealed to any person **under the age of twenty-one years**.” |

## Appendix B

### Examples of Local Laws with
### Age-Restrictions on Firearms Sales

| Locality | Year Enacted | Statute | Statutory Language |
|---|---|---|---|
| Memphis, TN | 1856 | William H. Bridges, *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix* 50 (1867). | "Any person who sells, loans or gives to any **minor** a pistol, . . . except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor[.]" |
| Montgomery, AL | 1866 | George Washington Stone, *The Penal Code of Alabama, Montgomery, 1866* 63 (1866). | "Any person who sells, gives, or lends to any boy **under eighteen years of age**, any pistol, . . . must, on conviction, be fined not less than fifty, nor more than five hundred dollars." |
| Chicago, IL | 1873 | Chicago, Ill., Ordinance Prohibiting the Sale to or Furnishing Minors with Firearms, § 1 (March 17, 1873), *in Proceedings of the Common Council of the City* | "[N]o person within said city shall sell to or in any manner furnish any **minor** with any gun, pistol, revolver, or other firearms[.]" |

26

| | | | |
|---|---|---|---|
| | | *of Chicago, for the Municipal Year 1872–3, Being from December 2d, 1872, to November 24th, 1873*, at 140 (1874). | |
| Frankfort, KY | 1876 | Frankfort, Ky., Amendment to Ordinance No. 11: Crimes and Punishment, §§ 7-9 (Apr. 8, 1876), *in Ordinances, Charter and Laws for the Government of the City of Frankfort, Kentucky* 22-24 (1876). | "If any person . . . shall sell a deadly weapon to a **minor**, . . . such person shall, upon conviction, be fined not less than twenty-five nor more than one hundred dollars[.]" |
| Wheeling, WV | 1881 | *Laws and Ordinances, for the Government of the City of Wheeling* 206 (White & Allen eds., 1891). | "It shall also be unlawful for any person or persons to sell or give away to a **person not of age**, any . . . colt, . . . or any pistol, . . . or weapon of the like kind." |
| Carson City, NV | 1885 | *Ordinance No. 67: An Ordinance to Prohibit the Selling of Dangerous Weapons to Minors*, Morning Appeal (Carson City, Nev.), Apr. 18, 1885, at 1. | "It shall be unlawful for any person, firm or association to sell or dispose of any . . . revolver pistol, gun . . . to **any person under the age o[f] 21 years**." |