No. 21-2017

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————————

MARYLAND SHALL ISSUE, INC., ET AL.,

*Plaintiffs-Appellants*,

v.

WES MOORE, ET AL.,

*Defendants-Appellees*.

———————————————

On Appeal from the United States District Court
for the District of Maryland
(No. 1:16-cv-03311) (Hon. Ellen L. Hollander)

———————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES
AND AFFIRMANCE**

———————————————

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org

March 8, 2024

*Counsel for amicus curiae
Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

ARGUMENT .................................................................................2

   I.   Plaintiffs Have Not Met Their Burden To Establish that the Second
       Amendment's Plain Text Covers Their Conduct .......................................2

   II.  This Court Should Consider Historical Context in Evaluating the
       Historical Tradition ......................................................................7

   III.  The Most Relevant Time Period for Historical Analysis Is the
       Reconstruction Era, Not the Founding Era ................................................12

CONCLUSION...................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910
  (Feb. 20, 2024) ................................................................................................passim

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................................passim

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022)................................................................................................11

*Doe v. Bonta*,
  650 F. Supp. 3d 1062 (S.D. Cal. 2023), *appeal docketed*, No. 23-55133 (9th Cir.
  Feb. 13, 2023) .........................................................................................................7

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...............................................................................15

*Frein v. Pa. State Police*,
  47 F.4th 247 (3d Cir. 2022) ...................................................................................5

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .................................................................................9

*Kipke v. Moore*,
  No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023).......................14

*Lara v. Commissioner Pennsylvania State Police*,
  91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81
  (3d Cir. Feb. 14, 2024).........................................................................................14

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)...............................................................................................13

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)...............................................................................................11

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*,
No. 23-1719 (4th Cir. July 10, 2023) ................................................................14

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346
(11th Cir. 2023) ............................................................................................13, 15

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ......................................................................................passim

*New York v. Arm or Ally, LLC*,
No. 1:22-cv-06124, 2024 WL 756474 (S.D.N.Y. Feb. 23, 2024) ........................7

*Or. Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*,
Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) ................................5

*Teixeira v. Cnty. of Alameda*,
873 F.3d 670 (9th Cir. 2017) (en banc) ..............................................................4

*United States v. Jackson*,
69 F.4th 495 (8th Cir. 2023), *petition for cert. filed*, No. 23-6170 (Nov. 28, 2023) ....9

*United States v. Libertad*,
No. 1:22-cr-00644, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ......................4, 7

*United States v. Reyna*,
No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), *appeal
docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023) ....................................................3

*United States v. Rowson*,
652 F. Supp. 3d 436 (S.D.N.Y. 2023) ..............................................................10

*United States v. Smith*,
No. 1:22-cr-10157, 2024 WL 328871 (D. Mass. Jan. 29, 2024) ..........................7

*We the Patriots, Inc. v. Lujan Grisham*,
No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*,
No. 23-2166 (10th Cir. Oct. 20, 2023) ..............................................................14

**OTHER AUTHORITIES**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ......................17

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.)...........................................................................18

Brief for the United States, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), 2023 WL 5322645...........................................................................9

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)...............................................................18

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....16

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ............................................................15

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (now published at 97 Ind. L.J. 1439), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ......................18

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ...........................................................................16

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ...........................................................16

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ...........................................................16

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ..................................15

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021)...........................................................................15

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Maryland's handgun-qualification-license ("HQL") law is constitutional under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons in the State's opening and supplemental briefs, Dkt. 38 ("State Br."); Dkt. 86 ("State Suppl. Br."). Everytown submits this amicus brief to address three methodological points. *First*, on the initial, textual inquiry of *Bruen*'s framework, Plaintiffs have the burden to establish that the law's minimal requirements infringe their right to keep and bear arms, and they have not met that burden. *Second*, *Bruen* requires consideration of the historical context in which states and localities chose to legislate (or not), and regulations from around the time a new societal condition emerged are especially relevant. *Third*, if this Court wishes to decide the most relevant time period for historical analysis, it should focus on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

# ARGUMENT

## I.   Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If so, the court then asks whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. If not, the inquiry ends. *See generally id.* at 31-38 (separating application of test into Part III.A (text) and Part III.B (history)).

Plaintiffs have the burden on the initial, textual inquiry; the government's burden to show consistency with historical tradition arises only *after* the plaintiffs have carried their burden. *See id.* at 24, 44 n.11 (indicating that a presumption that the Constitution protects a plaintiff's conduct arises after ("when" or "because") the textual inquiry is satisfied). If the burden were on the government throughout—in what would be an unusual departure from ordinary principles of constitutional litigation—the Court would have said so.

Plaintiffs have not met their textual burden. Under *Heller* and *Bruen*, a court's textual analysis should focus on the "'normal and ordinary' meaning of the Second Amendment's language," as "confirmed by the historical background of the Second Amendment." *Bruen*, 597 U.S. at 20 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 576-77, 592 (2008)); *Antonyuk v. Chiumento*, 89 F.4th 271, 300 (2d Cir.

2023) (noting that, at *Bruen*'s first step, courts are to "interpret[] the plain text of the [Second] Amendment as historically understood"), *petition for cert. filed*, No. 23-910 (Feb. 20, 2024). As the State explains, *see* State Br. 38, a Marylander wishing to obtain an HQL to purchase a handgun need only complete an online application with a $50 fee, submit fingerprints, and pass a four-hour firearm-safety course. But Plaintiffs have offered no evidence that these simple steps "infringe" the "right to keep and bear arms." *See* State Suppl. Br. 2, 11, 18-21.

Plaintiffs seek to sidestep their burden by describing their proposed conduct as "acquir[ing] a handgun to possess in the home for self-defense," Dkt. 18 ("Pls. Br.") 17; *see* Dkt. 85 ("Pls. Suppl. Br.") 9. But that cannot be the relevant conduct for the step-one analysis because Maryland's law does not prevent Plaintiffs from acquiring a handgun. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can [be] meaningfully compare[d] to the Second Amendment's plain text—a plain text that is more complex than mere possession."), *appeal docketed*, No. 23-1231 (7th Cir. Feb. 7, 2023).

Rather, Plaintiffs apparently wish to purchase a handgun with *zero* administrative inconvenience or safety training. They argue that this conduct is protected because "less-than-total deprivations trigger the Second Amendment's

3

protections," *i.e.*, a regulation short of a total prohibition can infringe the Second Amendment. Pls. Suppl. Br. 9-11. But wherever this line should be precisely drawn, it is certainly not the case—as Plaintiffs insist—that the Second Amendment confers a right to purchase handguns free of *any* administrative or safety requirements. *See* State Suppl. Br. 18-19 (explaining that, under Supreme Court precedent, an administrative regulation is unconstitutional only if it "impose[s] such a substantial burden as to destroy the viability of the substantive right itself," and not simply because it renders the exercise of a constitutional right more difficult); Dkt. 58 ("Panel Op.") 35-36 (Keenan, J., dissenting) (finding that the Supreme Court "has provided clear guidance that an 'infringement' of an individual's Second Amendment rights would require a greater impediment than a simple processing delay, firearms training, or the imposition of an administrative fee"); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (en banc) ("[T]he Second Amendment does not elevate convenience and preference over all other considerations."); *United States v. Libertad*, No. 1:22-cr-00644, 2023 WL 4378863, at *3 (S.D.N.Y. July 7, 2023) (noting that "any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it").[2]

---

[2] The panel majority and Plaintiffs cite to founding-era definitions of "infringe" as purported support for their argument that less-than-total deprivations can amount to infringements. *See* Panel Op. 11 n.8; Pls. Suppl. Br. 10; *see also Frein*

*Bruen* itself reinforced that conclusion in stressing that its analysis cast no constitutional doubt on carry-licensing regimes that do not require a special need for self-defense (so-called "shall-issue" laws), "which often require applicants to undergo a background check or pass a firearms safety course." 597 U.S. at 38 n.9.[3] Because those regimes "do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.*

---

*v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022). But, as Judge Keenan noted in her dissent, the true import of these founding-era definitions, "[p]articularly when compared to our modern understanding of 'infringe,'" is that they "seem to require a greater intrusion"—*i.e.*, "that a particular provision will 'infringe' an individual's rights under the plain text of the Second Amendment only if the statutory condition is so burdensome that it ultimately prevents law-abiding, responsible individuals from possessing or bearing a handgun." Panel Op. 36 n.9 (Keenan, J., dissenting). In any event, as explained, *supra* p. 4, there is no support for the contention that a simple administrative prerequisite like the HQL law infringes the Second Amendment right.

[3] The panel majority and dissent disagreed as to whether *Bruen*'s reassurances regarding shall-issue licensing laws sound in history or plain text. *Compare* Panel Op. 12-13 n.9 (majority opinion) (footnote relates to historical analysis), *with id.* 33-34 (Keenan, J., dissenting) (footnote speaks to plain text). This Court need not resolve that question to uphold Maryland's law under *Bruen*'s endorsement of shall-issue regimes. En Banc Pet. 15; *see Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *46-49 (D. Or. July 14, 2023) (upholding Oregon's permit-to-purchase provisions under *Bruen*'s shall-issue discussion without deciding whether analysis is governed by plain text or historical analysis), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.). In any case, *Bruen*'s shall-issue discussion offers insight into *both* steps, "reflect[ing] a recognition that such regulations are not inherently inconsistent with the Second Amendment or our historical traditions." *Antonyuk*, 89 F.4th at 300; *see infra* pp. 10-11.

Rather, they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* Justice Kavanaugh, joined by the Chief Justice—two of the six members of the *Bruen* majority, and thus necessary for that majority—likewise emphasized that "shall-issue regimes," which "may require … fingerprinting, a background check, a mental health records check, and training in firearms handling … among other possible requirements," are "constitutionally permissible" as a facial matter. *Id.* at 80 (Kavanaugh, J., concurring).

The most straightforward explanation for these observations would seem to be that the six Justices in *Bruen*'s majority concluded that licensing regimes with requirements like background checks and safety courses—regimes, in other words, like Maryland's—do not infringe the right to keep and bear arms. *See* State Suppl. Br. 20. That finds further support in the majority's statement that it did not rule out constitutional challenges where, in practice, licensing regimes have *particular features*—"for example, lengthy wait times in processing license applications or exorbitant fees"—that would "*deny ordinary citizens their right to public carry.*" 597 U.S. at 38 n.9 (emphasis added); *see also id.* at 80 (Kavanaugh, J., concurring) (contemplating only as-applied challenges to shall-issue regimes); *id.* at 71-72 (Alito, J., concurring) (emphasizing that all *Bruen* decided was that "a State may not enforce a law … that *effectively prevents* its law-abiding residents from carrying a gun

for [self-defense]" (emphasis added)). Multiple courts have read *Bruen*'s discussion of shall-issue licensing laws similarly.[4]

In short, Plaintiffs have not carried their textual burden, and this Court may affirm on that basis alone.

## II.    This Court Should Consider Historical Context in Evaluating the Historical Tradition

If this Court proceeds to *Bruen*'s historical step, it should recognize the importance of historical context for that analysis. Close historical cousins to a modern regulation will not exist before the societal or technological condition that prompted regulation arose. Accordingly, regulations that emerged alongside or shortly after a new condition should carry particular weight, and to the extent that

---

[4] *See, e.g.*, *Doe v. Bonta*, 650 F. Supp. 3d 1062, 1070 (S.D. Cal. 2023) (noting that *Bruen*, *Heller*, and *McDonald* "collectively confirm that the Second Amendment permits laws and regulations that precondition the right to keep and bear arms on the obligation to comply with such ministerial tasks as providing personal identifying information and submitting to a background check"), *appeal docketed*, No. 23-55133 (9th Cir. Feb. 13, 2023); *Libertad*, 2023 WL 4378863, at *4 ("[T]he implication of both the *Bruen* majority opinion and the Kavanaugh concurrence is that 'shall-issue' licensing regimes, so long as they … are not applied in practice to frustrate th[e] right [to keep and bear arms], do not even trigger a *Bruen* [historical] inquiry[.]"); *United States v. Smith*, No. 1:22-cr-10157, 2024 WL 328871, at *2 (D. Mass. Jan. 29, 2024) (agreeing with *Libertad* and concluding that a "de minimis burden" on possession rights "fails to 'trigger *Bruen* scrutiny'" (citation omitted)); *New York v. Arm or Ally, LLC*, No. 1:22-cv-06124, 2024 WL 756474, at *13 (S.D.N.Y. Feb. 23, 2024) (concluding that, consistent with *Heller* and Justice Kavanaugh's *Bruen* concurrence, regulations requiring background checks prior to firearm purchases do not "infringe' on the right to bear arms and, thus, do not trigger Second Amendment scrutiny").

a court seeks an older regulatory tradition, it must look to more distant cousins. In *Bruen*'s words, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to history. 597 U.S. at 27.

Here, a historical tradition of regulations closely analogous to Maryland's—including numerous "shall-issue" carry-licensing and permit-to-purchase laws—arose beginning in the late 19th century alongside evolving societal conditions. Further, that tradition, far from being a departure from earlier understandings of the right to keep and bear arms, reflects and confirms the longstanding principle that legislatures may disarm those who are not law-abiding, responsible citizens. This Court should therefore reject Plaintiffs' contention, *see* Pls. Br. 25-26; Pls. Suppl. Br. 14 n.4, that the relevant historical tradition is too recent.[5]

The Supreme Court has repeatedly described Second Amendment rights, as historically understood, as belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 26, 70. Whatever the precise contours of "law-abiding" and "responsible," the historical materials confirm that, at a minimum, legislatures may limit access to firearms by those who would pose a danger if armed. *See* State Suppl. Br. 12 n.4 (incorporating historical sources cited in Br. for

---

[5] For an explanation of why Reconstruction-era historical evidence should take precedence over founding-era evidence even absent such new social conditions, *see infra* pp. 12-19.

the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *10-27 (U.S. Aug. 14, 2023) (explaining that history establishes an "enduring principle" that the "Second Amendment allows [legislatures] to disarm individuals who are not law-abiding, responsible citizens")); State Br. 19-20, 34-37 (describing historical tradition); State Suppl. Br. 16 n.7 (same). Federal courts and jurists have repeatedly recognized as much. *See, e.g.*, *Antonyuk*, 89 F.4th at 314 & n.23 (concluding that "the use of dangerousness as a disqualifier does not appear controversial" and collecting cases finding this practice rooted in historical tradition); *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."); *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category … presented an unacceptable risk of danger if armed."), *petition for cert. filed*, No. 23-6170 (Nov. 28, 2023); State Br. 21-22 (collecting cases).

That tradition has taken different forms as regulatory priorities and possibilities evolved. "Licensing was the result of changes in American society in the nineteenth century, including urbanization and concomitant shifts in norms of governance." *Antonyuk*, 89 F.4th at 322. As the "explosive growth of cities" heightened the need to limit firearm access by dangerous individuals, increased

administrative capacity and the emergence of police forces also made new forms of regulation possible. *Id.* at 323. Prohibitions that were once enforced ex post by justices of the peace could now operate ex ante—via licensing—to prevent dangerous people from accessing firearms. *Id.* at 323-24.[6] Carry-licensing regimes thus proliferated in the late 19th century, *see id.* at 318-19; State Suppl. Br. 16 n.7, Dkt. 89-1 at 8-9 (proposed amicus brief of gun-violence-prevention groups), and permit-to-purchase laws followed in the early 20th century, *see* Br. of Amicus Everytown for Gun Safety, No. 1:16-cv-03311 (D. Md. Dec. 3, 2020), Doc. 129, at 6-8. Viewed in historical context, it makes sense that close historical analogues to Maryland's law (licensing and permitting laws) did not emerge until the late 19th century and beyond. But only the form of regulation was new; the substance conformed to a longstanding tradition of disarming those who are not law-abiding, responsible citizens. Indeed, *Bruen* appeared to recognize as much in emphasizing the constitutionality of shall-issue licensing regimes "designed to ensure only that those bearing arms … are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at

---

[6] The panel majority appeared to take issue with the prophylactic nature of Maryland's law, finding it distinguishable from earlier laws because it "burdens all people—even if only temporarily—rather than just a class of people whom the state has already deemed presumptively dangerous." Panel Op. 16; *see also* Pls. Suppl. Br. 13. But the law only genuinely burdens those who fail to meet the HQL requirements; all others need only undergo minor inconvenience and delay. Plaintiffs have offered no evidence that, if founding-era governments had had the administrative capacity to *prevent* dangerous people from accessing firearms rather than punishing them after the fact, they would not have done so.

38 n.9 (quoting *Heller*, 554 U.S. at 635); *see United States v. Rowson*, 652 F. Supp. 3d 436, 466 n.23 (S.D.N.Y. 2023) ("The existence of shall-issue licensing regimes cited with approval in *Bruen* … implicitly reflects the longstanding practice of disqualifying categories of persons based on … dangerousness.").

The "more nuanced" analogical approach thus makes clear that *both* newer licensing laws *and* older prohibitions are part of the long historical tradition justifying today's permit-to-purchase regimes. But even if this Court were to prioritize founding-era evidence and find it lacking, it should not infer that the founding generation thought permit-to-purchase laws unconstitutional—especially as the capacity for implementing such laws had not yet arisen. "Reasoning from historical silence is … risky; it is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms." *Antonyuk*, 89 F.4th at 301; *cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) (observing that "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so").

Rather, absent affirmative evidence to the contrary, courts should presume that a Reconstruction-era or later public understanding of the permissible scope of regulation also reflects the founding-era understanding. *Cf. McIntyre v. Ohio Elections*

*Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty

fundamental enough to have been embodied within constitutional guarantees are

not readily erased from the Nation's consciousness."); *Antonyuk*, 89 F.4th at 304

(finding it "implausible" that "public understanding would promptly dissipate

whenever [one] era gave way to another"). Here, carry-licensing laws from the late

19th century and permit-to-purchase laws from the early 20th century are

consistent with earlier historical principles and therefore demonstrate the

constitutionality of Maryland's law.

### III.   The Most Relevant Time Period for Historical Analysis Is the Reconstruction Era, Not the Founding Era

*Bruen* left open the question "whether courts should primarily rely on the

prevailing understanding of an individual right when the Fourteenth Amendment

was ratified in 1868" or when the Bill of Rights was ratified in 1791. 597 U.S. at

37. This Court need not decide which understanding is more probative of the

meaning of the Second Amendment today because, as explained above, evidence

from both periods supports the constitutionality of the HQL law. *See* State Br. 19-

20, 34-37; State Suppl. Br. 11-12 n.4, 16 n.7. If, however, it reaches the question,

this Court should hold that the 1868 meaning controls.

To begin, because "[c]onstitutional rights are enshrined with the scope they

were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34, focusing

on 1868 in a case against a state is the only way to answer the originalist question:

How did the people understand the right at the time of its adoption? The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* Moreover, applying the 1791 public understanding of the right to keep and bear arms against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F.4th at 305.

Multiple courts after *Bruen* have agreed that, in challenges to state laws, historical evidence from the Reconstruction era is at least as relevant as, if not more relevant than, evidence from the founding. *See, e.g.*, *Antonyuk*, 89 F.4th at 305, 318 n.27 (observing that "evidence from Reconstruction regarding the scope of the right to bear arms incorporated by the Fourteenth Amendment is at least as relevant as evidence from the Founding Era"); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) (where the understanding of the right differs between founding and Reconstruction eras, "the more appropriate

13

barometer is the public understanding of the right when the States ratified the

Fourteenth Amendment"), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th

Cir. 2023); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL

4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from

the time period of the ratification of the Fourteenth Amendment are equally if

not more probative of the scope of the Second Amendment's right to bear arms

as applied to the states"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023);

*Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29,

2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Lujan Grisham*, No.

1:23-cv-00771, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with

*Bondi* and *Maryland Shall Issue*), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20,

2023).[7]

   The conclusion that the 1868 understanding of the Second Amendment

right should apply in a case against a state is far from radical. When asked by

---

   [7] The Third Circuit took a different approach in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d Cir. Feb. 15, 2024). This Court should not follow *Lara*. Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*, *see* 597 U.S. at 38. *Lara*, 91 F.4th at 133-34. But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38; *infra* p. 12. Because it failed to recognize that issue and cannot be squared with originalist principles, *Lara* is not persuasive.

14

Justice Thomas about the correct time period during oral argument in *Bruen*,

counsel for New York's NRA affiliate responded with the Reconstruction era.[8] It is

also the position of leading scholars of originalism. "Many prominent judges and

scholars—across the political spectrum—agree that, at a minimum, 'the Second

Amendment's scope as a limitation on the States depends on how the right was

understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at

1322 n.9 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)); *see, e.g.*,

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the

Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8

Geo. J.L. & Pub. Pol'y 1, 52 (2010) (explaining that 1868 is "the proper temporal

location for applying a whole host of rights to the states" and that interpreting the

Second Amendment "as instantiated by the Fourteenth Amendment—based on

the original public meaning in 1791—thus yields an inaccurate analysis"); Steven

G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the

Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American

History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008); Evan D.

Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022).[9] In sum,

---

[8] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[9] *See also, e.g.*, Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment*

originalist analysis compels applying the 1868 understanding of the right in a case challenging a state law.[10]

This conclusion raises the question (not directly presented here) as to the correct temporal focus in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments. *See* 597 U.S. at 37. Accordingly, it appears that originalists must justify applying either the 1868 understanding or the 1791 understanding (if they conflict) in all cases.

Existing doctrine does not resolve this choice: *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is

---

*May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008).

[10] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the *federal* government.

pegged to the public understanding … in 1791." *Id.* If the majority believed those

decisions controlled the issue, it would have said so. Instead, the Court expressly

left open whether 1868 or 1791 is the relevant focus, referencing "ongoing

scholarly debate on whether courts should primarily rely on the prevailing

understanding of an individual right when the Fourteenth Amendment was ratified

in 1868 when defining its scope (as well as the scope of the right against the Federal

Government)." *Id.* at 37-38. The Court then cited works by two scholars

supporting the 1868 view, Professors Akhil Amar and Kurt Lash, and none

supporting the 1791 view. *See id.*

On Professor Amar's account, when the Fourteenth Amendment was

ratified, then-contemporary understandings of incorporated rights could transform

their meaning as to the federal government.[11] In Professor Lash's words—as

quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into

existence, they readopted the original Bill of Rights, and did so in a manner that

invested those original 1791 texts with new 1868 meanings." Kurt T. Lash, *Re-*

*Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at

2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published

---

[11] *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 223 (1998)
("[I]n the very process of being absorbed into the Fourteenth Amendment, various
rights and freedoms of the original Bill may be subtly but importantly
transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a
doctrinal 'feedback effect' against the federal government").

at 97 Ind. L.J. 1439)); *see Bruen*, 597 U.S. at 38. On this view, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with *Bruen*'s explication of historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy the historical analysis, 597 U.S. at 30 (emphasis added)—an incomprehensible statement if the Court believed the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[12]

Further, while any historical inquiry this Court conducts should focus on the period around 1868, that date is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 597 U.S. 34-35, 44-50, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period

---

[12] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

*after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, regardless of which period this Court determines to be the most relevant, it should look to "practice" thereafter to "settle" the meaning of the right and demonstrate that the HQL law is constitutional.

19

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

Dated: March 8, 2024                /s/ William J. Taylor, Jr.

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
wtaylor@everytown.org
(646) 324-8215

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 4,872 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*


## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2024, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*